**CV 18-7219 (JS)**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

RAY ROSS,

Petitioner,

- against -

PEOPLE OF THE STATE OF NEW YORK,

Respondent.

RESPONDENT'S AFFIDAVIT AND MEMORANDUM OF LAW
IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

MADELINE SINGAS
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3660

Jason R. Richards
John B. Latella
  Assistant District Attorneys
    *of Counsel*

CONFIDENTIAL PURSUANT TO CIVIL RIGHTS LAW § 50-b

## TABLE OF CONTENTS

Page

Respondent's Affidavit In Support Of Opposition To
Petition For A Writ Of Habeas Corpus ............................................................i

Respondent's Memorandum of Law
    Statement of the Case .......................................................................1
    The Trial
     Request for Johnson's NYSIS Record ...................................3
    The People's Case
     Defendant's Sexual Conduct .........................................................5
     Law Enforcement Involvement, Defendant's Arrest, and Expert Testimony.....8
     Defense Case .................................................................. 11
     The Preclusion Of Denise Sawyer's Testimony...............................16
    Trial Order Of Dismissal, Deliberation, Verdict, And Sentence ......................... 17

Point One
    Petitioner's Contention That His Convictions Were Not
    Supported By Legally Sufficient Evidence Is Procedurally
    Barred From Habeas Corpus Review And Without Merit. ............................. 19

Point Two
    Petitioner's Claim Of Ineffective Assistance Of Counsel Is
    Entirely Without Merit ........................................................................ 26

Point Three
    Petitioner's Claim Regarding The Alleged Failure To
    Disclose A Pending Criminal Matter Of A Witness Is
    Unexhausted, Not Cognizable On Habeas Review, And In
    Any Event Meritless ..............................................................................30

Point Four
    Petitioner's Claim That The Court Erroneous Precluded A
    Witness From Testifying On His Behalf Does Not
    Warrant Habeas Relief........................................................................35

Conclusion................................................................................. 39

Certificate of Service

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
RAY ROSS,

                     Petitioner,

        - against -

PEOPLE OF THE STATE OF NEW YORK,

                    Respondent.
----------------------------------------------------------x

AFFIDAVIT IN SUPPORT
OF OPPOSITION TO
PETITION FOR A WRIT
OF HABEAS CORPUS

CV 18-7219 (JS)

STATE OF NEW YORK)
               ) ss.:
COUNTY OF NASSAU  )

      JOHN B. LATELLA, being duly sworn, deposes and states:

      1.      I am an assistant district attorney, of counsel to Madeline Singas, District Attorney of Nassau County, who is representing respondent.  I am admitted to practice law before this Court.

      2.      This affidavit is submitted in support of respondent's opposition to the petition for a writ of habeas corpus.  The statements made herein are based on information and belief, the source of which is the records of the District Attorney of Nassau County.

i

3.       From March 2013 until June 2014, defendant sexually abused M.J.,[1] a then-twelve-year-old girl.  Defendant lived with his girlfriend in an upstairs bedroom of a house in West Hempstead, Nassau County.  M.J. and her mother Sarita Johnson ("Johnson"), the sister of defendant's girlfriend, lived in separate parts of the house with other family members.  The abuse took place in defendant's bedroom, with the door closed.  Defendant touched M.J.'s breasts and buttocks with his hands, and placed his penis on M.J.'s buttocks prior to ejaculating.  In addition, on weekend excursions with M.J. to visit his ex-wife in Brooklyn, defendant stopped in the parking lot of a Nassau County store and touched M.J.'s breasts, buttocks, and vagina under her clothing while they sat in the back seat of his truck.  After removing his own pants and exposing himself, defendant pulled down M.J.'s pants, licked M.J.'s vagina, and placed M.J.'s hand on his penis so that he would ejaculate.  He told M.J. that he wanted to "smash," a term he used for sexual intercourse.

4.       Defendant and M.J. also exchanged hundreds of texts messages on a phone that defendant had provided her.  After observing defendant and M.J. together in defendant's room in the summer of 2014, Johnson confiscated M.J.'s phone and contacted the District Attorney's Office.  Johnson forbade M.J. from having further contact with defendant, but defendant purchased M.J. a second phone and resumed texting her.

---

[1] Pursuant to Civil Rights Law § 50-b, the victim will be referred to herein as "M.J." for purposes of confidentiality.

5.    After M.J. and Johnson spoke to the Nassau County police detective in December 2014, defendant was arrested.  He was charged, under Indictment No. 1050N/15, with course of sexual conduct against a child in the first and second degrees (Penal Law §§ 130.75[1][b], 130.80[1][b]), for his conduct towards M.J. from March 1, 2013 until December 29, 2013; one count of endangering the welfare of a child (Penal Law § 260.10[1]), for his conduct that occurred between March 1, 2013, and December 29, 2013; and one count of endangering the welfare of a child, for his conduct that occurred between December 30, 2013, and October 17, 2014.

6.    At trial, defense counsel vigorously attempted to discredit M.J.'s and Johnson's testimony.  The court, however, denied counsel's request for a copy of Johnson's NYSIS, or "rap sheet," and precluded a potential defense witness, Denise Sawyer, from testifying.  Defendant was subsequently convicted of course of sexual conduct against a child in the second degree, and two counts of endangering the welfare of a child.

7.    In a brief received at the Nassau County District Attorney's Office on March 30, 2017, defendant appealed to the Appellate Division, Second Department.  In his brief, defendant raised three claims: (1) he was denied a fair trial because he was entitled to review Sarita Johnson's NYSIS criminal history report for cross-examination purposes, and because he should have been allowed to call Denise Sawyer as a defense witness to impeach Johnson; (2) the evidence was insufficient to prove his guilt beyond a reasonable doubt because of a lack of corroboration of M.J.'s testimony; and (3) he

was denied the effective assistance of counsel because counsel failed to argue that the proof was insufficient based on a lack of corroboration.  *See* Appellant's Brief, Points I-III.

8.      On June 29, 2017, the People filed their response, in which they argued that petitioner was not denied a fair trial; that there was overwhelming and corroborated proof of the crimes of which petitioner was convicted; and that petitioner was not denied the effective assistance of counsel.  *See* Respondent's Brief, Points I and II.

9.      On March 21, 2018, the Appellate Division, Second Department affirmed the judgment of conviction.  *People v. Ross*, 159 A.D.3d 925 (2d Dept. 2018).  The Appellate Division held that petitioner's sufficiency claim, predicated on a lack of corroboration, was "unpreserved for appellate review." *Id.* at 926.  Moreover, the claim was "without merit" because "corroboration of the complainant's sworn testimony was not required under Penal Law §§ 130.16 and 260.11 because the complainant's lack of consent did not result from incapacity to consent due to 'mental defect or mental incapacity.'" *Id.*  Finally, the court noted that the proof was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt" and that the "verdict of guilty was not against the weight of the evidence." *Id.*

10.     Next, the Appellate Division found that the "record demonstrates that the People fulfilled their discovery obligations under CPL 240.45(1)(b) and (c) by disclosing to the defense any known judgments of conviction or pending criminal actions related to the prosecution's witnesses." *Id.*

11.     Finally, the Appellate Division concluded that petitioner was not denied the effective assistance of counsel, as the "record as a whole demonstrates that counsel provided the defendant with meaningful representation." *Id.* (citing, *inter alia*, *People v. Baldi*, 54 N.Y.2d 137 [1981]).

12.     In a letter dated April 26, 2018, petitioner sought leave to appeal to the New York Court of Appeals by "request[ing] that the Court grant a certificate granting [petitioner] leave to appeal." *See* Petitioner's Leave Letter.

13.     On June 4, 2018, the People opposed petitioner's request for leave to appeal, as his claims were either unpreserved for review or simply not worthy of further review. *See* People's Leave Opposition.

14.     On June 28, 2018, Judge Feinman of the Court of Appeals denied petitioner's application for leave to appeal. *People v. Ross*, 31 N.Y.3d 1121 (2018) (Feinman, J.).[2]

The Habeas Petition

15.     In a habeas petition dated December 11, 2018, and filed in the United States District Court for the Eastern District of New York on December 17, 2018, petitioner claims that he is entitled to relief for reasons that he raised on direct appeal,

---

[2] Defendant was subsequently adjudicated a level-one sex offender at a hearing held pursuant to New York Correction Law Article 6-c. The Appellate Division affirmed this determination. *See People v. Ross*, 167 A.D.3d 1053 (2d Dept. 2018). Because no issues are raised with respect to this determination, respondent has not provided the hearing minutes or briefs on appeal to this Court. They can be provided on request.

namely: 1) that he was deprived of the effective assistance of counsel because counsel failed to argue that there was no corroboration of M.J.'s testimony; 2) that he was deprived of a fair trial because he was not provided with a witness's criminal record and because he was not allowed to cross-examine a witness regarding Johnson's credibility; and 3) that there was, effectively, insufficient evidence to prove the crimes course of sexual conduct in the second degree and endangering the welfare because of a lack of corroboration.

16.     On January 14, 2019, this Court issued an Order to Show Cause ordering respondent to reply to the Petition within twenty days from the Order.  On January 28, 2019, this Court granted respondent an extension of time request, and ordered respondent to respond to the Petition by March 5, 2019.

17.     Pursuant to this Court's Order to Show Cause, respondent is providing the Court with a copy of the trial transcript and record, copies of petitioner's and respondent's briefs on appeal, all relevant state court decisions and opinions, and an affidavit from defense counsel regarding the effective assistance he rendered throughout defendant's trial.

18.     Respondent opposes the petition.  In the first instance, petitioner is incarcerated at Fishkill Correctional Facility, but has not named the custodian of his correctional facility as the respondent in this case.  Accordingly, this Court lacks personal jurisdiction over petitioner.  *See generally Rumsfeld v. Padilla*, 542 U.S. 426 (2004); *see also Dawkins v. New York*, 08-CV-2441 (NGG), 2011 WL 3625150, at *1 n.1

(E.D.N.Y. Aug. 16, 2011) (noting that the petitioner "incorrectly names the State of New York as the Respondent in this action").  Without waiving this Court's lack of jurisdiction as a ground upon which to dismiss this Petition (*see Gooden v. Gonzales*, 162 F. App'x 28, 29 [2d Cir. 2005] [noting that the respondent had waived a jurisdictional argument supporting dismissal when the respondent did not "contend in this appeal that the Attorney General is an improper respondent"]), because of petitioner's "*pro se* status*,*" and in the interests of "judicial efficiency," (*Brewster v. People of State of N.Y.*, 08-CV-4653 (JFB), 2010 WL 92884, at *1 n.1 [E.D.N.Y. Jan. 6, 2010]), respondent also opposes issuance of the writ for the reasons set forth in the accompanying memorandum of law.

WHEREFORE, on the basis of this affidavit and the attached memorandum of law, the Petition should be denied.

/s/ John B. Latella
JOHN B. LATELLA
Assistant District Attorney
Nassau County District Attorney's Office
262 Old Country Road
Mineola, New York 11501
516-571-6553

Sworn to before me this
4th day of March, 2019
/s/ Susan Beallias
Notary Public
SUSAN BEALLIAS
Notary Public, State of New York
No. 30-4728937
Qualified in Nassau County
Commission Expires April 30, 2022

vii

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RAY ROSS,

                    Petitioner,

           - against -

PEOPLE OF THE STATE OF NEW YORK,

                    Respondent.
--------------------------------------------------------x

RESPONDENT'S
MEMORANDUM OF LAW

CV 18-7219 (JS)

STATEMENT OF THE CASE

From March 2013 until June 2014, defendant sexually abused M.J.,[1] a then-twelve-year-old girl. Defendant lived with his girlfriend in an upstairs bedroom of a house in West Hempstead, Nassau County. M.J. and her mother Sarita Johnson ("Johnson"), the sister of defendant's girlfriend, lived in separate parts of the house with other family members. The abuse took place in defendant's bedroom, with the door closed. Defendant touched M.J.'s breasts and buttocks with his hands, and placed his penis on M.J.'s buttocks prior to ejaculating. In addition, on weekend excursions with M.J. to visit his ex-wife in Brooklyn, defendant stopped in the parking lot of a Nassau County store and touched M.J.'s breasts, buttocks, and vagina under her clothing while they sat in the back seat of his truck. After removing his own pants and exposing himself, defendant pulled down M.J.'s pants, licked M.J.'s vagina, and placed

_____

[1] Pursuant to Civil Rights Law § 50-b, the victim will be referred to herein as "M.J." for purposes of confidentiality.

1

M.J.'s hand on his penis so that he would ejaculate.  He told M.J. that he wanted to "smash," a term he used for sexual intercourse.

Defendant and M.J. also exchanged hundreds of texts messages on a phone that defendant had provided her.  After observing defendant and M.J. together in defendant's room in the summer of 2014, Johnson confiscated M.J.'s phone and contacted the District Attorney's Office.  Johnson forbade M.J. from having further contact with defendant, but defendant purchased M.J. a second phone and resumed texting her.

After M.J. and Johnson spoke to the Nassau County police detective in December 2014, defendant was arrested.  He was charged, under Indictment No. 1050N/15, with course of sexual conduct against a child in the first and second degrees (Penal Law §§ 130.75[1][b], 130.80[1][b]), for his conduct towards M.J. from March 1, 2013 until December 29, 2013; one count of endangering the welfare of a child (Penal Law § 260.10[1]), for his conduct that occurred between March 1, 2013, and December 29, 2013; and one count of endangering the welfare of a child, for his conduct that occurred between December 30, 2013, and October 17, 2014.

At trial, defense counsel vigorously attempted to discredit M.J.'s and Johnson's testimony.  The court, however, denied counsel's request for a copy of Johnson's NYSIS, or "rap sheet," and precluded a defense witness from testifying.  Defendant was subsequently convicted of course of sexual conduct against a child in the second

degree, and two counts of endangering the welfare of a child.  He was found not guilty of course of sexual conduct in the first degree.

The Trial

    Request for Johnson's NYSIS Record

During jury selection, Johnson informed the prosecutor that she had been arrested for shoplifting two years earlier, in 2014, and had been granted an adjournment in contemplation of dismissal in resolution of the case (T.229-30).[2]  After receiving this information, defense counsel requested that the prosecutor conduct a complete search of her background—"run a NYSIS"—and turn the report over to the defense (T.229-31).  He further argued that he was entitled to know the date of Johnson's arrest (T.236-37).

The prosecutor indicated that he had already searched Johnson's criminal history, and that any records relating to the adjournment in contemplation of dismissal, would be sealed.  The prosecutor declined to release the report to defense counsel because it showed "no criminal convictions or any open cases" (T.230, 232).

After inspecting the report and determining that it was blank, the court asked the prosecutor to "gather as much information" as possible regarding the 2014 incident (T.233, 235, 289).  The prosecutor again searched the records of the District Attorney's

_____

[2] Parenthetical references preceded by "T" are to the minutes of the trial, and those preceded by "S" refer to the minutes of the sentence.  For the sake of clarity, defense witnesses are referred to by first name and all witnesses are referred to in parentheticals by their first initials and surnames.

3

Office and the court system, and learned that "there is only one record of any criminal matter," which dated to March 21, 1995. The record showed that, after being charged with petit larceny, Johnson pled guilty to disorderly conduct and received fifteen days in jail (T.291). Because related jail records reflected that Johnson was never incarcerated, however, the "official disposition in the Court system" was incorrect (T.292). The prosecutor again informed the court that this was "all the information" that the People possessed (T.292).

Defense counsel renewed his argument that he was entitled to the rap sheet (T.346-47). In addition, because he had conducted his own investigation of the case and was told that Johnson had been arrested in Queens County in 2005 and in Nassau County in 2010, he requested Johnson's date of birth, which the prosecutor provided (T.348-49, 352).

Although the court was "satisfied" with the prosecutor's handling of his obligations and urged defense counsel to provide any additional information that he had, the court directed the prosecutor to conduct additional searches based on defense counsel's disclosures of the alleged 2005 and 2010 arrests (T.350-52). The prosecutor again searched for "any cases that resulted in a criminal or even an unsealed disposition," and could only find references to the 1995 case (T.355-56). He reiterated the discrepancy between the disorderly conduct disposition and the jail records in that case (T.356-57).

Defense counsel argued that the 2014 case was "perhaps" Johnson's "wedge to try to help herself" (T.359), and asserted that he was entitled to see "paperwork" related to the case (T.361). The prosecutor again stated that he had "turned over as much information" as was required under the Criminal Procedure Law and case law (T.361). He emphasized that the files were sealed, and not accessible to the People (T.361).

Thereafter, the court ruled again that "there is no criminal conviction, so there is no obligation on the assistant district attorney to provide anything else to defense counsel" (T.363). The court further noted that it would add Johnson's criminal history report to the record as a court exhibit, and that defense counsel would be permitted to inspect it (T.353, 549).

The People's Case

Defendant's Sexual Conduct

M.J., age fifteen on the day of her testimony, lived with her mother SARITA JOHNSON ("Johnson") and several family members in a two-story home in West Hempstead, New York. Johnson, who depended on child support for her income and received assistance from defendant in paying bills, lived on the first floor of the house with her family, while defendant and his girlfriend, Johnson's sister Tara Johnson, lived on the second floor (S. Johnson: T.446, 449, 515, 520-24, 543; M.J.: T.744-50). On the day of her testimony, M.J. attended high school and had never been left back or forced to take a long period time off from school (M.J.: T.751-52).

5

In March 2013, when M.J. was twelve years old and in sixth grade, she began "hanging out" with defendant, who she referred to as "Ray Ray." She and defendant watched television in his room. Defendant was on disability from his work and often remained at home watching television; defendant owned the only television set in the house (S. Johnson: T.448, 450-51, 533, 592; M.J.: T.751-57, 887-89). Although the door initially remained open while M.J. was in defendant's room, defendant eventually began closing it (S. Johnson: T.451; M.J.: T.758).

On one occasion, defendant, with the door closed and while wearing only a t-shirt and boxer shorts, grabbed M.J.'s buttocks underneath her undergarments. M.J. asked defendant what he was doing, and defendant replied, "nothing" (M. Johnson: T.757-58). M.J. explained that, after this incident, she returned to defendant's room frequently. "[O]nce or twice a week," as she sat on his bed, defendant continued to touch M.J.'s buttocks and her vagina. He also fondled M.J.'s breasts under her shirt while touching his penis (M. Johnson: T.759-65). M.J. demonstrated for the jury how defendant would masturbate (M.J.: T.763).

In the summer of 2013, M.J. would also lie facedown on defendant's bed with her pants pulled down. Defendant, having closed the door to his room, rubbed his exposed penis on M.J.'s buttocks and "would cum" (T.777-79).

During the summer of 2013, on nearly every Saturday, M.J. and defendant, unaccompanied by her other family members, went on car trips to Brooklyn to visit Paula Ross, defendant's ex-wife, and his children (S. Johnson: T.452-55, 529, 561-63;

6

M.J.: T.750, 765-66, 801, 891-92, 894-96, 943-45, 971-74, 984).  Later that summer, as
M.J. and defendant were returning to West Hempstead alone, defendant stopped in the
parking lot of a store in West Hempstead.  At defendant's command, M.J. climbed into
the back seat of defendant's truck.  Defendant pulled down M.J.'s pants, as well as his
own pants, and exposed his penis.  He made himself erect and touched her breasts,
buttocks, and vagina under her clothing.  After kissing M.J. on the neck, he also licked
M.J.'s vagina.  Defendant took M.J.'s hand, placed it on his penis, and ejaculated.
Defendant stated to M.J. that he wanted to "smash," a term he used to describe sexual
intercourse (M.J.: T.772-76).  M.J.'s weekend excursions to Brooklyn, including stops in
the store parking lot during the return trip, continued from September to December 30,
2013, when M.J. turned thirteen (M. Johnson: T.782, 802-03).

In October of 2013, defendant purchased a cell phone for M.J. and agreed to pay
for cellular service (M.J.: T.783, 798).  M.J. called defendant's number, which was stored
in the phone under the name "Ray Ray," daily.  She frequently exchanged text messages
with him, and slept with the phone under her pillow (M.J.: T.798-800, 884, 923).  After
defendant purchased her the phone, M.J. began entering defendant's room "almost
every day," with the door closed and after both defendant and M.J. knew that Tara was
not home.  Defendant touched M.J.'s breasts and vagina (M. Johnson: T.803-06, 821-
22).  Defendant told M.J. that he loved her and would purchase her a car after they
moved into a house together (M.J.: T.801).  Defendant also loaned M.J. a clarinet so

that she could join her high school's band, and attended her parent-teacher conferences (M. Johnson: T.963-67).

Defendant continued to abuse M.J. in his bedroom until June 2014, well after M.J. had turned thirteen (M. Johnson: T.806, 820).  M.J. was scared, but did not tell anyone about the abuse because he had threated to "call social services" on Johnson, and because M.J. still wanted defendant to pay for her phone (M. Johnson: T.806). Defendant also continued to take M.J. to Brooklyn "almost every weekend," until June 2014.  Upon returning from Brooklyn, he would stop in the parking lot of a different store because there were "too many people" at the old location.  In the new location, defendant pulled down M.J.'s pants and touched her breasts, buttocks, and vagina. He also licked her vagina and masturbated (M. Johnson: T.802, 810, 817, 819).

Law Enforcement Involvement, Defendant's Arrest, and Expert Testimony

Defendant's relationship with M.J., and especially their trips to Brooklyn, caused numerous fights between M.J. and Johnson during the summer of 2014.  Defendant told M.J. that he would "take care" of Johnson.  In July 2014, Johnson forbade M.J. from being near or contacting defendant.  But later that morning, she saw M.J. and defendant together in a park as M.J. was playing with relatives.  Defendant purchased an ice cream for M.J., but not any of the other children.  In August of 2014, Johnson walked into defendant's room while the door was closed and saw M.J. sitting on defendant's bed as defendant was laying down (S. Johnson: T.463, 470-73; M.J.: T.823-

27, 882, 890, 921-23, 949, 952, 968).  Johnson ordered M.J. out of the room.  Alarmed by these events, she brought M.J.'s phone to the District Attorney's office to be examined.  The phone contained a series of text messages that defendant and M.J. exchanged (S. Johnson: T.482-84, 566-72, 593-98, 612, 620; M.J.: T.830-32, 882, 923-30).

Defendant and M.J. had no further contact until October 2014, when defendant gave M.J. a new phone.  M.J. resumed exchanging calls and texts using the new phone (M.J.: T.842, 852, 912, 932-34).  Although she kept the second phone a secret from her mother, Johnson discovered it when M.J. called her for a ride home on October 20, 2014.  Johnson reviewed the text messages that defendant and M.J. had exchanged, and then took M.J. to the District Attorney's Office (S. Johnson: T.484, 492-97, 573, 621-22; M.J.: T.853-54, 863-64, 869, 898, 937-41, 988).  Johnson also sought orders of protection against defendant from Family Court, after which defendant moved out of the house (M.J.: T.863; S. Johnson: T.501-03).

On December 10, 2014, M.J. and Johnson met with Nassau County Detective RHUBENS TOUSSAINT outside their home (S. Johnson: T.503, 575-585; Toussaint: T.629-30, 667-65).  After taking notes, Toussaint went to his stationhouse and typed M.J.'s statement.  He returned the same night, and M.J. and Johnson signed the statement (S. Johnson: T.585-90; Toussaint: T.631, 653-54, 664, 678, 683-84; M. Johnson: T.865, 899-911).  Toussaint collected both cell phones from Johnson and arranged for defendant's surrender (M.J.: T.788, 867; Toussaint: T.631-32, 655-59).

9

Approximately 520 pages of records showing telephone calls and text messages between M.J. and defendant were introduced into evidence (Sprint Representative KELLY WALKER: T.715, 724), as well as printouts of the messages recovered from both phones (M.J.: T.832-40, 854-61).

JOSH HANSON, Director of the Nassau County Child Advocacy Center, an expert in forensic interviewing, child sexual abuse, and sexual penetration, provided expert testimony on the behaviors of pedophiles and sexual predators (Hanson: T.1004-13).

Defense counsel sought to cross-examine Johnson about her 2014 arrest to determine if she had a "vested interest" in accusing defendant of sexual abuse so that she could receive an adjournment in contemplation of dismissal plea offer (T.512-13). He further posited that Johnson "did get a favorable ruling at the same time she was the complainant's mother" and claimed that he still had not seen a document showing the "date of the disposition" of the 2014 charge (T.513-14).  The court precluded this cross-examination as "mere speculation," the prejudicial nature of which outweighed its probative value (T.514).

Defense counsel also informed the prosecutor of allegations that Johnson was charged with a misdemeanor in 2011 following an incident in Rockville Centre, Long Island (T.548-49).   After contacting the Rockville Centre Police Department, the prosecutor informed the court that the only record concerning Johnson was for an

"aided case" in 2011.  The police lent assistance to Johnson, who was ill.  The court made this document a court exhibit (T.554-55).

<u>Defense Case</u>

RAFAEL MICKENS ("Rafael"), a janitor and M.J.'s father, explained that he dated and lived with Johnson for eight years until their relationship ended in 2006 and he moved out of their West Hempstead home (R. Mickens: T.1068-71).  They remained estranged (R. Mickens: T.1079).  Rafael claimed that he was involved in M.J.'s life because he spoke to her on the phone and took her to visit family in Harlem twice a month in the summer.  Despite this contact, he conceded that he did not "see her that much" or attend her parent-teacher conferences, although he offered that he was present at a school concert and her middle-school graduation (R. Mickens: T.1072-74, 1078, 1086).

Rafael's brother George had purchased M.J. a cell phone in 2011 so that he could contact her (Mickens: T.1075-77, 1081).  He noted that Johnson ordered the phone service terminated (Mickens: T.1081-83).

Rafael's brother GEORGE MICKENS purchased M.J. a cell phone in 2011, with Rafael's permission, as a reward for doing well in school (G. Mickens: T. 1091-94, 1099).  Defendant paid the service bill on the phone beginning in 2013, when George could no longer afford to do so (G. Mickens: T.1096, 1098).

PAULA ROSS, a sales associate who was defendant's ex-wife and mother of their three children, explained that she would see defendant and M.J. in West Hempstead and Brooklyn.  They would go on outings for which defendant paid (P. Ross: T.1104-12, 1121-25).  She claimed that she had a close relationship with M.J. and that M.J. enjoyed seeing her (P. Ross: T.1115-19).  On one occasion, she recalled defendant purchasing ice cream for a large group of children (P. Ross: T.1123).  She conceded that she never saw defendant and M.J. together without anyone else present (P. Ross: T.1130).

JASMYN ROSS, a store clerk and defendant's daughter, noted that, in 2013, defendant would spend time with her on family outings.  Defendant was "always" with M.J., and sometimes M.J.'s sister Mercedes would join them (J. Ross: T.1151-55).  Defendant drove M.J. home from the trips to Brooklyn in a white truck (J. Ross: T.1157).

JUSTYN ROSS, a sanitation worker who had resided with his mother Paula in Brooklyn, also described the outings on which M.J. joined (Justyn Ross: T.1163-64, 1167).  On some, but not all, occasions he rode back with M.J. and defendant to West Hempstead (Justyn Ross: T.1169-70).  He also noted that, in 2014, defendant moved in with him (Justyn Ross: T.1167).

Johnson's sister TARA JOHNSON, defendant's girlfriend, claimed that she and defendant supported Johnson's children and assumed financial responsibility for their home, and also attended their parent-teacher conferences (T. Johnson: T.1196, 1204-

12

05, 1245). She stated that defendant's room had the only functional cable television in the house, which all of her nieces and nephews who resided at the home watched. In 2013 and 2014, defendant was often alone with the children, including M.J., because he had a knee disability (T. Johnson: T.1208-09, 1256).

The sisters' relationship was strained, and they had a physical altercation in the past. When Tara and defendant were not home, the door to defendant's room was always locked to stop Johnson from stealing from Tara. Otherwise, the door remained unlocked. (T. Johnson: T.1209-11, 1217, 1242-44).

On Saturdays, defendant took the children living with him in West Hempstead on outings. Defendant grew close to M.J. because they "did a lot of things together." M.J. wished to move in with defendant (T. Johnson: T.1213, 1218-19, 1229). According to Tara, the attention defendant gave M.J., and the money he spent on her, caused Johnson to become angry and resentful of defendant, and Johnson and M.J.'s relationship grew contentious in the summer of 2014 (T. Johnson: T.1219-25, 1228-29, 1231). After Johnson saw defendant and M.J. watching television together, she made the "sudden" rule that M.J. could not spend time with defendant (T. Johnson: T.1230).

Despite being prohibited from seeing defendant, M.J. sought permission from Tara to call him on her new cell phone beginning in the fall of 2014, until Johnson took the phone away permanently (T. Johnson: T.1230, 1254). Tara admitted that police officers "escorted" defendant out of the house in 2014 and that she stayed behind. She

13

claimed that she did so because her responsibility for "overseeing" the house was more important than ending her relationship with her sister (T. Johnson: T.1221, 1244).

Tara claimed that M.J. denied that defendant had molested her, but admitted that she had not seen any of the text message exchanges between M.J. and defendant (T. Johnson: T.1249-50).

Testifying last, defendant RAY ROSS, a fifty-five-year-old truck driver who typically worked the overnight shift, explained that he was the father of three children and was legally divorced from Paula Ross (R. Ross: T.1263-64).  In 2013, he was living with Tara in West Hempstead, and was on disability because of an injury (R. Ross: T.1265-67, 1270).  He claimed that he was the sole means of support for all the people who resided at the West Hempstead home (R. Ross: T.1290-93, 1297-98, 1323).

Defendant admitted that on Saturdays in 2013 he drove his white truck to Brooklyn with M.J., sometimes accompanied by M.J.'s sister (R. Ross: T.1282-84, 1304-05, 1321).  He conceded that, on many occasions, he was often alone with M.J. in his room and on return trips from Brooklyn, but he denied engaging in sexual conduct.  He claimed that he was unfamiliar with the term "smash," and denied that he texted M.J. about "smashing" (R. Ross: T.1285-84, 1289-91, 1300, 1305-07).

In 2013, defendant was aware that M.J. had a cell phone that her uncle George had given her.  Defendant noted that he eventually paid the bill for this phone and a second phone that he purchased for her in 2014.  Defendant acknowledged that he texted M.J. that he wanted this second phone kept secret from Johnson.  Nevertheless,

14

he claimed that the arrangement through which he provided M.J. a phone pleased Johnson until defendant's relationship with Johnson became strained in the summer of 2014 (R. Ross: T.1275-78, 1281-82, 1294, 1311, 1319-20).

Defendant acknowledged that he sent text messages to M.J. in which he told her that he "loved her;" that she was "in danger of losing" him; that "I'll never find another [M.J.], you're my heart;" that a "part of him died" when Johnson would not allow them to see each other; that he was upset that she would not call to say "hi Ray Ray;" that he did not want her to "forget who loves you and take care of you" because she would "lose" him; and that he wanted M.J. to meet him "once [Johnson] left the house." He accounted for these messages by asserting that they were sentiments that he would send to any of his children and were not "sexual," and he denied sending the final text regarding M.J. entering his room once her mother was not at home.  He claimed that he sent the texts to M.J. because he wanted to boost her "esteem" (R. Ross: T.1286-88, 1309, 1316-17, 1320-22).  Even though he acknowledged that he would call and send text messages to M.J. between 1:00 a.m. and 4:00 a.m., he claimed that he would do this for all of his children (R. Ross: T.1301-04)

He admitted that he attended M.J.'s parent-teacher conferences and that M.J. had become an honors student (R. Ross: T.1296-97, 1307).  He further asserted that the only reason he requested the return of the clarinet he had given M.J. was because he was not "appreciated" for the support he had given her (R. Ross: T.1298, 1308).

15

In 2014, Johnson informed defendant that she was going to have M.J.'s cell phone turned off (R. Ross: T.1299).  She also told defendant to "stay away" from M.J., but defendant claimed that he did not know why (R. Ross: T.1288-89).  Defendant denied threatening to take the phone away first as punishment for something M.J. had done (R. Ross: T.1321).

<u>The Preclusion Of Denise Sawyer's Testimony</u>

Midway through the defense case, defense counsel informed the court that, after a weekend recess, Johnson had contacted the Nassau County Police Department to make a trespassing allegation against Denies Sawyer, a neighbor, and had threatened her.  Defense counsel noted that he had not previously planned to call Sawyer as a witness, but wished to do so "given what we have now" (T.741, 1051, 1141, 1143).  The court asked whether defense counsel's only purpose in calling Sawyer was to "impugn" Johnson, and defense counsel answered that "[m]aybe" Sawyer had witnessed interactions between defendant and M.J. and that she could elucidate Johnson's "bias" and "perhaps even her reputation in the community" (T.1141, 1179, 1183).  Defense counsel further demanded police paperwork for interactions that occurred between Johnson and Sawyer because those interactions might reflect on Johnson's credibility (T.1034-35, 1041-42, 1051, 1054).

The prosecutor acknowledged that Johnson had informed the District Attorney's Office that Sawyer had been in her backyard.  Relying on *People v. Seabrook*, 76 A.D.3d

16

606 (2d Dept. 2010), *People v. Ruiz,* 18 A.D.3d 220 (1st Dept. 2005), and *People v. Lyons,* 2010 WL 4227250 (Supreme Court, Queens County, Oct. 10 2010) (T.1054, 1179), the prosecutor argued that the matter was "collateral," as it had "nothing to do with the present case" (T.742). He further noted that, because defense counsel was admittedly not planning to call Sawyer until the trespass allegation arose, she had "no other relevant testimony" in the case, and that there was no evidence that Sawyer was going to offer testimony about Johnson's motive to lie (T.1143, 1179-80).

The court found that defense counsel sought to call Sawyer after a "separate and distinct and post action incident" (T.1181), and because Sawyer's testimony was "collateral" and she could not offer "any meaningful testimony," the court precluded the witness (T.1185, 1191-92).

Trial Order of Dismissal, Deliberation, Verdict, and Sentence

At the close of the People's case, defense counsel moved for a trial order of dismissal on the ground that the People had failed to establish M.J.'s date of birth. Specifically, counsel argued that M.J. had testified as to her date of birth, but no birth certificate had been offered into evidence to prove her age (T.1043-45). He further argued that the text messages were insufficient by themselves to support the count of endangering the welfare of M.J. (T.1044-45).

The prosecutor opposed the motion, noting that, in New York, a witness could testify as to his or her own age or date of birth, and that, in the light most favorable to

the People, the evidence was sufficient to support all of the charges in the indictment (T.1046-47). The court reserved decision on defendant's motion (T.1047, 1335). There was no subsequent denial of the motion, and defense counsel did not renew the motion after the verdict was rendered.

After a series of jury notes and an *Allen* charge delivered on the third day of deliberations, the jury reported that it had reached a verdict, and acknowledged the "gravity" of the case and its "deep responsibility" (T.1465-71). Thereafter, the jury found defendant guilty of course of sexual conduct against a child in the second degree, and two counts of endangering the welfare of a child. The jury found defendant not guilty of course of sexual conduct against a child in the first degree (T.1473-75).

The court, after observing that it was "uncontradicted" that M.J. came from a "dysfunctional" family and that defendant had "pitted" M.J. against her family, sentenced defendant to three years in prison to be followed by five years of post-release supervision for the course of sexual conduct against a child conviction, and one year in jail on each of the endangering the welfare of a child convictions (S.22, 26). The court directed that all of the sentences run concurrently with each other, and also imposed a lifetime order of protection in favor of M.J. (S.26).

18

<u>POINT ONE</u>

Petitioner's Contention That His Convictions Were Not Supported By Legally Sufficient Evidence Is Procedurally Barred From Habeas Corpus Review And Without Merit (Responding to Point III of the Petition).

Petitioner contends that the evidence supporting his convictions for second degree course of sexual conduct and endangering the welfare of a child is legally insufficient because of a lack of corroboration of M.J.'s testimony (Petition at Point III).  This contention is procedurally barred from federal habeas corpus review and meritless in any event. The evidence presented at petitioner's trial overwhelmingly supported petitioner's convictions.

At trial, petitioner failed to argue that the proof was insufficient because it was uncorroborated. When petitioner then raised these claims for the first time on direct appeal, the Appellate Division ruled that it was "unpreserved for appellate review." *People v. Ross*, 159 A.D.3d 925, 926 (2d Dept. 2018).  The court went on to hold that the claim was "without merit."  *Id.*  Thus, the state courts have "expressly relied on a procedural default as an independent and adequate state ground" (*Velasquez v. Leonardo*, 898 F.2d 7, 9 [2d Cir. 1990]) in denying petitioner's unpreserved claim.

"Federal courts generally will not consider a federal issue in a case if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quotation omitted).  The failure to preserve an issue for appellate review is just such an independent and adequate state ground. *Garvey*, 485 F.3d at 720 ("[T]he

19

procedural bar of [C.P.L.] § 470.05(2) constitutes an independent and adequate state ground for the Appellate Division's holding."). Accordingly, petitioner's contentions that his convictions were not supported by legally sufficient evidence are procedurally barred from review by this Court. *See Rattray v. Brown*, 261 F. Supp. 2d 149, 156 (E.D.N.Y. 2003) ("It is well settled that where a state court decision states that a claim is procedurally barred, and then rules 'in any event' on the merits, the claim is procedurally barred.") (citing *Harris v. Reed*, 489 U.S. 255, 264 [1989]; *Velasquez*, 898 F.2d at 9).

Petitioner could nonetheless overcome the procedural bar by establishing cause for his default and resulting prejudice, or by showing that the federal court's failure to review his claim will result in a fundamental miscarriage of justice, *i.e.*, that he is actually innocent of the crimes of which he was convicted. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Here, however, petitioner makes no showing at all with respect to those standards. He has not even alleged any cause for his procedural default, much less demonstrated that he was prejudiced as a result. *See Velasquez*, 898 F.2d at 9. Furthermore, petitioner has not— and cannot—make a showing that he is actually innocent of the charges.

Even if there were no procedural bar, petitioner still would not be entitled to habeas corpus relief based on his sufficiency claim. Petitioner has failed to establish that the state court's conclusion, that the evidence was legally sufficient to support his convictions, resulted in a decision that was contrary to, or involved an unreasonable

application of, Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). An "'unreasonable application of'" such precedent "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 [2003]). "Rather, [a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. at 419-20 (quotation omitted).

The standard for reviewing the legal sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A petitioner 'bears a very heavy burden' when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus." *Ayala v. Ercole*, 2007 WL 1135560, *6 (E.D.N.Y Apr. 17, 2007) (quoting *Eingaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 840 [2d Cir. 1997]).

In this case, the People were required to prove that defendant, "over a period of time not less than three months in duration . . . being eighteen years old or more, engage[d] in two or more acts of sexual conduct with a child less than thirteen years old." Penal Law § 130.80(b)(1). The People were also required to prove a lack of consent because M.J. was incapable of consent, either by being, *inter alia*, less than

21

seventeen years of age, mentally disabled, or mentally incapacitated (Penal Law § 130.05[1], Penal Law § 130.05[2][b], Penal Law § 130.05[3][a], [b], [c]).  In addition, to prove that defendant endangered M.J.'s welfare, the People were required to prove that defendant "knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old . . ."  Penal Law § 260.10.

The Penal Law imposes on the People the additional burden to corroborate a victim's testimony when the lack of consent element "results solely from incapacity to consent because of the victim's mental defect, or mental incapacity."  Penal Law § 130.16.  If the gravamen of the endangering charge is conduct that would constitute a crime under article 130 of the Penal Law, then a corroboration requirement is also imposed if the victim lacks the capacity to consent due to "mental defect or mental incapacity."  Penal Law § 260.11.  Finally, with respect to age, New York follows "the long-standing rule that the necessity for corroboration of the testimony of a child under the age of 12 rests solely on whether, as determined by the Judge before whom the testimony is to be given, the child understands the nature of an oath."  *People v. Fuller*, 50 N.Y.2d 628, 636 (1980).  As these corroboration requirements show, the prosecution was not required to corroborate M.J.'s testimony.

Here, the evidence plainly showed that M.J., an accomplished student, did not suffer from any mental disease of defect; indeed, defendant in his own testimony praised M.J.'s success in school.  *See People v. Cratsley*, 86 N.Y.2d 81, 84 (1995) (incapacity to consent established when the "complainant had suffered brain damage at birth").

22

Moreover, given that M.J. was fifteen when she testified, she was permitted to give sworn testimony and the court was not required to inquire as to whether she was fit to do so. *See People v. Mendoza*, 49 A.D.3d 559, 560 (2d Dept. 2008) ("the Supreme Court providently exercised its discretion in determining that the five-year-old complainant was competent to give sworn testimony"); *People v. McLoud*, 291 A.D.2d 867, 867 (4th Dept. 2002) (where the defendant was convicted of course of sexual conduct in the first degree, "corroboration was not required" as "the 11-year-old victim gave sworn testimony and she was not incapable of consent . . . because of mental defect or incapacity") (internal quotations and citations omitted); *People v. Pumarejo*, 222 A.D.2d 616, 616 (2d Dept. 1995) ("corroboration is required only in sexual offense cases in which the victim is incapable of consent because of mental defect or incapacity, a situation which was not shown to exist here").

But even if petitioner were correct that the People were required to corroborate M.J.'s testimony, the People easily satisfied this (nonexistent) requirement. Indeed, it is well-settled law that the corroboration requirement of sections 130.16 and 260.11 of the Penal Law "may be satisfied with circumstantial evidence and need not point to the particular form" of the offending conduct. *People v. De Berry*, 76 A.D.2d 933, 933 (2d Dept. 1980). Here, contrary to defendant's contention (*see* Petition at Point III), there was ample circumstantial evidence corroborating defendant's sexual conduct. M.J. testified that defendant's abuse began in his bedroom as both he and M.J. were watching television alone in his room. In August of 2014, Johnson walked into defendant's room

23

while the door was closed and saw M.J. sitting on defendant's bed as defendant was laying down (S. Johnson: T.463, 470-73; M.J.: T.823-27, 882, 921, 923, 949, 952, 968).

Defendant's abuse of M.J. also occurred when she and defendant would return from weekend excursions to Brooklyn. Defendant stopped his white truck in a parking lot in West Hempstead and abused M.J. in the back seat of the car. Johnson and numerous defense witnesses testified as to these weekend excursions, including details about defendant's vehicle and the group activities. Moreover, defendant himself acknowledged being alone with M.J. in his room and in his truck (S. Johnson: T.452-55, 529, 561-63; Ja. Ross: T.1151-55, 1157; Ju. Ross: T.1163-64, 1167-70; T. Johnson: T.1213, 1218-19, 1229; R. Ross: T.1282-84, 1304-07, 1321). This alone was sufficient to corroborate the charges. *See People v. Dickson*, 112 A.D.2d 312, 312 (2d Dept. 1985) (corroboration established when the "testimony of the 12-year-old complainant, the defendant's niece, was specific concerning the details of the incident, and closely paralleled the defendant's own account of his activities with the complainant on the day in question insofar as they relate to the specifics of time and place").

Moreover, petitioner attempts to argue that the myriad text message exchanges between petitioner and M.J. were innocuous expressions. Petitioner is wrong. In messages and records of calls totaling 520 pages of evidence, and some of which were exchanged between 1:00 a.m. and 4:00 a.m., defendant told M.J., *inter alia*, that he "loved her;" that she was "in danger of losing" him; that "I'll never find another [M.J.], you're my heart;" that a "part of him died" when Sarita would not allow them to see each

other; that he was upset that she would not call to say "hi Ray Ray;" that he did not want her to "forget who loves you and take care of you" because she would "lose" him; and that he wanted M.J. to meet him "once [Johnson] left the house" (R. Ross: T.1286-88, 1301-04, 1309, 1316-17, 1320-22). Defendant conveniently ignores that these messages, sent on phones that he concededly paid for and which he wanted kept secret from Johnson, were powerful circumstantial evidence in the context of the ongoing abuse that defendant inflicted upon M.J. *See People v. Scaringe*, 137 A.D.3d 1409, 1418 (3d Dept. 2016) (victim's testimony corroborated "most significantly, by the multiple text messages introduced into evidence in which defendant, among many other things, described the day on which the victim claimed that they had sexual intercourse as 'a dream come true'").

Given this evidence, the state court's decision that the evidence was legally sufficient to establish petitioner's guilt was not an unreasonable application of United States Supreme Court precedent. A rational trier of fact could have concluded that petitioner was guilty of the course of sexual conduct and endangering the welfare of a child charges. Accordingly, petitioner's legal insufficiency claim should be rejected in this forum, as it has been in the New York courts.

POINT TWO

Petitioner's Claim Of Ineffective Assistance Of Counsel Is Entirely Without Merit (Responding to Point 1 of the Petition).

Extrapolating from his wholly meritless sufficiency contention discussed *supra* in Point One, petitioner assails his trial counsel for failing to argue that the proof was insufficient based on a lack of corroboration (*see* petition at Point 1).  But as petitioner's very *premise* is false, his conclusion that his attorney was ineffective fares no better than his sufficiency contention, and should, likewise, be rejected.

The right to the effective assistance of counsel in criminal proceedings is guaranteed by the Constitution. *See* U.S. Const., Amend. VI.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court adopted a two-pronged test for evaluating claims that trial counsel was ineffective. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Scrutiny of counsel's performance under this test is "highly deferential." *Id.* at 689. Indeed, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

And, when a claim of ineffective assistance of counsel arises in the context of a federal habeas corpus petition, the standard of review is "doubly" deferential:

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard . . . For purposes of [28 U.S.C.] § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." . . . A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

.

. . . Even under *de novo* review, the [*Strickland*] standard for judging counsel's representation is a most deferential one . . .

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).

*Harrington v. Richter*, 562 U.S. 86, 101-05 (2011) (internal citations omitted) (emphasis in original); *accord Premo v. Moore*, 562 U.S. 115, 121-22 (2011).

Here, petitioner has not met this demanding, "doubly deferential" standard. On direct appeal, the Appellate Division held that petitioner as the "record as a whole demonstrates that counsel provided the defendant with meaningful representation." *Ross*, 159 A.D.3d at 926. Petitioner not only has failed to establish that trial counsel was ineffective, but he has also failed to establish that the state appellate court's well-founded decision regarding counsel's performance was contrary to, or involved an unreasonable application of, *Strickland* and its progeny.

First, as discussed *supra*, petitioner's claim depends on there being something for trial counsel to have argued with respect to corroboration. But, as a legal matter,

corroboration was not a requirement for the jury to convict petitioner. And, as a factual matter, there was ample corroborating evidence. Trial counsel cannot be upbraided for failing to make arguments that are legally and factually wrong. *See Bierenbaum v. Graham*, 607 F.3d 36, 52 (2d Cir. 2010) (when defense counsel failed to make a motion that "would not have been granted," petitioner was not deprived of the effective assistance of counsel); *Graziano v. United States*, 2013 WL 298116, at *12 (E.D.N.Y. Jan. 25, 2013) (counsel's failure to make "a meritless motion was certainly not ineffective") (Bianco, J.). *See also* Trial Counsel Affidavit.

Moreover, petitioner cannot show that the Appellate Division unreasonably applied the standard announced in *Strickland*. Petitioner's ineffective assistance claim was before the Appellate Division when that court determined that petitioner was not denied the effective assistance of counsel. The Appellate Division applied the appropriate standard of review, citing, *inter alia, People v. Baldi*, 54 N.Y.2d 137 (1981). *See Ross*, 159 A.D.3d at 926. As the Court of Appeals for the Second Circuit has held, *Baldi* "is not contrary to *Strickland*." *Rosario v. Ercole*, 601 F.3d 118, 126 (2d Cir. 2010). And, the court's findings reflect no unreasonable application of federal law, under any standard of review, because as noted in respondent's brief on direct appeal, trial counsel served defendant exceedingly well in the face of extremely grave allegations. *See* Respondent's Brief at 35.

In fact, it is because of defense counsel's vigorous presentation, including his cross-examination of the key witnesses in this case, that the jury acquitted petitioner of

the more serious charge of course of sexual conduct in the first degree.  And, it was through the efforts of defense counsel that petitioner was able to raise the contentions regarding the fairness of his trial before the Appellate Division, even though, as discussed *infra* and in respondent's brief on direct appeal, those arguments on direct appeal were and remain meritless.  Petitioner's claim should be rejected.

<u>POINT THREE</u>

Petitioner's Claim Regarding The Alleged Failure To Disclose A Pending Criminal Matter Of A Witness Is Unexhausted, Not Cognizable On Habeas Review, And In Any Event Meritless (Responding to Point 2 of the Petition, In Part).

Repeating a claim raised on direct appeal to the Appellate Division, petitioner claims that he was deprived of a fair trial when the court refused to order the prosecutor to turn over the "NYSIS information" of Sarita Johnson.   *See* Petition at Point 2. Petitioner's regurgitated claim is unexhausted, not cognizable before this Court, and, as it was before the Appellate Division, completely meritless.

First, petitioner has failed to exhaust his claim in the state courts, as he must before this Court may consider it.  28 U.S.C. § 2254(b)(1)(A).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his federal claim to the state court.  *See Picard v. Conner*, 404 U.S. 270, 275 (1971).  In New York, this means raising the claim on direct appeal to the Appellate Division and then seeking review of the claim at the Court of Appeals.  *See Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991) (claims not fairly presented to New York courts where petitioner failed to include them in letter seeking leave to appeal to New York Court of Appeals from Appellate Division's affirmance of judgment).

But the petitioner cannot simply go "through the state courts."  *Picard*, 404 U.S. at 276.  Instead, the state court must have an opportunity to consider "the substance of [the] federal habeas corpus claim."  *Id.* at 278.  Thus, while the petitioner does not need to cite "book and verse on the federal constitution" (*id.*), a generalized claim of a denial

30

of a fair trial is insufficient to notify the state courts of the constitutional nature of the claim. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."); *Whitehead v. Haggett*, 2017 WL 491651, at *16 (E.D.N.Y. Feb. 6, 2017) (same).

The Second Circuit has identified the following four ways in which a petitioner may fairly present his federal claims to state court: "(a) reliance on pertinent federal cases employing constitutional analysis; (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Jackson v. Edwards*, 404 F.3d 612, 618 (2d Cir. 2005) (quoting *Daye v. Attorney General of New York*, 696 F.2d 186, 191 [2d Cir. 1982]). Applying this standard, petitioner has not fairly presented this claim.

Here, petitioner relies solely on section 240.45 of the Criminal Procedure Law. He does not cite a single right found in the federal Constitution of which he was deprived. In this circumstance, petitioner has not fairly presented his claim. *See Carvajal v. Artus*, 633 F.3d 95, 107 (2d Cir. 2011) (petitioner's claim unexhausted when, on appeal, petitioner solely relied on "state court decisions interpreting state statutory law").

31

Petitioner may not return to the state courts for further review of these claims, as the Court of Appeals has already denied him leave to appeal the Appellate Division's decision affirming the judgment of conviction. *See* C.P.L. §§ 460.10(5)(a), 460.20. When state procedural rules no longer permit a habeas petitioner to present his claim to the highest state court empowered to review it, the unexhausted claim will be "deemed" exhausted but procedurally defaulted. *St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004). In such cases, federal habeas corpus review of the claims is generally not permitted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (a claim that can be presented to a state's highest court, but which is not presented, results in procedural default); *Gray v. Netherland*, 518 U.S. 152, 162 (1996) ("the procedural bar that gives rise to exhaustion . . . thus prevents federal habeas corpus review of the defaulted claim"). Indeed, a habeas court may reach the merits of the claim "only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *St. Helen*, 374 F.3d at 184 (quoting *Bousley v. United States*, 523 U.S. 614, 622 [1998]).

The "prejudice" requirement of the cause and prejudice showings necessary to overcome petitioner's procedural default involves not just a showing of a possibility of prejudice, but a showing that the alleged errors worked to petitioner's actual and substantial disadvantage. *See United States v. Frady*, 456 U.S. 152, 168 (1982) (a habeas petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions). Thus,

32

when the claims cannot provide a basis for habeas corpus relief, such as when they are meritless or not cognizable on federal habeas corpus review, the prejudice requirement cannot be met.  *See Cappiello v. Hoke*, 698 F. Supp. 1042, 1052 (E.D.N.Y.) (Raggi, J.) ("Naturally, petitioner's procedural default of his claim . . . is prejudicial only if such claim is meritorious."), *aff'd for the reasons stated below*, 852 F.2d 59 (2d Cir. 1988).

In this case, petitioner has not demonstrated any cause for failing to argue that his claims were of a constitutional dimension, nor has he at any time claimed actual innocence.  Moreover, as discussed below, because petitioner is entitled to no relief, he has accordingly suffered no prejudice.

That petitioner cites to no federal constitutional violation is telling in this case. Indeed, petitioner cites only to a statute codified in New York law.  But, it is fundamental that "habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Under New York law, the requirement that a defendant must be provided with the pre-trial statements of any witness who is called to testify for the People (*see* C.P.L. § 240.45[1][a]) as well as "any known criminal convictions and the existence of any criminal actions pending against trial witnesses" (*see* C.P.L. § 240.45[1][b], [c]); *People v. Machado*, 90 N.Y.2d 187, 191 [1997]), is strictly a creature of state law.  However, neither C.P.L. § 240.45 nor its federal counterpart (*Jencks v. United States*, 353 U.S. 657 [1957]; 18 U.S.C. § 3500), is grounded in the United States Constitution.  *See Hirsch v. Plescia*, 2005 WL 2038587 at *7 (E.D.N.Y Aug. 23, 2005). Thus, petitioner's claim regarding the failure to fulfill the mandates of C.P.L. § 240.45

33

fails to assert a federal constitutional claim that is reviewable in this habeas corpus proceeding.  *See Bermudez v. Conway*, 09-cv-1515 (DLI), 2012 WL 3779211 (E.D.N.Y. 2012); *Onega v. Ercole*, 07-cv-1222 (RRM), 2012 WL 2377789 (E.D.N.Y. 2012).

In any event, for the reasons stated in respondent's Appellate Division brief at Point I(A), petitioner's claim is meritless as a matter of state law.  And indeed, the Appellate Division resoundingly agreed with this argument when it determined that the "record demonstrates that the People fulfilled their discovery obligations under C.P.L. 240.45(1)(b) and (c) by disclosing to the defense any known judgments of conviction or pending criminal actions related to the prosecution's witnesses."  *Ross*, 159 A.D.3d at 926.  Nor, as set forth in respondent's brief at Point 1(C), can respondent demonstrate any prejudice from any purported error, as the jury could have rejected Johnson's testimony *in toto* and still convicted petitioner on the basis of overwhelming evidence.

<u>POINT FOUR</u>

Petitioner's Claim That The Court Erroneous Precluded A Witness From Testifying On His Behalf Does Not Warrant Habeas Relief (Responding to the Petition, Point 2, In Part).

Again regurgitating a claim from his direct appeal, petitioner claims that the court erred in precluding Denise Sawyer from testifying. *See* Petition at Point 2. But, the court's decision was a correct application of settled law. Petitioner is entitled to no relief from this Court.

"The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *see also Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001). However, the right to present a defense is not boundless. The accused in a criminal case "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers*, 410 U.S. at 302. Moreover, where, as here, a habeas corpus petitioner claims that a state court made erroneous rulings that deprived him of the right to present a defense, the reviewing court must distinguish between mere errors of state law and those of constitutional dimension. *See Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000). An error is of constitutional dimension if it deprived the petitioner of fundamental fairness. *See Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988). In other words, the excluded evidence must be material to the petitioner's defense, in that its inclusion would have created a reasonable doubt as to

his guilt. *See id.* at 925. Judged by these standards, petitioner's claim does not warrant habeas relief.

The trial court's decision to preclude Sawyer's testimony was a proper application of state law. After a weekend recess in testimony during the defense case, defense counsel reported to the court that he had learned about an incident involving Sarita Johnson over the weekend. According to counsel, Johnson had contacted the Nassau County Police Department to make a trespassing allegation against a neighbor, Denise Sawyer, and had threatened her. Even though defense counsel had not planned to call Sawyer as a witness, he announced that he wished to do so "given what we have now" (T.741, 1051, 1141, 1143).

The court asked whether defense counsel's only purpose in calling Sawyer was to "impugn" Johnson. Defense counsel answered that "[m]aybe" Sawyer had witnessed interactions between defendant and M.J. and that Sawyer could elucidate Johnson's "bias" and "perhaps even her reputation in the community." Under these circumstances, the court would have been correct in ruling that Gandino's testimony would have violated the long-standing prohibition under New York State law against calling other witnesses to "contradict a witness' answers concerning collateral matters solely for the purpose of impeaching that witness' credibility" (T.1141, 1179, 1183).

In response to defense counsel's speculative argument that Sawyer could testify as to Johnson's reputation in the community, the prosecutor argued that the sole purpose in calling Sawyer was to allow her to testify about the trespass incident, which

was wholly "collateral," and had "nothing to do with the present case." In support of his argument, the prosecutor emphasized defense counsel's admission that he was not planning to call Sawyer prior to the court's weekend recess and before the incident had occurred (T.742, 1143, 1179-80).

The court agreed that defense counsel sought to call Sawyer after a "separate and distinct and post action incident" (T.1181). Because Sawyer's testimony was "collateral," and because she could not offer "any meaningful testimony," the court precluded the witness (T.1185, 1191-92). This was a proper ruling.

It is well settled that extrinsic evidence of "immoral, vicious, or criminal acts" may not be used to impeach a witness (*People v. Lyde*, 160 A.D.2d 817, 817-18 [2d Dept. 1990]), as such evidence will only "divert the jury's attention from the main issues involved in the trial." *People v. Pavao*, 59 N.Y.2d 282, 289-90 (1983).

Here, defense counsel's entire offer of proof reflects that the only purpose for Sawyer's testimony was to sully Johnson's credibility. Defense counsel simply wished to elicit details of an unrelated, irrelevant, alleged bad act that had taken place a few days earlier, and well after defense counsel had already finished cross-examining Johnson.

As the proffered testimony was wholly immaterial to any issue at petitioner's trial, it was properly precluded. *See People v. James*, 177 A.D.2d 595, 596 (2d Dept. 1991) ("The trial court properly exercised its discretion by refusing to admit the proffered testimony of the police informant's sister concerning the informant's purported

37

jealousy over a third sister's relationship with the defendant. This testimony was not probative of any issues in the case."); *People v. Fitzpatrick*, 171 A.D.2d 972, 975 (3d Dept. 1991) (when proffered extrinsic evidence offered by the defendant in response to the testimony of the People's rebuttal witness was "irrelevant and immaterial to any issue involving defendant's guilt or innocence" and its only purpose would have been to "impeach a prosecution witness's credibility," the trial court properly precluded the evidence); *accord* Federal Rule of Evidence 608(b) ("extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness"); *United States v. LaChance*, 788 F.2d 856, 877 (2d Cir. 1986) (the trial court properly struck testimony from a witness related to another witness's credibility, as the testimony was "collateral," and thus not permitted to be proven through "extrinsic evidence").

Finally, as discussed *supra* at Point Three and in respondent's brief on direct appeal, Johnson's credibility was not dispositive of the jury's verdict.  Simply put, the jury could have chosen to find Johnson utterly reprehensible (and may well have on the basis of matters having nothing to do with Sawyer's testimony), and still convicted petitioner.  To claim that he was denied a constitutional right because he could not go on a "fishing expedition" into Johnson's credibility is not the sort of claim that even approaches the basis for habeas relief.

Accordingly, for all these reasons, petitioner's claims should be rejected and the writ of habeas corpus denied.

<u>CONCLUSION</u>

<u>The Petition For A Writ Of Habeas Corpus Should Be Denied.</u>

Dated:  Mineola, New York
        March 4, 2019

                                        Respectfully submitted,

                                        MADELINE SINGAS
                                        District Attorney, Nassau County
                                        *Attorney for Respondent*
                                        262 Old Country Road
                                        Mineola, New York 11501

                                  By:  <u>/s/ John B. Latella</u>
                                        John B. Latella
                                        Assistant District Attorney

Jason R. Richards
John B. Latella
    Assistant District Attorneys
        of Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 4, 2019, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon:

Ray Ross, DIN: 16-A-2823
*Petitioner Pro Se*
Fishkill Correctional Facility
271 Matteawan Road, P.O. Box 1245
Beacon, New York 12508

MADELINE SINGAS
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

By:   /s/ John B. Latella
      JOHN B. LATELLA