

1    SUPREME COURT OF THE STATE OF NEW YORK
          COUNTY OF NASSAU :   PART 47
2    --------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3
4                    -against-
                                        Ind. No. 1050N/15
5
6    RAY ROSS,                              <u>JURY TRIAL</u>
7                      DEFENDANT.
     --------------------------------------x
8
                          Mineola, New York
9                         February 4, 2016
10
     B E F O R E:   HON. TERENCE P. MURPHY
11                  Acting Supreme Court Justice
12
13   A P P E A R A N C E S:
14
                HON. MADELINE SINGAS
15              District Attorney of Nassau County
                BY:  ANTHONY PERRI, ESQ.
16              Assistant District Attorney
                For the People
17
18
                SCOTT B. ZERNER, ESQ.
19              277 Broadway, Suite 408
                New York, New York  10007
20              Attorney for Defendant
21
22
23
24              Kathi A. Fedden
                Official Court Reporter
25

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                                    2

1             THE CLERK:  Case on trial, Indictment 1050N of

2       '15, People versus Ray Ross.

3             Appearances.

4             MR. PERRI:  For the People, Assistant District

5       Attorney Anthony Perri.  Good morning.

6             MR. ZERNER:  For defendant, Scott Zerner, 277

7       Broadway, suite 408, New York, New York.  Good morning,

8       your Honor.  Nice to meet you.

9             THE CLERK:  You are Ray Ross?

10            THE DEFENDANT:  Yes, sir.

11            THE CLERK:  People ready for trial?

12            MR. PERRI:  Yes, your Honor.

13            THE CLERK:  Defense ready?

14            MR. ZERNER:  The defense is ready.

15            THE CLERK:  The prospective jurors are not in

16      the courtroom.

17            THE COURT:  This matter is on for trial.

18      We're read to proceed.  There are preliminary matters we

19      need to attend to before we call the jury panel over.

20      First and foremost, I want to resolve any issues of a

21      plea agreement.

22            People?

23            MR. PERRI:  Your Honor, the People extended an

24      offer to the defendant prior to indictment of a

25      registrable misdemeanor and probation along with a stay

1     away order of protection.  That offer was rejected.

2     Since the defendant has been indicted, he has not been

3     interested in any offer.

4              The People would recommend ten years

5     incarceration at this time if he were to plead guilty to

6     the top count, which is a B violent sexual felony.

7              THE COURT:  If the defendant asks for that

8     misdemeanor disposition, is it still available to him at

9     this point?

10             MR. PERRI:  No, your Honor.

11             THE COURT:  So there is no offer from the

12     People.

13             MR. PERRI:  No, your Honor.

14             THE COURT:  People, are there any pre-trial

15     decisions that have been made by any other judge with

16     regard to this matter?

17             MR. PERRI:  No, your Honor.

18             THE COURT:  No prior hearings?

19             MR. PERRI:  No, your Honor.

20             THE COURT:  That's your understanding,

21     Counsel?

22             MR. ZERNER:  Yes, your Honor.  There were no

23     issues with regards to any pre-trial hearings.  I

24     surrendered my client to the precinct.  He made no

25     statement.  There were no issues about that.  The

1    complainant is known to my client.  There are no

2    identification issues at this time either.

3              Your Honor, my client, you know, this is the

4    first time he had any interaction with the criminal

5    justice system.  He might appear a little nervous to you

6    as a result of that, but I can assure you he's been up

7    to speed on everything going on.  I conveyed to him the

8    offer that the People made prior to the indictment and

9    he resoundingly rejected that offer, maintaining his

10   innocence.

11             THE COURT:  Very good, thank you.

12             Any evidentiary issues the Court should be

13   aware of prior to trial that either need to be decided

14   or at least be informed of?

15             MR. PERRI:  Your Honor, as was discussed in

16   chambers, the People intend on offering into evidence

17   text messages that were sent between the complainant in

18   this case and the defendant.  It is the People's

19   position that those text messages substantiate the

20   allegations that there was a sexual relationship between

21   the parties.  It also aids in setting up the time line

22   for the final count in the indictment, which is

23   endangering the welfare of a child.

24             The text messages, themselves, which are

25   inappropriate in their nature and the People will argue

1      to the jury are themselves evidence of conduct that the

2      defendant should have known was injurious to the moral,

3      mental welfare of the child, the complainant in this

4      case, they're evidence of that charge, itself, as well

5      as evidence of the sexual course of conduct charges that

6      go up to the child's 13th birthday.

7              The People intend to offer those into evidence

8      along with phone records from the Sprint wireless phone

9      company that further substantiate ongoing contact

10     between the defendant and the complainant by cell phone

11     to the number associated with the text messages and that

12     that just further corroborates the complainant's

13     testimony.  And the People believe it is relevant to

14     this case in the sum, the substance of the text

15     messages, as well as the fact that the text messages and

16     the phone conversations occurred.

17             THE COURT:  What's the claimed date of birth

18     of the minor?

19             MR. PERRI:  Your Honor, Millinia, the minor in

20     this case, her date of birth is December 30, 2000, your

21     Honor.

22             THE COURT:  Mr. Zerner, do you want to be

23     heard on the evidentiary issue?

24             MR. ZERNER:  Yes, thank you, your Honor.

25             Your Honor, the indictment, itself doesn't

1    make any mention about text messages being the source of

2    this endangering the welfare of a child charge.  There

3    are no charges involving aggravated harassment.  I don't

4    see anything on the face of it that shows that texting

5    back and forth between people of various ages is

6    something that, on its face, would be injurious to the

7    welfare of a minor.  Frankly, that charge that we're

8    talking about right now is vague on its face and I ask

9    that you reconsider your decision not to dismiss that

10   charge.

11             Nevertheless, the other charges on the

12   indictment also just talk about a course of conduct with

13   a nine month spread of time.  All of that needs to be

14   proven by the prosecution by witness testimony on the

15   stand.

16             As far as showing text messages, I was handed

17   or I received in the mail on Tuesday afternoon 120 pages

18   worth of text messages.  Many of them don't have a

19   precise year on them and the prosecutor is trying to

20   bolster his case by using these text messages.  There

21   were text messages sent back and forth between the

22   parties.  Let him get that evidence from the witnesses

23   on the stand.

24             As far as these text messages in and of

25   themselves showing that there is a course of conduct

1    that was injurious to a child, it just doesn't meet the

2    statute, your Honor.  I ask you deny the request to

3    allow these text messages into evidence.

4              THE COURT:  The Court's ruling is this:

5    Subject to proper foundation being laid, the Court sees

6    no reason why those text messages should be precluded.

7              With regard to days off, People are requesting

8    2/16?

9              MR. PERRI:  Yes, your Honor.

10             THE COURT:  And the defense is requesting

11   2/24?

12             MR. ZERNER:  Yes, your Honor, should we get to

13   that date.

14             THE COURT:  Is it a personal matter you have

15   to attend to?

16             MR. ZERNER:  No, your Honor.  Frankly, I do do

17   18b work in Suffolk County.

18             THE COURT:  You are the 18b of the day?

19             MR. ZERNER:  I was the 18b for tomorrow.  I

20   swapped out with another attorney for that day with the

21   assumption that we won't get to that point.

22             THE COURT:  Mr. Ross, I have a couple of

23   things I have to speak to you about.

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  The first is your entitlement to

1    be present at all material stages of this case,

2    including trial.  If you voluntarily absent yourself

3    from the proceedings, the trial will go on in your

4    absence.  Do you understand?

5              THE DEFENDANT:  Yes I do.

6              THE COURT:  If for whatever reason, traffic,

7    snowstorm, illness, anything that has a reasonable

8    explanation and excuse for your nonappearance will be

9    taken into consideration with regard to whether or not

10   the trial proceeds in your absence.

11             The essence of my warning to you is if you

12   voluntarily absent yourself from the proceedings, the

13   case will go on without you.

14             I have received acknowledgment from you and

15   your attorney that you have been informed of that right

16   to be present and the consequences for your failure to

17   appear without reasonable excuse, okay?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  That's called the Parker warning

20   and that will be marked as Court Exhibit number next in

21   order.

22             THE CLERK:  Court Exhibit I so marked.

23             THE COURT:  Secondly, with regard to your

24   entitlement to be involved in your trial, there is

25   something known as an Antommarchi waiver.  Essentially

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                          9

1    what happens in some instances, particularly when we're

2    selecting jurors, jurors don't wish to speak publicly

3    about issues, whether it's health or history and they

4    ask to speak up here at the bench.  The Court's asking

5    you whether or not you waive your right to be up here at

6    the bench with your attorney when the Court is speaking

7    privately, if you will, but on the record with potential

8    jurors or speaking with your attorney and the assistant

9    district attorney on legal matters during trial.  It

10   makes for a more efficient process.

11          What happens is I'll speak to the attorneys

12   and they'll come back, your attorney will come back and

13   speak to you and let you know exactly what transpired

14   and if there are any questions that you have and need to

15   be answered by your attorney and he needs to ask me,

16   then he will ask me.  So you will be fully informed, you

17   just won't be present up here at the bench.  Do you

18   understand that, sir?

19          THE DEFENDANT:  Yes, sir, I do.

20          THE COURT:  Has your attorney explained that

21   aspect of the trial to you?

22          THE DEFENDANT:  Yes, he has.

23          THE COURT:  And I have received your

24   acknowledgment executed by you and your attorney known

25   as the Antommarchi waiver explaining to you the rights

Proceedings                                    10

1    that I have just explained to you and that you waive

2    your right to be present during the sidebar discussions.

3    So that will be marked as Court Exhibit next in order.

4              THE CLERK:  Court Exhibit II so marked.

5              THE COURT:  Based on the days off requested by

6    counsel, it's anticipated the People's case will take

7    two weeks?

8              MR. PERRI:  Approximately, yes, your Honor.

9              THE COURT:  Approximately less or more?

10             MR. PERRI:  Approximately less, yes.

11             THE COURT:  Very good.  And all your witnesses

12   are available?

13             MR. PERRI:  Yes, your Honor.  The only witness

14   who has a possible issue is the representative from the

15   Sprint corporation.  They are definitely available on

16   the 17th for testimony.  There is a possibility that we

17   could have them on the 11th, but that is not confirmed.

18             THE COURT:  We will we have two days off.  We

19   have the 12th and the 15th off, so I anticipate we'll

20   get there, plus you're asking for the 16th, so it's

21   almost a week --

22             MR. PERRI:  Thank you, your Honor.

23             THE COURT:  -- of no trial and that should

24   work out.

25             Then obviously, Mr. Zerner, you have no

1    obligation, your client has no obligation to put on a

2    case, but you do anticipate if you do put on a case it

3    will be about one week?

4                MR. ZERNER:  That's correct, your Honor.

5                THE COURT:  I'll tell the jury approximately

6    three weeks given the time off that we anticipate.

7                Have the People filed and served Rosario?

8                MR. PERRI:  Yes, your Honor.

9                THE COURT:  Mr. Zerner, you acknowledge

10   receipt of the Rosario material?

11               MR. ZERNER:  I do acknowledge receipt, your

12   Honor.  I also handed over a potential witness list to

13   both the Court, as well as Mr. Perri.

14               THE COURT:  Very good.

15               I don't believe there is any need for any

16   Sandoval ruling; is that correct.

17               MR. PERRI:  That's the People's understanding,

18   your Honor.

19               THE CLERK:  Court Exhibit III, Rosario, Judge.

20               THE COURT:  Yes, please.  Thank you.

21               If there's going to be any stipulations by

22   counsel, please do that outside the presence of the jury

23   in sufficient time prior to that stipulation having to

24   be introduced so that the Court can review it and we can

25   discuss how it's going to be presented to the jury.

Proceedings

1              If it's possible to pre-mark exhibits, I ask

2     you to pre-mark exhibits.

3              With regard to the witness list, I have the

4     People's witness list and I have the defense potential

5     witness list.  I'll read those names off to the jurors,

6     potential jurors without attribution to either side and

7     they'll be marked as Court's Exhibits next in order.

8              THE CLERK:  People's witness list will be

9     Court Exhibit IV.  Defense witness list Court Exhibit V.

10             THE COURT:  Mr. Zerner, I understand your

11    client is requesting that I instruct the potential

12    jurors on the fact that they should take no adverse

13    inference against the defendant for his failure to take

14    the stand; is that correct?

15             MR. ZERNER:  That's correct, your Honor.

16             THE COURT:  Very good.  That will be so

17    instructed throughout the Court's charges.

18             I ask counsel if there is an objection, please

19    stand, note your objection and do not engage in any

20    argument except if the Court asks for some and that will

21    be done outside the presence of the jury, if necessary.

22             With regard to jury selection, I would ask

23    counsel to please direct your questions of the potential

24    jurors simply to their qualifications to act as jurors

25    in this matter and not to engage in any extended

Proceedings                                                13

1    discussion of the law, as it's the Court's

2    responsibility to instruct the jury on the law.

3              People, anything else?

4              MR. PERRI:  No, your Honor, not at this time.

5              THE COURT:  Mr. Zerner, anything you need to

6    put on the record?

7              MR. ZERNER:  No, your Honor, thank you.

8              THE COURT:  Very good.

9              With regard to the Court's description of the

10   allegations, the Court essentially will tell the

11   potential jurors that during the period of March 1st of

12   2013 to December 29th of 2013 the defendant engaged in

13   inappropriate sexual contact with a minor under the age

14   of 13 at the time at three locations in Nassau County.

15   I guess they're all West Hempstead?

16             MR. PERRI:  West Hempstead, Lakeview, yes,

17   your Honor.

18             THE COURT:  Hempstead, West Hempstead,

19   Lakeview?

20             MR. PERRI:  Yes, your Honor.

21             THE COURT:  Is that acceptable to the People?

22             MR. PERRI:  Your Honor, the only clarification

23   would be that the People allege that the acts continued

24   past that day through October 17th as part of the

25   endangering the welfare charge, but the complainant has

Proceedings                                    14

1    aged out of the statute of course of conduct in the

2    first.

3            THE COURT:  You are saying October what?

4            MR. PERRI:  Through October 17th of 2014.

5            THE COURT:  So if the Court describes the

6    allegations as I have, that will resolve the first two

7    counts as a description?

8            MR. PERRI:  Yes, your Honor.

9            THE COURT:  And then continue that and that

10   the defendant engaged in conduct that endangered the

11   welfare of a child up until October 17, 2014.

12           MR. PERRI:  That's acceptable, yes, your

13   Honor.

14           THE COURT:  Mr. Zerner?

15           MR. ZERNER:  Nothing about that, your Honor,

16   although something else comes to mind that we talked

17   about in chambers that we haven't yet addressed in open

18   Court.  I believe Joshua Hanson is a possible witness

19   three on the People's list.  I believe that's an expert

20   witness.  I have asked for a CV to be provided to me as

21   soon as possible.

22           THE COURT:  People.

23           MR. PERRI:  Your Honor, if the People are in

24   possession of a CV, they will provide it to counsel as

25   Rosario material, but there is no requirement that the

1    People create or ask the witness to produce one to turn

2    over to the defense.

3                THE COURT:  Do you have one?

4                MR. PERRI:  No, your Honor, I do not have one.

5                THE COURT:  Do you have any documentation

6    regarding the potential witness's training and

7    experience as an expert?

8                MR. PERRI:  Your Honor, he is a licensed

9    therapist.  He has extensive -- he's extensively worked

10   with children with sexual abuse working both for the

11   Safe Center here on Long Island, as well as in Kings

12   County, and that he has been a forensic interviewer and

13   worked with hundreds of children with regard to

14   allegations of sexual abuse.

15               THE COURT:  With no written documentation to

16   that effect?

17               MR. PERRI:  I do not have that at this time.

18   If your Honor wishes to have an offer of proof prior to

19   him being called as a witness, I will provide that to

20   the Court and to defense counsel in anticipation of

21   that.

22               THE COURT:  I think that would satisfy defense

23   counsel's concerns.

24               MR. PERRI:  Yes, your Honor.

25               THE COURT:  The jury panel is on its way.

1          They'll have to fill out their questionnaires, so

2     hopefully we'll get started by 11 o'clock.

3                    MR. PERRI:  Thank you, your Honor.

4                    THE COURT:  We'll be adjourned until that

5     time.

6                    (A recess was taken.)

7                    THE CLERK:  Continued case on trial, People

8     versus Ray Ross.  All parties are present, Judge.  The

9     prospective jurors are not in the courtroom at this

10    time.

11                   Are the People ready?

12                   MR. PERRI:  Yes, your Honor, the People are

13    ready.

14                   THE CLERK:  Defense ready?

15                   MR. ZERNER:  Defense is ready, thank you.

16                   (Whereupon, the prospective jurors entered the

17    courtroom.)

18                   THE CLERK:  People of the State of New York

19    versus Ray Ross, Indictment number 1050N of 2015.  All

20    parties are present, Judge.  Are the People ready to

21    proceed?

22                   MR. PERRI:  Yes, your Honor.

23                   THE CLERK:  Is defense ready?

24                   MR. ZERNER:  Defense is ready.

25                   (Whereupon, the prospective jury panel was

1    duly sworn by the Clerk of the Court.)

2        THE COURT:  Members of the jury panel, welcome

3    to the Supreme Court of Nassau County sitting here in

4    the County Court building.  I am Judge Terence P. Murphy

5    and I will be presiding at this trial.

6        We're about to begin the process of the

7    selection of jurors in a criminal case.  Before I

8    continue, I want to thank you for being here.  I realize

9    that it may be an inconvenience for you, but a trial by

10    jury is and has been the cornerstone of our system of

11    justice, yours and mine, for over 200 years.  Under our

12    system, members of the community sitting as a jury and

13    not some government official decide whether a person

14    accused of a crime by the government is guilty or not

15    guilty.

16        The integrity and sustainability of our system

17    of justice depends upon citizens such as you willing to

18    put aside inconvenience and offer your time, attention

19    and dedication and fulfill your civic responsibility by

20    serving as jurors.  The good news is that upon

21    completion of jury service, you will be exempt from

22    being called again for at least six years, at least

23    under the state system.

24        Now, I understand that there may be some of

25    you who have certain engagements, limitations or

1    responsibilities such as work commitments, childcare

2    issues, vacations scheduled or school commitments or a

3    medical or physical condition that would prevent you

4    from serving as a juror at this time.  Be informed that

5    there are no blanket exceptions.  Should you be released

6    from serving on this jury, you will return to central

7    jury for further instructions and possible assignment to

8    another case.

9          This trial will last approximately three

10   weeks, towards the end of February.  If you have such

11   plans or limitations that I have just explained, you

12   will now be called up to the bench in an orderly fashion

13   and I will hear you on the issue.  Please follow the

14   directions of the court officer sergeant, a former

15   active duty Marine, so he has an expertise in directing

16   you folks to be where you are at when you are supposed

17   to be there.  So please follow his instruction.

18         Now, when you step up to the podium, please

19   state your name and spell your last name for the record.

20         PROSPECTIVE JUROR:  Gabriel Mizrahi.

21         THE COURT:  Yes, sir, what's your issue?

22         PROSPECTIVE JUROR:  I'm part time stay home

23   dad, part time insurance, so I have to be home every day

24   by 1:30 to take cares of the kids.

25         THE COURT:  How old are your children?

1              PROSPECTIVE JUROR:  Twelve and 14.

2              THE COURT:  What time they get home from

3    school?

4              PROSPECTIVE JUROR:  My daughter gets home

5    1:30.  My son 3:00.

6              THE COURT:  Do you pick them up, sir?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  You will be returned to central

9    jury for reassignment or postponement of your jury

10   service until the summertime.

11             PROSPECTIVE JUROR:  My name is Nancy

12   Soderstrom.  I'm a single person and I run my own

13   business and not working for three weeks would be

14   difficult.

15             THE COURT:  What type of business are you

16   involved in?

17             PROSPECTIVE JUROR:  Hairdresser.

18             THE COURT:  And do you work in a salon?

19             PROSPECTIVE JUROR:  I work in my home.  I have

20   a little salon in my home and I'm single and I have no

21   other income.

22             THE COURT:  You have scheduled appointments

23   and if you miss those appointments you don't get paid?

24             PROSPECTIVE JUROR:  Exactly.

25             THE COURT:  You are excused, ma'am.

1           PROSPECTIVE JUROR:  Lee Ann Kerekes.  I have a

2      very young, small child at home, she's six.  I take care

3      of her when my husband is working.

4           THE COURT:  You are excused.

5           PROSPECTIVE JUROR:  Julia Coello.  My problem

6      is I don't know how to read or speak English.  I have no

7      transportation.

8           THE COURT:  How did you get here today, ma'am?

9           PROSPECTIVE JUROR:  Today I pay for taxi.

10           THE COURT:  You will be returned to central

11      jury and let them know of your transportation issues,

12      okay?

13           PROSPECTIVE JUROR:  Okay.

14           PROSPECTIVE JUROR:  Sofia Thermidor.  I have

15      work every morning from 7:30 to 3:30, but I also have

16      class every day from 3:00 to 9:00.

17           THE COURT:  You are excused, ma'am.

18           Where do you go to school?

19           PROSPECTIVE JUROR:  I'm taking classes now at

20      Nassau for grad school.

21           THE COURT:  Very good.  You are excused.

22           PROSPECTIVE JUROR:  My name is Judy Hitner.

23      Can I come up and talk to you about something

24      personally?

25           THE COURT:  Yes, ma'am.

```
1              (Whereupon, the following discussion was held

2       at the bench:

3              PROSPECTIVE JUROR:  I'm going through panic

4       attacks and the thought of having to be confined here

5       for even the day makes me very anxious and I'm afraid I

6       won't be able to focus on anything because I'm going to

7       be worrying about having an anxiety attack.

8              THE COURT:  Are you under doctor's care?

9              PROSPECTIVE JUROR:  I do take medications for

10      years and I'm already getting --

11             THE COURT:  You have seen a doctor with regard

12      to that issue?

13             PROSPECTIVE JUROR:  Uh-huh.

14             THE COURT:  You are excused, ma'am.)

15             (Whereupon, the proceedings continued in open

16      court.)

17             PROSPECTIVE JUROR:  My name is Jafil Alli.

18      I'm currently a student.

19             THE COURT:  Where?

20             PROSPECTIVE JUROR:  City College of New York.

21             THE COURT:  When are your classes?

22             PROSPECTIVE JUROR:  Tuesdays and Thursdays.

23             THE COURT:  What time?

24             PROSPECTIVE JUROR:  3:00 to 6:00.

25             THE COURT:  You are excused, sir.
```

Proceedings                                22

1          PROSPECTIVE JUROR:  Thank you, sir.

2          PROSPECTIVE JUROR:  My name is Mark Bradley.

3    Can I approach the bench?

4          THE COURT:  Yes.

5          (Whereupon, the following discussion was held

6    at the bench:

7          PROSPECTIVE JUROR:  Basically I never sat jury

8    duty before and I'm also going to be out of the country

9    next week.  I would like to see if I can postpone.

10          THE COURT:  You are going out of the country

11    for what?

12          PROSPECTIVE JUROR:  It's actually like a

13    vacation for five days.

14          THE COURT:  Is it scheduled?

15          PROSPECTIVE JUROR:  It's been scheduled.

16          THE COURT:  Do you have plane tickets?

17          PROSPECTIVE JUROR:  Honestly, I have it in my

18    phone, but I left my phone in the car.

19          THE COURT:  Where are you going?

20          PROSPECTIVE JUROR:  Canada til like the 15th.

21          THE COURT:  When are you leaving?

22          PROSPECTIVE JUROR:  I'm leaving the 10th.

23          THE COURT:  You are excused, sir, but can I

24    ask why you asked to come up?

25          PROSPECTIVE JUROR:  I just never done this

Proceedings                                            23

1       before.  I'm a little shy.

2              THE COURT:  You will go back to central jury

3       and be reassigned for another date for jury duty.)

4              (Whereupon, the proceedings continued in open

5       court.)

6              THE COURT:  Ladies and gentlemen, before we

7       continue, you're certainly welcome to come up and speak

8       to me at the bench if you need to privately, but you see

9       how much effort it takes to accomplish that, so if you

10      can speak publicly, I would ask you to.  But certainly

11      if it's a private matter that you wish to speak

12      privately, you are welcome.

13             Your name?

14             PROSPECTIVE JUROR:  Susan Rosen.

15             THE COURT:  You want to come up?

16             (Whereupon, the following discussion was held

17      at the bench:

18             PROSPECTIVE JUROR:  I'm Sabbath observant, so

19      on Fridays I would have to leave earlier.  I don't know

20      if the Court ends at 3:00, 4:00 or 5:00, but I would

21      need an hour to get home before sundown on Fridays.

22             THE COURT:  Did you hear when I talked about

23      private and public comments?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  And you wish to speak privately

1          about your religious observation?

2                    PROSPECTIVE JUROR:  I thought it was more

3          private.  I didn't want everybody to know.

4                    THE COURT:  We break at 4:30 and on some

5          Fridays we won't have the trial.  Is 4:30 sufficient

6          time for you?

7                    PROSPECTIVE JUROR:  4:30 will be a tight

8          squeeze, but I can probably do it.

9                    THE COURT:  It would be no later than 4:30.)

10                   (Whereupon, the proceedings continued in open

11         court.)

12                   PROSPECTIVE JUROR:  Patricia Lloyd.  I'm

13         having an ongoing issue with my leg that I recently had

14         a lot of tests at the doctor and MRIs for.

15                   THE COURT:  You are continuing?

16                   PROSPECTIVE JUROR:  I have an appointment with

17         a specialist on February 12th.

18                   THE COURT:  Well, February 12th is a holiday.

19         That's won of the holidays that we won't be here in

20         Court.  It's Friday, it's Lincoln's birthday and there

21         is a scheduled holiday for Friday and Monday,

22         Presidents' Day.  Does your condition prevent you from

23         being able to sit and concentrate for a number of hours

24         at a time?

25                   PROSPECTIVE JUROR:  It bothers my leg and back

Proceedings                                    25

1      to sit for a long period of time.

2                  THE COURT:  Would that impact your

3      concentration level?

4                  PROSPECTIVE JUROR:  I believe so.

5                  THE COURT:  You are seeing a doctor?

6                  PROSPECTIVE JUROR:  A specialist.

7                  THE COURT:  You are excused.

8                  PROSPECTIVE JUROR:  Yasmine Falk.  I own my

9      own consulting business and I'm obligated from my

10     contract with clients to work a minimum number of hours

11     each week with them.

12                 THE COURT:  And you are excused, ma'am.  You

13     go back to central jury for a new scheduled time for

14     jury duty.

15                 PROSPECTIVE JUROR:  Keith Arnone.  To miss

16     potentially three weeks of work is financially a big

17     problem.

18                 THE COURT:  What do you do?

19                 PROSPECTIVE JUROR:  I'm in construction, a

20     brick layer.

21                 THE COURT:  Union brick layer?

22                 PROSPECTIVE JUROR:  Yes.

23                 THE COURT:  If you are not working, you are

24     not getting paid?

25                 PROSPECTIVE JUROR:  No.  Today I'm not getting

1    paid.

2          THE COURT:  You are excused, sir.

3          PROSPECTIVE JUROR:  Charles Iovino.  I would

4    like to see you.

5          THE COURT:  Can you speak from the podium,

6    sir?  You wish to speak privately?

7          PROSPECTIVE JUROR:  Privately.

8          THE COURT:  Step up.

9          (Whereupon, the following discussion was held

10   at the bench:

11         PROSPECTIVE JUROR:  I have arthritic

12   arthritis.  I need a hip.  I've been seeing a doctor and

13   I'm in the first stages of Parkinson's also.

14         THE COURT:  So you can't sit for long periods

15   of time?

16         PROSPECTIVE JUROR:  No, that's the bad part.

17   Believe me, I wish I could.

18         THE COURT:  You are excused.)

19         (Whereupon, the proceedings continued in open

20   court.)

21         PROSPECTIVE JUROR:  Lloyd Maixner.  I work

22   nights and I don't get paid for jury duty, so.

23         THE COURT:  Where do you work?

24         PROSPECTIVE JUROR:  VSA & Tech Diagnostics.

25         THE COURT:  You are excused.

1          PROSPECTIVE JUROR:  Theresa Lustberg.  I don't

2    have an issue serving other than the fact that my

3    daughter is disabled.  She's 23, so if she gets sick, I

4    gotta bail.  She's heavily medicated.  She takes about

5    20 medications a day.  So if she texts me or her nurse

6    or my husband and says she's starting to tank, I have to

7    leave.  I have to be there with her.

8          THE COURT:  Does this happen often, this

9    situation?

10          PROSPECTIVE JUROR:  We spent last Thursday

11    night in the E.R.  It happens once a week or once every

12    two weeks.

13          THE COURT:  Okay, ma'am, you are excused.

14          PROSPECTIVE JUROR:  My name is Karen Hegemann.

15    I just had knee replacement and I'm having vascular

16    injections in my leg and it's hard for me to sit.

17          THE COURT:  That's ongoing, ma'am?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  You are excused.

20          PROSPECTIVE JUROR:  Ken Hank Christiansen.

21    I'm part time at work.  I'm trying to get full time and

22    I financially can't afford to miss work.

23          THE COURT:  You are excused.

24          PROSPECTIVE JUROR:  Christine Varasano.  I'm a

25    classroom teacher.  Being out of the classroom for an

Proceedings                                    28

1          extended period of time would be difficult.

2                    THE COURT:  What grade do you teach?

3                    PROSPECTIVE JUROR:  Fifth grade.

4                    THE COURT:  You teach in a public school or

5          private school?

6                    PROSPECTIVE JUROR:  I teach in a public

7          school.  I also have a six and eight year old that I

8          need to be home at 4:00 after school for them.

9                    THE COURT:  Where do you work, ma'am?

10                   PROSPECTIVE JUROR:  In Roslyn.

11                   THE COURT:  What time are you released from

12         school?

13                   PROSPECTIVE JUROR:  I am released from school

14         at 3:20.

15                   THE COURT:  To get home by 4:00 for your

16         children?

17                   PROSPECTIVE JUROR:  Right.

18                   THE COURT:  You are excused, ma'am.

19                   PROSPECTIVE JUROR:  My name is Elizabeth

20         Bavaris.  I have three children, 11, 12 and five and I

21         got to be there for them after school to pick them up

22         from school.

23                   THE COURT:  Are you working, ma'am?

24                   PROSPECTIVE JUROR:  Yes.

25                   THE COURT:  Where?

Proceedings                                    29

1              PROSPECTIVE JUROR:  I work for a doctor's

2     office.

3              THE COURT:  What are your hours at the

4     doctor's office?

5              PROSPECTIVE JUROR:  10:00 to 6:00.

6              THE COURT:  Do you work full time?

7              PROSPECTIVE JUROR:  I do, but on my break I

8     pick them up from school.  They get out of school at

9     3:00, so I take my break at 3:00 to pick them up.

10             THE COURT:  You are excused.

11             PROSPECTIVE JUROR:  Ronnie Britt.  I don't

12    mind serving but I have vacation beginning on the 13th

13    of February.  It's going to run for a week.

14             THE COURT:  You are excused, sir.

15             PROSPECTIVE JUROR:  My name is Rita

16    Lomoriello.

17             THE COURT:  How do you spell your last name?

18             PROSPECTIVE JUROR:  L-O-M-O-R-I-E-L-L-O.

19             PROSPECTIVE JUROR:  I feel I'm not qualified

20    to serve here because my husband was shot, so.

21             THE COURT:  Okay.

22             PROSPECTIVE JUROR:  Plus I have Lyme disease

23    and my comprehension is not that great either.

24             THE COURT:  You feel apprehensive being in the

25    courtroom based on your husband's situation?

Proceedings                                          30

1      PROSPECTIVE JUROR:  I find this very

2  difficult.

3      THE COURT:  Did you go to Court at any time

4  with regard to your husband?

5      PROSPECTIVE JUROR:  No, I did not.  I should

6  have sued the city, but I didn't.

7      THE COURT:  Just the fact that was your

8  husband shot by a police officer?

9      PROSPECTIVE JUROR:  No, he was shot by a group

10 of kids.

11     THE COURT:  This case has nothing to do with

12 shooting or guns or anything, but are you telling the

13 Court that that experience just prevents you from

14 sitting in judgment of anybody?

15     PROSPECTIVE JUROR:  Yeah.

16     THE COURT:  Any questions?

17     MR. ZERNER:  No.

18     MR. PERRI:  No, your Honor.

19     THE COURT:  Ma'am, you are excused.)

20     (Whereupon, the proceedings continued in open

21 court.)

22     PROSPECTIVE JUROR:  Eileen Friedman.  I'm

23 going to Mexico on February 20th.

24     THE COURT:  Ma'am, you are excused because I

25 don't want to delay your vacation nor interrupt the

Proceedings                                    31

1     trial.

2              PROSPECTIVE JUROR:  Thank you.

3              PROSPECTIVE JUROR:  My name is Lauren Silagy.

4     I'm enrolled in the New York City Teaching Fellows and I

5     need to schedule to take exams at the end of the month.

6              THE COURT:  Do you have obligations during the

7     month?

8              PROSPECTIVE JUROR:  No, just studying all the

9     time.

10             THE COURT:  You are excused.

11             PROSPECTIVE JUROR:  Michael Palmisano.  My

12    daughter is pregnant and she lives in Norton,

13    Massachusetts and she's due on the 23rd of February and

14    at that time she has a toddler.  I have to go there to

15    care for the toddler.

16             THE COURT:  So you are scheduled to go up and

17    care for your daughter?

18             PROSPECTIVE JUROR:  As soon as she goes into

19    labor.

20             THE COURT:  You are excused, sir.

21             PROSPECTIVE JUROR:  Vincent Abbondandolo.  I

22    am the primary caretaker of my two children, ages two

23    and three months and I work nights.  My wife works

24    during the day.

25             THE COURT:  You are excused.

Proceedings                                             32

1              PROSPECTIVE JUROR:  Nisha Joseph.  I'm a full

2      time working mother and my job don't pay me and I have

3      three kids, 12, seven and ten-year-old.

4              THE COURT:  You are excused, ma'am.

5              PROSPECTIVE JUROR:  My name is Denise

6      Wofchuck.  I don't feel comfortable in this environment.

7      There is just too many guns.  It just makes me very

8      nervous, I'm sorry.

9              THE COURT:  Is this the first time you have

10     been called for jury duty, ma'am?

11             PROSPECTIVE JUROR:  No.  I was called before,

12     but I wasn't picked.  This is the first time I ever came

13     to be questioned for a criminal case.

14             THE COURT:  So you're apprehensive with regard

15     to sitting as a juror in a criminal case?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Would you be apprehensive sitting

18     as a juror in a civil case?

19             PROSPECTIVE JUROR:  Depending on what the case

20     was, but no, this I can't do.

21             THE COURT:  A civil case is litigation between

22     private parties, okay, usually injury or contract or

23     something of that nature.  Would you be apprehensive

24     sitting on a type of case of that nature?

25             PROSPECTIVE JUROR:  No.

Proceedings                        33

1              THE COURT:  I'm going to mark your card civil

2       cases only.  You will be returned to central jury and

3       you may be reassigned to a civil case.

4              PROSPECTIVE JUROR:  Thank you.

5              PROSPECTIVE JUROR:  B-A-M-I-G-B-A-D-E.  That

6       is the last name.  First name is M-O-R-A-D-A-V-E-Y-O.

7       Can I speak to you privately?

8              THE COURT:  Step up.

9              (Whereupon, the following discussion was held

10      at the bench:

11             PROSPECTIVE JUROR:  I have a serious medical

12      problem; diabetes, I am incontinent and the way I'm

13      talking to you now, I had to squeeze not to pee.  Don't

14      matter.  I carry a packet in the car.  When it comes

15      over me, I have to pull over and pee.

16             THE COURT:  You are excused.)

17             (Whereupon, the proceedings continued in open

18      court.)

19             PROSPECTIVE JUROR:  Barbara Baumann.  I'm a

20      full-time student.

21             THE COURT:  Where at?

22             PROSPECTIVE JUROR:  Nassau.

23             THE COURT:  You are excused, ma'am.

24             PROSPECTIVE JUROR:  My name is Chang.  I don't

25      understand poor English.

1          THE COURT:  That's not one of the reasons at

2     this juncture to be excused, so I'm going to ask you to

3     have a seat again and if your name is called, we'll

4     inquire about your ability or inability to understand

5     English, okay.  So, you can have a seat.

6          PROSPECTIVE JUROR:  Robert Scnaier.  I was

7     downsized from my last place of employment.  I'm

8     currently in sales now in a job a little over six

9     months.

10          THE COURT:  You are excused.  Good luck to

11     you.

12          PROSPECTIVE JUROR:  Doreen Lafosse.  I

13     actually have a flight scheduled to go away on the 22nd

14     of February.

15          THE COURT:  Is that for a vacation?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  You are excused, ma'am.

18          PROSPECTIVE JUROR:  Mitsy Lopez Baranello.  I

19     currently have tickets purchased for vacation the week

20     of Presidents' Day.

21          THE COURT:  You are excused, ma'am.

22          PROSPECTIVE JUROR:  Silvia Polizzi.  I have

23     two young kids, six and nine.  They get out at 2:15 and

24     I don't have anybody else to watch them.

25          THE COURT:  Do you pick them up, ma'am?

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Are you working presently?

3           PROSPECTIVE JUROR:  Until 1:00.

4           PROSPECTIVE JUROR:  Angelo Deliguori.  I'm a

5     student at Nassau Community College.  The times vary

6     between Monday and Thursday.

7           THE COURT:  During the day, sir?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  You are excused.

10           PROSPECTIVE JUROR:  Marie Ziesig.  I have

11     tickets for Chicago leaving tomorrow, coming back two

12     weeks from now.

13           THE COURT:  You are excused, ma'am.

14           PROSPECTIVE JUROR:  Abreu.  Tomorrow I'm going

15     for my GED testing tomorrow.  I'm a full-time student.

16           THE COURT:  You are also a full-time student?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  You are excused.

19           PROSPECTIVE JUROR:  Daniel Anacrelico.  I'm a

20     full-time student at Suny Old Westbury.

21           THE COURT:  You are excused.

22           For those of you who remain, I presume that

23     you are able to spend the next three weeks with us here

24     in the supreme court acting as a juror at this trial.

25           Now, during the course of my remarks I will

1    explain briefly what the trial involves and I will also

2    explain to you the separate functions that the jury and

3    the judge perform in a trial of this nature.

4            The formal name of the case is the People of

5    the State of New York against Ray Ross.  The words

6    People of the State of New York, often referred to

7    simply as the People, mean the government of the State

8    of New York.  The fact that this action is brought in

9    the name of the People, that is, the government of the

10   State of New York, or that the evidence is presented by

11   a public official, an assistant district attorney, does

12   not in any way indicate that the public, the citizens of

13   this state want a specific verdict.  The People or the

14   citizens are served by whatever verdict is justified by

15   the evidence.

16           The case comes to us by way of an indictment.

17   An indictment is merely a written document filed by the

18   government that contains an accusation of criminal

19   conduct.  The defendant has answered that he is not

20   guilty of the accusations.  Neither the indictment,

21   itself nor the fact that an indictment has been filed

22   constitutes any evidence whatsoever.

23           A trial shall be conducted for you, should you

24   be selected as a members of the jury, to decide whether

25   the defendant is guilty or not guilty.

1              The defendant is charged with the crimes of

2      course of sexual conduct against a child in the first

3      degree, course of sexual conduct against a child in the

4      second degree, and endangering the welfare of a child,

5      two counts.

6              Now, essentially, the allegations are that the

7      defendant engaged in sexual -- inappropriate sexual

8      contact with a person whose date of birth is December

9      30, 2000 at different locations in West Hempstead,

10     Hempstead and/or Lakeview during the time period of

11     March 1st of 2013 through December 29, 2013 and that the

12     defendant engaged in conduct up until about October 17,

13     2014 that endangered the welfare of a child.

14             At the end of the trial I will give you

15     detailed instructions on the crimes charged and it is

16     upon those instructions that you must base your

17     decision.  I have given you this brief description of

18     the charges only for the sole purpose of allowing you to

19     consider whether there is anything about the nature of

20     the charges that would affect your ability to be fair

21     and impartial, that's all.  You are not to use this

22     description I have offered for any other purpose.  In

23     particular, you are not now, nor during the presentation

24     of evidence, to use this description to come to a

25     decision about whether or not the defendant is guilty.

1           The People are represented by the District

2      Attorney of Nassau County, Ms. Madeline Singas.   The

3      district attorney is in turn represented by Assistant

4      District Attorney Anthony Perri.

5                Mr. Perri.

6                MR. PERRI:  Good morning.

7                THE COURT:  The defendant in this case, as you

8      know, is Mr. Ray Ross.

9                Mr. Ross.

10               THE DEFENDANT:   (Indicating.)

11               THE COURT:  And the defendant is represented

12     by his counsel, Mr. Scott Zerner.

13               MR. ZERNER:  Good morning.

14               THE COURT:  The defendant, the defendant's

15     attorney and the prosecuting attorney have all been now

16     identified to you.  Is there anyone here who knows the

17     defendant, the attorneys or me?  If you do, please raise

18     your hand.

19               Seeing no hands, we'll continue.

20               Now, among the witnesses who may be called or

21     may be involved in the case are the following and my

22     mentioning these names imposes no burden on either side

23     to call that person as a witness.  I name them only to

24     see if anyone knows them that would prevent you from

25     sitting on this jury.

1           Millinia Johnson, Sarita Johnson, Joshua

2     Hanson, a representative from Sprint Wireless Services,

3     a representative from Chase Bank.  If you have

4     connection to those two entities, please let us know.

5     Detective Rhubens Toussaint, Detective Anthony Draghi,

6     Detective Brady, Monique Flores, Eleanor Hobbs, Tara

7     Johnson, Robert Jones, Rafael Mickens, Sherman Roberts,

8     Kelly Ross, Jasmine Ross, Justyn Ross, Lorigan Ross,

9     Paula Ross.

10          Does anyone know these people that I have

11    mentioned?

12          We'll continue.

13          Does anyone know anything about this case as I

14    have described it?

15          Has anyone read or seen anything in the news

16    or heard about it discussed by anyone?

17          We'll move on.

18          Now, a jury is composed of 12 people, as you

19    may know.  In addition to the 12 jurors, we will also

20    select alternate jurors.  The first person called who is

21    sworn as a juror will serve as the jury's foreperson.

22    During this part of the trial, a decision will be made

23    as to who will sit as jurors in this case.  We are

24    looking to select a jury that is impartial and qualified

25    to hear and determine the facts of the case.  This stage

1    of the trial is known as voir dire.

2              The two words voir dire are a combination of

3    Latin and French words which come to us from ancient

4    common law from where we derived our present day laws.

5    The term simply means to speak the truth.

6              During my questioning and that of counsel, I

7    simply ask of you to speak the truth.  My questions and

8    those of counsel allow the attorneys the opportunity to

9    get to know a little bit about you in order to help them

10   come to a conclusion about whether to select you as a

11   juror in this particular case.  The purpose of the

12   questions is to permit the Court and the attorneys to

13   select a jury free of predisposition, prejudice or bias.

14   There are no right or wrong answers to the questions.

15   We're simply looking for honest answers.

16             None of the questions are intended to pry into

17   your personal life or embarrass you in any way.  If you

18   are asked a question that you are uncomfortable

19   answering publicly, simply ask to speak about it at the

20   bench as you have seen.

21             Don't be concerned if you are excused from

22   service in this particular case.  Excusal [sic] from a

23   case is in no way and does in no way reflect upon a

24   prospective juror's character or ability.  In fact, you

25   may get selected on another case after returning to

Proceedings                    41

1        central jury.  The questioning allows our process or

2        system of justice to work to its most effective manner.

3                Procedurally here's what happens:  Each

4        prospective juror's name will be drawn from a selection

5        drum.  That juror will then be seated in the jury box

6        and asked questions by the Court and the attorneys.  The

7        purpose of the questions, as I have indicated, is to

8        select a jury free of predisposition, prejudice and

9        bias.  You must answer all the questions as candidly and

10       completely as you are able.

11               Can anyone not abide by my instruction on that

12       point?  You have promised to do so by your oath.

13               Now let's discuss your role if you are

14       selected as a juror.  The jury's responsibility is to

15       evaluate fairly the testimony and other evidence

16       presented at the trial in order to determine the facts

17       of the case, then to apply the law to those facts and to

18       decide whether the People have proven beyond a

19       reasonable doubt that a crime has taken place and that

20       the defendant is the person who committed the crime.  In

21       making it's decision, the jury must not consider or

22       speculate about matters relating to sentence or

23       punishment.  If there is a verdict of guilty, it will be

24       my responsibility to impose an appropriate sentence.

25               Is there anyone that cannot abide by that

1        instruction to not consider or speculate about

2        sentencing or punishment?

3                We'll move on.

4                In reaching its verdict, guilty or not guilty,

5        the jury must be fair.  So, what makes a person a fair

6        juror?  A fair juror is a person who will base his or

7        her decision solely on the testimony and other evidence

8        presented at this trial and will not make a final

9        decision on the verdict until the end of the case.  A

10       fair juror is a person who will accept and apply the law

11       of New York as I will explain it.  And finally, a fair

12       juror is a person who, without fear, favor, bias,

13       prejudice or sympathy for either the People or the

14       defendant or any witness, be the witness a police

15       officer or civilian, that renders a verdict consistent

16       with that juror's honest evaluation of the testimony and

17       other evidence and that juror's honest application of

18       the law.

19               My role at the trial, the role of any judge,

20       is to help assure a fair and orderly trial in accordance

21       with our law, to preside over the trial, decide

22       questions of law that arise between the parties and then

23       explain to you, the jury, as I am now, what the law is

24       that you must accept and agree to follow.

25               We're both judges in this case.  You, the

1      jury, judge the facts of the case in order to reach a

2      verdict of guilty or not guilty, and I judge the law.

3      Meaning, I decide questions of law and instruct you, the

4      jury, on the law.

5              Nothing I say or how I say it and no ruling I

6      make on the law is intended to be, nor should it be

7      considered by you as an expression of an opinion on the

8      facts of the case or of whether the defendant is guilty

9      or not guilty.

10             At this point I must instruct you on a few

11     basic principles of law which you must accept and agree

12     to follow.

13             First, every person accused of a crime is

14     presumed innocent.  That is, he or she stands innocent

15     in the eyes of the law.  The People must rebut this

16     presumption, if they can, by the presentation of

17     evidence which convinces you beyond a reasonable doubt

18     of the defendant's guilt.

19             In a criminal case, the burden of proof is on

20     the People and remains on the People throughout the

21     entire trial.  The defendant is not required to prove or

22     disprove anything.  Is there anyone who, despite this

23     instruction, cannot afford the defendant this

24     presumption of innocence?

25             PROSPECTIVE JURORS:  (Indicating.)

1            THE COURT:  Can I have your name, ma'am?

2            PROSPECTIVE JUROR:  Dawn Trentadue.

3            THE COURT:  Thank you, ma'am.  You can have a

4       seat.

5            Sir, your name?

6            PROSPECTIVE JUROR:  Kevin White, W-H-I-T-E.

7            THE COURT:  And the third person?

8            PROSPECTIVE JUROR:  Nancy Leya.

9            THE COURT:  Thank you all.  We'll discuss it

10      further with you should your name be called.

11           Now, I'll explain to you at the close of the

12      case exactly what reasonable doubt means, but for now

13      let me say this, a reasonable doubt is not a mere

14      possibility or whim or doubt borne of a guess or a

15      fancy, but it's a doubt that you have after you have

16      gone over all the evidence, the absence of certain facts

17      or the presence of certain facts, that leaves in your

18      mind such uncertainty that you are not fully convinced

19      of the defendant's guilt.  Simply, a reasonable person,

20      uncertain of guilt.

21           Would you be -- you would be required to

22      acquit the defendant, that is, to return a verdict of

23      not guilty if at the end of the case you have a

24      reasonable doubt of guilt because of the evidence or the

25      lack of evidence presented to you.  Is there anyone who,

1    despite this instruction, cannot accept this principle

2    of the People's burden to prove the case beyond a

3    reasonable doubt?

4            On the other hand, the People are not

5    obligated to prove guilt beyond all doubt because

6    nothing in life is absolutely certain.  Is there anyone

7    here, despite this instruction, would require absolute

8    certainty of guilt before you would convict the

9    defendant?

10            PROSPECTIVE JUROR:  I don't understand what

11    they're talking about.

12            THE COURT:  Thank you, ma'am.

13            Can you assure the Court that if you find

14    guilt beyond a reasonable doubt you will return a

15    verdict of guilty?  And if you do not find guilt beyond

16    a reasonable doubt that you will return a verdict of not

17    guilty?

18            Under our system of law, as I have indicated,

19    the defendant has no burden.  The defendant is not

20    obligated to take the witness stand or call any

21    witnesses or explain his or her actions in any way.  You

22    must not draw any inference unfavorable to the defendant

23    if he chooses not to testify.

24            Is there anyone here that, despite this

25    instruction, will or might allow the fact that the

1    defendant has not testified to influence you in your

2    deliberations?

3            You recall that I instructed you may not

4    consider punishment, sympathy or prejudice for one side

5    or the other in your deliberations, determinations or

6    verdict.

7            Is there anyone who feels you cannot eliminate

8    punishment, sympathy or prejudice in performing your

9    duties and responsibilities as a juror?

10           It's not essential that you agree with or like

11   every one of these principles of law.  Under my oath I

12   must instruct you as to the law as I understand it to be

13   and, under your oath as jurors, you must accept the law

14   as I explain it to you, whether you agree with it or

15   not, and apply it to the facts as you find them.

16           Is there anyone here who cannot accept this

17   principle that you must follow the law as I explain it

18   to you?

19           When you judge the facts, you are to consider

20   only the testimony of witnesses, exhibits received in

21   evidence, any stipulations by the parties or other

22   evidence presented in this courtroom.

23           A stipulation is information the parties agree

24   to present to the jury as evidence without having to

25   call a witness to testify.

Proceedings                    47

1          Testimonial evidence is the answers witnesses

2    give to questions asked by the lawyers and perhaps the

3    Court.

4          Other evidence may include physical objects

5    such as documents, photographs, video, clothing or

6    charts.

7          Some factors you may wish to consider in

8    evaluating the testimony of the witnesses are did the

9    witness have an opportunity to see or hear the events

10   about which he or she testified?

11         Did the witness have the ability to recall

12   those events accurately?

13         Was the testimony of the witness plausible and

14   likely to be true or was it implausible and not likely

15   to be true?

16         Was the testimony of the witness consistent or

17   inconsistent with other testimony or evidence in the

18   case?

19         Did the manner in which the witness testified

20   reflect upon the truthfulness of that witness's

21   testimony?

22         To what extent, if any, did the witness's

23   background, training, education or experience affect the

24   believability of that witness's testimony?

25         Did the witness have a bias, hostility or some

1        other attitude that affected the truthfulness of the

2        witness's testimony?

3                  You may also consider whether a witness had or

4        did not have a motive to lie.  If a witness had a motive

5        to lie, you may consider whether, and to what extent, if

6        any, that motive affected the truthfulness of that

7        witness's testimony.

8                  As judges of the facts, you alone determine

9        the truthfulness and accuracy of the testimony of each

10       witness.  You must decide whether a witness told the

11       truth and was accurate or, instead, testified falsely or

12       was simply mistaken.  You must also decide what

13       importance to give the testimony you accept as truthful

14       and accurate.  It's the quality of the testimony that is

15       controlling, not the number of witnesses who testify.

16                 I'll instruct you further on this subject at

17       the end of the trial.

18                 Now, you have heard the names of some police

19       officers.  In this case you will hear the testimony of

20       police officers.  That testimony of a witness should not

21       be believed solely and simply because the witness is a

22       police officer.  At the same time, a witness's testimony

23       should not be disbelieved solely and simply because the

24       witness is a police officer.  You must evaluate a police

25       officer's testimony in the same way you would evaluate

1       the testimony of any other witness.

2               The trial will continue each morning beginning

3       at approximately 9:30 and going until approximately

4       12:30.  Lunch will be from 12:30 until 2:00.  Afternoon

5       sessions will be from 2:00 p.m. until about 4:30 p.m.

6               Those of you who are not called right away

7       should also pay attention and listen to the questions

8       the attorneys ask.  It's likely that when you are

9       called, the same questions will be posed to you.

10              With regard to the schedule, as I indicated,

11      it will take about three weeks.  I've also indicated to

12      you that February 12th is a holiday.  There will be no

13      Court session.  February 15th, the Monday, again, there

14      will be no Court session.  February 16th there will be

15      no Court session because of a conflict with

16      availabilities.  And February 24th there will be no

17      Court session.  Other than that, you will be here Monday

18      through Friday for testimony.

19              As a final note before I start my questioning

20      and the selection process of the first 14 individuals, I

21      want to again thank you for your participation in the

22      jury selection process.  It's an important civic

23      responsibility and you will have fulfilled it whether

24      you serve on this jury, another jury or no jury at all.

25              Now, because it's just about 12:30, we won't

Proceedings                                                    50

1      start the calling of potential jurors to be seated.  I

2      want to instruct you, as the trial has begun, if you

3      will, I don't want you to talk about the case.  You

4      don't know much about it.  You know a little bit about

5      it as I described, but don't talk about it to anyone you

6      know, any of your fellow potential jurors.  Just forget

7      about it over lunch hour, enjoy your lunch and then come

8      back here to be ready to start again at 2:00 p.m.

9                  Later on I'll have to give you formal

10     admonitions, but for now I just want you to forget about

11     the case.  Please follow the directions of the court

12     officer sergeant and I'll see you at 2:00 p.m.

13                  (Whereupon, the prospective jurors exited the

14     courtroom.)

15                  THE COURT:  Anything for the record before we

16     break?

17                  MR. PERRI:  No, your Honor.

18                  THE COURT:  Mr. Zerner?

19                  MR. ZERNER:  Nothing, your Honor.

20                  THE COURT:  See you all back here at 2:00 p.m.

21     sharp.

22                  (A luncheon recess was taken.)

23                  AFTERNOON SESSION

24                  THE CLERK:  Continued case on trial, People

25     versus Ross.  All parties are present.  The prospective

Kathi A. Fedden, Sr. Court Reporter

1       jurors are not.

2               People ready?

3               MR. PERRI:  Yes, your Honor.

4               THE CLERK:  Defense ready?

5               MR. ZERNER:  Yes.

6               THE COURT:  Good afternoon all.

7               Anything for the record before we call in the

8       prospective jury panel?

9               MR. PERRI:  No, your Honor.

10              MR. ZERNER:  No, your Honor, thank you.

11              THE COURT:  Gentlemen, seats are one through

12      seven, eight through 14, okay (indicating).

13              MR. ZERNER:  We plan on having two alternates?

14              THE COURT:  Two.

15              (Whereupon, the prospective jurors entered the

16      courtroom.)

17              THE CLERK:  Let the record reflect the

18      presence of the prospective jurors.

19              Again, are the People ready?

20              MR. PERRI:  Yes, your Honor.

21              THE CLERK:  Defense ready?

22              MR. ZERNER:  Yes.

23              THE COURT:  Good afternoon, ladies and

24      gentlemen.  We'll now start the selection of names.  If

25      you hear your name called, please follow the direction

1          of the court officers.

2                    THE CLERK:   The following prospective jurors

3          please step up:   Michael Pioli, P-I-O-L-I.

4                    Seat number two, Stephanie Olive, O-L-I-V-A.

5                    Seat number three, Enock Edouard,

6          E-D-O-U-A-R-D.

7                    Seat number four, Jillian Friscia,

8          F-R-I-S-C-I-A.

9                    Seat five, Geanartta Prysock, P-R-Y-S-O-C-K.

10                   Seat six, Christopher Valant, V-A-L-A-N-T.

11                   Seat seven, Anthony Bracco, B-R-A-C-C-O.

12                   Seat number eight, Rania Frydman,

13         F-R-Y-D-M-A-N.

14                   Seat number nine, Peter Trimarchi,

15         T-R-I-M-A-R-C-H-I.

16                   Seat number ten Valerie Vietri, V-I-E-T-R-I.

17                   Seat 11, Donald Metzler, M-E-T-Z-L-E-R.

18                   Seat 12 Rita Vella, V-E-L-L-A.

19                   Seat 13, Valsa, V-A-L-S-A, Mammen,

20         M-A-M-M-E-N.

21                   Seat 14, Gerard Trotta, T-R-O-T-T-A.

22                   THE COURT:   Ladies and gentlemen in the

23         audience, I just would like to remind you to please pay

24         attention to the colloquy between the Court and the

25         potential jurors and, of course, the attorneys and the

1    potential jurors.  Many of the questions that are asked

2    of these jurors will be asked of you as well, okay.

3             Mr. Pioli, good afternoon, sir.

4             PROSPECTIVE JUROR:  Good afternoon.

5             THE COURT:  You indicated on your

6    questionnaire that you served on a criminal trial before

7    as a juror?

8             PROSPECTIVE JUROR:  Yes, sir.

9             THE COURT:  But it didn't reach a verdict?

10            PROSPECTIVE JUROR:  Yes, sir.

11            THE COURT:  So you didn't have the opportunity

12   to deliberate with your fellow jurors?

13            PROSPECTIVE JUROR:  No, sir.

14            THE COURT:  You understand that each case and

15   each trial are separate and distinct from another.

16   Issues are different, laws are different and

17   instructions are different.  So, notwithstanding you

18   have had that experience as a trial juror before, can

19   you follow my instructions on the law as I give it?

20            PROSPECTIVE JUROR:  Yes, I can, sir.

21            THE COURT:  Very good.

22            Can you tell me what the professional

23   organization N.Y.P.D.L.B.A. is?

24            PROSPECTIVE JUROR:  It's the union I'm

25   involved with now that I'm retired from the N.Y.P.D.,

1    sir.

2            THE COURT:  What is L.B.A.?

3            PROSPECTIVE JUROR:  Lieutenants Benevolent

4    Association.

5            THE COURT:  Having retired from the police

6    department, you now serve in a private capacity as an

7    investigator?

8            PROSPECTIVE JUROR:  Yes, sir.

9            THE COURT:  You know that there are going to

10   be police officer witnesses here in this case.  Does

11   your experience as a police officer impact your ability

12   to be fair and impartial as a juror in this case?

13           PROSPECTIVE JUROR:  No, it will not impact

14   that.  I can be fair and impartial.

15           THE COURT:  And the mere fact that a witness

16   is a police officer, does that have any bearing on how

17   you evaluate the credibility of that witness?

18           PROSPECTIVE JUROR:  No, sir.

19           THE COURT:  You will evaluate a police officer

20   witness in the same manner and way as you would any

21   other witness, civilian or otherwise?

22           PROSPECTIVE JUROR:  Yes, sir.

23           THE COURT:  Very good.

24           And with regard testimony in Court, is that

25   you as a police officer?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Ms. Oliva, good afternoon.  Who do

3    you know that works in a law office?

4          PROSPECTIVE JUROR:  My mom's friend is a

5    lawyer.

6          THE COURT:  Anything about that relationship

7    that would prevent you from being fair and impartial?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  You work at a hospital?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  You are still in a program?

12          PROSPECTIVE JUROR:  No, that's over.

13          THE COURT:  You completed that?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  No trial jury experience?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  No one that you know has been the

18    victim or convicted of a crime?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Okay.  Anything about your life

21    experience that would prevent you from being fair and

22    impartial?

23          PROSPECTIVE JUROR:  I am just not good at

24    making decisions and I don't think this would be good

25    for me, to be honest.

1           THE COURT:  Well, you make decisions every

2    day, don't you?  In your job you have responsibilities,

3    don't you?

4           PROSPECTIVE JUROR:  I do.

5           THE COURT:  And working as a medical assistant

6    there are important decisions that have to be made,

7    aren't there?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  And you make those decisions,

10   don't you?

11          PROSPECTIVE JUROR:  I'm not the final

12   decision, no.

13          THE COURT:  Right, but you do make decisions.

14   You make choices, right?  You make choices even in your

15   own personal life.

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And you evaluate things, right,

18   before making a decision, whether it be buying a car or

19   some other purchase, you take into consideration many

20   different aspects of the purchase?

21          PROSPECTIVE JUROR:  I did, but nothing ever

22   like this.

23          THE COURT:  Well, in many instances a juror is

24   a first time juror who has never ever experienced being

25   a juror before and it is a difficult and high

1    responsibility.  I won't make light of that.  So

2    everyone comes into the process, I think, with some

3    apprehension and some uncomfortableness, but in the

4    final process they are able to listen to the evidence as

5    presented, make evaluations as you might do in your

6    everyday life and then make a decision.  Do you think

7    you can do that?

8                   PROSPECTIVE JUROR:  I don't know.

9                   THE COURT:  Is it because it's a criminal case

10   or the nature of the allegations or just in your own

11   personality?

12                  PROSPECTIVE JUROR:  My own personality.  I

13   don't want to make the wrong decision.

14                  THE COURT:  Would you be afraid to make a

15   decision?

16                  PROSPECTIVE JUROR:  A little bit.

17                  THE COURT:  And in that sense, do you think

18   you would have -- is there a threat that you might not

19   make a decision, but you would rely on others to make

20   your decision and then follow along?

21                  PROSPECTIVE JUROR:  I don't know honestly,

22   that's why.  I'm nervous too.

23                  THE COURT:  All right, thank you.

24                  Mr. Edouard, how are you, sir?

25                  PROSPECTIVE JUROR:  Good.

```
1                    THE COURT:  Are you retired, sir?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Where did you retire from, if I

4       might ask?

5                    PROSPECTIVE JUROR:  The Department of

6       Education.

7                    THE COURT:  So you were a teacher?

8                    PROSPECTIVE JUROR:  No, I was -- I do central

9       office.

10                   THE COURT:  Administrative.

11                   PROSPECTIVE JUROR:  Administration.

12                   THE COURT:  So you didn't deal with students?

13                   PROSPECTIVE JUROR:  No.  Well, I don't deal --

14      the department deal with students, but to deal

15      personally with students, no.

16                   THE COURT:  And you are involved in your

17      church?

18                   PROSPECTIVE JUROR:  Yes.

19                   THE COURT:  And anything about that

20      involvement that would prevent you from being able to

21      render a fair and impartial verdict in this case?

22                   PROSPECTIVE JUROR:  No.

23                   THE COURT:  Anything about your life

24      experience that would prevent you from being a fair

25      juror?
```

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Thank you.

3              Ms. Friscia, anything about the case that

4    would prevent you from being fair and impartial?

5              PROSPECTIVE JUROR:  I don't think so.

6              THE COURT:  You have three children, right?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  And in this case it involves

9    allegations against a child or allegations of conduct

10   towards a child.  Anything about that that would prevent

11   you from being fair and impartial?

12             PROSPECTIVE JUROR:  I don't think so.

13             THE COURT:  When you say you don't think so,

14   what do you mean?

15             PROSPECTIVE JUROR:  I mean, of course, the

16   first thing I think of when I hear cases like this of my

17   own daughters, but I'll try my best to be fair.

18             THE COURT:  When you say you'll try your best,

19   I need a commitment.  And that's a natural sense when

20   you hear something like that.  No one will challenge

21   that.  It's a question of whether you can put that --

22   knowing it doesn't involve your children, but knowing

23   that there is a process and a rule of law and that the

24   People have a burden of proving their case and if they

25   don't, then you must acquit the defendant.  If they do,

1      then you must find the defendant guilty.  Can you do

2      that?  Can you promise me you can do that?

3                  PROSPECTIVE JUROR:  Yes.

4                  THE COURT:  Who do you know in law

5      enforcement?

6                  PROSPECTIVE JUROR:  My brother-in-law.

7                  THE COURT:  As a police officer?

8                  PROSPECTIVE JUROR:  Yeah, N.Y.P.D.

9                  THE COURT:  Does he talk to you about his job?

10                  PROSPECTIVE JUROR:  No.  He's retired now.

11                  THE COURT:  Ms. Prysock, you were on a jury in

12      Brooklyn a number of years ago, a criminal trial.

13                  PROSPECTIVE JUROR:  Yes.

14                  THE COURT:  And it did reach a verdict.

15                  PROSPECTIVE JUROR:  Yes.

16                  THE COURT:  You went through the whole

17      process, the back and forth in the deliberation room

18      with your fellow jurors, right?

19                  PROSPECTIVE JUROR:  Yes.

20                  THE COURT:  Understanding that you have to

21      make your own decision with regard to the facts, but

22      also understanding that you have to have that

23      conversation with your fellow jurors before you make

24      that independent decision and then whether or not there

25      is a unanimous decision resulting in a verdict are you

1           all right with that?

2                     PROSPECTIVE JUROR:  Yes.

3                     THE COURT:  And you heard me speak with one of

4           your fellow prospective jurors indicating that that was

5           a different case and you have to follow my rules on the

6           law, right?

7                     PROSPECTIVE JUROR:  Yes.

8                     THE COURT:  They're not my rules, I'll just

9           recite them to you.

10                    Anything about your life experience that would

11          prevent you from being fair and impartial?

12                    PROSPECTIVE JUROR:  No.

13                    THE COURT:  Mr. Valant, good afternoon.

14                    PROSPECTIVE JUROR:  Good afternoon.

15                    THE COURT:  You were on a civil trial?

16                    PROSPECTIVE JUROR:  Yes.

17                    THE COURT:  And that didn't go to verdict, it

18          was settled?

19                    PROSPECTIVE JUROR:  Yes.

20                    THE COURT:  You know civil cases are

21          completely different from criminal cases.  You

22          understand that?

23                    PROSPECTIVE JUROR:  Yes, sir.

24                    THE COURT:  You will be able to follow my

25          instructions on the law?

Voir Dire                          62

1              PROSPECTIVE JUROR:  Absolutely.

2              THE COURT:  Anything about your life

3     experience that would prevent you from being fair and

4     impartial?

5              PROSPECTIVE JUROR:  No, sir.

6              THE COURT:  You indicated you know someone

7     that might have been the victim of a crime.

8              PROSPECTIVE JUROR:  My father was held up 30

9     years ago.

10             THE COURT:  Were the police involved?

11             PROSPECTIVE JUROR:  It was in California at

12    the time.

13             THE COURT:  So you don't know much about it.

14             PROSPECTIVE JUROR:  Not that much.

15             THE COURT:  Nothing about it would impact your

16    decision-making process?

17             PROSPECTIVE JUROR:  No, sir.

18             THE COURT:  Who do you know in law

19    enforcement?

20             PROSPECTIVE JUROR:  Security at the television

21    station.  Retired police officers are our security now

22    in the city.

23             THE COURT:  Anything about that relationship

24    that would prevent you from being able to be a fair and

25    impartial juror?

1              PROSPECTIVE JUROR:  No, sir.

2              THE COURT:  In your job are you on TV?

3              PROSPECTIVE JUROR:  I'm the floor manager.

4              THE COURT:  For a program that's being

5       televised?

6              PROSPECTIVE JUROR:  Channel 5 news every

7       night.

8              THE COURT:  So you hear the news, I guess,

9       every night?

10             PROSPECTIVE JUROR:  Yes, sir.

11             THE COURT:  Anything about that, I guess,

12      closeness to the news that would prevent you from being

13      fair and impartial?

14             PROSPECTIVE JUROR:  No, sir.

15             THE COURT:  Mr. Bracco, you have indicated

16      that you know someone that might have been the victim of

17      a crime.

18             PROSPECTIVE JUROR:  My ex-wife.

19             THE COURT:  Can you talk about that?

20             PROSPECTIVE JUROR:  Yeah.  It didn't go too

21      far, but she was mugged.

22             THE COURT:  Were the police called, do you

23      know?

24             PROSPECTIVE JUROR:  The police were called,

25      yes.

1           THE COURT:  Were you married at the time?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Are you satisfied with the way the

4     police handled the matter for you?

5           PROSPECTIVE JUROR:  Yes, sir.

6           THE COURT:  Was anyone apprehended?

7           PROSPECTIVE JUROR:  No, unfortunately.

8           THE COURT:  Nothing about that experience with

9     your wife that would prevent you from being fair and

10    impartial, is there?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Are you retired now?

13          PROSPECTIVE JUROR:  No, I'm on disability

14    right now.

15          THE COURT:  Could I ask what you did before

16    you were disabled?

17          PROSPECTIVE JUROR:  With a union.

18    Electrician, Local 3.

19          THE COURT:  Ms. Frydman, F-R-Y, that's an

20    interesting pronunciation.

21          PROSPECTIVE JUROR:  Yeah, it is.

22          THE COURT:  Anything about the case or your

23    life experience that would prevent you from being fair

24    and impartial?

25          PROSPECTIVE JUROR:  Not at all, sir.

1              THE COURT:  First time you have been called

2        for jury duty?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Mr. Trimarchi, who do you know in

5        law enforcement, sir?

6              PROSPECTIVE JUROR:  Three cousins are in law

7        enforcement, N.Y.P.D.

8              THE COURT:  Anything about the relationship

9        with your cousins that would prevent you from serving as

10       a fair and impartial juror?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Do they talk to you about their

13       cases?

14             PROSPECTIVE JUROR:  They have spoken about

15       cases.

16             THE COURT:  Are they patrol officer?

17             PROSPECTIVE JUROR:  Yes, they are.

18             THE COURT:  And they give you general

19       information about what happened?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  You could put all of that out of

22       your mind and listen to the witnesses here at this trial

23       and make your independent decisions with regard to the

24       truthfulness and accuracy of those -- of that testimony?

25             PROSPECTIVE JUROR:  Yes, sir.

1          THE COURT:  And how much weight you would give

2     to the information or evidence provided?

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  And you were involved in

5     information technology in your business.

6          PROSPECTIVE JUROR:  That's correct.

7          THE COURT:  You have young children, sir, I

8     see.

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Anything about being a dad to

11    young children that would impact you adversely from

12    being a fair and impartial juror?

13         PROSPECTIVE JUROR:  It does cast a little

14    doubt and a little skepticism, but I think I will try to

15    do the best.

16         THE COURT:  Well, we're starting from a

17    position where Mr. Ross is presumed innocent.

18         PROSPECTIVE JUROR:  Right, of course.

19         THE COURT:  And because there is no evidence

20    presented by the district attorney and it's their burden

21    to present, so, your verdict at this point, if I asked

22    you to render a verdict, would be what?

23         PROSPECTIVE JUROR:  Well, I haven't heard

24    anything, so I don't know, but being skeptical of it and

25    hearing, I probably would not be favorable.

1        THE COURT:  Well, this is what I'm trying to

2    elicit, the People have a burden to prove the case

3    beyond a reasonable doubt.

4        PROSPECTIVE JUROR:  Understood.

5        THE COURT:  At this juncture, you have heard

6    nothing.  Nothing has been presented, so your verdict

7    would be what?  It would have to be what?

8        PROSPECTIVE JUROR:  No verdict.

9        THE COURT:  It would be not guilty.

10        PROSPECTIVE JUROR:  Right.

11        THE COURT:  Because the People convenient

12    proved their case.  They haven't presented any evidence.

13    So -- and that's because the defendant is presumed

14    innocent and the People have to rebut the presumption by

15    offering evidence.  So when you say you are skeptical,

16    are you skeptical of the presumption of innocence?

17        PROSPECTIVE JUROR:  Yes.  I mean, there will

18    be some doubt in the back of my mind.  Maybe I'm not

19    saying it correctly, but I will try, obviously, my best

20    to put it aside.

21        THE COURT:  Okay.  So are you saying because

22    the defendant is here on trial, you have a sense that

23    he's guilty?

24        PROSPECTIVE JUROR:  As my doubt, I would say

25    yes.

1           THE COURT:  Okay.  Would you be able to follow

2      my instruction on the law that the defendant is presumed

3      innocent?

4           PROSPECTIVE JUROR:  Absolutely, yes.

5           THE COURT:  And that the People have the

6      burden of proving the defendant guilty beyond a

7      reasonable doubt?

8           PROSPECTIVE JUROR:  Absolutely, yes.

9           THE COURT:  So that skepticism or doubt that

10     you have mentioned, you can put that aside?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  And you will follow my

13     instructions?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And right now the defendant is

16     presumed innocent?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Would be found not guilty if I

19     asked you to render a verdict right now because the

20     People have not offered any evidence whatsoever.

21          PROSPECTIVE JUROR:  Right.  There is no

22     evidence, so I wouldn't be able to render anything, so

23     yes.

24          THE COURT:  All right.

25          Ms. Vietri, hi.  Who do you know in a law

1          office?

2                   PROSPECTIVE JUROR:  I used to work for a law

3          office like 31 years ago.

4                   THE COURT:  So nothing about that that would

5          prevent you from being a juror?

6                   PROSPECTIVE JUROR:  It was insurance.

7                   THE COURT:  Anything about your life

8          experience or the nature of the allegations prevent you

9          from being able to be a juror?

10                  PROSPECTIVE JUROR:  No, sir.

11                  THE COURT:  Mr. Metzler, hi.

12                  PROSPECTIVE JUROR:  Hi.

13                  THE COURT:  Your wife works in some capacity

14         for the Nassau County Police Department I see.

15                  PROSPECTIVE JUROR:  Yes.

16                  THE COURT:  And you know, you have heard there

17         will be Nassau County police officers testifying.

18         Anything about your wife's relationship and professional

19         duties with the police department that would prevent you

20         from being fair and impartial?

21                  PROSPECTIVE JUROR:  No.

22                  THE COURT:  Do you have any predisposition

23         towards the credibility of a police officer simply

24         because he's a witness and a police officer?

25                  PROSPECTIVE JUROR:  No, sir.

1          THE COURT:  You would start from scratch or

2     zero with that witness?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  And evaluate the testimony as you

5     would any witness?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  You have indicated that someone

8     you know testified in Court.

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Who is that?

11          PROSPECTIVE JUROR:  My mother-in-law.

12          THE COURT:  In a civil case?

13          PROSPECTIVE JUROR:  Yeah, I believe so.  I

14     don't know exactly.  We didn't talk about it or anything

15     like that.

16          THE COURT:  You just knew she had to go to

17     Court one day?

18          PROSPECTIVE JUROR:  Yeah.

19          THE COURT:  Who do you know in a law office?

20          PROSPECTIVE JUROR:  Being with the fire

21     department I have a lot of friends that are in the fire

22     department that are New York City cops.

23          THE COURT:  And when you say in the fire

24     department, you are talking about FDNY?

25          PROSPECTIVE JUROR:  Volunteer, sir.

Voir Dire

1              THE COURT:  Okay.

2              Ms. Vella, good afternoon.  Who do you know in

3      a law office?

4              PROSPECTIVE JUROR:  A cousin.

5              THE COURT:  Do you know what kind of law?

6              PROSPECTIVE JUROR:  She works in medical

7      malpractice.

8              THE COURT:  So that has nothing to do with the

9      matters at trial here.

10             Anything about your life experience that would

11     prevent you from being fair and impartial?

12             PROSPECTIVE JUROR:  I'm a teacher, so I work

13     with children.  I have been working with children for 12

14     years, so I am a little bit biased and I have had

15     students that have suffered from sexual abuse.

16             THE COURT:  And what grades do you teach as a

17     music teacher?

18             PROSPECTIVE JUROR:  I teach high school

19     grades, nine through 12.

20             THE COURT:  And when you say that you're close

21     to the students that you teach, does that bring a bias

22     with you to this case here?

23             PROSPECTIVE JUROR:  Honestly, yes, because of

24     my experiences, but, of course, I would do my best to

25     not hold a bias, but I'm being honest with you in

1    telling you my experience with those students.

2           THE COURT:  So if a young person testified

3    here at trial, you would evaluate the credibility of

4    that individual in a different light than you would any

5    other person that came up and testified?

6           PROSPECTIVE JUROR:  I don't feel so, no,

7    because there would also have to be evidence to support.

8           THE COURT:  So understanding that you have a

9    close relationship with young children, a professional

10    relationship with young children, does that impact your

11    ability to be fair and impartial to listen to the

12    evidence, to evaluate it fairly and impartially, to make

13    a decision as to the truthfulness and accuracy of that

14    testimony and then apply the law to the facts as you

15    determine them?

16           PROSPECTIVE JUROR:  No, it would not affect.

17           THE COURT:  Okay, thank you.

18           Ms. Mammen, hi.

19           PROSPECTIVE JUROR:  Hi.

20           THE COURT:  You served on a jury, I guess, a

21    while ago.

22           PROSPECTIVE JUROR:  Civil.

23           THE COURT:  So you know it's completely

24    different from this case.  You indicated that you know

25    someone that might have been the victim of a crime.

1              PROSPECTIVE JUROR:  I personally was.

2              THE COURT:  Can you talk about that?

3              PROSPECTIVE JUROR:  Me and my husband were

4    mugged at gunpoint, robbed.

5              THE COURT:  This trial doesn't have anything

6    to do with any type of weaponry or any robbery or

7    anything.  So that incident, and I'm sorry that you had

8    to go through that, has no bearing on any of the issues

9    here.

10             Were the police called?

11             PROSPECTIVE JUROR:  Yes, once we got home, we

12   called the cops.

13             THE COURT:  Did it happen in Nassau County?

14             PROSPECTIVE JUROR:  No, Brooklyn.

15             THE COURT:  Are you satisfied with the way the

16   police took care of it?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  And you have indicated that

19   someone you know might have been the witness to a crime?

20             PROSPECTIVE JUROR:  Well, I personally saw.

21             THE COURT:  That same incident?

22             PROSPECTIVE JUROR:  No, another incident when

23   they were robbing the wheels from a car during a

24   snowstorm.

25             THE COURT:  Did you get involved in any way?

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Mr. Trotta, good afternoon.

3              PROSPECTIVE JUROR:  Good afternoon, your

4      Honor.

5              THE COURT:  Who do you know in law

6      enforcement, sir?

7              PROSPECTIVE JUROR:  I am retired from Nassau

8      County Police Department ambulance medical technician.

9              THE COURT:  So you have had a long experience

10     with police officers and their duties as police

11     officers.

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Generally responding to an

14     incident where a person has been injured and you have to

15     get them to the hospital, give them treatment.

16             PROSPECTIVE JUROR:  That's correct.

17             THE COURT:  And get them to the hospital.

18             Would you give a police officer more credence

19     as a witness simply because he's a police officer?

20             PROSPECTIVE JUROR:  Yes, I would only because

21     they're supposed to be trained observers.

22             THE COURT:  Well, it's fair to say that

23     notwithstanding they're trained observers, they can make

24     mistakes, right?

25             PROSPECTIVE JUROR:  Yes.  They put their shoes

1    on one at a time just like the rest of us.

2                THE COURT:   They may misinterpret matters.

3                PROSPECTIVE JUROR:   That's correct.

4                THE COURT:   So you have heard me in my

5    instructions talk about how you evaluate the credibility

6    of a witness.

7                PROSPECTIVE JUROR:   Yes.

8                THE COURT:   Can you follow those guidelines in

9    evaluating the credibility of a police witness?

10               PROSPECTIVE JUROR:   Yes.

11               THE COURT:   And I indicated in that

12   instruction that you can evaluate the witness based on

13   training and experience and such, but you have to be

14   fair in making that evaluation.   You can't bring a bias

15   or a prejudice in favor of the witness or against a

16   witness.   You have to wait and hear the testimony before

17   making an evaluation as to the truthfulness and

18   accuracy, based on your every day experiences of making

19   decisions and evaluations.   Can you promise me you will

20   do that?

21               PROSPECTIVE JUROR:   Yes, your Honor.

22               THE COURT:   Ladies and gentlemen, I've now

23   concluded my initial questioning of you and now I'll

24   turn the podium over to Mr. Perri for his inquiries for

25   the next 15 or 20 minutes.

1          MR. PERRI:  Thank you, your Honor.

2          Good afternoon, ladies and gentlemen.  I thank

3     the Court, defense counsel.  My name is Assistant

4     District Attorney Anthony Perri and I have been assigned

5     by the District Attorney of Nassau County, Madeline

6     Singas, to prosecute this case.  I am the attorney for

7     the government who is here before you to present you

8     evidence that it is our belief will prove this case

9     beyond a reasonable doubt.  And in finding jurors that

10    are going to be able to listen to this case, to give it

11    their utmost attention, to be able to honestly and fully

12    devote the next few weeks to ascertaining the truth that

13    the evidence before you will present to you is what

14    we're looking to get from all of you.

15          Not everyone will be the right juror for the

16    right case.  It's not any comment for you personally.

17    And the most important thing right now is this is one of

18    the only opportunities where we actually get to interact

19    back and forth and I get to ask you questions and you

20    can answer them or bring to the Court's attention any

21    issues.  It's very important right now for everyone to

22    be as honest as possible, as forthcoming as possible and

23    that if there is something we touch upon that you

24    believe is important or you don't feel comfortable

25    speaking about in front of anyone else, ask to speak

1          privately with the Court and counsel.  There's always an

2          option for that.

3                  Now, as the judge has noted, as the Court has

4          noted, this case is a case -- it's a serious matter and

5          that is a painful topic.  And the question before you

6          isn't right now whether or not you want to sit here and

7          listen to evidence, testimony, allegations and proof

8          regarding the topic of child sexual abuse.  The question

9          is whether or not you, as you sit here now, feel you

10         have the strength to do your duty to the community, to

11         be able to keep your attention, to be able, whether or

12         not you have children or grandchildren, nieces or

13         nephews, to be able to give that attention to the Court,

14         to the People and to the defense to perform your duties

15         fairly.

16                 Is there anyone just based on the allegations,

17         themselves and the fact this is a case that involves the

18         topic of child sexual abuse that believes they cannot

19         sit and listen fairly and attentively to the evidence

20         that will be presented before them?

21                 Mr. Trotta, is that a problem for you?

22                 PROSPECTIVE JUROR:  No, sir.

23                 MR. PERRI:  Ms. Vella, you did say you had

24         some concerns because you have had students that have

25         come to you alleging that they were the victims of child

Voir Dire                                                78

1          sexual abuse; is that true?

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. PERRI:  And when you say you were going to

4          bring a bias, can you explain that a little more?

5                    PROSPECTIVE JUROR:  Just my natural impression

6          would be some sort of, I guess, empathy for the child

7          because I have had students that have gone through those

8          experiences.  But I also do have the ability to be fair

9          and nonjudgmental before hearing any evidence that will

10         sway my decision one way or the other.

11                   MR. PERRI:  And Ms. Friscia, you have

12         children, correct?

13                   PROSPECTIVE JUROR:  Yes.

14                   MR. PERRI:  Do you feel you can be fair and

15         impartial in this matter?

16                   PROSPECTIVE JUROR:  Yeah.

17                   MR. PERRI:  Now, on the topic of child sexual

18         abuse, is there anyone here that when they heard this

19         case was going to be of this nature of a crime that

20         their first reaction to that was that they thought the

21         child was probably lying was their first reaction to

22         hearing it?  Is there anyone here that thought

23         immediately from hearing that was the allegation, they

24         are assuming the mother's probably lying or put her up

25         to it?  Did anyone here believe that this was just

 1          probably a result of someone watching too many

 2          television programs or a child being confused about what

 3          truth and reality are?

 4                    At the same time I have to ask you has anyone

 5          here actually witnessed with their own two eyes child

 6          sexual abuse?  I assume probably not.

 7                    Mr. Trimarchi, you have not witnessed child

 8          sex abuse?

 9                    PROSPECTIVE JUROR:  No.

10                    MR. PERRI:  It's fair to say no one on this

11          jury has actually witnessed it with their own two eyes.

12                    Is there anyone here that doesn't believe

13          child sex abuse doesn't happen?

14                    Once again, no hands.

15                    So, Mr. Edouard, if you haven't seen it, but

16          you believe it does happen in society, how do you come

17          to believe that there is such a thing as child sexual

18          abuse, that it occurs?

19                    PROSPECTIVE JUROR:  It's very difficult.

20                    MR. PERRI:  What do you mean that it's very

21          difficult?

22                    PROSPECTIVE JUROR:  If there is no evidence

23          and it's not that easy at all.

24                    MR. PERRI:  Ms. Prysock, why would you

25          believe, if you haven't seen it with your own two eyes,

1    how do you believe it actually occurs in society?

2            PROSPECTIVE JUROR:  Well, you have to look at

3    the evidence and you have to be a good listener.  Listen

4    to the facts.

5            MR. PERRI:  Now when you say listen to the

6    facts and listen to the evidence, Mr. Bracco, as far as

7    the facts and the evidence, is part of the facts and the

8    evidence of why we know the child sex abuse happens in

9    society is because we've heard people tell us it has

10   happened to them?

11           PROSPECTIVE JUROR:  Well, people say it has

12   happened.  You still need to prove that it did happen.

13           MR. PERRI:  So you are saying if someone tells

14   you that something has happened to them, if they relay

15   and give their testimony about what has happened to

16   them, you don't regard that as proof it happened?

17           PROSPECTIVE JUROR:  Well I guess I can take it

18   into consideration.

19           MR. PERRI:  What other proof would you look

20   for, Mr. Bracco?

21           PROSPECTIVE JUROR:  I don't know.  There has

22   to be reasonable doubt.

23           MR. PERRI:  Ms. Mammen, as far as someone

24   telling you what happened to them, giving you their

25   testimony, do you regard that as evidence?

1          PROSPECTIVE JUROR:  Depending on how well I

2    know the person.  The credibility of the person.

3          MR. PERRI:  How would you judge the

4    credibility?  Because as the judge has read all the

5    names, you are not going to know anyone at this trial.

6    So, how would you judge their credibility?

7          PROSPECTIVE JUROR:  Like a close friend or a

8    close relative tells me.

9          MR. PERRI:  Well, aside from your close

10   friends and relatives, if you're meeting someone for the

11   first time and you are a nurse, correct?

12         PROSPECTIVE JUROR:  Yes.

13         MR. PERRI:  You meet lots of people telling

14   you information about themselves.  So every day you will

15   have to make decisions about whether or not you trust

16   them, whether you believe what they are saying and

17   whether you can follow what they are saying.  How do you

18   do that in your everyday life?

19         PROSPECTIVE JUROR:  Well, I work in the

20   emergency room and then sometimes we see victims,

21   patients come in and the physical evidence that they

22   have been hurt.

23         MR. PERRI:  Don't doctors and nurses often ask

24   the patient what's wrong?

25         PROSPECTIVE JUROR:  Yes, we do.

1          MR. PERRI:  Don't they try to get information

2     from them when they first meet them in the emergency

3     room?

4          PROSPECTIVE JUROR:  Yes.

5          MR. PERRI:  Isn't that also evidence when you

6     are trying to figure out what happened to the person?

7          PROSPECTIVE JUROR:  What their complaint is?

8          MR. PERRI:  Yes.

9          PROSPECTIVE JUROR:  No, I have to substantiate

10    with some kind of physical injuries.

11         MR. PERRI:  Mr. Metzler, if I can ask you, the

12    idea that testimony -- that someone telling their

13    narrative, their story, that's evidence of a crime.  Do

14    you disagree with that or how do you feel about that?

15         PROSPECTIVE JUROR:  I don't disagree with it.

16    You have to get the facts and everything.

17         MR. PERRI:  Can you get the facts from

18    testimony?

19         PROSPECTIVE JUROR:  Yeah.

20         MR. PERRI:  Ms. Vietri, as far as testimony as

21    evidence, if witnesses take the stand, how would you

22    decide whether or not you can -- whether you can trust

23    what they have been saying to you from the stand here?

24         PROSPECTIVE JUROR:  I don't know.

25         MR. PERRI:  In your everyday life, how do you

1    decide whether someone is telling you the truth or not?

2              PROSPECTIVE JUROR:  I would always assume

3    somebody is telling me the truth unless a witness could

4    prove them wrong.

5              MR. PERRI:  Unless it's contradicted with

6    other facts?

7              PROSPECTIVE JUROR:  Yes.

8              MR. PERRI:  Mr. Trimarchi, how do you decide

9    whether or not someone is lying to you?

10             PROSPECTIVE JUROR:  Well, I evaluate just like

11   in this process right here, you are going to say

12   something and counsel is going to say something against

13   what you are saying, so vice versa.  I would take that

14   into consideration.

15             MR. PERRI:  When you say evaluate, what

16   factors would you take into your evaluation?

17             PROSPECTIVE JUROR:  A person's eye contact,

18   nervousness, different kind of physical attributes.

19             MR. PERRI:  Mr. Trimarchi, I put you on the

20   spot.  As far as being asked to testify in Court, do you

21   think that's an easy thing to do?

22             PROSPECTIVE JUROR:  No.

23             MR. PERRI:  When you are being put on the spot

24   and asked to discuss even your thought process here, do

25   you get a little nervous?

1          PROSPECTIVE JUROR:  Personally?

2          MR. PERRI:  Yes.

3          PROSPECTIVE JUROR:  Sure.

4          MR. PERRI:  So if I started asking you more

5     deep probing questions about your personal life, how

6     would that affect your nervousness?

7          PROSPECTIVE JUROR:  Probably would be more

8     defensive.

9          MR. PERRI:  And Ms. Prysock, if I put you on

10    the spot and asked you to discuss intimate details of

11    your life, especially of a sexual nature, how would that

12    make you feel?

13         PROSPECTIVE JUROR:  Very uncomfortable.

14         MR. PERRI:  How would you show that probably?

15         PROSPECTIVE JUROR:  Comments, my response, my

16    body motion and attitude.

17         MR. PERRI:  Those are some of the factors that

18    Mr. Trimarchi listed of ways he would know if somebody

19    would be lying.  Should that lead him to believe you are

20    lying about what you are saying, the level of

21    uncomfortableness you might display?

22         PROSPECTIVE JUROR:  He can just come right out

23    and ask me if I'm lying.

24         MR. PERRI:  Well, in the State of New York we

25    don't allow jurors to do that.  Some other jurisdictions

1    might let you ask questions, but here you are not.

2             So would you say because you became

3    uncomfortable, because of your tone, some of the

4    attitude you gave, would that necessarily mean you are

5    lying?

6             PROSPECTIVE JUROR:  No, that's not always

7    valid.

8             MR. PERRI:  Ms. Oliva, we talked about

9    different reactions when being put on the spot and being

10   asked questions.  Do you think -- are you going to

11   require the People in this kind of a case to have their

12   witness, the alleged victim of that person, react in a

13   certain specific way?  Are you expecting a certain

14   manner in which the alleged victim is going to testify?

15            PROSPECTIVE JUROR:  No, I guess not because

16   I'm acting.  You would think I'm guilty the way I'm

17   acting.  I'm all nervous.  I don't know.

18            MR. PERRI:  Do you think it's easy or more

19   difficult for someone younger to testify in Court?

20            PROSPECTIVE JUROR:  More difficult.

21            MR. PERRI:  What about being asked questions

22   and cross-examined, is that easy or more difficult for a

23   younger person?

24            PROSPECTIVE JUROR:  I think more.

25            MR. PERRI:  Mr. Pioli, do you think that

1       just -- that there is any one specific reaction you are

2       looking for from a child victim testifying in Court?

3                   PROSPECTIVE JUROR:  No.

4                   MR. PERRI:  And Mr. Valant, are you looking

5       for any specific reaction?  Do you think a child witness

6       has to behave in a certain way when they testify?

7                   PROSPECTIVE JUROR:  No, sir.

8                   MR. PERRI:  Now the judge is also going to

9       give you instructions with respect to inconsistencies as

10      a way to judge someone's credibility.  That you look to

11      see if someone is testifying in similar manners when

12      they are relating the facts of an incident.  But I would

13      like everyone here for a moment to think about something

14      that happened to you, a major life event, whether it's a

15      wedding, major birthday party, a death in your family

16      that happened three years ago.  Picture that for one

17      moment and remember where you were at, where other

18      people were at.

19                  Ms. Vietri, what were you thinking about?

20                  PROSPECTIVE JUROR:  A Sweet 16.

21                  MR. PERRI:  Whose Sweet 16?

22                  PROSPECTIVE JUROR:  My granddaughter's.

23                  MR. PERRI:  Were there lots of people there?

24                  PROSPECTIVE JUROR:  Yes.

25                  MR. PERRI:  And have you told people about

1      that Sweet 16?

2                 PROSPECTIVE JUROR:  Yes.

3                 MR. PERRI:  Have you told more than one

4      person?

5                 PROSPECTIVE JUROR:  Yes.

6                 MR. PERRI:  And approximately how many people

7      were there?

8                 PROSPECTIVE JUROR:  One hundred seventy.

9                 MR. PERRI:  Now, Ms. Vietri, do you telling

10     the story of your granddaughter's Sweet 16 the same

11     exact way every time you tell it?

12                PROSPECTIVE JUROR:  Pretty much, yeah.

13                MR. PERRI:  It doesn't vary depending on who

14     you are talking to?

15                PROSPECTIVE JUROR:  Probably more detailed to

16     some of my friends.

17                MR. PERRI:  If right now in front of

18     strangers, would you provide the same amount of detail

19     and commentary about the Sweet 16?

20                PROSPECTIVE JUROR:  Probably not.

21                MR. PERRI:  And would you tell me how you feel

22     about all your relatives?

23                PROSPECTIVE JUROR:  No.

24                MR. PERRI:  So it would affect you depending

25     on who you were talking to how much information you

1       gave?

2                  PROSPECTIVE JUROR:  Absolutely.

3                  MR. PERRI:  Mr. Trotta, what event were you

4       thinking about that's happened in the last three years?

5                  PROSPECTIVE JUROR:  To tell you the truth, I

6       didn't even think of one.

7                  MR. PERRI:  No event.

8                  Five years?

9                  PROSPECTIVE JUROR:  I don't know.  I guess the

10      passing of my dog.

11                 MR. PERRI:  Okay.  And do you like discussing

12      the passing of your dog?

13                 PROSPECTIVE JUROR:  Yeah, I don't mind it.  I

14      don't know about discussing it in public.  If we were

15      having a private conversation, I would discuss it.

16                 MR. PERRI:  There is nothing about a private

17      discussion here.  If I were to start asking you lots of

18      questions about how you felt, where everyone else in

19      your life was when your dog died, what shirt you were

20      wearing when the dog died, what vet you went to, details

21      about him, would you be expected to answer all those

22      questions right now on the spot?

23                 PROSPECTIVE JUROR:  Yeah, I think I could

24      answer most of them correctly.

25                 MR. PERRI:  And Mr. Bracco, what life event

1      were you thinking about?

2              PROSPECTIVE JUROR:  My mother in-law's death.

3              MR. PERRI:  When did she pass away?  I'm

4      sorry.

5              PROSPECTIVE JUROR:  Two years ago.

6              MR. PERRI:  Was there a wake and a funeral?

7              PROSPECTIVE JUROR:  Yeah.

8              MR. PERRI:  Were there multiple people there.

9              PROSPECTIVE JUROR:  Yes, there were.

10             MR. PERRI:  And if I were to ask you about the

11     wake and the funeral and ask someone else that was also

12     at the same event about what happened at the wake and

13     funeral, would you expect there to be differences in how

14     you told it?

15             PROSPECTIVE JUROR:  Most likely, yes.

16             MR. PERRI:  Does that mean you are lying to me

17     now if I asked you details?

18             PROSPECTIVE JUROR:  No.

19             MR. PERRI:  Does that mean the other person is

20     lying?

21             PROSPECTIVE JUROR:  No.  They saw it a

22     different way.

23             MR. PERRI:  Does it mean there wasn't a wake

24     and there wasn't a funeral?

25             PROSPECTIVE JUROR:  No.

1              MR. PERRI:  Now, Ms. Friscia, if someone told

2       you a story from their life, whether it's about a

3       wedding, about their children's play, whether it's about

4       a holiday, whatever, if every single time they told you

5       it the exact same way without any variation, would you

6       think that's normal?

7              PROSPECTIVE JUROR:  Probably not.

8              MR. PERRI:  How about you, Ms. Vietri, would

9       you think that's normal?

10             PROSPECTIVE JUROR:  I don't know.  I mean, I

11      don't think I would think anything of it.

12             MR. PERRI:  Ms. Frydman, as far as judging

13      credibility, what are some of the factors you take into

14      consideration when you try to decide whether someone is

15      lying to you?

16             PROSPECTIVE JUROR:  Well, if it's like this,

17      if it's knowing someone, then it would be in a Court

18      case, I don't know them.  But usually it would be

19      credibility based on the consistencies in the story like

20      you just went over that I believe about consistencies,

21      that they can change from time to time.

22             MR. PERRI:  Do you agree because there are

23      some inconsistencies it doesn't mean a person is lying

24      necessarily?

25             PROSPECTIVE JUROR:  I do agree.  It could be

1    if they remembered something else or if they were

2    nervous.

3              MR. PERRI:  Does everyone here in the box, on

4    a slightly different topic, does everyone here believe

5    that criminal law applies in families?  Just because a

6    crime happens inside a household, because the victim and

7    the perpetrator know each other, have a relationship,

8    regardless of that, the law still applies to them.  Just

9    because you know someone doesn't mean the police don't

10   get involved, doesn't mean that the law doesn't apply,

11   doesn't mean you can't be brought to Criminal Court.

12             Does anyone disagree that sometimes issues

13   that happen inside the house get resolved in Criminal

14   Court?

15             Mr. Edouard, do you think the law applies to

16   families?

17             PROSPECTIVE JUROR:  Yes.

18             MR. PERRI:  And Mr. Edouard, you worked for

19   the department of education.

20             PROSPECTIVE JUROR:  Yes.

21             MR. PERRI:  What was your role in the central

22   office?  What did you do?

23             PROSPECTIVE JUROR:  Well, as the judge

24   mentioned, administration and I was working as an

25   assistant in accounting and change the title to

1    bookkeeper and I did that with the nonpublic school

2    unit.

3              MR. PERRI:  Now just that was a question I had

4    about that.  So it was accounting that you did for the

5    central office.  You didn't supervise teachers or

6    students?

7              PROSPECTIVE JUROR:  No.

8              MR. PERRI:  Important for a school to get the

9    money.

10             For you, when do you believe the law should be

11   involved in a family?  Always?  Every dispute?

12             PROSPECTIVE JUROR:  Whenever there is a

13   problem, yes, of course.

14             MR. PERRI:  Do you think that it changes when

15   you have a child involved in a case, when you have a

16   minor involved?

17             Do you not think the parent is doing their job

18   to protect the child?

19             PROSPECTIVE JUROR:  I think the parent is

20   responsible.

21             MR. PERRI:  Now, even if you are right, assume

22   you are right for a second and the parent has some

23   responsibility, I'm not disagreeing with you the parent

24   might have some responsibility.  Does the parent having

25   some responsibility, does that change the perpetrator,

Voir Dire                                            93

1    the person who breaks the law, does that make them less

2    guilty if the parent wasn't doing as much as they should

3    be able to do to protect that person?

4              PROSPECTIVE JUROR:  I think at this moment it

5    is very hard.  The kids don't really listen and paying

6    attention, then it doesn't matter how it happened or

7    whatever happened, I have to then blame the parents.

8              THE COURT:  Two minutes, Mr. Perri.

9              MR. PERRI:  Thank you, your Honor.

10             Ms. Mammen, what do you think about that?  If

11   you believe a parent is not living up to their

12   responsibilities of protecting their child, does that

13   make it okay to hurt that child?

14             PROSPECTIVE JUROR:  No.

15             MR. PERRI:  Does the law have any special

16   responsibilities for that child if the parent isn't

17   looking after them?

18             PROSPECTIVE JUROR:  Yeah, the law has the

19   responsibility to look after the child if the child

20   isn't taken care of by the parents.

21             MR. PERRI:  Mr. Metzler, do you believe that?

22             PROSPECTIVE JUROR:  Yes.

23             MR. PERRI:  And, Mr. Trimarchi, do you believe

24   that even if a parent is also responsible or should have

25   done something to prevent something, does that not

Voir Dire                                                      94

1      affect the guilty person who broke the law?

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. PERRI:  The last topic.

4                    THE COURT:  Mr. Perri, I think your time is

5      up.

6                    MR. PERRI:  I apologize.  Thank you, your

7      Honor.  Thank you.

8                    THE COURT:  Mr. Zerner, your time.

9                    MR. ZERNER:  Thank you very much, your Honor.

10                    Good afternoon, everyone.  I'm going to go

11     quickly because the time goes fast, as you can imagine,

12     when you are standing up here.

13                    I want to thank you for your attention and I

14     want to apologize if right now I'm asking you to think

15     of something that is unpleasant, and more than that, I

16     apologize if while I'm doing my job I need to ask

17     unpleasant questions.

18                    Mr. Trimarchi, it wasn't so comfortable when

19     the judge was asking you questions back and forth,

20     right?

21                    PROSPECTIVE JUROR:  Yup.

22                    MR. ZERNER:  Now you work at Ernst & Young?

23                    PROSPECTIVE JUROR:  That's right.

24                    MR. ZERNER:  What do you do for them?

25                    PROSPECTIVE JUROR:  Information technology.

1          MR. ZERNER:  Are you the guy that comes to my

2     desk when I can't get the computer to make it do what

3     it's supposed to do?

4          PROSPECTIVE JUROR:  I'm that guy.

5          MR. ZERNER:  When you come to my desk and I'm

6     the CFO or big vice-president or something like that and

7     I just did something stupid like I pulled the plug out

8     of the wall, what do you say to me?

9          PROSPECTIVE JUROR:  You pulled the plug out of

10    the wall.  I put it back in.  The computer is working

11    and have a great day.

12         MR. ZERNER:  Would you say it the same way as

13    I'm the CFO as if I'm a guy that started last week?

14         PROSPECTIVE JUROR:  Yes, sir.

15         MR. ZERNER:  You would say it the same way

16    every time?

17         PROSPECTIVE JUROR:  I'm serving you.

18         MR. ZERNER:  All right.

19         Mr. Pioli, do you treat everyone the same way

20    when you interact with them?

21         PROSPECTIVE JUROR:  No.

22         MR. ZERNER:  Do you treat kids the same way as

23    you treat adults?

24         PROSPECTIVE JUROR:  No.

25         MR. ZERNER:  You retired as a lieutenant

1          N.Y.P.D.?

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. ZERNER:  And you started off as a

4          patrolman?

5                    PROSPECTIVE JUROR:  Yes, I did.

6                    MR. ZERNER:  And you worked your way up?

7                    PROSPECTIVE JUROR:  Yes.

8                    MR. ZERNER:  And eventually you had a

9          supervisor role?

10                    PROSPECTIVE JUROR:  Yes.

11                    MR. ZERNER:  You would train patrolman and

12          other people below you in the hierarchy?

13                    PROSPECTIVE JUROR:  Yes.

14                    MR. ZERNER:  What precinct did you work in?

15                    PROSPECTIVE JUROR:  Many precincts.  Would you

16          like me to list them all?

17                    MR. ZERNER:  No.  Just think of any of the

18          precincts you worked in as a supervisor.

19                    When someone would come in off the street and

20          tell you a crime had taken place, what would you do with

21          that information.

22                    PROSPECTIVE JUROR:  Take all the information

23          down and probably send out my police officers to go

24          investigate.

25                    MR. ZERNER:  You would do your due diligence.

1           PROSPECTIVE JUROR:  Yes.

2           MR. ZERNER:  If you had somebody yelling and

3    screaming and carrying on and telling you you must take

4    the police report, what would you do?

5           PROSPECTIVE JUROR:  Try to calm them down.

6           MR. ZERNER:  Eventually would you take a

7    report?

8           PROSPECTIVE JUROR:  Yes.

9           MR. ZERNER:  Even if you really didn't know

10   what the credibility was of what they were telling you

11   because you weren't an eyewitness to it, you would still

12   take a report right?

13          PROSPECTIVE JUROR:  Yes.

14          MR. ZERNER:  I know everyone works in

15   different jobs, but can you imagine that circumstance in

16   your job where someone is demanding something and

17   basically you have two choices, right, you can kind of

18   comply with what they are asking you to do or you can

19   tell them no.  If you tell them no, you can imagine a

20   circumstance where they call your boss and your boss's

21   boss and eventually there is some stuff that might rain

22   down on you, right?  Can everyone imagine that?

23          Ms. Vella, you work in the school system.

24   It's a hierarchy, right?

25          PROSPECTIVE JUROR:  Yes.

Voir Dire

1          MR. ZERNER:  And you were saying earlier when

2     Mr. Perri was asking you questions, that you, of course,

3     have empathy for children, right?

4          PROSPECTIVE JUROR:  Yes.

5          MR. ZERNER:  Can we all agree with that, we

6     are all required to have empathy for children?

7          PROSPECTIVE JUROR:  Yes.

8          MR. ZERNER:  We all were once children and we

9     hope that adults would look after us and most, if not

10    all of us, now have children, grandchildren, nieces

11    nephews, right?  So that's not an award winning idea

12    that I'm coming up with.  This is what the situation is,

13    right.

14          Now, can you imagine a situation, Ms. Prysock,

15    where there is an extended family living together?

16          PROSPECTIVE JUROR:  Yes, I have, yes.

17          MR. ZERNER:  And not everyone grows up that

18    way, but maybe we have friends or other people in our

19    lives that grew up in an extended household where there

20    were aunts, uncles, cousins.

21          PROSPECTIVE JUROR:  Right.

22          MR. ZERNER:  So maybe in that kind of

23    situation it's sort of that it takes a village situation

24    where maybe an aunt or uncle is maybe acting as a parent

25    towards a child, right?

1              PROSPECTIVE JUROR:  Right.

2              MR. ZERNER:  And Ms. Friscia, you can imagine

3    that circumstance?

4              PROSPECTIVE JUROR:  Yes.

5              MR. ZERNER:  So it's not a circumstance where

6    the child's expected to say oh, you're not my father, I

7    don't have to listen to you, right?

8              PROSPECTIVE JUROR:  Uh-huh.

9              MR. ZERNER:  Ms. Frydman, how do you feel

10   about that?

11             PROSPECTIVE JUROR:  That the child is not

12   supposed to listen to an adult?

13             MR. ZERNER:  What do you think about that?

14   Should the child not listen to the adult?

15             PROSPECTIVE JUROR:  Well, it depends on what

16   the adult is telling them.

17             MR. ZERNER:  Say the adult is telling them you

18   have to shut off your phone and go to sleep.

19             PROSPECTIVE JUROR:  Right.

20             MR. ZERNER:  Is that okay?

21             PROSPECTIVE JUROR:  Yes.

22             MR. ZERNER:  So even an uncle can do that,

23   right?

24             PROSPECTIVE JUROR:  Yes.

25             MR. ZERNER:  You don't have to be the

Voir Dire                                                    100

1    biological parent of the child in order to say that,

2    right?

3                    PROSPECTIVE JUROR:  Yes.

4                    MR. ZERNER:  Anybody here have teenagers?  Put

5    up your hands.

6                    How old were your kids when you got them cell

7    phones?

8                    PROSPECTIVE JUROR:  First kid?

9                    MR. ZERNER:  Yeah.

10                   PROSPECTIVE JUROR:  She was 15.  She's 19 now.

11                   MR. ZERNER:  How about you?

12                   PROSPECTIVE JUROR:  Fifteen and 17.

13                   MR. ZERNER:  Somebody in the back.

14                   PROSPECTIVE JUROR:  Seventeen.

15                   MR. ZERNER:  And you paid for the cell phone,

16   right?

17                   PROSPECTIVE JUROR:  Yes.

18                   MR. ZERNER:  Maybe the kid would say to you I

19   saw on the commercials that the phone is for free,

20   right, but they don't understand when your phone goes up

21   $42 a month, you are paying $42 a month every month from

22   now until the end of time.

23                   When your kids had the cell phones, especially

24   initially, if you wanted to punish them for bad

25   behavior, would it be natural to take the phone away

Voir Dire                                                          101

1     from them?

2              PROSPECTIVE JUROR:  Yes.

3              MR. ZERNER:  That's not a ridiculous

4     punishment, right?

5              PROSPECTIVE JUROR:  No.

6              MR. ZERNER:  Ms. Vietri, if you it took away a

7     teenager's cell phone, do you think they are going to be

8     happy about that?

9              PROSPECTIVE JUROR:  No.

10             MR. ZERNER:  Can we all agree on that?  Even

11    if it's just punishment for a small offense, every

12    teenager, we can imagine, would be upset with that,

13    right?

14             Ms. Vietri, you said earlier on you are going

15    to assume someone is telling you the truth, right?

16             PROSPECTIVE JUROR:  Yes.

17             MR. ZERNER:  But here you are going to hear

18    two different stories, all right, where it can't be that

19    both sides are telling the truth.  Can you accept your

20    responsibility to judge the credibility of the people

21    that come up on the witness stand?

22             PROSPECTIVE JUROR:  Yes.

23             MR. ZERNER:  Ms. Oliva, how do you feel about

24    that?

25             PROSPECTIVE JUROR:  I don't know.  I mean, I

Voir Dire                                                          102

1    feel bad for everybody, so I don't know, I feel bad for

2    this person and this person.

3              MR. ZERNER:  I completely respect your

4    honesty.  I'm always amazed at how honest people are in

5    this circumstance.  We're all strangers.  We've been

6    sitting in a room talking for a few hours, but you folks

7    took an oath and you all take it seriously and it's

8    difficult because you come in here and you have all seen

9    television shows and movies and read books about what

10   takes place in courtrooms, right, but for a lot of you

11   this is your first time in a courtroom.

12             Mr. Trimarchi, I think you were very honest

13   when the judge asked you how do you feel about this and

14   you said I don't know.  It's not favorable hearing about

15   a case that involves child sex abuse, right?

16             PROSPECTIVE JUROR:  Yes, sir.

17             MR. ZERNER:  And the judge asked you about six

18   different ways before he finally got you to say that

19   maybe you would be okay with the presumption of

20   innocence, right?

21             PROSPECTIVE JUROR:  Right.

22             MR. ZERNER:  But we've all heard that term,

23   right, since we were in grade school, right, and there

24   was a book and movie presumed innocent, right?  Everyone

25   is familiar with that term?  The judge will instruct

1    you.  He already told you a little bit about it.  If you

2    sit on this case you will hear a lot about presumed

3    innocent.

4          So right now, if you had to vote right now,

5    everybody accept, Mr. Trimarchi, how would you vote

6    right now whether Ray Ross is guilty or not guilty?

7          PROSPECTIVE JUROR:  I don't know.

8          MR. ZERNER:  Mr. Edouard?

9          PROSPECTIVE JUROR:  It's difficult.

10         MR. ZERNER:  Why is it tough right now?  You

11   haven't heard anything.

12         PROSPECTIVE JUROR:  Well this side you always

13   say not guilty.  The other side I assume that is guilty

14   and then I'm not in that situation.  I'm just the one I

15   cannot make any judgment.  Definitely I would -- it's

16   not easy to say which side is telling the truth.

17         MR. ZERNER:  No one is saying it's easy.  This

18   is very difficult and I'm not asking you for your

19   sympathy for me, but eventually you will see me, if you

20   are on this case, cross-examine a 15 year-old-girl.  I'm

21   not looking forward to it, but my client has been

22   falsely accused of something and it's my job to

23   cross-examine the people that are accusing him of this.

24   But right now as you sit here, you haven't heard any

25   evidence whatsoever, so Lieutenant Pioli, how would you

Voir Dire                                                          104

1     vote right now?

2             PROSPECTIVE JUROR:  Not guilty.

3             MR. ZERNER:  So even the police lieutenant can

4     tell us that you have to vote not guilty now, right.  It

5     has to be that way.  I see most of you nodding your

6     heads, but I don't see Ms. Vietri nodding her head.

7             PROSPECTIVE JUROR:  I would say not guilty

8     now.

9             MR. ZERNER:  Exactly.

10            You understand that the judge will tell you

11    that this burden that the prosecution has to carry never

12    shifts.  I don't have to do anything, but I have to

13    defend my client and I will do a lot of things.

14            I'm going to tell you right now, even though

15    you heard the judge tell you, that you can't hold it

16    against my client if he doesn't testify.  My client is

17    going to testify in this case.  You will hear him.  He

18    will sit on the witness stand and he will tell you that

19    he did not do the things that he's accused of doing

20    here.  He did not do this.

21            MR. PERRI:  Objection.

22            THE COURT:  Mr. Zerner, let's get back to the

23    inquiry with regard to qualification.

24            MR. ZERNER:  Certainly, your Honor.

25            Now, anybody here divorced?  The rest of you

1    who are not divorced, is it all fair to say you have a

2    friend or relative or parent or child that's been

3    through a divorce?  I see just about everyone nodding

4    their heads.  It's something that is unfortunately very

5    common.

6              Anybody that's dealt with this personally or

7    maybe one degree of separation away say that it was a

8    pleasant experience?  Universally it was a difficult

9    situation that you went through or your parent or your

10   child or your friend, right?

11             Is it fair to say that when this situation

12   goes on that perhaps there are sides that are taken

13   within a family?

14             Ms. Frydman, how do you feel about that?

15             PROSPECTIVE JUROR:  Well, I went through it

16   with my parents and a lot of the time they really wanted

17   me -- they would say things to try to get me to pick a

18   side between them.  I always actually stayed impartial.

19             MR. ZERNER:  Did you personally go to Court

20   when this was going on?

21             PROSPECTIVE JUROR:  No.  I was really young.

22             MR. ZERNER:  Do you have older siblings?

23             PROSPECTIVE JUROR:  No.

24             MR. ZERNER:  Anybody else have that

25   circumstance where their parents were going through a

1          divorce?

2                    PROSPECTIVE JUROR:  I was really little.  We

3          didn't go to Court though.

4                    MR. ZERNER:  And, Mr. Bracco, you personally

5          were divorced, right?

6                    PROSPECTIVE JUROR:  Yes.

7                    MR. ZERNER:  Was that pleasant?

8                    PROSPECTIVE JUROR:  No.

9                    MR. ZERNER:  Was there some things your wife

10         accused you of that you didn't do?

11                   PROSPECTIVE JUROR:  Yes.

12                   MR. ZERNER:  Who else said they were divorced?

13                   PROSPECTIVE JUROR:  (Indicating.)

14                   MR. ZERNER:  Mr. Metzler, did your wife accuse

15         you of things you didn't do?

16                   PROSPECTIVE JUROR:  Yes.

17                   MR. ZERNER:  Was that pleasant?

18                   PROSPECTIVE JUROR:  No.

19                   MR. ZERNER:  How did you feel about it?

20                   PROSPECTIVE JUROR:  Angry, bad.

21                   MR. ZERNER:  Did you want your attorney to

22         zealously represent you?

23                   PROSPECTIVE JUROR:  Yes.

24                   MR. ZERNER:  And did you go to Court?

25                   PROSPECTIVE JUROR:  Yes.

Voir Dire                                                          107

1          MR. ZERNER:  There was no jury though, right?

2          PROSPECTIVE JUROR:  No jury.

3          MR. ZERNER:  Just the judge, right?

4          PROSPECTIVE JUROR:  Yes.

5          MR. ZERNER:  Who else?

6          Ma'am, were there accusations going back and

7     forth within this divorce?

8          PROSPECTIVE JUROR:  Not with my divorce, but

9     my husband's divorce.

10         MR. ZERNER:  You have seen it, you have

11    experienced it, right?

12         PROSPECTIVE JUROR:  Yes.

13         MR. ZERNER:  What do you remember about that,

14    about the tension of that whole situation?

15         PROSPECTIVE JUROR:  It's still tense at times.

16         MR. ZERNER:  Ms. Prysock.

17         PROSPECTIVE JUROR:  Yes.

18         MR. ZERNER:  You also have gone through this?

19         PROSPECTIVE JUROR:  Yes.

20         MR. ZERNER:  Was it pleasant?

21         PROSPECTIVE JUROR:  No.

22         MR. ZERNER:  The most important thing that I'm

23    going to ask you to do, we've already touched on, you

24    need to keep an open mind.  Can everybody assure me that

25    you are going to listen to everything before you make a

1          decision, Mr. Valant?

2                    PROSPECTIVE JUROR:  Yes, sir.

3                    MR. ZERNER:  Because I'm a huge baseball fan.

4          Love baseball.  Think about baseball constantly.  I do a

5          broadcast of my 12-year-old's baseball game on the web.

6          I think about three people listen to it, but it's a lot

7          of fun.

8                    The thing about baseball is there is a

9          visiting team and a home team, right?  Somebody bats

10         first and the team that bats first doesn't get last

11         licks.  But here in Criminal Court the prosecution will

12         go first and he's going to go last.  Those are the rules

13         and I accept them.  And the reason for that is because

14         he has the burden.  He has to prove what I'm telling you

15         he's not going to be able to prove.

16                   So now what's going to happen is he's going to

17         give his opening statement first.  You have already seen

18         him talk to you first.

19                   MR. PERRI:  Objection, your Honor.

20                   THE COURT:  Mr. Zerner.

21                   MR. ZERNER:  I'll wrap this up.

22                   THE COURT:  Please.

23                   MR. ZERNER:  What I need you to do is when you

24         hear from prosecution witness after prosecution witness

25         after prosecution witness, that you keep an open mind so

```
 1        that when I put on my witnesses, you haven't already

 2        decided the case.

 3                   Mr. Trimarchi, can you do that?

 4                   PROSPECTIVE JUROR:  Absolutely.

 5                   MR. ZERNER:  Is there anybody sitting here

 6        saying they can't do it?

 7                   PROSPECTIVE JUROR:  I don't know.

 8                   MR. ZERNER:  I respect that you don't know.  I

 9        respect that.

10                   Does anybody else feel that way and, for

11        whatever reason, you feel you shouldn't say it?

12        Mr. Vella?

13                   PROSPECTIVE JUROR:  No.

14                   MR. ZERNER:  You have worked with kids.  You

15        still work with kids?

16                   PROSPECTIVE JUROR:  Yes.

17                   MR. ZERNER:  Have you had the experience where

18        kids have come to you with an allegation about something

19        involving an adult, whether it's physical abuse, sexual

20        abuse?

21                   PROSPECTIVE JUROR:  Not personally, but I have

22        been involved in meetings where it's been discussed.

23                   MR. ZERNER:  You have been told you have a

24        duty to report this, right?

25                   PROSPECTIVE JUROR:  Yes.
```

1          MR. ZERNER:  You know that, right?

2          PROSPECTIVE JUROR:  Yes.

3          MR. ZERNER:  But you never had a personal

4    situation where you have reported the situation?

5          PROSPECTIVE JUROR:  No.

6          MR. ZERNER:  Have you ever suspected that

7    somebody was being physically or sexually abused?

8          PROSPECTIVE JUROR:  No.

9          MR. ZERNER:  Has anybody had that situation in

10   their life, whatever job you do, whatever situation you

11   have, where you have suspected physical or sexual abuse

12   against a child that you have known?

13         PROSPECTIVE JUROR:  You just mentioned the

14   possibility that they won't be able to prove it.  You

15   just said that, right?

16         MR. ZERNER:  Yes.

17         PROSPECTIVE JUROR:  If it's not possible to

18   prove it, what is the purpose of being in Court for

19   judgment for all those things?  Why, if you know things

20   that they won't win?

21         THE COURT:  Mr. Edouard, let me take that

22   question, okay.  There has been an accusation by a

23   government official coming through the indictment that

24   Mr. Ross engaged in criminal conduct against a minor.

25   Mr. Ross has denied that accusation.  So we have a trial

Voir Dire                                                    111

1          to determine the facts and to determine whether the

2          accusation can be proved by the assistant district

3          attorney beyond a reasonable doubt.

4                    The defense counsel has the absolute right to

5          challenge the People's proof, the district attorney's

6          proof and then it will be up to you and your fellow

7          jurors to make independent judgments with regard to the

8          evidence and the facts and whether the facts that you

9          have determined, prove beyond a reasonable doubt the

10         defendant's guilt.  Do you understand?

11                   PROSPECTIVE JUROR:  All right.  Thank you,

12         your Honor.

13                   THE COURT:  You're welcome, sir.

14                   MR. ZERNER:  Ms. Friscia, you said earlier on

15         when you heard this case involved children you couldn't

16         help but think of your own children, right?

17                   PROSPECTIVE JUROR:  Right.

18                   MR. ZERNER:  You are married?

19                   PROSPECTIVE JUROR:  Yes.

20                   MR. ZERNER:  Could you also put yourself in

21         the shoes of if your husband was falsely accused of

22         something?

23                   PROSPECTIVE JUROR:  Depending on what it was.

24         Once I hear a child is involved, I kind of shut down and

25         it will take a lot for me to prove that he wouldn't be.

Voir Dire                                                      112

1          MR. ZERNER:  So you are assuming that

2     something happened.

3          PROSPECTIVE JUROR:  I can't see a child making

4     up something.  For what reason?  Why?

5          MR. ZERNER:  Could you imagine a situation

6     where there is a dispute within a family and there is

7     coaching going on?

8          PROSPECTIVE JUROR:  Yes.

9          MR. ZERNER:  So, Ms. Frydman was talking

10    earlier on that her parents were trying to get her to

11    say one thing or another, right?

12         Ms. Oliva, you were little, but maybe it was a

13    similar thing going on.  Can everyone imagine that

14    situation where the child is simply doing what the

15    parent is telling them to do?  So if the situation is

16    that the mother's going to reward if the child says X,

17    and punish if the child doesn't say X, right, you can

18    imagine that circumstance, Ms. Vella?

19         PROSPECTIVE JUROR:  Yes.

20         MR. ZERNER:  We can all imagine that

21    situation.

22         Mr. Valant?

23         PROSPECTIVE JUROR:  Yes.

24         MR. ZERNER:  Ms. Prysock?

25         PROSPECTIVE JUROR:  Yes.

Voir Dire                                                    113

1          MR. ZERNER:  So now you are going to keep an

2    open mind and you are all going to assure me that you

3    will listen to the entire case before you make a

4    decision, right?

5          Is anybody saying look, I can't do it, Scott?

6    I would like to, but I can't.

7          Ms. Oliva, I understand your feelings about

8    it.

9          Anybody else?

10         Mr. Perri said it correctly, that you just

11   might not be the right juror for this case.  There is

12   no right or wrong answers.  It's a difficult case.

13   There is no extra per diem for a difficult case versus

14   the easier case.

15         THE COURT:  Two minutes.

16         MR. ZERNER:  Thank you very much, your Honor.

17         I really like this part because I get to talk

18   even though I run out of time and sometimes I step over

19   the line.  But everyone understands that there is going

20   to be a point in time where when I'm asking questions

21   that there might be a situation where there's an

22   objection to my question and the prosecutor objects.

23   Maybe the judge agrees with the prosecutor, maybe the

24   judge agrees with me.  Can you all assure me you are not

25   going to hold it against my client?

Voir Dire

1          Mr. Edouard, you are not sure?

2          PROSPECTIVE JUROR:  (Indicating.)

3          MR. ZERNER:  Can we all agree with

4     Mr. Edouard, if I'm overzealous or loud, we're not going

5     to hold it against Ray Ross, right?  Fair enough?

6          Thank you very much, ladies and gentlemen.

7          THE COURT:  Ms. Friscia, I want to follow up

8     on one thing.  With regard to children and their

9     believability, you're required by your oath to take

10    witnesses as they come to the witness stand.  So can you

11    promise me that if a child witness comes to this witness

12    stand and sits there, that you will make no pre-judgment

13    with regard to the credibility of that witness --

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  -- just because she's a child?

16          Can you promise me that?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Can you promise me you will listen

19    to the answers of that witness, to the questions posed

20    by the attorneys and the Court, maybe the Court, and

21    decide based on the facts, as we talked about

22    credibility and such, as to the truthfulness or the

23    accuracy -- and the accuracy of that witness's

24    testimony?

25          PROSPECTIVE JUROR:  Yes.

Voir Dire

1         THE COURT:  Just like you would with an adult

2   and just like you would with a police officer who

3   testifies?  Can you do that?

4         PROSPECTIVE JUROR:  Yes.

5         THE COURT:  And you can promise me that?

6         PROSPECTIVE JUROR:  Yes.

7         THE COURT:  Okay.

8         Ladies and gentlemen, now -- and to you in the

9   audience -- we're going to take about a five-minute

10  break.  At this time the attorneys have an opportunity

11  to determine who will be selected to serve as jurors on

12  this particular case.  Once that's done, we'll start the

13  second round.  So, those in the audience, your names

14  will be called and you will have a chance to sit up here

15  and answer some questions too.

16        (Whereupon, the prospective jurors exited the

17  courtroom and a recess was taken.)

18        THE CLERK:  Continued case on trial, People v.

19  Ray Ross.

20        Are the People ready?

21        MR. PERRI:  Yes, your Honor.

22        THE CLERK:  Defense ready?

23        MR. ZERNER:  We are ready, your Honor.

24        THE CLERK:  Mr. Ross is present.  The

25  prospective jurors are not.

Voir Dire                                                116

1       MR. ZERNER:  I wanted to state a couple of

2  things first of all.  Commonly when I tried cases in the

3  past, the judge will make a little discussion with the

4  prospective jurors and to the jurors that if you see the

5  attorneys in the hallway and they don't speak to you,

6  don't hold it against them because they are not being

7  rude and, of course, I didn't think of it and just now I

8  went to the men's room and as I'm walking out, one of

9  the jurors from the back row was there, so I just smiled

10  and didn't say a word.

11       If we can at some point work that into the

12  mix.  I always feel funny about that.  If you see them

13  at the deli or wherever as the course of the trial goes

14  on.

15       THE COURT:  Very good.

16       MR. ZERNER:  You commonly do the first 12 and

17  we'll deal with cause and peremptories and then the last

18  two, is that the way you do it?

19       THE COURT:  Yes.  You will follow the

20  direction of the clerk.

21       THE CLERK:  This is jury selection round

22  number one.  In consideration of the first 12 jurors in

23  the box for the 12 open seats, People, for cause?

24       MR. PERRI:  Your Honor, the People would

25  challenge jurors two and three for cause.

1              With respect to juror number two, repeatedly

2       when pressed about whether she would be able to make a

3       decision --

4                   THE COURT:  Mr. Zerner?

5                   MR. ZERNER:  I join in those applications,

6       Judge.

7                   THE COURT:  Two.

8                   MR. PERRI:  Two and three, your Honor.

9                   THE CLERK:  Oliva and Edouard?

10                  MR. PERRI:  Yes, sir.

11                  THE CLERK:  Mr. Perri, anything further for

12      cause?

13                  MR. PERRI:  No, your Honor.

14                  THE CLERK:  Defense for cause?

15                  MR. ZERNER:  Yes, your Honor.  You want all my

16      causes right now or one by one?

17                  THE COURT:  One by one, please.

18                  MR. ZERNER:  Juror number four for cause.

19      Even though your Honor did a terrific job of trying to

20      get her to agree to various concepts of the criminal

21      justice system, she stated several times that she

22      doesn't think she can be fair and impartial.  She would

23      shut down in listening to testimony about children,

24      et cetera, et cetera.

25                  MR. PERRI:  Your Honor, the People would

1  oppose that application.  Your Honor did rehabilitate

2  the juror.  The juror said unequivocally she could

3  listen to the testimony of a child, she would follow the

4  law and she would judge her credibility.

5           THE COURT:  Application denied.

6           Next, Mr. Zerner.

7           MR. ZERNER:  Number nine for cause, your

8  Honor.

9           THE CLERK:  Trimarchi.

10          MR. ZERNER:  Your Honor, he started off by

11 saying that he wasn't favorable to anybody that was

12 charged with this.  He had doubt and skepticism.  It

13 took him about six different times before he finally

14 threw in the towel and allowed you to lead him into

15 saying that he would follow your instructions, your

16 Honor.  I think it's clear where he's coming from.

17          MR. PERRI:  Your Honor, the People would

18 oppose that application.  The juror specifically said

19 that he would quote "absolutely" be able to follow the

20 law and your instructions.  The People maintain you did

21 rehabilitate him.  Although he did at some points make

22 statements somewhat towards what defense counsel said,

23 he firmly stated he would be able to follow his oath and

24 follow the law.

25          THE COURT:  Counsel's application on that

Voir Dire                                                    119

1    juror is granted.  The Court did have concerns with

2    regard to his ability to be fair and impartial to the

3    defendant.

4              THE CLERK:  Mr. Zerner, anything further?

5              MR. ZERNER:  Nobody else for cause, your

6    Honor.

7              THE CLERK:  Peremptory challenges, People?

8              MR. PERRI:  Your Honor, the People exercise a

9    peremptory challenge for juror number five.

10             THE CLERK:  Prysock.

11             MR. PERRI:  Juror eight.

12             THE CLERK:  Frydman.

13             MR. PERRI:  Juror number 11 and juror number

14   13.

15             THE CLERK:  Metzler and Mammen.  We're only

16   doing up to and including Vella, first 12.

17             MR. PERRI:  Okay.

18             THE COURT:  So juror number 13 remains as a

19   potential juror.

20             THE CLERK:  Peremptory challenge, defense, up

21   to and including Ms. Vella.

22             MR. ZERNER:  Thank you.  We'll exercise our

23   first perempt on juror number one.

24             THE CLERK:  Pioli.

25             MR. ZERNER:  Second one on juror four.

                Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                    120

1            THE CLERK:  Ms. Friscia.

2            MR. ZERNER:  We'll exercise our third one on

3    juror ten.

4            THE CLERK:  Vietri.

5            That leaves us with Valant, Bracco and Vella

6    will be one two and three.

7            Are we in agreement with that, People.

8            MR. PERRI:  Yes, your Honor.

9            THE CLERK:  Defense counsel?

10           MR. ZERNER:  Yes, we're in agreement.

11           THE CLERK:  In consideration of the last two

12   jurors on the board for the next two seats, Mammen and

13   Trotta, People for cause?

14           MR. PERRI:  None for cause, your Honor.

15           THE CLERK:  Defense for cause?

16           MR. ZERNER:  Not for cause.

17           THE CLERK:  People, peremptory challenges?

18           MR. PERRI:  No peremptories, your Honor.

19           THE CLERK:  Defense, peremptory challenges?

20           MR. ZERNER:  No perempts at this time.

21           THE CLERK:  So that will make Valsa Mammen

22   juror four and Gerard Trotta juror number five.

23           People, we concur?

24           MR. PERRI:  Yes.

25           THE CLERK:  Defense counsel?

Voir Dire                                                      121

1          MR. ZERNER:  Yes.

2          THE COURT:  Very good.  Can we call the panel

3    in, please?

4          Off the record.

5          (A discussion was held off the record.)

6          (Whereupon, the prospective jurors entered the

7    courtroom.)

8          THE CLERK:  Let the record reflect the

9    presence of the prospective jurors.  All parties are

10   present.

11         People ready?

12         MR. PERRI:  Yes, your Honor.

13         THE CLERK:  Is the defense ready?

14         MR. ZERNER:  We are.

15         THE CLERK:  Jurors, the following names I'm

16   about to call are the people who have been selected to

17   this jury.  If you hear your name called, please remain

18   in your seat.  The other jurors are excused with the

19   thanks of the Court.

20         Christopher Valant, Anthony Bracco, Rita

21   Vella, Valsa Mammen and Gerard Trotta.  Those jurors

22   please remain seated.  The other jurors are excused with

23   the thanks of the Court.  Thank you very much for your

24   service and your time.  He will direct you further.

25         Will the jurors please rise?  Raise your right

1    hand.

2                   (Whereupon, the selected jurors were duly

3    sworn by the Clerk of the Court.)

4                   THE CLERK:  Are these jurors acceptable to the

5    People?

6                   MR. PERRI:  Yes, your Honor.

7                   THE CLERK:  To the defense?

8                   MR. ZERNER:  They are.

9                   THE COURT:  Ladies and gentlemen, you are now

10   sworn jurors on this trial.

11                  Mr. Valant, as you were the first juror

12   selected, you will be the jury foreperson.

13                  PROSPECTIVE JUROR:  Yes.

14                  THE COURT:  I will give you further

15   instructions on those duties when we have a full jury,

16   okay.

17                  Now, you will report back to a designated

18   meeting area on Tuesday morning to be ready to go to

19   work at 9:30 a.m.  I do caution you to come to Court

20   earlier than that, obviously, so that you can get

21   yourself a parking spot closest to the courthouse.  You

22   will speak to the court officers.

23                  Now, because you are sworn jurors, I have to

24   give you some admonitions and I'll give you the

25   shortened version because I'll give the full version

1     when we have the full jury.  Essentially it's this:

2              Don't talk about the case to anyone.  You can

3     tell your employers that you have been selected as a

4     juror and that you have to be in Court on such and such

5     a date at such and such a time.  That's all you can say

6     to your employers, family members and such.

7              Don't talk about any of the substance of the

8     case.

9              Don't read about the case.  If you see

10    something in the newspapers or hear something on the

11    television, turn it off.

12             Don't research any issues or any of the

13    person's involved in this case, the names you have heard

14    as such.

15             Don't visit any of the places mentioned so

16    far.

17             Report to me if anyone tries to persuade you

18    through an offering of money or some other offering to

19    give them information about the case, whoever that may

20    be.  And if you see someone else on the jury being

21    approached, also report that to me.

22             Finally, as I say to all jurors, simply forget

23    about the case until you're next in Court.  That will be

24    Tuesday morning, 9:30 a.m. and that's because we're

25    continuing the selection process of jurors.

Voir Dire                                          124

1              (Whereupon the selected jurors exited the

2     courtroom.)

3              THE COURT:  Ladies and gentlemen, we're going

4     to go through the second set of jury selection.

5              THE CLERK:  The following prospective jurors

6     please step up:

7              Aida Perla, P-E-R-L-A, seat one.

8              Seat two, John Harris, H-A-R-R-I-S.

9              Seat three, Richard Ferrara, F-E-R-R-A-R-O.

10             Seat four, Howard Granat, G-R-A-N-A-T.

11             Seat five, Damiano Leoni, D-A-M-I-A-N-O

12     L-E-O-N-I.

13             Seat six, Charles Tergino, T-E-R-G-I-N-O.

14             Seat seven, Alan Cantor, C-A-N-T-O-R.

15             Seat eight, Matthew Smith, S-M-I-T-H.

16             Seat nine, Dawn Trentadue, Trentadue.

17             Seat ten, Malti Bisht, M-A-L-T-I  B-I-S-H-T.

18             Seat 11, Hyang Chang, H-Y-A-N-G  C-H-A-N-G.

19             Seat 12, Gavin Rendell, R-E-N-D-E-L-L.

20             Seat 13, Nancy Leya, L-E-Y-A.

21             Seat 14, Yoselin Benedict, Y-O-S-E-L-I-N

22     B-E-N-E-D-I-C-T.

23             THE COURT:  Can I see counsel for one second?

24             (A discussion was held off the record.)

25             THE COURT:  Mr. Cantor, hi.  You have

Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                      125

1    indicated that you have had some difficulty hearing the

2    proceedings?

3                    PROSPECTIVE JUROR:  Yeah, when I was out

4    there.

5                    THE COURT:  Do you wear a hearing aid?

6                    PROSPECTIVE JUROR:  No.  I tried once a couple

7    of years ago but I had difficulty with it, so I returned

8    it.

9                    THE COURT:  Is it customary that you miss some

10   of what people say, even in general conversation with

11   you?

12                   PROSPECTIVE JUROR:  I think that's fair.

13                   THE COURT:  So, Mr. Cantor, you are excused

14   with the thanks of the Court and you will be returned

15   back to central jury.

16                   Ms. Chang, you are excused as well.  Thank you

17   for your service.  Ms. Chang was excused for language

18   difficulties.

19                   THE CLERK:  Seat seven, prospective juror

20   Susannamma, S-U-S-A-N-N-A-M-M-A, Cherian, C-H-E-R-I-A-N.

21                   Seat number 11, William Reed, R-E-E-D.

22                   THE COURT:  Okay, ladies and gentlemen, I'm

23   going to go out of order this time because I'd like to

24   speak to two of the prospective jurors who had indicated

25   earlier that they may have some concerns about the

Voir Dire                                                    126

1       presumption of innocence and that's Ms. Leya.

2               PROSPECTIVE JUROR:  It wasn't more for that,

3       for my background.  I have a son who is in the seminary

4       and he's in his fourth year of becoming a priest and I

5       have two nephews, one is a priest and one is another

6       seminarian and I have another niece who is a nun.  I

7       didn't want that to cause any problems with the trial.

8               THE COURT:  Well, does that relationship and

9       those professions and occupations and callings of your

10      relatives impact your decision-making process?

11              PROSPECTIVE JUROR:  Not mine, but I wanted to

12      make sure it was fair for the defendant if anything is

13      in my background.

14              THE COURT:  As well as being fair to the

15      People?

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  So as I indicated, the defendant

18      is presumed innocent.  He has no burden in the case

19      whatsoever.  The People have the obligation to prove the

20      charges beyond a reasonable doubt.  And if they don't,

21      you acquit the defendant or find him not guilty.  If the

22      People do sustain their burden, then you would find him

23      guilty.  Can you do that?

24              PROSPECTIVE JUROR:  Yes, I can.

25              THE COURT:  Thank you, ma'am.

Voir Dire                                                127

1              Ms. Trentadue, you also raised your hand

2     earlier with regard to the legal principle of

3     presumption of innocence.  Do you want to talk about

4     that a little bit?

5              PROSPECTIVE JUROR:  I have a 13-year-old

6     daughter and she is my world and I don't know.  I

7     believe that parents have a lot to do with their child's

8     upbringing, so that's one thing.  But I also believe

9     there are a lot of things around them that can harm

10    them, so that is what makes me worried.

11             THE COURT:  So in my instructions earlier I

12    said there is an accusation made by a government

13    official and Mr. Ross has denied that accusation.  So,

14    there is now a process of finding what the facts are and

15    that's a trial in our system of justice.  And because

16    the People make the accusation, they have the burden of

17    proving those accusations by offering proof through

18    evidence.  And we talked about the types of evidence;

19    testimony of witnesses, videos, objects.  I don't know

20    what the People are going to present, but there are

21    those different types of evidence that we talked about.

22             If the People don't prove their case, then you

23    must acquit or find the defendant not guilty.  If the

24    People do meet their burden, sustain their burden of

25    proof beyond a reasonable doubt, then you find the

Voir Dire                                                    128

1    defendant guilty.  Can you follow that principle of law?

2              PROSPECTIVE JUROR:  I want to say yes.

3              THE COURT:  But do you think because you have

4    a daughter, a 13-year-old, that if a child testified --

5              PROSPECTIVE JUROR:  I may be biased toward the

6    child.

7              THE COURT:  Believing what she says just

8    because she says it and of her age and because you have

9    a child of the same age?

10             PROSPECTIVE JUROR:  I guess I can't believe

11   like an innocent child could lie, I guess.

12             THE COURT:  Lie or be mistaken or make things

13   up.

14             PROSPECTIVE JUROR:  I'm sure they can be

15   coerced to make things up, I'm sure, but my daughter

16   couldn't, you know.

17             THE COURT:  You have to be able to promise me,

18   you can't try.  There is an old saying, you know, if you

19   go on an airplane and the pilot says I'm going to try to

20   get you to Florida, would you go on that airplane?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  You want the pilot that says I can

23   get you to Florida.  I have the skill, experience,

24   et cetera.  And in this particular instance, we want,

25   expect and need jurors who can give their full

1    commitment to being unbiased and not prejudiced for one

2    side or the other, that they would be able to put aside

3    any of those empathies or sympathies and then look at a

4    witness and listen to a witness and evaluate that

5    witness based on how you would evaluate anyone that you

6    come across, either in your professional lives or your

7    personal lives, and decide whether they are truthful and

8    they're accurate.  Or are they telling a lie or are they

9    simply mistaken.  And then, when you make those

10   determinations, to apply whatever weight you deem is

11   appropriate to the testimony.

12           For example, the witness could say it's sunny

13   out today and that's truthful and it's accurate, but did

14   it really have any impact on the issues to be

15   determined?  If not, then great, the witness was

16   truthful and accurate, but it didn't mean anything

17   because it had no bearing on the issues.  Can you

18   promise me that you can do that?  Or is your

19   relationship with your daughter such that this is

20   probably not the right case for you?

21           PROSPECTIVE JUROR:  I don't believe this is

22   the right case for me.

23           THE COURT:  That's fine, ma'am, we appreciate

24   it and I thank you for your frankness and I'm going to

25   excuse you with the thanks of the Court and return you

Voir Dire                                                      130

```
 1        to central jury.

 2                  THE CLERK:  The following prospective juror

 3        please step up, Susan Rosen, R-O-S-E-N.

 4                  THE COURT:  Ms. Leya, so we had our earlier

 5        discussion and then you heard my comments and my

 6        colloquy with Ms. Trentadue.  Can you promise me you can

 7        be fair and impartial?

 8                  PROSPECTIVE JUROR:  Yes, your Honor.

 9                  THE COURT:  Thank you.

10                  Ms. Perla, hi.

11                  PROSPECTIVE JUROR:  Hi.  How are you?

12                  THE COURT:  Good, thanks.

13                  Now, you are employed as a security officer?

14                  PROSPECTIVE JUROR:  Yes, I am.

15                  THE COURT:  So is that in a store setting?

16                  PROSPECTIVE JUROR:  It's a huge company.  It's

17        Allied Barton, but I work at a pharmaceutical.

18                  THE COURT:  Can you just generally describe

19        your responsibilities?

20                  PROSPECTIVE JUROR:  I'm the supervisor there,

21        so I'm in charge of about six other security officers.

22        I patrol in the security vehicle making sure they are

23        doing what they are supposed to do.

24                  THE COURT:  As a supervisor?

25                  PROSPECTIVE JUROR:  Yes.
```

Voir Dire                                                        131

1              THE COURT:  What are the line officers doing,

2       if you will?

3              PROSPECTIVE JUROR:  Monitoring cameras.  TV

4       cameras.

5              THE COURT:  In the manufacturing plant?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  It's a manufacturing plant?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  So you are supervising security

10      officers who are monitoring the employees?

11             PROSPECTIVE JUROR:  Yeah, because it's like

12      seven different buildings, so they're like a mile away

13      from each other so that's why I have the vehicle so I

14      can get to the different places.

15             THE COURT:  Are you monitoring the outside

16      areas and perimeters?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Nothing inside with employees?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  So you are just looking for

21      trespassers or other individuals who are not authorized

22      to be in particular areas?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And you have indicated on your

25      form that you may know someone who might have been the

Voir Dire                                                              132

1      victim of a crime.

2                PROSPECTIVE JUROR:  Myself.

3                THE COURT:  Can you talk about that?

4                PROSPECTIVE JUROR:  When I was younger, I was

5      in the child's shoes.

6                THE COURT:  Okay.  Why don't you come on up.

7                (Whereupon, the following discussion was held

8      at the bench:

9                THE COURT:  So when you say you were in the

10     child's shoes, are you saying that --

11               PROSPECTIVE JUROR:  I was sexually abused from

12     the age of 12 to the age of 16 and nothing happened

13     because I didn't open my mouth until I was 18.

14               THE COURT:  Was that with a family member?

15               PROSPECTIVE JUROR:  A friend of the family

16     member.

17               THE COURT:  Counsel have any questions?

18               MR. ZERNER:  Do you think you can be fair and

19     impartial listening --

20               PROSPECTIVE JUROR:  I can't promise you

21     anything.

22               MR. ZERNER:  Do you think you would be better

23     suited for a different type of case?

24               PROSPECTIVE JUROR:  Yes.

25               THE COURT:  Any further questions?

Voir Dire                                                        133

1              MR. ZERNER:  Those are all the questions I

2        have.

3              THE COURT:  Any questions?

4              MR. PERRI:  No, your Honor.

5              THE COURT:  Ms. Perla, I want to thank you for

6        being here.  I also want to thank you for your frankness

7        and I'm truly sorry for the experience that you had to

8        endure and I hope you find peace and solace even though

9        you didn't find justice.

10             I'm going to excuse you and you just follow

11       the directions of the court officer and he'll bring you

12       back to the central jury or tell you to go back to

13       central jury.

14             MR. ZERNER:  Good luck.

15             THE COURT:  Good luck, ma'am.)

16             (Whereupon, the proceedings continued in open

17       court.)

18             THE CLERK:  The following prospective juror

19       please step up, Gary Goldberg, G-O-L-D-B-E-R-G.

20             THE COURT:  Mr. Goldberg, hi.

21             PROSPECTIVE JUROR:  How are you doing?

22             THE COURT:  Good, thanks.

23             Can you tell me what your occupation is?

24             PROSPECTIVE JUROR:  I'm a medical record aid

25       at Nassau University Medical Center.

Voir Dire                                                    134

1              THE COURT:  You are an administrator at the

2    hospital?

3              PROSPECTIVE JUROR:  I work in the medical

4    record department and correspond to people or companies

5    that want a copy of a patient's record when they were

6    there, I'll print it out and mail it out to whoever.

7              THE COURT:  Whoever the questioner is?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Who do you know in law offices?

10             PROSPECTIVE JUROR:  My brother's a lawyer in

11   Brooklyn.

12             THE COURT:  Does he do criminal defense?  Does

13   he do prosecution?  Does he do civil matters?

14             PROSPECTIVE JUROR:  He does a lot of like

15   malpractice and that sort of stuff.

16             THE COURT:  Does he talk to you about his

17   cases?

18             PROSPECTIVE JUROR:  Just that he has a case.

19   No details.

20             THE COURT:  Very good.

21             Anything about your life experience or this

22   case that would prevent you from being able to sit as a

23   juror?

24             PROSPECTIVE JUROR:  No, sir.

25             THE COURT:  Mr. Harris, good afternoon.

Voir Dire                                                                                      135

1              PROSPECTIVE JUROR:  Good afternoon.

2              THE COURT:  You have served on federal jury

3      duty?

4              PROSPECTIVE JUROR:  It was a civil case that

5      got moved from Nassau into Brooklyn into the Federal

6      Court.

7              THE COURT:  You understand it's completely

8      different?

9              PROSPECTIVE JUROR:  Yeah.

10             THE COURT:  And you will be able to follow my

11     instructions on the law?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  You have indicated that you know

14     someone who might have been the victim of a crime.

15             PROSPECTIVE JUROR:  Myself.

16             THE COURT:  Can you talk about that?

17             PROSPECTIVE JUROR:  I was on a consulting

18     assignment in Las Vegas and somebody broke into my hotel

19     room and stole my clothes and computers and everything

20     else.

21             THE COURT:  Were the police called?

22             PROSPECTIVE JUROR:  Yeah, but they said what

23     happens in Vegas stays in Vegas.

24             THE COURT:  Are you satisfied with the way

25     everyone handled the matter?

1          PROSPECTIVE JUROR:  Pretty much.  What are you

2     going to do.  I was going in and out every couple of

3     days for a month or so on assignment.

4               THE COURT:  Okay.

5               Who do you know in law enforcement?

6               PROSPECTIVE JUROR:  My brother was N.Y.P.D.

7               THE COURT:  Anything about your relationship

8     with your brother and his job that would prevent you

9     from being fair and impartial on a criminal case?

10              PROSPECTIVE JUROR:  Not at all.

11              THE COURT:  Mr. Ferrara, how are you, sir?

12              PROSPECTIVE JUROR:  Well, thank you.

13              THE COURT:  Who do you know that testified in

14    Court?

15              PROSPECTIVE JUROR:  It was me.

16              THE COURT:  Can you talk about that?

17              PROSPECTIVE JUROR:  Yeah.  I was a supervisor

18    at a local store and it was a shoplifting, so they

19    brought me in as a witness.

20              THE COURT:  So you were subject to questioning

21    by the assistant district attorney?

22              PROSPECTIVE JUROR:  Yes.

23              THE COURT:  And then you were subject to

24    cross-examination by a defense counsel?

25              PROSPECTIVE JUROR:  Yes.

1            THE COURT:  Anything about that experience

2    that would make you favor one side or the other --

3            PROSPECTIVE JUROR:  No.

4            THE COURT:  -- as a juror?

5            PROSPECTIVE JUROR:  No.

6            THE COURT:  Did you own the liquor store or

7    did you work there?

8            PROSPECTIVE JUROR:  It wasn't a liquor store.

9            THE COURT:  I'm sorry, I thought you said

10   liquor store.

11           PROSPECTIVE JUROR:  It was a pharmacy.

12           THE COURT:  Did you own it?

13           PROSPECTIVE JUROR:  No, I was an employee.

14           THE COURT:  Were there any weapons involved in

15   it?

16           PROSPECTIVE JUROR:  No, it was a simple

17   shoplifting.  The guy came in, took items and tried to

18   run out the store.

19           THE COURT:  Now you work for the United States

20   Postal Service.

21           PROSPECTIVE JUROR:  Yes, I do.

22           THE COURT:  Anything about your life

23   experience that would prevent you from being fair and

24   impartial?

25           PROSPECTIVE JUROR:  No.

Voir Dire                                        138

1          THE COURT:  Mr. Granat, is that how you

2     pronounce your name?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  No jury experience.

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  You don't know anyone who might

7     have been the victim of a crime or convicted of a crime?

8          PROSPECTIVE JUROR:  No, sir.

9          THE COURT:  Are you retired now, sir?

10          PROSPECTIVE JUROR:  Trying not to be.

11          THE COURT:  So presently unemployed?

12          PROSPECTIVE JUROR:  Presently unemployed.

13          THE COURT:  Can you tell me what you were

14     doing prior.

15          PROSPECTIVE JUROR:  Medical book store

16     manager.  But I must be honest and say I do, on

17     reflection, think I would be biased as a father of four

18     and grandfather of six.

19          THE COURT:  You have four girls, right?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  How many grandchildren are girls?

22          PROSPECTIVE JUROR:  Three and three.

23          THE COURT:  And when you say you would bring a

24     bias, what do you mean by that?

25          PROSPECTIVE JUROR:  I don't feel I could

Voir Dire                                                      139

1    honestly be open to consider both sides when it comes to

2    a case of child abuse.

3              THE COURT:  So you have made a decision

4    already essentially, is that what you are telling the

5    Court?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  And no matter what's been

8    presented --

9              PROSPECTIVE JUROR:  I don't feel I could

10   honestly give equal credence to both sides.

11             THE COURT:  Thank you, sir.

12             Mr. Leoni.

13             PROSPECTIVE JUROR:  Good afternoon, your

14   Honor.

15             THE COURT:  You know someone that might have

16   been the victim of a crime.

17             PROSPECTIVE JUROR:  Myself.

18             THE COURT:  Can you talk about that?

19             PROSPECTIVE JUROR:  It was years ago.  I was

20   Christmas shopping and I got approached by a couple of

21   gentlemen for whatever I had in my pocket.

22             THE COURT:  And do you know somebody that

23   might have been accused of a crime?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Can you talk about that?

1                PROSPECTIVE JUROR:  No.

2                THE COURT:  Can you talk about it privately up

3       here with me?

4                PROSPECTIVE JUROR:  Yes, your Honor, I can.

5                (Whereupon, the following discussion was held

6       at the bench:

7                THE COURT:  Okay.

8                PROSPECTIVE JUROR:  I would like to go off the

9       record.

10               THE COURT:  We can't go off the record, so

11      let's just see if we can kind of address it.

12               Did it involve you?

13               PROSPECTIVE JUROR:  Not directly, no.

14               THE COURT:  Did it involve a family member?

15               PROSPECTIVE JUROR:  Yes.

16               THE COURT:  That person was accused of a

17      crime?

18               PROSPECTIVE JUROR:  Correct your Honor.

19               THE COURT:  Here in Nassau County?

20               PROSPECTIVE JUROR:  Yes, correct, your Honor.

21               THE COURT:  Was there a trial?

22               PROSPECTIVE JUROR:  Yes, your Honor.

23               THE COURT:  Was there a resolution or a

24      disposition?

25               PROSPECTIVE JUROR:  A resolution meaning?

Voir Dire                                                         141

1           THE COURT:  Was there a verdict?

2           PROSPECTIVE JUROR:  Yes, your Honor.

3           THE COURT:  And you were close to this

4      individual?

5           PROSPECTIVE JUROR:  Yeah.  I'm his son.

6           THE COURT:  And having had that experience, I

7      presume you saw some of the proceedings.

8           PROSPECTIVE JUROR:  I read about it in the

9      paper.

10          THE COURT:  Were you involved in anything

11     directly?

12          PROSPECTIVE JUROR:  I directly wasn't

13     involved, no.

14          THE COURT:  Do you hold a bias towards anyone

15     based on the experience?

16          PROSPECTIVE JUROR:  To be honest with you,

17     your Honor, it has nothing to do with the case that is

18     proceeding here today, so I mean, it's one thing doesn't

19     have to do with another.  Totally different

20     circumstances of what's going on here today.

21          THE COURT:  Do you feel that the district

22     attorney was fair in their duties?

23          PROSPECTIVE JUROR:  Both these guys?  In

24     regards to?  These guys here today?

25          THE COURT:  No, when your family member was

1    prosecuted.

2              PROSPECTIVE JUROR:  No, I don't think they

3    were.

4              THE COURT:  And it happened here in Nassau

5    County.

6              Was it recent or was it a long time ago?

7              PROSPECTIVE JUROR:  It was five years ago and

8    some of the family is still on probation and one family

9    member is in the witness protection.

10             THE COURT:  And you are not happy or you don't

11   believe that the assistant district attorney who

12   prosecuted that case treated the family members fairly.

13             PROSPECTIVE JUROR:  Certain family members,

14   no.  Like I said --

15             THE COURT:  Do you think you would be better

16   off on another case, on a civil case to act as a juror

17   to fulfill your responsibility?

18             PROSPECTIVE JUROR:  It all depends what the

19   case is about, your Honor.

20             THE COURT:  Understandably, but you would be

21   more comfortable on a civil case than you would on a

22   criminal case?

23             PROSPECTIVE JUROR:  I know what's criminal.

24             THE COURT:  A car accident or a medical

25   malpractice.

Voir Dire                                                        143

1          PROSPECTIVE JUROR:  I don't know.  I really

2     wouldn't know.  I know the difference between criminal

3     and civil.  Civil I think of like divorce and stuff like

4     that.

5          THE COURT:  Yeah.

6          PROSPECTIVE JUROR:  Car accident, I don't know

7     if I can do that.

8          MR. PERRI:  In a case where there is not a

9     prosecutor and it's not the government or the district

10    attorney's office and the police department involved but

11    two private citizens, would you feel more comfortable in

12    that case than dealing with a district attorney and

13    police from Nassau County?

14         PROSPECTIVE JUROR:  Yeah, which is two

15    individuals, that's fine.

16         THE COURT:  Counsel, you have any questions?

17         MR. ZERNER:  The case that you are talking

18    about, did it involve any kind of children witnesses or

19    children complainants?

20         PROSPECTIVE JUROR:  No.

21         MR. ZERNER:  Was it a federal case that they

22    ended up in witness protection?

23         PROSPECTIVE JUROR:  I don't wish to comment

24    any further.

25         MR. ZERNER:  Okay.

Voir Dire                                                    144

1        THE COURT:  Well, let me just ask you this

2   with regard to that line of inquiry, was it the Nassau

3   County District Attorney's Office that prosecuted the

4   case or was it another jurisdiction?

5        PROSPECTIVE JUROR:  It was definitely Nassau

6   County.  Then I guess it kind of escalated to --

7        THE COURT:  The federal level.

8        PROSPECTIVE JUROR:  Something like that.  I

9   wanted to stay out of it as much as I can and not be

10  involved because I have my own life to live and I'm on

11  the straight and narrow.

12       THE COURT:  Understood.  All right, sir, I'm

13  just going to ask you to step over to the side for a

14  second with the clerk.  You have all your gear?

15       PROSPECTIVE JUROR:  Yes, I do.

16       THE COURT:  Thank you very much for your

17  comment.

18       PROSPECTIVE JUROR:  I apologize for taking up

19  the Court's time.

20       THE COURT:  Not at all.

21       (Whereupon, the prospective juror exited the

22  discussion.)

23       THE COURT:  The Court believes that there is

24  just cause to disqualify him for this particular case,

25  Counsel.

1           MR. PERRI:  Yes, your Honor.

2           MR. ZERNER:  I agree, your Honor.

3           THE COURT:  Excused.

4           (Whereupon, the prospective juror was excused

5       and the proceedings continued in open court.)

6           THE CLERK:  The following prospective juror

7       step up, Lauren Groeger, G-R-O-E-G-E-R.

8           THE COURT:  Ms. Groeger, thank you for your

9       patience, but your number was called, as they say.  I'm

10      going to give you a chance to kind of relax, get

11      comfortable in the seat and I'll come back to you, okay.

12          PROSPECTIVE JUROR:  Okay.

13          THE COURT:  Mr. Tergino, good afternoon.  You

14      have indicated in your questionnaire that you may have

15      known someone that was the victim of a crime.

16          PROSPECTIVE JUROR:  Yes, my son was robbed at

17      knifepoint by about three individuals.

18          THE COURT:  Was that in Nassau County?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Was it recently?

21          PROSPECTIVE JUROR:  He was a teenager.  About

22      maybe ten years ago.

23          THE COURT:  Were the police called?

24          PROSPECTIVE JUROR:  We went to the precinct to

25      make a report so they knew there were individuals in the

1    area.

2              THE COURT:  Did it go any further than you

3    filing a report with your son?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Are you satisfied with the way the

6    police handled the case?

7              PROSPECTIVE JUROR:  Yeah, I would say so.

8              THE COURT:  Would you have any favoritism or

9    bias for or against a police officer witness simply

10   because he's a police officer, based on that experience?

11             PROSPECTIVE JUROR:  No, I don't think so.

12             THE COURT:  Who might you know that works in a

13   law office?

14             PROSPECTIVE JUROR:  My cousin is a lawyer.

15   He's a lawyer in Nassau County, but it's not criminal.

16             THE COURT:  So he's not in the district

17   attorney's office?

18             PROSPECTIVE JUROR:  Private.

19             THE COURT:  He's a private attorney that

20   handles civil matters essentially?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Do you ever talk to him about his

23   work?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Anything about the case or your

Voir Dire                                                      147

1    life experience that would prevent you from being fair

2    and impartial?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Ms. Cherian, hi.  You have never

5    served as a juror before, have you?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Have you been able to understand

8    everything that I have said today?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Have you been able to understand

11   the questions of the attorneys?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  And when they have asked other

14   potential jurors questions?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  And you work as a nurse?

17             PROSPECTIVE JUROR:  Yeah.

18             THE COURT:  What type of nursing do you do?

19             PROSPECTIVE JUROR:  Patient care, assist

20   medications, admissions, discharges.

21             THE COURT:  Just in a general recovery ward?

22             PROSPECTIVE JUROR:  General.

23             THE COURT:  Anything that you want to tell me

24   that would prevent you from being able to be a fair and

25   impartial juror?

Voir Dire

1    PROSPECTIVE JUROR:  Nothing.

2    THE COURT:  Did you understand what I asked?

3    PROSPECTIVE JUROR:  Yes, I understood.

4    THE COURT:  You can be fair and impartial?

5    PROSPECTIVE JUROR:  Yeah.

6    THE COURT:  Yes?

7    PROSPECTIVE JUROR:  Yes.

8    THE COURT:  You seem hesitant.  Is there

9  something about the case that makes you have a concern?

10    PROSPECTIVE JUROR:  Not really.

11    THE COURT:  You will listen to the evidence?

12    PROSPECTIVE JUROR:  Yeah.

13    THE COURT:  And you will make a decision based

14  on the evidence?

15    PROSPECTIVE JUROR:  Yeah.  Not myself, I have

16  a team.  My head nurses and supervisors, I have to go by

17  everybody making decisions.  I cannot make a decision

18  myself.

19    THE COURT:  You don't make a decision

20  yourself, but you will have to make a decision by

21  yourself in this case.  Do you understand that?

22    PROSPECTIVE JUROR:  Yeah.

23    THE COURT:  Do you know how many of the jurors

24  have to agree before a verdict can be rendered?

25    PROSPECTIVE JUROR:  No.

Voir Dire                                          149

```
1                THE COURT:  Okay.  Thank you, ma'am.

2                Mr. Smith, good afternoon.

3                PROSPECTIVE JUROR:  Good afternoon, sir.

4                THE COURT:  Who do you know in law

5      enforcement?

6                PROSPECTIVE JUROR:  People I work with and a

7      couple of my friends.

8                THE COURT:  And you're a public safety

9      officer?

10               PROSPECTIVE JUROR:  Yes, for Nassau County.

11               THE COURT:  What's your role as a public

12     safety officer?

13               PROSPECTIVE JUROR:  I'm stationed at traffic

14     court.  Nassau County Traffic Court and over at the

15     Department of Social Services.

16               THE COURT:  Are you a peace officer?  Do you

17     have peace officer status?

18               PROSPECTIVE JUROR:  No, we're security

19     officers, but we do pretty much all the same work that

20     the court officers do.

21               THE COURT:  So you deal with police officers

22     on a daily basis?

23               PROSPECTIVE JUROR:  Yes, at traffic court we

24     assist in arrests and the police officers over there.

25               THE COURT:  Anything about your role as a
```

Voir Dire                                                            150

1    public safety officer that would prevent you from being

2    fair and impartial?

3                PROSPECTIVE JUROR:  Well, I would lean towards

4    the police officers, what they are saying, over someone

5    else.

6                THE COURT:  And that's because?

7                PROSPECTIVE JUROR:  Because they are trained

8    in observing and stuff like that.

9                THE COURT:  Well, would that be the -- would

10   the fact that the individual is a police officer make

11   you decide that that individual was telling the truth?

12               PROSPECTIVE JUROR:  No, it would just persuade

13   me a little bit more if a police officer was saying

14   something.

15               THE COURT:  Because of particular training?

16               PROSPECTIVE JUROR:  Yes.

17               THE COURT:  So that's -- is that simply one

18   factor that you would take into consideration in

19   evaluating the truthfulness or accuracy of that witness?

20               PROSPECTIVE JUROR:  No.

21               THE COURT:  Or is that the only factor you

22   would take?

23               PROSPECTIVE JUROR:  I would say that's the

24   only factor.

25               THE COURT:  So if Police Officer Jones got

Voir Dire                                                    151

1    here on the stand, you would believe everything he said

2    because he's a police officer and he was trained?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  So if Police Officer Jones came up

5    here on the stand, how would you evaluate his

6    credibility?

7              PROSPECTIVE JUROR:  It's hard to say.

8              THE COURT:  Well, if Mr. Jones came up here on

9    the witness stand, how would you evaluate his

10   credibility?

11             PROSPECTIVE JUROR:  You would have to -- like,

12   it's hard to say.  You listen to the evidence and

13   everything else.

14             THE COURT:  Would you listen and hear what he

15   had to say, right?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  You would listen and hear whether

18   he had or was in close proximity of the events that he's

19   talking about, right?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  You would look at his demeanor,

22   right?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And determine or you would also

25   look at the way and listen to the way he answered

Voir Dire                                          152

1    questions, whether he sounded credible or if he was

2    testifying to things that are simply incredible, right?

3    You would take those considerations into account?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Would you do the same for Police

6    Officer Jones?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  So the mere fact that Police

9    Officer Jones is a police officer doesn't have or does

10   have bearing on how you would evaluate his credibility?

11             PROSPECTIVE JUROR:  It shouldn't, but it still

12   does.

13             THE COURT:  Okay.

14             Ms. Rosen, good afternoon.  You have indicated

15   here on your questionnaire that you know someone that

16   might have been the victim of a crime?

17             PROSPECTIVE JUROR:  Yes.  My daughter a few

18   years ago was seeing a young man who was the victim of

19   sexual abuse when he was a child and she was seeing him

20   for about a year and then she broke up with him because

21   she just was afraid that maybe he would repeat some of

22   the things that went on with him.

23             THE COURT:  Okay.  I'm going to stop you there

24   because it's about 4:30 and it's time to break.  We have

25   other potential jurors that we have to get to as well

Voir Dire                                                    153

1    tomorrow.  So, we'll stop there and we'll continue

2    tomorrow and, Ms. Groeger, you have a whole night to

3    relax before you get to be questioned.

4              Can I see counsel for a second, please?

5              (Whereupon, a discussion was held off the

6    record.)

7              THE COURT:  Ms. Cherian, I want to thank you

8    for coming in to Court today and volunteering to be a

9    juror, but I'm going to excuse you, okay.

10             PROSPECTIVE JUROR:  Thank you.

11             THE COURT:  You will be free to go and please

12   follow the directions of the court officer.

13             PROSPECTIVE JUROR:  Thank you so much.

14             THE COURT:  You're welcome.

15             THE CLERK:  Perez Franklin, F-R-A-N-K-L-I-N.

16             THE COURT:  Sergeant, just hold one second.

17             So, ladies and gentlemen, it's 4:30 and I'm

18   going to excuse you.  Remember my admonitions.  Forget

19   about the case until tomorrow morning when you come back

20   at the designated location so we can continue this

21   selection process.

22             Ladies and gentlemen in the audience, your

23   names haven't been called yet, but you never know, they

24   may be called tomorrow morning, so you will be back here

25   at 9:00.  Be here so that we can get started by 9:30.

Voir Dire

1    The court officer will tell you exactly where to form

2    up.  Thank you very much.

3              (Whereupon, the prospective jurors exited the

4    courtroom.)

5              THE COURT:  Counsel, anything for the record?

6              MR. PERRI:  No, your Honor.

7              MR. ZERNER:  No, your Honor, thank you.

8              THE COURT:  Very good.  So we'll continue

9    tomorrow morning and then we'll talk about the

10   scheduling tomorrow.

11             (Whereupon, the trial was adjourned to

12   February 5, 2016.)

13

14              *              *              *

15

16

17

18

19

20

21

22

23

24

25

Kathi A. Fedden, Sr. Court Reporter

1    SUPREME COURT OF THE STATE OF NEW YORK
          COUNTY OF NASSAU  :  PART 47
2    --------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3
4              -against-                    Ind. No. 1050N/15
5                                           JURY TRIAL
6    RAY ROSS,
7                        DEFENDANT.
     --------------------------------------x
8
                         Mineola, New York
9                        February 5, 2016
10
11   B E F O R E:   HON. TERENCE P. MURPHY
                    Acting Supreme Court Justice
12
13   A P P E A R A N C E S:
14
               (Same as previously noted)
15
16
                    Kathi A. Fedden
17                  Official Court Reporter
18
19              *              *              *
20
21              THE CLERK:  Continued case on trial,
22        Indictment 1050N of '15, People v. Ray Ross.
23              Are the People ready to proceed?
24              MR. PERRI:  Yes, your Honor, the People are
25        ready.

Voir Dire                                                        156

1          THE CLERK:  Defense ready?

2          MR. ZERNER:  We are ready.

3          THE CLERK:  Let the record reflect the

4     presence of Mr. Ross.  The prospective jurors are not in

5     the courtroom at this time.  Shall we bring the jurors

6     in, Judge?

7          THE COURT:  Please.

8          (Whereupon, the prospective jurors entered the

9     courtroom.)

10         THE CLERK:  Let the record reflect the

11    presence of the prospective jurors minus number ten.

12         The following prospective juror step up for

13    seat number ten:  Margaret Mahoney, M-A-H-O-N-E-Y.

14         THE COURT:  Good morning, ladies and

15    gentlemen.  I'm glad to see you here this morning,

16    especially with the crazy weather we're having and it's

17    gotten worse since I have arrived at work and hopefully

18    you were here early enough so the travel wasn't too bad.

19         We continue today with jury selection in this

20    matter.  I know I have spoken with Mr. Goldberg and

21    Mr. Harris yesterday afternoon.  Mr. Ferrara, we

22    commented to each other.  Mr. Granat as well.  So I'll

23    begin today with Ms. Groeger.  Good morning.  Is there

24    anything about the case or your life experience that

25    would prevent you from being fair and impartial in

Voir Dire                                                                157

1    evaluating the evidence and making decisions?

2              PROSPECTIVE JUROR:  No, I think I would be

3    fair.

4              THE COURT:  Who do you know in a law office?

5              PROSPECTIVE JUROR:  Well, my fiance is

6    finishing up law school, but he also works at the law

7    clinic in school and they do deal with criminal

8    defendants as well as other things.  He also works part

9    time at a firm, more corporate securities.

10             My brother's a lawyer and my future

11   sister-in-law is a lawyer also.  They don't deal with

12   criminal.

13             THE COURT:  The relationship with your fiance,

14   does that include him speaking to you about the cases

15   that he assists on?

16             PROSPECTIVE JUROR:  Not in any specific

17   details.

18             THE COURT:  So nothing about that relationship

19   or information that he passed on to you would affect

20   your impartiality?

21             PROSPECTIVE JUROR:  No.  I mean, I have

22   learned a lot just in general about the law from him,

23   but he doesn't really talk to me about any specifics.

24             THE COURT:  Have you learned that as a juror

25   you would have to follow the instructions of the judge?

Voir Dire                                                    158

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Whether you agree with it or not?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  You would apply the law to the

5    facts that you determine based on the testimony of the

6    witnesses and other evidence presented at trial?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Mr. Tergino, we chatted a little

9    bit yesterday.  Anything about the case or your life

10   experience that would prevent you from being fair and

11   impartial?

12         PROSPECTIVE JUROR:  I want the Court to know I

13   am a retired correction officer.

14         THE COURT:  City or Nassau County?

15         PROSPECTIVE JUROR:  City.

16         THE COURT:  How many years did you serve?

17         PROSPECTIVE JUROR:  Twenty.

18         THE COURT:  In that capacity you certainly

19   interacted with individuals who were accused of crimes,

20   convicted of crimes as well and served sentences imposed

21   by the Court.  So you have heard many stories and gotten

22   information about individuals with regard to their

23   circumstances.

24         Can you put all that aside and start fresh, if

25   you will, with regard to hearing the evidence in this

Voir Dire                                                      159

1    case?

2                 PROSPECTIVE JUROR:  It might be a little hard.

3                 THE COURT:  It would be hard for you.  Why is

4    that?

5                 PROSPECTIVE JUROR:  Going through the training

6    academy and being told all along we're responsible for

7    custody and control and everybody is there because they

8    can't make bail or they're awaiting trial, it wasn't

9    always the case.  Probably 98 percent of the time it was

10   not the case.

11                THE COURT:  So do you have a concern that you

12   can't follow the presumption of innocence that the

13   defendant is entitled to?

14                PROSPECTIVE JUROR:  I would try my best, but I

15   feel, like I said, 98 percent of the time between plea

16   bargains or guilty pleas or just outright loss of trial

17   results in -- once a case is indicted, it's usually --

18                THE COURT:  Well, you have heard me instruct

19   you, right, and everyone else that an indictment is

20   simply a mechanism to get an individual to Court to face

21   trial based on an accusation made by a district attorney

22   or a complainant now prosecuted by the district

23   attorney's office.  And the defendant has entered a

24   denial or interposed a denial to that accusation.

25                PROSPECTIVE JUROR:  Absolutely.

Voir Dire                                                                160

```
 1              THE COURT:  But you believe that your history

 2      and experience in law enforcement would prevent you from

 3      being fair and impartial?

 4              PROSPECTIVE JUROR:  I would just say that I'm

 5      a little skeptical because of my experience.

 6              THE COURT:  All right.

 7              Mr. Franklin, good morning.  You work for New

 8      York State?

 9              PROSPECTIVE JUROR:  Yes, sir.

10              THE COURT:  Are you in enforcement in any

11      capacity?

12              PROSPECTIVE JUROR:  To some extent because I'm

13      the tax auditor and we enforce the tax.

14              THE COURT:  So you do investigations.

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  As you audit companies and

17      individuals?

18              PROSPECTIVE JUROR:  No, no, not individuals,

19      just companies.

20              THE COURT:  Companies or corporations?

21              PROSPECTIVE JUROR:  Yes.

22              THE COURT:  If you find something amiss or

23      something that doesn't seem to be right, you further

24      investigate that issue?

25              PROSPECTIVE JUROR:  Yes.
```

Voir Dire                                      161

1          THE COURT:  Then what happens?

2          PROSPECTIVE JUROR:  We would come to a

3   conclusion.  For instance, basically it's for alleged

4   independent contractors.  That's a section of the

5   Department of Labor.

6          THE COURT:  Does it then get turned over to

7   the attorney general?

8          PROSPECTIVE JUROR:  Not really.

9          THE COURT:  You handle it within the tax

10  department?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Would you handle the resolution?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Or negotiation, if you will?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Are there criminal charges ever

17  brought?

18         PROSPECTIVE JUROR:  Not really, no.

19         THE COURT:  So it's a civil matter with regard

20  to status or payment of taxes?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  You know that's completely

23  different than a criminal case?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  You know someone who might have

Voir Dire                                                    162

1        been accused of a crime?

2                    PROSPECTIVE JUROR:  My nephew.

3                    THE COURT:  Can you talk about that?

4                    PROSPECTIVE JUROR:  Not really because I don't

5        know all the details about it.

6                    THE COURT:  Did it happen in Nassau County?

7                    PROSPECTIVE JUROR:  No, no, no, that's in New

8        Jersey.

9                    THE COURT:  You don't know any of the details

10       about it?

11                   PROSPECTIVE JUROR:  No.  I don't want to know

12       because when it comes to criminals, I have a problem

13       with that.

14                   THE COURT:  And was that your nephew who was

15       convicted of a crime?

16                   PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  But you don't know what crime he

18       was convicted of?

19                   PROSPECTIVE JUROR:  Not quite.

20                   THE COURT:  Did it have to do with an assault

21       or did it have to do with drugs?

22                   PROSPECTIVE JUROR:  I think assault something.

23                   THE COURT:  Did you ever go to Court to

24       observe the proceedings?

25                   PROSPECTIVE JUROR:  No, I don't want to go

Kathi A. Fedden, Sr. Court Reporter

1    there at all.

2              THE COURT:  Did you form any opinion as to

3    whether or not your nephew was treated fairly?

4              PROSPECTIVE JUROR:  Not really because once

5    you are involved in criminal activities, forget it.  I

6    don't want to be part of it.

7              THE COURT:  So you kind of disassociated

8    yourself from all that?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  And you don't have any details

11   whatsoever.

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Okay.

14             Mr. Smith, we spoke, right?

15             PROSPECTIVE JUROR:  Yes, sir.

16             THE COURT:  As a public safety officer you had

17   indicated that you might have issues with regard to --

18   with regarding the evaluation of police officers who

19   would testify.  You would give them more credibility

20   because of their position as a police officer; is that

21   correct?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Ms. Rosen, I think we left off

24   with you yesterday.  I'm going to ask you to come on up,

25   if you will.

Voir Dire                                                                            164

1              (Whereupon, the following discussion was held

2       at the bench:

3              THE COURT:  So you had made mention yesterday

4       with regard to some sort of sexual abuse.  I wanted to

5       be able to speak to you about it and have you be able to

6       speak about it with me openly but without anybody else

7       having to hear.  Can you talk about that?

8              PROSPECTIVE JUROR:  My daughter, she was 22 at

9       the time -- 21 and was involved with a young man.  She

10      liked him very much, but halfway through the

11      relationship she found out he was sexually abused as a

12      child, as well as his brother and she kept asking me do

13      you think he's okay, do you think he will be a bad

14      husband, a bad father?  I couldn't answer those

15      questions, so she eventually broke up with him.  That

16      was my first and only exposure.

17             THE COURT:  You know there is an allegation in

18      this case that a young girl or a minor was sexually

19      abused.  Would that experience that your daughter had

20      and all those concerns and issues and doubts impact your

21      ability to make a decision in this case?

22             PROSPECTIVE JUROR:  It would.

23             THE COURT:  You think it would probably

24      influence you in your decision making?

25             PROSPECTIVE JUROR:  Yes.

Voir Dire                                                  165

1          THE COURT:  Counsel, any questions?

2          MR. PERRI:  No objection.

3          MR. ZERNER:  No objection.

4          THE COURT:  We're going to excuse you from

5    this panel.  You will go back to central jury.  Thank

6    you for coming in and I'm sorry that you had to go

7    through that experience with your daughter.  I know it

8    must have been traumatic.

9          PROSPECTIVE JUROR:  Thank you, your Honor, I

10   appreciate it.

11         THE COURT:  Counsel, we have two left I think,

12   so we'll put them in.

13         MR. PERRI:  Judge, is it that we have two

14   left?

15         THE COURT:  Put a seat up here for the last

16   one.

17         MR. PERRI:  Or if you want to excuse either

18   Mr. Smith or the corrections officer at this point for

19   cause.

20         MR. ZERNER:  That's fine, it saves us the

21   problem with having the seats up and down.  Number eight

22   and six, we can let them both go, Judge.

23         THE COURT:  Six and eight?

24         MR. PERRI:  Yes.

25         THE COURT:  Then we'll put the last one in.)

```
 1                    (Whereupon, the proceedings continued in open

 2          court.)

 3                    THE COURT:  Mr. Tergino and Mr. Smith, I want

 4          to thank you both for your service in coming in today

 5          and being part of the selection process, but you are

 6          excused, both of you.  Please follow the direction of

 7          the court officer.  He will tell you what you need to

 8          do.

 9                    THE CLERK:  Seat number six, Clara Arnedo,

10          A-R-N-E-D-O.

11                    Seat number eight, Maria Bruni, B-R-U-N-I.

12                    Seat number nine, Kevin F. White.

13                    THE COURT:  So for those potential jurors who

14          have just taken their seat, I will give you a couple of

15          minutes to relax and get comfortable.  I'll speak with

16          Ms. Mahoney now.

17                    You are a retired fire department EMT; is that

18          correct?

19                    PROSPECTIVE JUROR:  No, no, I'm sorry that's

20          my son and husband.

21                    THE COURT:  You shouldn't be sorry, it was my

22          mistake.  I'm sorry.  Having -- so are both with the

23          fire department?

24                    PROSPECTIVE JUROR:  My son is with the EMT and

25          my husband is retired from National Grid.
```

Voir Dire                                                    167

1              THE COURT:  Does your son speak with you about

2       his work as an EMT for the fire department?

3              PROSPECTIVE JUROR:  He's on the phones right

4       now.  He's communications, so no, he doesn't.

5              THE COURT:  Anything about your son's

6       involvement with the fire department and I suppose with

7       the police officers who respond to those types of

8       incidents that would prevent you from being fair and

9       impartial?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Who do you know that might have

12      been the victim of a crime?

13             PROSPECTIVE JUROR:  My and husband and I.  Our

14      apartment was robbed when we were first married and my

15      sister's house was robbed in the '70s.

16             THE COURT:  You didn't see the perpetrator?

17             PROSPECTIVE JUROR:  No, we just came back from

18      vacation.

19             THE COURT:  Was that in Nassau County?

20             PROSPECTIVE JUROR:  No, Brooklyn.

21             THE COURT:  Were the police called?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  And a report filed?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Any further developments?

Kathi A. Fedden, Sr. Court Reporter

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Are you satisfied with the way the

3    police handled the matter?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Anything about the nature of the

6    case or your life experience that would prevent you from

7    being fair and impartial?

8          PROSPECTIVE JUROR:  Working in a high school I

9    have had some interaction -- I'm a secretary, so I have

10   some limited interaction with a young lady who is a

11   victim of sexual abuse and we all kind of took her under

12   our wing, so that might always stay in the back of my

13   head just how sorry I felt for her.

14         THE COURT:  Right, but you weren't involved in

15   the incident or the situation.

16         PROSPECTIVE JUROR:  Absolutely not.

17         THE COURT:  Or the investigation.

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Or any of the process.

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  So you just have an individual who

22   comes to you with a claim, I suppose, of some sort of

23   inappropriate conduct.

24         PROSPECTIVE JUROR:  Not even that far.  She

25   would sit with me.  My boss is assistant principal, so

1    she would sit with me while my boss is not available to

2    see her yet.  We would strike up conversation about

3    teenage stuff.

4             THE COURT:  You knew because she was going

5    through some sort of traumatic experience, some sort of

6    difficulty, you offered some human kindness to her; is

7    that fair to say?

8             PROSPECTIVE JUROR:  Yes, that's very fair.

9             THE COURT:  And that was a situation within

10   your professional responsibilities, but also as an adult

11   with children of your own.

12            Can you put aside empathy and sympathy and

13   bias based on that experience and deal with the facts as

14   you are going to determine them in this particular case?

15            PROSPECTIVE JUROR:  I think once I heard both

16   sides of the story, I think I could.

17            THE COURT:  Okay.  Now, as you know, I have

18   instructed you, there is only one side that has any

19   burden in this case and that's the district attorney who

20   has to present the evidence that will convince you

21   beyond a reasonable doubt of the defendant's guilt.  If

22   they can't do that, then the defendant is not guilty and

23   you will find that through your verdict.  The defendant

24   has no burden whatsoever.  He has no obligation to

25   explain actions or inactions.  He has no obligation

Voir Dire                                                          170

1    whatsoever to testify at trial and you can't take any

2    adverse inference against that.  He's presumed innocent

3    under our law and that's where you start from, a

4    presumption of innocence.  The district attorney has to

5    rebut that presumption.

6              Can you follow that instruction?

7              PROSPECTIVE JUROR:  I find that confusing.

8    Why do we hear two sides of the story?

9              THE COURT:  Well, you know, in your common

10   life experiences maybe someone would want to say I want

11   to hear both sides.  I want to hear what you want to

12   have to say and I want to hear what you have to say and

13   then I will make my decision.  That's outside in private

14   settings where there's an opportunity to hear both

15   sides.

16             Under our law, when an accusation is made

17   against a person, the entity or the official who is

18   making that allegation has to back it up.  Has to back

19   it up with competent evidence to establish guilt beyond

20   a reasonable doubt.  The individual being accused under

21   our law has no requirement because he's presumed

22   innocent and we give that presumption to every

23   individual who comes to trial in a criminal case.

24             So, under our law and our criminal justice

25   system, the accuser and the prosecutor has to prove the

1      case on their own.  If they can't do it, the defendant

2      is found not guilty.  If they do do it, then the

3      obligation is to find the defendant guilty.  Can you

4      understand that distinction?

5                  PROSPECTIVE JUROR:  I think I understand it

6      better now, yeah.

7                  THE COURT:  That's just the way the rules are

8      and I'm asking you can you follow those rules in

9      deciding whether or not or in deciding this particular

10     case?

11                 PROSPECTIVE JUROR:  I think I could, yes.

12                 THE COURT:  Remember the airplane pilot, okay.

13                 PROSPECTIVE JUROR:  Okay.

14                 THE COURT:  What do you think?

15                 PROSPECTIVE JUROR:  I think the defense side

16     would influence me.  I don't think I could separate the

17     two sides in my head.

18                 THE COURT:  Meaning that you would require the

19     defendant to get up on the witness stand and testify?

20                 PROSPECTIVE JUROR:  No.  I think I feel that

21     like if the prosecutor presents something and then the

22     defense presents something, I would have to weigh those

23     two things to come to a decision.

24                 THE COURT:  And that's exactly what you would

25     do, but if the defendant doesn't put any proof on, then

Voir Dire                                                                     172

1        all you have left is the People's proof and you have to

2        make a decision based on the People's proof.

3                PROSPECTIVE JUROR:  I see.

4                THE COURT:  The defendant has no requirement

5        and although counsel has indicated during jury selection

6        that he expects and intends to put Mr. Ross on the

7        stand, okay, but he's not obligated to and that has to

8        be emphasized.  And if he doesn't, if counsel believes

9        that the district attorney has not proved the case, then

10       he may say, Mr. Ross, you don't have to testify.  I

11       don't want you to testify.  That's their choice,

12       absolutely.  And you can't take any adverse inference.

13       You can't hold it against the defendant if he chooses

14       not to testify.  You just have to rely on what the

15       People have offered as evidence.

16               PROSPECTIVE JUROR:  I think I'm talking more

17       about the defense's case, not necessarily the gentleman,

18       but the whole case that they present.

19               THE COURT:  You know what there case is?

20               PROSPECTIVE JUROR:  He's not guilty.

21               THE COURT:  Ease presumed innocent.  It's up

22       to the district attorney.

23               PROSPECTIVE JUROR:  Okay.

24               THE COURT:  If you are telling me you have to

25       hear from the defense, that's a different issue.

```
 1                PROSPECTIVE JUROR:  No, I don't have to hear,

 2        no.

 3                THE COURT:  And you wouldn't hold it against

 4        the defendant?

 5                PROSPECTIVE JUROR:  No.

 6                THE COURT:  Then you would listen to what

 7        proof the People put on through witnesses and other

 8        types of evidence and make your decision based on that,

 9        evidence or lack of evidence, without holding anything

10        against the defendant?

11                PROSPECTIVE JUROR:  Yes.

12                THE COURT:  I know it is sometimes a

13        counterintuitive rule because people naturally want to

14        get the most information, give me everything and I'll

15        sort it out.

16                Under our rules of evidence and the criminal

17        justice system, that's not the way it goes.  So we

18        always take time to kind of explain it and different

19        questions lead to different answers giving you more

20        information and understanding.

21                Mr. Reed, hi.  You heard all that?  What are

22        you saying?

23                PROSPECTIVE JUROR:  I can be fair and

24        impartial.

25                THE COURT:  You don't have to hear from the
```

Voir Dire                                                    174

1          defense if they choose not to put on any case?

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  You won't hold it against them?

4                    PROSPECTIVE JUROR:  No.

5                    THE COURT:  You will rely on what the People

6          present as evidence and make your decision?

7                    PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  If the defense puts on a case, you

9          he evaluate it all fairly and impartially and come to

10         your own conclusion?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  Now your wife is a paralegal.

13                   PROSPECTIVE JUROR:  Yes.  She does P.I.,

14         personal injury.

15                   THE COURT:  So that's civil cases.  People

16         have a motor vehicle accident or medical malpractice.

17         Completely different law applies.

18                   PROSPECTIVE JUROR:  Wills, trusts and estates,

19         estate planning.

20                   THE COURT:  And with regard to someone you

21         know in the law office, that goes back to your wife?

22                   PROSPECTIVE JUROR:  That's my wife.

23                   THE COURT:  Anything about the nature of the

24         case or your life experience that prevents you from

25         being fair and impartial?

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Mr. Rendell, how are you, sir?

3           PROSPECTIVE JUROR:  Good morning.

4           THE COURT:  You have indicated that you know

5    someone who might have been the victim of a crime?

6           PROSPECTIVE JUROR:  Myself.  Nothing major.

7    My car was burglarized and some things stolen.

8           THE COURT:  Were the police notified?

9           PROSPECTIVE JUROR:  No outcome as of right

10   now.  It was pretty recent.

11          THE COURT:  Are you satisfied with the way the

12   police are handling it?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  You know someone that might have

15   been convicted of a crime?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Can you talk about that?

18          PROSPECTIVE JUROR:  Myself, a DUI nine years

19   ago.

20          THE COURT:  Nassau County?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Obviously it's resolved and

23   concluded.  Anything about the way the police treated

24   you or the assistant district attorney treated you that

25   would prevent you from being fair and impartial to the

Voir Dire                                                            176

1          prosecution side and the defense?

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  Was that matter here in County

4      Court or was it down in District Court?

5                    PROSPECTIVE JUROR:  Main Street.

6                    THE COURT:  Main Street in Hempstead?

7                    PROSPECTIVE JUROR:  Yeah.

8                    THE COURT:  You hold no bias or prejudice

9      against anyone?

10                   PROSPECTIVE JUROR:  No.

11                   THE COURT:  You can be fair and impartial?

12                   PROSPECTIVE JUROR:  Yes.

13                   THE COURT:  Who do you know in law

14     enforcement?

15                   PROSPECTIVE JUROR:  My father is a retired

16     detective out of the Sixth Precinct.

17                   THE COURT:  Did your dad talk to you about his

18     investigations?

19                   PROSPECTIVE JUROR:  Somewhat.

20                   THE COURT:  Did he give you detailed

21     information?

22                   PROSPECTIVE JUROR:  Probably more than he

23     should have I would imagine.

24                   THE COURT:  Anything about gaining that

25     information from a detective that would prevent you from

Voir Dire                                                177

1       being fair and impartial?

2                       PROSPECTIVE JUROR:  No.

3               THE COURT:  Would you give a detective sitting

4       here on the witness stand greater credibility because

5       he's a detective based on your dad being a detective?

6                       PROSPECTIVE JUROR:  The answer should be no,

7       but I would say I would probably give a little more

8       credence to that individual because the position they

9       hold and the oath they are sworn to uphold and what they

10      do on a day-in day-out basis I would probably give them

11      more credibility.

12              THE COURT:  Well, if you didn't hear anything

13      and the detective came here on the witness stand, would

14      you have a predisposition to believe him as compared to

15      a civilian witness that comes up here on the witness

16      stand and has yet to say anything?

17                      PROSPECTIVE JUROR:  I would say no, because

18      the officer, as far as I know, didn't witness a crime.

19      He's just there on behalf of the law.  So, it would

20      probably be equal if you put it that way.  Obviously it

21      makes sense.  You have to hear, as she said earlier,

22      both sides to really form an opinion of what's right and

23      what's wrong and what happened.

24              THE COURT:  So the mere fact that he's a

25      police officer won't impress you in any way to give him

1    greater believability; is that fair to say?

2            PROSPECTIVE JUROR:  Yes.

3            THE COURT:  Would you listen to the answer to

4    the questions posed and make your own independent

5    conclusions as to whether he's truthful accurate, maybe

6    mistaken, maybe misinterpreted, something?

7            PROSPECTIVE JUROR:  Everybody is human.

8            THE COURT:  That's all we're asking is that

9    you hold that witness to the exact same standard as you

10   would any other witness and the mere fact that he's a

11   police officer doesn't give him, you know, a thumb on

12   the scale, if you will, on the credibility scale simply

13   because he's a police officer.

14           Yes, he's assigned and appearing here in his

15   professional capacity and you can take into

16   consideration training and experience and the first

17   couple of questions you will hear of the officer is

18   where do you work, how long have you been doing this,

19   what kind of training you have.  So you can take that

20   into consideration, but it's based on the testimony of

21   the witness, himself or herself and not simply because

22   he comes in either wearing a uniform or wearing a badge,

23   okay.

24           PROSPECTIVE JUROR:  Correct.

25           THE COURT:  So you can affirmatively state to

1   me that you will evaluate a police officer's testimony

2   in the exact same manner you would any other witness?

3                PROSPECTIVE JUROR:  Correct.

4                THE COURT:  With the caveat you are able to

5   take into consideration training and experience,

6   et cetera.

7                Ms. Leya, hi.  Anything about the case or your

8   life experience that would prevent you from being fair

9   and impartial?

10               PROSPECTIVE JUROR:  No.

11               THE COURT:  No trial jury experience?

12               PROSPECTIVE JUROR:  I did this about ten years

13  ago.  I got as far as here and that was about it.

14               THE COURT:  Was it a criminal case or civil

15  case?

16               PROSPECTIVE JUROR:  It was a criminal case.

17  It was out in Riverhead.

18               THE COURT:  Now you talked about your family

19  and their callings.  I think it's fair to say there may

20  be philosophies involved with such a calling.

21               Can you put, I guess, those religious

22  philosophies aside and look at the evidence fairly and

23  impartially and then apply the law that I instruct you,

24  whether you agree with it or not, to the facts that you

25  determine?

1          PROSPECTIVE JUROR:  Yes, I can.

2          THE COURT:  And would you give anybody any

3    special weight with regard to their believability for

4    truthfulness or accuracy for any reason?

5          PROSPECTIVE JUROR:  No.  I believe I have to

6    hear both sides of what was going on to make my

7    decision.

8          THE COURT:  When you say both sides, does that

9    mean you have to hear from the defense?

10          PROSPECTIVE JUROR:  Well, I need to hear what

11    the district attorney and what the other lawyer has to

12    say.

13          THE COURT:  Well, in terms of questioning a

14    particular witness?

15          PROSPECTIVE JUROR:  I believe I need to hear

16    everything that has to be said, however it's going to be

17    presented.

18          THE COURT:  Well, if the defense just sat at

19    the table, never asked a question on cross-examination,

20    never put on a witness, never put on any evidence, would

21    that impact your decision-making process?

22          PROSPECTIVE JUROR:  I think I would have to be

23    able to listen to everything.  I don't know if I can

24    make a decision right now because maybe he feels he has

25    a strong enough case that he does not need to bring

Voir Dire                                                                181

1    anybody up, that the assistant district attorney is not

2    able to provide everything that he needs to provide.

3              THE COURT:  Absolutely.  That's exactly how

4    you would kind of have to evaluate it.  You wouldn't

5    rely on any speculation, but the rule is is that the

6    People have to prove the case.

7              PROSPECTIVE JUROR:  Right.

8              THE COURT:  The defense doesn't have to

9    disprove anything.  It's the People's obligation.  If

10   the defense says, as your hypothetical offered, that the

11   defense believes that the People haven't proved the case

12   and they don't need to challenge anything, would you

13   hold that against the defense?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Would you then be able to make an

16   independent judgment as to whether or not you, as a

17   juror, believe or find that the People have proven their

18   case beyond a reasonable doubt as that standard will be

19   explained to you?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Okay.

22             Ms. Benedict, hi.

23             PROSPECTIVE JUROR:  Hi.  How are you, your

24   Honor?

25             THE COURT:  Good, thanks.

1           Your spouse is a police officer?

2           PROSPECTIVE JUROR:  Correct.

3           THE COURT:  In Nassau County?

4           PROSPECTIVE JUROR:  Village of Amityville.

5           THE COURT:  How long has your spouse been a

6   police officer in Amityville?

7           PROSPECTIVE JUROR:  Eighteen years.

8           THE COURT:  And any other law enforcement

9   experience?

10          PROSPECTIVE JUROR:  My brother-in-law is a

11  police officer N.Y.P.D. as well.

12          THE COURT:  Anything about your close

13  relationship with a police officer that would prevent

14  you from being fair and impartial?

15          PROSPECTIVE JUROR:  As far as my relationship

16  with police officers, no.

17          THE COURT:  Is there something else that

18  might?

19          PROSPECTIVE JUROR:  As you can see I do have

20  two little girls.  I do have two very dear friends of

21  mine that suffer from child abuse, so I hold that very

22  close and I don't want my personal experience to affect

23  the defendant in any way.  So, I don't think it would be

24  fair.

25          THE COURT:  Do you think you would carry that

1    concern and experience with you into the deliberation

2    room and would it impact your ability to deliberate

3    fairly and impartially?

4              PROSPECTIVE JUROR:  As much as I understand

5    the law that is innocent until proven guilty, I do

6    believe so.

7              THE COURT:  So you have a predisposition based

8    on your experience?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  And your fears towards your young

11   children?

12             PROSPECTIVE JUROR:  Absolutely.  As a mother

13   of two little girls.  I also have a son.  As of mother

14   of two little girls, having such close friends go

15   through that, it's always in the back of my mind as

16   being more overprotective with my children in such case.

17             THE COURT:  Understood.  So this is probably

18   not the type of case for you.

19             PROSPECTIVE JUROR:  Right.

20             THE COURT:  I'm going to ask you to remain,

21   okay, but I understand what you are saying.

22             Counsel may have a question or two for you,

23   but thank you.

24             Ms. Arnedo, you work for a school district?

25             PROSPECTIVE JUROR:  Yes.

Voir Dire                                                    184

1          THE COURT:  Do you work with children?

2          PROSPECTIVE JUROR:  Not directly, no.

3          THE COURT:  Anything about this case or your

4    life experience that would prevent you from being fair

5    and impartial?

6          PROSPECTIVE JUROR:  There might be something,

7    yes.

8          THE COURT:  Can you talk about it?

9          PROSPECTIVE JUROR:  Private, yes.

10         (Whereupon, the following discussion was held

11   at the bench:

12         PROSPECTIVE JUROR:  So I grew up in El

13   Salvador with my mother and sister and she would go out

14   for work --

15         THE COURT:  Your mom?

16         PROSPECTIVE JUROR:  Yes.  And she couldn't

17   find anybody to leave us with one day and she trusted us

18   with a neighbor and that neighbor just --

19         THE COURT:  Acted inappropriately?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  With you?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  And your sister?

24         PROSPECTIVE JUROR:  I'm not sure about my

25   sister.  She didn't say anything.  I didn't notice

Voir Dire                                                                      185

1          anything.  I was around six-years-old at the time.

2                    THE COURT:  And you remember it to this day?

3                    PROSPECTIVE JUROR:  I remember it.  I think my

4          emotions would interact.

5                    THE COURT:  Did you call the police?

6                    PROSPECTIVE JUROR:  No.

7                    THE COURT:  Did anything ever happen?

8                    PROSPECTIVE JUROR:  I told my mom and she had

9          an altercation with him, but in El Salvador if you don't

10         report them right away it's different than here.

11                   THE COURT:  Okay.

12                   Counsel?

13                   MR. PERRI:  No objection.

14                   MR. ZERNER:  I have no objection, your Honor.

15                   THE COURT:  Ms. Arnedo, I'm going to ask you

16         to take your seat again and then we'll just go through

17         the process.  Thank you for being honest and frank with

18         us.)

19                   (Whereupon, the proceedings continued in open

20         court.)

21                   THE COURT:  Ms. Bruni, hi.  Who do you know in

22         law enforcement?

23                   PROSPECTIVE JUROR:  Several people, but a

24         cousin.  Also I had a very close friend that was a

25         prosecutor here in Nassau County.  Very, very close

Voir Dire                                                                186

1   friend, yes.

2           THE COURT:  Is that individual still a

3   prosecutor?

4           PROSPECTIVE JUROR:  No, I think she retired

5   about five years ago.

6           THE COURT:  Anything about that relationship

7   that would prevent you from being fair and impartial?

8           PROSPECTIVE JUROR:  I don't think so, no.

9           THE COURT:  When you say you don't think so,

10  would you allow that relationship with that prosecutor

11  to influence your decision making?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Would you give Mr. Perri extra

14  credit, if you will, because he has the same job as your

15  friend?

16          PROSPECTIVE JUROR:  Absolutely not.

17          THE COURT:  You wouldn't take points away from

18  him, would you?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Because he has the same job?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  You understand that he has a job.

23  His job is to present evidence here at trial.

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  And you will listen to the

1    witnesses and the evidence presented and make your own

2    independent evaluations?

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  Your husband is a physician?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  A family care physician?

7                    PROSPECTIVE JUROR:  No, he works in urgent

8    care.  He was an emergency room physician for about 25

9    years and he recently entered the other field.

10                   THE COURT:  So he's not retired, he's just

11   moved on?

12                   PROSPECTIVE JUROR:  He works for CDMB, the

13   urgent care company.

14                   THE COURT:  Anything about your husband's

15   profession dealing with patients and such that would

16   prevent you from being fair and impartial?

17                   PROSPECTIVE JUROR:  No.

18                   THE COURT:  You know someone who might have

19   sued someone?

20                   PROSPECTIVE JUROR:  Yes.

21                   THE COURT:  Was that a business?

22                   PROSPECTIVE JUROR:  A business matter, yes.

23                   THE COURT:  So that's civil?

24                   PROSPECTIVE JUROR:  Yes.

25                   THE COURT:  Were you involved?

Voir Dire                                                            188

1              PROSPECTIVE JUROR:  Not directly.

2              THE COURT:  You didn't have to go to Court?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  You did?

5              PROSPECTIVE JUROR:  I did not go to trial

6       though.

7              THE COURT:  It was settled?

8              PROSPECTIVE JUROR:  Settled before.

9              THE COURT:  Anything about that experience?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Go ahead.

12             PROSPECTIVE JUROR:  I'm just concerned about

13      my job because we do have accompany, my husband and I.

14      It's actually my husband's company.  It's a medical

15      diagnostics and I'm the only person at the office

16      because the six employees go to different sites to

17      perform medical tests, so I answer the phones, I keep

18      the books.  I do everything in that office.  I make the

19      daily deposits in the bank.

20             THE COURT:  If you are here for three weeks,

21      would that create a real problem for the business?

22             PROSPECTIVE JUROR:  Not a real problem, but I

23      have to make deposits because we have to have the money

24      for payroll every two weeks.

25             THE COURT:  No one else can do that?

Kathi A. Fedden, Sr. Court Reporter

Voir Dire

1    PROSPECTIVE JUROR:  Unfortunately not.  My

2    husband works full time at the urgent care.

3    THE COURT:  Okay, thank you.

4    Mr. White, you testified in Court.  Is that --

5    well, you tell me.  Why did you have to testify in

6    Court?

7    PROSPECTIVE JUROR:  I'm a retired sergeant

8    from N.Y.P.D.

9    THE COURT:  That was on cases that you were

10    involved with?

11    PROSPECTIVE JUROR:  Yes, it is.

12    THE COURT:  And you testified on numerous

13    occasions I presume?

14    PROSPECTIVE JUROR:  Yes, I did.

15    THE COURT:  You know there will be police

16    officer witnesses here.  Will you give them greater

17    credibility?

18    PROSPECTIVE JUROR:  Absolutely.  When I was a

19    sergeant I had to do my time in internal affairs, so I

20    had to investigate both members of the service and

21    civilians.  It's all about facts and testimony, not

22    hearsay.

23    THE COURT:  So the mere fact that there are

24    police officers in your mind doesn't give them any

25    greater or lesser credibility than a civilian witness?

Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                    190

1              PROSPECTIVE JUROR:  Not at all.

2              THE COURT:  You will -- are you saying you

3    have to wait to hear what the individual has to say?

4              PROSPECTIVE JUROR:  Yes, I do.

5              THE COURT:  And evaluate their credibility

6    based on your own human experiences in life?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Do you think the fact that you had

9    to investigate police officers and civilians will have

10   any impact on the way you evaluate witnesses here?

11             PROSPECTIVE JUROR:  Not at all.

12             THE COURT:  Thank you, Mr. White.

13             Ladies and gentlemen, I'm now going to turn it

14   over to Mr. Perri for 15 minutes of questions.

15             MR. PERRI:  Thank you, your Honor.

16             Good morning, ladies and gentlemen.  Thank

17   you, your Honor, defense counsel.  Thank you all for

18   coming in today despite the weather and for doing your

19   civic duty.

20             Again, my name is Anthony Perri.  I'm the

21   prosecutor that is assigned to this case by Madeline

22   Singas, the District Attorney of Nassau County and, as I

23   said to the last group that was in the box, the most

24   important thing is to be as forthcoming and honest, as

25   truthful as you can be to find out whether or not this

Voir Dire                                                                191

```
 1        case is the right fit for you and whether or not you can

 2        be fair and impartial and attentive to listening to all

 3        the facts, testimony and evidence that is going to be

 4        presented to you here in Court today.  Not today, but in

 5        the next coming three weeks.

 6                    Is there anyone here at the present moment,

 7        based on the allegations, that feels they are not going

 8        to be able to be fair and impartial?

 9                    Mr. Granat, you said that was because of your

10        daughters?

11                    PROSPECTIVE JUROR:  Yes.

12                    MR. PERRI:  Even if you understand the alleged

13        victim in this case isn't your daughter?  As the judge

14        instructs you that you have to put your personal biases

15        away, you can't use them against the defendant, you have

16        to listen to the evidence and render a verdict, you feel

17        you won't be able to do that?

18                    PROSPECTIVE JUROR:  No.

19                    MR. PERRI:  Anyone else?

20                    PROSPECTIVE JUROR:  (Indicating.)

21                    MR. PERRI:  Sir.  Yes, Mr. Franklin.

22                    PROSPECTIVE JUROR:  Yes.

23                    MR. PERRI:  Why do you feel that way?

24                    PROSPECTIVE JUROR:  I don't think I can be

25        impartial.
```

Voir Dire                                                             192

 1              MR. PERRI:  Why?

 2              PROSPECTIVE JUROR:  As I said before, when it

 3     comes to crime, I have a problem with that.

 4              MR. PERRI:  You understand the purpose of the

 5     proceeding, this trial is to determine whether or not a

 6     crime actually occurred and that the burden is on the

 7     People, not the defense.

 8              PROSPECTIVE JUROR:  I don't feel I cannot

 9     separate my feelings, no, from the facts.

10              MR. PERRI:  And anyone else raise their hands?

11              PROSPECTIVE JUROR:  (Indicating.)

12              MR. PERRI:  Thank you, you have already

13     spoken.  I appreciate your honesty.

14              When we're actually dealing with the evidence

15     and the purpose of this proceeding is to determine

16     whether or not a crime actually occurred and whether we

17     have proof beyond a reasonable doubt, not all doubt, not

18     absolute certainty, but proof beyond a reasonable doubt

19     the crime occurred and the defendant committed that

20     crime, a lot of us as a reference point when we come to

21     Court and we participate in the process from the outside

22     coming in, our reference point for a lot of us are

23     television shows, crime shows, whether it's CSI, Bones,

24     Chicago PD.

25              By show of hands, how many people here watch

```
 1        any kind of show involving law enforcement, the police,

 2        investigations?

 3                    PROSPECTIVE JURORS:  (Indicating.)

 4                    MR. PERRI:  Almost everyone.

 5                    Now, Ms. Groeger, why do you watch those

 6        shows?

 7                    PROSPECTIVE JUROR:  Well, I'm kind of forced

 8        to because my fiance is obsessed with them.  It's not

 9        really by choice, but I do watch them.  It's

10        interesting.

11                    MR. PERRI:  In a lot of those shows there is

12        usually a moment where a group of people in lab coats

13        have that one key piece of evidence.

14                    Mr. Harris, you are laughing.

15                    PROSPECTIVE JUROR:  It's Hollywood, man.  I

16        get it, it doesn't happen like that in real life.

17                    MR. PERRI:  What don't you think it's accurate

18        in how they are portraying it?

19                    PROSPECTIVE JUROR:  How quickly these things

20        turn around.

21                    MR. PERRI:  Ms. Leya, you raised your hand.

22        Do you believe the way the investigation, the science,

23        the police, the prosecution, is that accurate how it's

24        shown?

25                    PROSPECTIVE JUROR:  I was a big fan of CSI and
```

Voir Dire                                                           194

1       I was amazed on how beautiful the lab was and I don't

2       think that's the way it is.

3                MR. PERRI:  We won't be using any kind of that

4       technology.  I may have some projectors.

5                Do you understand that unlike on the

6       procedural criminal shows, as the judge will instruct

7       you, there is no requirement and there won't be

8       scientific evidence.  There is not going to be DNA and

9       in those shows there seems to be fingerprints, DNA, some

10      magical piece of evidence that turns up from the lab.

11               Ms. Leya, are you going to hold that against

12      the prosecution that we can't rise to the standards of

13      Hollywood?

14               PROSPECTIVE JUROR:  No.

15               MR. ZERNER:  Mr. Reed, you are laughing.  Do

16      you think it's accurate that there is always that

17      magical last piece of a jigsaw puzzle in television?

18               PROSPECTIVE JUROR:  It's always, even dating

19      myself even back in Matlock and Columbo there was always

20      something.  Perry Mason was all right.

21               MR. PERRI:  Fitting in pieces of the puzzle

22      that might be missing here and that you always find out

23      on the television show that the bad guy says I did it

24      and this is why.

25               One of the elements of the crime here is

Voir Dire                                          195

1    not -- we don't have to prove why something happened.

2    What someone's motive is.

3              Is there anyone going to require us to,

4    especially where we're alleging sex -- child sex abuse

5    took place, is anyone going to require an answer as to

6    why something happened as to opposed to if it did or did

7    not happen?

8              In the line of that, a lot of us have stereo

9    types in our minds, especially about what a child

10   predator looks like.

11             Mr. Ferraro, when you hear the idea or see or

12   hear on the news or television show that you have a

13   child predator, what comes to mind?

14             PROSPECTIVE JUROR:  You are basically blind

15   because a child predator could be anybody.

16             MR. PERRI:  Actually, does anyone disagree

17   with that, that it could be anybody, that they don't

18   have to look a certain way?  They are not going to be a

19   creepy bogeyman that hides in the dark and snatches

20   children at night.

21             Right now it's very current with television,

22   Bernie Madoff.  Does anyone wonder why Bernie Madoff was

23   able to steal everyone's money that he dealt with?

24             Ms. Mahoney, Bernie Madoff, did he look like

25   he was a thief?

Voir Dire                                                          196

1              PROSPECTIVE JUROR:  The real Bernie Madoff?

2    Yes.

3              PROSPECTIVE JUROR:  He was shifty looking to

4    me, but if you told me I was going to make a couple of

5    million, I probably would have believed you.

6              MR. PERRI:  Was he wearing nice suits?

7              PROSPECTIVE JUROR:  I don't remember.

8              MR. PERRI:  Does anybody remember what Bernie

9    Madoff looked like here?

10             Mr. Rendell, did he wear nice suits?

11             PROSPECTIVE JUROR:  I would hope so.

12             MR. PERRI:  Was he working out of his garage?

13             PROSPECTIVE JUROR:  He was a charge guy.  He

14   embezzled millions of dollars from people.

15             MR. PERRI:  And because of that skill set you

16   just said, smoke and mirrors, Mr. Ferrara, because of

17   that skill set did anyone, up until the day it came

18   crashing, did anyone suspect it was going on?

19             PROSPECTIVE JUROR:  No.

20             MR. PERRI:  One other thing I want to talk

21   about with you would be, I mean, everyone throughout

22   some point in their life has kept a secret.  By a show

23   of hands, how many in this jury box who are here has

24   kept a secret at some point in their life?

25             PROSPECTIVE JURORS:  (Indicating.)

Voir Dire                                    197

1            MR. PERRI:  So almost everyone out of the

2       entire box except for a few people.

3            I want you to think about a big secret you

4       kept.  I'm not going to ask what the secret was, but,

5       Mr. White, you raised your hand about keeping a secret.

6       Without explaining what it is, what were -- emotionally,

7       why did you keep the secret?

8            PROSPECTIVE JUROR:  So the other person

9       wouldn't find out.

10           MR. PERRI:  What were you afraid would happen?

11           PROSPECTIVE JUROR:  I would probably hear why

12      did you do that?

13           MR. PERRI:  Ms. Bruni, you raised your hand.

14      Why did you keep a secret?

15           PROSPECTIVE JUROR:  Just to protect the person

16      that told me the secret.  It's not my secret.

17           MR. PERRI:  You were keeping someone else's

18      secret?

19           PROSPECTIVE JUROR:  Yes.

20           MR. PERRI:  Has anyone ever had to actually

21      reveal what they were keeping in?

22           Ms. Groeger, you were shaking your head.  Who

23      did you decide to tell, without having to say what it

24      was?

25           PROSPECTIVE JUROR:  My fiance.  We weren't

1          engaged at the time.

2                    MR. PERRI:  Why did you choose him?

3                    PROSPECTIVE JUROR:  Just someone I could trust

4          and talk to and he would understand my feelings.

5                    MR. PERRI:  And if it was an important secret,

6          would you have just told that to anybody?

7                    PROSPECTIVE JUROR:  I mean, if it was an

8          important secret?

9                    MR. PERRI:  You are saying you trusted him.

10                   PROSPECTIVE JUROR:  It's not something I would

11         tell everyone.  Just because I don't want feelings to

12         get involved, hurt feelings, bad blood, you know.

13                   MR. PERRI:  Does anyone disagree with what

14         Ms. Groeger just said?  The relationship is important

15         when you are telling someone.  It's not easy to tell a

16         secret sometimes.

17                   One example that I can say and think many

18         people say is how many people here at some point when

19         you were children or if you have children, your children

20         were bullied or yourself at any point during grade

21         school?  I think it's happened to almost everyone here.

22                   Ms. Leya, you are shaking your head yes.  Did

23         the first time and every time, did you immediately go to

24         the teacher?

25                   PROSPECTIVE JUROR:  No.

1          MR. PERRI:  Why didn't you go to the teacher?

2     They are right there.

3          PROSPECTIVE JUROR:  Fear of repercussion that

4     the children would, you know, back in the '70s it wasn't

5     as it is now, if you told, it would make things even

6     worse.

7          MR. PERRI:  And how many people here, similar

8     to Ms. Leya, how many people here actually reported the

9     bullying as soon as it happened?  Went to the teacher,

10    they were right there in the classroom, told them what

11    was going on.

12          No one is shaking their head yes.  Even though

13    that authority figure, the person who was supposed to

14    protect you was right there.  Does that mean you weren't

15    bullied if you didn't tell someone you were being

16    bullied?

17          PROSPECTIVE JUROR:  I had three older

18    brothers.  I didn't have to tell the teacher.

19          MR. PERRI:  Why would you tell your three

20    older brothers?  They are not the ones in charge.

21          PROSPECTIVE JUROR:  Because you never snitched

22    to the teacher.  That was a whole different stigma.

23          MR. PERRI:  Because of the stigma of what you

24    had to reveal.

25          Mr. Reed, I thought you might have been

Voir Dire                                                      200

1    shaking your head at some point.  You didn't tell what

2    was going on?

3              PROSPECTIVE JUROR:  Because at the time I

4    just -- I compartmentalize everything and then dealt

5    with it in my own way.  It was frank revenge or

6    whatever.  You know, I always, as a kid, found some way

7    to get back without getting in trouble.

8              MR. PERRI:  Now is there anyone here that -- I

9    mean everyone here agrees, by a show of hands, every

10   human being is capable of lying; is that correct?

11             PROSPECTIVE JURORS:  (Indicating.)

12             MR. PERRI:  And that, at times, they might try

13   to convince you they are not, but children are still

14   human beings.

15             Do children also lie at times?

16             Now, I see, Mr. Rendell, you shook your head

17   again.  Is there a difference when children are telling

18   the truth and lying about small things and big things?

19             PROSPECTIVE JUROR:  How do you mean?

20             MR. PERRI:  If it's something important or

21   something minor.  The difference between getting a minor

22   item, like spilling the milk, getting your hand caught

23   in the cookie jar.

24             PROSPECTIVE JUROR:  A lie is a lie is a lie.

25             MR. PERRI:  You don't think there is any

Voir Dire                                                        201

1      difference between a small or big issue?

2              PROSPECTIVE JUROR:  It depends if you are a

3      good liar or not.

4              MR. PERRI:  Do you think most people lie for

5      no reason?

6              PROSPECTIVE JUROR:  No.

7              MR. PERRI:  What do you think?

8              PROSPECTIVE JUROR:  Some people, do but they

9      have issues.

10             MR. PERRI:  Do you think a normal average

11     human being lies for no reason at all?

12             PROSPECTIVE JUROR:  No.

13             MR. PERRI:  Ms. Groeger, what do you think?

14             PROSPECTIVE JUROR:  No, I don't think people

15     would have the need to lie unless there was a serious

16     issue.  I definitely think there is a difference even

17     between even a child lying about something minor or more

18     serious.

19             MR. PERRI:  How would you try to determine,

20     Ms. Groeger, how would you try to figure out if someone

21     was telling the truth?

22             PROSPECTIVE JUROR:  I mean, there is really no

23     one way.  If you trust someone, you hope they are

24     telling you the truth.  I mean, there is really nothing.

25             MR. PERRI:  Aside from people you trust, if

Voir Dire                                    202

1      you meet someone on the street, what would you look for?

2              PROSPECTIVE JUROR:  I guess just like the way

3      either like answering questions or, you know, kind of by

4      their story, if it seems like it's not making sense.  I

5      mean, I wouldn't necessarily go by body language because

6      I feel in general people get nervous when they are being

7      spoken to.  Sometimes they might fidget a little bit.

8              THE COURT:  Two minutes, Mr. Perri.

9              MR. PERRI:  Thank you, your Honor.

10             Now, one of the responsibilities of being a

11     juror is the fact you will have to deliberate together

12     at the end of the case and that deliberations are not

13     easy and that it requires you both to work together to

14     discuss the case, discuss the facts that have been

15     presented to you and at the same time stand up for

16     yourself on your own beliefs and not just go along with

17     the flock.

18             Ms. Bruni, how do you feel about having to

19     argue to deliberate and yet at the same time not just go

20     with the majority?

21             PROSPECTIVE JUROR:  Oh, no, I would impose my

22     views if I think they are right.

23             MR. PERRI:  If it was 11 to one in one

24     direction or the other and you disagreed with the

25     majority and people say c'mon, we want to leave, what

Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                      203

1    would you do?

2          PROSPECTIVE JUROR:  It's a very important

3    decision because it's going to harm somebody somehow.

4    So, I would really try to convince them, the rest of the

5    jurors, of my point if I think I'm right.

6          MR. PERRI:  Mr. White, if while you are

7    deliberating you feel that there are jurors who are not

8    participating, like there is one example I have been

9    told happened in Brooklyn where a juror literally from

10   walking into the jury chamber, walks in and said I don't

11   want to discuss the case, sat in the bathroom, locked

12   herself in there and the juror just came back eventually

13   with not ever disclosing that or doing anything about

14   it, what would you do if somebody just refuses?

15         PROSPECTIVE JUROR:  Twelve angry men.  You

16   would have to do something right away.

17         MR. PERRI:  Would you notify the Court and the

18   court officers?

19         PROSPECTIVE JUROR:  Absolutely.

20         MR. PERRI:  Is there anyone here that feels

21   they would not be able to deliberate, work together,

22   stand on their own two feet?

23         PROSPECTIVE JUROR:  (Indicating.)

24         MR. PERRI:  Ms. Mahoney?

25         PROSPECTIVE JUROR:  I think I tend to believe

Voir Dire                                                      204

1   everybody, so I think I might, I don't want to use the

2   word bully, but I think I might cave in because I might

3   think I'm the only one that's wrong and everybody else

4   is right.

5              MR. PERRI:  That's a very natural thing for

6   many of us to believe.  No one wants to oftentimes stick

7   out.  As Ms. Bruni said, it's a very serious decision

8   that has to be made at the end of the case and in

9   evaluating all the evidence before you.  You have to be

10  sure you are able to do that.

11             THE COURT:  That's it, Mr. Perri.

12             MR. PERRI:  Thank you, your Honor.

13             THE COURT:  Mr. Zerner, 15 minutes.

14             MR. ZERNER:  I would like to thank everybody

15  for coming in today.  I know how difficult it was

16  dealing with the snow and I really do appreciate that

17  all of you got jury duty notices.  You all came in

18  yesterday, sat all day yesterday and today you fought

19  the snow and you had to deal with your driveways, your

20  car and everything else and come here and deal with this

21  parking lot.

22             Now, I once had jury duty.  I was in the

23  district attorney's office.  I was there seven years.  I

24  moved and got married and I got jury duty and I really

25  wanted to sit for jury duty.  I didn't get to sit, but I

Voir Dire                                                    205

1    appreciate every one of you and all of your attention

2    and all of your honesty.

3              Mr. Franklin, is it fair to that you are

4    saying that the sting of your nephew being accused of a

5    crime was a sting to the whole family?

6              PROSPECTIVE JUROR:  Some extent, yes.

7              MR. ZERNER:  That's the feeling I'm getting

8    from listening to you answer the questions from the

9    judge.

10             PROSPECTIVE JUROR:  To some extent.

11             MR. ZERNER:  Does anyone else have a feeling

12   about that if a family member is doing something wrong,

13   the sting kind of permeates the entire family?

14             Mr. Reed, how do you feel about that?

15             PROSPECTIVE JUROR:  I don't think it's the

16   case.  That's going back to like the whole one rotten

17   thing spoils the milk.

18             MR. ZERNER:  That's an expression that came to

19   my mind as well.

20             Mr. White, you are a police officer.  You

21   dealt with internal affairs, right?

22             PROSPECTIVE JUROR:  Yes.

23             MR. ZERNER:  So that's a similar thing where

24   you say 99.9 percent of cops are doing an excellent job

25   all day, every day, a hard job, tough job.  A couple of

1    bad guys end up on the face of the Post, it makes us all

2    look bad.

3            PROSPECTIVE JUROR:  Absolutely.

4            MR. ZERNER:  Anybody hear the expression

5    garbage in garbage out?  A lot of times it's used for

6    computers, but it's a situation where if you start with

7    bad information or a bad code in a computer, you start

8    off wrong, that you can't help but get a wrong result,

9    right?

10           Mr. Rendell, how do you feel about that?

11           PROSPECTIVE JUROR:  It makes sense.

12           MR. ZERNER:  So Mr. White, before you were a

13   sergeant, you were a patrol officer?

14           PROSPECTIVE JUROR:  Right.

15           MR. ZERNER:  Anybody else here personally in

16   law enforcement?  I don't think anybody else was.

17           Your father was.

18           When people would come into the precinct, if

19   you got someone coming into the precinct demanding the

20   charges be taken, what would you do?

21           PROSPECTIVE JUROR:  You have to take the

22   report.

23           MR. ZERNER:  Right, you have to take the

24   report.  You weren't there when whatever she is alleging

25   took place, right?  Very few crimes take place in front

Voir Dire                                                             207

1    of police officers.  The DA is usually the guy that says

2    that, but I want you to know that.

3              The cops are going to come here and testify.

4    I don't care if your parents were cops or you hate cops,

5    these cops didn't see anything.  The prosecutor will

6    agree to that.  All you will see is people talk about

7    that they heard a report and took a report.

8              Ms. Mahoney, how do you feel about that?

9              PROSPECTIVE JUROR:  Yeah, I mean, it's obvious

10   if the police officer didn't see it, then he would just

11   have to go by why he's saying what he's saying.

12             MR. ZERNER:  A few of you have either been

13   divorced or separated, right?  I don't want to keep

14   picking on you, Mr. White.  I saw that in your

15   paperwork.  You are going through it now?

16             PROSPECTIVE JUROR:  Yes.

17             MR. ZERNER:  Anybody else go through a

18   divorce, whether it's themselves personally, parents,

19   sibling?  It's all too common.  Usually it's one degree

20   of separation.  If it wasn't you, it's a relative.

21             Is it pleasant, Mr. Harris?

22             PROSPECTIVE JUROR:  No.

23             MR. ZERNER:  Can we imagine situations where

24   there were accusations flying back and forth?

25             I'm getting nods about that.

Voir Dire                                                      208

1              Is it fair to say sometimes children are used

2       as pawns in that situation, right?

3              Now, Mr. Granat, I appreciate, again, I'm

4       always amazed at how honest and forthright everyone is

5       in this process.  I understand you have four daughters.

6       I have two sons.  So there have been times when I said

7       to my wife thank God I have sons because I don't have to

8       worry as much.  Have you had the opposite thought?

9              PROSPECTIVE JUROR:  Most definitely.

10             MR. ZERNER:  My daughters go out, I don't know

11      what's happening, but I'm only imaging the worst.  When

12      I have had those conversations with my wife, she will

13      turn to me and say yeah, but somebody can accuse our

14      boys of something.

15             Can we imagine that situation?  My sheet is

16      messed up also, Ms. Bruni?  No use at this point, I may

17      as well turn it over.

18             PROSPECTIVE JUROR:  I have two sons, that's

19      why.

20             MR. ZERNER:  And just because they're not the

21      ones that might get pregnant if everything goes wrong,

22      it doesn't mean you can't worry and shouldn't worry

23      about them, right?

24             PROSPECTIVE JUROR:  Absolutely.

25             MR. ZERNER:  Can everyone understand that

Voir Dire                                                              209

1      situation?

2                Mr. Franklin?

3                PROSPECTIVE JUROR:  Yes.

4                MR. ZERNER:  So anybody can accuse anybody of

5      anything, right?

6                PROSPECTIVE JUROR:  Yes, definitely.

7                MR. ZERNER:  And I started off by saying thank

8      you for coming in because you had jury duty, right, and

9      did any of you get jury duty notice and say woo-woo, I

10     got jury duty?  They say to their spouse, their boss,

11     their friends, guess where I'm going to be?  But you all

12     came in and you are all doing the right thing by dealing

13     with your obligation, right.

14               You know what you never see in the paper is

15     anybody being prosecuted for offering a false instrument

16     or for perjury or for lying in Court, right?  It's

17     always the back page of the paper when an athlete gets

18     in trouble, Plaxico Burres with the gun or a hundred

19     examples like that.

20               Allen Iverson, anybody remember this guy?

21     Allen Iverson was accused of doing something with a

22     woman in the suburbs of Philadelphia a few days ago on

23     the back page of the paper with a fan and ultimately it

24     came out she lied about it.  What do you think?

25               THE COURT:  Mr. Zerner, I'm going to interrupt

1    you now because that's a completely different case,

2    ladies and gentlemen.  We don't know the facts and

3    circumstances of that case and the hypothetical is not

4    applicable to our case here.  You will hear and

5    determine what happened based on the testimony and

6    evidence that's presented at trial.  So, Mr. Zerner,

7    please move on.

8            MR. ZERNER:  I'll ask it a different way.

9            Mr. Ferraro, do you think there should be a

10   consequence if somebody gets on the witness stand and

11   lies?

12           PROSPECTIVE JUROR:  By law it seems if someone

13   does something against the Court and commits perjury or

14   whatever, it's punishable by XYZ.  So if someone commits

15   something against the Court or breaks a law, somewhere,

16   somehow you have to answer for that.

17           MR. ZERNER:  Do you think that commonly

18   happens, that people get in trouble for lying in Court?

19           THE COURT:  Mr. Zerner.

20           Mr. Ferraro, excuse me one second.

21           Mr. Zerner, I'm going to ask you to move on.

22           MR. ZERNER:  That's fine, your Honor.

23           The judge talked about it yesterday.  I'm sure

24   you were all listening attentively that we all kind of

25   have a natural feeling about protecting children.  I

Voir Dire                                                      211

1       don't relish having to cross-examine a child, but I have

2       a job to do in protecting my client that has been

3       falsely accused.

4              Can you all assure me you will not hold it

5       against me or my client when I cross-examine this child?

6              I don't see everyone nodding their heads.

7              Mr. Granat, you would hold that against me?

8              PROSPECTIVE JUROR:  Yes.

9              MR. ZERNER:  So you shouldn't let me do my

10      job?

11             PROSPECTIVE JUROR:  You would have to do your

12      job.

13             MR. ZERNER:  Is anybody sitting here saying

14      where there is smoke, there is fire?  He's been accused,

15      so he probably did something.

16             Mr. Franklin, how do you feel about that?

17             PROSPECTIVE JUROR:  I don't know.  In my

18      opinion I always think -- I'm not saying whenever there

19      is smoke, there is fire, but however, I think there is

20      something.

21             MR. ZERNER:  Okay.  So you can't give my

22      client the presumption of innocence as you sit here?

23             PROSPECTIVE JUROR:  There might be something

24      that led to that situation, that's how I feel.

25             MR. ZERNER:  So if you hear a situation that

Voir Dire                                                          212

1    you have a child that's living in a home with an

2    extended family and that her mother has four children by

3    three different men --

4              MR. PERRI:  Objection.

5              MR. ZERNER:  -- in an extended family.

6              THE COURT:  Mr. Zerner, there was an

7    objection, so please halt your comments.

8              The objection is sustained.  Please move on.

9              MR. ZERNER:  Now, Ms. Leya, you said that you

10   wanted to hear both sides of everything, right?

11             PROSPECTIVE JUROR:  Well, I need to know what

12   each side has to say or however it's going to be said to

13   either it was you or, I mean, I have to know what's

14   going on on both sides.

15             MR. ZERNER:  Okay.  And you would keep an open

16   mind through the entire trial?

17             PROSPECTIVE JUROR:  Yes.

18             MR. ZERNER:  Is there anybody that's going to

19   say first impressions are lasting impressions and you

20   are going to make up your mind part of the way through

21   the case?

22             PROSPECTIVE JUROR:  I can't say for certain,

23   but I can't say for certain I wouldn't.

24             MR. ZERNER:  I appreciate your honesty with

25   that.

1         We talked yesterday when you folks were in the

2    back of the room that in baseball there is one team that

3    gets to hit first and the other team gets to hit last.

4    Here the prosecution goes first all the time.  You see

5    the prosecution going first, except at the very end they

6    get their closing statement last.  These are the rules

7    and the judge will enforce these rules.  And I

8    appreciate the judge reminding you of your obligations

9    and that's going to happen throughout the trial.

10         I'm just asking you all to keep an open mind

11   because there are rules and the prosecution is going to

12   put on witnesses first.  I'm going to cross-examine

13   them.  I'm not going to sit on my hands.  You don't have

14   to worry about that.  My client will testify.  I'm glad

15   he's able to testify because it's not the case in every

16   criminal proceeding, but he will testify and he will

17   tell you --

18             MR. PERRI:  Objection.

19             MR. ZERNER:  -- he did not do what he was

20   accused of doing.

21             MR. PERRI:  Objection.

22             THE COURT:  Thank you.

23             Mr. Zerner, let's not go to the point where

24   we're anticipating what testimony will be.  So the

25   objection is sustained with regard to what people are

1       going to say.

2               Ladies and gentlemen, when those witnesses

3       come on the witness stand, you will hear what they say

4       when they are under oath.  And what counsel say in their

5       openings or jury selection or closings is not evidence,

6       okay.  You will weight until the witness gets on the

7       witness stand under oath and testifies, answers

8       questions that are posed to that particular witness and

9       then you will have evidence, okay.

10              MR. ZERNER:  Anybody hear ever deal with

11      expert witnesses?  Anybody have any interaction with

12      experts?

13              PROSPECTIVE JUROR:  (Indicating.)

14              MR. ZERNER:  You have, okay.

15              Anybody else?

16              Anybody ever hear the expression, a hired gun?

17              I see a lot of nods.

18              Mr. Harris, how do you feel about an expert

19      witness getting paid to come in here and saying

20      something and saying it to the satisfaction of the party

21      paying them?

22              PROSPECTIVE JUROR:  I think the question you

23      are asking is kind of loaded, but I will give you my gut

24      answer.  I'm in analytics for my life.  That's my job.

25      I need to get the best information I can get to process

1    an answer.  If the expert is expert in that field, then

2    I would have to listen to what they have to say.  If

3    they are being paid to do it, they are being paid to it

4    do it.  It's part of the process.

5              If it wasn't part of the process, you wouldn't

6    be allowed to do it, so I don't have a problem with

7    that.

8              MR. ZERNER:  Anybody else have any strong

9    feelings about what Mr. Harris just said?

10             Any of you have teenage children or

11   grandchildren by a show of hands?

12             PROSPECTIVE JURORS:  (Indicating.)

13             MR. ZERNER:  About how old was your child when

14   you first got them a phone?

15             PROSPECTIVE JUROR:  I would say fifth grade.

16   I don't know what age that is.

17             MR. ZERNER:  I think that's what it is now.  I

18   got roped into giving my fifth grader a phone.  Is that

19   about the same situation you are talking about?

20             After you gave your child the phone, would it

21   be common to use as a possible punishment or actual

22   punishment taking the phone away from them?

23             PROSPECTIVE JUROR:  No, because it was just a

24   communication device just to keep in touch.  Hey, I got

25   soccer practice after school.  Pick me up at such and

1    such a time.  It wasn't like -- I'm dating myself -- a

2    Gameboy or anything like that.

3                MR. ZERNER:  Let's talk about the Gameboy.  At

4    times when your child had the Gameboy and you wanted

5    them to finish their vegetables or clean up their room

6    and they didn't, you would make a threat to take it

7    away?

8                PROSPECTIVE JUROR:  No.  Like I said, my

9    child's phone was just for communication.  I never had

10   to go that route because the way we always had the

11   agreement, do XYZ and you get ABC, so.  Never had to

12   worry about it, so.

13               MR. ZERNER:  And you have a 14-year-old

14   daughter?

15               PROSPECTIVE JUROR:  Yes.

16               MR. ZERNER:  And you have interacted with her

17   and her friends?

18               PROSPECTIVE JUROR:  Yes.

19               MR. ZERNER:  You ever coach any of their

20   sports or been involved in any extracurricular

21   activities?

22               PROSPECTIVE JUROR:  Not with them.  Back when

23   I first graduated high school I coached wrestling for my

24   junior high and I also coached soccer camp.

25               MR. ZERNER:  Were there any situations where

1    somebody was accused of doing something wrong with a

2    child when you were coaching?

3                PROSPECTIVE JUROR:  No.

4                MR. ZERNER:  Anybody have that situation where

5    they were coaching or their children were being involved

6    in whatever sports or extracurricular activities and

7    there were any accusations?

8                THE COURT:  Two minutes, Mr. Zerner.

9                MR. ZERNER:  Thank you, your Honor.

10               Anybody here grow up in an extended family in

11   a house with multiple generations and that sort of

12   thing?

13               No.  Okay.

14               PROSPECTIVE JUROR:  I did.

15               MR. ZERNER:  Grandparents, aunt's, uncles that

16   sort of thing?

17               PROSPECTIVE JUROR:  Yeah.

18               MR. ZERNER:  Is it fair to say that sometimes

19   your aunt or uncle would get involved with you in the

20   same way as your parents might?

21               PROSPECTIVE JUROR:  When I was growing up, the

22   village took care of the child that fully exist.  Even

23   if your aunt, your immediate relative or whatever spoke

24   to you, even a stranger on the street which basically

25   would have known you, you would have to listen.

1          MR. ZERNER:  So that came up in conversation

2    yesterday, the whole it takes a village concept.  And

3    you would show proper respect for the other adult

4    figures, whether it was your aunt or uncle rather than

5    your mother or father?

6          PROSPECTIVE JUROR:  Yes.

7          MR. ZERNER:  Whether we grew up with that, can

8    everyone accept that concept that sometimes it would

9    actually be a benefit to the parent if an aunt or uncle

10   would be a disciplinarian or the aunt or uncle might

11   provide emotional support or financial support or

12   whatever else, right?  Just the fact of doing that isn't

13   a bad thing, is it, if you have an aunt or uncle helping

14   out with raising your child?  Everyone can agree with

15   that.

16          Again, I want to thank you and ask you to keep

17   an open mind if you are selected as a juror on this

18   case.

19          Thank you, your Honor.

20          THE COURT:  You're welcome.

21          Ladies and gentlemen, we're going to take a

22   five-minute break, give the attorneys the opportunity to

23   review their notes and make selections as to who will

24   serve as jurors in this particular case.

25          So, you are excused now.  Please follow the

Voir Dire                                              219

1      directions of the court officer.

2                 (Whereupon, the prospective jurors exited the

3      courtroom and a recess was taken.)

4                 THE CLERK:  Jury selection round two, all

5      parties are present, including the defendant.  The

6      prospective jurors are not in the courtroom at this

7      time.

8                 In consideration of the first seven jurors on

9      the board for the seven open seats, People, for cause.

10                MR. PERRI:  Your Honor, the People would argue

11     to the Court juror four should be excused for cause.  He

12     repeatedly expressed he could not be fair and impartial

13     due to his four daughters to both defense counsel and

14     the Court.

15                THE COURT:  You agree?

16                MR. ZERNER:  I do.

17                THE COURT:  Excused on consent.

18                MR. PERRI:  I believe we already excused juror

19     six, Ms. Arnedo for cause.

20                THE COURT:  You agree?

21                MR. ZERNER:  Yes.

22                THE COURT:  Potential juror six is excused for

23     cause.

24                MR. PERRI:  Your Honor, I would also state

25     juror seven should be excused for cause.

Voir Dire                                                            220

1           THE COURT:  Mr. Zerner, you agree?

2           MR. ZERNER:  I do.

3           THE COURT:  Excused for cause.

4           THE CLERK:  Perez Franklin.

5           Defense, cause?

6           MR. ZERNER:  No, none for cause.

7           THE CLERK:  Peremptory challenges, People?

8     You have exercised three already.

9           MR. PERRI:  People exercise a peremptory

10    challenge on juror one.

11          THE CLERK:  Gary Goldberg.

12          Anything further, Mr. Perri?

13          MR. PERRI:  No, thank you.

14          THE CLERK:  Defense, peremptory challenges?

15          MR. ZERNER:  If I can have a moment.

16          (Pause in the proceedings.)

17          MR. ZERNER:  No perempts on those three.

18          THE CLERK:  John Harris is juror number six.

19    Richard N. Ferrara is juror seven.  And Lauren Groeger

20    is juror eight.

21          Do the People concur?

22          MR. PERRI:  Yes.

23          THE CLERK:  Defense counsel?

24          MR. ZERNER:  Yes.

25          THE CLERK:  In consideration of the next four

Voir Dire                                                    221

1     jurors on the board for four open seats, Bruni through

2     Reed, People for cause?

3                THE COURT:  Counsel, with regard to Ms. Bruni,

4     she had indicated issues with work and the company

5     business and payroll and that sort of thing.

6                MR. ZERNER:  No objection.

7                MR. PERRI:  No objection, your Honor.

8                THE COURT:  Juror number eight excused on

9     consent.

10               THE CLERK:  People, any further cause in that

11    batch?

12               MR. PERRI:  Ms. Mahoney, I believe juror ten,

13    excuse for cause.  She repeatedly said she could not

14    make up her mind.  She would not be able to deliberate.

15               THE COURT:  Mr. Zerner?

16               MR. ZERNER:  No objection.

17               THE COURT:  Granted.

18               Off the record.

19               (A discussion was held off the record.)

20               MR. PERRI:  So, your Honor, that's all I have

21    for cause.

22               THE COURT:  You have asked and it was

23    consented to, Ms. Mahoney, number ten for cause?

24               MR. PERRI:  Yes.

25               THE COURT:  That's granted.

Voir Dire                                                                222

1          And, People, that's all you have for cause?

2              MR. PERRI:  Yes, Ms. Bruni and Mahoney.

3              THE COURT:  So the remaining potential jurors

4    are Mr. White, number nine and Mr. Reed, number 11.

5              MR. PERRI:  Yes.

6              THE COURT:  Mr. Zerner, cause?

7              MR. ZERNER:  Nothing for cause.

8              THE CLERK:  Peremptory challenge, People,

9    White and Reed?

10             MR. PERRI:  No peremptory challenges, your

11   Honor.

12             THE CLERK:  Defense, White and Reed?

13             MR. ZERNER:  We'll exercise a peremptory

14   challenge on Mr. Reed.

15             THE CLERK:  That will make Kevin F. White

16   juror nine.

17             For the last three jurors on the board for the

18   three open seats, that being Rendell, Leya and Benedict,

19   People, for cause.

20             MR. PERRI:  Ms. Benedict for cause, your

21   Honor.  She spoke repeatedly because of her daughters --

22             THE COURT:  Mr. Zerner?

23             MR. ZERNER:  No objection.

24             MR. PERRI:  That's all, your Honor.

25             THE CLERK:  Defense, cause?

Voir Dire                                                                223

1              MR. ZERNER:  Yes, I'm going to ask for cause

2    on Leya.  She had issues with the presumption of

3    innocence.  She said that she wanted to hear both sides

4    about everything.  You spoke to her at great length

5    about it and eventually she gave in, however, I think

6    it's obvious that she has got issues with the

7    presumption of innocence and the possibility that the

8    defense case isn't required to or dealing with the same

9    issues as the prosecution's case, Judge.

10             THE COURT:  The Court disagrees with regard to

11   your characterization that Ms. Leya gave in.  The Court

12   would characterize it as a fuller understanding of the

13   principles of law that the individual would have to

14   follow and not simply a personal preference with regard

15   to resolving conflict.  So, that application is denied.

16             THE CLERK:  Peremptory challenges, People?

17             MR. PERRI:  None, your Honor.

18             THE CLERK:  Peremptory challenges, defense?

19             MR. ZERNER:  We will exercise our peremptory

20   challenge number five on Gavin Rendell and number six on

21   Nancy Leya.

22             THE COURT:  I just wanted the record to

23   reflect there were a number of other jurors that were

24   excused on consent of counsel and may not have made it

25   to the record.  That was Ms. Rosen, potential juror

Voir Dire                                                           224

1    number nine with regard to experience -- familial

2    experience with sex abuse.

3              Potential juror eight, Matthew Smith with a

4    police officer bias.

5              Potential juror number six, Mr. Tergino,

6    excused police officer bias.

7              And then potential juror number ten, Malti

8    Bisht who failed to appear today and the Commissioner of

9    Jurors was notified.  I think that's all that didn't

10   make the record.

11             (Whereupon, the prospective jurors entered the

12   courtroom.)

13             THE CLERK:  Let the record reflect the

14   presence of the jurors.  All parties are present.

15             People ready?

16             MR. PERRI:  Yes, your Honor.

17             THE CLERK:  Is the defense ready?

18             MR. ZERNER:  We are.

19             THE CLERK:  The following names I'm going to

20   call are the folks selected to the jury.  If you hear

21   your name, please stay seated.  The other jurors are

22   dismissed and excused with the thanks of the Court.  You

23   can go back to central jury and get your pills and your

24   stuff from the commissioner saying that your service is

25   over and done.  If you possibly can't make it back

Voir Dire                                                      225

1      there, if there is too much snow or stuff, the

2      commissioner will mail your stuff to your house.

3               The following jurors please stay seated:  John

4      Harris, Richard Ferrara, Lauren Groeger and Kevin White.

5      The other jurors, the officer will give you further

6      instructions outside.

7               (Whereupon, the excused prospective jurors

8      exited the courtroom.)

9               THE CLERK:  Are the jurors acceptable to the

10     People?

11              MR. PERRI:  Yes, your Honor.

12              THE CLERK:  To the defense?

13              MR. ZERNER:  They are.

14              (Whereupon, the selected jurors were duly

15     sworn by the Clerk of the Court.)

16              THE COURT:  So lady and gentlemen, you are now

17     sworn jurors.  You join five other jurors who have been

18     previously selected and sworn and you will report back

19     to the designated reporting location that the court

20     officer sergeant will let you know about on Tuesday

21     morning at an appropriate time so we can get started at

22     9:30.

23              Remember, the earlier you get to the parking

24     lot, the better parking spot you get.  If you like to

25     walk, get here late.  If you don't, get here early.  We

1    need to get started at 9:30.  We'll get everybody

2    together and the Court can't start until we get all the

3    jurors together because as one body, a jury, we need all

4    of you here before we can take any action whatsoever.

5          Because you are sworn jurors I have to give

6    you some admonitions.  I'll give you the full

7    explanation when we have all jurors present, but for

8    now, as sworn jurors I ask you to follow these

9    directions:

10          Don't talk about the case with anyone.  You

11    can tell your employer and your family that you have

12    been selected to serve on a jury and that you will be

13    required to be in Court on such and such a date at such

14    and such a time, but that's all you can tell them.

15          Don't read about the case if you see it in the

16    newspaper, anywhere.

17          Don't visit anyplace that was mentioned in my

18    preliminary description.

19          Don't research any of the places, persons or

20    things about the case that you have heard so far.

21          Report to me if anyone tries to influence you

22    by the offering of money or any other valuable

23    information about the case.

24          If you see another juror being approached by

25    an individual offering money or valuables or

Voir Dire                                                                227

1    information, please report that to the Court as well.

2         The overall instruction is this:  Forget about

3    jury duty until Tuesday morning when you have to report.

4    Forget about the case.  Hopefully the sun will come out,

5    the snow will be melted and you can have a nice

6    Superbowl weekend and we'll see you Tuesday morning.

7         (Whereupon, the selected jurors exited the

8    courtroom.)

9         THE COURT:  Okay.  Mr. Perri, anything for the

10   record?

11        MR. PERRI:  No, your Honor, thank you.

12        THE COURT:  Mr. Zerner, anything for the

13   record?

14        MR. ZERNER:  No, thank you, your Honor.

15        THE COURT:  We need three more seated jurors

16   and two alternates.  That's five.  We'll order a 70

17   person panel and I expect that we'll get those five

18   individuals out of that panel Monday morning.  Where

19   we're going to be is undetermined at this moment.  So,

20   you can report here and we'll let you know where we have

21   to meet.

22        MR. PERRI:  Thank you, your Honor.

23        (Whereupon, the trial was adjourned to

24   February 8, 2016.)

25            *              *              *

Kathi A. Fedden, Sr. Court Reporter

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
           COUNTY OF NASSAU :  PART 47
 2    ---------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3

 4              -against-              Ind. No. 1050N/15

 5                                    JURY TRIAL

 6    RAY ROSS,

 7                     DEFENDANT.
      ---------------------------------------x
 8
                        Mineola, New York
 9                      February 8, 2016

10

11    B E F O R E:   HON. TERENCE P. MURPHY
                     Acting Supreme Court Justice
12

13    A P P E A R A N C E S:

14
                 (Same as previously noted)
15

16

17

18                   Kathi A. Fedden
                     Official Court Reporter
19

20

21           *            *              *

22

23              THE CLERK:  This is case on trial, People

24    versus Ray Ross.

25              People ready?
```

Proceedings                                                                      229

1             MR. PERRI:  Yes, your Honor the People are

2      ready.

3             THE CLERK:  Is the defense ready?

4             MR. ZERNER:  The defense is ready.  I have

5      something I would like to put on the record.

6             THE CLERK:  Mr. Ross is present, but the

7      prospective jurors are not in the courtroom.

8             THE COURT:  Mr. Perri, anything for the record

9      before the panel comes in?

10            MR. PERRI:  Yes, your Honor.  I'm handing up a

11     copy to the Court and a copy to defense counsel

12     additional Rosario material, specifically the CV resume

13     of the expert witness the People may intend to call at

14     trial, Joshua Hanson.  It's a three-page document.

15            THE COURT:  That will be marked Court Exhibit

16     next in order.

17            THE CLERK:  Court VI.

18            MR. PERRI:  The People have another item to

19     put on the record which is information that could be

20     classified as Giglio material with respect to the

21     witness Sarita Johnson, the mother of the child in this

22     case.

23            During preparations for trial she disclosed to

24     the People that approximately two years ago she had been

25     arrested, although there is no conviction.  It appears

Proceedings                                           230

1       it was an adjournment in contemplation of dismissal for

2       a petit larceny, shoplifting from the Home Goods in

3       Rockville Centre, New York.  She attempted to take from

4       the store forks and knives.  She was stopped, the

5       property was returned and the records indicate, running

6       her criminal background and also in examining our

7       records that I have access to, that the record of that

8       arrest was sealed.  She believes she was given an

9       adjournment in contemplation of dismissal.  Of course,

10      the ACOD would not be proper grounds for

11      cross-examination of the bad act of theft.  The People

12      are disclosing that.

13              THE COURT:  Mr. Zerner, acknowledge

14      notification?

15              MR. ZERNER:  I acknowledge receipt of the

16      three-page document purported to be a CV of Joshua

17      Hanson.  It appears he's not a doctor.  I prefer he not

18      be referred to by the People in that way if he's called

19      as a witness.

20              With regards to Sarita Johnson, I would ask a

21      NYSIS be run.  It seems clear that the People did not

22      run a NYSIS before they handed over Rosario material on

23      Ms. Johnson when I received the Rosario material on

24      Thursday morning.  Now it seems there was some

25      conversation where Ms. Johnson has revealed one

Proceedings                                           231

1     situation in the last couple of years.

2              I think it would serve the interest of justice

3     and serve the fairness of the proceedings if the People,

4     using their resources, simply run a NYSIS.  Let's see

5     what this woman does have on her sheet.  It would be

6     wrong for us to simply find out that well, she didn't

7     think it was relevant and she told Mr. Perri about one

8     thing from perhaps 2014, but there is something else

9     from prior years.

10             I do have a good-faith basis for asking this

11    question.  I did have multiple conversations with

12    multiple people that have had relationships with her and

13    it seems to me there were multiple interactions she had

14    with the authorities, both at her home, as well as at

15    other locations, both within Nassau County, I believe in

16    Queens County and other places.

17             So, I would simply ask the People be

18    instructed to run a NYSIS and, of course, to turn that

19    over to both myself and the Court.

20             MR. PERRI:  Your Honor, the People did do

21    their due diligence.  It's my belief at this time after

22    having done that --

23             THE COURT:  Having done what?

24             MR. PERRI:  Having run a NYSIS for the

25    individual, there are no other materials the People are

Proceedings                                          232

1    required to turn over; that there is no other Giglio

2    material contained in that document.  And, your Honor,

3    the ACOD would not, if it appeared, would not appear on

4    a NYSIS, which it did not, and so that is -- it's not

5    that she was hiding anything in that respect, your

6    Honor.

7              MR. ZERNER:  Your Honor, if the prosecutor --

8    he has a NYSIS.  I would simply like to see it.  He's

9    doing a cyclical argument right now.  He's saying he's

10   done it, due diligence, and found out about this ACOD

11   but it wouldn't appear on a NYSIS.  Let's take a look at

12   an actual NYSIS.

13             This is a woman I believe is 55 years old.

14   She's had interaction with the criminal justice system

15   in several different ways in several different counties.

16   Let's find out what it is.

17             THE COURT:  Mr. Perri, did you run a NYSIS?

18             MR. PERRI:  Yes, your Honor.  The People would

19   oppose turning that document over and we do not believe

20   there is any material in that document that would be

21   other discoverable in the Constitution to be turned

22   over.

23             THE COURT:  You made the argument that this

24   Giglio material was not on a NYSIS?

25             MR. PERRI:  Well, your Honor, it was not on

Proceedings                                                    233

1       the NYSIS because the ACOD has expired and so,

2       therefore, an ACOD does not appear on someone's NYSIS

3       once the case is dismissed after the ACOD period.  There

4       is nothing on the NYSIS to indicate the petit larceny

5       happened.  The witness voluntarily turned that

6       information over to us.

7                   THE COURT:  Was the arrest on the NYSIS?

8                   MR. PERRI:  No, your Honor.  All that

9       information is expunged from the NYSIS once an ACOD

10      period expires.

11                  THE COURT:  Can I see the NYSIS?

12                  MR. PERRI:  (Handing.)

13                  Your Honor, the photograph there on the NYSIS

14      is not the complainant in this case.  We ran her name

15      with --

16                  THE COURT:  Is not the complainant?

17                  MR. PERRI:  I'm sorry.  Well, she was the

18      original complainant as the mother of the alleged victim

19      in this case.  That is not her photograph.  That is not

20      her record.  We ran her name with her social security

21      number through the New York State system.  We did find

22      orders of protection that are related to this case that

23      came up, but no criminal convictions and, therefore, the

24      NYSIS should not be turned over, your Honor.

25                  THE COURT:  Did you run a criminal history of

                    Kathi A. Fedden, Sr. Court Reporter

Proceedings                                                      234

1      Ms. Johnson?

2              MR. PERRI:  Yes.  Sarita Johnson, yes, your

3      Honor, with her social security number.

4              THE COURT:  Hold on.  Did a record come up on

5      Ms. Johnson that --

6              MR. PERRI:  That printout contains orders of

7      protection that were issued by the Family Court and by

8      this Court related to this -- issued by the Family Court

9      related to incidents in this case indicating that the

10     search was positive matched for Sarita Johnson, but

11     there are no criminal convictions or any open pending

12     cases that come up with that search, your Honor.

13             THE COURT:  So the name came up associated

14     with another individual based on an order of protection,

15     that is what you are saying?

16             MR. PERRI:  No, your Honor, that there was a

17     partial match to another individual based on just

18     percentage of accuracy for criminal records.  There is

19     nothing in the criminal records of New York State

20     related to the actual Sarita Johnson in this case.

21     There are, however, we did have a match in her NYSIS

22     report for orders of protection just showing we have the

23     right individual, your Honor, that we are searching for.

24     Sarita Johnson does come up, but the only record of her

25     in the system are orders of protection.

Proceedings                                    235

1           THE COURT:  You don't know that is the Sarita

2      Johnson that is involved in this case, do you?

3           MR. PERRI:  Yes, your Honor, because I have

4      the orders of protection that come up.  They were issued

5      by the Family Court related to the issues in this case.

6           THE COURT:  Thank you.

7           Mr. Zerner, you have heard the People's

8      representation that they have done a criminal history

9      search.  It came up blank for any criminal history, if

10     you will.  There is an associated report with an

11     individual with regard to an order of protection.  The

12     Court believes that the People have done their due

13     diligence.  There is no other outstanding matter that

14     requires them to offer to you a NYSIS that came up blank

15     or a NYSIS -- another person's NYSIS that mentions Ms.

16     Johnson's name.

17          Let's wait to hear from Ms. Johnson.  If

18     anything comes up in the testimony of Ms. Johnson, you

19     may have a further application or point to make, but as

20     of now, there is nothing for the Court to do.

21          MR. ZERNER:  Just very briefly, for the

22     record, your Honor, I believe I am entitled to that

23     document.  I believe that document should have been

24     provided last Thursday.  I do have a good-faith basis

25     that there were going to be incidents with the criminal

1     justice system.  I don't know because I haven't been

2     shown this document whether this is statewide or

3     countywide.

4          Furthermore, your Honor, what Mr. Perri just

5     put on the record was that his office was prosecuting

6     Ms. Johnson two years ago.  He hasn't pinpointed when

7     that was, but the allegation that we're dealing with in

8     this trial is supposedly an incident that took place

9     through 2013 and there was an outcry made in August and

10    into October of 2014.

11         Was Ms. Johnson being prosecuted by the Nassau

12    County District Attorney's Office at that time?  I

13    certainly think that's what we're being told.

14         THE COURT:  You are talking about a NYSIS.

15    That has nothing to do with a NYSIS and a document that

16    must be turned over to you.  There is no document that

17    must be turned over to you because when they ran it,

18    there was no criminal history that came up on

19    Ms. Johnson.

20         Is that correct, Mr. Perri?

21         MR. PERRI:  Yes, your Honor.

22         THE COURT:  So it's material and it may be

23    right for cross-examination and credibility and all

24    that, but there is not a document that is supposed to be

25    turned over to you under Giglio or Brady.

Proceedings                                                    237

1          MR. ZERNER:  Your Honor, I think at a minimum

2     I should be informed of dates of this arrest because --

3     and let's play this out -- because I'm not being given

4     the document, for argument sake.

5          THE COURT:  Hold it, sir.  We can talk about

6     this at a later time before we get to openings and

7     that's what we're going to do, but with regard to any

8     document that you are entitled to right now, the Court

9     rules that you are not because there is no document.

10          Now, anything else for the record?

11          MR. PERRI:  No, your Honor.

12          MR. ZERNER:  Just for the record, your Honor,

13     I believe there is a document.  I believe the document

14     was just passed from the prosecutor to the bench.

15          THE COURT:  My ruling is that there is no

16     document that you are entitled to receive under Brady or

17     Giglio.

18          MR. ZERNER:  I understand your ruling.  I hope

19     my exception is noted.  All I'm simply asking is for the

20     date of the arrest.

21          THE COURT:  We're going to talk about that

22     later.  That's information we can deal with later.  I'm

23     trying to get a jury for this trial.

24          Now, in that regard, I'm going to caution

25     counsel that in their questioning, you're limited in

Proceedings                                                  238

1    your questioning to inquiring of the jurors as to their

2    either bias or qualification to act as a juror.  The

3    Court allowed some leeway in the first panel that came

4    through, but the Court will interject itself if it finds

5    that your hypotheticals or your questioning deals with

6    matters of law that it's within the Court's province to

7    deal with or other matters that are extraneous to the

8    limited inquiry that you are entitled to make, and that

9    is to inquire of the jurors as to their qualifications

10    or potential biases.  It's not an opportunity for

11    counsel to engage in setting up for the jurors what's

12    going to happen at trial.

13         So, I hope that you take that cautionary

14    instruction to heart.

15         THE CLERK:  Bring in the prospective jurors.

16         (Whereupon, the prospective jurors entered the

17    courtroom.)

18         THE CLERK:  Case on trial, People of the State

19    of New York versus Ray Ross, Indictment 1050N of '15.

20         Are the People ready to proceed?

21         MR. PERRI:  Yes, your Honor, the People are

22    ready.

23         THE CLERK:  Defense ready?

24         MR. ZERNER:  The defense is ready, thank you.

25         (Whereupon, the prospective jury panel was

1    duly sworn by the Clerk of the Court.)

2              THE COURT:  Good morning, ladies and

3    gentlemen.  For those potential jurors who are still

4    standing, I apologize for the lack of accommodations,

5    but we're going to get you a seat in just a matter of a

6    few moments.

7              I want to address all of you with some

8    preliminary comments and then we'll hear excuses from

9    those who are unable to serve as jurors at this trial.

10             Members of the jury panel, welcome to the

11   Supreme Court of Nassau County, State of New York

12   sitting here in the County Court building.  I am Judge

13   Terence P. Murphy and I will be presiding at this trial.

14   We are in the middle of the process of selecting a jury

15   in the criminal case.

16             Before I continue, I want to thank you for

17   being here.  I realize that it may be an inconvenience

18   for you, but a trial by jury is and has been the

19   cornerstone of our system of justice, yours and mine,

20   for more than 200 years.  Under our system, members of

21   the community sitting as a jury and not governmental

22   official decide whether a person accused of a crime by

23   the government is guilty or not guilty.  The integrity

24   and sustainability of our American system of justice

25   depends on citizens such as you willing to put aside the

Voir Dire                                                                        240

1    inconvenience and offer your time, attention and

2    dedication and fulfill your civic responsibility by

3    serving as jurors.

4            The good news is that upon completion of jury

5    service, you will be exempt from being called again for

6    at least six years, at least under the state system.

7            Now, I understand that there may be some of

8    you who have certain engagements, limitations or

9    responsibilities such as work commitments, financial

10   hardship, child or parent care issues, scheduled

11   vacations or a medical or physical condition that would

12   prevent you from serving as a juror at this time.  Be

13   informed, however, that there are no blanket exceptions

14   to jury service.  Should you be released from serving on

15   this jury, you will return to central jury for further

16   instructions and possibly being selected as a juror on

17   another case, either criminal or civil.

18           This trial will last approximately until the

19   end of February and that's because we have a couple of

20   days off in that time frame.  There will be no Court

21   sessions on February 12th and 15th because of national

22   holidays or local holidays.  There will be no Court

23   session on February 16th and there will be no Court

24   session on February 24th because of some conflicts that

25   the Court has.

Voir Dire                                                                    241

```
 1              Now, if you have such plans or limitations as
 2    I have just explained, you will now be called up to the
 3    bench in an orderly fashion and I will hear you on the
 4    issue.  Please follow the instructions and the direction
 5    of the court officers.
 6              PROSPECTIVE JUROR:  Gail Rubel, R-U-B-E-L.  I
 7    have flights on February 24th.
 8              THE COURT:  Okay.  For vacation?
 9              PROSPECTIVE JUROR:  Vacation.
10              THE COURT:  You are excused, ma'am.  Go back
11    to central jury.
12              PROSPECTIVE JUROR:  My name is George Kaylor,
13    K-A-Y-L-O-R.  I had a heart attack several months ago.
14    I'm on medication.
15              THE COURT:  Does that impact --
16              PROSPECTIVE JUROR:  I just want to let you
17    know I have my doctor's contact information in my top
18    pocket and my emergency medicines in my bottom pocket in
19    case anything happens.  That's it.
20              THE COURT:  Thank you.
21              PROSPECTIVE JUROR:  My name is Niclaou,
22    N-I-C-L-A-O-U, Sotiriss, S-O-T-I-R-I-S-S.  I got a
23    medical problem.
24              THE COURT:  Hold on.  One, what is your issue?
25              PROSPECTIVE JUROR:  I have a medical problem.
```

1    I have to go to the bathroom very recently for

2    prostrate.

3              THE COURT:  So you are under medical

4    attention?

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  And treatment?

7              PROSPECTIVE JUROR:  Yeah.

8              THE COURT:  You are excused, sir.  You go back

9    to central jury.

10             PROSPECTIVE JUROR:  Pishanidar,

11   P-I-S-H-A-N-I-D-A-R, Sammy.  I'm a resident at North

12   Shore University Hospital in Manhasset clinical duties,

13   including patient care that cannot be taken over by

14   other faculty at the hospital.

15             THE COURT:  If you are out, sir, who handles

16   the patient care?

17             PROSPECTIVE JUROR:  It is distributed among

18   the other physicians, which their schedule is not

19   altered because of my absence.

20             THE COURT:  Are the patients being cared for

21   in your absence?

22             PROSPECTIVE JUROR:  They will have to wait

23   longer to see a physician in my absence.  Possibly

24   waiting an extra week for an appointment.

25             THE COURT:  You are excused.  You go back to

Voir Dire                                                        243

1        central jury.

2                PROSPECTIVE JUROR:  John Pusateri,

3        P-U-S-A-T-E-R-I.  I have a flight scheduled as well.

4                THE COURT:  Where are you going to, sir?

5                PROSPECTIVE JUROR:  Fort Meyers.  I have it on

6        my phone.

7                THE COURT:  Work or vacation?

8                PROSPECTIVE JUROR:  Vacation.

9                THE COURT:  You are excused.

10               PROSPECTIVE JUROR:  Robert Benz, B-E-N-Z.  I'm

11       a C.P.A. and I have meetings set up next week to

12       represent tax audits.

13               THE COURT:  You are excused, sir.

14               PROSPECTIVE JUROR:  Grasian Welch, W-E-L-C-H.

15       I have cardiac arrhythmia.  I go to treatment for my

16       doctor.

17               THE COURT:  It prevents you from being here

18       all day?

19               PROSPECTIVE JUROR:  Yes.

20               THE COURT:  You are excused.

21               PROSPECTIVE JUROR:  Patel.  Biyush,

22       B-I-Y-U-S-H, Patel.  I'm self-employed.  I have nobody

23       in my business.

24               THE COURT:  What type of business do you have,

25       sir?

1      PROSPECTIVE JUROR:  Card and gift store and

2   Lotto machine in Albertson.

3      THE COURT:  Who is running the store today?

4      PROSPECTIVE JUROR:  My wife.  She's a post

5   office worker.

6      THE COURT:  So she took a day off to cover?

7      PROSPECTIVE JUROR:  Because of my being here.

8      THE COURT:  You are excused, sir.

9      PROSPECTIVE JUROR:  Vicky Moore.  I have a

10  flight scheduled from February 16th to the 21st.

11     THE COURT:  You are excused, ma'am.

12     PROSPECTIVE JUROR:  Darvish Zadeh,

13  D-A-V-R-I-S-H  Z-A-D-E-H.  I have to pick up my son from

14  daycare.  He just started, so.

15     THE COURT:  Is that every day, sir?

16     PROSPECTIVE JUROR:  Pretty much every day.

17     THE COURT:  What time you pick him up?

18     PROSPECTIVE JUROR:  2:30.

19     THE COURT:  You are excused.

20     PROSPECTIVE JUROR:  Sofia Charlotin,

21  C-H-A-R-L-O-T-I-N.  I won't be able to serve because I

22  have classes.  I'm a graduate student at Adelphi

23  University.

24     THE COURT:  You go during the day full time?

25     PROSPECTIVE JUROR:  I teach during the day and

Kathi A. Fedden, Sr. Court Reporter

1    go to school at night.

2              THE COURT:  Where do you teach?

3              PROSPECTIVE JUROR:  I'm a teaching assistant

4    at Adelphi University.

5              THE COURT:  That's part of your graduate

6    curriculum?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  You are excused.

9              PROSPECTIVE JUROR:  Wareesh Hoda,

10   W-A-R-E-E-S-H  H-O-D-A.  I'm a part-time student at

11   Queens College.  I have classes five times a day

12   teaching Arabic from nine to one.

13             THE COURT:  You are excused.

14             PROSPECTIVE JUROR:  Susan Hammer.  I have a

15   flight scheduled for the 15th.

16             THE COURT:  Where are you going?

17             PROSPECTIVE JUROR:  Vegas.

18             THE COURT:  Good luck.  You are excused.

19             PROSPECTIVE JUROR:  Carly Lapp, L-A-P-P.  I

20   work at a cardiologist.  The days I'm there I'm the only

21   tech that can perform the tests on them and I'm also

22   studying for my registry exam.

23             THE COURT:  You are excused, ma'am.

24             PROSPECTIVE JUROR:  Laura Lopiccolo-Bollet,

25   L-O-P-I-C-C-O-L-O- B-O-L-L-E-T.  I'm a caregiver to my

Voir Dire

1    father-in-law.  He's a senior in my home.  I also work

2    part time.  When I'm not at work, I go home to take care

3    of him.

4                 THE COURT:  You are excused.

5                 PROSPECTIVE JUROR:  Christina Nicolosi,

6    N-I-C-O-L-O-S-I.  I'm a single mother of three kids and

7    I have no one to pick up my kids from school.

8                 THE COURT:  How old are they?

9                 PROSPECTIVE JUROR:  Three six and eight.

10                THE COURT:  And you pick them up during the

11   day before five?

12                PROSPECTIVE JUROR:  2:30.

13                THE COURT:  You are excused.

14                PROSPECTIVE JUROR:  My name is --

15                THE COURT:  What is your last name?

16                PROSPECTIVE JUROR:  Cho, C-H-O.  I'm a very

17   small dry-cleaner.  Me and my wife only working.  My

18   wife and me only two people, so I cannot stay.

19                THE COURT:  You are excused, sir.

20                PROSPECTIVE JUROR:  Marmor, M-A-R-M-O-R, Jose.

21   I'm a part-time student at Nassau Community College.

22                THE COURT:  When do you have classes, sir?

23                PROSPECTIVE JUROR:  Tuesday, Thursday and

24   Friday morning.

25                THE COURT:  You are excused.

Voir Dire                                                                    247

```
 1                PROSPECTIVE JUROR:  My name is Mehmet Yinzirn,
 2       M-E-H-M-E-T  Y-I-N-Z-I-R-N.  Actually, I can't speak and
 3       not very well English.
 4                THE COURT:  How long you been in America, sir?
 5                PROSPECTIVE JUROR:  Almost ten years.
 6                THE COURT:  What do you do for a living?
 7                PROSPECTIVE JUROR:  I drive.
 8                THE COURT:  You what?
 9                PROSPECTIVE JUROR:  I am driver.
10                THE COURT:  You are excused, sir.
11                PROSPECTIVE JUROR:  Thank you.
12                PROSPECTIVE JUROR:  Nicholas Boyco, B-O-Y-C-O.
13       As of Thursday my employer will be on vacation and I'll
14       be in charge.
15                THE COURT:  What do you do?
16                PROSPECTIVE JUROR:  Insurance adjuster.
17                THE COURT:  You will be the only one in the
18       office?
19                PROSPECTIVE JUROR:  Correct.
20                THE COURT:  You are excused.
21                Ladies and gentlemen, when I say that you are
22       excused, that means you go back to central jury for
23       rescheduling of your jury service.
24                PROSPECTIVE JUROR:  Benedetto,
25       B-E-N-E-D-E-T-T-O, Kim.  I have three children that I
```

Voir Dire                                                        248

1    pick up and drive to school every day and they are also

2    off next week.

3              THE COURT:  How old are they?

4              PROSPECTIVE JUROR:  Thirteen, 13 and 14.

5              THE COURT:  You are excused.

6              PROSPECTIVE JUROR:  Hwang, H-W-A-N-G.  First

7    name Agnes.  My English is not very well.

8              THE COURT:  How long have you been in America,

9    ma'am?

10             PROSPECTIVE JUROR:  America, 14 years.

11             THE COURT:  Do you work?

12             PROSPECTIVE JUROR:  No, I'm a housewife.

13             THE COURT:  Have you had difficulty

14   understanding what I have said to the audience?

15             PROSPECTIVE JUROR:  Sometimes I understand.

16   Some of them difficult ones I can't understand.

17             THE COURT:  You are excused, ma'am.

18             PROSPECTIVE JUROR:  Philip Barnett,

19   B-A-R-N-E-T-T.  I'm the sole care provider for my

20   87-year-old father who is legally blind and I also have

21   a one-person consulting business that I work out of from

22   home and together --

23             THE COURT:  You are excused, sir.

24             PROSPECTIVE JUROR:  Thank you.

25             PROSPECTIVE JUROR:  Kaplan, Benjamin.  I'm a

Voir Dire                                                        249

1     medical resident at Jones Hospital.  I have call every

2     four or five days which requires me to be at the

3     hospital 24 hours.

4              THE COURT:  Is that part of your training,

5     sir?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  You are excused.

8              PROSPECTIVE JUROR:  David Mansbach,

9     M-A-N-S-B-A-C-H.  I have two business travel commitments

10    in February.  I'm also trying to tour schools with my

11    daughter for colleges.

12             THE COURT:  When are the trips scheduled for?

13             PROSPECTIVE JUROR:  One is on the 16th.  One

14    is on the 21st.

15             THE COURT:  You are excused, sir.

16             PROSPECTIVE JUROR:  Viscovich,

17    V-I-S-C-O-V-I-C-H.  First name Karl.  I'm just

18    responsible for getting my 11 and nine-year-old to and

19    from school every day.  If it was over the summer, it

20    wouldn't be a problem.  My wife works from morning to

21    late afternoon.

22             THE COURT:  What time do you have to get them

23    to school?

24             PROSPECTIVE JUROR:  My son at a quarter to

25    nine and 3:20.

1          THE COURT:  You are excused.

2          PROSPECTIVE JUROR:  Jermain Velasco,

3     V-E-L-A-S-C-O.  I'm the sole breadwinner for my family.

4     I work on commission as a car salesperson and pretty

5     much the majority of my sales or income is coming from

6     commission.  If I'm not at work, I don't make any money.

7          THE COURT:  You are excused, sir.

8          PROSPECTIVE JUROR:  Sharon Richardt,

9     R-I-C-H-A-R-D-T.  I also have a trip planned for

10    February 26th.

11         THE COURT:  Where are you going, ma'am?

12         PROSPECTIVE JUROR:  Las Vegas.

13         THE COURT:  Good luck.  You are excused.

14         PROSPECTIVE JUROR:  Mara Savignano,

15    S-A-V-I-G-N-A-N-O.  I have a one-year-old I'm still

16    nursing and I lost my main baby-sitter.

17         THE COURT:  You are excused, ma'am.

18    Congratulations.

19         PROSPECTIVE JUROR:  Good morning.  Lillian

20    Gamarra, G-A-M-A-R-R-A.  Sir, my husband is sick.  He's

21    taking so many medicines sometimes he's dizzy.

22         THE COURT:  You are excused, ma'am.

23         PROSPECTIVE JUROR:  Christine Gunnip,

24    G-U-N-N-I-P.  I have a flight early March.  I want to

25    make sure that March 11th, if the trial should run.

Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                                                      251

1              THE COURT:  We'll be done well before March

2     11th, ma'am.

3              PROSPECTIVE JUROR:  Thank you.

4              PROSPECTIVE JUROR:  Sobi, S-O-B-I, Mathai,

5     M-A-T-H-A-I.  I have two little ones in school,

6     nine-years-old and seven-years-old.  School finishes at

7     3:30 and 3:20.

8              THE COURT:  You pick them up?

9              PROSPECTIVE JUROR:  Yeah.

10             THE COURT:  You are excused.

11             PROSPECTIVE JUROR:  Stephanie Marcus.  I'm a

12    pediatric hematology and oncology nurse that works at

13    the clinic.  One of the other nurses is on maternity

14    leave so we're already short staffed.

15             THE COURT:  You are excused.  You will be

16    rescheduled for a different time.

17             PROSPECTIVE JUROR:  George Kaylor.  My wife

18    has a doctor's appointment with her radiologist on

19    Thursday afternoon.  She's recovering from uterine

20    cancer.

21             THE COURT:  What I'm going to do is excuse you

22    from this case, give you the opportunity to reschedule

23    once your situation settles down.

24             PROSPECTIVE JUROR:  Thank you very much.

25             THE COURT:  You're welcome, sir.

Voir Dire                                                    252

1          Ladies and gentlemen who remain in the

2     audience, I want to thank you for your attention.  I

3     presume that you will be available to sit as a juror in

4     this case.  As I said, probably to about the end of

5     February.

6          During the course of my remarks, I will

7     explain briefly what this trial involves and I will also

8     explain to you the separate functions that the jury and

9     the judge perform in a trial of this nature.

10          The formal name of this case is the People of

11     the State of New York against Ray Ross.  The words

12     People of the State of New York, often referred to

13     simply as the People, mean the government of the State

14     of New York.

15          The fact that this action is brought in the

16     name of the People, that is, the government of the State

17     of New York, or that the evidence is presented by a

18     public official, an assistant district attorney, does

19     not in any way indicate that the public, the People of

20     this state, want a specific verdict.  The People are

21     served by whatever verdict is justified by the evidence.

22          The case comes to us by way of an indictment.

23     An indictment is merely a written document filed by the

24     government that contains an accusation of criminal

25     conduct.  The defendant has answered that he is not

Voir Dire                                                    253

1    guilty of the accusation.  Neither the indictment,

2    itself nor the fact that an indictment has been filed

3    constitutes any evidence whatsoever.  A trial shall be

4    conducted for you, should you be selected as a members

5    of the jury, to decide whether the defendant is guilty

6    or not guilty.

7        The defendant is charged with the crimes of

8    course of sexual conduct against a child in the first

9    and second degrees and endangering the welfare of a

10   child, two counts.

11       Now, essentially the defendant is charged and

12   accused of engaging in inappropriate sexual conduct with

13   a female, date of birth of December 30, 2000 in and

14   about West Hempstead or Hempstead or Lakeview during the

15   time frame between March 1st, 2013 and December 29,

16   2013.

17       Additionally, the defendant is charged with

18   engaging in conduct that endangered the welfare of a

19   child up to and about October 17th of 2014.

20       Now, at the end of the trial I will give you

21   detailed instructions on the crimes charged and it is

22   upon those instructions that you must base your

23   decision.  I have given you this brief description of

24   the charges only for the sole purpose of allowing you to

25   consider whether there is anything about the nature of

Voir Dire                                                                    254

1       the charges that would affect your ability to be a fair

2       and impartial juror, that's all.  You are not to use

3       this description I have offered for any other purpose.

4                In particular, you are not now, during the

5       presentation of evidence, to use this description to

6       come to a decision about whether or not the defendant is

7       guilty.  The People are represented by the district

8       attorney of Nassau County, Ms. Madeline Singas.  The

9       district attorney is in turn represented by Assistant

10      District Attorney Anthony Perri.

11               Mr. Perri.

12               MR. PERRI:  (Indicating.)

13               THE COURT:  The defendant in this case is

14      Mr. Ray Ross.

15               Mr. Ross.

16               THE DEFENDANT:  (Indicating.)

17               THE COURT:  And Mr. Ross is represented by his

18      counsel, Mr. Scott Zerner.

19               MR. ZERNER:  (Indicating.)

20               THE COURT:  The defendant, the defendant's

21      attorney and the prosecutor attorney now having all been

22      identified to you, is there anyone here who knows the

23      defendant, the attorneys or me?

24               Seeing no show of hands, we'll move on.

25               Among the witnesses who may be called or may

be involved in this case are the following:  Millinia

Johnson, Sarita Johnson, Joshua Hanson, a representative

from Sprint Wireless Services, a representative from

Chase Bank, Detective Rhubens Toussaint, Detective

Anthony Draghi, Detective Brady, Monique Flores, Eleanor

Hobbs, Tara Johnson, Robert Jones, Rafael Mickens,

Sherman Roberts, Kelly Ross, Jasmine Ross, Justyn Ross,

Lorigan Ross, Paula Ross.

My mentioning these names imposes no burden on

either side to call that person as a witness.  I name

these individuals only to see if anyone knows them and,

therefore, it would not be appropriate to sit as a juror

in this case.

Does anyone know these people by the names I

called?

Seeing no hands, we'll move on.

Does anyone know anything about this case as I

described it so far?

Has anyone read or seen anything in the news

or heard about it discussed by anyone?

No hands, so we'll continue.

Now, as I indicated, we're in the process of

selecting a jury for this trial.  A jury is composed of

12 people.  In addition to the 12 jurors, we will also

select alternate jurors.

Voir Dire                                                256

1          The first person called who is sworn in as a

2     juror will serve as the jury's foreperson.

3          During this part of the trial, a decision will

4     be made as to who will sit as jurors in the case.  We're

5     looking to select a jury that is impartial and qualified

6     to hear and determine the facts of the case.  This stage

7     of the trial is known as voir dire.  The two words voir

8     dire are a combination of Latin and French words which

9     come to us from ancient common law from where we derived

10    our present day law.  The term means to speak the truth.

11         During my questioning and that of counsel, I

12    simply ask you to speak the truth.  My questions and

13    those of counsel allow the attorneys the opportunity to

14    get to know a little bit about you in order to help them

15    come to a conclusion about whether to select you as a

16    juror on this particular case.  Don't be concerned if

17    you are excused from service in this case.

18         Excusal from a case in no way reflects upon a

19    prospective juror's character or ability.  In fact, you

20    may get selected on another case after returning to

21    central jury.  This questioning allowing our process or

22    system of justice to work to its most effective manner.

23         Procedurally here's what happens:  Each

24    prospective juror's name will be drawn from the

25    selection drum to my right and that juror will then be

Voir Dire                                                       257

1     seated in the jury box to my left and asked questions by

2     the Court and the attorneys.  The purpose of the

3     questions is to permit the Court and the attorneys to

4     select a jury free from predisposition, prejudice and

5     bias.

6              There are no right or wrong answers to

7     questions.  We are simply looking for honest answers.

8     None of the questions, as I have indicated, are intended

9     to pry into your personal life or embarrass you in any

10    way.

11             You must answer all the questions as candidly

12    and as completely as you are able.  If you are asked a

13    question that you are uncomfortable answering publicly,

14    simply ask to speak about it at the bench.

15             Can anyone not abide by my instructions?  You

16    have promised to do so by your oath.

17             Once selected, you will have a defined role.

18    Let's discuss the role of the jury.  The jury's

19    responsibility is to evaluate fairly the testimony and

20    other evidence presented at the trial in order to

21    determine the facts of the case, to apply the law to

22    those facts, and to decide whether the People have

23    proven beyond a reasonable doubt that a crime has taken

24    place and that the defendant is the person who committed

25    the crime.

Voir Dire                                              258

1          In reaching its verdict, guilty or not guilty,

2     the jury must be fair.  So what makes a person a fair

3     juror?  A fair juror is a person who will base his or

4     her decision solely on the testimony and other evidence

5     presented at this trial and will not make a final

6     decision on the verdict until the end of the case.

7          A fair juror is a person who will accept and

8     apply the law of New York as I explain it during the

9     course of the trial.

10         And, finally, a fair juror is a person who,

11    without fear, favor, bias, prejudice or sympathy for

12    either the People or the defendant or any witness, be

13    the witness a police officer or civilian, that renders a

14    verdict consistent with that juror's honest evaluation

15    of the testimony and other evidence and that juror's

16    honest application of the law.

17         My role at the trial, the role of any judge,

18    is to simply help assure a fair and orderly trial in

19    accordance with our law, to preside over the trial and

20    decide questions of law that arise between the parties

21    and then to explain to you, the jury, as I am now, what

22    the law is that the jury must accept and agree to

23    follow.

24         We are both judges in this case.  You, the

25    jury, judge the facts of the case in order to reach a

1    verdict of guilty or not guilty, and I judge the law,

2    meaning I decide questions of law and instruct the jury

3    on the law.

4            Nothing I say or how I say it and no ruling I

5    make on the law is intended to be, nor should it be

6    considered by you as an expression of an opinion on the

7    facts of the case or of whether the defendant is guilty

8    or not guilty.

9            At this point I will instruct you on a few

10   basic principles of law which you must accept and agree

11   to follow.

12           First, every person accused of a crime is

13   presumed innocent.  That is, he or she stands innocent

14   in the eyes of the law.  The People must rebut this

15   presumption, if they can, by the presentation of

16   evidence which convinces you beyond a reasonable doubt

17   of the defendant's guilt.

18           In a criminal case, the burden of proof is on

19   the People and remains on the People throughout the

20   entire trial.  The defendant is not required to prove or

21   disprove anything.

22           Is there anyone who, despite this instruction,

23   cannot afford the defendant this presumption of

24   innocence?

25           Seeing no hands, we'll move on.

Voir Dire                                                          260

```
 1                  I'll explain to you at the close of the case

 2      what reasonable doubt means.  A reasonable doubt is not

 3      a mere possibility or whim or doubt borne of a guess or

 4      fancy, but it's a doubt which you have after you have

 5      gone over all the evidence, the absence of certain facts

 6      or the presence of certain facts that leaves in your

 7      mind such uncertainty that you are not fully convinced

 8      of the defendant's guilt.

 9                  You will not be -- you will be required to

10      acquit the defendant, that is, return a verdict of not

11      guilty, if at the end of the case you have a reasonable

12      doubt of guilt because of the evidence or lack of

13      evidence presented to you.

14                  Is there anyone who, despite this instruction,

15      cannot accept this principle?

16                  PROSPECTIVE JUROR:  (Indicating.)

17                  THE COURT:  Ma'am, can I have your name,

18      please?

19                  PROSPECTIVE JUROR:  Irene Caniano.

20                  THE COURT:  Thank you, ma'am.  We'll inquire a

21      little bit more about that later.

22                  We're speaking about the principle of the

23      People's burden of proof which is beyond a reasonable

24      doubt.  Is there anyone here who, despite my instruction

25      on the burden of proof, that the People have to prove
```

1        the defendant guilty beyond a reasonable doubt, that

2        would require absolute certainty of guilt before you

3        would convict the defendant?

4                We'll move on.

5                Can you assure the Court that if you find

6        guilt beyond a reasonable doubt that you will return a

7        verdict of guilty?  And if you do not find guilt beyond

8        a reasonable doubt, you will return a verdict of not

9        guilty?

10               Seeing no hands, I will presume you can abide

11       by those instructions.

12               Now, I told you before that the defendant has

13       no burden whatsoever at this trial.

14               Under our system of law, the defendant is not

15       obligated to take the witness stand or call any

16       witnesses or explain his actions in any way.  You must

17       not draw any inference unfavorable to the defendant if

18       he chooses not to testify.

19               Is there anyone here who, despite this

20       instruction, will or might allow the fact that the

21       defendant has not testified at trial to influence you in

22       your deliberations?  In other words, does anyone require

23       that the defendant testify?

24               As a juror you may not consider the

25       possibility of punishment or sympathy, bias or prejudice

1    for one side or the other in your deliberations,

2    determinations of a verdict.  Is there anyone here who

3    feels that you cannot eliminate punishment, sympathy,

4    bias or prejudice in performing your duties and

5    responsibilities as a juror, including rendering a

6    verdict?

7              PROSPECTIVE JUROR:  (Indicating.)

8              THE COURT:  Ma'am, can I have your name?

9              PROSPECTIVE JUROR:  Kelly Nevins.

10             THE COURT:  Thank you, ma'am.  We'll talk

11   about that a little more if you are called.

12             PROSPECTIVE JUROR:  (Indicating.)

13             THE COURT:  Sir, your name?

14             PROSPECTIVE JUROR:  Brendan Fahey, F-A-H-E-Y.

15             THE COURT:  Thank you, Mr. Fahey.

16             PROSPECTIVE JUROR:  Christine Gunnip.

17             THE COURT:  Thank you all.

18             We'll address your concerns if you are called

19   to sit in the jury box and be subject to questioning.

20             Now, in that vein, if you will, it's not

21   essential that you agree with or like every one of these

22   principles of law.  Under my oath, I must instruct you

23   as to the law as I understand it to be and, under your

24   oath as jurors, you must accept the law as I explain it

25   to you, whether you agree with it or not, and then apply

Voir Dire                                                    263

1       it to the facts as you find them.

2               Is there anyone here who cannot accept this

3       principle?

4               We'll move on.

5               Now, when you judge the facts, you are to

6       consider only the testimony of witnesses, exhibits

7       received in evidence, any stipulations by the parties

8       and other evidence presented in this courtroom.

9               A stipulation is information the parties agree

10      to present to the jury as evidence without calling a

11      witness to testify.

12              Testimonial evidence is the answers witnesses

13      give to questions asked by the lawyers and perhaps the

14      Court.  So, you must listen to the question in order to

15      understand the context of the answer of the witness.

16              Questions posed are not evidence.  It is the

17      witness's answer to the question that constitutes

18      evidence.

19              Other evidence may include physical objects

20      such as documents, photographs, video, clothing or

21      charts.

22              Some factors you may wish to consider in

23      evaluating the testimony of the witnesses are did the

24      witness have an opportunity to see or hear the event

25      about which he or she testified?

Voir Dire                                                            264

1          Did the witness have the ability to recall

2     those events accurately?

3          Was the testimony of the witness plausible and

4     likely to be true or was it implausible and not likely

5     to be true?

6          Was the testimony of the witness consistent or

7     inconsistent with other testimony or evidence in the

8     case?

9          Did the manner in which the witness testified

10    reflect upon the truthfulness of that witness's

11    testimony?

12         To what extent, if any, did the witness's

13    background, training, education or experience affect the

14    believability of that witness's testimony?

15         Did the witness have a bias, hostility or some

16    other attitude that affected the truthfulness of the

17    witness's testimony?

18         You may consider whether a witness had or did

19    not have a motive to lie.  If the witness had a motive

20    to lie, you may consider whether and to what extent, if

21    any, that motive affected the truthfulness of that

22    witness's testimony.

23         As judges of the facts, you alone determine

24    the truthfulness and accuracy of the testimony of each

25    witness.  You must decide whether a witness told the

1    truth and was accurate or, instead, testified falsely or

2    maybe was simply mistaken.

3           You must also decide what importance to give

4    to the testimony you accept as truthful and accurate.

5    It is the quality of the testimony that is controlling,

6    not the number of witnesses who testify.  I'll instruct

7    you further on this subject at the end of the trial.

8           In this case you will hear the testimony of

9    police officers.  The testimony of a witness should not

10   be believed solely and simply because the witness is a

11   police officer.  At the same time, a witness's testimony

12   should not be disbelieved solely and simply because the

13   witness is a police officer.  You must evaluate a police

14   officer's testimony in the same way you would evaluate

15   the testimony of any other witness.

16          With regard to scheduling, the trial will

17   continue each morning at 9:30 a.m. and go to about 12:30

18   p.m.  Lunch will be from 12:30 to 2:00, approximately,

19   and then the afternoon session will be from 2:00 p.m.

20   until 4:30 p.m.  That 4:30 p.m. time is a relatively

21   hard time, if you will, because we have to break at

22   4:30.

23          Those of you who are not called right away

24   should also pay attention and listen to the questions

25   the attorneys ask.  It's likely that when you are

1    called, the same questions will be posed to you.

2            As a final note before I start my questioning,

3    I want to again thank you for your participation in the

4    jury selection process.  It is an important civic

5    responsibility and you will have fulfilled it whether

6    you serve on this jury, another jury or no jury at all.

7            What's going to happen now is the clerk will

8    start to select 14 names and you will sit in the box

9    starting with the first row closest to the audience is

10   number one and the last potential juror will be seat 14.

11           THE CLERK:  We will call names from the drum.

12   When you hear your name called, use the swinging gate on

13   the right side of the courtroom.  Follow the directions

14   of the officer.

15           The following prospective jurors please step

16   up.  For seat number one, Kenneth parker, P-A-R-K-E-R.

17           Seat number two, Judith Pastor, P-A-S-T-O-R.

18           Seat number three, Patrick Pierre,

19   P-I-E-R-R-E.

20           Seat four, Kelly Nevins, N-E-V-I-N-S.

21           Seat five, Janette Ramseur, R-A-M-S-E-U-R.

22           Seat six, Therese Quigley, Q-U-I-G-L-E-Y.

23           Seat seven, Dianna Diop, D-I-O-P.

24           Seat eight, Damary Jurado, D-A-M-A-R-Y

25   J-U-R-A-D-O.

Voir Dire

1          Seat nine, Christine Gunnip, G-U-N-N-I-P.

2          Seat ten, Damarr Whittick, D-A-M-A-R-R

3   W-H-I-T-T-I-C-K.

4          Seat 11, Arun Modgill, A-R-U-N  M-O-D-G-I-L-L.

5          Seat 12, Susan Goldman, G-O-L-D-M-A-N.

6          Seat 13, Elizabeth Trotta, T-R-O-T-T-A.

7          Seat 14, Mary Hildebrandt,

8   H-I-L-D-E-B-R-A-N-D-T.

9          THE COURT:  Ms. Nevins, you raised your hand

10  when I was offering my instructions with regard to the

11  prohibition about considering punishment, sympathy, bias

12  or prejudice for one side or the other in your

13  deliberations and determination.  Can you tell me why

14  you can't abide by that instruction?

15          PROSPECTIVE JUROR:  I think with the sympathy,

16  you said the age of the person was they were born in

17  2000?

18          THE COURT:  Yes, ma'am.

19          PROSPECTIVE JUROR:  That would make them a 14-

20  or 15-year-old.

21          THE COURT:  Right.

22          PROSPECTIVE JUROR:  I have nieces and nephews

23  that are 14 and 15.

24          THE COURT:  It's the nature of the

25  allegations?

Voir Dire                                                    268

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And the fact that you have close

3     relatives --

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  -- that are the approximate age of

6     the complaining witness in this case?

7          PROSPECTIVE JUROR:  Correct.

8          THE COURT:  And would you hold that sympathy

9     to your nieces and nephews against the defendant in

10    terms of evaluating the evidence that's presented by the

11    district attorney?

12         PROSPECTIVE JUROR:  Yeah.

13         THE COURT:  Please be honest.

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  So you come in with a

16    predisposition -- well, you have a concern that you

17    could not be fair and impartial simply based on the

18    allegations that are set out in this case and the fact

19    that you have nieces and nephews of the same age of the

20    complainant?

21         PROSPECTIVE JUROR:  Correct.

22         THE COURT:  Ms. Gunnip, you raised your hand

23    as well on that same issue.

24         PROSPECTIVE JUROR:  My daughter lives next to

25    a convicted pedophile who had solicited a 14-year-old

Voir Dire

1    for sex.

2             THE COURT:  So again, it's the nature of the

3    allegations that prevent you from being able to be fair.

4             PROSPECTIVE JUROR:  Knowing him and knowing

5    what he did, I don't know if I can be fair.

6             THE COURT:  Could I see counsel for a second?

7             (Whereupon, the following discussion took

8    place at the bench:

9             THE COURT:  Counsel, with regard to those two

10   individuals, they raised their hand earlier during the

11   instructions and they gave reasons.  Do you wish to

12   inquire of them in any way, shape or form?  I'll leave

13   them in the box.  If you agree they should be excused on

14   consent for cause, I'll replace them with two

15   individuals in the box so we can move this along a

16   little bit.

17            MR. PERRI:  We can replace them, that's fine.

18            MR. ZERNER:  I agree that they should be

19   removed for cause now.

20            THE COURT:  We'll replace them.

21            MR. ZERNER:  Sure.

22            MR. PERRI:  Thank you, your Honor.)

23            (Whereupon, the proceedings continued in open

24   court.)

25            THE COURT:  Ms. Nevins and Ms. Gunnip, I want

1    to thank you for your service as citizens of the

2    community coming for jury service, but we're going to

3    excuse you because it's clear that this is not the

4    appropriate case for either of you to sit on.  So, you

5    will be returned to central jury and placed back in the

6    pool for further selection.

7            THE CLERK:  The following prospective jurors

8    please step up as your name is called.  David Nolan,

9    N-O-L-A-N, seat four.

10           Edgar Calderon, C-A-L-D-E-R-O-N for seat nine.

11           THE COURT:  Mr. Parker, good morning.

12           PROSPECTIVE JUROR:  Good morning.

13           THE COURT:  Is there anything about the case

14   or your life experience that would prevent you from

15   being fair and impartial in this matter?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  Are you presently in school?

18           PROSPECTIVE JUROR:  No.

19           THE COURT:  You have a college degree?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  That's in psychology?

22           PROSPECTIVE JUROR:  Yeah.

23           THE COURT:  So you are looking for

24   opportunities in that field?

25           PROSPECTIVE JUROR:  Yes.

Voir Dire                                                        271

```
 1                THE COURT:  And you never served on a jury
 2       before?
 3                PROSPECTIVE JUROR:  Never.
 4                THE COURT:  Were you ever called for jury
 5       service before?
 6                PROSPECTIVE JUROR:  I believe once while I was
 7       at school.
 8                THE COURT:  Thank you.
 9                Ms. Pastor, good morning.
10                PROSPECTIVE JUROR:  Good morning.
11                THE COURT:  You too have never served on a
12       jury before.
13                PROSPECTIVE JUROR:  No, I haven't.
14                THE COURT:  Have you ever been called before?
15                PROSPECTIVE JUROR:  Yes, I have.
16                THE COURT:  Anything about the case or your
17       life experience that would prevent you from being fair
18       and impartial?
19                PROSPECTIVE JUROR:  No, your Honor.
20                THE COURT:  Mr. Pierre, good morning.
21                PROSPECTIVE JUROR:  Good morning, your Honor.
22                THE COURT:  I see here you are a Local 3
23       member.
24                PROSPECTIVE JUROR:  That's correct.
25                THE COURT:  And in your duties you're a
```

1      foreman at Madison Square Garden for the different

2      events that they put on; is that correct?

3                    PROSPECTIVE JUROR:  That is correct, your

4      Honor.

5                    THE COURT:  Do you deal simply with the

6      electrical aspects of it?

7                    PROSPECTIVE JUROR:  No, your Honor, pretty

8      much I handle the changeovers and also the concert

9      load-ins and load-outs.

10                    THE COURT:  So you work -- I guess you work

11      closely with the quote, unquote "roadies" of the

12      different groups or individuals?

13                    PROSPECTIVE JUROR:  Absolutely, your Honor.

14                    THE COURT:  And you make sure they have --

15      they know how to get their stuff onto the stage and how

16      it gets located and set up?

17                    PROSPECTIVE JUROR:  Correct.

18                    THE COURT:  Very good.

19                    Do you get to enjoy the shows after the work

20      is done?

21                    PROSPECTIVE JUROR:  Somewhat.

22                    THE COURT:  You had indicated you know someone

23      that was accused of a crime.  Can you talk about that?

24                    PROSPECTIVE JUROR:  Sure.  Within junior high

25      dealing with the wrong crowd, one of the guys within our

Voir Dire                                                           273

1    group went and robbed some kid he saw.  He must have

2    known him at the time, and me being present, we all went

3    and got arrested, yes.

4              THE COURT:  And was that matter disposed of?

5              PROSPECTIVE JUROR:  Well, it never went to

6    trial.

7              THE COURT:  Are you satisfied with the -- did

8    it happen in Nassau County?

9              PROSPECTIVE JUROR:  No, it did not.

10             THE COURT:  Are you satisfied with the way you

11   were treated in that particular matter by the police or

12   the district attorney's office, if they were involved?

13             PROSPECTIVE JUROR:  Absolutely.  It was

14   resolved.  I learned my lesson from not hanging with the

15   wrong crowd.

16             THE COURT:  Very good.  Thank you.

17             PROSPECTIVE JUROR:  You're welcome.

18             THE COURT:  Mr. Nolan, hi.

19             PROSPECTIVE JUROR:  Your Honor.

20             THE COURT:  I see you were born at Langley Air

21   Force Base, Virginia.

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Does that mean you were an air

24   force brat?

25             PROSPECTIVE JUROR:  Yes.

Voir Dire                                                    274

1          THE COURT:  For your entire childhood?

2          PROSPECTIVE JUROR:  No.  That was four years.

3          THE COURT:  Anything about the case or your

4    life experience that would prevent you from being fair

5    and impartial?

6          PROSPECTIVE JUROR:  No, your Honor.

7          THE COURT:  Thanks.

8          Ms. Ramseur, hi.

9          PROSPECTIVE JUROR:  Hi.

10         THE COURT:  Who do you know in a law office?

11         PROSPECTIVE JUROR:  I worked at a law office

12   in Manhattan.

13         THE COURT:  Is that at the bar association?

14         PROSPECTIVE JUROR:  No.  It was a private

15   firm.

16         THE COURT:  Are you retired from that now?

17         PROSPECTIVE JUROR:  Yes.  Well, I left there

18   and I worked for the Unified Court System.  I'm retired

19   from there.

20         THE COURT:  Where did you work in the Court

21   system?

22         PROSPECTIVE JUROR:  I worked in Housing Court

23   in the five boroughs except for Staten Island, plus I

24   did two years -- two, three years in Civil Court in

25   Manhattan and Brooklyn.

Voir Dire                                                          275

1          THE COURT:  So you were in the Court, itself.

2    Were you a clerk?

3          PROSPECTIVE JUROR:  No, I was a Court

4    attorney.

5          THE COURT:  Okay.  And you're a member of the

6    Queens Bar Association?

7          PROSPECTIVE JUROR:  Yes, I am.

8          THE COURT:  Now, in that experience as a Court

9    attorney and a lawyer, you handled criminal matters?

10          PROSPECTIVE JUROR:  No, we were mostly civil.

11    All civil.

12          THE COURT:  And you know civil cases and civil

13    law is different from criminal law.

14          PROSPECTIVE JUROR:  Absolutely.

15          THE COURT:  Would you have any problem

16    following my instructions on the law even if you

17    disagree with it or believe that I'm wrong on the law?

18          PROSPECTIVE JUROR:  I would do my best.

19          THE COURT:  Well, you know that doing your

20    best is admirable, but it won't get you seated as a

21    juror.

22          PROSPECTIVE JUROR:  Yes, I would follow the

23    law.

24          THE COURT:  Thank you.  I need that

25    commitment.  Thank you, ma'am.

Voir Dire                                                    276

1           Ms. Quigley hi.

2           PROSPECTIVE JUROR:  Hi.

3           THE COURT:  Now, you did serve on a number of

4     types of juries.  Well, at least you served as a grand

5     juror; is that correct?

6           PROSPECTIVE JUROR:  That's correct.

7           THE COURT:  So you know grand jury is a

8     different process, right?

9           PROSPECTIVE JUROR:  Right.

10          THE COURT:  It has nothing to do with a trial

11    and what happens at a trial.  There are different

12    burdens of proof.  There are different standards of

13    proof.  There are different purposes, quite frankly.

14          Anything about your experience as a grand

15    juror that would prevent you from being fair and

16    impartial?

17          PROSPECTIVE JUROR:  No, your Honor.

18          THE COURT:  Anything about the nature of the

19    case or your life experience that would prevent you from

20    being fair and impartial?

21          PROSPECTIVE JUROR:  No, your Honor.

22          THE COURT:  You would be able to follow my

23    instructions on the law?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Mr. Diop, hi.  How are you?

1          PROSPECTIVE JUROR:  I'm good.  How are you?

2          THE COURT:  Good, thank you.

3          Anything about the nature of the case or your

4     life experience that would not allow you to be a juror

5     here?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  You're a nurse.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  What type of patients do you deal

10    with?

11         PROSPECTIVE JUROR:  I'm a surgical nurse.  I

12    take care of renal and liver transplantations.  I'm also

13    the director of infection control.

14         THE COURT:  In your experience as a registered

15    nurse, have you ever had to deal with young patients?

16         PROSPECTIVE JUROR:  No, I deal with adults.

17         THE COURT:  Okay.  Anything about your life

18    experience that would prevent you from being fair and

19    impartial?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Ms. Jurado, you have indicated

22    that you know someone that might have been the victim of

23    a crime?

24         PROSPECTIVE JUROR:  Me, yes.

25         THE COURT:  Can you talk about that?

Voir Dire

1          PROSPECTIVE JUROR:  It was my mother and

2    sister.

3          THE COURT:  Could you say just generally what

4    happened?

5          PROSPECTIVE JUROR:  It was a domestic violence

6    situation with my father.

7          THE COURT:  Were you involved at all with that

8    or you just heard about it?

9          PROSPECTIVE JUROR:  I wasn't in face to face

10   involved with it because I was in school at that time.

11         THE COURT:  Anything about that experience

12   involving family discord and criminal conduct maybe that

13   would prevent you from being fair and impartial as a

14   juror here?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  You know, if there is -- well, let

17   me put it this way:  Do you carry with you some strong

18   feelings with regard to what happened between your mom

19   and your dad?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Were the police called?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  And do you know what happened?

24   Your dad was arrested, I guess?

25         PROSPECTIVE JUROR:  Yes.

Voir Dire                                                    279

1          THE COURT:  Do you know whether the matter was

2     concluded?

3          PROSPECTIVE JUROR:  It's currently being

4     concluded.

5          THE COURT:  So it's still pending?

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  Did that happen in Nassau County?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Did you have to deal with the

10    police at all?

11         PROSPECTIVE JUROR:  Yes, as a translator.

12         THE COURT:  For a family member?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  And did you have to deal with an

15    assistant district attorney in any way?

16         PROSPECTIVE JUROR:  It's sort of different.

17    I'm dealing with an immigration lawyer now.

18         THE COURT:  But with regard to the criminal

19    case, did you talk to a district attorney?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  A member of the district

22    attorney's office, an investigator?

23         PROSPECTIVE JUROR:  No, your Honor.

24         THE COURT:  Okay.  And when you say you know

25    someone who might have been convicted of a crime or been

1    witness to a crime, does that go back to that same

2    incident?

3              PROSPECTIVE JUROR:  Yes, your Honor.

4              THE COURT:  Anything about your life

5    experience or the nature of the case that would prevent

6    you from being fair and impartial?

7              PROSPECTIVE JUROR:  No, your Honor.

8              THE COURT:  Now I indicated earlier that the

9    allegations were that some of this conduct or some of

10   these events occurred in Hempstead or West Hempstead or

11   Lakeview, an area near Western Beef or National

12   Liquidators or the old Western Beef.  Anything about

13   that area of town that would prevent you from being fair

14   and impartial?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Because I know you live in

17   somewhat close proximity to that area.  Not too close?

18             PROSPECTIVE JUROR:  Not too close.

19             THE COURT:  Okay.

20             Mr. Calderon, hi.

21             PROSPECTIVE JUROR:  Hi.

22             THE COURT:  You served on a civil jury.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And that went to a verdict, so you

25   had the opportunity to deliberate with your fellow

Voir Dire                                                                281

1      jurors?

2                  PROSPECTIVE JUROR:  Yes.

3                  THE COURT:  You know that process and how you

4      engage in conversation and discussion.  You hold on to

5      your independent conclusions, but you listen to others

6      to see if you may be right or wrong.  If you believe you

7      are right, you hold on to your position.  If you are

8      convinced by others that your position is wrong, you

9      would be willing to consider modifying your position,

10     right?

11                 PROSPECTIVE JUROR:  That's correct.

12                 THE COURT:  Civil cases are different from

13     criminal cases, so you would have to follow my

14     instructions on the law as I gave them to you, okay?

15                 PROSPECTIVE JUROR:  Yes.

16                 THE COURT:  Anything about the nature of the

17     case or your life experience that would prevent you from

18     being fair and impartial?

19                 PROSPECTIVE JUROR:  Not at the moment, no.

20                 THE COURT:  As you head into this process,

21     you're confident that you are going to be fair and

22     impartial?

23                 PROSPECTIVE JUROR:  I will try.

24                 THE COURT:  When you say you will try, is that

25     a yes?

Voir Dire                                                                    282

1           PROSPECTIVE JUROR:  Yes, I will have an open

2     mind.

3           THE COURT:  And you'll wait to hear what

4     evidence is presented?

5           PROSPECTIVE JUROR:  Absolutely.

6           THE COURT:  Very good.

7           Mr. Whitlock [sic], hi.  Is that you, sir?  I

8     couldn't decipher W-H-I-T.

9           PROSPECTIVE JUROR:  Whittick.

10          THE COURT:  Thank you, sir.  I apologize for

11    messing that up.

12          I see that you do landscaping work.

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Do you work through the winter?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Seasonal?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Anything about the case that

19    would --

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  And anything in your life

22    experience that would prevent you from being fair and

23    impartial?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Thank you.

1              Mr. Modgill, hi.  I see that you are a driver,
2       sir.
3              PROSPECTIVE JUROR:  Yes.
4              THE COURT:  Do you go into New York City?
5              PROSPECTIVE JUROR:  Yes.
6              THE COURT:  And being out of work will not
7       create a financial hardship to you or your family?
8              PROSPECTIVE JUROR:  Just the winter.  I had an
9       accident, that's why.
10             THE COURT:  You are okay to sit?
11             PROSPECTIVE JUROR:  Yes.
12             THE COURT:  Anything about the nature of the
13      case or your life experience that would prevent you from
14      being fair and impartial?
15             PROSPECTIVE JUROR:  Nothing, no.
16             THE COURT:  Ms. Goldman, hi.
17             PROSPECTIVE JUROR:  Hi.
18             THE COURT:  You have indicated that you might
19      know someone who may have been the victim of a crime.
20             PROSPECTIVE JUROR:  I mean, my parents were
21      held up at gunpoint.
22             THE COURT:  Did that happen a long time ago?
23             PROSPECTIVE JUROR:  Long time ago.
24             THE COURT:  Anything about that that would
25      prevent you from being fair and impartial?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Were you a young child?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  You weren't involved at all?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  And you indicated that you know

7    someone who might have been convicted of a crime.  Can

8    you talk about that?

9          PROSPECTIVE JUROR:  I have a cousin in jail

10   currently for murder.

11         THE COURT:  Did that happen locally?

12         PROSPECTIVE JUROR:  California.

13         THE COURT:  Were you involved in it at all or

14   just through family communication and conversation?

15         PROSPECTIVE JUROR:  Just communication with

16   him knowing, but no.  I flew out to California and visit

17   him in jail.

18         THE COURT:  Do you speak with him now?

19         PROSPECTIVE JUROR:  I haven't spoken to him in

20   about a year or two.

21         THE COURT:  You know this case involves

22   charges, right, criminal charges and an accusation of

23   criminal conduct.  Would your cousin's experience and

24   your relationship with your cousin impact you in your

25   deliberative process?

Voir Dire

1    PROSPECTIVE JUROR:  No.

2    THE COURT:  You will come in, as we talked

3  about earlier, with an open mind?

4    PROSPECTIVE JUROR:  Yes.

5    THE COURT:  That it's the People's burden to

6  prove their case beyond a reasonable doubt.  The

7  defendant has no burden whatsoever.  He's presumed

8  innocent.  He doesn't have to prove or disprove

9  anything.  If the People prove their case, you will

10  convict the defendant.  And if you find the People

11  haven't proven their case, you will acquit the defendant

12  or find him not guilty.  Can you commit to me to do

13  that?

14    PROSPECTIVE JUROR:  Yes.

15    THE COURT:  Ms. Trotta, hi.

16    PROSPECTIVE JUROR:  Good afternoon, your

17  Honor.

18    THE COURT:  You indicate you know someone who

19  might have been the victim of a crime.

20    PROSPECTIVE JUROR:  I had my wallet stolen

21  from my locker at work.  I was going to have to testify

22  in the case, but they settled.

23    THE COURT:  Anything about that experience

24  that would impact your ability to be fair and impartial

25  here?

Voir Dire

1           PROSPECTIVE JUROR:  No, your Honor.

2           THE COURT:  Did you speak with the police at

3  the time?

4           PROSPECTIVE JUROR:  Yes, I did.

5           THE COURT:  Were you satisfied with the way

6  they handled the case?

7           PROSPECTIVE JUROR:  Yes, I was.

8           THE COURT:  That being said, would you give a

9  police officer greater credibility because he's

10  testifying as a police officer?

11           PROSPECTIVE JUROR:  No, your Honor.

12           THE COURT:  You will come in and evaluate that

13  officer's credibility just as you would any other

14  witness that comes and testifies?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Who do you know in law

17  enforcement?

18           PROSPECTIVE JUROR:  We have multiple family

19  friends.

20           THE COURT:  They are just friends.  You don't

21  talk any specifics with regard to their job or

22  responsibilities?

23           PROSPECTIVE JUROR:  No.  As friends talk, yes.

24           THE COURT:  Do they get -- do they speak to

25  you in detail about their responsibilities or cases?

Voir Dire                                                                287

1          PROSPECTIVE JUROR:  No, not often.

2          THE COURT:  Or experiences?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Would you allow that to influence

5   you in your decision-making process?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Whatever was discussed was in the

8   private conversation, right, so you don't know whether

9   it's true, false, it's accurate?

10          PROSPECTIVE JUROR:  Right.

11          THE COURT:  And you will promise me that you

12   will evaluate the testimony for truthfulness and

13   accuracy of the witnesses with an open mind and wait to

14   hear what they say?

15          PROSPECTIVE JUROR:  I will.

16          THE COURT:  Ms. Hildebrandt, hi.

17          PROSPECTIVE JUROR:  Hello.

18          THE COURT:  Have you graduated yet from

19   college?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Are you looking for opportunities?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  In the field that you studied?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Who do you know in law

Voir Dire                                                     288

1    enforcement?

2              PROSPECTIVE JUROR:  Some family and friends

3    that are lawyers.

4              THE COURT:  Anything about that relationship

5    that would prevent you from being fair and impartial?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Well, ladies and gentlemen, I

8    finished my initial inquiry of you and I thank you for

9    your frank and honest answers.  Because it's now right

10   about 12:30, I think this is an appropriate time to

11   break for lunch.  It hasn't stopped snowing, but it's

12   not snowing that hard, so I think you will be able to

13   get across the street for lunch if you so choose.

14             Now, because we're in the middle and this

15   applies to the people in the audience as well, because

16   we're in the middle of selecting individuals to sit as

17   jurors on this case, I'm going to ask you simply to

18   forget about the case over the lunch hour.  Don't do

19   anything with regard to the case.

20             Don't talk about anything that's been said

21   here.

22             Don't read about it, don't research it, don't

23   look up on the Internet any of the people, places or

24   things that were spoken about.  Just go out and enjoy

25   your lunch and when you come back in, we can start

Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                      289

1    talking about the case a little bit more, okay.

2         So, thank you all for your patience.  Enjoy

3    your lunch.  We'll see you back here.  The sergeant will

4    tell you exactly where to meet.  We'll be back here at

5    2:00 p.m. to get started right away.

6         (Whereupon, the prospective jurors exited the

7    courtroom.)

8         THE COURT:  Gentlemen, please be back promptly

9    so that we can start the afternoon session at 2:00.  I

10   would like to get through two panels if we have to so we

11   can get a jury today, if possible.

12        MR. PERRI:  Yes, your Honor.

13        THE COURT:  So I need everyone's cooperation

14   to get this thing rolling.

15        Secondly, Mr. Perri, please get all the

16   particulars with regard to the incident that we spoke of

17   this morning.

18        MR. PERRI:  Your Honor, with respect to that

19   incident, I have no date of incident.

20        THE COURT:  Here's what I'm going to ask you

21   to do:  You gave the Court some information.  Over the

22   lunch hour, gather as much information as you possibly

23   can and then report that back to the Court at 2:00 p.m.

24        MR. PERRI:  Yes, your Honor.

25        THE COURT:  Thank you.

1        (A luncheon recess was taken.)

2        AFTERNOON SESSION

3        THE CLERK:  Case on trial, People v. Ray Ross.

4   The prospective jurors are not present.

5        People ready?

6        MR. PERRI:  Yes, your Honor.

7        THE CLERK:  Defense ready?

8        MR. ZERNER:  I'm ready, your Honor.

9        Just two things I wanted to put on the record.

10  As we talked about late last week, frequently when I

11  have been trying cases the judge will make an

12  announcement if you see the attorney in the hallway or

13  whatever.  Just now while I was standing outside

14  listening to my headphone, one of the prospective jurors

15  came over and wanted to chat with me.  I said I'm not

16  allowed to chat with you.

17       I think it would be better coming from you.

18  It sends the message to everyone.  I always feel awkward

19  about that.

20       THE COURT:  I usually tell the juries not to

21  talk with counsel when they become sworn jurors.

22       MR. ZERNER:  I know that, but unfortunately --

23       THE COURT:  I'll make mention of it.

24       MR. ZERNER:  Thank you, your Honor.

25       THE COURT:  What's the other thing you wanted

Voir Dire                                                              291

1    to say?

2            MR. ZERNER:  Well, you instructed the

3    prosecutor to get some information about the People

4    versus Sarita Johnson.  I'm quite interested in what the

5    result of that was.

6            THE COURT:  Mr. Perri.

7            MR. PERRI:  I'll hand it up to the Court.  I

8    reran a NYSID repository search, statewide search for

9    Sarita Johnson.  It comes up completely blank with no

10   criminal convictions, no pending cases.

11           THE COURT:  Is this for Nora Ammirati?

12           MR. ZERNER:  No, your Honor.

13           MR. PERRI:  No, your Honor, she's the

14   paralegal that has access to the system.  Sarita

15   Johnson's NYSID number is the one that's on the top.

16   That's what was entered.  It comes back blank.

17           We did search our system, as well as the Court

18   system through CRIMS and there is the only record of any

19   criminal matter that comes up is from 1995.  It appears

20   to be a petit.  I did speak with Sarita Johnson about

21   this, but the district attorney's office has no record

22   of a disposition in the case, just that it did exist.

23           What Ms. Johnson indicated to me was that in

24   1995 she also was arrested for a petit larceny for

25   stealing gloves and a scarf in Garden City.  It appears

Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                                    292

1    that this arrest was in Garden City from the CRIMS

2    ticket.  She also states that that case was also

3    dismissed as an adjournment in contemplation of

4    dismissal.

5              In the CRIMS report, it does say, although it

6    does not show up on the NYSID, that there was a plea to

7    a disorderly conduct violation, but it also says there

8    was 15 days as a sentence imposed.

9              We called the jail to cross reference whether

10   Sarita Johnson had ever been incarcerated in the Nassau

11   County jail.  She's never been incarcerated there.  So

12   the disposition in the Court system appears to be

13   incorrect.  Her official criminal record shows that

14   there was no unsealed plea even to a violation as part

15   of the criminal record.

16             We do acknowledge, as the complainant has

17   admitted to us, that there are two incidents where she

18   did steal.  One, that was in Rockville Centre at a Home

19   Goods store for cutlery and one in Garden City.  It

20   appears to be approximately May of 1995.  I'm sorry,

21   your Honor, March 21st was the first date in the Court

22   system of 1995 which she says involved stealing a scarf

23   and gloves in Garden City.  That's all the information

24   that I have, your Honor.

25             THE COURT:  Thank you.

1              Can we call the jury in, please?  If there is

2       any issue, Mr. Zerner, we'll talk about it after we get

3       a jury.

4              MR. ZERNER:  Understood, your Honor.  I would

5       like to do this as efficiently as possible as well.

6              (Whereupon, the prospective jurors entered the

7       courtroom.)

8              THE CLERK:  Let the record reflect the

9       presence of the prospective jurors.

10             Are the People ready to proceed?

11             MR. PERRI:  Yes, your Honor.

12             THE CLERK:  Is the defense ready?

13             MR. ZERNER:  The defense is ready, thank you.

14             THE COURT:  Good afternoon, ladies and

15      gentlemen.  We'll continue with the selection of jurors

16      in this case.

17             Mr. Perri.

18             MR. PERRI:  Thank you, your Honor.

19             Good afternoon, ladies and gentlemen.  May it

20      please the Court, defense counsel.  My name, again, is

21      Anthony Perri.  I'm the assistant district attorney

22      assigned by Madeline Singas to prosecute this case.  I

23      want to thank you for spending your time today and

24      getting here in the snow and coming back after lunch.

25             As the judge has said and defense counsel will

Voir Dire                                                    294

1    also say, that this is a very important phase of the

2    trial.  In fact, it's the only time that both the Court

3    and the attorneys in the case actually get to speak with

4    you, interact with you, ask you questions, answer any of

5    your questions directly during the case to find out

6    whether or not you are the right jurors for this case.

7    All that we ask from you is that you have forthcoming

8    answers, honest answers, that you are as truthful as

9    possible so we can figure out whether or not you're fit

10   for the case that is before us here today.

11         If there's anything either when I'm asking

12   questions or defense counsel is asking questions you

13   want to discuss in private, you can always ask to

14   approach the judge and speak not in front of everyone

15   else about any issue that comes before you.

16         Before we get into any specific topics, I have

17   a couple of questions for some of the prospective

18   jurors.

19         Mr. Parker, you got your undergraduate degree

20   in psychology.  What kind of job are you looking to get?

21   Where would you like to work?

22         PROSPECTIVE JUROR:  Well, I plan on working in

23   psychology and social work because that's what I

24   primarily studied.  I also plan on going back for get my

25   Master's Degree eventually.

Voir Dire                                                    295

1           MR. PERRI:  Do you want to be a clinical

2     psychologist, a therapist?

3           PROSPECTIVE JUROR:  Yeah.

4           MR. PERRI:  And Ms. Pastor, what was it you

5     said, you are currently not employed?  Are you retired?

6           PROSPECTIVE JUROR:  Self-employed.

7           MR. PERRI:  What do you do?

8           PROSPECTIVE JUROR:  I free-lance.

9           MR. PERRI:  What do you free-lance as?

10          PROSPECTIVE JUROR:  I'm a makeup artist.

11          MR. PERRI:  How long have you been doing that?

12          PROSPECTIVE JUROR:  Thirty years.

13          MR. PERRI:  Now, Mr. Pierre, you have down

14    that you do know some people in law enforcement.  Can

15    you tell me who they are?

16          PROSPECTIVE JUROR:  I have a brother-in-law.

17          MR. PERRI:  What does he do?

18          PROSPECTIVE JUROR:  He's a detective.

19          MR. PERRI:  Is that here in Nassau, the city.

20          PROSPECTIVE JUROR:  In the city.

21          MR. PERRI:  And anyone else?

22          PROSPECTIVE JUROR:  Yes.  I have also my

23    brother works for the social security.

24          MR. PERRI:  What does he do for social

25    security?

Voir Dire                                                                                          296

1          PROSPECTIVE JUROR:  He pretty much checks the

2     finances.

3          MR. PERRI:  Is he an investigator?

4          PROSPECTIVE JUROR:  Yes.

5          MR. PERRI:  And anyone else, any other

6     connections to law enforcement?

7          PROSPECTIVE JUROR:  No, just those two.

8          MR. PERRI:  With your brother-in-law who is a

9     detective, do you discuss his work in detail, his cases

10    he's working on?

11         PROSPECTIVE JUROR:  No.

12         MR. PERRI:  Any interaction with him or your

13    brother who is an investigator for social security, any

14    of those interactions lead you to have any negative

15    impression of law enforcement?

16         PROSPECTIVE JUROR:  No.

17         MR. PERRI:  And just because your

18    brother-in-law or your brother are involved in law

19    enforcement, would that cause you to give a detective

20    that takes the stand here any extra credit because they

21    are a detective or would you judge their credibility

22    fairly?

23         PROSPECTIVE JUROR:  Fairly.

24         MR. PERRI:  Mr. Nolan, it says you are an

25    analyst for Astoria Bank.

Voir Dire

1              PROSPECTIVE JUROR:  Yes.

2              MR. PERRI:  What does that mean?

3              PROSPECTIVE JUROR:  I work in the loan

4       department.

5              MR. PERRI:  How long have you worked for them?

6              PROSPECTIVE JUROR:  Twenty five years.

7              MR. PERRI:  And you have a son who is an

8       insurance adjuster?

9              PROSPECTIVE JUROR:  Yes.

10             MR. PERRI:  Are you close with him?  Does he

11      live locally?

12             PROSPECTIVE JUROR:  He lives with me.  He's

13      only been at it for six months.

14             MR. PERRI:  Did he just graduate?

15             PROSPECTIVE JUROR:  No.

16             MR. PERRI:  Does anyone else live with you?

17             PROSPECTIVE JUROR:  No.

18             MR. PERRI:  Ms. Ramseur, you said you are an

19      attorney.  Are you still working?  Are you still

20      practicing?

21             PROSPECTIVE JUROR:  I retired.

22             MR. PERRI:  When?

23             PROSPECTIVE JUROR:  2013.

24             MR. PERRI:  And you understand, as the judge

25      already said, that even though you are an attorney

1    admitted to the bar, that when you step back to

2    deliberate, you're acting as a civilian.  You don't have

3    any special capacity.  You can't give legal advice to

4    the jury.

5              PROSPECTIVE JUROR:  Absolutely not.

6              MR. PERRI:  You have to follow the judge's

7    rules, correct?

8              PROSPECTIVE JUROR:  Correct.

9              MR. PERRI:  Any problems with that?

10             PROSPECTIVE JUROR:  None.

11             MR. PERRI:  Thank you, ma'am.

12             Ms. Hildebrandt, you said you also have family

13   and friends involved in law enforcement?

14             PROSPECTIVE JUROR:  Yes.  Family friend's a

15   lawyer.

16             MR. PERRI:  Is it just a lawyer?

17             PROSPECTIVE JUROR:  Yeah, I think so.

18             MR. PERRI:  No one in the police department?

19             PROSPECTIVE JUROR:  I have some cousins that

20   are cops.

21             MR. PERRI:  Where are they police?

22             PROSPECTIVE JUROR:  One in the city and one in

23   Westchester.  We don't talk about their work or

24   anything.

25             MR. PERRI:  Are you going to give police

Voir Dire                                                                                                299

1    officers any extra benefit because they take the stand?

2              PROSPECTIVE JUROR:  No.

3              MR. PERRI:  Are you going to hold it against

4    them because they are police officers?

5              PROSPECTIVE JUROR:  No.

6              MR. PERRI:  And Ms. Jurado, and we're sorry

7    for you, what you said happened in your home with your

8    parents with the incident.  You said that case is still

9    open?

10             PROSPECTIVE JUROR:  Yeah.

11             MR. PERRI:  Do you know if the criminal case

12   is still open or just the immigration?

13             PROSPECTIVE JUROR:  I believe the criminal

14   case is closed.

15             MR. PERRI:  May I ask how recent did this

16   incident occur?

17             PROSPECTIVE JUROR:  2014.

18             MR. PERRI:  Were you home at the time of the

19   incident?

20             PROSPECTIVE JUROR:  The latest one, yes.

21             MR. PERRI:  I'm sorry.  Does that mean there

22   has been more than one incident?

23             PROSPECTIVE JUROR:  Yeah.

24             MR. PERRI:  And you have been present when the

25   police have come to your house?

Voir Dire                                                              300

1              PROSPECTIVE JUROR:  Most of the time.

2              MR. PERRI:  And you said you acted as a

3        translator with the police for your family.  In your

4        interaction with the police, was it positive, negative?

5        How did you feel about how they conducted themselves?

6              PROSPECTIVE JUROR:  It was positive.

7              MR. PERRI:  And as far as a resolution with

8        the criminal case, did you feel that your father was

9        dealt with fairly?

10             PROSPECTIVE JUROR:  Yes.

11             MR. PERRI:  Mr. Whittick, you said you worked

12       in landscaping.  Do you work for yourself or somebody

13       else?

14             PROSPECTIVE JUROR:  For myself.

15             MR. PERRI:  And how long have you been working

16       as a landscaper?

17             PROSPECTIVE JUROR:  Ten years.

18             MR. PERRI:  And where is most of your work

19       that you have?

20             PROSPECTIVE JUROR:  Long Island.

21             MR. PERRI:  And Mr. Modgill, are you also

22       self-employed?

23             PROSPECTIVE JUROR:  Yes.

24             MR. PERRI:  Ms. Goldman, you shared also about

25       your cousin who was convicted of a crime out in

Voir Dire                                                    301

```
1        California and you said that you have gone to visit him;

2        is that correct?

3                  PROSPECTIVE JUROR:  Yes.

4                  MR. PERRI:  Were you close with him before

5        this happened?

6                  PROSPECTIVE JUROR:  Yes.

7                  MR. PERRI:  Do you feel he was dealt with

8        fairly in the criminal justice system out there?

9                  PROSPECTIVE JUROR:  I don't know.

10                 MR. PERRI:  It seems like a no.

11                 More importantly, do you understand this case

12       has nothing to do with that case?

13                 PROSPECTIVE JUROR:  I understand.

14                 MR. PERRI:  Just because I'm a prosecutor, you

15       won't hold it against the People or our witnesses

16       because of what happened to your cousin?

17                 PROSPECTIVE JUROR:  No.

18                 MR. PERRI:  But just for me to know from your

19       demeanor, it seems that it is still very sensitive.

20                 PROSPECTIVE JUROR:  It's sensitive.

21                 MR. PERRI:  And, Ms. Trotta, you also said you

22       had family and friends in law enforcement.

23                 PROSPECTIVE JUROR:  Yeah.  I have a cousin who

24       is a New York City cop.  A very close family friend who

25       is a New York City cop and another close friend that is
```

Voir Dire                                                    302

1        a retired New York City detective.

2               MR. PERRI:  Now, in finding whether or not

3        anyone here is the right fit to be a juror in this case,

4        obviously this is a very painful topic.  The charges

5        that have been brought in this case fundamentally

6        involve whether or not the defendant has had

7        inappropriate sexual contact with an individual at the

8        time who was 12 and 13 years of age.  Namely, the niece

9        of his girlfriend at that time.

10              Is there anyone from the fact that this is a

11       case that involves the crime of child sexual abuse or

12       that involves a household -- occurred within a

13       household, does anyone feel they cannot be fair and

14       impartial because of that?

15              Mr. Calderon?

16              PROSPECTIVE JUROR:  Yes.

17              MR. PERRI:  Why do you feel that?

18              PROSPECTIVE JUROR:  My cousin had a daughter

19       that age.  Just in a conversation she mentioned that her

20       husband then had something to do with her daughter and

21       the daughter left the husband with her father, something

22       like six years ago.

23              MR. PERRI:  Are you close with this person?

24              PROSPECTIVE JUROR:  With my cousin I'm not

25       very close.  We talk from time to time.  I'm aware of

Voir Dire                                                        303

1    that.  But just in that perspective, I don't think I

2    have maybe a five percent doubt I will not be fair in

3    this case.

4         MR. PERRI:  Even if the judge and I and the

5    defense attorney obviously will explain, this is not

6    that case.  This has nothing to do with what happened,

7    unfortunately, in your family.

8         Despite being told this, you have to judge

9    this case on the facts and the testimony that is before

10   you, you still feel you wouldn't be able to follow the

11   judge's instructions?

12        PROSPECTIVE JUROR:  I would follow, yes.

13        MR. PERRI:  Despite what unfortunately may

14   have happened to your cousin's daughter, are you sure

15   you can be fair and impartial?

16        PROSPECTIVE JUROR:  Yeah.  I said before I

17   will try it and keep an open mind.

18        MR. PERRI:  As the judge has said, trying,

19   unfortunately, here is just not good enough.  You have

20   to be able to promise the Court you will be fair.

21        PROSPECTIVE JUROR:  I will promise.

22        MR. PERRI:  Thank you, sir.

23        Is there anyone else?

24        Now, was there anyone that when they heard the

25   allegation of the case, the first thought they had was I

1    bet the kid is lying?  I bet this is made up.  I bet the

2    mother put her up to.  This couldn't have happened.

3    This is something so horrible, it couldn't have

4    happened.  Is there anyone that thought probably it's

5    going to be false was their first reaction?

6              Ms. Goldman, you shook your head no.  I have

7    to ask you, have you ever directly witnessed anything

8    like this occurring to anyone?

9              PROSPECTIVE JUROR:  I'm Ms. Trotta.

10             PROSPECTIVE JUROR:  No, I never did.

11             MR. PERRI:  Do you believe child sex abuse

12   happens?

13             PROSPECTIVE JUROR:  Yes.

14             MR. PERRI:  Why do you believe it happens if

15   you haven't witnessed it?

16             PROSPECTIVE JUROR:  Why do I believe it

17   happens?  DNA proves that it happens.  I believe that

18   we're just taking -- if we're just taking testimony,

19   then I believe that you can prove that case by taking

20   somebody's testimony and you can decide the case.

21             MR. PERRI:  You mentioned two different

22   things.  You mentioned DNA evidence on one hand and you

23   also said testimony, that you can judge a case based on

24   someone telling you what happened to them.

25             PROSPECTIVE JUROR:  Yes.

1    MR. PERRI:  Are you saying you would

2  absolutely require there be DNA evidence to believe that

3  person?

4    PROSPECTIVE JUROR:  No.

5    MR. PERRI:  You would accept testimony is

6  actually evidence you can consider?

7    PROSPECTIVE JUROR:  Yes.

8    MR. PERRI:  Mr. Nolan, would you require there

9  has to be physical evidence in order to believe

10  something happened?

11    PROSPECTIVE JUROR:  No.

12    MR. PERRI:  Mr. Pierre, do you believe we have

13  to bring out the guys in lab coats like CSI, there has

14  to be DNA?

15    PROSPECTIVE JUROR:  No.

16    MR. PERRI:  Ms. Pastor, do you require that?

17    PROSPECTIVE JUROR:  No.  I would have to hear

18  all of the testimony.

19    MR. PERRI:  You would agree that testimony is

20  evidence?

21    PROSPECTIVE JUROR:  No, I would really have to

22  hear the story.

23    MR. PERRI:  When you are listening to

24  someone's testimony, as you put it, their story, when

25  they take the stand and tell you what they say happened

1   to them, how would you try to judge their credibility?

2   What would you do?

3           PROSPECTIVE JUROR:  I would have to really

4   listen to all the parties involved and, you know, come

5   to a conclusion of, you know, guilt or innocence.

6           MR. PERRI:  Do you believe you have to hear

7   from both sides?

8           PROSPECTIVE JUROR:  I would believe that I

9   would have to.  I wouldn't want to listen to one side

10  and not the other.

11          MR. PERRI:  Well, as the judge explained at

12  the beginning, in a criminal case the burden is always

13  the People's.  It's my case that I have to prove and the

14  defense doesn't have to do anything.  He doesn't have to

15  stand up or take the stand or say a word or put on a

16  case.  He may.  He could.  He can call witnesses, but he

17  doesn't have to.  The burden is entirely on my side.

18          PROSPECTIVE JUROR:  Don't they have a side to

19  say?

20          MR. PERRI:  Of course, they are allowed.

21          PROSPECTIVE JUROR:  To present their case.

22          MR. PERRI:  But they are not required.

23          Are you going to require them to have to put

24  up a fight?

25          PROSPECTIVE JUROR:  Am I only going to listen

1    to you?

2              MR. PERRI:  You only have to.

3              THE COURT:  Ma'am, let me try to explain,

4    okay.  You know if you have a conversation with two

5    people, one person may say something, another person may

6    say another thing and with all your common knowledge and

7    experience will decide who is more likely to be accurate

8    and truthful.  It's different here in Court.

9              First and foremost, under our system of law, a

10   person who is accused of a crime is presumed innocent.

11   It's simply an accusation.

12             PROSPECTIVE JUROR:  Absolutely.

13             THE COURT:  Because the accusation is made,

14   that party has the burden of proving that accusation,

15   okay.  It's the assistant district attorney's obligation

16   and burden to prove the accusations against the

17   defendant beyond a reasonable doubt.  The defendant has

18   no burden.  Right now he's presumed innocent.  The

19   People have to rebut that presumption, okay, which means

20   to disprove that presumption through evidence presented

21   at trial.

22             So, under our system of law, the defendant

23   doesn't have to prove anything or disprove anything.

24   It's up to the People.  And you as a juror have to

25   evaluate whether the People have presented enough proof

Voir Dire                                                          308

```
1    and evidence to prove the guilt of the defendant beyond

2    a reasonable doubt as I have explained earlier.

3              If they never reach that standard, then you

4    must acquit the defendant, find him not guilty.  If they

5    do meet the standard, then, of course, you are obligated

6    to convict the defendant.

7              So, you understand the difference between a

8    normal inquiry or a private inquiry?  When you are

9    making an evaluation between two people, you may want to

10   hear from everybody and gather as much information as

11   you can.  In this particular instance, under our law,

12   the burden of offering that information in evidence

13   relies solely on the People.  Can you follow that

14   principle of law?

15             PROSPECTIVE JUROR:  Yes, now I can.

16             THE COURT:  Everybody else, do you understand

17   now better the rule of the game, if you will, and it's

18   not a game because it's very serious, but the rules that

19   are in place with regard to a proceeding in this nature,

20   it's different from the outside.  If you can follow that

21   rule, you must follow that rule.  If you can't, raise

22   your hand and say you can't and then we'll discuss it.

23   But without raising your hand I can presume now that you

24   are committed to me that you can follow that instruction

25   and that rule as you deliberate and make determinations
```

Voir Dire                                                                       309

1    in this case.

2              MR. PERRI:  Ms. Diop, I'm going to ask you how

3    you would try to judge someone's credibility?  How would

4    you try to determine whether someone you are meeting for

5    the first time on a witness stand is being honest with

6    you?  How do you figure that out?

7              PROSPECTIVE JUROR:  I would listen to what

8    they have to say and how they express themselves while

9    they tell it.

10             MR. PERRI:  What would you be looking for?

11             PROSPECTIVE JUROR:  I would look to see if

12   they're nervous, if they're teary.  If their actions --

13   I would overall just look at the person and assess them.

14             MR. PERRI:  Do you think it's easy to testify

15   in front of everyone?

16             PROSPECTIVE JUROR:  No, it's not.

17             MR. PERRI:  Do you think if someone is on the

18   stand and being asked a lot of questions about intimate

19   details of their life they might get nervous?

20             PROSPECTIVE JUROR:  Yes.

21             MR. PERRI:  And are you going to require that

22   in order to believe a witness that they are going to

23   have to cry?

24             PROSPECTIVE JUROR:  No.

25             MR. PERRI:  Do you think that, I mean, if --

Kathi A. Fedden, Sr. Court Reporter

Voir Dire                                                            310

1      and I won't do this -- if I were to ask you about

2      intimate details, especially of a sexual nature, would

3      that be embarrassing to do in front of everyone?

4                  PROSPECTIVE JUROR:  Yes, and be upsetting.

5                  MR. PERRI:  Is there any specific way you are

6      saying a witness, especially a child witness, is going

7      to have to react in order for you to believe them?

8                  PROSPECTIVE JUROR:  No.

9                  MR. PERRI:  Ms. Goldman, do you agree with

10     that?

11                 PROSPECTIVE JUROR:  I'm having a bit of a hard

12     time with the whole thing.

13                 MR. PERRI:  What do you mean?

14                 PROSPECTIVE JUROR:  I have nine grandchildren,

15     one of whom was born in the same year.  I'm just trying

16     to picture what that child could be going through to sit

17     on a stand and have to --

18                 MR. PERRI:  But do you understand that that is

19     the system of law?

20                 PROSPECTIVE JUROR:  I understand.

21                 MR. PERRI:  And that if the judge instructs

22     you, it's the People's burden we, have to prove our

23     case, that you are not going to hold that against either

24     the People or the defense, just the fact that the child

25     has to testify?

Voir Dire                                                          311

1        PROSPECTIVE JUROR:  Absolutely.

2        THE COURT:  Ms. Goldman, you referenced trying

3   to imagine what a witness might be going through.  That

4   lends itself to speculation, would you agree?  Because

5   you really don't know what she's going through or anyone

6   is going through.  So you have to rely and you have to

7   be able to commit that you will make your evaluations of

8   the witness based on her or his answers to the questions

9   that are posed and then evaluate the truthfulness and

10  accuracy of that witness based on all those life

11  experiences you have all had in making those types of

12  evaluations and then decide not so much what a witness

13  might be going through, but what the facts are.  What

14  happened?  And you can base it based on the answers

15  given.

16       PROSPECTIVE JUROR:  Okay.

17       THE COURT:  So as judges of the facts, you

18  have to decide what happened, okay?

19       PROSPECTIVE JUROR:  You have to get past the

20  emotion.

21       THE COURT:  What's that?

22       PROSPECTIVE JUROR:  You have to get past the

23  emotion of the scene.

24       THE COURT:  Well, maybe in evaluating.

25       PROSPECTIVE JUROR:  I'm sorry.  His question

Voir Dire                                                                    312

1    was how would you evaluate?  What do you expect to see?

2    So I was kind of imagining what a child would be like on

3    the stand.  For me, that's emotional.  I was just being

4    honest.

5             Yes, I understand what my duties would be.

6             THE COURT:  Very good.

7             Two minutes.

8             MR. PERRI:  Ms. Diop, the one thing I forgot,

9    you have to rely on, as you say, the facts that are

10   given to you and evaluate those facts also.  That's the

11   basis of everything.

12            Now, Ms. Quigley, have you had a major life

13   events in the last two to three years?

14            PROSPECTIVE JUROR:  Yes.

15            MR. PERRI:  What were you thinking of right

16   now?

17            PROSPECTIVE JUROR:  What happened?

18            MR. PERRI:  Yeah.

19            PROSPECTIVE JUROR:  I broke my ankle.

20            MR. PERRI:  An event more like a public event?

21            PROSPECTIVE JUROR:  No.

22            MR. PERRI:  No one graduated, no weddings?

23            PROSPECTIVE JUROR:  Well, yes, I have had

24   graduation last June.

25            MR. PERRI:  Who graduated?

Voir Dire                                                              313

1              PROSPECTIVE JUROR:  My son.

2              MR. PERRI:  Was there more than one person at

3      the graduation?

4              PROSPECTIVE JUROR:  Yes.

5              MR. PERRI:  And if I asked you about your

6      son's graduation, and I asked that other person about

7      your son's graduation, especially a friend of his, a

8      college student, would they tell me the exact same

9      things about what happened?

10             PROSPECTIVE JUROR:  No.

11             MR. PERRI:  Does that mean you are lying?

12             PROSPECTIVE JUROR:  No.

13             MR. PERRI:  Does it mean the other person is

14     lying?

15             PROSPECTIVE JUROR:  No.

16             MR. PERRI:  Does it mean your son didn't

17     graduate?

18             PROSPECTIVE JUROR:  No.

19             MR. PERRI:  If I asked you about your son's

20     graduation as opposed to a close friend or relative,

21     would you tell me the same thing you would tell them?

22             PROSPECTIVE JUROR:  No.

23             MR. PERRI:  Why not?

24             PROSPECTIVE JUROR:  Because I look at it

25     differently than someone who wasn't close to my son.

1       I'm his mom.

2               MR. PERRI:  Would you be more likely to give

3       me, a stranger up until now, or a close friend more

4       information?

5               PROSPECTIVE JUROR:  Sure.

6               MR. PERRI:  Who?  Who would you give more

7       information to, a stranger or friend?

8               PROSPECTIVE JUROR:  Same amount of

9       information, no.

10              MR. PERRI:  Who would you give more

11      information to?

12              PROSPECTIVE JUROR:  A close friend.

13              THE COURT:  That's it, Mr. Perri.

14              MR. PERRI:  Thank you, your Honor.

15              THE COURT:  Mr. Zerner.

16              MR. ZERNER:  Thank you, your Honor.

17              Good afternoon, ladies and gentlemen.  We have

18      very limited time, so I'm just going to plow right

19      ahead.

20              Ms. Quigley, you put on your questionnaire you

21      served on a grand jury.

22              PROSPECTIVE JUROR:  Yes.

23              MR. ZERNER:  Anybody else ever been a grand

24      juror or served or testified in a grand jury?

25              PROSPECTIVE JUROR:  (Indicating.)

Voir Dire                                                    315

1          MR. ZERNER:  Do you remember what the

2    difference is between a grand jury and this, what we

3    call it petit jury?

4          PROSPECTIVE JUROR:  Okay, I'm not quite sure

5    whether or not I was on a grand jury or a civil.  I was

6    here and it was for a felony.

7          MR. ZERNER:  I think you were on a grand jury

8    and you heard bits and pieces of cases where there was a

9    prosecutor, right?

10          PROSPECTIVE JUROR:  Yes.

11          MR. ZERNER:  But there was no Judge, right?

12          PROSPECTIVE JUROR:  There was.  We went to

13    trial, yes.

14          MR. ZERNER:  That probably wasn't grand jury.

15          PROSPECTIVE JUROR:  Right.  Once the judge had

16    said something to me, I thought maybe it wasn't.  It was

17    here.

18          MR. ZERNER:  I'll come back to you, but for a

19    different point.

20          Now, Ms. Jurado, I apologize for bringing up a

21    topic that has already been discussed and believe me

22    there is no good that comes to me from asking you about

23    a harmful or a difficult topic in your life.  Everyone

24    accepts me saying that, right?  But I have a job to do,

25    right?

Voir Dire                                        316

1              If any of you individually end up on this

2       jury, you understand that the prosecutor is going to

3       call a child witness and the child is going to testify

4       and when she's done answering his questions, the

5       prosecutor's questions, I'm going to have to ask her

6       questions, right?  Everyone understands that's what I

7       need to do here.

8              You are not going to hold that against me,

9       right?  You are not going to hold it against my client,

10      right?

11             And the prosecutor was asking different people

12      you have police in your family.  I think living on Long

13      Island we all have one degree of separation.  It's

14      either a relative, friend or neighbor.  Nobody is going

15      to give the police any more or less credibility because

16      they are a police officer, right?

17             Is it fair to say you are also not going to

18      give any other witness, because they are over 18 or

19      under 18 or over 70 or under 70 years of age any more or

20      less credibility?  Is that fair to say?

21             Thank you for your assurances everyone.

22             Mr. Calderon, you said you were sued at one

23      point?

24             PROSPECTIVE JUROR:  Yeah, but it was about a

25      traffic accident.

1          MR. ZERNER:  Hey, you know, usually coming to

2    Court is not that pleasant, whether it's about a

3    criminal charge or traffic accident.  You weren't happy

4    to be there, right?

5          PROSPECTIVE JUROR:  Right.

6          MR. ZERNER:  Is it fair to say you kept an

7    open mind when you went to Court?

8          PROSPECTIVE JUROR:  Just relying on the truth,

9    telling the truth.

10         MR. ZERNER:  Can everyone assure me you will

11   keep an open mind if you end up on this jury?  You don't

12   know what happened and you do want to hear as much as

13   you can hear about this, right?

14         Ms. Quigley, your son graduated last year from

15   college, high school?

16         PROSPECTIVE JUROR:  High school.

17         MR. ZERNER:  We can prove he graduated from

18   high school, right?

19         PROSPECTIVE JUROR:  Yes.

20         MR. ZERNER:  Tell me the name of the high

21   school.

22         PROSPECTIVE JUROR:  Wantagh High School.

23         MR. ZERNER:  If I wanted to contact Wantagh

24   High School, we can get proof of that, right?

25         PROSPECTIVE JUROR:  Yeah.

Voir Dire                                                      318

1              MR. ZERNER:  We understand it might be a

2      different situation if you have somebody saying

3      something about somebody, it might not be proof, right,

4      about whether the incident actually happened.

5              Is it fair to say anybody can say anything

6      about anybody, right?

7              Ms. Jurado, earlier on when you were

8      describing an incident in your home, you said that this

9      happened to somebody close to you, but you weren't there

10     for at least one of the incidents, right?

11             PROSPECTIVE JUROR:  Yes.

12             MR. ZERNER:  And so the incident that you were

13     not there for, how could you testify about that?  Were

14     you ever asked to testify about it?

15             PROSPECTIVE JUROR:  No.

16             MR. ZERNER:  Because you weren't there, right?

17             PROSPECTIVE JUROR:  Yes.

18             MR. ZERNER:  A lot of times we talk about a

19     witness, right?

20             Mr. Whittick, you have heard the term

21     "witness," right?

22             PROSPECTIVE JUROR:  Right.

23             MR. ZERNER:  Sometimes you hear eyewitness.

24     That means what it says, somebody sees something with

25     their eyes.  We don't call it an ear witness, but

1    sometimes that's even more, you heard something.

2              You will hear the judge talk about that the

3    witnesses only will be allowed to talk about what they

4    witnessed.  Their witnesses coming up.

5              We talked about whether you hear only one

6    side, Ms. Quigley, right?  And a couple of you said you

7    would like to hear from everybody about everything,

8    right?

9              Can I get your assurances that you will keep

10   an open mind through the entirety of the case?

11             The way the order is is that first the

12   prosecutor will call his witnesses, right, and then I

13   can and I'm going to tell you that I am going to call

14   witnesses and you will hear from my client, even though

15   I don't have to.  The judge already told you that.  But

16   you can't make up your mind after day two when you have

17   only heard from three or four prosecution witnesses.

18   Give yourself the chance to keep an open mind through

19   the time you have heard from everybody.  Is that

20   something you can agree with, Mr. Parker?

21             PROSPECTIVE JUROR:  Yes.

22             MR. ZERNER:  Now, you have gotten a degree in

23   psychology?

24             PROSPECTIVE JUROR:  Yes.

25             MR. ZERNER:  If you hear from a witness who

Voir Dire

1    has that same degree in psychology, are you going to

2    give that person any more or less weight?

3                PROSPECTIVE JUROR:   No.

4                MR. ZERNER:   Now, anybody here go through a

5    divorce?

6                PROSPECTIVE JURORS:   (Indicating.)

7                MR. ZERNER:   If you personally didn't go

8    through a divorce, did you have a parent or a child or a

9    close family member, sibling somebody that went through

10   a divorce?  If it's not that, maybe it's two degrees of

11   separation, a close friend; fair to say?

12               I'm getting a few head shakes.

13               Mr. Pierre, you had a friend or relative go

14   through a divorce?

15               PROSPECTIVE JUROR:   My parents.

16               MR. ZERNER:   How old were you when that

17   happened?

18               PROSPECTIVE JUROR:   I think I was in my early

19   20s.

20               MR. ZERNER:   So you were an adult?

21               PROSPECTIVE JUROR:   Yes.

22               MR. ZERNER:   Was it pleasant?

23               PROSPECTIVE JUROR:   No.

24               MR. ZERNER:   Is it fair to say that they would

25   tell you different things about the other person?

Voir Dire                                                              321

1        PROSPECTIVE JUROR:  Yes.

2        MR. ZERNER:  Did it seem like they wanted you

3   to take sides?

4        PROSPECTIVE JUROR:  Yes.

5        MR. ZERNER:  Can everyone agree with that and

6   imagine that if you haven't personally gone through

7   that, if you have a situation where there is strife

8   within a family, you have different people saying

9   different things and then you have an agenda, right?

10       Fair to say some of these things boil back

11  down to money, right?  Even if it's not directly,

12  eventually we're talking about that, right?

13       Is it fair to say sometimes people lie when

14  they are talking about financial situations?

15       PROSPECTIVE JUROR:  Right.

16       MR. ZERNER:  Easy to agree with that?

17       PROSPECTIVE JUROR:  Oh, yeah.

18       MR. ZERNER:  Ms. Diop, do you live with

19  extended family?  I thought I saw that in your

20  questionnaire.

21       PROSPECTIVE JUROR:  I live with my two

22  daughters and my daughter's boyfriend.

23       MR. ZERNER:  Anybody here live with an

24  extended family, either with nieces and nephews or, you

25  know, three generations; you know, parents, yourself and

Kathi A. Fedden, Sr. Court Reporter

1          your children?

2                    PROSPECTIVE JUROR:  I live with my grandmother

3          and my mom.

4                    MR. ZERNER:  You grew up you had your

5          grandmother, your parents and you?

6                    PROSPECTIVE JUROR:  Not always.  It was my

7          parents and I moved in with my grandma.

8                    MR. ZERNER:  Were there times when your

9          grandmother would be acting as your parent, whether it

10         was a positive thing or a negative thing, to discipline

11         you?

12                   PROSPECTIVE JUROR:  Yeah.

13                   MR. ZERNER:  Everyone, if you haven't had that

14         situation exactly, it's okay for your grandmother to

15         tell you you can only have one piece of candy, right?

16                   PROSPECTIVE JUROR:  Yes.

17                   MR. ZERNER:  Maybe your grandmother will let

18         you have two.  Your parents would only let you have one,

19         but if you were looking for a third piece she would

20         discipline you.

21                   We heard the expression it takes a village to

22         raise a child.  Even if you haven't grown up with that

23         situation, you can imagine the situation where an aunt

24         or uncle is acting as a parent to a child.  We can

25         understand a situation where the child is saying you are

1    not my father or you are not my mother.

2            Anybody here have teenagers?

3            PROSPECTIVE JURORS:  (Indicating.)

4            MR. ZERNER:  That's always a loaded question.

5            Mr. Pierre, how old was your child when they

6    first got a phone?

7            PROSPECTIVE JUROR:  Thirteen.

8            MR. ZERNER:  And you paid for the phone?

9            PROSPECTIVE JUROR:  My wife did.

10           MR. ZERNER:  But your family finances were

11   going towards this phone?

12           PROSPECTIVE JUROR:  Yes.

13           MR. ZERNER:  Is it a boy or girl?

14           PROSPECTIVE JUROR:  Female.

15           MR. ZERNER:  Did she ever say to you I saw the

16   commercial on TV, the phone is free?

17           PROSPECTIVE JUROR:  Negative.

18           MR. ZERNER:  I get the phone is free, but my

19   child doesn't understand it's an extra $47 a month on

20   the plan.

21           Did you ever use as a punishment a threat of

22   taking away the phone?

23           PROSPECTIVE JUROR:  Absolutely.

24           MR. ZERNER:  Everyone either done that or you

25   can accept that as a situation?  We can all imagine a

Voir Dire                                                          324

1    teenager, whether it's now five years ago, ten years

2    ago, not liking having a phone taken away from them,

3    right?

4              Ms. Ramseur?

5              PROSPECTIVE JUROR:  Yes, I can understand

6    that.

7              MR. ZERNER:  And we can all accept that I have

8    no problem admitting my phone is important to me.  I'm

9    47.  It's certainly important to teenagers and people my

10   age, older younger, right?  We can all smile and accept

11   that.  You wouldn't want to lose your phone or have it

12   taken away from you, right?

13             Let's talk about expert witnesses for a

14   second.  We already talked about we're not going to give

15   anybody more or less credence because they are old,

16   young, wear a uniform or don't wear a uniform.

17             Ms. Pastor, that's okay with you?

18             PROSPECTIVE JUROR:  Absolutely.

19             MR. ZERNER:  What if somebody comes on the

20   stand and says I didn't see anything happen, but I'm an

21   expert, I have dealt with similar type of cases?  Are we

22   going to give them anymore credence?

23             PROSPECTIVE JUROR:  No.

24             MR. ZERNER:  If somebody is going to give you

25   hypothetical situations, I saw a similar situation.

1      PROSPECTIVE JUROR:  No.

2      MR. ZERNER:  Everyone is okay with that?

3      Just because somebody went to extra years of

4  college or has dealt with this, they don't know what

5  happened, they don't know what happened; is that fair to

6  say, Mr. Whittick?

7      PROSPECTIVE JUROR:  Yes, sir.

8      MR. ZERNER:  Mr. Calderon, how do you feel?

9      PROSPECTIVE JUROR:  I agree.

10     MR. ZERNER:  Anybody here work in computers?

11     PROSPECTIVE JUROR:  (Indicating.)

12     MR. ZERNER:  I couldn't possibly have 14

13  people and nobody works in computers.

14     Ms. Goldman, you do.  You are familiar with

15  the expression garbage in, garbage out?  What does that

16  mean?

17     PROSPECTIVE JUROR:  Whatever you put in is

18  what you are getting out.  The computer is not going to

19  make it right.

20     MR. ZERNER:  If you put bad information into a

21  system, the computer can't, you know, all of a sudden

22  magically change it.  Bad information in, you will get a

23  bad result out, right?

24     Mr. Parker, you agree with that?

25     PROSPECTIVE JUROR:  I agree.

Kathi A. Fedden, Sr. Court Reporter

Voir Dire

1    MR. ZERNER:  Does anybody not agree with that?

2    Anyone not familiar with that concept?

3        Now, Ms. Ramseur, so you worked within the

4    Court system, right?

5        PROSPECTIVE JUROR:  Yes.

6        MR. ZERNER:  I'm guessing a lot of other

7    people have worked within hierarchies, but there is

8    somewhat of a hierarchy within the Court system, right?

9        PROSPECTIVE JUROR:  Uh-huh.

10       MR. ZERNER:  Did you ever have a situation

11   where you had an angry person or an insistent person who

12   is demanding you do something?

13       PROSPECTIVE JUROR:  I worked in Housing Court,

14   yes.

15       MR. ZERNER:  Remember, I try to only ask

16   questions I know the answer to.  I was pretty sure I had

17   you on that one.

18       Is it fair to say there are basically two ways

19   you can handle that?  One is to kind of kill them with

20   kindness, fill out this form and this is the procedure.

21   Are you familiar with that?

22       PROSPECTIVE JUROR:  You could, but that

23   wouldn't work in Housing Court.

24       MR. ZERNER:  That's one method, right?

25   Everyone kind of see that situation?

1      Mr. Pierre, I think the judge -- I would love

2   to talk to you about Madison Square Garden and concerts.

3   Did you have a situation where you have the quote,

4   unquote "talent" that are demanding things?

5      PROSPECTIVE JUROR:  Yes.

6      MR. ZERNER:  You hear about the ridiculous

7   demands, I only want red M&Ms.

8      PROSPECTIVE JUROR:  Yes.

9      MR. ZERNER:  Do you know the situation where

10   you might kind of yes somebody?  You nod, you smile and,

11   you know, you give them what they are asking for.  Why

12   do you do that?

13      PROSPECTIVE JUROR:  The only reason being you

14   want to be sure they are pleased at the end of the day.

15      MR. ZERNER:  What happens if they are not

16   pleased?

17      PROSPECTIVE JUROR:  You have a bad outcome.

18   That client no longer wants to deal with you.

19      MR. ZERNER:  Right.  Whether they are being

20   reasonable or not, if they are unhappy with you telling

21   them no, then you are going to buy for yourself more

22   friction, more agita, if I can use a good Long Island

23   term.  We can all understand that term.  Understand the

24   situation about okay, all right, ma'am, fill out this

25   form, right.

1          But I think we've all said we know police

2     officers, have police officers in the family.  Just

3     because a police officer takes a report from somebody,

4     Ms. Quigley, the police officer didn't witness what

5     happened.  Does that mean that it happened?

6               PROSPECTIVE JUROR:  No.

7               MR. ZERNER:  Can everyone kind of understand

8     that?

9          So, if the police officer is being harangued

10    by a civilian that says I need you to take this report,

11    this and this and this happened, if the police officer

12    says all right, ma'am, fill this out, you know, tell me

13    what happened, just because the police officer is using

14    paper that says Nassau County Police Department on it

15    doesn't mean that he is saying I believe that it

16    happened, right?

17              PROSPECTIVE JUROR:  Right.

18              MR. ZERNER:  We can all agree that very, very

19    few crimes take place in front of police officers.

20              PROSPECTIVE JUROR:  Yes.

21              MR. ZERNER:  So is it fair to say that just

22    because the prosecutor calls a few detectives or police

23    personnel, right, if they answer questions for Mr. Perri

24    and they might answer questions for a minute, it could

25    be an hour, could be a day, but if I stand up and say

Voir Dire

1   you didn't see what happened, right, you can all keep an

2   open mind and you can accept that police officer's

3   testifying because that's his job.  He's getting paid to

4   be here, right?  But because he's involved in the case

5   doesn't mean that anything actually happened, that there

6   is any proof that anything happened, right?

7        Mr. Nolan, how do you feel about that?

8        PROSPECTIVE JUROR:  I agree.

9        MR. ZERNER:  Does anybody disagree with that?

10  That's still the same garbage in, garbage out.

11        The police officer is like the computer, he's

12  getting information, but he's just getting information.

13  He doesn't know if it's right.  If he's getting bad

14  information because somebody has an agenda, then there

15  is bad information.

16        Mr. Modgill, have you ever been unfairly

17  accused of something?

18        PROSPECTIVE JUROR:  It happens.

19        MR. ZERNER:  Do you remember an incident where

20  this happened?

21        PROSPECTIVE JUROR:  No.

22        It does happen.

23        MR. ZERNER:  It does happen, right?  I mean,

24  people are wrongfully accused of things big and small

25  every day.

1    We can all agree with that, Mr. Parker?

2         PROSPECTIVE JUROR:  I agree.

3         MR. ZERNER:  Nobody is sitting here and saying

4    well, Mr. Ross is sitting in Criminal Court, so he

5    probably did something, right?  You are all accepting.

6         The judge told you this man sitting here is

7    presumed innocent.  If you had to vote right now,

8    Mr. Whittick, whether Ray Ross did anything criminal at

9    all, how would you vote?

10        PROSPECTIVE JUROR:  (No response.)

11        MR. ZERNER:  It's always a tough question and

12   I hesitate to ask it, but I want this response because

13   this man is not guilty.  I can tell you he's not guilty

14   because that man, the judge already told you, he's not

15   guilty.  The only way --

16        MR. PERRI:  Objection, your Honor.

17        THE COURT:  Hold it, Mr. Zerner.

18        MR. ZERNER:  I only heard the chair.

19        THE COURT:  So, ladies and gentlemen, I told

20   you about our process, right, and the burdens that each

21   party has and the positions each party has as they come

22   into Court.

23        So, there has been an accusation made through

24   an indictment, right, a piece of paper that says the

25   government of the State of New York accuses you,

Kathi A. Fedden, Sr. Court Reporter

Mr. Ross, of doing such and such.  Mr. Ross has denied

those accusations.  So we have a trial for you, the

jury, to determine what the facts are, okay.

Then I told you that Mr. Ross is presumed

innocent, which means at this juncture, presumed

innocent means you would have to find him not guilty or

acquit the defendant.  That's the presumption.  The

district attorney has to rebut the presumption by the

presentation of evidence.  You'll decide whether or not

the evidence was sufficient to prove the defendant's

guilt beyond a reasonable doubt, which is the standard

of proof that has to be met.

When the question is posed to you at this

point in time when no evidence has been presented by the

People, they have failed to rebut the presumption of

innocence, so the answer would have to be you would have

to find Mr. Ross not guilty because no evidence has been

presented to establish his guilt.  Does that explain it

a little better?

Mr. Whittick, do you understand?

PROSPECTIVE JUROR:  Yes.

THE COURT:  At this moment in time if you had

to vote as a jury and return a verdict, the verdict must

be not guilty because there has been no evidence

presented, okay.  It's a hypothetical.  Sometimes it

Voir Dire

1    gets confusing, but that's where we start from.

2              And then when evidence is presented to you,

3    you will start to make those evaluations as to whether

4    or not the People have built their case to a point where

5    they have proved, through the testimony of the witnesses

6    or other evidence that we've discussed has been

7    presented to you to evaluate for the accuracy of that

8    evidence, for the truthfulness of the testimony and to

9    the weight that you give to that evidence to determine

10   whether or not the People have met their burden.

11             Go ahead, Mr. Zerner.

12             MR. ZERNER:  Thank you, your Honor.

13             So now, Ms. Goldman, earlier on the prosecutor

14   was asking you questions and you said well, I have nine

15   grandchildren.  Is it fair to say that, look, everyone

16   has the inclination to protect a child, right?  It's not

17   a controversial statement.  We all were children, right,

18   and many of us have children, grandchildren.  If we

19   don't currently have them, we have nieces and nephews

20   and plan to eventually probably have children, right?

21   But we also already said we're not going to give a child

22   any more credence just because they are a child, right?

23   And children can lie as well as anybody else; is that

24   fair to say, Ms. Goldman?

25             PROSPECTIVE JUROR:  Yes.

Kathi A. Fedden, Sr. Court Reporter

1      MR. ZERNER:  Ms. Ramseur, how do you feel
2  about that?
3          PROSPECTIVE JUROR:  I agree.
4      MR. ZERNER:  It could be a situation where a
5  parent or somebody else tries to get them to push
6  forward an agenda, whether it's a money concern or
7  something else, right?
8          Ms. Quigley, you're okay with that?
9      PROSPECTIVE JUROR:  Yes.
10     THE COURT:  Two minutes, Mr. Zerner.
11     MR. ZERNER:  Thank you, your Honor.
12     Mr. Pierre, you agree with that?
13     PROSPECTIVE JUROR:  Absolutely.
14     MR. ZERNER:  Again, you have all given me your
15 assurance that you are not going to hold it against me
16 and certainly not hold it against my client if I need to
17 ask some tough questions of any witness, whether it's a
18 child or an adult, right?  You understand that --
19 withdraw that.
20         Several times the prosecutor is referred to as
21 the People, right?  And some of you might be familiar,
22 maybe not everyone, you hear the People of the State of
23 New York or the People of California versus O.J.
24 Simpson, right?  I'm a person of the State of New York,
25 you are all People of the State of New York.  Just

1  because the prosecutor -- sometimes we use as a synonym

2  for district attorney or prosecutor, the People.  And I

3  thought earlier on I saw a couple of you unsure when you

4  were hearing that.

5         This is the prosecutor who is trying to prove

6  this case, all right.  And just because he works for the

7  government, is it fair to say that you are not going to

8  give him any more credence or any more right?  And the

9  judge already told you that the People of the State of

10  New York, the government, the society is served by

11  whatever verdict you folks come back with because you

12  are also the People of the State of New York, right?  Is

13  that fair to say?

14         PROSPECTIVE JUROR:  I have some agreement with

15  that.

16         MR. ZERNER:  Thank you very much for your

17  attention, ladies and gentlemen.

18         THE COURT:  Thank you, Mr. Zerner.

19         Now, ladies and gentlemen sitting in the jury

20  box, and ladies and gentlemen of the audience, you will

21  now be given a short recess as the Court and the

22  attorneys discuss the case outside of your presence.

23         During this recess the lawyers will be given

24  an opportunity to, as required by law, to have one or

25  more of the prospective jurors sitting in the box to be

Voir Dire

1    selected as jurors for the trial.  So follow the

2    direction of the court officer.

3            Remember my admonitions.  Don't say anything

4    or do anything about the case.  Just go out, take a

5    five-minute break.  We'll call you right back in.

6            (Whereupon, the prospective jurors exited the

7    courtroom.)

8            THE COURT:  Gentlemen, five minutes.  Let's

9    keep it tight.  Let's try to get this done and the next

10   round done, if necessary.

11           MR. ZERNER:  Of course, your Honor, thank you.

12           (A recess was taken.)

13           THE CLERK:  Jury selection round three.  All

14   parties are present.  The prospective jurors are not in

15   Court.

16           In consideration of the first three jurors on

17   the board for the three open seats, People for cause?

18           MR. PERRI:  None for cause, your Honor.

19           THE CLERK:  Defense for cause?

20           MR. ZERNER:  No, none for cause on the first

21   three.

22           THE CLERK:  Peremptory challenges, People.

23           MR. PERRI:  The People would exercise a

24   peremptory challenge for jurors one and two.

25           THE CLERK:  That being Parker and Pastor.

Voir Dire

1        Anything further?

2        MR. PERRI:  No.

3        MR. ZERNER:  Those were People's peremptory

4   challenge five and six?

5        THE CLERK:  Those were peremptory challenges

6   People's seven and eight.

7        THE COURT:  No, People's.

8        MR. PERRI:  No.

9        THE CLERK:  I am sorry, five and six.  Parker

10   is number five.  Six is Pastor.

11        THE COURT:  So the answer to your question is

12   yes.

13        MR. ZERNER:  I love when every once in awhile

14   I get that, Judge.

15        THE CLERK:  Defense, peremptory challenge.

16        MR. ZERNER:  No.

17        THE CLERK:  Patrick Pierre will be juror ten.

18   Agreed, People?

19        MR. PERRI:  Yes.

20        THE CLERK:  Defense?

21        MR. ZERNER:  Yes.

22        THE CLERK:  For the next two seats, Nolan and

23   Ramseur, People, for cause.

24        MR. PERRI:  No for cause.

25        THE CLERK:  Defense for cause?

Voir Dire

1    MR. ZERNER:  Not for cause, no.

2    THE CLERK:  People, peremptory challenges.

3    MR. PERRI:  People exercise a peremptory for

4    five, Ms. Ramseur.

5    THE CLERK:  Defense counsel on Nolan,

6    peremptory challenge?

7    MR. ZERNER:  Right, if I can have a moment

8    with my client, please.

9    (Pause in the proceedings.)

10    MR. ZERNER:  Yes, we will exercise a

11    peremptory challenge on Mr. Nolan.

12    THE CLERK:  Again, the next two jurors on the

13    board for the two open seats, Quigley and Diop, People,

14    for cause?

15    MR. PERRI:  None for cause.

16    THE CLERK:  Defense for cause.

17    MR. ZERNER:  Not for cause.

18    THE CLERK:  People, peremptory challenge?

19    MR. PERRI:  No.

20    THE CLERK:  Defense, peremptory challenge?

21    MR. ZERNER:  We will exercise a peremptory

22    challenge on Ms. Quigley.

23    THE CLERK:  Any further challenges?

24    MR. ZERNER:  No, not on Ms. Diop.

25    THE CLERK:  Dianna Diop will be juror 11.

Voir Dire                                                    338

1       Concur, People?

2               MR. PERRI:  Yes.

3               THE CLERK:  Defense?

4               MR. ZERNER:  Yes.

5               THE CLERK:  For the last juror, Damary Jurado,

6       People, for cause.

7               MR. PERRI:  No, your Honor.

8               THE CLERK:  Defendant, for cause?

9               MR. ZERNER:  Yes, for cause.  She obviously

10      had multiple interactions with the criminal justice

11      system and she had a lot of thoughts about that.

12              THE COURT:  The Court grants the for cause

13      application.  There is a pending domestic violence, as I

14      understand, in Nassau County.  This has a lot of issues

15      regarding domestic issues, if not violence.

16              THE CLERK:  Edgar Calderon, People, for cause.

17              MR. PERRI:  No, your Honor.

18              THE CLERK:  Defendant, for cause.

19              MR. ZERNER:  No, your Honor.

20              THE CLERK:  People, peremptory challenge.

21              MR. PERRI:  No, your Honor.

22              THE CLERK:  Defendant, peremptory challenge?

23              MR. ZERNER:  Just a moment, please.

24              Yes, peremptory.

25              THE CLERK:  Damarr Whittick, People, for

Voir Dire

1    cause.

2         MR. PERRI:  No, your Honor.

3         THE CLERK:  Defendant, for cause.

4         MR. ZERNER:  No.

5         THE CLERK:  People, peremptory challenge.

6         MR. PERRI:  No, your Honor.

7         THE CLERK:  Defendant, peremptory challenge?

8         MR. ZERNER:  No peremptory challenge.

9         THE CLERK:  That makes Damarr Whittick the

10   last sworn juror.  People concur?

11        MR. PERRI:  Yes.

12        THE CLERK:  Defense?

13        MR. ZERNER:  Yes.

14        THE CLERK:  Alternate seat number one.  Each

15   side is entitled to two peremptory challenges.

16        Arun Modgill, People, for cause.

17        MR. PERRI:  No, your Honor.

18        THE CLERK:  Defendant, for cause.

19        MR. ZERNER:  No, your Honor.

20        THE CLERK:  People, peremptory.

21        MR. PERRI:  No, your Honor.

22        THE CLERK:  Defendant, peremptory challenge?

23        MR. ZERNER:  Yes, peremptory.

24        THE CLERK:  Alternate seat one, Susan Goldman,

25   People, for cause.

Voir Dire

1          MR. PERRI:  No, your Honor.

2          THE CLERK:  Defendant, for cause.

3          MR. ZERNER:  Yes, your Honor.  Ms. Goldman

4    hesitated greatly when there was a discussion about

5    whether she could be fair.  I believe she was hesitating

6    both with regards to the situation involving her jailed

7    cousin in California and with regards to her

8    grandchildren that she, I believe, brought up on her

9    own.  We believe it should be for cause on Ms. Goldman.

10         THE COURT:  Could you be more specific with

11   regard to grandchildren?  I must have missed that.

12         MR. ZERNER:  Yes, your Honor, let me try to

13   pinpoint.  I believe it was on Mr. Perri's questioning

14   where he was asking about a witness being nervous and

15   how she might respond and I believe he then questioned

16   Ms. Goldman and unsolicited she said well, I have nine

17   grandchildren and I'm going to picture them.

18         THE COURT:  Understood.

19         MR. PERRI:  Your Honor, the People oppose.  We

20   both engaged in extensive colloquy with Ms. Goldman.

21   She absolutely stated she could be fair and impartial.

22   She can separate it from the fact she had grandchildren.

23   You spoke with her essentially about the fact that she

24   has to judge it not on emotion.  She agreed with you.

25   She also clarified that she would separate any

1    emotional -- that the question I asked caused her to

2    think emotionally, but in your explanation of the law

3    she would follow it.

4              THE COURT:  The application is denied.  She

5    did show some emotion with regard to her cousin.

6    Apparently she was close to her cousin who is now

7    serving a prison sentence for a conviction for murder,

8    but that she didn't offer any type of inclination to the

9    Court in any way that she couldn't be fair and impartial

10   in evaluating the evidence as presented here today.

11             With regard to the emotional attachment, the

12   Court recalls now the Court directed that she's not

13   allowed to rely on speculation and emotion, but she was

14   answering the DA's question and she understood the rule

15   that she had to abide by and she said she would.  That's

16   denied.

17             THE CLERK:  Peremptory challenge on Susan

18   Goldman.

19             MR. PERRI:  No, your Honor.

20             THE CLERK:  Defense, Goldman?

21             MR. ZERNER:  Yes, we will exercise a

22   peremptory on Ms. Goldman.

23             THE CLERK:  Defendant has exhausted peremptory

24   challenges on seat one.

25             Elizabeth Trotta, People, for cause.

1          MR. PERRI:  No.

2          MR. ZERNER:  No.

3          THE CLERK:  People, peremptory.

4          MR. PERRI:  No, your Honor.

5          THE CLERK:  Elizabeth Trotta will be alternate

6     number one.  Counsel, you concur?

7          MR. PERRI:  Yes.

8          MR. ZERNER:  Yes.

9          THE CLERK:  Mary Hildebrandt, People, for

10    cause.

11         MR. PERRI:  No.

12         THE CLERK:  Defense, for cause.

13         MR. ZERNER:  No.

14         THE CLERK:  People, peremptory.

15         MR. PERRI:  People exercise a peremptory

16    challenge for Ms. Hildebrandt.

17         THE COURT:  So we need one alternate.  Does

18    counsel want to have a conversation?

19              (Whereupon, a discussion was held off the

20    record.)

21              THE COURT:  Counsel, there was one alternate

22    juror seat remaining and I understand that counsel have

23    agreed to seat potential juror number six, Ms. Quigley

24    who was previously a defendant perempt, to now be seated

25    as alternate number two.

1           MR. ZERNER:  Yes, your Honor.

2           MR. PERRI:  Yes, your Honor.

3           THE COURT:  Both sides agree?

4           MR. PERRI:  Yes.

5           MR. ZERNER:  Yes.

6           (Whereupon, the prospective jurors entered the

7      courtroom.)

8           THE CLERK:  Let the record reflect the

9      presence of the prospective jurors.

10          Are the People ready?

11          MR. PERRI:  Yes, your Honor.

12          MR. ZERNER:  Defense is ready, thank you.

13          THE CLERK:  Ladies and gentlemen in the jury

14     box, the following names I'm about to call are the

15     people who have been selected.  If you hear your name

16     called, please remain seated.  The other jurors are

17     excused with the thanks of the Court.  See the officer

18     at the back door.

19          Patrick Pierre, Dianna Diop, Damarr Whittick,

20     Elizabeth Trotta and Therese Quigley.  Those jurors

21     remain seated.  The other jurors, thank you very much

22     for your service.  See the officer on the way out.

23          (Whereupon, the selected jurors were duly

24     sworn by the Clerk of the Court.)

25          THE COURT:  Ladies and gentlemen, you're now

Voir Dire                                                344

1    sworn jurors on this trial.  There are some restrictions

2    that you must comply with as sworn jurors.  I'll

3    elaborate on those restrictions when you come back to

4    Court, but for now, let me say this, you are under

5    obligations not to talk about the case to anyone other

6    than your employer and your family and simply to tell

7    them that you have been selected as a trial juror in a

8    criminal case and that you must report to Court on such

9    and such a day and such and such a time.  That's all.

10            Don't read about the case in any type of

11   format, including the newspaper or the Internet.

12            Don't visit any of the places mentioned while

13   sitting as a trial juror.

14            Don't do any research about the people,

15   places, things, issues or law that have been mentioned

16   here in any way, shape or form, whether on your phone or

17   by the Internet.

18            Report to me if anyone tries to influence you

19   or any other jurors by offering you money or some other

20   valuable for information about the case.  Simply forget

21   about the case until tomorrow morning when you will

22   report to the place selected by the court officer

23   sergeant to be ready to begin trial at 9:30.

24            Get here a little bit earlier so you can get

25   yourself a parking spot.  If you get here late, you are

Voir Dire                                                                345

1    going to walk a little bit to get to Court, okay.

2            So, other than those restrictions, I offer you

3    a good night and I'll see you all tomorrow.

4            THE CLERK:  Are these jurors acceptable to the

5    People?

6            MR. PERRI:  Yes, your Honor.

7            THE CLERK:  To the defense?

8            MR. ZERNER:  It is, thank you very much.

9            (Whereupon, the selected jurors exited the

10   courtroom.)

11           THE COURT:  Ladies and gentlemen in the

12   audience, with the selection of those five jurors, we

13   have now reached our full complement for a trial jury

14   and two alternate jurors.  So, your duties and

15   obligations to this part have concluded and you will be

16   returned to central jury for further instructions,

17   whether to be released or to be given further

18   instruction with regard to selection as a juror on

19   another trial.

20           I just want to thank you on behalf of the

21   Court system and the attorneys, including Mr. Ross, the

22   defendant, for your attention that you paid to this

23   process.  It's slow and plotting, but it gets done for

24   each and every case because it affords us the best

25   possibility we have, both the prosecution and the

1    defense, and we as citizens of this community and

2    country to afford an individual accused of a crime a

3    fair and impartial trial.  So that protects us, each and

4    every one of us if, in fact, we may be charged with a

5    crime.  So, I want to thank you all for your attention

6    and please follow the direction of the court officers.

7              (Whereupon, the prospective jurors exited the

8    courtroom.)

9              THE COURT:  Anything for the record, Counsel?

10             MR. PERRI:  No, your Honor.

11             THE COURT:  Mr. Zerner?

12             MR. ZERNER:  I'm not really sure whether we

13   have exhausted the issues with regard to the NYSIS and

14   Sarita Johnson.  It's my understanding from speaking to

15   multiple witnesses that Sarita Johnson has been charged

16   with crimes both in Nassau and in Queens and more than

17   just the two instances that Mr. Perri has brought to the

18   Court's attention.

19             What most concerns me is this morning

20   Mr. Perri told us we found out about one incident in

21   2014.  Then he was told go find out what the story is

22   about 2014.  He came back with some information about

23   that, but he also, all of a sudden, found out about

24   1995.

25             My question is why should I be confident, why

1   should my client be confident that that's all the

2   information we have?  We know that there is more to it

3   than that.  The problem is the prosecutor is refusing

4   to turn over a NYSIS which I have never seen before in

5   any county, ever, about somebody that he knows he's

6   going to call as a witness and now three days after

7   providing Rosario, still refuses to turn it over.

8               And B, he's telling us well, I checked on the

9   number and the number seems to indicate that it doesn't

10  match up and we're seeing orders of protection.

11              It seems to me he's leaving himself a way to

12  hedge.  He's already done it once today.  This morning

13  he told us about it once today when your Honor told him

14  to go and find out about the 2014 incident.  He seemed

15  to push back that he shouldn't have to or didn't want to

16  do that kind of inquiry.  He reluctantly did it and now

17  he tells us about 1995.

18              He's making out Sarita Johnson to be someone

19  out of Les Miserables who steals forks because she was

20  hungry.  I believe Mr. Perri has an obligation not just

21  to try to win this case, but to do justice.  That's the

22  way I was taught when I was a district attorney.  He has

23  an obligation to all the People, including Ray Ross, and

24  I don't believe he's living up to that obligation right

25  now.

Voir Dire

1        THE COURT:  Mr. Zerner, what is it that you

2   want from the assistant district attorney?

3        MR. ZERNER:  I want him to run an FBI.

4        THE COURT:  I have a criminal repository for a

5   NYSID number that the assistant district attorney

6   indicates correlates to Ms. Sarita Johnson and that

7   comes back no criminal history information associated.

8   There is no other history, related information

9   associated.  There is no job or license information.

10  There is no New York State wanted information.  There is

11  no New York State missing information.

12        MR. ZERNER:  If I may ask, what's the date of

13  birth?

14        THE COURT:  With regard to federal NCIC or FBI

15  response, a search of the NCI person files was not made

16  due to insufficient data and the search of the three

17  files was not made due to insufficient data.  If you

18  have something that you have with regard to Ms. Johnson,

19  some information, exchange it with the assistant

20  district attorney so that if there is something there,

21  he can do his due diligence and look for it.  Maybe it

22  was under a different name or a different spelling or

23  some other matter.

24        MR. ZERNER:  From interviewing multiple

25  witnesses who may or may not testify here, I've been

1    told that police brought charges against her in Queens

2    County around 2005 and brought charges against her in

3    Nassau County around 2010.

4              May I ask your Honor what's the date of birth

5    on the document you are looking at?

6              THE COURT:  I just have the NYSID number.

7              MR. ZERNER:  Why is there no date of birth?

8    It seems like Mr. Perri is trying to look through a

9    pinhole instead of trying to do justice.

10             Johnson is a very common name.  Let's go ahead

11   and make sure we have the right date of birth, the right

12   address, the right situation.  I know that Sarita

13   Johnson has lived over the last 15, 20 years in both

14   Queens and in Nassau.  We've already found that she had

15   at least two interactions with the criminal justice

16   system.

17             THE COURT:  Mr. Zerner, I'm going to leave it

18   at this because I'm satisfied.  Right now I'm satisfied

19   with what the assistant district attorney has told me.

20   He has an obligation.  I anticipate that he's

21   fulfilling -- I presume he's fulfilling his obligation.

22   If it shows that he's not, then we'll cross that bridge

23   and the consequences of that failure at the appropriate

24   time.

25             My word to you is this, if you have

Voir Dire

350

1    information, give him the information that you have so

2    that he can follow up on what you have provided to him.

3    It could be a different name.  As you say, it could be a

4    different date of birth.  It could be a different

5    spelling of Johnson.  It could be a different Queens

6    address that was given as a home of residence.  So, I

7    don't know.

8            I can only rely on, at this juncture, on what

9    the assistant district attorney has said, that he has

10   executed his due diligence to research the criminal

11   history of a witness that he's to present here at trial.

12   If there is other information out there, I think you

13   have an obligation to give it to him to allow him to do

14   further inquiry.

15           MR. ZERNER:  Your Honor, I'm giving him that

16   information right now.  It's my understanding 2005 in

17   Queens County she was charged with a crime.

18           MR. PERRI:  Your Honor.

19           THE COURT:  Hold on one second.  We don't

20   exchange information in that manner, Mr. Zerner.  What

21   you do is either you speak to your adversary counsel

22   directly and say this is what I have, can you follow up

23   on it.

24           MR. ZERNER:  I will do that, your Honor, but

25   my problem is this:  I have asked, I have discussed, I

Kathi A. Fedden, Sr. Court Reporter

1    have gently prodded Mr. Perri where is the NYSIS?

2            THE COURT:  Hold on one second.  Please

3    exchange the information with Mr. Perri.

4            Mr. Perri, as an officer of the Court and

5    assistant district attorney prosecutor, I'm directing

6    you to follow up on the information that the defense

7    counsel gives you to see whether or not there is a

8    criminal history for a Ms. Sarita Johnson.  That's all

9    I'm going to say.

10           MR. PERRI:  Your Honor, just to clarify

11   though, under the discovery statute and I have no

12   knowledge of any of the incidences he's talking about at

13   all.  I have no knowledge whatsoever about them, but the

14   discovery statute requires disclosure not of any time

15   she's had interaction with the police or an arrest even,

16   but it requires if there is a conviction or pending

17   case.

18           THE COURT:  That's what you are going to look

19   for.

20           MR. PERRI:  Yes, your Honor, of course, but

21   just what counsel is reiterating --

22           THE COURT:  He's going to give you as much

23   information as he possibly can based on what he's

24   discovered through his investigation.

25           MR. PERRI:  Yes, your Honor.

Voir Dire

1    THE COURT:  And then you have an obligation to
2    follow up on that.  If you come back with no convictions
3    and no pending cases or whatever information you come
4    back, I want to hear about it and then I'll make a
5    decision whether or not you need to exchange it.
6        MR. PERRI:  Your Honor, as you're holding, we
7    have run the NYSID for this individual and it does come
8    back clean.  I will take the information.
9        THE COURT:  Now you have more information.
10    Maybe you can call someone, I don't know.
11        MR. ZERNER:  The other thing I wanted to get
12    on the record, what's the date of birth of the person
13    you are running the NYSID for?  I'm providing him with a
14    piece of paper right now that says 2005 in Queens --
15        THE COURT:  You don't have to repeat it.
16        MR. ZERNER:  I wanted to make sure because,
17    again --
18        THE COURT:  It's on the record three times
19    already.  Now you have given him a letter.  I know.  I
20    have given him a direction.
21        Do you have a date of birth for Ms. Johnson?
22        MR. PERRI:  Your Honor, yes.  Are you ordering
23    me to disclose that?
24        THE COURT:  Yeah.  There seems to be a real
25    challenge to Ms. Johnson's criminal history which would

Voir Dire                                                          353

1        go to Brady.

2                MR. PERRI:  Yes, your Honor, 2/6/1966.

3                THE COURT:  Did you hear that, Mr. Zerner?

4                MR. ZERNER:  I did and that's what my

5        understanding is and was.

6                MR. PERRI:  Which is also the date of birth on

7        the order of protection issued to the defendant and it's

8        in the caption.

9                THE COURT:  Thank you, Counsel.  I know you

10       are going to do what you are supposed to do.

11               With regard to the NYSID repository history,

12       it will be marked Court Exhibit next in order.

13               Please be ready to go 9:30 tomorrow.  We'll be

14       back in our courtroom.

15               MR. PERRI:  Yes, your Honor.

16               MR. ZERNER:  Thank you, your Honor.

17               (Whereupon, the trial was adjourned to

18       February 9, 2016.)

19

20               *               *               *

21

22

23

24

25

Kathi A. Fedden, Sr. Court Reporter