```
 1   SUPREME COURT OF THE STATE OF NEW YORK
            COUNTY OF NASSAU :  PART 47
 2   -------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
 4            -against-                Ind. No. 1050N/15
 5                                       JURY TRIAL
 6   RAY ROSS,
 7                   DEFENDANT.
     -------------------------------------x
 8
                      Mineola, New York
 9                    February 9, 2016
10
     B E F O R E:   HON. TERENCE P. MURPHY
11                  Acting Supreme Court Justice
12
13   A P P E A R A N C E S:
14
              (Same as previously noted)
15
16
17
18              Kathi A. Fedden
                Official Court Reporter
19
20        *              *              *
21
22         THE CLERK:  Continued case on trial, People
23   versus Ray Ross.
24         People ready at this time?
25         MR. PERRI:  Yes, your Honor.
```

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                    355

```
 1                THE CLERK:  Defense ready?

 2                MR. ZERNER:  Defense is ready, thank you.

 3                THE CLERK:  All parties are present.  The jury

 4       is not in the courtroom at this time.

 5                THE COURT:  There is one matter I think we

 6       have to tend to before the jury comes in.  That's with

 7       regard to Ms. Sarita Johnson's prior criminal history as

 8       it applies to a Brady or Giglio responsibility of the

 9       assistant district attorney.

10                The Court has received and I believe defense

11       counsel has already received a memorandum or Email

12       bullet point response from the assistant district

13       attorney to include a couple of cases in support.

14                Now, Mr. Perri, I want to hear from you with

15       regard to any criminal matters that you researched with

16       regard to the information provided to you by your

17       adversary counsel.

18                MR. PERRI:  Your Honor, with respect to the

19       information, which was only a year, and alleging a

20       non-descript incident in two different years, the People

21       once again went through and ran Sarita Johnson's NYSID.

22       It once again comes up with no information regarding any

23       criminal convictions.

24                We entered Sarita Johnson's NYSID number, her

25       name, verified her date of birth into the Unified Court
```

Kathi A. Fedden, Sr. Court Reporter

1    System CRIMS database to look for any cases that

2    resulted in a criminal or even an unsealed disposition.

3    The only information that was located there was the

4    information that I turned over to the Court yesterday

5    about the 1995 petit larceny and shoplifting incident in

6    Garden City.  It did not result in a criminal

7    conviction.

8         The information about disposition in the

9    Court's system was in direct conflict with what the jail

10   had about that case.  Her criminal record shows no

11   record of that arrest or any plea taken in that case and

12   in confronting and discussing that incident with Sarita

13   Johnson, she acknowledged it, she explained that it was

14   also a shoplifting incident which would correspond to

15   the larceny charge that was in the CRIMS database in the

16   Court system and she believes, much as with the second

17   incident, that it resulted in an adjournment in

18   contemplation of dismissal, no criminal convictions.

19   And as the ACOD periods on both of those cases would

20   have -- the six month ACOD would have more than run by

21   today's date, it's the People's position that those

22   incidents were expunged from her criminal record.  The

23   arrests are no longer present on her criminal record and

24   there was no criminal disposition.  Sarita Johnson has

25   no criminal history the People are aware of in New York

Proceedings

1    State or Nassau County in searching by both the district

2    attorney's database, the Nassau County Police

3    Department's Swift Justice database, the New York State

4    Unified Court System's criminal database and running her

5    New York State criminal record.

6         The People are not able to find any criminal

7    convictions at all for Ms. Johnson.

8         THE COURT:  Mr. Zerner.

9         MR. ZERNER:  Thank you.  I believe we have

10   several problems here.  I think problem number one is,

11   for whatever reason, the prosecutor is continuing to

12   each time this investigation goes on, he's only looking

13   at it in a light most favorable to the People.  We will

14   get to the point in the trial when that's appropriate.

15        THE COURT:  I'm going to challenge you on that

16   particular assertion, Mr. Zerner.  What I have heard

17   from the assistant district attorney is that he's done a

18   comprehensive search for criminal convictions with

19   regard to a potential witness in this particular case

20   and the records that were accessed reveals no criminal

21   convictions.

22        Now, you have provided some general

23   information to the assistant district attorney and you

24   told the Court that you have a good faith belief that

25   there are some criminal convictions.  He went back and

1    researched it and they're not there within the confines

2    of official records, which is his obligation, and only

3    limited to that parameter.

4         Now, if you have particular information, you

5    must give it to the assistant district attorney or I'm

6    not going to hear it.  Because we're playing a cat and

7    mouse game from what I see and it's not the burden of

8    the assistant district attorney to kind of go out into

9    the netherworld and find out if there is something there

10   when he has nothing to go on except some general

11   assertions from you.

12        MR. ZERNER:  I accept what the Court is

13   telling me right now, your Honor.  However, if I may

14   continue, what the DA has told us is that there was a

15   charge in 2014.  What we do know is that the allegation

16   that my client is defending himself against happened in

17   2014.  I think I'm entitled to --

18        THE COURT:  What's the charge?

19        MR. ZERNER:  The petit larceny from 2014.  So

20   there is two problems, Judge.  Problem number one is it

21   sounds like whoever the assistant district attorney was,

22   but certainly a Nassau assistant district attorney

23   dealing with that case, presumably at 99 Main Street,

24   didn't have a NYSIS at the time that showed the 1995

25   conviction.

1              Forgetting that for a second, in 2014,

2     whatever the petit larceny was, and I believe everybody

3     in this room understands it can be a kit kat from a

4     7-Eleven or a $999 item from Saks Fifth Avenue,

5     regardless, at some point in 2014, perhaps before she

6     brought an allegation that her daughter had this

7     interaction with my client, perhaps she's using that as

8     a wedge to try to help herself.  We don't know.  And the

9     reason I don't know is because the DA won't provide the

10    date and the information about that petit larceny.

11             Your Honor will recall that yesterday in the

12    morning the DA told us about a 2014 incident.  Then

13    after lunch he told us about 2014 and 1995.  I don't

14    understand why this simply can't be turned over and

15    shown to the person who is entitled to it, myself,

16    defending my client.

17             Now, again, the DA --

18             THE COURT:  What is it you want turned over,

19    sir?  There is no documentation with regard to that.

20             MR. ZERNER:  There is a file somewhere in the

21    DA's office that shows a 2014 docket number began

22    against Sarita Johnson.  I want to know the day it

23    began.  I want to know when the offer was made.  I want

24    to know whether the allegation that was brought against

25    my client was before, during or after the pendency of

1    that case.  It was certainly during the pendency of the

2    six month ACOD period.

3              This is a woman who now we know has an

4    interaction back and forth with CPS.  She's had problems

5    with the fathers of her children along the way,

6    including during that time frame.  Let's shine the light

7    of day on it.  Let's find out exactly what was going on

8    with it.

9              The DA searched, he states, the Nassau County

10   Police Department system.  I accept that representation.

11   He just made it on the record again.  I told him there

12   was something that happened in Queens.  Now he's saying

13   I didn't go specifically to Queens, I went statewide and

14   I didn't find anything.  That would be fine except

15   yesterday he said the same thing and when he looked

16   further, he did find something.

17             The Chinese water torture is problematic,

18   especially when presumably this woman is testify today

19   or tomorrow.

20             THE COURT:  How does that impact the witness's

21   credibility and/or the exculpatory or go to exculpating

22   your client?

23             MR. ZERNER:  If the DA knew that their

24   complainant in this case was a defendant in another

25   case, perhaps a Chinese wall should have been erected.

1          Perhaps a special prosecutor should have been brought

2     in.  Presumably that didn't happen.

3               Again, the items that were stolen this time, I

4     believe, were silverware.  It could be $10 or $999.  I

5     think I'm entitled to know what did she steal?  What was

6     the date that it happened?  Where was the location?  Did

7     she have interaction with store security, with the

8     police, with both?  I think I'm entitled to see that

9     paperwork.

10              THE COURT:  Mr. Perri.

11              MR. PERRI:  Your Honor, what defense counsel

12    is asserting is found nowhere in case law or in the

13    Criminal Procedure Law.  The People have turned over as

14    much information under the CPL and also under case law

15    as required regarding bad acts, as well as criminal

16    convictions.  There is no criminal conviction regarding

17    either of these incidents.  The files are sealed.  The

18    information is not accessible to the People.  The cases

19    were dismissed.

20              Defense counsel is allowed to cross-examine

21    the witness on the bad act of theft.  He can

22    cross-examine her on what she stole.  He can

23    cross-examine the witness on when she stole and why she

24    stole it.  The bad act has been put forth because it

25    goes to her credibility and the People concede it's

Proceedings                                362

1      proper grounds for cross-examination.  But the case law

2      is clear, just an arrest is not grounds for

3      cross-examination.  And interaction with the police is

4      not grounds for cross-examination.  And just the fact

5      that CPS is involved in this woman's life is not grounds

6      for cross-examination.

7              Your Honor, the People have handed up with

8      respect to the information that we turned over that

9      defense counsel referenced, that the People discovered

10     when trying to find more information about either the

11     2014 or 2010 incident that defense counsel alleged

12     regarding mostly CPS involvement in the family that did

13     not result in any criminal charges.

14             THE COURT:  I'm not going to go to CPS.  The

15     Court has reviewed the CPS records and has issued a

16     ruling that they're confidential records and they were

17     not to be turned over.

18             MR. PERRI:  Your Honor, the People just ask

19     for an instruction, as defense counsel has already

20     alluded to when he says he wants to shine the light of

21     day, with regard to the information that I provided to

22     the Court and defense counsel last night by exposing all

23     this and using it to cross-examine against the witness.

24     The People ask him to be precluded from that.  These are

25     not bad acts that go to her credibility.

1        THE COURT:  That's a whole different issue.

2   When reading it this morning I was quite surprised it

3   was even offered.

4        So, first things first.  I want to thank you

5   for making my evidentiary ruling with regard to what

6   defense counsel can cross-examine the witness on, but

7   your ruling does not impact the Court's potential

8   decision with regard to the limits of examination by

9   defense counsel.

10        MR. PERRI:  Your Honor, I understand.  I

11   didn't mean any disrespect.

12        THE COURT:  And I didn't take it as

13   disrespect.

14        One, as the assistant district attorney has

15   alluded to, based on the records that have been

16   accessed, there is no criminal conviction, so there is

17   no obligation on the assistant district attorney to

18   provide anything else to defense counsel.

19        With regard to the two incidents that have

20   been addressed, the Court doesn't know what happened.

21   There was some interaction with the criminal justice

22   system, but as far as the Court understands, those

23   interactions resulted in a disposition favorable to the

24   defendant witness, Ms. Johnson.  Therefore, unless the

25   door is somehow opened to inquire of Ms. Johnson with

Proceedings                                    364

1    regard to those prior incidents, the Court sees no

2    reason why they should be addressed under a

3    cross-examination posture and we'll wait and see how the

4    testimony of Ms. Johnson comes out.

5              Secondly, with regard to the CPS records, the

6    Court has already, as I have indicated, made a ruling

7    that those CPS records offered no exculpatory material

8    for the defendant, nor went to any issues of credibility

9    of the witnesses, so again, in that vain, unless the

10   door is somehow opened by the assistant district

11   attorney, that area of inquiry will be out of bounds for

12   defense counsel.

13             I hope that results in an understanding of the

14   Court's posture on those two positions.

15             Mr. Zerner, your exceptions are noted for the

16   record.  I preserve your client's appellate rights,

17   should they be necessary.

18             MR. ZERNER:  Thank you, your Honor.

19             MR. PERRI:  Your Honor, I just ask for an

20   opportunity, before calling Sarita Johnson, to advise

21   her of the Court's ruling as I prepared her to have to

22   address these issues in case the Court did not rule as

23   you just did.  Just five minutes, your Honor, before she

24   is called.

25             THE COURT:  After?

Proceedings                                365

1              MR. PERRI:  After openings.

2              THE COURT:  We usually take a break because

3       there is an instruction given to the jury and then there

4       is openings, so that gives the court reporter tired

5       fingers and it gives the jurors a tired posture having

6       sat in their seats for an hour and a half or so, so

7       we'll take a break and what you do on that break is your

8       prerogative.

9              MR. PERRI:  Thank you, your Honor.

10             (Whereupon, the jury entered the courtroom.)

11             THE CLERK:  Let the record reflect the

12      presence of the jury.  Shall I take a roll call, Judge?

13             THE COURT:  Please.

14             (Whereupon, a roll call of the jury was

15      taken.)

16             THE CLERK:  Jurors all present and accounted

17      for.

18             THE COURT:  Good morning, ladies and

19      gentlemen.  I'm glad to see everyone made it today.  For

20      those of you who didn't have to come to Court yesterday,

21      see how lucky you were, because it was a tough commute,

22      but we're all here together now to begin the trial.

23             I have further instructions for you.  Some of

24      the points that I make will be repetitive from my

25      preliminary instructions, but those points deal with the

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                    366

1    principles of law and human understanding gets better by

2    repetition.  And I know some of those principles may

3    have been foreign to you the first time you heard them,

4    but I hope you have an understanding of them now and

5    will continue to build on that understanding so you will

6    be fully cognizant of your responsibilities with regard

7    to how to follow the law and apply the law to the facts

8    that you will determine here at trial.

9           We're about to proceed with the trial of the

10   case of the People versus Ray Ross.  At the outset, I'm

11   going to explain the various stages of a trial and what

12   you may expect to see and hear during the trial so that

13   you may better understand what is taking place.  I will

14   also remind you of some of the basic principles of law

15   which apply to this and all criminal trials.

16          At the conclusion of the case, I will again

17   remind you of those principles, I will define the crimes

18   charged, explain the law that applies to the charged

19   crimes and will list for you the elements that the

20   People must prove beyond a reasonable doubt.

21          The elements of a charged crime is a term that

22   refers to the various parts of our law's written

23   definition of the crime, in addition to the

24   identification of a person as the one who committed the

25   crime.

1            As you know, there are multiple crimes charged

2       in the indictment and you know that is simply an

3       accusation with no evidentiary weight.  A separate crime

4       is charged against the defendant in each count.  You

5       must decide each count separately.  Your verdict on one

6       count should not control your verdict on any other

7       count.  Evaluate the evidence presented as to each crime

8       and to each element of each crime, okay.

9            As you can see, a court reporter is taking

10      down everything that is being said.  What she takes down

11      is called the record of the trial.  You may not take

12      notes during the trial.  There are reasons for this

13      rule.  There is no real need for notes since every word

14      of each witness is recorded by the court reporter and

15      during deliberations, upon your request, the testimony

16      can be read back to you.

17           It is often difficult to take notes and at the

18      same time to look at the witness and fully comprehend

19      and appreciate what the witness is saying and how the

20      witness is saying it.  Since you are the finders of

21      fact, you are responsible for evaluating the

22      believability and accuracy of a witness's testimony.

23      It's important that you be able to both fully comprehend

24      what a witness is saying and how a witness is saying it

25      without the distraction of taking notes.

1           The trial formally begins with what the law

2     calls an opening statement by the prosecutor.   The

3     purpose of the People's opening address is to acquaint

4     you, the members of the jury, with the specific charges

5     and allegations set forth in the indictment and to give

6     you an outline of what the case is about and what the

7     People expect to prove in offering evidence at trial.

8           What the district attorney says in his opening

9     statement is not evidence in this case.   It's simply his

10    outline to you.

11          Next, the defendant's counsel may, if he so

12    desires, also deliver an opening address, but, of

13    course, there is no requirement that he do so.   That's

14    because the defendant has no burden in the case.   The

15    burden lies entirely with the People.

16          Should the defendant's counsel present an

17    opening statement, I caution you that just as the

18    prosecutor's opening is not evidence, the defense

19    counsel's opening is not evidence as well.

20          Now, after completion of the opening

21    statements, the prosecutor will proceed with the

22    presentation of evidence.   Remember, the indictment is

23    not evidence, it's simply a document that contains an

24    accusation.   The defendant has pled not guilty to the

25    accusations and the trial is for you to hear the

1   evidence and decide whether the defendant is guilty or

2   not guilty.

3           Testimony is, of course, the most common form

4   of evidence and comes from the questioning of witnesses

5   by the lawyers and perhaps the Court.  A question by

6   itself is not evidence.  It is the question with the

7   answer that is evidence.  So, you must consider the

8   question with the witness's answer and decide whether

9   you find the answer believable and accurate.

10          Next, evidence may also come in the form of a

11  stipulation.  As I previously indicated, a stipulation

12  is information which both parties agree to present to

13  the jury as evidence without the necessity of calling a

14  witness to testify as to the information provided.

15          Lastly, evidence may come in the form of

16  physical objects such as documents, photographs,

17  clothing or charts.  When a lawyer is questioning a

18  witness and in a question refers to a physical object

19  for the first time, the object is normally marked for

20  identification so we can more easily refer to it.  An

21  item marked for identification is not evidence and is,

22  therefore, not available for your inspection and

23  consideration.

24          Sometimes a lawyer will ask the Court to

25  receive the object in evidence.  If I grant a request to

1     admit the object in evidence, then the object becomes

2     evidence and is available for your inspection and

3     consideration during jury deliberations.

4                    Now, during the trial you may hear that a

5     lawyer or an investigator for a lawyer spoke to a

6     witness about his or her testimony before calling him or

7     her to testify.  Also, a witness may review documents

8     and other material pertaining to the case before he or

9     she testifies at trial.  The law permits such conduct

10    and it is a normal part of preparing for trial and not

11    improper at all.

12                    After the People have completed the

13    presentation of their evidence, the defendant may, but

14    is not required, to present evidence.

15                    Now, you will recall the fact that a defendant

16    does not testify as a witness is not a factor from which

17    any inference unfavorable to the defendant may be drawn.

18    Remember, the defendant is presumed to be innocent.  He

19    has no burden to prove or disprove anything whatsoever

20    at trial.

21                    To the contrary, it is the People who have the

22    burden of proving the defendant guilty beyond a

23    reasonable doubt.  That means, before you can find the

24    defendant guilty of a crime, the People must prove

25    beyond a reasonable doubt every element of each crime

Proceedings                                     371

1      charged, including that the defendant is the person who

2      committed the crime.

3              The burden of proof never shifts from the

4      People to the defendant.  If the People fail to satisfy

5      their burden of proof, you must find the defendant not

6      guilty.  If the People satisfy their burden of proof,

7      you must find the defendant guilty.

8              Now, what does our law mean when it requires

9      proof of guilt beyond a reasonable doubt?  We spoke

10     about it a little before jury selection.  The law uses

11     the term proof beyond a reasonable doubt to tell you how

12     convincing the evidence of guilt must be to permit a

13     verdict of guilty.

14             The law recognizes that in dealing with human

15     affairs, there are very few things in this world that we

16     know with absolute certainty other than taxes and death,

17     right.  You have heard that.  Therefore, the law does

18     not require that the People prove a defendant's guilt

19     beyond all possible doubt.

20             On the other hand, it is not sufficient to

21     prove that a defendant is probably guilty.  In a

22     criminal case, the proof of guilt must be stronger than

23     that, it must be beyond a reasonable doubt.

24             A reasonable doubt is an honest doubt of the

25     defendant's guilt for which a reason exists based upon

Proceedings                                    372

1    the nature and quality of the evidence.  It is an actual

2    doubt, not an imaginary doubt.  It's a doubt that a

3    reasonable person, acting in a matter of this

4    importance, would be likely to entertain because of the

5    evidence that was presented or because of the lack of

6    convincing evidence.

7            In determining whether or not the People have

8    proven the defendant's guilt beyond a reasonable doubt,

9    you should be guided solely by a full and fair

10   evaluation of the evidence.  After carefully evaluating

11   the evidence, each of you must decide whether or not

12   that evidence convinces you beyond a reasonable doubt of

13   the defendant's guilt.

14           Whatever your verdict may be, it must not rest

15   upon baseless speculation, nor may it be influenced in

16   any way by bias, prejudice, sympathy or by a desire to

17   bring an end to your deliberations or to avoid an

18   unpleasant duty.  That means render a verdict.

19           If you are not convinced beyond a reasonable

20   doubt that the defendant is guilty of the charged crime,

21   again, you must find the defendant not guilty.  If you

22   are convinced beyond a reasonable doubt that the

23   defendant is guilty of a charged crime, then you must

24   find the defendant guilty of that crime.

25           As judges of the facts, you alone determine

Proceedings                                              373

1    the truthfulness and accuracy of the testimony of each

2    witness.  You must decide whether a witness told the

3    truth and was accurate or, instead, testified falsely or

4    maybe was simply mistaken.  You must also decide what

5    importance to give to the testimony you accept as

6    truthful and accurate.

7              It's the quality of the testimony that is

8    controlling, not the number of witnesses who testify.

9              Regarding police officer testimony or a child

10   witness testimony, you evaluate such testimony in the

11   same way you would evaluate the testimony of any other

12   witness.

13             There is no particular formula for evaluating

14   the truthfulness and accuracy of another person's

15   statement or testimony.  You bring to this process all

16   of your varied experiences.  In life you frequently

17   decide the truthfulness and accuracy of statements made

18   to you by other people.  The same factors used to make

19   those decisions should be used in this case when

20   evaluating testimony.

21             There are, as I am sure you appreciate, rules

22   for all stages of a trial, including rules that govern

23   whether certain evidence may be introduced and, if so,

24   how and when.  Part of my job is to enforce those rules.

25   The rules are designed to ensure that the evidence you

1    hear and see is relevant and in a form that permits you

2    to evaluate it fairly.  I'm now going to explain some of

3    those rules that are commonly applied during a trial so

4    that you will better understand the Court's ruling when

5    it's made and you will appreciate, as I have just

6    explained, that the rules are designed only to assure a

7    fair and orderly trial.

8           During the presentation of evidence, the

9    lawyers for the parties will, in turn, beginning with

10   the assistant district attorney, be asking questions of

11   a witness.  During such questioning, if a lawyer

12   believes a question or some other presentation of

13   evidence is improper with a rule of law, that lawyer

14   will object.  Very normal.

15          When an objection is made, I will decide

16   whether the rules permit the question to be asked or the

17   evidence to be introduced.

18          Making objections is part of a lawyer's job.

19   You are not to draw any unfavorable inference to either

20   side just because a lawyer makes an objection.  They

21   take place at every trial.

22          A lawyer may object before a witness answers a

23   question or after a witness answers a question.  When an

24   objection is made to a question before the witness

25   answers, if I overrule the objection, the witness will

1   be permitted to answer.  If I sustain the objection,

2   there is no answer and, therefore, no evidence.

3   Remember, a question alone is not evidence.

4          Now, if a lawyer objects after the witness has

5   answered the question and I overrule the objection, the

6   answer will stand as evidence.  If I sustain the

7   objection, the answer is not evidence, the question and

8   answer are then stricken from the record and you are

9   not -- and you are to completely disregard the answer.

10  So, as a standing rule, if I sustain an objection after

11  an answer is given, you are to strike the question and

12  answer from your mind and not to use that in any way,

13  shape, manner or form, okay.

14         Sometimes I will say stricken from the record.

15  Sometimes I won't just to move things along, but recall

16  that rule, okay.

17         Also, the Court has an obligation under the

18  laws of New York to make sure that certain fundamental

19  rules of law are followed even if one of the lawyers

20  does not voice an objection.  So, on occasion, you may

21  hear me say sustained or words to that effect even

22  though one of the lawyers has not objected.  In any

23  event, any ruling by the Court on an objection of

24  counsel or otherwise is based on our law and my

25  understanding of the law and expresses no opinion about

1    the facts of the case and whether the defendant is

2    guilty or not guilty.  Remember, you're responsible for

3    that decision.

4              Now, from time to time during the course of

5    the trial there will be conferences at the bench with

6    counsel.  If they become prolonged, it may be necessary

7    for the Court and the parties to excuse themselves for a

8    short period.  If that happens, what generally will

9    happen is I'll ask you to take a break and you will be

10   escorted out of the courtroom by the court officer until

11   I have finished with the conference with counsel.  The

12   conferences deal with questions and matters of law or

13   scheduling of the trial and that's my responsibility.

14   So, when the occasion does arise when there are

15   conferences at the bench or outside of your presence, I

16   ask you to be patient and understanding while the

17   conferences are conducted.

18              Upon completion of the presentation of

19   evidence, and I remind you that the defense has no

20   burden whatsoever, it's the People's burden to present

21   evidence, although defense counsel is certainly entitled

22   to and would proceed after the district attorney has

23   concluded his case.

24              Now, upon completion of all the evidence

25   presented, the lawyers will address you in a closing

1   statement or what the law calls a summation.  Defense

2   counsel will go first, followed by the assistant

3   district attorney.  What a lawyer says in summation,

4   just as what he says in openings, is not evidence.  The

5   summations simply provide each lawyer an opportunity to

6   review the evidence presented and submit for your

7   consideration the facts, inferences and conclusions

8   which they contend may be properly drawn from the

9   evidence presented.

10          After summations are concluded I will instruct

11   you on the rules of law applicable to the case.  You

12   must accept and follow those rules.  You will then begin

13   your deliberations.

14          During your deliberations your function as

15   jurors will be to decide what the facts are and to apply

16   the rules of law that I set out.  You will determine

17   what the facts are from all the testimony that you hear,

18   the exhibits that are submitted and any stipulations the

19   parties have agreed to or, in other words, you will

20   decide the case on the evidence.  The conclusion you

21   reach from determining the facts and applying the law

22   will be your verdict, guilty or not guilty.

23          Under our law, juror number one will serve as

24   the foreperson, so Mr. Valant, you are designated as the

25   jury foreperson.

1          During the trial, the foreperson has the same

2     responsibilities as any other juror.  During

3     deliberations the foreperson will sign any note that the

4     jury sends to me, including that the jury has reached a

5     verdict.  That's simply a formality.

6          During deliberations, the jury foreperson has

7     no greater power or lesser power than any other of the

8     12 deliberating jurors.  It's just a scribe, if you

9     will, to sign any note that comes from the jury.  The

10    foreperson doesn't have to write the note.  Any juror

11    can write a note.  The foreperson will simply sign it

12    indicating that it comes from the jury.  The foreperson

13    will announce the jury's verdict.

14         Now, during the trial, if you need to speak

15    with me about something relating to your jury service or

16    the trial, please tell a court officer that you need to

17    speak to me.  I will then arrange an appropriate meeting

18    with the parties in the courtroom.

19         Do not discuss with your fellow jurors

20    whatever you feel necessary to bring to my attention and

21    after we have had our conversation, do not discuss with

22    your fellow jurors whatever it was we discussed unless

23    you get further instructions from me.

24         During the trial, we do our best to avoid

25    delay.  From experience, I know delays are inevitable

Proceedings                                                379

1   for a multitude of reasons through nobody's deliberate

2   fault.  When a delay occurs, I simply ask for your

3   understanding and patience.

4          I also request that you be here at the times I

5   set so the absence or lateness of a juror is not the

6   occasion for delay.  If an emergency arise that will

7   make you late or prevent you from attending, please call

8   the Court at the number that you have been given, leave

9   a number where you can be reached and explain the

10  problem so we can minimize everyone's convenience.

11         That being said, it's as important for the

12  last juror to be on time as it is for the first juror.

13  That's because you're one body.  We cannot start until

14  the last juror arrives.  Please be considerate of your

15  fellow juror's time and convenience when traveling to

16  Court each day.

17         Now, we have two alternate jurors, numbers 13

18  and 14.  An alternate juror is expected to pay the same

19  close attention to the case as any of the other 12

20  jurors.  The only difference between an alternate juror

21  and one of the 12 jurors is that the alternate jurors do

22  not know at this time whether you will be called at some

23  point during the trial to substitute in for one of the

24  12 jurors.

25         Our law expects that the first 12 jurors who

Proceedings                                                              380

1    begin the trial will be the 12 jurors who will be there

2    at the end of the trial and deliberate.  So, it takes an

3    extraordinary emergency before there will be a

4    substitution for an alternate.

5              One final note.  Please recall my instructions

6    as to the definition of a fair jury.  As you have

7    observed, many prospective jurors were called and

8    questioned and excused for one reason or another, but

9    you, ladies and gentlemen, were selected to serve.  You

10   are the ones in whom both sides expressed confidence and

11   are convinced will be fair and impartial and that each

12   of you will keep an open mind throughout the trial and

13   reach your conclusions and your ultimate decisions only

14   during your final deliberations after listening

15   carefully to the evidence, the summations of counsel and

16   my instructions to you on the law and then only after

17   exchanging views and reasoning together with other

18   members of the jury.

19             Now, I had given you the shorthand version of

20   certain restrictions on you while you serve as sworn

21   jurors at this trial.  I'll now give you the full

22   explanation and the reasons why.

23             Our law requires jurors to follow certain

24   instructions in order to help assure a just and fair

25   trial.

1          Now, first, do not converse or communicate

2     either among yourselves or with anyone else about

3     anything related to the case while you are serving as a

4     juror.  You may tell the people with whom you live and

5     your employer that you are a juror and give them

6     information about when you will be required to be in

7     Court, but you may not talk with them or anyone else

8     about anything related to the case.

9          Do not at any time during the trial request,

10    accept, agree to accept or discuss with any person the

11    receipt or acceptance of any payment or benefit in

12    return for supplying any information about the trial.

13          You must promptly report directly to me any

14    incident within your knowledge involving an attempt by

15    any person to improperly influence you or any member of

16    the jury.

17          Don't visit or view the premises or places

18    where the charged crimes were allegedly committed or any

19    other premises or places involved in the case.

20          And you must not use Internet maps or Google

21    Earth or any other program or device to search for or

22    view any location discussed in the testimony.

23    Everything that you are going to need to render your

24    verdict will happen here through the testimony and

25    presentation of evidence at trial.

Proceedings                                              382

1          Do not read, view or listen to any accounts or

2   discussions of the case reported by newspapers,

3   television, radio, the Internet or any other news media.

4          Do not attempt to research any fact, issue,

5   law or person related to this case, whether by

6   discussion with others, by research in the library or on

7   the Internet or by any other means.

8          Now, ladies and gentlemen I want you to

9   understand why these rules are so important.

10          Our law does not permit jurors to converse

11   with anyone else about the case or to permit anyone to

12   talk to them about the case because only jurors are

13   authorized to render a verdict.  Only you have been

14   found to be fair and only you have promised to be fair.

15   No one else has been so qualified.

16          Our law also does not permit jurors to

17   converse among themselves about the case until the Court

18   tells them to begin deliberations because premature

19   discussions can lead to premature final decisions.

20          Our law does not permit you to visit a place

21   discussed in the testimony for the following reasons:

22          First, you cannot always be sure that the

23   place is in the same condition as it was on the day in

24   question.

25          Second, even if it were in the same condition,

1    once you go to a place discussed in the testimony to

2    evaluate the evidence in light of what you see, you now

3    become a witness and not a juror or a judge of the

4    facts.  As a witness, you may now have an erroneous view

5    of the scene that may not be subject to correction by

6    either party.  That is simply not fair.

7              Finally, our law requires that you not read or

8    listen to any news accounts of the case and that you do

9    not attempt to research any fact, issue, law or person

10   related to the case.  That's because your decision must

11   be based solely on the testimony and other evidence

12   presented to you in this courtroom.  It would not be

13   fair to the parties for you to base your decision on

14   some reporter's view or opinion or upon information you

15   acquire outside of the courtroom.

16             The rules are designed to help guarantee a

17   fair trial and our law, accordingly, sets forth serious

18   consequences if the rules are not followed.  I trust you

19   understand and appreciate the importance of following

20   these rules and in accord with your oath and promise I

21   know you will do so.

22             A final matter.  You have seen through your

23   days here in Court that it's a very public place.

24   People are coming and going and interact or intersect

25   with each other almost everywhere, including the

1    facilities.

2            A couple of rules:  You will see, in

3    particular, defense counsel and maybe Mr. Ross or maybe

4    the assistant district attorney, some of the court

5    officers, some of the staff, Mr. Clerk, Ms. Court

6    Reporter or myself in the hallways.  We will not say

7    hello to you or acknowledge your existence, if you will.

8    And that's not a crude act on our part, it's simply so

9    that there is no reason for anyone to suggest that there

10   was any impropriety or conflict with regard to you, the

11   judges of the facts, and anyone else involved with this

12   proceeding.

13           So please don't take any exception to anyone

14   who passes by you and doesn't acknowledge you, okay.

15   It's for those reasons and those reasons alone that we

16   won't say good morning or hello, okay.  And then I ask

17   you to do the same.  If you see us, simply pass by us

18   without any type of acknowledgment, okay.

19           So with that, I have concluded my preliminary

20   instructions and now I'm going to turn it over to

21   Mr. Perri, the assistant district attorney, for his

22   opening statement.

23           MR. PERRI:  Your Honor, ladies and gentlemen

24   of the jury, defense counsel, the evidence will show on

25   August 3, 2014 Ray Ross, the defendant, a then

1      55-year-old man, was texting a 13-year-old girl,

2      Millinia Johnson.  A girl, not his wife, not his

3      daughter, not his granddaughter, not his girlfriend,

4      although he had all these relationships in his life at

5      that time.

6              At approximately 2:38 a.m. you will see that

7      he was still up texting, texting a 13-year-old niece of

8      his girlfriend, Tara Johnson.  He was texting Millinia,

9      nicknamed Patty, chatting at 2:38 a.m. what he was

10     watching on TV, the fights.

11             At that time the defendant lived upstairs in

12     the same house as Millinia, 301 Coventry Road North,

13     West Hempstead, Nassau County, New York State.  The

14     defendant lived upstairs from her in a bedroom with his

15     girlfriend, Millinia's Aunt Tara.

16             Also up there lived his girlfriend's daughter

17     and children in yet another bedroom and Millinia's

18     brother Malik in yet another room.  Their grandmother,

19     the homeowner, was in a nursing home.

20             Millinia lived downstairs on the lower level

21     of the split ranch house.  She shared one room with her

22     mother and three sisters.  She even shared a bed.  There

23     was often not a working television down there, let alone

24     one with cable.  That was upstairs with the defendant,

25     with Ray Ray as she called him.

Opening Statement - People                                386

1        The texts that night, you will see, were

2   brief.  They ended 2:42 a.m. that summer, the summer

3   before Millinia started eighth grade.  This was after

4   the defendant already dialed her phone to no avail three

5   times a little earlier, 1:37 a.m., 1:40 a.m., 1:42 a.m.

6        The evidence will show, however, that the next

7   day the texts were neither brief nor were they innocent.

8   From 4:45 p.m. through 9:15 p.m. the next day the

9   defendant and a 13-year-old Millinia texted each other

10   approximately 80 times.

11        You will see how the conversation started off

12   with an apology from Millinia.  She apologized that she

13   could no longer go on trips to Brooklyn with the

14   defendant because her mother, Sarita Johnson, Tara's

15   sister, would not allow it anymore.  This quickly sent

16   the defendant into a rage against the child's mother.

17   The defendant accused Sarita of not spending money on

18   her daughter like the defendant would.  Of Sarita, her

19   mother, being jealous of her daughter's relationship

20   with the defendant.  Of him stating over and over that

21   he is the only one that she can depend on.

22        The defendant persisted, demanding that the

23   13-year-old make a choice, that she had to choose him

24   over her mother.

25        You will read how Millinia was confused by all

Kathi A. Fedden, Sr. Court Reporter

Opening Statement - People                                387

1    this.  She didn't know what to do, protesting that

2    Sarita was still her mother, even though she didn't like

3    that the defendant was not allowed to see her anymore.

4        This wavering, this failure to cast aside her

5    mother in favor of the defendant, it was too much of an

6    insult for the defendant to bear.  The defendant

7    informed her he was quote "finished with her."  Finished

8    with the niece of his girlfriend.  That he was quote

9    "done with her."  Not because she didn't do her

10   homework, not because she didn't do chores or summer

11   reading or because she misbehaved in any way, shape or

12   form.  No, he was done, he was finished with a

13   13-year-old because she quote "wants to go with the

14   enemy," her mother.

15       Millinia, going by Patty, tells the defendant

16   she loves him and sends him photos of them together in

17   his white truck out on trips doing fun things together

18   over the past year.  And you will read the defendant

19   tells her that he still loves her, but immediately

20   demands back from her her clarinet, the instrument that

21   he paid for but that she needed to play in her middle

22   school band.  Her betrayal had to cost her.  He had to

23   get that back.

24       He accuses her of being quote "brainwashed by

25   her bum mom."  The defendant decided she has to learn a

1     lesson, so then, although he had been in contact with

2     her over the cell phone upwards of a dozen times that

3     day, he just stopped picking up.  In the phone records

4     you will see Millinia desperately attempting to call

5     him, the 55-year-old boyfriend of her aunt, calling him

6     approximately 39 times in approximately a few minutes

7     that night.  And then after that, the texting continues.

8         Millinia does say something ugly.  She

9     threatens to cut his dick off so that no one else can be

10    quote "smashed by him."  The evidence will show you that

11    means to have sex with him.

12        The only part of that sentence that disturbed

13    the defendant, however, was that she threatened to

14    castrate him.  The obvious sexual inferences don't

15    appear to surprise him at all.  He continues to chat

16    with a 13-year-old girl for hours after she said she

17    would cut his dick off.

18        He tells the girl that her mother doesn't like

19    him because she quote "can't control him."  He tells the

20    girl that she is quote "fucked up and troubled thanks to

21    her mother."

22        And then after over a dozen completed or

23    attempted phone calls over the next hour, Millinia

24    texted the defendant plaintively quote "just give me one

25    more chance."  She explains she only threatened to

1       castrate the defendant because his penis belonged to

2       her.

3                   Now, the defendant's response, the evidence

4       will show, was not to say that's inappropriate.  It was

5       not to go get her mother.  It was not even to stop

6       texting her or stop calling her.  The defendant's

7       response was simply two words, quote "that's selfish."

8       Selfish for a 13-year-old girl to demand her sexual

9       abuser's fidelity.

10                  That's when Millinia continues to beg and the

11      defendant finally offers her one more chance, but then

12      again changes his mind, saying he needs to smash, to

13      have actual sex, to have actual vaginal intercourse, as

14      the evidence will show, which, thankfully, at that time

15      was a bridge that he had not dragged Millinia across.

16                  He texted quote "don't keep me on hold."

17      Also, "you will lose me to somebody else."  Texting this

18      to the 13-year-old.  He informs her then she's going to

19      lose her clarinet, her money, her music.  She's going to

20      lose everything, including a bank account that he

21      allegedly opened for her without her mother's knowledge.

22                  Ladies and gentlemen, nowhere in those texts,

23      nowhere will you see that he accuses her of doing

24      anything actually wrong.  Anything other than making him

25      wait.  Anything other than not choosing him over her

Opening Statement - People                          390

1    mother.

2          And around approximately 10:00 p.m. there are

3    a few more texts, a few more phone calls and then a

4    noticeable gap in time.  And then after that gap, a

5    message from the adult, from the defendant, the

6    55-year-old who was right upstairs, quote "you left

7    without saying good night or anything."

8          Millinia's response, I didn't want to wake

9    you.

10          Ladies and gentlemen, Millinia will take the

11   stand and she will fill in that gap.  She will tell you

12   that that night she went upstairs.  She entered the

13   defendant's bedroom and, like so many times before, like

14   so many times since the end of her sixth grade year,

15   like so many times since she was 12, past her 13th

16   birthday, throughout her seventh grade year, through and

17   including that night, Millinia will tell you that yet

18   again this defendant sexually abused her.

19          She will tell you how he exposed his penis.

20   How he would masturbate.  How he would grope her breasts

21   and buttocks.  How he rubbed her vagina.  How he placed

22   his mouth on her vagina, licking it.  How because

23   Millinia would not willingly allow the defendant to

24   place his adult penis in her 13-year-old mouth or place

25   his penis in her vagina, he would compromise with her.

1   He would have her flip over and just rub his erect penis

2   on her buttocks until he would ejaculate onto her.

3          Millinia will sit and tell you how the

4   defendant, dozens of times, dozens upon dozens of times

5   did this to her.  Did this to her in her grandmother's

6   home when her aunt was out with friends.  When no one

7   was protecting her from the nice generous man that lived

8   upstairs.

9          How the defendant did this to her countless

10  times parked at the National Wholesale Liquidators or

11  once at the old Western Beef just up the road.  It would

12  happen in these locations when they were on their way

13  back from the many, many trips that they took to

14  Brooklyn to visit the defendant's other family.  Trips

15  that only Millinia, out of all the children and the

16  adults, not even the defendant's own girlfriend, only

17  Millinia was invited to go with the defendant on the

18  weekends through sixth and seventh grade in school.

19         After all that, after all he had done for her

20  and to her, how thoughtless it must have seemed to him

21  for her to leave without saying good night.

22         Millinia will tell you also about a time

23  before this was her life.  She will tell you about a

24  dance performance that she had at a talent show in her

25  middle school where she danced to "Want You Back" by

1    Cher Lloyd with one of her best friends.  Her mother was

2    in the audience.  It was a moment that was a happy

3    memory, but a mile marker in her life.  Because it was

4    soon after this, not before this when the defendant

5    first started taking an interest in Millinia.

6            It was her last quarter of sixth grade when he

7    started to tell her she was pretty.  When he started

8    buying her ices and eventually offered to take care of

9    paying for her phone because her uncle and father could

10   no longer do that.

11           It was around this time that Millinia also

12   started hanging out with the defendant, her new

13   54-year-old friend.  They would watch wrestling together

14   in his room.  She would run upstairs and hop on the bed

15   because there was often no working television down in

16   the basement.

17           At some point the defendant started to close

18   the door and then at some point while she was still in

19   sixth grade the defendant started rubbing her back and

20   then one day the defendant took his hand, placed it down

21   the back of her clothes and grabbed her buttocks inside

22   of her underwear.  And she said to him, What are you

23   doing?  And he said back, What are you doing?

24           Nothing more happened that day.  He stopped.

25   She eventually left.  She didn't tell anyone.  But she

1     went back.  And soon thereafter the evidence will show

2     that when she came back the defendant realized he could

3     be bolder, so one day when it was warmer out before she

4     still finished her sixth grade year, he put his hands

5     inside her clothes again, but this time also rubbed her

6     in her breast area and vagina all while he was still

7     rubbing himself in his boxer shorts as he sat next to

8     her on the bed.

9           Alone in the room with her, this continued all

10    summer.  And this was the summer when they started

11    taking trips to Brooklyn to go to the aquarium, to go

12    get ices, to go get ice cream, to visit his other

13    family.

14          Now, first these trips on the way back were

15    not eventful.  Soon that changed as well.  Instead of

16    straight home in the evenings, they would stop at

17    National Wholesale Liquidators in West Hempstead on the

18    border of Hempstead, a few miles from home, still Nassau

19    County.

20          They would stop, however, not to go shopping.

21    They would stop and he would say get in the back seat.

22    He would have her take off her pants or shorts and he

23    would do the same.  Millinia will explain to you how he

24    would play with himself.  How he would rub his penis.

25    How it would get hard and bigger.  How it would point

Opening Statement - People                                           394

up.  How he would kiss her, rub her breasts under her
shirt, her bottom and her vagina.

At some point that summer before she started
seventh grade in 2013, the defendant would place his
mouth on her vagina and lick it.  He would tell her,
then 12-years-old, that he wanted to have sex with her.
Saying he wanted to smash her and also saying he wanted
to fuck her.

At some point that summer he would then start
to take her hand and place it on his penis.  He would
have her masturbate him and it was in that truck that
Millinia will tell you how she remembers the defendant
climaxing, having an orgasm.  How he would curse when
that would happen and then watery white stuff would come
out of his penis.

Millinia and her mother will both tell you how
she would go that summer and throughout seventh grade
year two, three times a month out with the defendant on
the weekends to Brooklyn.  All throughout the time she
was in seventh grade.

Millinia will tell you how more often than not
this was how the trips ended, all the way through the
summer, through September, through October, through
November and through December.  During this time she
would also, multiple occasions during any given month,

1    visit the defendant in his bedroom at night or in the

2    afternoon.  The sexual contact continued.  The oral

3    sexual contact continued and it was in this bedroom

4    before she reached her 13th birthday where he would get

5    on top of her, have her face down and rub his penis

6    against her butt until he ejaculated.

7             Around this time when Millinia was still 12,

8    the defendant got Millinia a new cell phone.  She didn't

9    ask for it.  Her mother didn't ask for it.  And he

10   didn't tell her mother he paid for it.  He didn't tell

11   anyone he bought the phone for her at all and that would

12   be one of eventually two cell phones this defendant

13   purchased for Millinia Johnson, that he would buy for

14   her to keep track of her, to control her, to manipulate

15   her, to ensure that she was his and no one else's.

16            He would start to call and they would start to

17   call back and forth and they will start to text more and

18   more.  It will become every day, multiple times a day.

19            You will hear from Millinia and you will see

20   in the defendant's phone records all these calls on this

21   new phone happening while she's being seduced and

22   sexually molested by this defendant.

23            Millinia and her mother will explain to you

24   that she turned 13 on December 30th of 2013.  The judge

25   will explain to you at this point she ages out of the

1    statute defining the crimes of course of sexual conduct

2    in the first and second degree.  But the evidence will

3    show you that this technicality obviously had no meaning

4    for the defendant.

5              The evidence will show you that the abuse

6    continued unabated past her 13th birthday through

7    January, February, March, April, May, June into the

8    summer after seventh grade year.

9              Millinia will tell you and you will see in the

10   text messages from the final weeks of that abuse in

11   August of 2014 that she thought at times she loved the

12   defendant or at least that he loved her and she liked

13   the attention and the gifts, maybe him.  He promised her

14   a car.  He promised her that he and she would live in a

15   house together some day.

16             You will learn these promises were targeted at

17   Millinia and had their desired effect because of the

18   life Millinia lived.  Millinia's mother, Sarita Johnson

19   who will also testify here, just like any one of us,

20   she's not a sinner, not a saint 100 percent either way.

21   She's not wealthy.  She's not employed, training for

22   work with DSS.  She's not highly educated.  There aren't

23   many gifts in this house.  There is not a lot of money

24   and not a lot of hope going around.

25             Millinia, she's a teenager.  You will see that

1    she likes being given money like any teenager would.

2    She likes being given clothes.  She likes being given a

3    new free phone.  She wants these things just like any

4    teenager would.  And like any teenager, the evidence

5    will also show she wanted a father.  Hers is not there

6    and when he is, he doesn't have much money himself than

7    her mom and has far less time for Millinia.

8              You may think Sarita should have done

9    something sooner and you may be right.  What the

10   evidence will show you is that Sarita Johnson, the

11   mother of Millinia, when she was finally confronted with

12   the reality and the possibility of what was happening to

13   her daughter, when she finally saw the text messages,

14   she was and acted like Millinia's mother.  She took

15   repeated and definitive steps to protect her daughter

16   from this defendant.

17             By the summer of 2014 Sarita decided her

18   daughter was too close to this 55-year-old man.  She was

19   spending too much time with him, not enough time with

20   her own family and not enough time with friends her own

21   age.

22             During that summer she told Millinia she

23   couldn't go to Brooklyn.  She became angry, distant and

24   fought with her mother about it, repeatedly accusing her

25   of being jealous of the relationship she had with the

1    defendant.

2              Sarita, for all her faults, laid down the law

3    and didn't allow Millinia to go to Brooklyn anymore.

4    She also emphatically stated to Millinia in front of the

5    defendant that she was too old to be hanging out with

6    him alone in his bedroom any longer.

7              Although it was easy enough to make sure she

8    didn't run off to Brooklyn on the weekends in the

9    defendant's truck, it was harder to make sure the two

10   didn't have contact at home.  Thus, Millinia will tell

11   you, now in July and the first weeks of August 2014, the

12   sexual abuse continued at her home.  The defendant

13   having her repeatedly come up to his room.

14             August 8th the defendant tells her 9:18 p.m.,

15   come up to the room once her mother's gone.

16             Millinia writing back, she's scared because

17   her mother already threatened to call the police.

18             Then you will see the same pattern all over

19   again, the defendant's threats against Millinia's

20   mother.  Millinia's request for her phone to get paid.

21   The defendant promising to cut her off if she doesn't do

22   what he wants.  A long silent evening.  Multiple late

23   night phone calls between the two and a text from

24   Millinia at 12:37 a.m., Ray Ray, if I lose you, I'm

25   afraid I would lose who I will always love.

1          But that summer, that summer thankfully this

2     cycle gets broken and it is Sarita Johnson who breaks

3     that cycle.

4          Ms. Johnson will tell you how she came home in

5     early August and found the two of them alone after she

6     said they were not allowed to be.  She found them in the

7     defendant's room, the door closed, both on the bed.

8     Millinia will explain the defendant had just started to

9     rub her body when her mother knocked on the door.  They

10    stopped.  Millinia's mom ordered her to go back

11    downstairs and nothing else was said that night.  But

12    more was done.

13         A few days later Sarita took the phone as she

14    slept and she looked at the text messages between her

15    and the defendant and she was alarmed.

16         She confronted Millinia who became angry.  She

17    cried.  She sobbed.  But Millinia didn't tell her about

18    all the sexual conduct.  At that time Millinia refused

19    to fill in the gaps for her mother.  She was

20    embarrassed.  She was in trouble.  She was conflicted

21    about how she felt about the defendant.  She didn't want

22    to lose out on all the attention, the gifts.  She didn't

23    want to go back to living the life her mother couldn't

24    provide her without the defendant being there.

25         Ms. Johnson, with what to her were obviously

1    inappropriate texts between a 55-year-old man and

2    13-year-old girl, went on August 10, 2014 to the

3    district attorney's office.  She filed a complaint about

4    just the texts and the unrelenting attention and

5    aggressive behavior that she saw the defendant exhibit

6    towards her daughter.

7          She didn't know whether or not the defendant

8    was sexually abusing her daughter.  She didn't report he

9    had done that.  Therefore, through no fault of her own,

10    the Criminal Complaints Bureau did what all

11    bureaucracies do with that limited report.  They took it

12    and filed it.

13          Ms. Johnson kept her daughter's phone.  She

14    watched her like a hawk.  Millinia didn't go to

15    Brooklyn.  She didn't go to the defendant's room and she

16    eventually started eighth grade.  No more texts, no more

17    calls for maybe two months.  Maybe that is where it

18    could have just ended sadly.

19          The evidence will show Sarita didn't go

20    breaking down doors in the courthouse or show up

21    repeatedly at the DA's office.  She wasn't demanding

22    action at every moment, seeking the defendant's head on

23    a platter.  For better or worse, out of ignorance, maybe

24    out of hope, maybe the worst didn't happen and it was

25    over and they can move on from this.  She trusted the

1       system and got on with their lives.  But it was the

2       defendant who couldn't move on, who couldn't let go.

3       Who couldn't just stay away from Millinia.

4              So, in October of 2014, he gave Millinia

5       Johnson a second phone.  Millinia, a 13-year-old girl

6       who had been cut off from her digital life with her

7       friends took that phone happily.  But this phone, the

8       evidence will show, was truly a secret phone.  One her

9       mother couldn't know about.

10             When the defendant started texting her on it,

11      you will read how he was concerned about who other than

12      her mother would know she had a phone.  Soon thereafter,

13      during the five days she had this phone, inappropriate

14      calling and texting recommenced.  Same numbers,

15      different phones.  Same cycle of love and rejection.

16      Same goal; control and access.

17             You will see in the phone records and in the

18      text messages the defendant's attempt to reestablish his

19      old ways.  But you will also see his growing impatience

20      and his frustration with Millinia Johnson.  She isn't

21      visiting him.  Instead, she's avoiding being alone with

22      him and you will read the defendant demanding that she

23      call, demanding that she will text him.  Threatening to

24      take the phone away again.  Not as a punishment, not for

25      doing anything except not giving him the attention he

1    required and the attention he felt he deserved.

2          He then writes quote "Don't worry, everything

3    is going back like before."  But Millinia is distant.

4    She's realizing she doesn't want it to go back to like

5    it was before.

6          Before anything more could happen, Millinia

7    thankfully got sloppy.  She forgot she's not supposed to

8    have a phone.  She missed the bus and called her mother

9    on that phone who, when she picked up, was shocked and

10    surprised that her daughter could be calling from her

11    old cell phone number when her mom still had that old

12    phone.

13          So, on or about October 17, 2014 she took that

14    phone from Millinia demanding she unlock it, looked at

15    the messages, confiscated it and Millinia this time

16    admitted to slightly more sexual contact; kissing,

17    touching, but not everything, not to her mother.  Not

18    when she was caught having the phone she wasn't supposed

19    to have.  She didn't immediately tell her mother at that

20    point.  She didn't tell her mother to her face the

21    defendant performed oral sex on her or he ejaculated on

22    her.

23          But with what her daughter told her, Sarita

24    again took action.  She went to the Child Advocacy in

25    Bethpage.  They then went to Family Court in Westbury,

1    got a stay away order of protection in favor of her

2    daughter against the defendant.  Finally back to the

3    district attorney's office to file a second complaint

4    written by Millinia with her mother still present though

5    and that new complaint now contained additional

6    allegations of kissing and inappropriate touching.

7          Pursuant to that order, the defendant moved

8    out and eventually, over a year later, Tara, still his

9    girlfriend, moved out to be with him.

10          Nevertheless, Millinia and her mother and her

11   sisters still live in the basement of that house, one

12   room sharing beds.  The only difference financially is

13   now they have to pay more of the bills associated with

14   Sarita and Tara's mother's house that once were paid for

15   by the defendant and by Tara.

16          After the defendant was gone, that second

17   complaint that Sarita and Millinia filed finally came

18   through the normal channels to the Fourth Precinct and

19   Squad of the Nassau County Police Department.  It was

20   assigned to a male detective, Rhubens Toussaint, signed

21   by a supervisor without any special instructions and

22   Detective Toussaint reached out to Sarita, attempted to

23   set up an appointment and eventually went to her home.

24          He went alone without a female officer,

25   questioned Millinia in the squad car separate from her

1    mother.  And Millinia was shy.  You will hear Detective

2    Toussaint describe her as embarrassed and upset to talk

3    about it with a stranger.  Slowly she opened up a little

4    more and for the first time explained the initial

5    details of her actual sexual abuse.

6              Sarita gave over the cell phones to the

7    detective.  Sarita also gave the detective the

8    defendant's cell phone number.  The detective called

9    that number, spoke with the defendant, identified

10   himself as a detective.  The voice on the other end

11   identified himself as the defendant and the detective

12   arranged to have the defendant turn himself in.

13             During that arrest the defendant gave his date

14   of birth, 3/31/1959, and cell phone number, the same

15   cell phone number that he had been using to text

16   Millinia for so long.

17             The day before the second secret phone was

18   taken, the defendant texted Millinia at 12:08 p.m.  The

19   day before it was gone, that connection was lost.  He

20   texted her quote "you will never know what's good until

21   it's gone.  Don't be stupid.  Nobody will ever treat you

22   like me again."

23             Nobody, no grown adult, no 54- or 55-year-old

24   man, no family friend, no alleged father figure should

25   ever treat Millinia who is 12 and 13 like that again,

1      he's right.

2             The evidence will prove beyond all reasonable

3      doubt that the defendant on or about and between March

4      1, 2013 and December 29, 2013 had repeated, monthly, if

5      not more than weekly, had sexual contact and oral sexual

6      contact for his own sexual gratification with Millinia

7      Johnson when she was 12-years-old and he was

8      54-years-old.

9             The evidence will prove this conduct continued

10     long after Millinia turned 13 and that along with the

11     messaging, the calling, the manipulation, the control

12     that the defendant executed against her was injurious to

13     her mental, moral and physical welfare when she was less

14     than 17 years of age.

15            The evidence will prove that the defendant is

16     guilty on all counts of all the charges that are before

17     you and, therefore, at the close of this case you will

18     have to come back with the only verdict that justice

19     demands, guilty.  Guilty of everything contained in the

20     indictment.  Thank you.

21            THE COURT:  Thank you, Mr. Perri.

22            Mr. Zerner.

23            MR. ZERNER:  Thank you, your Honor.

24            Good morning, Judge Murphy, good morning

25     members of the jury, good morning to the prosecutor.

Opening Statement - Defense                                    406

1        It's quite a story you just heard, but it's just a

2    story.  The prosecutor has taken bits and pieces of what

3    he's heard and he's done what he could do to make it fit

4    into the parameters of the New York State Penal Law.

5    You heard what he just said.  I hope you all paid close

6    attention to it and I hope you hold him to that.

7    Because again, we discussed this in jury selection, he

8    has the burden to prove these things.

9            Those were ugly things he just said.  We

10   talked about it during jury selection.  If you had to

11   vote before you saw any evidence, you have to vote not

12   guilty.

13           Judge Murphy just told you this morning,

14   opening statements are not evidence.  Everything he just

15   said to you is not evidence.  It's not evidence.  He has

16   to be able to prove each and every one of these

17   allegations that he's telling you right now.  If you are

18   unsure, just keep that word in mind, unsure.  We all

19   talk about beyond a reasonable doubt, presumed innocent,

20   what does the standard mean.  Just think to yourself, if

21   you are unsure, he's not guilty now, and he stays not

22   guilty.

23           Let me address the situation that we were

24   talking about in this home.  Ray Ross has been dating

25   Tara Johnson since before Millinia Johnson was born.

Opening Statement - Defense                          407

1    Ray and Tara have not gotten married, but Ray and Tara

2    have been together and are still together for about 16,

3    17 years.  You know how I know that?  I have had

4    multiple conversations with Tara Johnson.  But don't

5    worry about my conversations with Tara Johnson, Tara

6    Johnson is going to take that witness stand and she's

7    going to tell you.

8              So think about the family dynamic in this

9    household, all right.  Tara Johnson is the aunt of

10   Millinia Johnson and Tara Johnson is the long-time

11   girlfriend of Ray Ross.  She's better suited than

12   anybody in this room to know what was going on in that

13   house, what was going on with her niece and perhaps,

14   most importantly, with what was going on with her

15   sister, Sarita Johnson.

16             Now, the prosecutor is going to start calling

17   witnesses and I don't know if he's going to call Sarita

18   Johnson and then Millinia or he's going to call Millinia

19   and then Sarita, but you will hear from both of them,

20   I'm sure of it.  Again, just like you felt before I

21   stood up, both of them are going to tell you a very

22   powerful story.  They have been working on that story

23   for a year-and-a-half or two years.  They have had the

24   prosecutor helping them, preparing them for this day for

25   a year.  And again, when they're done answering

1    questions from the prosecutor, you are going to feel

2    awful and you are going to feel like let's stop the

3    trial right now, let's find a noose, let's find a

4    guillotine, let's just kill Ray Ross right now.  But

5    again, you have to listen to everything and you have to

6    wait for not just the questions that any witness is

7    getting from the prosecutor, but listen to the questions

8    that they get not only from myself, defending Ray Ross,

9    but the Judge may ask questions also.

10          There may be times when the Judge is saying

11    well, wait a minute, what was this and the Judge might

12    interject and ask something of any witness.  Let's just

13    keep that in mind.  Listen to everything along the way.

14          Now, this home in West Hempstead is the major

15    asset in the Johnson family.  The home is owned by

16    Pauline Johnson who is in her mid-80s who is living in a

17    home, who, unfortunately, it's my understanding,

18    medically is unable to come and testify.  But she's the

19    owner of this home.  And I'm not a real estate

20    appraiser, I can't give you a precise dollar amount, but

21    this family has had this home for a long, long time and

22    this is ultimately what most of what we're talking about

23    here boils down to.

24          Pauline Johnson has two daughters, Tara

25    Johnson and Sarita Johnson.  Tara Johnson, again, Ray

1    Ross' girlfriend.  Sarita Johnson, Millinia Johnson's

2    mother.  These two sisters are very different.  You will

3    hear that Tara Johnson has worked for 20-odd years at a

4    bank.  She works a regular job, gets up every day and

5    goes to work.  She has a child and she has tried to help

6    with her sister's children, with her nieces and nephews.

7           Sarita Johnson has four children by three

8    different men.

9           MR. PERRI:  Objection.

10          MR. ZERNER:  And you are going to hear --

11          THE COURT:  Overruled.

12          Mr. Zerner, please.  Maybe you didn't hear.

13          MR. ZERNER:  All I heard was a chair move.

14          THE COURT:  When you hear a chair move, stop

15    and see why the chair is moving.  There was an objection

16    and it's overruled, but I need an opportunity to rule on

17    the objection.

18          MR. ZERNER:  I apologize, your Honor, and

19    sometimes I'm so in love with my own voice that I don't

20    hear.

21          The Judge tells you when he overrules an

22    objection, it means I'm allowed to say what I'm saying.

23          And ask yourself why the prosecutor is so

24    interested in you not knowing that Sarita Johnson has

25    four children by three different men.

1              MR. PERRI:  Objection.

2              THE COURT:  That objection is sustained.

3    Please move on.

4              MR. ZERNER:  So Tara Johnson has always helped

5    with her nieces and nephews.  And the fathers of each of

6    those children are around and you are going to hear from

7    at least one of them testifying for the defense.  And

8    again, I ask that you listen very clearly and very

9    intently, because the one thing we can all agree on is

10   nobody in this room right now, except for Ray Ross, has

11   been to that location, knows the people involved, has

12   history with the people involved.

13             So you are going to hear different stories

14   from different people and we talked about the order of

15   these things.  The prosecutor goes first and the

16   prosecutor asks his questions of his witnesses first and

17   you are going to be angry about what you are hearing

18   because if it was true, it's awful.  It's not true.  Ray

19   Ross has been falsely accused of this crime and there is

20   a reason for it.

21             You are going to hear from various people in

22   Sarita Johnson's life that will tell you that Sarita

23   Johnson has manipulated and alienated multiple people in

24   her life, including the fathers of her children,

25   including her sister.  And you are going to have a

1    better idea after you hear everything from everyone.

2          Ray Ross has never been accused of a crime his

3    entire life.  Ray Ross is a church going man.  He tithes

4    his ten percent of his income to his church.  The way

5    you have been hearing this, it sounds like Ray Ross is

6    like the monopoly guy with the top hat on, that he's

7    just this wealthy guy that is spreading money all around

8    and owns the world.

9          Ray Ross is a sanitation worker.  He's a hard

10   working man.  He gets up and goes to work early in the

11   morning.  He goes to church on Sundays, has three

12   children.  You will hear from them.  You will hear from

13   his ex-wife.  Ask yourself, and we talked about divorce

14   and everything else during jury selection, this is a man

15   who has been accused of these awful crimes and the woman

16   that he is not the husband to in 17, 18 years, will

17   testify for him, all right.  Ask yourself what that

18   means about Ray Ross.  Think about that.

19         And I have only been talking to you for about

20   ten minutes, but I am pleased that I have gotten about

21   11 of you to unfold your arms and I understand.  Body

22   language is something that we pay attention to and I

23   understand.  It's awful.  I was sitting listening to

24   Mr. Perri paint this picture also.  All I'm asking you

25   to do is listen to everything all the way through

1    because first you are going to hear from, I don't know,

2    six, seven, eight different witnesses the prosecutor is

3    going to call, all right.  And again, you heard in his

4    opening statement the prosecutor tell you the reasons

5    that anything might not have been the way it should have

6    been.  So I think just towards the end of his statement

7    he said well, Detective Toussaint, who is a gentleman,

8    he's a man, went to the complainant's home by himself.

9    And because he did that, that there were problems with

10    what was received or the statement that was taken by

11    Detective Toussaint.

12           So, okay, the prosecutor has to prove each and

13    every element and these are his witnesses, but he's

14    already making excuses for these witnesses.  So either

15    the detective knows what went on or the detective went

16    and he messed things up or he didn't follow protocol.  I

17    don't know.  We'll find out.  He's going to testify.

18    But the one thing he keeps telling you is that well,

19    whatever the complainant did, we really shouldn't

20    nitpick at it.  We shouldn't really, you know, anything

21    she did that isn't consistent, there is a reason for it.

22    Anything she did that was consistent, you have to

23    believe.  Again, keep an open mind.

24           We talked about this during jury selection

25    that I'm going to have to ask her questions.  There are

1   going to be times you will be saying to yourself, he

2   should back off.  There will be plenty of objections.

3   The prosecutor has been objecting already and we haven't

4   really gotten started.  But please realize that my

5   client sits here innocent.  He's not guilty.  He's being

6   falsely accused and these folks are telling a story and

7   you have to allow me to do my job.

8          And let's examine what's being said, why it's

9   being said, how it's being said.  Let's look at that.

10  That's what our job is here, right.  We're really trying

11  to find out can we figure out what happened and if we

12  can't, if we're unsure, if at the end of eight, nine,

13  ten days, whatever it ends up being, if you are still

14  not sure, if you have a picture, as I expect you will,

15  of a dysfunctional home with extended family, with

16  multiple generations, with multiple parental figures,

17  and if you say to yourself at the end, I don't know what

18  happened in there, all right, it's just not clear, I'm

19  unsure about what happened, you can't convict this man.

20         Now, in that same vein, the prosecutor has put

21  forward charges and, again, they're only charges,

22  powerful charges and he decides what the charges are

23  going to be.  The prosecutor gets to literally draft the

24  charges, write the charges, right.  He does that after

25  he speaks to his witnesses.  So he had plenty of time to

Opening Statement - Defense                              414

1    speak with Millinia Johnson and Sarita Johnson before he

2    went into the grand jury and before he decided what he

3    would charge my client with.  And you will eventually

4    see the actual language of those charges at the very

5    end, all right.

6              I was taught that's where you start.  My first

7    day in the DA's office I was told look at each and every

8    element.

9                    (Pause in the proceedings.)

10             MR. ZERNER:  I'm sorry, I thought I heard

11   something.

12             THE COURT:  You heard the chair move, but

13   there is no objection.  You can continue.

14             MR. ZERNER:  That's where I am going to ask

15   you to finish when you have the opportunity to look at

16   the charges and ask yourself how do you defend yourself

17   against an allegation that over a nine-month period of

18   time you did something.  Nine months, 275 days.

19             MR. PERRI:  Objection, your Honor.

20             THE COURT:  Ladies and gentlemen, just recall

21   my instruction earlier that neither the prosecutor's

22   opening statement nor the defense opening statement is

23   evidence.  You will make your determinations based on

24   the testimony and other evidence that is presented to

25   you at trial.

1                Please move on, Mr. Zerner.

2                MR. ZERNER:  Of course.

3                So again, you will take a look at the language

4        and you will decide for yourself is there proof beyond a

5        reasonable doubt that Mr. Ross did any of these things

6        at any time.

7                Now, again, the prosecutor is claiming that

8        starting in March of 2013 something was going on.

9        That's what he's claiming.  The first time any legal

10       governmental officials are involved with any of that

11       stuff appears to be August of 2014.  That's the first

12       time.  So that's August 2014 and now we stand here

13       today, February 2016.  Just think for yourself if you

14       were accused of anything, anything, going back 34

15       months, 35 months, how do you start?  How do you start

16       to show what --

17               MR. PERRI:  Objection.

18               THE COURT:  Overruled.  Continue.

19               MR. ZERNER:  Thank you, Judge.

20               Now, the prosecutor hits you over the head

21       about one particular incident that he's claiming

22       happened on a particular day at a particular time.  But

23       when you get a look at the charging sheet, when you get

24       a look at the charge, itself, ask yourself why he didn't

25       simply charge that.

1          I don't know if any of you used Superbowl

2    boxes.  You watched the Superbowl a couple of days ago,

3    right.  I'm always amazed at how complex they can be.

4    You get zero and three and you are psyched.  Those are

5    good numbers.  Other times the numbers change, first,

6    second, third, fourth quarter the number change.  Then

7    there are boxes every time there is a score change.  If

8    it's six nothing, somebody wins.  Then there is an extra

9    point and somebody else wins.  Not me, I'm very busy

10   with trial preparation and I might have had some gluten

11   free pretzels and chips.  Somebody was telling me about

12   a $150,000 box.  I'm sure it wasn't in this county.  It

13   wasn't legal.

14          They explained every time anybody scored there

15   was a payoff and the boxes touching, it paid off.  I'm

16   not a horse racing guy, but apparently there is stuff

17   like that where the touching close by you also get a

18   payout of a different amount.

19          That's what the prosecutor is doing here.  He

20   can't prove one particular thing --

21          MR. PERRI:  Objection.

22          THE COURT:  Overruled.

23          MR. ZERNER:  -- so he's trying to encompass

24   it.  Ask yourself why he keeps objecting.

25          THE COURT:  Mr. Zerner.

Opening Statement - Defense                    417

1           Ladies and gentlemen, let me interrupt

2    Mr. Zerner right there.  As I have indicated to you

3    earlier, objections are part of the process.  They are

4    absolutely permitted and the Court will make a

5    determination whether the objection is a proper

6    objection or an improper objection under the rules of

7    law that apply to this particular case.

8           So, please don't take any exception, if you

9    will, to my rulings with regard to an objection, okay,

10   or the fact that an attorney has made an objection.

11          That being said, Mr. Zerner, please continue

12   but don't offer your opinions with regard to why your

13   adversary counsel is offering an objection.

14          MR. ZERNER:  Your Honor, perhaps we should

15   have sidebar.

16          THE COURT:  No, sir, continue please.

17          MR. ZERNER:  Thank you.

18          We talked during jury selection about what if

19   you were charged with a crime.  It came up each of the

20   three days with the jury selection.  I know not

21   everybody was here for every day with everything.  What

22   if it were you?  What if it were you?

23          Now you have been told over and over again by

24   the judge that I don't have to put on a case.  I don't

25   have to even do this opening statement.  Maybe some of

1    you are wishing that I wasn't.  But you are hearing from

2    me now and you are going to hear from Ray Ross at the

3    end of the case.

4            Frequently you have the situation where you

5    say I want to hear everything.  Where you honestly say I

6    don't know.  That's what you honestly have to say.  We

7    also discussed this during jury selection:  If you had

8    to vote right now, you would have to vote not guilty.  A

9    lot of people hesitated when I asked that question and

10   the hesitation is right, because the hesitation is well,

11   what are you asking me?  Obviously, I can't do anything

12   now.  We haven't heard anything yet.

13           The same situation now.  I know it's day four

14   and it snows every day now for some unknown reason.  I

15   know it's been a long four days and we have a lot of

16   days ahead of us, all right, but just keep an open mind,

17   please.  That's your obligation.  It's the right thing

18   to do.

19           Again, imagine that you were charged with a

20   crime, all right.  We're going to hear a lot of stuff.

21   I'm down to only one set of the folded arms.  You are

22   going to hear awful allegations.  They're just

23   allegations, that's all they are.  There is a reason

24   behind it, so please look for that as you hear from

25   various witnesses coming forth.

1          So, now as we discussed, you are going to hear

2     from Millinia Johnson.  She's going to be a very

3     sympathetic individual.  Now Millinia Johnson had an

4     extended family filling in where her mother could not.

5     She had a loving aunt that was in the household.  She

6     had older siblings.  She had a grandmother.  She had a

7     safety net.  We talked about it takes a village.  She

8     had a safety net.

9          You are hearing about cell phones.  The first

10    cell phone she got was from her father.  Other people

11    that were in her life were her half siblings' fathers.

12    These men tried to have an influence in their own

13    children's lives and in the lives of the children's half

14    siblings.  So again, keep that in mind when you hear

15    about different things.

16          You will hear from Ray Ross' children who are

17    not technically related to his girlfriend's sister's

18    children, right.  But that wasn't the way they acted

19    towards each other.  They acted as a family.  And you

20    will hear how the different people in the family were

21    treated.  How they treated each other.  And ask yourself

22    when you hear about how Ray Ross acted towards any of

23    the children.  Keep in mind the possibility is that Ray

24    Ross bought ices for all the children because he's a

25    kind and generous man.  If he bought ices for all of

Opening Statement - Defense                     420

1       Sarita Johnson's children and for Tara Johnson's child

2       and for his own children, it could be that he was buying

3       ices because he was a nice guy and he was doing the

4       right thing, not because he's grooming one of them as a

5       possible victim or a later victim or anything like that.

6       Keep that in mind, please.  Please keep that in mind,

7       all right.

8               Aunt Tara is still Aunt Tara.  Aunt Tara tried

9       to stay and support not only Millinia Johnson but the

10      other nieces and nephews in the house for a year.  So

11      again, keep the time line in mind, right.

12              You have the matriarch of the family, Pauline

13      Johnson, moves into an assisted living.  She's not in

14      the home anymore.  That home you have these two sisters,

15      Tara and Sarita Johnson, and you have multiple other

16      people, multiple generations.  The family tree extends

17      left, right and down.  And the bills are being paid in

18      the household by a hodgepodge of everybody.

19              Again, Ray Ross is a good man and a generous

20      man, but he's not a wealthy man.  He's working a regular

21      job.  Tara Johnson is working a regular job.  Sarita

22      Johnson is not working.  I don't know if she's

23      contributing in any way, shape or form, but the way this

24      house stays together, the way the oil bill gets paid,

25      the way the cable bill gets paid, the way there is food

1     in the refrigerator, it comes from Tara and Ray.

2              Then in an attempt to control what's going on

3     with the household, there are times when there are

4     issues between Sarita and the various fathers of her

5     children.  But Ray Ross has a right to be there.  Ray

6     Ross is the guest, a one time paramour of Tara Johnson.

7     He's lived there for years and years.  He's in a

8     committed relationship with Tara Johnson.  This is Tara

9     Johnson's home.

10             Now, Sarita and Tara don't see eye to eye.

11    It's amazing that they are sisters because they are so

12    different from each other, but they are sisters and this

13    house belongs to both of them.  You will hear Tara

14    Johnson tell you that she got up in the morning, went to

15    work in the bank, got home at night and tried to have

16    little, if anything, to do with her sister.  These are

17    two women in their fifties and they co-existed.

18             Now, Tara wasn't trying to get Sarita to move

19    out.  Tara was trying to support Sarita, Sarita's

20    children, help mother them.  You are going to hear

21    testimony and I started to allude to it before, before I

22    was interrupted, that Ray's ex-wife Paula was also at

23    that home, along with his current long-time girlfriend,

24    and Paula does hair.  She's a hair dresser.  And you are

25    going to hear that Paula would come to this house and do

1          the hair of Millinia and the other girls in the house.

2                     Think about how much positivity there is for

3          his ex-wife to still be active in his life with his new

4          extended family.  Think about that.

5                     So, Sarita tries to bring charges in August of

6          2014 and the DA is telling you well, there was a failing

7          in the system and it was someone that wasn't trained and

8          they weren't sure and it ended up in a drawer.

9                     So Ray is still living in the house, Tara is

10         still living in the house and Sarita is there most of

11         the time because she's not working and she doesn't like

12         it and she, again, goes to Family Court and she makes

13         herself heard, let's put it that way.  And she gets an

14         order of protection which now requires that Ray Ross

15         move out of the home.

16                     So she's already gotten the fathers of her

17         children to not be active in their lives.

18                     MR. PERRI:  Objection.

19                     THE COURT:  Objection sustained.

20                     Please limit your comments to your challenges

21         to the People's case.

22                     MR. ZERNER:  So Sarita Johnson now has Ray

23         Ross removed from the home and Ray Ross moves out.  It's

24         not his home.  He's not married to Tara.  He moves out.

25         He doesn't put up a fuss.  He moves out of the house.

Opening Statement - Defense                    423

1     And Tara is conflicted.  She stays there because she

2     wants to be there for her family.  These kids are her

3     nieces and nephews and she's trying to be there for

4     them.  But she never, never, you will hear her, and

5     Mr. Perri will have the chance to cross-examine her,

6     hear what she says, how she says it, she never waivers.

7     She's with Ray.  She doesn't believe this.  She believes

8     that he is falsely accused and she will testify for Ray

9     Ross.

10          But now a year goes by and Tara does move out

11    because things in the home are just becoming untenable.

12    So this house that was so important to everybody, now

13    it's just Sarita and the kids living there and I don't

14    know why she would still be living downstairs if there

15    is an upstairs.  Maybe we will hear that during the

16    course of the People's case.  That was something

17    Mr. Perri said in his opening statement.  But they have

18    a whole house, at one point upwards of 12 people living

19    in it, and now it's down to maybe five or four people

20    living in it.  So I don't know why five people would be

21    living in one room if there are three empty rooms.  But

22    maybe we will have an explanation to that.  Or maybe you

23    will be told there is no explanation, but you have to

24    just accept that.

25          You don't have to just accept that.  Demand

1      answers.  And if you are unsure, that's what reasonable

2      doubt is.  You are not sure.

3              Now, we also talked about during jury

4      selection that we're not going to give anybody extra

5      credit when they testify, right.  It's Long Island.

6      There are a ton of police that live on Long Island.  I

7      have worked with tons of police.  My neighbor is a cop.

8      Again, it's one degree of separation.  I believe there

9      are about 5,000 police officers.

10              THE COURT:  Mr. Zerner, excuse me, this is

11     opening statement, this is not jury selection, so that

12     bridge has been crossed.  So if you are talking about

13     witnesses, please talk about the witnesses without the

14     preparatory introductions.

15              MR. ZERNER:  Just trying to tie it together.

16     Some of the jurors haven't been here since Thursday,

17     your Honor, I'm sorry.

18              The point is you will hear from police

19     personnel and we talked about garbage in, garbage out.

20     If they have bad information, these are bad charges.

21              You also said you are not going to give any

22     witness any more credibility.  I expect there will be a

23     box of tissues at the witness stand and you will have

24     people crying.  It's awful allegations, but again, keep

25     in mind that they are just another witness who is

1       telling another story.

2               If you are unsure, despite the fact you have a

3       crying child or a screaming mother or any of that,

4       understand that you have to evaluate their credibility

5       as a whole, all right.  Don't let the meter of your

6       believing any particular witness be set until we're

7       done, okay.  Listen to everything.  Because here, I'm

8       standing here right now with you on February 9th and you

9       might hear from Tara Johnson today.  I'm sorry, you

10      might hear from Sarita Johnson today.  But I want you to

11      remember what I'm telling you about Tara Johnson.  You

12      won't hear from Tara Johnson until probably seven,

13      eight, nine days from now.  It's very difficult to keep

14      it all together, that's what I'm saying.

15              If you kind of imagine one of those red lines

16      that you turn right and it shows that if you like

17      something or you don't like something or one of the

18      surveys they give you at every restaurant, they give you

19      the iPad, tell me how the service is, if it's a nine or

20      ten.  Don't set those things until you are done with

21      everything.

22              Because Sarita Johnson comes in here and tells

23      you she's the mother of the year and she's doing her

24      best, despite everybody hurting her, wait until you also

25      hear from Tara Johnson.  Wait until you hear from Ray

1    Ross.  Wait until you hear about everything before you

2    set how you are evaluating any of it.

3            I didn't look over at the court reporter

4    before.  I'm not sure if I'm going to too fast or too

5    slow.  I think I'm probably doing a little bit faster

6    than preferred and I'm sorry about that, but the huge

7    benefit of having Kathi here, of having a court reporter

8    here is if you are unsure about anything, and I'll talk

9    about this again at my closing statement, everything is

10   there.  Everything we're saying there is a record of.

11   So whatever you hear today and you are trying to

12   remember and you can't talk to each other during the

13   trial and then at the end there is going to be

14   summations and you are going to say to yourself what was

15   said back on February 9th or February 10th, it's okay,

16   because all of it is right there available for you to

17   hear and for you to remember.

18            You may hear from a quote, unquote "expert

19   witness."  Please listen carefully to him as well.  Ask

20   yourself does he have an agenda.  Ask yourself does he

21   actually know the people involved?  Ask yourself is he

22   using hypotheticals?  Is he saying well, this is being

23   said and because of this, that must have happened?  Ask

24   yourself if he had an open mind when he started the

25   process or if he came into this with belief that then

1    tainted how he views the information that he's being

2    given and ask yourself why is he here, who is paying him

3    to be here, please.

4              Now aside from that, ladies and gentlemen, all

5    I really want to do is thank you.  This is one of the

6    most difficult cases that you are going to possibly ever

7    be a juror for your entire life.  It's difficult.  It

8    simply is.  Whatever you thought when you first got that

9    little card in the mail that told you to call in for

10   jury duty, you didn't think this.  You just didn't.  I

11   know you didn't.  But this is where we are.  And as

12   distasteful as some of what we're going to hear is going

13   to be, remember your oath, remember what we've been

14   discussing, that this man is presumed innocent, that

15   this man is the beneficiary of needing this case proven

16   beyond a reasonable doubt.

17             If you are unsure, you must come back with the

18   only verdict for all of these charges that Ray Ross is

19   not guilty.  Please keep an open mind.  Please listen to

20   everything.  Please don't prejudge him, as you would not

21   want to be prejudged if you were ever, God forbid, in

22   the position that he is in right now.  Thank you very

23   much, ladies and gentlemen.

24             THE COURT:  Thank you, Mr. Zerner.

25             So, ladies and gentlemen, we've been going for

1    a while now so what I'm going to do is give you a

2    five-minute break to use the facilities, stretch your

3    legs and such.

4             Remember my admonitions.  Don't talk about the

5    case.  Just take a break.  Quite frankly, a full break

6    until we call you back in about five or seven minutes,

7    okay.

8             (Whereupon, the jury exited the courtroom.)

9             THE COURT:  Okay, Counsel, five minutes.

10            MR. ZERNER:  I don't know if you want to do it

11   now or after we come back from the break, your Honor.  I

12   wanted to quickly put one thing on the record, if I may.

13   I apologize, your Honor, I have never tried a case

14   before you before.  However, last week I was given a

15   two-page trial instruction manual of sorts.

16            THE COURT:  Yes, sir.

17            MR. ZERNER:  And in that instruction I was

18   told that for objections there should be no colloquy and

19   if there is a problem we should ask for sidebar.  That's

20   all I did during what happened during the opening.  I'm

21   shocked that there were so many objections during the

22   opening.  It's not my practice to do that and I didn't

23   do that to Mr. Perri.  Obviously, it's his right to do

24   what he wants to do.  However, as we're on the precipice

25   of him calling witnesses, I simply want to obey the

1    rules of this courtroom and if I think that we need

2    sidebar, I think what you want is for me to ask for a

3    sidebar.

4              THE COURT:  That's correct, but I hold the

5    discretion and authority to either grant that sidebar or

6    deny it.  And with regard to the objection that was

7    sustained and you requested a sidebar, the Court, in its

8    authority and discretion, declined that request.

9              Now, if you want to put something on the

10   record outside the presence of the jury, you can.  I'll

11   give you that opportunity, but I was not going to

12   interrupt your opening statement with sidebar that I

13   thought was not required or appropriate at the time.

14             MR. ZERNER:  Okay.  Like I say, I'm not even

15   so much talking about during openings, I'm really

16   looking forward to the length of this trial, itself and

17   it seems to me that it's clear that Mr. Perri is going

18   to try to object on a frequent basis and that's fine and

19   I understand that and I see that coming, but I think

20   there will be multiple times that perhaps I think a door

21   has been opened and he doesn't and we're going to need

22   to have a sidebar and I know it slows things down.  I

23   don't want to do it, but I'm simply discussing it with

24   you now so that if and when this arise we have had this

25   preliminary conversation.

Opening Statement - Defense                    430

1              THE COURT:  Understood, Mr. Zerner.  I say

2    again, I reserve my right to decline a request for

3    sidebar.  Although I recognize that we would be in a

4    different posture when we're engaged in testimonial

5    evidence where an objection is lodged versus an opening

6    statement which is not evidence where an objection is

7    lodged, okay.  Does that assuage your concern?

8              MR. ZERNER:  To a certain extent, yes, your

9    Honor.

10             THE COURT:  Good.  I'll certainly always give

11   you the opportunity to make a record at an appropriate

12   time, but if I feel the objection should be sustained

13   based on the mere fact that an objection is raised, I'll

14   do that.  If there requires further explanation for the

15   record for appellate purposes, we'll do it outside the

16   presence of the jury at an appropriate break time.

17             MR. ZERNER:  Of course, your Honor.  Thank you

18   so much.

19             (A recess was taken.)

20             (Whereupon, People's Exhibits 1 through 9 were

21   pre-marked for identification outside the presence of

22   the Court and jury.)

23             (Whereupon, the jury entered the courtroom.)

24             THE CLERK:  Let the record reflect the

25   presence of the jury.

1          Are the People ready?

2          MR. PERRI:  Yes, your Honor.

3          THE CLERK:  Is defense ready?

4          MR. ZERNER:  The defense is ready, thank you.

5          THE COURT:  So welcome become, ladies and

6    gentlemen.  As you see, that five minute to seven minute

7    break turned into 20 minutes, okay, but that happens on

8    occasion.

9          I'll try to limit it as much as I can, but I

10   took care of a matter that was unrelated to our trial in

11   the exercise of my other responsibilities and

12   obligations.  So now it's 20 after 12 and the witness

13   that the People will be putting on is going to be a

14   fairly extensive witness, so logistics suggest that we

15   take our break for lunch now and then we'll be back here

16   promptly at 2:00 p.m. for the testimony of the People's

17   first witness.

18         So, enjoy your lunch.  Please remember my

19   admonitions.  Forget about the case until you come back

20   from lunch.  See you in a bit.

21         (Whereupon, the jury exited the courtroom.)

22         THE COURT:  Mr. Perri, you had something for

23   the record.

24         MR. PERRI:  Yes, your Honor.  Just in the

25   spirit of full disclosure, the People, through their



 1        social worker that works in the office as a crime victim

 2        advocate, provided Sarita Johnson with approximately $40

 3        for the purpose of paying for her cell phone.  It had

 4        been turned off and in order to logistically to be able

 5        to arrange her here today, as well as her child

 6        tomorrow, the People need to remain in contact with her.

 7               We also provided through that same social

 8        worker a blouse and I believe possibly a sweater for

 9        Millinia Johnson.

10               THE COURT:  Very good.

11               Mr. Zerner, you acknowledge receiving that

12        information?

13               MR. ZERNER:  I acknowledge receiving that

14        information and I expect that I'll be allowed to

15        cross-examine on that, if I so choose.

16               THE COURT:  All right.  Those decisions will

17        be made at the appropriate time.

18               With regard to the child victim advocate,

19        because we had one instance not related to this trial

20        where the advocate came in with the witness, you're put

21        on notice.

22               MR. PERRI:  Yes, your Honor, I'm aware the law

23        does not permit that what happened in that other

24        incident.

25               MR. ZERNER:  Your Honor, if I may just follow

1    up on that.  Was the advocate in the grand jury?

2            THE COURT:  We're going to discuss that

3    outside.  I'm going to break now and we'll talk about

4    that, if necessary, off the record.

5            2:00 p.m. for all.

6            MR. PERRI:  Yes, your Honor.

7            (A luncheon recess was taken.)

8            AFTERNOON SESSION

9            THE CLERK:  Continued case on trial, People

10   versus Ray Ross.

11           People ready?

12           MR. PERRI:  Yes, your Honor, the People are

13   ready.

14           THE CLERK:  Defense ready?

15           MR. ZERNER:  Yes, we are, thank you.

16           THE CLERK:  The jury is not present, Judge.

17           THE COURT:  People.

18           MR. PERRI:  Your Honor, with respect to the

19   conversation we had in chambers prior to the luncheon

20   recess, the district attorney's office contacted the

21   records department of the Family Court here in Nassau

22   County.  ADA Rosenbaum spoke with one of the members of

23   the records department regarding the orders of

24   protection in this case.  The orders of protection that

25   were issued were never vacated until their maximum

1    expiration date.  They remain in full force and effect,

2    according to the Family Court, your Honor, until the

3    expiration date and at that time, obviously, this is a

4    point for argument, but at that time there was a full

5    stay away order of protection in effect with this case,

6    your Honor.

7            THE COURT:  Now, you wish to offer those

8    orders of protection for what purpose?

9            MR. PERRI:  Your Honor, the People wish to

10   offer those orders of protection for the purpose of

11   completing the narrative primarily.  As defense counsel

12   opened on that steps were not reasonable, steps were not

13   taken in this case, that there was a long delay in the

14   eventual prosecution of the defendant, there were events

15   that the mother in this case did take to protect her

16   child.  One of those was petitioning for an order of

17   protection for that child in Family Court that was

18   granted.  That the orders of protection, themselves

19   would corroborate her testimony that she did take those

20   affirmative steps for her child.

21           Those orders removed the defendant from the

22   home and he was not there present when Detective

23   Toussaint came to interview the child and we believe

24   that is integral to the narrative and to how the

25   investigation unfolded, your Honor.

1          THE COURT:  So it goes to Ms. Johnson's

2     credibility with regard to the timing and the

3     circumstances of Mr. Ross' departure from the household?

4          MR. PERRI:  Yes, your Honor.

5          THE COURT:  Okay.

6          Mr. Zerner, do you have any reply?

7          MR. ZERNER:  Very briefly, your Honor.  What's

8     the date of Detective Toussaint's visit that the People

9     are talking about here?

10          THE COURT:  That will come in through

11     testimony.

12          MR. ZERNER:  Right, but I just want to see if

13     the time line makes sense from what he's saying.  We're

14     talking about O.P.s from October.  Name the dates.  I

15     know there was more than one.

16          THE COURT:  That is subject to inquiry at

17     trial.  This is not, you know, a give and take between

18     counsel with regard to visitation.  You have whatever

19     Rosario material is required to be turned over.

20          MR. ZERNER:  That's fine.  I'll dig through

21     for that.  I thought it would be easier.

22          With regards to the order of protection that

23     the counsel for my client at that proceeding agreed to

24     the order of protection, so it was on consent.  There

25     was no Judge that ruled after any type of colloquy back

1    and forth about whether or not this order of protection

2    should be granted.  So, it seems to me that the

3    prosecutor here shouldn't be able to couch his offering

4    of these documents into evidence as showing that another

5    Court of competent jurisdiction made any type of ruling

6    about this issue.

7            THE COURT:  Okay.  That's all subject to

8    cross-examination and the circumstances under which --

9    how are you going to get the orders of protection in,

10   Mr. Perri?

11           MR. PERRI:  Your Honor, the People have and

12   have marked for identification certified copies that are

13   stamped and sealed by the Family Court with a raised

14   seal present and they would be moved in under the CPL,

15   your Honor, under a certified municipality record of the

16   state, yes, your Honor.

17           THE COURT:  However, the matter is being

18   inquired of on direct examination, Mr. Zerner, you have

19   your opportunity for cross-examination on it.  That

20   being said, we can bring the jury in.

21           (Whereupon, the jury entered the courtroom.)

22           THE CLERK:  Let the record reflect the

23   presence of the jury.

24           Again, are the People ready?

25           MR. PERRI:  Yes, your Honor, the People are

1              ready.

2                            THE CLERK:  Is defense ready?

3                            MR. ZERNER:  Yes, the defense is ready.

4                            THE COURT:  Good afternoon, ladies and

5              gentlemen.  We're about to begin the testimonial aspect

6              of the trial.

7                            Mr. Perri.

8                            MR. PERRI:  Your Honor, the People call Sarita

9              Johnson.

10     S A R I T A     J O H N S O N, residing in the County of

11              Nassau, having been called as a witness on behalf of

12              the People, having been duly sworn by the Clerk of the

13              Court, was examined and testified as follows:

14                            THE CLERK:  State your name and spell both

15              your last name and your first name.  Give us your county

16              of residence.

17                            THE WITNESS:  My name is Sarita Johnson,

18              S-A-R-I-T-A  J-O-H-N-S-O-N.  I live at 301 Coventry Road

19              North, West Hempstead, New York, Nassau County.

20                            THE COURT:  Mr. Perri, your witness.

21                            MR. PERRI:  Thank you, your Honor.

22     DIRECT EXAMINATION

23     BY MR. PERRI:

24              Q.   Good afternoon, Ms. Johnson.

25              A.   Hello.

S. Johnson - People - Direct                                    438

1          Q.   Ms. Johnson, you already stated you lived at 301

2    Coventry Road North in West Hempstead.   How long have you

3    lived there?

4          A.   Over 40 years.

5          Q.   In the vicinity of your home, is there a National

6    Wholesale Liquidators?

7          A.   Yes, there is.

8          Q.   Where is it located?

9          A.   Hempstead Avenue, West Hempstead.

10         Q.   Is that in Nassau County?

11         A.   Yes, it is.

12              MR. PERRI:   I ask that the witness be shown

13         what's been marked for identification as People's 3, 4

14         and 5, your Honor?

15              THE COURT:   Please.

16              (Handed to witness.)

17              THE COURT:   Ms. Johnson, you can take a look

18         at those items.

19              THE WITNESS:   Okay.

20         Q.   Ms. Johnson, after you reviewed those three items,

21   do you recognize them?

22         A.   Yes, I do.

23         Q.   What do you recognize them to be?

24         A.   National Wholesale Liquidators.

25         Q.   When you say that, are they photographs of National

S. Johnson - People - Direct                    439

1    Wholesale Liquidators?

2        A.   Yes, they are.

3        Q.   Are they fair and accurate depictions of how that

4    location looks?

5        A.   Yes, they are.

6             THE COURT:  At what time, Mr. Perri?

7        Q.   From -- is that a fair and accurate depiction of

8    how they looked in 2013 through the present?

9        A.   Yes.

10            MR. PERRI:  Your Honor, I ask they be received

11       in evidence.

12            THE COURT:  Any objection, Mr. Zerner?

13            MR. ZERNER:  I would like a brief opportunity

14       to look at the photos and perhaps to have a brief voir

15       dire.

16            THE COURT:  You may.

17            MR. ZERNER:  If I can have a brief voir dire.

18   VOIR DIRE EXAMINATION

19   BY MR. ZERNER:

20       Q.   Good afternoon, Ms. Johnson.

21       A.   Good afternoon.

22       Q.   Ms. Johnson, did you take these photographs?

23       A.   No, I did not.

24       Q.   Do you know when these photographs were taken?

25       A.   No, I do not.

S. Johnson - People - Direct                    440

1      Q.   Do you know who took these photographs?

2      A.   No, I do not.

3      Q.   When were you shown these photographs for the first

4   time?

5      A.   Yesterday.

6      Q.   Yesterday you were shown these photos for the first

7   time?

8      A.   Yes.

9      Q.   But you have no idea when these photos were taken?

10     A.   No.

11          MR. ZERNER:  Your Honor, I object at this

12     time.  She doesn't know anything about the photos.

13     There is no snow in the photos.  Clearly they weren't

14     taken recently.  I don't know what the relevance of

15     these photos is.

16          THE COURT:  Mr. Perri, you want to respond?

17          MR. PERRI:  Your Honor, the relevancy of the

18     photos will be established by further testimony that the

19     People anticipate will be one of the locations of the

20     incident.  They are relevant as to the layout, the

21     location that the witness is familiar with it of that

22     establishment and it is not relevant whether or not the

23     witness took the photos as far as the foundation for

24     them to be admissible.

25          THE COURT:  The objection is sustained.

```
 1                    MR. ZERNER:  Thank you, your Honor.

 2                    THE COURT:  I sustained the objection,

 3        Mr. Perri.

 4                    MR. PERRI:  Yes, your Honor.

 5   DIRECT EXAMINATION (Cont'd)

 6   BY MR. PERRI:

 7        Q.   Ms. Johnson, is there a Western Beef grocery store

 8   near your home?

 9        A.   Yes, there is.

10        Q.   And where is it located?

11        A.   Woodfield Road.

12        Q.   And has that Western Beef moved?

13        A.   Yes, it has.

14        Q.   Now, Ms. Johnson, where was the old location for

15   the Western Beef grocery store?

16        A.   Both are located on Woodfield Road, but further

17   down closer to Hempstead Avenue.

18        Q.   And what towns were they in?

19        A.   West Hempstead.

20        Q.   Now, as far as the National Wholesale Liquidators

21   and the Western Beef, are they located in the County of

22   Nassau?

23        A.   Yes, they are.

24        Q.   Now, about your home, 301 Coventry Road, who owns

25   that house?
```

S. Johnson - People - Direct                    442

1       A.   My mother.

2       Q.   And where is she presently living?

3       A.   She's in a nursing home.

4       Q.   Why is she in a nursing home?

5       A.   She had a stroke.

6       Q.   How long has she been in the nursing home?

7       A.   Five, six years.

8       Q.   Now, I'm talking about today, who is living at 301

9   Coventry with you?

10      A.   My children, Malik, Mercedes, Millinia, Sherima and

11  my sister's daughter Taqiyya, my niece.

12      Q.   I'm sorry, just to clarify, when you say Taqiyya a

13  niece, is she your niece?

14      A.   Yes.

15      Q.   Who is Taqiyya's mother?

16      A.   Tara is her mother.

17      Q.   Where does Taqiyya live in the house?

18      A.   A bedroom upstairs to the right.

19      Q.   And does anyone live with Taqiyya?

20      A.   Her children.

21      Q.   Now, specifically about your daughter Millinia,

22  where does she live?

23      A.   Downstairs.

24      Q.   Who else lives with Millinia downstairs?

25      A.   I do, my daughters, the two other daughters and

S. Johnson - People - Direct                                443

1   myself.

2        Q.   How old is Millinia right now?

3        A.   Fifteen years old.

4        Q.   What's her date of birth?

5        A.   12/30/2000.

6        Q.   Now, does your daughter Millinia go to school?

7        A.   Yes, she does.

8        Q.   What school does she go to?

9        A.   Malverne High School.

10       Q.   What grade is she in right now?

11       A.   Ninth grade.

12       Q.   Has Millinia ever skipped a grade?

13       A.   No, she hasn't.

14       Q.   Has she ever been left back?

15       A.   No.

16       Q.   Has she ever taken off any extended periods of time

17  from school?

18       A.   No.

19       Q.   Does Millinia have a nickname?

20       A.   Yes.

21       Q.   What is her nickname?

22       A.   Patty.

23       Q.   Not today, but back in 2013 when Millinia was in

24  sixth grade, were you still living in the same house?

25       A.   Yes, I was.

S. Johnson - People - Direct                              444

1      Q.    Were your children living with you?

2      A.    Yes.

3      Q.    And who else was living in the house at that time

4   that you haven't mentioned?

5      A.    The defendant Ray Ross and my sister Tara.

6      Q.    And when you say the defendant, could you please

7   point out the person you mean by pointing at them and naming

8   an article of clothing they are wearing?

9      A.    Sitting right there in black.

10            MR. PERRI:  Your Honor, may the record reflect

11     the witness has identified the defendant?

12            THE COURT:  So noted.

13     Q.    How long have you known the defendant?

14     A.    Ten years at least.

15     Q.    And who is he to your family?

16     A.    My sister's boyfriend.

17     Q.    And, to your knowledge, is your sister still in a

18   relationship with the defendant?

19     A.    Yes, she is.

20     Q.    How long has she been in a relationship with the

21   defendant?

22     A.    At least ten years.

23     Q.    When did the defendant move into -- withdrawn.

24            When did the defendant move into your mother's

25   house?

S. Johnson - People - Direct                    445

1          A.    Between eight and ten years ago.

2          Q.    Has he been living there ever since?

3          A.    Yes.

4          Q.    Was he living with you in 2013?

5          A.    Yes.

6          Q.    And does he presently live with you?

7          A.    No.

8          Q.    To your knowledge, was the defendant married

9    previously?

10         A.    Yes.

11         Q.    Does he have children?

12         A.    Yes, he does.

13         Q.    Does he have grandchildren?

14         A.    Yes.

15         Q.    In comparison to Millinia, approximately how old

16   are his children?

17         A.    Twenties, late 20s, 30s.

18         Q.    And do you know the name of the defendant's wife?

19         A.    Yes.

20         Q.    Have you met her?

21         A.    Yes, I have.

22         Q.    What is her name?

23         A.    Paula Ross.

24         Q.    And where does she live?

25         A.    Brooklyn.

S. Johnson - People - Direct                    446

1        Q.   Ms. Johnson, are you currently employed?

2        A.   No, I'm not.

3        Q.   How do you support yourself and your family?

4        A.   Social Services child support.

5        Q.   What, if anything, is the Department of Social

6   Services requiring you to do in order to receive support?

7        A.   Job readiness training program that I'm involved

8   in.

9        Q.   And when was the last time that you were full time

10  employed?

11       A.   '07.

12       Q.   Who did you work for?

13       A.   Veterans Transportation.

14       Q.   What did you do for them?

15       A.   I was a bus matron.

16       Q.   Now, when you were living at 301 Coventry Road in

17  2013, were you paying anything to live there?

18       A.   No.

19       Q.   Were you paying rent?

20       A.   No.

21       Q.   Were you paying utilities?

22       A.   No.

23       Q.   To your knowledge, before your mother had her

24  stroke, was your sister paying anything to live there?

25       A.   Yes.  No.  I'm sorry, no.

S. Johnson - People - Direct                447

```
 1              MR. PERRI:  Your Honor, may I ask the question

 2      again?

 3      A.    Okay, yeah.

 4              THE COURT:  Hold on one second, ma'am.

 5              You can ask the question again, sir.

 6              MR. PERRI:  Thank you.

 7      Q.    To your knowledge, Ms. Johnson, before your mother

 8   had her stroke, was your sister paying anything in order to

 9   live at 301 Coventry Road?

10      A.    No.

11      Q.    Who has power of attorney over your mother?

12      A.    My sister.

13      Q.    And while you were living at 301 Coventry Road in

14   2013, who did you believe was paying the bills for the house?

15      A.    My mother.

16      Q.    Now, your sister, Tara Johnson, does she work?

17      A.    Yes.

18      Q.    What does she do?

19      A.    She works at a bank.  She's a banker.

20      Q.    And where is that bank?

21      A.    Levittown.

22      Q.    What are her hours?

23      A.    Daytime hours, 9:00 to 5:00, 9:00 to 6:00.

24      Q.    Does she have friends other than the defendant?

25      A.    Yes.
```

S. Johnson - People - Direct                           448

1        Q.   Does she go out at night?

2        A.   Yes.

3        Q.   And does the defendant go with her when she goes

4   out?

5        A.   No.

6        Q.   What, if anything --

7             MR. ZERNER:  Your Honor, I'm going to object

8        at this time.  It sounds like we're talking about a very

9        wide range of time.

10            THE COURT:  The objection is overruled.

11            Mr. Perri, when you ask your question, please

12       give a time frame question.

13            MR. PERRI:  Yes, your Honor.

14       Q.   So while you were living with the defendant in 2013

15   and 2014, when the defendant wasn't going out with your

16   sister, what, if anything, was he doing instead?

17       A.   He would stay home and watch TV.

18       Q.   Where would he watch TV?

19       A.   In his room.

20       Q.   And who did he share the room with?

21       A.   My sister Tara.

22       Q.   Now, before this case, before 2013, 2014, did you

23   have any major problems with the defendant?

24       A.   No, I didn't.

25       Q.   How would you describe your relationship with the

S. Johnson - People - Direct                    449

1   defendant before this case?

2        A.   Cordial.  We spoke.  It was friendly.

3        Q.   You testified that he no longer is living with you.

4   When he left, did you owe him any money?

5        A.   No, I did not.

6        Q.   Have you ever dated the defendant?

7        A.   No, I did not.

8        Q.   While the defendant was living with you, would he

9   help out with the expenses in the house?

10       A.   Yes.

11       Q.   How would he do that?

12       A.   Paying bills with my sister.

13       Q.   A little bit about the layout of the house I want

14   to ask you, Ms. Johnson.

15       A.   Okay.

16       Q.   When you walk in the front door of your home, what

17   do you see?

18       A.   There is a platform and you can go upstairs or

19   downstairs.  It's a high ranch.

20       Q.   And where were you, Sherima, Millinia and Mercedes

21   sleeping?

22       A.   Down.  Downstairs.

23       Q.   What is the layout downstairs?  Could you please

24   describe it?

25       A.   It's like a dormitory; a big room with beds.

S. Johnson - People - Direct                    450

 1        Q.   How many beds were down there?

 2        A.   Two.

 3        Q.   Did you share beds?

 4        A.   No.

 5        Q.   How many people were sleeping in each bed?

 6        A.   Two and one and one.

 7        Q.   Was there a television downstairs?

 8        A.   No.

 9        Q.   Where was the defendant sleeping when he lived with

10   you?

11        A.   Upstairs.

12        Q.   And in the room the defendant slept in was there a

13   television?

14        A.   Yes, there was.

15        Q.   Did it have cable?

16        A.   Yes, it did.

17        Q.   Directing your attention to 2013 in the second half

18   of 2013, did anyone start watching television in the

19   defendant's room with him?

20        A.   Yes.

21        Q.   Who was that?

22        A.   Millinia, my daughter.

23        Q.   And how often would she watch television with the

24   defendant?

25        A.   Several times a week.

S. Johnson - People - Direct                      451

1        Q.    And when she was watching television with the
2   defendant, was there a door to that room?
3        A.    Yes.
4        Q.    And was it open or closed?
5        A.    It started open and then it would be closed.
6        Q.    Ms. Johnson, I want to direct your attention to
7   2013 when Millinia was in sixth grade.  Did there come a time
8   when she participated in a talent show?
9        A.    Yes.
10       Q.    Where was that talent show?
11       A.    It was at her middle school, Howard T. Herber.
12       Q.    And did you go to that talent show?
13       A.    Yes, I did.
14       Q.    And when did that talent show take place?
15       A.    In March.
16       Q.    What did Millinia do for the talent show?
17       A.    She did a dance with her friend Jasmine.
18       Q.    Directing your attention to the summer after
19   Millinia finished sixth grade, so after the talent show but
20   still in 2013, did there come a time when Millinia started
21   going on weekend trips?
22       A.    Yes.
23       Q.    Who would she go with?
24       A.    The defendant, Ray Ross.
25       Q.    To your knowledge, where would they go?

S. Johnson - People - Direct                                452

1     A.   To Brooklyn to visit his daughters, to a museum.

2     Q.   Did the defendant have a vehicle?

3     A.   Yes, he did.

4     Q.   What kind of vehicle did he have?

5     A.   A pickup.

6     Q.   And what color was the pickup?

7     A.   White.

8     Q.   And how many rows of seats did it have?

9     A.   It had two rows of seats.

10    Q.   Would you go with them?

11    A.   No, I would not.

12    Q.   Would your sister Tara go with them?

13    A.   No, she would not.

14    Q.   Did any of Tara's children or grandchildren go with

15  them?

16    A.   No.

17    Q.   Did anyone other than Millinia ever go with the

18  defendant to Brooklyn from your home?

19    A.   No.

20    Q.   During this time starting that summer in 2013,

21  normally what time would the defendant and Millinia return

22  from Brooklyn?

23              MR. ZERNER:  Your Honor, I'm going to object.

24  It sounds like we're talking about multiple occasions.

25  Are we saying they came back the same time every time

S. Johnson - People - Direct                    453

1        and this witness knows that?

2                THE COURT:  Thank you, Mr. Zerner.  Just

3        please note your objection.

4                Mr. Perri, as I have indicated earlier, when

5        you ask a question, please frame the question so that it

6        can be determined as to what time or occurrence you are

7        speaking of.

8                MR. PERRI:  Yes, your Honor.

9                THE COURT:  Thank you.

10       Q.    So how often would Millinia go with the defendant

11  during that summer to Brooklyn?

12       A.    Two to three times on the weekend a month -- per

13  month.

14       Q.    And when would he go, during the week or on the

15  weekend?

16       A.    Weekend.

17       Q.    And on average during that summer when the

18  defendant and Millinia were going to Brooklyn, would they

19  spend the night in Brooklyn?

20       A.    No.

21       Q.    And on average during that summer, approximately

22  what time of day would they return from Brooklyn?

23       A.    At night.

24       Q.    Did these trips continue in July and August of that

25  year of 2013?

S. Johnson - People - Direct                    454

1        A.   Yes, they did.

2        Q.   Did these trips continue when Millinia started

3    seventh grade?

4        A.   Yes.

5        Q.   In September of 2013 did the trips continue?

6        A.   Yes.

7        Q.   Did the frequency of the trips change?

8        A.   No.

9             THE COURT:  During what time frame, Mr. Perri?

10            MR. PERRI:  When she started seventh grade,

11       your Honor.

12            THE COURT:  In September?

13       Q.   In September of 2013, Ms. Johnson, did the

14   frequency of the trips that Millinia was taking with the

15   defendant to Brooklyn, did that change?

16       A.   No.

17       Q.   Did you ever give the defendant any money for

18   taking Millinia to Brooklyn?

19       A.   No.

20       Q.   Did you ever give Millinia or the defendant any

21   money to pay for meals while she was with him in Brooklyn?

22       A.   No.

23       Q.   In October of 2013 were Millinia and the defendant

24   still taking trips to Brooklyn?

25       A.   Yes.

S. Johnson - People - Direct                    455

1          Q.    Approximately how often were they going in October

2    of 2013?

3          A.    Two to three times a month on weekends.

4          Q.    And in November of 2013 while Millinia was in

5    seventh grade, was the defendant continuing to go with

6    Millinia to Brooklyn?

7          A.    Yes.

8          Q.    And when were they going?

9          A.    On weekends.

10         Q.    And how often were they going in November of 2013?

11         A.    Two to three times a month.

12         Q.    Did this continue in December of 2013?

13         A.    Yes.

14         Q.    And how long -- withdrawn.

15               And how often in December of 2013 would the

16   defendant go with Millinia to Brooklyn?

17         A.    Two to three times a month.

18         Q.    Other than go on trips to Brooklyn during the

19   summer of 2013 and during the first half of her seventh grade

20   year in 2013, what, if anything else, did your daughter and

21   the defendant do together?

22         A.    Watch TV, watch TV, continue to go to Brooklyn, the

23   museum, have ice cream.

24         Q.    Directing your attention to when Millinia was in

25   seventh grade.  At the start of seventh grade did there come

S. Johnson - People - Direct                456

1    a time where she got a new cell phone?

2        A.   Yes.

3        Q.   And did you buy her the cell phone?

4        A.   No, I did not.

5        Q.   Were you paying the monthly costs of the cell

6    phone?

7        A.   No, I was not.

8        Q.   Now, at the time when Millinia was in seventh

9    grade, who did you believe was paying for the cell phone each

10   month then?

11       A.   Her father.

12            MR. PERRI:  Your Honor, I ask the witness be

13       shown what's marked as People's 7 for identification.

14            (Handed to witness.)

15       Q.   Ms. Johnson, do you recognize those two

16   photographs?

17       A.   Yes, I do.

18       Q.   What do you recognize them to be?

19       A.   Millinia's cell phone.

20       Q.   And is that the cell phone that you were just

21   discussing that she received in seventh grade?

22       A.   Yes.

23       Q.   Is that an exact -- is that a fair and accurate

24   depiction of her cell phone?

25       A.   Yes, it is.

S. Johnson - People - Direct                    457

1          Q.    And is that an exact photostatic copy of the
2    photograph?

3          A.    Yes, it is.

4          Q.    Have there been any alterations made to those
5    photographs?

6          A.    No.

7               MR. PERRI:  Your Honor, I ask that it be
8          received into evidence.

9               THE COURT:  Could I see them, please?

10              Counsel, I'm sorry, I thought you asked the
11         question was it an exact duplicate of a photograph.  Is
12         that what your question was?

13              MR. PERRI:  Your Honor, I withdraw that
14         question.  It was not an appropriate question.

15              THE COURT:  So, Ms. Johnson, is it your
16         testimony that this is a fair and accurate
17         representation through a photograph of your daughter's
18         phone that she had at the beginning of the seventh
19         grade?

20              THE WITNESS:  Yes.

21              THE COURT:  How do you know that?

22              THE WITNESS:  This is exactly what it looks
23         like.

24              THE COURT:  Because you have seen it?

25              THE WITNESS:  I have seen it.

S. Johnson - People - Direct                458

```
 1              THE COURT:   Any other questions, Mr. Perri?

 2              MR. PERRI:   No, your Honor.

 3              THE COURT:   You are offering it into evidence,

 4      the photographs?

 5              MR. PERRI:   Yes, your Honor.

 6              THE COURT:   Mr. Zerner?

 7              MR. ZERNER:   If I can see it, please.

 8              (Handed to counsel.)

 9              MR. ZERNER:   If I can have a brief voir dire.

10              THE COURT:   You may.

11  VOIR DIRE EXAMINATION

12  BY MR. ZERNER:

13      Q.   Ms. Johnson, did you take this photograph?

14      A.   No, I did not.

15      Q.   Do you know when this photograph was taken?

16      A.   I do not.

17      Q.   Are there any distinguishing marks on this camera,

18  I mean this cell phone or camera phone, any personalized

19  items on it?  Maybe some people put, you know, cartoon

20  character or sports team or anything like that.

21      A.   Well, the numbers I have on the box, I believe that

22  I took that down before.

23      Q.   When did you take down this number, ma'am?

24      A.   The phone, because I had her phone when I took her

25  phone.
```

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Direct                     459

1        Q.    Well, you are saying a number on a box.  I don't

2    see any box depicted in these photos.

3        A.    There is a serial number on the back.

4        Q.    You know the serial number of your daughter's

5    phone?

6        A.    I have written it down.  I don't know what it is.

7    I can't recall it to you at this particular time.

8        Q.    When did you write it down?

9        A.    In the past.

10       Q.    Do you remember what month and what year?

11       A.    2013.

12       Q.    So it seems that the testimony is your daughter had

13   a cell phone before the phone that we're talking about at the

14   beginning of her seventh grade year, correct?

15               THE COURT:  Mr. Zerner.

16               MR. ZERNER:  I'm going to put it together to

17         the identification issue, your Honor.

18               THE COURT:  The question is not permitted on

19         this particular aspect of your inquiry, which is a voir

20         dire.

21               MR. ZERNER:  That's fine.  I object to this

22         being offered into evidence.  It seems clear to me that

23         there is no distinguishing number or box or time that

24         she knows that this is the cell phone that Mr. Perri is

25         asking her about.

S. Johnson - People - Direct                    460

1              THE COURT:  Thank you.

2              MR. PERRI:  Your Honor, the People would offer

3        it into evidence subject to connection through Detective

4        Toussaint.

5              THE COURT:  The defense objection is overruled

6        and the photograph is received in evidence.

7              (Whereupon, People's Exhibit 7 was received in

8        evidence.)

9              COURT OFFICER:  People's 7 in evidence.

10             THE COURT:  You can proceed, Mr. Perri.

11             MR. PERRI:  Thank you, your Honor.

12   DIRECT EXAMINATION (Cont'd)

13   BY MR. PERRI:

14        Q.   Now, when Millinia was in seventh grade in 2013 was

15   her father living with you?

16        A.   No.

17        Q.   Did he ever live with you?

18        A.   In the past.

19        Q.   And when did he move out approximately?

20        A.   Eight years ago.

21        Q.   And how involved was Millinia's father in her life

22   at that time?

23        A.   At that time?

24        Q.   Yes, ma'am.

25             THE COURT:  At what time?

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Direct                461

1              MR. PERRI:  Seventh grade.  The beginning of

2      seventh grade.

3         A.    Oh, he wasn't in her life much.

4         Q.    Did you ever ask the defendant to buy her a cell

5  phone?

6         A.    No.

7         Q.    Did you ask the defendant to pay the monthly cost

8  of her having a cell phone?

9         A.    No, I did not.

10        Q.    Ms. Johnson, do you remember your daughter

11 Millinia's 13th birthday?

12        A.    Yes.

13        Q.    Do you recall anything about what you did to

14 celebrate her birthday?

15        A.    Yes, I do.

16        Q.    What do you recall?

17        A.    We had a party for her and we had birthday cake.

18        Q.    And where was that party?

19        A.    In my house.

20        Q.    And what time of day was that?

21        A.    At night.

22        Q.    And who else was at that party?

23        A.    My family.

24        Q.    Now, directing your attention to the winter of

25 2014, the second half of Millinia's seventh grade year.

S. Johnson - People - Direct                    462

1    After your daughter's birthday did she continue to take trips

2    each month with the defendant?

3          A.    Yes, she did.

4          Q.    Was she going to Brooklyn with the defendant in

5    January?

6          A.    Yes.

7          Q.    How often was she going?

8          A.    Two to three times a month.

9          Q.    And did that continue in February?

10         A.    Yes.

11         Q.    And how often was she going in February?

12         A.    Two to three times a month.

13         Q.    And in March of her seventh grade year did that

14   continue?

15         A.    Yes, it did.

16         Q.    Approximately how often?

17         A.    Two to three times a month on weekends.

18         Q.    And did that continue in April?

19         A.    Yes.

20         Q.    And did that continue in May?

21         A.    Yes.

22         Q.    And did that continue in June?

23         A.    Yes.

24         Q.    And did the frequency of how often Millinia would

25   go with the defendant to Brooklyn, did that change during

S. Johnson - People - Direct                              463

1    that period at all?

2        A.    No.

3        Q.    During that time period, the second half of her

4    seventh grade year in 2014, did anyone else from the house

5    ever go with the defendant and Millinia to Brooklyn?

6        A.    No.

7        Q.    Directing your attention to the summer after

8    Millinia finished seventh grade, the summer of 2014, the

9    summer before she started eighth grade, at that time could

10   you please describe your relationship with your daughter

11   Millinia?

12       A.    She started becoming distant and fighting with me

13   for no apparent reason.  Some sort of hostility.

14       Q.    What, if anything, were you fighting about?

15       A.    When I asked her about going to Brooklyn, she would

16   say things like are you jealous of me or this sort of thing.

17       Q.    And was the defendant present for any of these

18   arguments?

19       A.    No.

20             Well, yes.

21                 MR. ZERNER:  Objection, your Honor.

22                 THE COURT:  Hold on, Ms. Johnson.

23                 The objection is overruled.  The defendant

24   [sic] answered.  Next question.

25       Q.    So to clarify, Ms. Johnson --

1          THE COURT:  No, the objection is sustained.

2     The witness answered the question.  Next question,

3     please.

4          MR. PERRI:  Your Honor, may we approach?

5          THE COURT:  No, sir.  Ask your next question.

6          MR. PERRI:  I apologize.

7     Q.   What, if anything -- I'm sorry, what, if anything,

8     did the defendant say during any this argument?

9     A.   The defendant had said --

10         MR. ZERNER:  Objection.

11         THE COURT:  Basis, Mr. Zerner?

12         MR. ZERNER:  There are several bases, your

13    Honor.  Basis number one is the defendant -- the witness

14    answered.

15         THE COURT:  Excuse me one second, Mr. Zerner.

16         Ladies and gentlemen, we're going to take a

17    five-minute break to allow you to stretch your legs and

18    use the facilities.

19         (Whereupon, the jury exited the courtroom.)

20         THE COURT:  Ms. Johnson, I'm going to excuse

21    you for a few minutes, okay.  So you can step outside

22    but you can't talk to anybody about your testimony,

23    okay.

24         THE WITNESS:  Okay.

25         THE COURT:  Just go outside and relax for a

S. Johnson - People - Direct                     465

1       few minutes.  We'll call you right back in.

2                   (Whereupon, the witness exited the courtroom.)

3                   THE COURT:  With regard to the defense

4       counsel's objection, Mr. Perri, you are stuck with your

5       witness's answer, okay.  And one of the basis for that

6       objection was that it was assuming facts not in evidence

7       because the witness answered no and yes, so you then

8       talked about your question included the defendant being

9       present for an argument.

10                  MR. PERRI:  Well, your Honor, just the fact

11      that the witness corrected her answer while answering

12      the question without any prompting from the People, that

13      she changed it from no to yes while she was answering

14      and so then the final answer she gave was that the

15      defendant was present.

16                  THE COURT:  She gave two answers to your

17      question, okay.  Your follow-up question presumed that

18      the defendant was present at an argument.  If there is a

19      question about your witness's answer, then just follow

20      it up with a clarifying question, okay.

21                  MR. PERRI:  Yes, your Honor.

22                  THE COURT:  Before you go on to another

23      question that presumes a fact.

24                  MR. ZERNER:  Thank you, your Honor.  That was

25      one of my points.

S. Johnson - People - Direct                    466

1              The other question I have is all of a sudden

2       there's a woman sitting in the back row.  Is she a

3       member of the district attorney's staff?

4              THE COURT:  I believe it may be the advocate.

5       The blonde haired lady in the blue blouse?

6              MR. PERRI:  Yes, your Honor.

7              THE COURT:  Is that the advocate?

8              MR. PERRI:  Yes, your Honor.

9              MR. ZERNER:  I would like her to be instructed

10      not to be speaking with the witness right now in the

11      hallway and not to be allowed to talk to her about her

12      testimony in any way, shape or form.  Obviously, I know

13      Mr. Perri knows about not being allowed to talk to his

14      witness during the course of her testimony.  I'm afraid

15      right now there is a conversation going on right now on

16      the other side of the wall between a member of the

17      district attorney's office and a witness.

18             THE COURT:  She's not a member of the district

19      attorney's office, but I understand your point.  I have

20      already instructed the witness she is not to have any

21      conversation with anyone regarding her testimony, but

22      the Court will caution the child advocate that she's

23      acting in an official capacity and she should not have

24      any conversations with anyone who is testifying.

25             MR. ZERNER:  I have the utmost respect for the

S. Johnson - People - Direct                    467

1    child advocates.  When I was in the DA's office they

2    were employees of the district attorney's office.  I

3    don't know if there is any difference in this county at

4    this time.

5              MR. PERRI:  She is an employee of the district

6    attorney's office.  She's a crime victim advocate, not a

7    child advocate.  We are not on cross yet.  This is still

8    direct that if we were to break in testimony, the

9    admonitions of not being able to talk to your witness

10   take effect at the time cross begins after direct is

11   concluded.

12             THE COURT:  Thank you.  The Court has some

13   discretion and authority with regard to who is going to

14   speak to a witness.

15             MR. ZERNER:  I would urge your Honor to

16   exercise that where it's --

17             THE COURT:  Thank you, Mr. Zerner, I have your

18   point.  Thank you.

19             So with regard to the objection, the Court has

20   sustained the objection.  You can start anew, Mr. Perri,

21   with your questioning of the witness.

22             We'll bring in the witness now and then we'll

23   bring in the jury.

24             MR. PERRI:  Your Honor, I'm sorry, I just want

25   to put one thing on the record and request of the Court

S. Johnson - People - Direct                          468

1     to admonish defense counsel about making either sounds

2     or some form of communication or giving looks in

3     response to every question the witness is giving to the

4     jury, turning and facing the jury as the witness is

5     giving her testimony.  If I'm incorrect, I apologize,

6     but from where I was standing I believe that was taking

7     place.

8               THE COURT:  Let me just say this with regard

9     to counsel, and that is is that I expect both sides to

10    conduct themselves with the utmost professionalism as

11    advocates in this particular proceeding and the Court

12    has the utmost confidence that both sides will conduct

13    themselves in accord with that obligation as officers of

14    the Court.

15              MR. ZERNER:  If I may very briefly respond,

16    your Honor, for the record.

17              THE COURT:  No, sir.  He was speculating

18    because he didn't know if he was right or he was wrong.

19    I didn't see anything, so there is no finding by the

20    Court and -- hold it, Mr. Zerner, please.  All I'm

21    saying is to both counsel that I expect and am confident

22    that you will conduct yourselves in a professional

23    manner.

24              MR. ZERNER:  Thank you, your Honor.  What I

25    was looking for was the witness looking at the woman in

S. Johnson - People - Direct                     469

1    the back of the room.  Sometimes in doing that I'm

2    turning my head like in a tennis match and I'm looking

3    at Mr. Perri and I'm looking at the jurors and then back

4    at the witness and back and forth and back and forth.

5                 THE COURT:  Thank you, Mr. Zerner.

6                 Ma'am, could I have your name, please?

7                 MS. TERINO:  Cara Terino.

8                 THE COURT:  Do you have any official role in

9    this proceeding?

10                MS. TERINO:  Official role?  I'm the crime

11   victim advocate in the Special Victim's Bureau.

12                THE COURT:  And you were here before we broke;

13   is that correct?

14                MS. TERINO:  Yes.

15                THE COURT:  And you heard me admonish the

16   witness that she shouldn't have any conversation with

17   anyone about the trial; is that correct?

18                MS. TERINO:  Yes.

19                THE COURT:  Thank you, ma'am.

20                MS. TERINO:  You're welcome.

21                (Whereupon, the witness returned to the

22   witness stand and the jury entered the courtroom.)

23                THE CLERK:  Let the record reflect the

24   presence of the jury.

25                People ready.

S. Johnson - People - Direct                    470

1                    MR. PERRI:  Yes, your Honor.

2                    THE CLERK:  Is the defense ready?

3                    MR. ZERNER:  We are, thank you.

4                    THE COURT:  Ladies and gentlemen of the jury,

5          before we broke there was an objection.  That objection

6          is sustained and Mr. Perri will ask his next question.

7   BY MR. PERRI:

8          Q.   Ms. Johnson, did you have multiple arguments with

9   your daughter that summer?

10         A.   Yes, I did.

11         Q.   And for any of those arguments was the defendant

12  present?

13         A.   Yes.

14         Q.   And when the defendant was present, what, if

15  anything, would you say to Millinia in front of him?

16         A.   I told Millinia that she was not allowed to go in

17  his room and to not be around him at all and he said that

18  don't worry about what she says, I'll take care of her.

19         Q.   Who is he speaking to at that time?

20         A.   He was speaking to Millinia.

21         Q.   Now, in July of 2014 what, if any, rules or

22  decisions had you made regarding where your daughter could

23  go?

24         A.   I said she cannot go.

25         Q.   Where could she not go?

S. Johnson - People - Direct                    471

1          A.    With the defendant.

2          Q.    How did she react to that decision?

3          A.    She was upset by it.

4          Q.    Ms. Johnson, are you familiar with Hempstead Lake

5     State Park?

6          A.    Yes, I am.

7          Q.    In July of 2014 did there come a time when you

8     observed the defendant and your daughter together in the

9     park?

10         A.    Yes, I did.

11               MR. ZERNER:  Objection; leading.

12               THE COURT:  Overruled.

13         Q.    Could you please explain what you observed?

14         A.    My daughter went to the park and I observed the

15    defendant in a white pickup truck at the entrance of the park

16    when my daughter was going to the park with her cousins and

17    my daughters.

18         Q.    What, if anything, happened when the defendant was

19    there at the entrance to the park?

20         A.    He was talking to her.

21         Q.    And was this after you had told -- sorry,

22    withdrawn.

23               Was this after the argument you had just described?

24         A.    Yes.

25         Q.    Now, directing your attention to August of 2014,

S. Johnson - People - Direct                            472

1    the next month, did there come a time when Millinia was again

2    in the defendant's room?

3                    MR. ZERNER:  Objection; leading.

4                    THE COURT:  Sustained.

5        Q.   In August of 2014, did there ever come a time when

6    you went to the defendant's room?

7        A.   Yes.

8        Q.   What, if anything, did you observe when you went to

9    the defendant's room in August of 2014?

10       A.   I knocked on the door.  It was closed and I opened

11   the door and I observed Millinia sitting on the bed in the

12   defendant's room.

13       Q.   And who else was present in the room?

14                   MR. ZERNER:  Objection; leading.

15                   THE COURT:  If anyone.

16       Q.   Who, if anyone, was present in the room?

17       A.   No one but the two people.

18       Q.   Who were the two people?

19                   MR. ZERNER:  You know, objection.  It assumes

20          facts not in evidence.  If it's only Millinia in the

21          room, then that's no one and then all of a sudden it's

22          two people.

23                   THE COURT:  Thank you, Mr. Zerner.

24                   The objection is overruled.  You can answer

25          the question.  Do you know who the two people in the

S. Johnson - People - Direct                               473

1          room were?

2                    THE WITNESS:   Yes.

3          Q.    Who were they?

4          A.    The defendant, Ray Ross and my daughter Millinia.

5          Q.    And where was the defendant when you entered the

6     room?

7          A.    In the bed.   On the bed.

8          Q.    And where was Millinia?

9          A.    On the bed.

10         Q.    And what, if anything, happened after you went into

11    the room?

12         A.    I told her to get out.

13         Q.    And what happened after you told her to get out?

14         A.    Then she came out.

15         Q.    And what, if anything, else did you do that evening

16    while you were in the room?

17         A.    I told her not to come back in here.

18         Q.    Now, soon after finding Millinia with the

19    defendant, did there come a time when you came into

20    possession of Millinia's cell phone?

21         A.    Yes, I did.

22         Q.    How did you get possession of Millinia's cell

23    phone?

24         A.    I took it from under her pillow.

25         Q.    And did she give you the phone willingly?

S. Johnson - People - Direct                    474

1        A.    No, she did not.

2        Q.    Where was Millinia when you took the phone?

3        A.    Asleep.

4        Q.    What, if anything, did you do with the phone after

5   you took it?

6        A.    I looked into it.

7        Q.    And what, if anything, did you observe on the cell

8   phone?

9        A.    I observed text messages between Ray Ross and my

10   daughter Millinia.

11              MR. PERRI:  Your Honor, I ask that this be

12        marked as People's 10 for identification?

13              THE COURT:  Please.

14              (Whereupon, People's Exhibit 10 was marked for

15        identification, only.)

16              COURT OFFICER:  People's 10 marked for ID.

17              MR. PERRI:  I ask it be shown to the witness,

18        your Honor.

19              THE COURT:  Please.

20              (Handed to witness.)

21        Q.    Ms. Johnson, do you recognize People's 10?

22        A.    Yes, I do.

23        Q.    What do you recognize it to be?

24        A.    Ray Ross' cell phone -- Millinia's cell phone.  I

25   see his number up there.

1        Q.   Could you please be more specific, what from

2   Millinia's cell phone?

3               THE COURT:  Ma'am, I'm just going to ask you

4        to look through the exhibit first.  Take your time and

5        look through the exhibit.

6               THE WITNESS:  Okay.

7        A.   These are text messages between Ray and my

8   daughter.

9        Q.   Ms. Johnson --

10       A.   Inappropriate.

11       Q.   Ms. Johnson, are those photographs of the text

12  messages you observed on Millinia's phone when you took it

13  from her?

14              MR. ZERNER:  Objection; leading.

15              THE COURT:  Overruled.

16       A.   Yes.

17       Q.   Are they fair and accurate depictions of the text

18  messages you observed on Millinia's phone?

19       A.   Yes.

20       Q.   Ms. Johnson, have you had a prior occasion to look

21  through that packet?

22       A.   Yes.

23       Q.   And are there any markings on the back of that

24  packet that you recognize?

25              MR. ZERNER:  Objection; leading.

S. Johnson - People - Direct                    476

1          THE COURT:  Overruled.

2     A.    My signature.

3     Q.    And any other markings?

4          MR. ZERNER:  Your Honor.

5          THE COURT:  Hold it, Mr. Zerner.

6          Hold it, Mr. Perri.  With regard to your

7     question, once again, please frame the question.  Any

8     other markings is a general question without a

9     direction.

10    Q.    Are there any other markings on the back of the

11    packet that you recognize?

12    A.    Yes.

13    Q.    What do you recognize?

14    A.    Millinia's signature.

15    Q.    And when did you place your signature on the back

16    of that packet?

17    A.    Six days after Millinia signed her name.

18    Q.    And what did you do prior to putting the signature

19    on the back of that packet?

20    A.    I observed the packet.

21    Q.    And have there been any alterations made to that

22    packet from the time you last observed it?

23    A.    No.

24         MR. PERRI:  Your Honor, I ask that that be

25    received in evidence subject to connection through

Kathi A. Fedden, Sr. Court Reporter

1    Millinia Johnson.

2              THE COURT:  Can the adversary counsel please

3    see it.

4              (Handed to counsel.)

5              MR. ZERNER:  If I can have a brief voir dire,

6    please?

7              THE COURT:  You may.

8              MR. ZERNER:  Thank you, your Honor.

9    VOIR DIRE EXAMINATION

10   BY MR. ZERNER:

11       Q.   Ms. Johnson, today is February 9, 2016, correct?

12       A.   Yes.

13       Q.   You came to the DA's office two days ago on Sunday,

14   February 7, 2016?

15       A.   Yes, I did.

16       Q.   And you signed the back of this packet, correct?

17       A.   Yes, I did.

18       Q.   So before February 7, 2016 had you ever seen this

19   packet?

20              THE COURT:  Did you hear the question, ma'am?

21       A.   Repeat the question.

22       Q.   Before February 7, 2016 had you ever seen this

23   packet?

24       A.   No.

25       Q.   On February 7, 2016 you met with Mr. Perri?

S. Johnson - People - Direct                    478

1        A.   Yes, I did.

2        Q.   And you did that in his office, the district

3   attorney's office across the way over here?

4        A.   Yes.

5        Q.   And he told you this was a packet including text

6   messages?

7             MR. PERRI:  Objection, your Honor.  This is

8        cross-examination.

9             THE COURT:  Overruled.

10            MR. ZERNER:  Thank you, your Honor.

11       Q.   Please answer the question.

12       A.   Say the question again.

13       Q.   Two days ago when you met with Mr. Perri in his

14  office, in the district attorney's office, he gave you this

15  packet and he said to you these are text messages from a cell

16  phone, correct?

17       A.   Yes.

18       Q.   And he told you to sign the back of it, right?

19            THE COURT:  Mr. Zerner, I'm going to ask you

20       with regard to the inflection in your voice to remain

21       steady.

22            MR. ZERNER:  I apologize, your Honor, it seems

23       she might not have heard me the first couple of times so

24       I wanted to project more.

25       Q.   Did you hear the question, ma'am?

S. Johnson - People - Direct                    479

1      A.   Yes, I observed the text messages that I signed the

2  back of the pamphlet.

3      Q.   Mr. Perri told you these were text messages and he

4  said sign the back, right?

5      A.   And I observed them and those are the same text

6  messages that I witnessed earlier on the phone.

7           MR. ZERNER:   Your Honor, objection.   It is not

8      responsive.

9           THE COURT:   Overruled.

10     Q.   Did you prepare this packet of photos, ma'am?

11     A.   No.

12          MR. ZERNER:   If I may, your Honor.

13     Q.   Before your daughter got a cell phone from Ray

14 Ross, she had a prior cell phone, correct?

15          THE COURT:   Hold it.   Mr. Zerner, this is voir

16     dire, so couch your inquiry as to the exhibit that's in

17     front of you.

18          MR. ZERNER:   I'm looking to see whether she

19     can compare and contrast cell phone one and cell phone

20     two.   I'm not sure if she can.

21          THE COURT:   No, sir, we're talking about this

22     particular exhibit, so couch your question with regard

23     to this exhibit and how the foundation has been laid by

24     the People.

25     Q.   Page one of this packet of materials at the top

S. Johnson - People - Direct                    480

1    says Ray Ray on it, correct?

2         A.    Uh-huh.

3         Q.    Yes or no, ma'am?

4         A.    Yes.

5         Q.    And you saw that when Mr. Perri handed you this

6    packet of papers on Sunday, right?

7         A.    Yes.

8         Q.    So this document that was not prepared by you shows

9    that it's Ray Ray's cell phone, right?

10        A.    Yes.

11        Q.    But you are telling us now it's Millinia's cell

12   phone.  How do you know?

13        A.    It has Ray's name on it because that's the person

14   that's corresponding with the Emails.

15        Q.    How do you know?

16        A.    Because you get the other person's number comes up

17   when you are talking to them.

18        Q.    Well, you said these are Emails or texts, ma'am?

19        A.    Text messages.

20        Q.    Are you sure?

21        A.    Absolutely.

22        Q.    And you are sure who the sender was and who the

23   recipient was?

24        A.    Yes.

25             MR. PERRI:  Objection.

S. Johnson - People - Direct                          481

1          THE COURT:  The objection is sustained.

2          Ladies and gentlemen, you can disregard the

3    question and the answer.

4          MR. ZERNER:  Your Honor, I object to these

5    being offered.  In fact, they are only being offered

6    subject to connection, but I believe they should not be

7    received in evidence.

8          THE COURT:  Thank you, Mr. Zerner.  The

9    exhibit is received in evidence subject to connection.

10         (Whereupon, People's Exhibit 10 was received

11   in evidence.)

12         COURT OFFICER:  People's 10 in evidence.

13         MR. ZERNER:  Subject to connection, your

14   Honor?

15         THE COURT:  Yes, sir.

16         MR. ZERNER:  I want to make sure.

17         THE COURT:  Thank you.

18         (Whereupon, a cell phone rang.)

19         THE COURT:  Ladies and gentlemen, that's just

20   a reminder that you should turn off all telephones.

21         A JUROR:  Your Honor, I thought it was off.  I

22   apologize.

23         THE COURT:  I'm not directing my comment to

24   any particular juror.

25

S. Johnson - People - Direct                    482

1    DIRECT EXAMINATION (Cont'd)

2    BY MR. PERRI:

3        Q.   Ms. Johnson, what did you do after viewing the text

4    messages on Millinia's cell phone?

5        A.   I went to the Safe Center.  Actually I went to the

6    DA Warren Thurer's office.  Am I pronouncing it right?

7             THE COURT:  So your answer is that you went to

8        Warren Thurer?

9             THE WITNESS:  Yeah.

10       Q.   Where does Warren Thurer work?

11       A.   262 Old Country Road.

12            THE COURT:  I'm sorry, Mr. Perri, was Warren

13       Thurer a name of a person?

14            MR. PERRI:  Warren Thurer.

15            THE COURT:  So just clarify the answer,

16       Mr. Perri, would you please, by a follow-up question.

17            MR. PERRI:  Yes, your Honor.

18       Q.   What, if any, steps did you take to involve law

19    enforcement after you saw the text messages on Millinia's

20    cell phone?

21       A.   I came to the DA's office.

22       Q.   Did you meet with anyone when you came to the

23    district attorney's office?

24       A.   Yes, I did.

25       Q.   Who did you meet with?

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Direct                483

1    A.   Warren Thurer.

2              THE COURT:  A person with the name of Warren

3    Thurer?

4              THE WITNESS:  Yes.

5              THE COURT:  As you understand that name to be.

6              THE WITNESS:  Yes.

7              THE COURT:  Next question.

8    Q.   And what did you do when you were at the district

9    attorney's office?

10   A.   I filed a complaint about what I found on the text

11   message and that there was inappropriate relations between

12   the defendant and my daughter.

13             (Whereupon, a cell phone rang.)

14             THE COURT:  Another reminder we all should

15   have our phones on mute or off quite frankly.

16             Next question, Mr. Perri.

17             MR. PERRI:  Yes, your Honor.

18   Q.   At the time you went to go see Warren Thurer at the

19   district attorney's office, was the defendant still living

20   with you?

21   A.   Yes.

22   Q.   For the rest of August of 2014 did you allow

23   Millinia to be alone with the defendant?

24   A.   No, I did not.

25   Q.   Did Millinia have a cell phone for the rest of

S. Johnson - People - Direct                              484

1   August of 2014?

2        A.   No, she did not.

3        Q.   In September when she started eighth grade in

4   middle school, did she have a cell phone?

5        A.   No, she did not.

6        Q.   And in September of 2014 when she started the

7   eighth grade, was she allowed to be alone with the defendant?

8        A.   No, she was not.

9        Q.   In October of 2014 did there come a time where you

10  became aware that Millinia had a cell phone?

11                 MR. ZERNER:  Objection; leading.

12                 THE COURT:  Overruled.

13       A.   Yes.

14       Q.   And how did you discover that Millinia had a cell

15  phone at that time?

16       A.   Millinia called me on that cell phone and I had

17  confiscated the first one.

18       Q.   And when Millinia called you, did you recognize the

19  number?

20       A.   Yes, I did.

21       Q.   And what did you do after Millinia called you?

22       A.   I took the phone from her.

23       Q.   And what, if anything, did you do with the phone

24  after you took it from her?

25       A.   I took it from her and -- I took the phone from her

S. Johnson - People - Direct                    485

1    and then I gave it to the detective.

2         Q.   At that time?

3         A.   Oh, at that time?

4              THE COURT:  Hold on one second.

5              (Whereupon, a cell phone rang.)

6              THE COURT:  Next question, Mr. Perri.

7         Q.   Immediately after --

8              A JUROR:  I'm trying, your Honor.

9              THE COURT:  If it happens again, we'll secure

10   it for you.

11             A JUROR:  Do you want to secure it now?

12             THE COURT:  Phil, can you take the phone or

13   one of the officers, I'm sorry?

14             A JUROR:  Thank you.

15             THE COURT:  Okay, Mr. Perri, go ahead.

16             MR. PERRI:  Your Honor, I ask the witness be

17   shown People's 6 marked for identification.

18             (Handed to witness.)

19        Q.   Ms. Johnson, do you recognize what's depicted in

20   that exhibit?

21        A.   Yes.

22        Q.   And what do you recognize it to be?

23        A.   Millinia's cell phone.

24        Q.   Is this the first or the second cell phone?

25        A.   This is the second cell phone.

S. Johnson - People - Direct                    486

1          Q.   And is that an exact -- is it a fair and accurate

2   depiction of that second cell phone?

3          A.   Yes, it is.

4          Q.   Is that the cell phone that you took from Millinia?

5          A.   Yes, it is.

6               MR. PERRI:  Your Honor, I ask that that be

7       received into evidence.

8               THE COURT:  Please show adversary counsel.

9               MR. PERRI:  Your Honor, I'm asking it be

10      received into evidence subject to connection with

11      Detective Toussaint.

12              (Handed to counsel.)

13              MR. ZERNER:  Brief voir dire, your Honor?

14              THE COURT:  You may.

15              THE WITNESS:  Excuse me, Judge, there was a

16      previous question that was asked.

17              THE COURT:  Okay, hold on, ma'am.  Mr. Zerner

18      is going to ask some questions right now.

19   VOIR DIRE EXAMINATION

20   BY MR. ZERNER:

21         Q.   Ms. Johnson, you were just shown a two-page

22   document, correct?

23         A.   Yes.

24         Q.   And you're telling us that this is Millinia's cell

25   phone?

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Direct                487

1          A.    Yes.

2          Q.    How do you know this to be Millinia's cell phone?

3          A.    That's the cell phone that I took from her.

4          Q.    Are there any markings on the phone to tell you

5    that this phone was Millinia's and not somebody else's?

6                Did you hear me, ma'am?

7          A.    I heard you.

8          Q.    Please answer the question then.

9          A.    That's Millinia's cell phone.  That was the phone

10   that I picked up and I took from her.

11         Q.    You are aware many cell phones look alike, correct?

12         A.    Yes.

13         Q.    You have been in cell phone stores and you have

14   seen multiple phones?

15         A.    Yes.

16         Q.    So how do you know that this phone in this

17   photograph belonged to your daughter?

18         A.    The numbers on the back, I always look at them.

19         Q.    So when you say the numbers on the back, the back

20   of the cell phone was removed and it's now in two pieces,

21   correct?

22         A.    Yes.

23         Q.    And there is a serial number inside that is 15

24   digits, correct?

25         A.    Uh-huh.

S. Johnson - People - Direct                    488

1          Q.   Yes?

2          A.   Yes.

3          Q.   You have to say yes or no for the reporter.

4          A.   Yes.

5          Q.   So you memorized that 15 digit number?

6          A.   That phone -- yes, I did.

7          Q.   Could you tell us what that number is right now,

8    ma'am?

9          A.   I couldn't tell you off my mind, no.

10         Q.   You just told us you memorized the number.

11         A.   Well, I can't recant it now.  I don't remember it.

12         Q.   When did you memorize the number?

13         A.   Before I handed it in when I had it in my

14   possession.

15         Q.   In 2014?

16         A.   Yes.

17         Q.   So was this photograph taken in 2014?

18         A.   I don't know.

19         Q.   You didn't take this photograph, right?

20         A.   It was taken.

21         Q.   Did you take this photograph?

22         A.   I did not take that photograph, no.

23         Q.   And there are no distinguishing marks on this phone

24   as far as a TV character or sports team or anything like that

25   that would indicate to you this was Millinia's cell phone,

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Direct                    489

1    correct?

2        A.   No.

3        Q.   The only way that you know this to be your

4    daughter's cell phone is that you claim that you memorized

5    the serial number?

6        A.   Yes.

7        Q.   And the first time you saw this cell phone was when

8    you took it out from under her pillow in October of 2014?

9        A.   I didn't take that phone out from under her pillow.

10       Q.   Did you memorize the number of the cell phone when

11   you did take it from under the pillow previously?

12                MR. PERRI:   Objection.

13                THE COURT:   Overruled.

14       Q.   Please answer the question.

15       A.   Yes.

16                MR. ZERNER:   If I can see People's 7, please.

17                THE COURT:   Mr. Zerner, this is voir dire.

18                MR. ZERNER:   Right, but it's voir dire about

19         these two cell phones and I think they look similar and

20         I would like to question the witness about it before we

21         rule on what the story is on this exhibit number.

22                THE COURT:   I'll rule on it, not we.

23                MR. ZERNER:   Yes, of course.

24                THE COURT:   Just follow up your questions with

25         regard to this particular exhibit, sir.

S. Johnson - People - Direct                    490

1        Q.   What brand of cell phone is this?

2        A.   Samsung.

3        Q.   What brand of cell phone was the prior one?

4        A.   Samsung.

5        Q.   Were the two phones similar?

6        A.   Yes.

7        Q.   Did you memorize both serial numbers?

8        A.   Yes, I did.

9        Q.   Tell us the serial numbers.

10       A.   I don't know them offhand.

11       Q.   Did you write down the serial numbers anywhere?

12       A.   Yes, I did.

13       Q.   Where did you write them down?

14       A.   I have them somewhere.  I don't have them on me.

15       Q.   Did you provide that document to the district

16  attorney?

17            Did you hear me, ma'am?

18       A.   Yes.

19       Q.   Did you provide that document to the district

20  attorney's office?

21       A.   No, I did not.

22       Q.   Did you give it to Warren Thurer back in August of

23  2014?

24            MR. PERRI:  Objection.  This is far beyond

25       voir dire.

S. Johnson - People - Direct                    491

1              THE COURT:  Overruled.

2        Q.   Please answer the question.

3        A.   No.

4        Q.   Did you give it to anybody in October of 2014?

5        A.   Give what to anyone?

6        Q.   The serial numbers that you had documented on a

7   piece of paper.

8        A.   No.

9        Q.   Do you commonly memorize 15 digit numbers?

10              THE COURT:  Next question.

11              MR. PERRI:  Objection.

12              THE COURT:  Mr. Zerner.

13              MR. ZERNER:  Your Honor, I object to this

14        being offered into evidence.

15              THE COURT:  Thank you.  The exhibit is

16        received in evidence subject to connection by Detective

17        Toussaint.

18              (Whereupon, People's Exhibit 6 was received in

19        evidence.)

20              COURT OFFICER:  People's 6 in evidence.

21              THE COURT:  Mr. Perri, next question.

22              MR. PERRI:  Yes, your Honor.

23   DIRECT EXAMINATION (Cont'd)

24   BY MR. PERRI:

25        Q.   Ms. Johnson.

S. Johnson - People - Direct                    492

1          A.    Yes.

2          Q.    After you took possession of that cell phone from

3    your daughter Millinia, what, if anything, did you personally

4    do with that cell phone when you took it into your

5    possession?

6          A.    I -- the steps I took was I went to the Safe Center

7    and I also went to Family Court to get an order of

8    protection.

9          Q.    And before you did that -- I want to back you up a

10   little bit.  I'm asking what, if anything, did you do with

11   the phone itself after you took it from Millinia?

12         A.    I had Millinia unlock the phone to show --

13         Q.    Was the phone locked when you received it?

14         A.    Yes, it was.

15               MR. ZERNER:  Objection; leading.

16               THE COURT:  Overruled.

17         A.    Yes, it was locked.

18         Q.    When you found the phone was locked, what, if

19   anything, did you do after you saw it was locked?

20               MR. ZERNER:  Objection; asked and answered.

21               THE COURT:  Overruled.

22         A.    I had her unlock the phone and I read the text

23   messages.

24         Q.    And what, if anything, did you discover when you

25   looked through the text messages?

S. Johnson - People - Direct                    493

1      A.   It was inappropriate text messages.

2      Q.   And were you able to determine the identity of who

3  was sending the text messages?

4      A.   Yes, I was.

5      Q.   Who did you believe was sending the text messages?

6      A.   Ray Ross, the defendant.

7           MR. PERRI:   Your Honor, I'm asking this be

8      marked as People's 12 [sic] for identification.

9           (Whereupon, People's Exhibit 11 was marked for

10     identification, only.)

11          COURT OFFICER:   People's 11 marked for ID.

12          MR. PERRI:   I ask it be shown to the witness,

13     your Honor.

14          (Handed to witness.)

15     Q.   Ms. Johnson, please look through that packet.

16     Ms. Johnson, do you recognize the photographs

17 contained in that packet?

18     A.   Yes, I do.

19     Q.   What do you recognize them to be?

20     A.   Text messages from Ray Ross, the defendant, to my

21 daughter.

22     Q.   Where did those text messages appear?  Where did

23 you see them?

24     A.   On her phone.

25     Q.   And, Ms. Johnson, have you seen that packet

1    previously?

2         A.    Yes.

3         Q.    And I'm going to ask you to look on the back.  Do

4    you recognize any markings on the back of that document?

5         A.    Yes, I do.

6         Q.    What do you recognize?

7         A.    My signature and Millinia's signature.

8         Q.    Did you place that signature on the back of the

9    document after you reviewed it?

10        A.    Yes, I did.

11        Q.    Have there been any alterations to the document

12   since you reviewed it?

13        A.    No.

14        Q.    Are those fair and accurate depictions of the text

15   messages you observed on Millinia's cell phone after you took

16   it from her?

17        A.    Yes.

18              MR. PERRI:  Your Honor, I ask that be received

19        into evidence subject to connection through Millinia

20        Johnson.

21              THE COURT:  Ma'am, when you say it's

22        Millinia's phone, what phone are you talking about?

23              THE WITNESS:  This is the second phone that

24        she had in her possession and she called me on that

25        phone.  After I took the first phone away, a second

S. Johnson - People - Direct                    495

1        phone appeared and she had called me on it and that's

2        how I knew there was another phone and I demanded that

3        Millinia unlock -- I took the phone and demanded her to

4        unlock the pass code and then I proceeded to read

5        through it.

6                    THE COURT:  And is it your testimony that the

7        exhibit contains the texts that you read from the phone

8        that you took from Millinia?

9                    THE WITNESS:  Yes.

10                   THE COURT:  Please show that to adversary

11       counsel.

12                   (Handed to counsel.)

13                   MR. ZERNER:  If I can have a brief voir dire,

14       your Honor?

15                   THE COURT:  You may, sir.

16  VOIR DIRE EXAMINATION

17  BY MR. ZERNER:

18       Q.   Ms. Johnson, so at the same time when you were here

19  on Sunday talking to ADA Perri looking at the other text

20  message packet, you were looking at this text message packet?

21       A.   Yes.

22       Q.   And how did you know that this was from the second

23  cell phone?

24       A.   I viewed what was on the first one and on the

25  second one.

S. Johnson - People - Direct                     496

1       Q.   Well, you were shown these documents on Sunday,

2   right?

3       A.   Yes.

4       Q.   Had you ever seen the documents as documents

5   before?

6       A.   No.

7       Q.   So the first time you saw them was approximately 18

8   months after you took this phone away from your daughter in

9   October of 2014?

10      A.   Say that again.

11      Q.   You have never seen the text messages on paper

12  before, correct?

13              THE COURT:  Before Sunday; is that correct?

14              THE WITNESS:  Before Sunday?

15              THE COURT:  Yeah.

16              THE WITNESS:  I saw them Sunday.

17      Q.   Right.  And prior to Sunday you had never seen them

18  in paper form, correct?

19      A.   I did.

20      Q.   When did you see these papers before Sunday,

21  February 7, 2016?

22      A.   Grand jury?  I can't recount exactly what day it

23  was, but.

24              THE COURT:  Ms. Johnson, did you ever see

25      copies of the text messages that we're speaking about

1      before Sunday?

2                  THE WITNESS:  No.

3                  THE COURT:  So this packet that's been marked

4      as People's Exhibit number 11 for ID, is that the first

5      time you saw --

6                  THE WITNESS:  Yes.

7                  THE COURT:  Hold on.

8                  Is that the first time you saw copies of text

9      messages from either the first phone or the second

10     phone?

11                 THE WITNESS:  Yes.

12                 THE COURT:  Go ahead, Mr. Zerner.

13                 MR. ZERNER:  Thank you.

14     Q.   So on Sunday when ADA Perri showed you this packet

15     of papers, did you also have the physical phone with you?

16     A.   In my possession?

17     Q.   Was it in the room with you and ADA Perri on

18     Sunday?

19     A.   I wouldn't know that.  I didn't have it on my

20     person.

21     Q.   Well, the phone was given to the police in October

22     of 2014, right?

23     A.   Yes.

24     Q.   You gave it to Warren Thurer?

25     A.   No.

S. Johnson - People - Direct                    498

1       Q.   Who did you give it to in October of 2014?

2       A.   Detective Toussaint.

3       Q.   So Detective Toussaint took that phone, right?

4       A.   Yes.

5       Q.   And then did you see the phone again ever?

6       A.   No.

7       Q.   The phone?

8       A.   No.

9       Q.   And this is a Samsung phone that looks like a lot

10   of other Samsung phones, correct?

11       A.   I suppose.

12       Q.   And there is no serial number on this photograph of

13   the phone for you to compare it to your memory of the

14   memorized 15 digit number, correct?

15       A.   No.

16       Q.   So ADA Perri showed you this packet of documents

17   and said sign the back, correct?

18       A.   I viewed them and I looked at them.

19           MR. PERRI:  Objection.

20           THE COURT:  Overruled.  Your witness answered

21   she viewed them.

22       Q.   Did you look through each and every paper when you

23   were with ADA Perri on Sunday?

24       A.   Yes, I did.

25       Q.   Did you initial each page as you went through?

S. Johnson - People - Direct                499

1        A.   No.

2        Q.   In fact, when you were given this packet of papers

3   on Sunday, February 7, you already saw your daughter's

4   signature from February 1, 2016, correct?

5        A.   Yes.

6        Q.   You are familiar with your daughter's signature,

7   right?

8        A.   Yes.

9        Q.   And you were shown a blank piece of paper, but it

10  wasn't blank, it already had your daughter's signature and

11  the date of 2/1/16, correct?

12       A.   Yes.

13       Q.   Were you with her when she signed that?

14            Did you hear me, ma'am?

15       A.   Yes.

16            THE COURT:  Mr. Zerner, please, if there is

17       some prompting that's needed, I'll prompt the witness.

18            MR. ZERNER:  Sorry, your Honor, of course.

19            THE COURT:  All right, ma'am, did you hear the

20       question?

21            THE WITNESS:  So was I with her?

22            THE COURT:  Were you present at the time that

23       Millinia signed that exhibit?

24            THE WITNESS:  Yes.

25            THE COURT:  On the 1st of February?

S. Johnson - People - Direct                    500

1              THE WITNESS:  Yes.

2              THE COURT:  Next question.

3         Q.   Were you asked to sign it on February 1st?

4         A.   No.

5         Q.   But you were in the room with her when she signed

6    it?

7         A.   Yes.

8         Q.   That was the same situation for the other

9    documents, Exhibit 6, right?

10             THE COURT:  I think it would be Exhibit 10.

11             MR. ZERNER:  Thank you, your Honor.

12        Q.   Same situation for that?

13        A.   Yes.

14        Q.   So she had already signed it six days earlier, but

15   you were in the room when it was signed on February 1st?

16        A.   Yes.

17        Q.   But you weren't asked to sign it back on February

18   1st?

19        A.   No.

20             MR. ZERNER:  I object, your Honor.

21             THE COURT:  The objection is overruled.  The

22        exhibit is received in evidence as People's 11 subject

23        to connection by Detective Toussaint.

24             (Whereupon, People's Exhibit 11 was received

25        in evidence.)

S. Johnson - People - Direct                    501

1               COURT OFFICER:  People's 11 in evidence.

2

3    DIRECT EXAMINATION (Cont'd)

4    BY MR. PERRI:

5        Q.    After you viewed the text messages on Millinia's

6    second cell phone, did there come a time where you went to

7    Family Court?

8        A.    Yes.

9        Q.    And why did you go to Family Court?

10       A.    I went to Family Court to get an order of

11   protection.

12       Q.    And did you, in fact, get an order of protection?

13       A.    Yes, I did.

14       Q.    And at the time you requested the order of

15   protection, where was the defendant living?

16       A.    301 Coventry Road North.

17       Q.    And after you received that order, did the

18   defendant continue to live at 301 Coventry Road North?

19       A.    Yes, he did.

20       Q.    And did there come a time when you went back to

21   Family Court?

22       A.    Yes.

23       Q.    And what happened the second time you went back to

24   Family Court?

25       A.    The second time I got an order of protection,

S. Johnson - People - Direct                                 502

1    right.   I got an order of protection.

2        Q.   Was the defendant present at Family Court the

3    second time?

4        A.   Yes.

5        Q.   And after that second order of protection was

6    issued, was the defendant continuing to live at 301 Coventry?

7        A.   Yes.

8             Oh, after the second one?

9        Q.   Yes, after the second one.

10       A.   No.

11       Q.   After you were at Family Court did there come a

12   time when you went back to the district attorney's office?

13       A.   Yes.

14       Q.   Who did you go with?

15       A.   Millinia.

16       Q.   And what did you do the second time you went to the

17   district attorney's office?

18       A.   Millinia made a statement.

19       Q.   And who did she make that statement to?

20       A.   Warren Thurer, the DA.

21       Q.   Now, after the defendant stopped living at 301

22   Coventry Road North, did you move inside the house?

23       A.   Repeat that, please.

24       Q.   After the defendant no longer was living at 301

25   Coventry Road North, did you or Millinia or Mercedes, did you

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Direct                                   503

1    move out of the basement of your house?

2        A.   No.

3        Q.   Do you still live there today?

4        A.   Yes.

5        Q.   Since the defendant moved out, have there been any

6    changes with respect to the finances at home?

7        A.   Yes.

8        Q.   How have they changed?

9        A.   Me and my son take over the bills and pay what

10   needs to be paid.

11       Q.   Now, after you went to the district attorney's

12   office, did there come a time when you met with Detective

13   Toussaint of the Nassau County Police Department?

14       A.   Yes, I did.

15       Q.   And how did you get in touch with Detective

16   Toussaint?

17       A.   He called me.

18       Q.   And did there come a time when you met Detective

19   Toussaint?

20       A.   Yes, I did.

21       Q.   Where did you meet him?

22       A.   At my house.

23       Q.   And what happened when he came to your house?

24       A.   We went down the street and we -- Millinia, we were

25   talking, and Millinia talked to him and opened up to

S. Johnson - People - Direct                    504

1    Detective Toussaint.

2        Q.   And you said you went down the street.  How did you

3    go down the street?

4        A.   In the car.

5        Q.   And when you say that Millinia opened up to

6    Detective Toussaint, were you present for when Detective

7    Toussaint was speaking to Millinia?

8        A.   Yes.

9        Q.   Were you in the actual car?

10       A.   Yes.

11       Q.   And did there come a time when you gave Detective

12   Toussaint anything?

13       A.   Yes, I did.

14       Q.   What did you give him?

15       A.   I gave him the two cell phones.

16           MR. PERRI:  Your Honor, I ask that the witness

17       be shown what's been marked as People's 1 for ID.

18               (Handed to witness.)

19       Q.   Ma'am, do you recognize People's 1 for

20   identification?

21       A.   Yes.

22       Q.   What do you recognize it to be?

23       A.   My daughter Millinia.

24       Q.   And, ma'am, is that a fair and accurate depiction

25   of how Millinia appeared when she was 12 years old in the

1    second half of her sixth grade year?

2         A.    Yes.

3                   MR. PERRI:  Your Honor, I ask that that be

4         received in evidence.

5                   THE COURT:  Please show adversary counsel.

6                   (Handed to counsel.)

7                   MR. ZERNER:  No objection, your Honor.

8                   THE COURT:  Received in evidence without

9         objection, People's 1.

10                  (Whereupon, People's Exhibit 1 was received in

11        evidence.)

12                  COURT OFFICER:  People's 1 in evidence.

13                  MR. PERRI:  Nothing further, your Honor.

14                  THE COURT:  Thank you.

15                  Ladies and gentlemen of the jury, we're going

16        to take five minutes, okay.

17                  (Whereupon, the jury exited the courtroom.)

18                  THE COURT:  Ms. Johnson, as you know, we're

19        going to take a break.  So, you are entitled to that

20        break as well, but don't talk to anybody about your

21        testimony while we're on break, okay.

22                  THE WITNESS:  Okay.  Thank you, your Honor.

23                  THE COURT:  Counsel, five minutes.

24                  MR. PERRI:  Yes, your Honor.

25                  (A recess was taken.)

S. Johnson - People - Cross                506

1              THE CLERK:  Are all parties ready?

2              MR. PERRI:  Yes, your Honor.

3              (Whereupon, the witness returned to the

4     witness stand.)

5              THE CLERK:  Is the defense ready at this time?

6              MR. ZERNER:  Yes, I'm sorry, with all the

7     noise, I'm pretty sure you had asked me, but I hadn't

8     quite heard.

9              THE COURT:  Please bring the jury back in.

10              (Whereupon, the jury entered the courtroom.)

11              THE CLERK:  Let the record reflect the

12     presence of the jury.

13              Again, People ready?

14              MR. PERRI:  Yes.

15              THE CLERK:  Defense ready?

16              MR. ZERNER:  Yes.

17              THE COURT:  Mr. Zerner.

18              MR. ZERNER:  Thank you, your Honor.

19     CROSS-EXAMINATION

20     BY MR. ZERNER:

21          Q.   Good afternoon, Ms. Johnson.

22          A.   Good afternoon.

23          Q.   Ms. Johnson, prior to today had you and I ever met?

24          A.   No.

25          Q.   But prior to today you have spent time with the

S. Johnson - People - Cross                          507

1    assistant district attorney, Anthony Perri, correct?

2         A.   Yes.

3         Q.   And we already learned you spent time with him this

4    past Sunday on February 7th?

5         A.   Yes.

6         Q.   And you also spent time with him on February 1,

7    2016?

8         A.   Yes.

9         Q.   But those aren't the only two times you met with

10   him, correct?

11        A.   Yes.

12        Q.   Tell us when else you have met with Mr. Perri.

13        A.   Grand jury, July.

14        Q.   July of 2015?

15        A.   Yes.

16        Q.   And did you meet with him more than once at that

17   point in time?

18        A.   No.

19        Q.   So you met with him one day in July of 2015?

20        A.   Yes.

21        Q.   And he prepared you before you went in and talked

22   to the grand jury?

23        A.   Yes, I spoke with him.

24        Q.   And he told you what to expect when you went into

25   the grand jury?

1              THE COURT:   You have to answer, yes or no.

2        A.   Yes.

3        Q.   Now, prior to July of 2015 had you met with

4   Mr. Perri?

5        A.   No.

6        Q.   Or anybody else in the district attorney's office?

7        A.   Who I mentioned earlier.

8        Q.   So you met with Warren Thurer.  Is he an assistant

9   district attorney also?

10             THE COURT:   If you know.

11        A.   I don't know.

12        Q.   And that was in the building next door, 262 Old

13   Country Road?

14        A.   Yes, it was.

15        Q.   And that was in October of 2014?

16        A.   Yes.

17        Q.   And you also met with him in August of 2014?

18        A.   Yes.

19        Q.   Were you pleased with him in August of 2014?

20        A.   Yes.

21        Q.   And when you met with him, he took down notes and

22   spoke to you?

23        A.   Yes.

24        Q.   But there was no arrest made in August of 2014,

25   right?

S. Johnson - People - Cross                                509

1      A.   No.

2      Q.   And you called Mr. Thurer after that?

3      A.   Did I call him after that?  I'm not sure of the

4 date.

5      Q.   But you did call him after that, right?

6      A.   Yeah.

7      Q.   You met with him and then after that you called

8 him, right?

9      A.   I'm not sure, so I'm not --

10     Q.   Ma'am, you understand what my role is here at this

11 trial, right?

12     A.   Yes.

13     Q.   What's my role?

14          THE COURT:  Objection sustained.

15          MR. PERRI:  Objection.

16     Q.   You understand that I'm the defense attorney

17 defending my client against charges, right?

18     A.   Yes.

19     Q.   And you have had defense attorneys in the past,

20 right?

21          MR. PERRI:  Objection.

22          THE COURT:  Sustained.

23     Q.   Now, Ms. Johnson, you have been arrested before,

24 right?

25          MR. PERRI:  Objection.

S. Johnson - People - Cross                    510

1              THE COURT:  Sustained.

2       Q.   Ms. Johnson, did you have any interaction with the

3    district attorney's office of Nassau County aside from

4    involving your daughter in 2014?

5              MR. PERRI:  Objection.

6              THE COURT:  Sustained.

7              MR. ZERNER:  Your Honor, if I can have a

8       sidebar.  I thought we talked about this.

9              THE COURT:  I don't know what your

10      recollections are, Mr. Zerner, but I don't appreciate

11      you offering those in front of the jury.

12             MR. ZERNER:  My apologies.

13             THE COURT:  You are entitled to speak to me

14      and we'll speak outside the presence of the jury.

15             So, ladies and gentlemen, I'm just going to

16      ask you to take a break and step outside.  You don't

17      have to go far.

18             (Whereupon, the jury exited the courtroom.)

19             THE COURT:  Ms. Johnson, I'm going to ask you

20      to excuse yourself for just a few minutes.  Again, don't

21      talk to anyone about the case.

22             THE WITNESS:  Yes.

23             (Whereupon, the witness exited the courtroom.)

24             THE COURT:  Mr. Zerner, please don't add any

25      editorialization, if you will, to your objections or

Kathi A. Fedden, Sr. Court Reporter

 1          requests for a sidebar.  Whether we talked about it or

 2          not is not something that the jury is supposed to be

 3          aware of and I don't appreciate it because then I then

 4          have to address it to you publicly.

 5                    So, the objection was sustained as to the form

 6          of the question, did she have any interaction with the

 7          district attorney's office.

 8                    MR. ZERNER:  However, I believe you made a

 9          ruling that I can cross-examine her on the fact that she

10          was charged with stealing items on at least two

11          different occasions.

12                    THE COURT:  I don't know if that was my

13          ruling.  Mr. Perri?

14                    MR. PERRI:  Your Honor, I believe your ruling

15          was the exact opposite, that you ruled that the petit

16          larcenies were not to be used for cross-examination.

17          You stated that she received a disposition favorable to

18          her and they were not related to this case.

19                    THE COURT:  And that is my recollection,

20          Mr. Zerner.  One, the 1995 interaction with the criminal

21          justice system is too remote in time for one, as the

22          prejudice would outweigh any probative value of that.

23          And with regard to both of them, my understanding

24          through the People's representations and research and

25          investigation and our conference in chambers is that you

S. Johnson - People - Cross                    512

1    were not allowed to engage in any cross-examination on

2    those two points for the basic reason that any probative

3    value to that, which I believe is none, is outweighed by

4    the prejudicial value or the prejudice to the witness.

5    So, please remove your line of questioning on those

6    points.

7              MR. ZERNER:  If I -- just so I'm clear, your

8    Honor, and I understand and I respect your ruling, it's

9    my understanding that there was a charge pending in 2014

10   and that's the year that she just testified to that she

11   had interaction with an assistant district attorney in

12   August and an interaction in October.  I would ask that

13   I be allowed to inquire whether there was any discussion

14   whether it was by the assistant district attorney or the

15   ADA looked her up in their system on the computer or if

16   he asked the question about whether she had any pending

17   charges against her when these charges were first

18   brought up.  I don't know.  I don't know if Warren

19   Thurer --

20             THE COURT:  What is the purpose for that, sir?

21             MR. ZERNER:  That she may very well have had a

22   vested interest in taking away from the possibility that

23   she was going to be convicted of a misdemeanor which may

24   or may not have had --

25             THE COURT:  By charging another individual

S. Johnson - People - Cross                        513

1       with criminal conduct, is that the theory?

2              MR. ZERNER:  That's one of the theories.  If

3       she turned around and said well, I was charged with a

4       misdemeanor, which again, I don't know, maybe she was

5       charged with stealing $999 worth of items.

6              Maybe a DA looked her up and said this isn't

7       her first time having a petit larceny and maybe they

8       won't offer her an ACOD and then she goes ahead and says

9       my daughter was molested.  In August the DA's office

10      does nothing about that.  Ten, 11 weeks later in October

11      she goes to the DA's office and says, you know, now I

12      want this person prosecuted.  The end result we know is

13      she received an ACOD.

14             I still haven't seen document one that shows

15      the date of the disposition of her misdemeanor charge

16      which was also prosecuted by the same district

17      attorney's office that is now taking her testimony where

18      she is the mother of the complainant.

19             THE COURT:  Mr. Zerner, you have made your

20      record.  If there is any exception to my ruling, it's

21      noted for the record, but the Court finds that the

22      argument is unpersuasive to allow you to engage in a

23      cross examination of this witness with regard to a

24      matter that was, for all accounts, made by the People,

25      was disposed of in the witness's favor and the Court

S. Johnson - People - Cross                          514

1    finds that if there was any disposition not in favor of

2    the defendant that's out there, that the prejudice to

3    the witness -- excuse me, the prejudice is outweighed --

4    excuse me.  The probative value of that inquiry is

5    clearly outweighed by the prejudice that it would enure.

6              MR. ZERNER:  I understand your ruling, but

7    please note my exception and what I am saying is that

8    this witness did get a favorable ruling at the same time

9    she was the complainant's mother and she was a

10   defendant, same county, same district attorney's office.

11             THE COURT:  Some other Court might look at

12   that and come to a different conclusion.  This Court's

13   conclusion is that it's mere speculation.

14             MR. ZERNER:  And if I might ask these blinds

15   be put down.

16             THE COURT:  You may.

17             MR. ZERNER:  They are blinding me.

18             THE COURT:  They are.

19             (Whereupon, the witness returned to the

20   witness stand and the jury entered the courtroom.)

21             THE CLERK:  Let the record reflect the

22   presence of the jury.  All parties are present.  People

23   ready?

24             MR. PERRI:  Yes, your Honor.

25             THE CLERK:  Defense ready?

```
 1                    MR. ZERNER:  We are.

 2                    THE COURT:  Before we break -- before we

 3          broke, ladies and gentlemen, there was an objection.

 4          That objection is sustained.  Mr. Zerner will continue

 5          his cross-examination of the witness.

 6                    MR. ZERNER:  Thank you, your Honor.

 7   BY MR. ZERNER:

 8          Q.    Ms. Johnson, you have been living at your home at

 9   301 Coventry Road North for 40 years you said?

10          A.    Yes.

11          Q.    And that's where you lived when you were a child?

12          A.    Yes.

13          Q.    How many siblings do you have?

14          A.    I have three.  Actually, two now.  One's deceased.

15          Q.    I'm sorry, there was a squeaking behind me.  I

16   didn't quite hear you.

17          A.    I have two siblings.

18          Q.    One of them is Tara Johnson?

19          A.    Yes.

20          Q.    She's your older sister?

21          A.    Yes.

22          Q.    What's the name of your other sibling?

23          A.    Anthony Johnson.

24          Q.    He's younger than you?

25          A.    Older than me.
```

S. Johnson - People - Cross                     516

1        Q.   So it's Anthony, Tara, Sarita?

2        A.   Yes.

3        Q.   Was there ever a time that you moved out of that

4    house?

5        A.   No, no.

6        Q.   You never lived in Laurelton, Queens with Rafael

7    Mickens?

8        A.   No.

9        Q.   Did you ever live anywhere with Rafael Mickens?

10       A.   He stayed at my house with me at some point in

11   time.

12       Q.   And who is Rafael Mickens to you?

13       A.   Millinia's father.

14       Q.   And when was he living with you at your home?

15       A.   I want to say over eight years ago.

16       Q.   So we're talking about 2008, give or take?

17       A.   Five maybe.  2005.  Maybe 2005.

18       Q.   So my question and I apologize for it being a

19   compound question, but I hope the judge will allow it, it was

20   for how many years and what span of time, please?

21            THE COURT:  Let's break it down, Mr. Zerner,

22       please.

23       Q.   When did Rafael Mickens first start living at 301

24   Coventry Road?

25       A.   Millinia is 15.  In the early part of her life, two

1    thousand something.  I'm not sure, 2001, 2002.

2         Q.   Okay.  So it's your testimony that Rafael Mickens

3    started living with you shortly after Millinia was born; is

4    that fair to say?

5         A.   Yes.

6         Q.   And for how many years did he live with you and

7    Millinia?

8         A.   Maybe five.  Five I want to say.

9         Q.   So approximately from 2001 until 2006?

10        A.   Yes.

11        Q.   Okay.

12             And why did he move out?

13                  MR. PERRI:  Objection.

14                  THE COURT:  Overruled.

15                  You can answer.

16        A.   Difference of agreement.  We separated.

17        Q.   Well, you were never married to him, right?

18        A.   No.

19        Q.   And he lived with you for about five years?

20        A.   Yeah.

21        Q.   And then you became pregnant by another man?

22                  MR. PERRI:  Objection.

23                  THE COURT:  The objection is sustained.  Next

24    question.

25        Q.   How many children do you have?

S. Johnson - People - Cross                     518

1          A.   I have four.

2          Q.   Could you tell us the first one's name and the year

3     of birth?

4          A.   Malik, 1993.

5          Q.   And your next child?

6          A.   Mercedes, 1997.

7          Q.   And they have the same father, right?

8          A.   Yes, they do.

9          Q.   What's his name?

10         A.   Robert Jones.

11         Q.   And were you ever married to him?

12         A.   No.

13         Q.   And did he ever live at 301 Coventry Road?

14              MR. PERRI:   Objection; relevance.

15              THE COURT:   No, overruled.

16              Did he ever live there, ma'am?

17              THE WITNESS:   No.

18         Q.   And then you had a baby Millinia in the year 2000,

19    right?

20         A.   Yes.

21         Q.   Rafael Mickens is her father?

22         A.   Yes.

23         Q.   And you never married him, but you did live with

24    him for about five years?

25         A.   Yes.

S. Johnson - People - Cross                         519

1        Q.    And then your youngest child's name is what?

2        A.    Sherima.

3        Q.    How old is she?

4        A.    Eight.

5        Q.    So she was born in two thousand?

6        A.    Seven.

7        Q.    Who is her father?

8        A.    Sherman Roberts.

9        Q.    And did he ever live at 301 Coventry Road?

10       A.    Briefly.  I believe he stayed with me for a brief

11  time.

12       Q.    What year would that have been?

13       A.    She was a baby.  She's eight now.  Roughly seven

14  years ago.  Maybe seven years ago.

15       Q.    So he lived with you for about a year, perhaps

16  around 2008; is that fair to say?

17       A.    2008?  No, earlier maybe.  I'm not sure actually.

18            THE COURT:  Next question, Mr. Zerner.

19            MR. ZERNER:  Thank you, your Honor.

20       Q.    Now, in 2008 when Sherman Roberts was living at 301

21  Coventry Road North, your sister Tara and Ray Ross lived

22  there as well, correct?

23       A.    Yes, they did.

24       Q.    And when Ray Ross moved into your house, he was

25  contributing to the bills, correct?

S. Johnson - People - Cross                    520

1      A.   I believe so.

2      Q.   Were --

3      A.   I don't know.  That was between him and Tara, my

4  sister.

5      Q.   Were you ever involved in paying the bills?

6      A.   No, but not because I wasn't willing to.

7      Q.   Well, then why weren't you paying the bills?

8      A.   There was some sort of discrepancy about me paying

9  period at all and there were not any clear lines about who's

10  to pay and who is going to be doing what, things like that.

11  Some sort of discrepancy.

12     Q.   Discrepancies within the family?

13     A.   Yes.

14     Q.   Now, have you ever worked a full-time job?

15     A.   Yes, I have.

16     Q.   And how recently did you work a full-time job?

17     A.   Full time on the books, '07.

18     Q.   What do you mean by on the books?

19     A.   I did odd jobs, baby-sat, cleaned, I even do nails,

20  things like that.

21     Q.   And that was never --

22     A.   To make money because I was taking care of my

23  children.

24     Q.   That was full time?

25     A.   It's full time because I can't say I was in one

S. Johnson - People - Cross                    521

1    particular place, like I punched in or I had a W-2 form.

2         Q.    But you did pay taxes on that income, correct?

3         A.    Yes, when I worked I did.

4         Q.    When you worked doing the odd jobs, did you pay

5    taxes?

6         A.    No, it wasn't substantial enough for me to report.

7         Q.    So approximately what was the dollar amount you

8    were making in these off the books jobs you describe?

9         A.    Maybe $40 at a time, things like that.

10        Q.    Forty dollars a week, $40 a day?

11        A.    Maybe three times a week maybe.  I can't be certain

12   exactly the date and time.

13        Q.    Did you keep records?

14        A.    Not per se.

15        Q.    And this was after you had your last full-time job?

16        A.    Yes.

17        Q.    And that was working as a bus matron?

18        A.    Yes.

19        Q.    How long did that job last?

20        A.    A year-and-a-half.

21        Q.    A year-and-a-half.

22              Why did that job end?

23        A.    I was pregnant with Sherima, my last child.

24        Q.    Now, prior to that year-and-a-half period, what

25   other jobs had you had full time?

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Cross                    522

```
 1        A.   Full time.  I worked in Great Neck, yes, I worked

 2   in Great Neck before full time.

 3        Q.   So geographically, what were you doing in Great

 4   Neck?

 5        A.   I worked in an office.  I worked in a library,

 6   circulation department, daycare.  I worked in corporate.

 7        Q.   Let's slow down.  First of all, when you worked in

 8   Great Neck, who did you work for specifically?

 9        A.   Lilo and Jerry Leeds.

10        Q.   And for how long did you work there?

11        A.   Five years.

12        Q.   Five years.

13             What kind of job was that?

14        A.   I just explained it.  I just said that.  I did

15   reception.  I did daycare.  I did circulation department,

16   library.

17             MR. ZERNER:  I'm sorry, Judge, if I can break

18        down the question.

19        Q.   Lilo and Leeds is an organization I'm not familiar

20   with.  Is it at that one organization that you did reception

21   and daycare?

22        A.   Yes.

23        Q.   And books?

24        A.   Yes.

25        Q.   Is it a library?
```

S. Johnson - People - Cross                    523

```
 1        A.    It was a publication company and I worked all over.

 2        Q.    And what years did you work there?

 3        A.    Up until '92.  Five years.

 4        Q.    That ended in 1992?

 5        A.    Yes.

 6        Q.    I'm sorry, it might have been --

 7        A.    I can't be certain.  You are going back in time.

 8        Q.    So between 1992 and 2007 did you have any full-time

 9   position at anyplace?

10        A.    No, because I was rearing children.  I did work

11   some websites through social services, odd jobs.  I worked at

12   the bus company.

13        Q.    How many hours a week were you working at the bus

14   company?

15        A.    Eight hours.

16        Q.    Eight hours a day, five days a week?

17        A.    Yes.

18        Q.    That's when you met Sherman Roberts, right?

19        A.    Yes.

20        Q.    And you got pregnant.  You met him, got pregnant.

21   You started a relationship?

22        A.    Yes.

23        Q.    After you had the baby you didn't go back to work?

24        A.    No.

25        Q.    Now, between 1992 and 2007 your sister Tara was
```

S. Johnson - People - Cross                    524

1    also living at 301 Coventry Road North, right?

2         A.   Yes.

3         Q.   And your mother was living there as well, right?

4         A.   Yes.

5         Q.   And were you ever involved in helping to pay the

6    bills at that home during that time frame?

7         A.   Yes.  We had a unique situation in which the lines

8    of my mother wanted me to pay or she didn't want me to pay.

9    It was like don't pay, pay.  It was some sort of discrepancy

10   about paying or not paying and different things.  It wasn't

11   clear.  At one point she said not to pay.

12        Q.   So what did you do with your money when you weren't

13   paying for household bills?

14             MR. PERRI:  Objection.

15        A.   Taking care of my children.

16        Q.   Were you also on public assistance?

17        A.   Yes.

18        Q.   So you were getting food stamps?

19        A.   Yes.

20        Q.   And you were getting welfare?

21        A.   Yes.

22             MR. PERRI:  Objection.

23        Q.   Welfare has changed names.

24             MR. PERRI:  Objection.

25             THE COURT:  Mr. Zerner, adversary counsel has

S. Johnson - People - Cross                                    525

1          stood up and noted an objection.   Overruled.

2                    Next question, Mr. Zerner.

3                    MR. ZERNER:   Thank you, your Honor.

4     Q.    Your sister Tara has worked a steady job for the

5     last 20 plus years, correct?

6     A.    Yes.

7     Q.    She works at HSBC bank?

8     A.    Yes, she does.

9     Q.    She's your older sister, right?

10    A.    Yes.

11    Q.    Now, you said that she got power of attorney with

12    regards to your mother, right?

13    A.    Uh-huh.

14    Q.    Yes?

15    A.    Yes.

16                   THE COURT:   You have to answer yes or no.

17    A.    Yes.

18    Q.    And did that bother you that she was made power of

19    attorney?

20    A.    No.

21    Q.    When was that done?

22    A.    When my mother went into -- sometime when she was

23    in the nursing home.   I couldn't be certain.

24    Q.    So around 2009, 2010?

25    A.    Yes.

1      Q.   And that was okay with you that she became power of

2   attorney?

3      A.   Yes.

4      Q.   And she made sure the bills were paid in the house,

5   correct?

6      A.   Yes.

7      Q.   Your sister Tara, right?

8      A.   Yes.

9      Q.   So let's focus on that time frame right there in

10  2009, 2010.  Tell us who was living in the house at that

11  point in time.

12     A.   Me and my children, her daughter.  That's it.

13     Q.   Ray Ross wasn't living there in 2010?

14     A.   Ray Ross, yes.

15     Q.   What about your nieces and nephews?  Not Tara's

16  children, but Anthony's children.

17     A.   They did have a brief stay there, they did.  They

18  had a situation and they stayed and then they moved on.

19     Q.   Were they contributing to the bills at that time?

20          THE COURT:  At what time are we speaking

21     about?

22          MR. ZERNER:  2009, 2010.

23     A.   I don't know.  Tara has a relationship with them on

24  their own.  I don't know everything that went on.

25     Q.   But they're your nieces and nephews the way they

S. Johnson - People - Cross                                527

1    are Tara's nieces and nephews?

2                    THE COURT:  Sustained.

3         Q.    When Mr. Sherman Roberts was living at the house,

4    did he also contribute to the bills, if you know?

5         A.    I don't know if they had a personal thing.  He

6    would help me like get things like food and things like that.

7         Q.    So Sherman Roberts contributed to the expenses

8    involving his daughter Sherima, right?

9         A.    Yeah.

10        Q.    Did he provide you cash?

11        A.    Cash.

12        Q.    What about Rafael Mickens, Millinia's father, did

13   he also help with the expenses involving childcare?

14        A.    Childcare?  Well, he was helpful.  We worked

15   together.  Yeah, he did contribute.

16        Q.    He provided money to you, right?

17        A.    He did.

18        Q.    And Robert Jones, did he also contribute to the

19   household?

20        A.    I would say to the children, yeah.

21        Q.    Well, contributing to you for food and childcare

22   expenses, that's contributing, right?

23        A.    Yeah.

24        Q.    Did you ever have any issues with them as far as

25   visitation of their children?

S. Johnson - People - Cross                    528

1              MR. PERRI:  Objection.

2              THE COURT:  Sustained.

3              Next question.

4    Q.   Now, Rafael Mickens is Millinia's father, right?

5    A.   Uh-huh.

6    Q.   Yes?

7    A.   Yes.

8    Q.   Is he married?

9              MR. PERRI:  Objection.

10             THE COURT:  When, sir?  Now, presently?

11   Q.   Is he married now?

12             THE COURT:  Overruled.

13   A.   I don't know.

14   Q.   Do you know if he's ever been married?

15             MR. PERRI:  Objection.

16             THE COURT:  Overruled.

17   A.   I don't know.

18   Q.   Aside from Millinia, do you know if Rafael Mickens

19   has any other children?

20             MR. PERRI:  Objection.

21             THE COURT:  Overruled.

22   A.   I don't know.

23   Q.   You don't know whether Rafael Mickens has children

24   besides Millinia?

25             MR. PERRI:  Objection.

S. Johnson - People - Cross                         529

1              THE COURT:  Sustained.

2        Q.   Does Robert Jones have any children besides Malik

3   and Mercedes?

4              MR. PERRI:  Objection.

5              THE COURT:  Sustained.

6        Q.   Now, you told us during direct examination that you

7   know Ray Ross' ex-wife, right?

8        A.   Yes.

9        Q.   Her name is Paula Ross?

10       A.   Yes.

11       Q.   But they're not married anymore, correct?

12       A.   I don't know.

13       Q.   But you know Paula Ross?

14       A.   I do.

15       Q.   And Paula Ross has been to the home at 301 Coventry

16   Road North?

17       A.   Yes, she has.

18       Q.   On more than one occasion?

19       A.   Yes.

20       Q.   And you have seen her interact with your children

21   and your nieces and nephews?

22       A.   Yes.

23       Q.   How would you describe her?

24       A.   She's okay.  Fair.

25       Q.   She's okay, right?

S. Johnson - People - Cross                          530

1          A.    Uh-huh.

2          Q.    Yes?

3          A.    Yes.

4          Q.    And she does hair, right?

5          A.    Yes.

6          Q.    Did you ever see her help your daughters with their

7    hair?

8          A.    Yes.

9          Q.    More than one of your daughters, correct?

10         A.    I don't know if it was more than one.

11         Q.    But she was kind to your daughters, correct?

12         A.    Yes.

13         Q.    Were there ever times when there were multiple

14   people at the home, including guests like Sherman Roberts,

15   Paula Ross when Ray Ross would buy dinner for everybody?

16         A.    I can't recollect.

17         Q.    You can't recollect any time when Ray Ross bought

18   pizza for everybody?

19         A.    I can't.

20         Q.    You can't recollect any time that Mr. Ross bought

21   ices for everyone?

22         A.    I can't.

23         Q.    You can't recollect any time that Mr. Ross bought

24   ice cream for everyone?

25         A.    I can't.

S. Johnson - People - Cross                         531

```
 1        Q.    Mr. Ross ever buy you a meal?

 2        A.    I can't say for certain.

 3        Q.    This extended family living in this house at 301

 4   Coventry Road North, did you commonly eat meals together?

 5        A.    Honestly, I cannot recollect.

 6        Q.    Well, my question is did you eat meals together,

 7   yes or no?

 8                    THE COURT:  On a regular basis, ma'am, did the

 9           extended family eat a meal together?

10                    THE WITNESS:  On a regular basis, no.

11        Q.    Do you recollect any times that the family would

12   eat together?

13        A.    I'm sure.  I can't specify, but yes, I'm sure we

14   did.  I'm pretty certain that I did.

15        Q.    So from 2007 to the present, is it fair to say that

16   you were home most days with your children?

17        A.    Yes, I was busy.  I know that I do shopping,

18   laundry, jobs, things like that.

19        Q.    Did you have outside help for childcare?

20        A.    Outside help?  No.

21        Q.    So in two thousand --

22        A.    What do you mean by that?

23                    MR. ZERNER:  I'll ask another question, your

24           Honor, if I may?

25                    THE COURT:  You may.
```

S. Johnson - People - Cross                    532

1      Q.    In 2007 you gave birth to Sherima, right?

2      A.    Yes.

3      Q.    So you were home with the baby, right?

4      A.    Yes.

5      Q.    And at that point in time Millinia was six or

6    six-and-a-half, right?

7      A.    Uh-huh.

8      Q.    Yes?

9      A.    Yes.

10      Q.    And you would be home with the kids, right?

11      A.    Yes.

12      Q.    And Ray would get up and go to work early in the

13    morning; is that fair to say?

14      A.    Yes.

15      Q.    Ray worked a regular job early in the morning, come

16    home late in the afternoon?

17      A.    I can't be certain if he left at night and came in

18    the morning or if he left in the morning and stayed to the

19    afternoon.

20      Q.    Maybe his hours changed, but he was a hard working

21    man, correct?

22      A.    He did work.  I know he -- I know that he left at

23    those times, whether overnight to morning or morning to

24    evening.

25      Q.    The whole time you knew Ray Ross, he had a steady

S. Johnson - People - Cross                         533

1   full-time job; is that fair to say?

2        A.   No.

3        Q.   Do you remember a point in time when Ray Ross did

4   not have a steady full-time job?

5        A.   Yes, I believe that he was out on disability.

6        Q.   What was that time frame?

7        A.   I can't recollect the year, but sometime within

8   that 2007 on down to when he left, '14, he was out on

9   disability.

10       Q.   But he was still contributing to the household,

11  correct?

12       A.   From what I know, yes.

13       Q.   Well, at that point in time there would be oil for

14  the heater, correct?

15       A.   Yes.

16       Q.   You do have oil heat at the house, right?

17       A.   Yes.

18       Q.   And at that point in time there is a mortgage on

19  the house?

20       A.   I'm not certain.

21       Q.   It's nothing that you personally deal with as far

22  as the bills in the house, right?

23       A.   No.

24       Q.   Right now in 2016 is the house in foreclosure?

25       A.   I'm not certain.

S. Johnson - People - Cross                    534

1       Q.    You are not aware of it even to today's date?

2       A.    No.

3       Q.    Who deals with the bills today?

4       A.    Me and my son, we do.  We taking over the

5    utilities.  And like I said, Tara left and she didn't put any

6    parameters, any perspective on anything about the house.

7       Q.    So it's Tara's fault?

8       A.    And neither did he.

9       Q.    So it's Tara's fault?

10            MR. PERRI:  Objection.

11      A.    I'm not saying.

12            THE COURT:  Hold it, ma'am.  There is an

13   objection.  The objection is sustained.

14      Q.    When did Tara move out of the house?

15      A.    A few months ago.

16      Q.    Did she tell you she was leaving before she left?

17      A.    Hearsay.  Actually, no.

18      Q.    You lived with your sister for how many years?

19      A.    Ten, 20.

20      Q.    Would you interact with her on a weekly basis?

21      A.    Well, I see her, but we didn't talk much and Tara

22   did not make anything apparent about the household.  She

23   never really talked about anything that was going on.

24      Q.    But when Tara was there the lights were on and the

25   heat worked, correct?

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Cross                    535

1      A.   It did.

2      Q.   And nobody ever came to the house and said it was

3   in foreclosure when Tara was living there, right?

4      A.   Not in foreclosure.  I, you know, nobody came to

5   me.  There has been people that have dropped things at the

6   house.

7      Q.   What kind of things did they drop?

8      A.   For Tara.

9           MR. PERRI:  Objection.

10          THE COURT:  The objection is sustained.

11     Q.   Now, your sister generally works -- scratch that.

12  Withdrawn.

13          When your sister was living at 301 Coventry Road

14  North, to the best of your recollection, she was working

15  regular hours, approximately 9:00 to 5:00?

16     A.   Yes.

17     Q.   That was Monday through Friday?

18     A.   I would assume so, yes.  Yes.

19     Q.   I don't want you to assume.  I want to know if you

20  noticed her leaving the house in the morning?

21     A.   I did notice her leaving the house in the morning.

22     Q.   Did you notice her coming back to the house at

23  night?

24     A.   Yes.

25     Q.   And now even your youngest child is in school,

S. Johnson - People - Cross                               536

1    correct?

2         A.   Uh-huh.

3         Q.   Yes?

4         A.   Yes.

5         Q.   And what grade is Sherima in?

6         A.   Sherima is in second grade.

7         Q.   What time does the last child get on the bus to go

8    to school now?

9              MR. PERRI:  Objection.

10             THE COURT:  Sustained.

11        Q.   What do you do on a daily basis?

12             MR. PERRI:  Objection.

13             THE COURT:  Sustained.

14        Q.   Now, earlier on when Mr. Perri was asking you

15   questions, he asked you whether any money was owed between

16   yourself and Mr. Ross, do you remember that?

17        A.   Yes.

18        Q.   And your answer was that nobody owes anybody

19   anything, right?

20             MR. PERRI:  Objection.

21             THE COURT:  Yes, the objection is sustained as

22        to the question.

23        Q.   Were there times that you observed Ray Ross

24   spending money for food that benefited your children?

25        A.   That benefited my children?  I can't say that he

S. Johnson - People - Cross                    537

1    didn't bring anything in and say you are welcome to have it,

2    but I can't say that he brought groceries in and said this is

3    for you all, like that.  That I can't.

4            Maybe he purchased something and said you are

5    welcome to have some, but never like I brought groceries in

6    for you and your children or Sarita, this is for the kids or

7    anything like that.

8        Q.    How many refrigerators are at the house?

9              MR. PERRI:  Objection.

10             THE COURT:  Sustained.

11       Q.    Would Tara ever spend money that benefited you and

12   your children?

13             MR. PERRI:  Objection.

14             THE COURT:  Overruled.

15       A.    Very little.  Again, never that I brought groceries

16   in for you and the kids.  Again, it may be something like she

17   might have brought something in from a job or a party and

18   left it in the kitchen and whoever wanted it, wanted it.

19   Sometimes she may say you can have some and maybe she would

20   just leave it there and assume someone would eat it.

21       Q.    Is it fair to say there is one kitchen in the home?

22       A.    Yes.

23       Q.    Several were sharing one refrigerator?

24       A.    Well, I have one.  I have a refrigerator, yes.

25       Q.    So the house we described as a split level?

S. Johnson - People - Cross                              538

1       A.   Yes.

2       Q.   And you basically live downstairs with your four

3  kids?

4       A.   Yes.

5       Q.   And is the kitchen upstairs?

6       A.   Yes.

7       Q.   And is there a kitchen downstairs?  And I'm sorry,

8  is there a refrigerator downstairs, as well as a refrigerator

9  upstairs in the kitchen?

10       A.   There is one upstairs.

11       Q.   Is there also a refrigerator downstairs?

12       A.   Yes.

13       Q.   Did you keep your food separated from --

14       A.   Yes.  From upstairs, yes.

15       Q.   And did you have a kitchen, a way to cook in the

16  basement?

17       A.   No.

18       Q.   So if you had food that you needed to prepare,

19  where would you do that?

20       A.   Upstairs.

21       Q.   So everyone shared that kitchen?

22       A.   Yeah.

23       Q.   There is no lock on the refrigerator, right?

24       A.   No.

25       Q.   And it's fair to say sometimes you took food from

S. Johnson - People - Cross                          539

1     the refrigerator upstairs?

2          A.   No.

3          Q.   You never took food from the refrigerator upstairs?

4          A.   No.  In fact, the refrigerator upstairs is not

5     working.

6          Q.   Well, was it working in 2013?

7               THE COURT:  Sustained.

8               MR. PERRI:  Objection.

9               THE COURT:  Mr. Zerner, can we move on from

10         the kitchen appliances.

11              MR. ZERNER:  Certainly, your Honor.

12         Q.   Mr. Perri asked you questions about how the

13    downstairs was set up and you answered it's like a dormitory?

14         A.   Uh-huh.

15         Q.   Yes?

16         A.   Yes.

17              MR. ZERNER:  I apologize, your Honor.

18              THE COURT:  That's fine.  Next question.

19         Q.   Were there bunk beds downstairs?

20         A.   Beds.

21         Q.   But not bunk beds like one on top of the other?

22         A.   No.

23         Q.   And you said to Mr. Perri that he asked you whether

24    any beds were shared and you said no, but then you said that

25    two people sleep in one bed, right?

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Cross                    540

1      A.   Yeah.

2      Q.   So somebody does share a bed, right?

3      A.   Yes.

4      Q.   Who shares a bed downstairs?

5      A.   The two older girls.

6      Q.   The two older girls being Mercedes and Millinia?

7      A.   Yes.

8      Q.   How do they get along?

9      A.   Good.

10     Q.   Is Mercedes a good influence on Millinia?

11     A.   Yes.

12          MR. PERRI:  Objection.

13          THE COURT:  Overruled.

14     Q.   Have you ever noticed the two girls talking about

15 girl things?

16          MR. PERRI:  Objection.

17          THE COURT:  Sustained.

18     Q.   Now, the two girls share a bed and then you have

19 your own bed?

20     A.   Yes.

21     Q.   And then there is one other bed?

22     A.   No.  There is one bed and then I have like a

23 pull-out bed, like a recliner that I sleep on.

24     Q.   So you sleep on a recliner, the two girls share a

25 bed.  Malik has a bed and Sherima has a bed?

S. Johnson - People - Cross                    541

1      A.    Malik's room is upstairs.  He's not in the
2   dormitory.  He's upstairs.

3      Q.    When did that start?

4      A.    He's been upstairs.

5      Q.    When did that start?

6      A.    Years.  I can't be specific.

7      Q.    Was he upstairs in 2013?

8      A.    Yes.

9      Q.    Was he upstairs in 2014?

10     A.    Yes.

11     Q.    Where was his bedroom in relation to the room that
12   Ray and Tara shared?

13     A.    Next door.

14     Q.    Right next door.  They shared a wall?

15     A.    Yeah.

16     Q.    And does Malik date?

17     A.    Date?

18          MR. PERRI:  Objection.

19          THE COURT:  Sustained.

20     Q.    Does Malik have any children?

21          MR. PERRI:  Objection.

22          THE COURT:  Sustained.

23     Q.    Is Malik married?

24          MR. PERRI:  Objection.

25          THE COURT:  No, overruled.

S. Johnson - People - Cross                           542

1        A.    Is Malik married?

2              THE COURT:   Yes.

3        A.    No.

4        Q.    Is Malik in a committed relationship?

5              MR. PERRI:   Objection.

6              THE COURT:   Sustained.

7        Q.    Now, you described earlier that there is a

8   television upstairs, but not a television downstairs?

9        A.    Yes.

10       Q.    So we're saying in 2013.  Let's focus on 2013.  How

11  many televisions were in that house in 2013?

12       A.    One.

13       Q.    There was only one television and that was located

14  in the room that Tara and Ray shared?

15       A.    Yes.

16       Q.    And Tara and Ray paid for the cable bill on that TV

17  as far as you know, right?

18       A.    Yes.

19       Q.    And did you ever ask about having a TV in your part

20  of the house?

21       A.    No, not that I recollect.

22       Q.    So you made a decision not to have TV, correct?

23       A.    Made a decision?  I just didn't think about it.

24             THE COURT:   Next question.

25       Q.    Were there times when Millinia specifically in 2013

1    expressed to you a desire to watch TV?

2         A.   She did.

3         Q.   Were there times that Sherima wanted to watch TV?

4         A.   I can't be specific.  I'm not sure.

5         Q.   Okay.  What shows did Millinia like to watch in

6    2013?

7         A.   She likes movies, wrestling, comedy.

8         Q.   So in 2013 Ray and Tara had a TV in their room and

9    they could receive movies on the TV?

10        A.   Yes.

11        Q.   Maybe they had HBO or other movie channels?

12        A.   Yes.

13        Q.   Do you know if they had HBO or other movie

14   channels?

15        A.   Yes.

16        Q.   Did you ever watch TV in that room?

17        A.   Briefly.  I would maybe come in and just look over.

18   I have walked in and would look over and leave or something

19   like that.

20        Q.   You don't watch much TV?

21        A.   No.

22        Q.   Do you have a dog?

23        A.   I do.

24        Q.   What kind of dog?

25             MR. PERRI:  Objection.

S. Johnson - People - Cross                           544

1           THE COURT:  Sustained.  Next question.

2    Q.    When did you first get a dog?

3           MR. PERRI:  Objection.

4           THE COURT:  Sustained.

5    Q.    Did you ever notice Ray and Tara going to church?

6           MR. PERRI:  Objection.

7           THE COURT:  No, overruled.

8    A.    Maybe once or twice.

9    Q.    You observed them once or twice or they went to

10   church once or twice?

11   A.    Excuse me?

12   Q.    I'm going to ask you another question.

13   A.    Go ahead.

14   Q.    Is it true that Ray Ross goes to church on a

15   regular basis?

16   A.    I don't know.

17   Q.    Is it true that Tara Johnson goes to church on a

18   regular basis?

19           MR. PERRI:  Objection.

20           THE COURT:  Sustained.

21           All right, ladies and gentlemen, it's now a

22   little bit past 4:30 and we have a closing time at 4:30,

23   so I'm going to break it here.

24           Remember my admonitions.  You are not to talk

25   about the case, read about it, think about it, discuss

S. Johnson - People - Cross                545

1     it whatsoever until we see you tomorrow morning, 9:30

2     a.m.  Thank you very much.

3                 (Whereupon, the jury exited the courtroom.)

4                 THE COURT:  Ms. Johnson, you are still on the

5     stand testifying at this trial, so you cannot have any

6     conversation with anyone about your testimony or the

7     trial until we meet again tomorrow morning.

8                 THE WITNESS:  Okay.

9                 THE COURT:  Have a good night.  See you again

10    tomorrow morning.

11                We're adjourned till tomorrow morning.

12                (Whereupon, the trial was adjourned to

13    February 10, 2016.)

14

15              *                    *                    *

16

17

18

19

20

21

22

23

24

25

```
1    SUPREME COURT OF THE STATE OF NEW YORK
          COUNTY OF NASSAU :  PART 47
2    ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3
4              -against-              Ind. No. 1050N/15
5                                     JURY TRIAL
6    RAY ROSS,
7                     DEFENDANT.
     ---------------------------------------x
8
                       Mineola, New York
9                      February 10, 2016
10
11   B E F O R E:   HON. TERENCE P. MURPHY
                    Acting Supreme Court Justice
12
13   A P P E A R A N C E S:
14
               (Same as previously noted)
15
16
17
18             Kathi A. Fedden
               Official Court Reporter
19
20        *              *              *
21
22             THE CLERK:  Continued case on trial, People
23   versus Ray Ross.  The jury is not present.  All parties
24   are present, Judge.
25             THE COURT:  Good morning, Counsel.
```

Proceedings                                      547

1            MR. PERRI:   Good morning, your Honor.

2            MR. ZERNER:   Good morning, your Honor.

3            THE COURT:   I was in at work at 8:30 this

4     morning and received a phone call from juror number

5     nine, Mr. Patrick Pierre who informed me that he was

6     engaged at work and could not make Court this morning

7     and, in fact, indicated that he probably couldn't be

8     here before 12:00.  I did not identify myself, but I

9     took the information down.  And I did inquire whether or

10    not this was going to be a persistent problem or whether

11    it was a one-time issue.

12            Mr. Pierre informed me it was a one-time

13    issue.  I took his contact number and I have had my

14    secretary call him a number of times this morning with

15    no response back.  My staff also made contact with

16    Madison Square Garden and spoke with Mr. Pierre's

17    supervisor and informed the supervisor of Mr. Pierre's

18    requested return phone call to chambers with regard to

19    his jury duty.  We still have not made contact with

20    Mr. Pierre.

21            I have communicated these issues with counsel

22    and it was agreed in a chambers conference that we allow

23    Mr. Pierre the opportunity to return to Court to

24    continue his duty as a sitting juror in this case.  Is

25    that correct, Mr. Perri?

Proceedings                                          548

1              MR. PERRI:  Yes, your Honor.

2              THE COURT:  Mr. Zerner?

3              MR. ZERNER:  Yes, your Honor.

4              THE COURT:  So it's now 11:15 and without

5     having heard from Mr. Pierre, the Court is going to

6     release the jury for the rest of the day, have them come

7     back tomorrow morning at 9:30.  Is that acceptable to

8     the People?

9              MR. PERRI:  Yes, your Honor.

10             THE COURT:  Acceptable to the defense?

11             MR. ZERNER:  Yes, your Honor.

12             THE COURT:  And the Court will make further

13    inquiry of Mr. Pierre when we see him tomorrow and find

14    out exactly what the issue was.

15             Anything for the record, Mr. Perri?

16             MR. PERRI:  No, your Honor.

17             THE COURT:  Mr. Zerner?

18             MR. ZERNER:  We were talking about something

19    in chambers before that we were talking about possibly

20    putting on the record.  It escapes me at the moment

21    though.

22             THE COURT:  It was an incident with regard to

23    Ms. Johnson and some interaction with the Rockville

24    Centre Police Department.

25             MR. ZERNER:  Yes, your Honor.  I provided to

1     the Court, as well as to the prosecutor, more evidence

2     of an incident that took place in 2011 in Rockville

3     Centre whereby their current witness was charged with a

4     misdemeanor.  We had been unsure about how many times

5     that she had been charged with that misdemeanor.  To

6     date I still have not personally been allowed to review

7     a NYSIS.  The prosecutor has not provided it, despite

8     my --

9                THE COURT:  It's been made a Court exhibit,

10    Mr. Zerner.  Can we have Court Exhibit VII I believe?

11               MR. ZERNER:  If a copy could be provided to

12    me, your Honor, that would be helpful.

13               THE COURT:  Any objection, Mr. Perri?

14               MR. PERRI:  I mean, your Honor, the People

15    would object.  He's not entitled to a NYSIS.  It's not

16    discoverable material.  The NYSIS is blank.  It does

17    have her NYSIS number.

18               THE COURT:  You will certainly be entitled to

19    look at the Court exhibit.

20               MR. ZERNER:  Thank you, your Honor.

21               My real question and, again, it keeps being

22    revealed why the prosecutor is so insistent on me not

23    seeing a blank document belies my imagination.

24               That being said, your Honor, it's clear to me

25    at this point that we have evidence of at least three

Proceedings                                      550

1    interactions with the criminal justice system.

2            THE COURT:  We have information, I don't know

3    if I would characterize it as evidence.  The latest you

4    provided was a snippet from a local newspaper that said

5    that there was some police, Rockville Centre Police

6    Department activity that named Ms. Johnson as having

7    been arrested for petit larceny at a Home Goods store in

8    2011.

9            MR. ZERNER:  That's right, and the record

10   reflects that in 2014 Mr. Perri provided a narrative

11   about that and in 1995 as well.  Nevertheless, your

12   Honor has made a ruling I would not be allowed to

13   inquire into that and has instructed the People to do

14   several things as far as investigating that.  I do thank

15   your Honor for that.  I know that my exception will be

16   noted on the record, as I believe I am both entitled to

17   a NYSIS and entitled to cross-examine on it, but, of

18   course, I will respect your ruling.

19           THE COURT:  Thank you, Mr. Zerner.  Your

20   exception is so noted.  I think that's it.

21           Can we have the jury?

22           (Whereupon, the jury entered the courtroom.)

23           THE COURT:  Good morning, ladies and gentlemen

24   of the jury.  I'm sorry for the delay, but I want to

25   inform you of the reasons for that delay.  As you know,

Proceedings                                    551

1      you are sitting as one body, a jury, and I further

2      indicated to you that as a singular body we need all 14

3      of you present and accounted for before we can continue

4      the process.  As you can see, we have one missing juror.

5      Don't speculate about why that individual juror is

6      missing.  We anticipate the juror will be back tomorrow

7      morning, so before I require you to stay the afternoon

8      without having anything done, I have made a decision to

9      adjourn the proceedings for today to allow you the

10     afternoon for some free time.  You still are on jury

11     duty.  You get credit for jury duty for the full day,

12     but you have the freedom to do whatever you want for the

13     rest of the day, other than doing the things that you

14     are not allowed to do as sitting jurors that you will

15     recall I admonished you or instructed you on.

16          I will ask you once again to remember those

17     admonitions, to comply with those admonitions.  Forget

18     about the case until tomorrow morning.  Enjoy the rest

19     of your day and we'll see you 9:30 tomorrow morning.

20          (Whereupon, the jury exited the courtroom.)

21          THE COURT:  All right, Counsel, tomorrow

22     morning hopefully we will get a full day in and continue

23     with those full days until the completion of the trial.

24          MR. PERRI:  Thank you, your Honor.

25          MR. ZERNER:  Thank you.

1              (Whereupon, the trial was adjourned to

2       February 11, 2016.)

3

4                    *                    *                    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK
          COUNTY OF NASSAU :   PART 47
2    ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK

3

4              -against-
                                   Indictment No. 1050N/15
5
                                   JURY TRIAL
6    RAY ROSS,

7                    DEFENDANT.
     ---------------------------------------x
8
                         Mineola, New York
9                        February 11, 2016

10

11   B E F O R E:   HON. TERENCE P. MURPHY
                    Acting Supreme Court Justice

12

13   A P P E A R A N C E S:

14

15              (Same as previously noted)

16

17                   Kathi A. Fedden
                     Wendy Silas
18                   Official Court Reporters

19           *              *              *

20

21              THE CLERK:   Continued case on trial, People v.

22   Ray Ross.  All parties are present.  The jurors are not

23   in the courtroom at this time.

24              Are the People ready?

25              MR. PERRI:  Yes, your Honor.

Proceedings                                    554

1              THE CLERK:  Defense ready?

2              MR. ZERNER:  We are ready.

3              THE COURT:  Okay.

4              MR. PERRI:  Your Honor, before bringing the

5     jury in, the People are handing up to the Court a faxed

6     copy from the Rockville Centre Police Department.

7              THE COURT:  You showed your adversary counsel?

8              MR. PERRI:  No, your Honor, this is not

9     discoverable.  This is from the Court's request that it

10    was about the aided case, non-criminal matter that was

11    in the Rockville Centre Police Department's computer

12    system.

13             In speaking further with Sergeant Beddi this

14    morning of the Rockville Centre Police Department this

15    morning in explaining the Court's request, when the

16    question of whether or not there were other records

17    regarding Sarita Johnson, the sergeant did agree if

18    there were dispositions in favor of Sarita Johnson, such

19    as an ACOD or a sealed violation, that those records

20    would be sealed.  They would not appear on their

21    computer and short of the Court granting an unsealing

22    order, the People do not believe that they are

23    accessible, if they do exist.  But that is the only

24    record of Sarita Johnson in the Rockville Centre Police

25    Department's computer system for an aided case.

Proceedings                                    555

1          THE COURT:  Okay.  The Court will mark that

2     Court exhibit next in order.

3          THE CLERK:  Court Exhibit VIII.

4          THE COURT:  Mr. Zerner, in that inquiry, the

5     Court's reviewed the documents provided by the assistant

6     district attorney.  It indicates that the only record

7     showing from the Rockville Centre Police Department was

8     an aided person case, a sick person essentially who was

9     Sarita Johnson.

10          MR. PERRI:  Your Honor, if I could just be

11     heard very briefly before calling the jury in.  Although

12     the People understand your rulings with respect to the

13     objections yesterday, the People want to make a very

14     brief record.

15          Over the People's objection the Court allowed

16     defense counsel to question Sarita Johnson specifically

17     about who the fathers were of each of her children,

18     whether she had lived with them or not, whether she had

19     been married to them or not.

20          THE COURT:  The Court's recollection is that

21     the Court sustained one objection and counsel rephrased

22     his questions and there was no objections to those

23     questions.

24          THE COURT:  But speaking of the line of

25     questioning, what's your record?

Proceedings                                          556

1            MR. PERRI:  Your Honor, the People

2      specifically objected to her being questioned about

3      welfare and food stamps and whether her partner was

4      married, the father of one of the children.  The Court

5      did overrule those objections.

6            The People's position would be none of these

7      questions are probative.  They are not bad acts.  They

8      are not criminal in nature.  They do not show a

9      willingness to put her needs above those of society.

10     They do not reflect upon her credibility to give

11     testimony.  They are extremely collateral to anything

12     going on in this case.

13           And the People, under the First Department

14     case, People versus Ruiz, 18 A.D.3d 220 would ask the

15     Court to curtail and limit such questioning and such

16     lines of questioning.  In that case the Court stated

17     that the defendant's theory of the evidence that the

18     interconnected family relationships tended to establish

19     a motive for the child victim in the child physical

20     abuse case to manufacture testimony was remote and

21     speculative and they did not allow the defense attorney

22     in that case to engage in such questioning.

23           The People wanted to put their reasons for the

24     objection on the record, your Honor.

25           THE COURT:  Thank you.

                Kathi A. Fedden, Sr. Court Reporter

Proceedings                                    557

1              Mr. Zerner, you have any reply, since we're

2     making a record?

3              MR. ZERNER:  Sure, very briefly, your Honor.

4              On the new Court exhibit, I will have the

5     opportunity to review that at some point?

6              THE COURT:  No.  It's an aided case response,

7     that's it.

8              MR. ZERNER:  Just wanted to know what the

9     situation was with that.

10             With regards to that situation, again, my

11    concern is I'm not sure why the prosecutor continues

12    making these circular arguments that I didn't find

13    anything and if there was something, then it had to have

14    been dismissed because I keep finding new things and

15    keep putting it in front of Mr. Perri and the Court.

16             Regardless of that, your Honor, with the

17    second issue that Mr. Perri is bringing up now, again,

18    on direct examination he asked various questions about

19    the household; who lives there, who used to live there,

20    who lives there now and obviously the household is

21    probative of what was going on and how it was going on

22    and I fully anticipate asking more questions about that

23    and I thank your Honor for allowing that line of

24    questioning.

25             THE COURT:  The Court will make its rulings as

1     questions come up and objections are raised.  I'll leave

2     it at that.  Can we bring in the jury?

3             Before the jury comes in, we have an issue

4     with a juror.  It seems to have been forgotten with all

5     the other issues that counsel wished to raise.  Juror

6     number nine called yesterday finally, said he was

7     engaged in his duties as the certified rigger foreperson

8     at Madison Square Garden, that he had a load-in, if you

9     will, to set a stage for Mr. West.  I asked who Mr. West

10    was.  He said Mr. Kanye West, his fashion show at

11    Madison Square Garden.  He was the only person qualified

12    to run that setting of the stage based on his

13    certification as a rigger.

14            The chambers and the Court called both

15    counsel.  We spoke on a conference call.  Both counsel

16    agreed that the trial should not be delayed any longer,

17    that Mr. Pierre, juror number nine, should be excused.

18    Is that correct, People?

19            MR. PERRI:  Yes, your Honor.

20            THE COURT:  Mr. Zerner?

21            MR. ZERNER:  That is correct, your Honor.

22            THE COURT:  Very good.  So we'll substitute in

23    alternate juror number one for Mr. Pierre and she'll

24    become juror number nine.

25            (Whereupon, the jury entered the courtroom.)

1              THE CLERK:  Let the record reflect the

2     presence of the jury minus juror number ten.

3              THE COURT:  I thought he was number nine.  It

4     would be juror number ten, Mr. Pierre.

5              So, ladies and gentlemen, you see once again

6     we're missing one of the jurors.  For reasons that don't

7     concern you and have no bearing on the trial, Mr. Pierre

8     will no longer be able to serve as a juror in this case.

9     So, he's been excused and, Ms. Trotta, you will take

10    your spot as a sitting juror number ten.

11             You can move over to alternate number one

12    spot, Ms. Quigley.

13             So, welcome all again and we'll continue with

14    the questioning of Ms. Johnson by Mr. Zerner.

15  S A R I T A   J O H N S O N, residing in the County of

16        Nassau, having been previously called as a witness

17        on behalf of the People, having been previously

18        duly sworn by the Clerk of the Court, was examined and

19        testified further as follows:

20             THE COURT:  Mr. Zerner, your witness, please.

21             MR. ZERNER:  Thank you, your Honor.

22  CROSS-EXAMINATION

23  BY MR. ZERNER:

24    Q.   Good morning, Ms. Johnson.

25    A.   Good morning.

S. Johnson - People - Cross                    560

1          Q.   Ms. Johnson, you told us earlier when you testified

2     a few days ago that your daughter would regularly go on a

3     weekend day with Ray Ross into Brooklyn two or three times a

4     month.  Do you remember talking about that?

5          A.   Yes, I do.

6          Q.   And those trips were never overnight trips,

7     correct?

8          A.   No.

9          Q.   And were those trips generally on Saturdays?

10         A.   Yes.

11         Q.   But they weren't every Saturday, right?

12         A.   Two to three times a month.  No, not every

13    Saturday.

14         Q.   And there are four or five Saturdays in a month,

15    right?

16         A.   Yes.

17         Q.   So it wasn't every Saturday, right?

18         A.   No.

19         Q.   How often did your daughter have her hair done?

20              MR. PERRI:  Objection.

21              THE COURT:  Sustained.  Give it a time frame,

22         Mr. Zerner, please.

23         Q.   Is it accurate to say that your daughter had her

24    hair styled approximately every other week?

25              THE COURT:  During what time frame, sir?

S. Johnson - People - Cross                    561

```
 1              MR. ZERNER:  During the time frame she
 2     testified to.
 3        Q.   About May 2013 to June 2014 your daughter typically
 4     had her hair done two or three times a month, correct?
 5              MR. PERRI:  Objection.
 6              THE COURT:  Overruled.
 7              If you know, ma'am.
 8        A.   I'm not certain.
 9        Q.   Who would style your daughter's hair?
10        A.   I would style her hair.
11        Q.   Were you the only one who styled her hair?
12        A.   No.
13        Q.   Who else would style her hair?
14        A.   She had her hair styled by Paula Ross on occasion,
15     maybe once or twice.  Not every week of every month, no.
16        Q.   Right, but maybe once or twice a month, correct?
17        A.   I can't even recall that.  I can't say like an
18     ongoing period.  I could say once.  I could say sporadically,
19     twice.  I can't say.
20        Q.   Twice altogether or twice a month?
21        A.   Honestly, I don't know and I can't say that I know.
22     She has done her hair, I can't say how many times.
23        Q.   But more than twice Paula Ross has styled your
24     daughter's hair; is that fair to say?
25        A.   I could say at least twice, that I can say, at
```

S. Johnson - People - Cross                562

1    least twice.

2        Q.   But it might be more than twice, correct?

3             MR. PERRI:   Objection.

4             THE COURT:   Sustained.  Move on, Mr. Zerner.

5        Q.   Now, Paula Ross would also style other people's

6    hair in the household, correct?

7             MR. PERRI:   Objection.

8             THE COURT:   Sustained.

9        Q.   Did Paula Ross ever offer to style your hair?

10       A.   No.

11       Q.   You wear wigs from time to time, correct?

12            MR. PERRI:   Objection.

13            THE COURT:   Sustained.

14       Q.   Did Paula Ross style your daughter's hair,

15   Millinia's hair prior to the talent show that we talked about

16   in the spring of 2013, if you remember?

17       A.   I can't be certain.

18       Q.   It was a special occasion though, right?

19       A.   Yes, it was.

20       Q.   Did you ever personally take Millinia to a hair

21   stylist in your neighborhood?

22            MR. PERRI:   Objection.

23            THE COURT:   Sustained.

24       Q.   Now, these trips that your daughter would take to

25   Brooklyn, first of all, about what time would she leave your

1   house to go to Brooklyn?

2        A.   Early afternoon, late afternoon.  It was daytime.

3        Q.   And about what time would she return?

4        A.   Nine on average.

5        Q.   Would you be there?

6        A.   Maybe, approximately.

7        Q.   Would you be there when she departed?

8        A.   Usually I would, but I can't be certain every

9   single time.

10       Q.   Would you be there on a general basis when she

11  would return?

12       A.   Yes.

13       Q.   So would you speak with Ray and Tara about the

14  plan, that they were going into Brooklyn?

15       A.   Yes.  When Millinia would ask me if she could go

16  with them, generally it was with his daughter.  His daughter

17  or they were going to an event, like maybe an amusement park

18  or to the museum.  It was to an event or his daughter was

19  going to be there.

20       Q.   So you knew on Saturday morning that late morning

21  or early afternoon your daughter would be going two or three

22  times a month with a combination of Ray, Tara, Ray's

23  daughters to an event, correct?

24       A.   Okay, so you are saying did I pre know these

25  events?

S. Johnson - People - Cross                564

1        Q.    That's what I'm asking, did you know before they

2   left that they were leaving?

3        A.    Yes.

4        Q.    It wasn't a surprise that your daughter was gone,

5   correct?

6        A.    On most occasions, no, no, it wasn't.

7        Q.    And she was going somewhere that you knew where she

8   was going and it was somewhere you approved of, correct?

9        A.    On most occasions, yes.

10       Q.    Did you ever offer Ray or Tara money to subsidize

11   the cost of these trips?

12       A.    On occasion I would give Millinia money.

13       Q.    On occasion you gave it to Millinia, but not to Ray

14   or Tara, correct?

15       A.    No.  They said it was okay.  No one said that to

16   me, no.

17       Q.    No one ever asked you for money, right?

18       A.    No.

19       Q.    They were offering to take your daughter to museums

20   and amusement parks and you were happy about that, right?

21       A.    Millinia asked me, she said she wanted to go and I

22   approved it.

23       Q.    And most of the time they returned home around

24   dinnertime on Saturday night, correct?

25       A.    Yes.

S. Johnson - People - Cross                565

1      Q.   Now, you spoke yesterday, two days ago now, you

2   spoke that there was an allegation that Ray was doing things

3   to your daughter in a parking lot at Western Beef or at

4   National Wholesale Liquidators.  Do you remember talking

5   about that?

6                    MR. PERRI:  Objection.

7                    THE COURT:  Overruled.

8      Q.   Do you remember talking about that, ma'am?

9      A.   I didn't discuss that with you.

10     Q.   Right, but when Mr. Perri asked you questions on

11  Tuesday, Mr. Perri asked you questions and you answered them,

12  right?

13     A.   Yes.

14     Q.   So you remember talking about that, right?

15     A.   Yes.

16     Q.   And now I'm asking you questions about it and my

17  first question about that is do you remember talking about

18  that?

19                    THE COURT:  Sustained.  She answered the

20           question yes, she remembers talking about it.  Next

21           question.

22     Q.   So did you ever personally witness any of these

23  things going on between Ray and Millinia?

24     A.   No.

25     Q.   Did you ask your sister about these incidents?

1          MR. PERRI:  Objection.

2          THE COURT:  No, overruled.

3     Q.    Did you talk to your sister, Tara Johnson about

4   these incidents?

5     A.    No.

6     Q.    Never?

7     A.    I don't remember.  I don't recall.

8     Q.    So an allegation came up you say in August of 2014

9   that your sister's long-term paramour was having illicit

10  relations with your daughter and you never asked your sister

11  Tara about that, that's your testimony?

12    A.    I never asked her about that.  I don't recall.  I

13  don't remember.  I took action, that I definitely recall.

14  When I felt that there was foul play, I took action.

15    Q.    But you personally never witnessed this foul play,

16  correct?

17    A.    No.

18    Q.    Now, your testimony on Tuesday was that in August

19  of 2014 you went to the district attorney's office to talk

20  about this, correct?

21    A.    Yes.

22    Q.    And you spoke to an ADA Warren Thurer?

23    A.    Yes.

24    Q.    And Warren Thurer took your complaints in the next

25  building over at 262 Old Country Road?

S. Johnson - People - Cross                    567

1      A.   Yes, yes, he did.

2              THE COURT:  Hold it, Mr. Zerner.

3              Ms. Johnson, please let Mr. Zerner finish his

4      question and then you answer.

5              THE WITNESS:  Okay.

6              THE COURT:  Mr. Zerner, please let Ms. Johnson

7      finish her answer and then you can ask your next

8      question.

9              MR. ZERNER:  Thank you, your Honor.

10     Q.   When you went to speak to ADA Thurer, who directed

11  you to speak to him?

12     A.   I took action myself.  I did my own research.

13     Q.   So you walked into 262 Old Country Road and how did

14  you know where to go and who to speak with?

15     A.   I did my own research.

16     Q.   So when you walked into the building and went

17  through the metal detector, how did you know what office to

18  go to, what floor in the building to go to?

19              MR. PERRI:  Objection.

20              THE COURT:   Sustained.

21     Q.   At some point you got to the district attorney's

22  office at 262 Old Country Road, correct?

23     A.   Yes.

24     Q.   And there was a waiting area and you asked to speak

25  to an assistant district attorney?

1        A.   Yes, I did.

2        Q.   And at some point somebody came out and introduced

3   himself as Assistant District Attorney Warren Thurer?

4        A.   Yes.

5        Q.   And then you spoke with him?

6        A.   Yes.

7        Q.   Was your daughter Millinia with you when you had

8   this conversation?

9        A.   Yes, yes, she was.

10        Q.   She was with you that day?

11        A.   Yes.

12        Q.   And did Mr. Thurer take notes when he spoke with

13   you?

14        A.   I can't be certain.

15        Q.   Who else was in the room with you besides your

16   daughter and Mr. Thurer?

17        A.   I can't be certain.

18        Q.   Well, thinking back on it, there were three people

19   in the room or more than three people in the room?

20        A.   I can't be certain.

21        Q.   Do you remember if you spoke in an office or in a

22   conference room or somewhere else?

23        A.   I spoke in an office.  In his office.

24        Q.   So there was a desk and had it had Mr. Thurer's

25   name on it?

S. Johnson - People - Cross                          569

1          A.    Yes, it did.

2          Q.    Was there a victim's advocate in the room?

3          A.    I can't be certain.

4          Q.    Did you ask Mr. Thurer if he had dealt with these

5     types of cases before?

6                     MR. PERRI:   Objection.

7                     THE COURT:   Sustained.

8          Q.    So Mr. Thurer may or may not have taken notes and

9     did he ask your daughter to sign anything?

10         A.    Yes.

11         Q.    You remember a document being shown to your

12    daughter and Mr. Thurer said please sign here?

13         A.    Yes.

14         Q.    And did you also sign that document?

15         A.    I can't be certain.

16         Q.    Have you seen that document again?

17         A.    Yes.

18         Q.    When did you see it?

19         A.    Yes, I have, when I filled it out.   I have a copy

20    of it.

21         Q.    So this was in August of 2014, right?

22         A.    Yes.

23         Q.    And have you seen it since then?

24         A.    (No verbal response.)

25         Q.    Please answer the question, ma'am.

1       A.   Yes.

2       Q.   When?

3       A.   I have a copy of it.

4       Q.   So have you reviewed it many times since you

5   received it?

6       A.   Yes, I have.

7       Q.   When you left the DA's office in August 2014, they

8   gave you a copy of the statement?

9       A.   Yes.

10      Q.   And it was signed by you and your daughter?

11      A.   Yes.

12      Q.   What did you do with that statement?

13           THE COURT:  The document.  I don't know if

14      it's a statement.

15           MR. ZERNER:  You are right, your Honor, let me

16      break that down.  Thank you, your Honor.

17      Q.   Was it a one-page statement?

18      A.   Yes.

19           THE COURT:  Is it a document?  We haven't

20      established that there was any statement.  It was a

21      document.

22      Q.   So there was a one page piece of paper that was

23   filled out and signed by yourself and your daughter; is that

24   fair to say?

25      A.   Yes.

S. Johnson - People - Cross                    571

1          Q.   And was there a recitation of this allegation of

2    what you were talking about?

3                    MR. PERRI:   Objection.

4                    THE COURT:   Sustained as to the form of the

5          question.

6          Q.   What was on this document?

7          A.   It was a statement, the original one, because there

8    were two.

9          Q.   Right.  We're talking about August of 2014.  Let's

10   focus on that.  There was a one page piece of paper?

11                   THE COURT:   Remember my instruction, a

12         question is asked and then it's answered, right?

13                   THE WITNESS:   Yes.

14                   THE COURT:   After it's

15         answered, the next question is posed.  We can't have it

16         all at once because the court reporter can't take it

17         down and there will be no record of what's being said in

18         Court.  So, please be patient, each of you.

19                   Next question.

20         Q.   Focusing on August of 2014 and the meeting you had

21   with ADA Thurer, you left that meeting with a one page piece

22   of paper, yes or no?

23         A.   Yes.

24         Q.   What was on that piece of paper?

25         A.   It was a complaint about the defendant.

S. Johnson - People - Cross                          572

1       Q.   Okay, thank you.

2            Now, you took that piece of paper and went home

3    with it, correct?

4       A.   Yes.

5       Q.   Did you show that piece of paper to your sister?

6       A.   No.

7       Q.   Did you show that piece of paper to Mr. Ross?

8       A.   No.

9       Q.   They were both still living in that same location

10   at 301 Coventry Drive North, right?

11      A.   Yes.

12      Q.   So in August of 2014 you all still lived in this

13   location.  Same thing in September of 2014; is that fair to

14   say?

15      A.   Yes.

16      Q.   Now, in October of 2014 you were all still living

17   in that location, right?

18      A.   Of October?

19      Q.   Yeah.  Let's talk about the first half of October,

20   from October 1st to October 16th you were all still living in

21   the same location, correct?

22      A.   Yes.

23      Q.   Now, in those two-and-a-half months from early

24   August of 2014 until the middle of October of 2014, had you

25   spoken to ADA Thurer?

S. Johnson - People - Cross                 573

1          A.   Yes.

2          Q.   How many times?

3          A.   Twice.

4          Q.   In person or on the phone?

5          A.   In person.

6          Q.   So after the first meeting when this document was

7     prepared, you had another meeting?

8          A.   Yes.

9          Q.   Also at 262 Old Country Road?

10         A.   Yes, I did.

11         Q.   Do you remember the approximate month and day it

12    happened?

13         A.   October.

14         Q.   October of 2014?

15         A.   Yes.

16         Q.   You came back and spoke to ADA Thurer again,

17    correct?

18         A.   Yes, I did.

19         Q.   Did you make an appointment ahead of time?

20         A.   I can't be certain.

21         Q.   You had his contact information, right?

22         A.   Yes.

23         Q.   So before walking in, did you call him and tell him

24    you were coming in?

25         A.   I can't be certain.

S. Johnson - People - Cross                    574

1        Q.    Were you pleased with the action that the district

2   attorney's office had taken from early August until

3   mid-October?

4        A.    I have no thoughts about it.   I did what I came to

5   do and it was done.

6        Q.    So now in October of 2014 Ray Ross moved out of the

7   home, yes or no?

8        A.    Yes.

9        Q.    Now, were there any police, detectives, any of

10  those officials that spoke to you or your daughter between

11  August of 2014 and let's say the end of November of 2014, yes

12  or no?

13               THE WITNESS:   Excuse me, Judge, is it fair to

14        say if someone voluntarily moved?

15               MR. ZERNER:   Your Honor.

16               THE COURT:   Excuse me, Mr. Zerner.

17               Ma'am, you can't offer any type of comments,

18        okay?

19               THE WITNESS:   Okay.

20               THE COURT:   What you have to do is simply

21        answer the questions of Mr. Zerner and then you will

22        have the opportunity, if Mr. Perri decides, to answer

23        further questions.

24               THE WITNESS:   Okay.

25               THE COURT:   So just answer the question.

S. Johnson - People - Cross                    575

```
 1                  THE WITNESS:  Sure, thank you.

 2                  THE COURT:  Can you repeat the question?

 3        Q.   Can you answer the question, ma'am?

 4                  THE COURT:  Hold it.  Can I have the court

 5        reporter please read back the last question.

 6                  (Whereupon, the penultimate question was read

 7        back by the reporter.)

 8                  THE COURT:  Can you answer that question,

 9        ma'am?

10                  THE WITNESS:  Can she repeat it?

11                  THE COURT:  Did any law enforcement officials

12        speak to you between August of 2014 and November of

13        2014?

14                  THE WITNESS:  I'm sorry, I can't recollect

15        exactly the dates.

16  BY MR. ZERNER:

17        Q.   So the answer is you don't remember?

18        A.   Yes.

19        Q.   Yes, you don't remember?

20        A.   Yes, I did speak to law enforcement.

21        Q.   What member -- I'm not talking about the district

22  attorney's office, I'm talking about the police department of

23  Nassau County.  Who from Nassau County Police Department did

24  you speak to between August and November of 2014?

25        A.   Detective Toussaint, Nassau County Police
```

S. Johnson - People - Cross                    576

1    Department.

2         Q.   Now, we have a statement from Detective Toussaint

3    dated December 10, 2014.  Are you saying that you spoke to

4    him before December 10th of 2014?

5         A.   Yes, I spoke to him on the phone to set up a

6    meeting.

7         Q.   So you spoke to him on the phone.  How did you know

8    to speak to Detective Rhubens Toussaint?

9         A.   I was assigned -- a letter came in the mail that we

10   would speak together and someone would be in contact with me.

11        Q.   So how was it determined where you would speak face

12   to face with Detective Toussaint?

13        A.   I spoke to him over the phone.

14        Q.   Right.  And during that phone conversation you

15   discussed where and when you would meet?

16        A.   Yes.

17        Q.   And how was it determined where and when you would

18   actually meet?

19                  MR. PERRI:   Objection.

20                  THE COURT:   Sustained.

21                  They discussed on the phone where and when

22        they would meet.

23        Q.   Did the detective offer to come to your house to

24   have this conversation?

25        A.   Yes.

S. Johnson - People - Cross                       577

1          Q.   And you were happy to have him come to your home?

2          A.   Yes, I was.

3          Q.   When he came to your home, did he come in a marked

4    squad car or in a plain unmarked car?

5          A.   Unmarked car.

6          Q.   And did he come alone or with other personnel?

7          A.   Alone.

8          Q.   And what time of day did he come?

9          A.   Afternoon.

10         Q.   Was it still light out?

11         A.   Yes, it was.

12         Q.   Now, we're talking about December 10th.  You are

13   sure it was still light out when he got there?

14              THE COURT:  I don't know if we're talking

15         about December 10th, Mr. Zerner.  That's assuming a fact

16         that is not yet in evidence.

17              MR. ZERNER:  I'll withdraw that question and

18         ask another one.

19         Q.   Is it fair to say you spoke to Detective Toussaint

20   at your home on December 10, 2014?

21         A.   Yes.

22         Q.   Where did you speak to him in your home?

23         A.   He came to my home.  I didn't speak to him in my

24   home.

25         Q.   Where did you speak to him?

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Cross                    578

1      A.   In his car.

2      Q.   Why did you speak to him in his car?

3           MR. PERRI:  Objection.

4           THE COURT:  Overruled.

5      A.   For our safety and we didn't want to be in the

6  neighborhood like right in front of my house.  We didn't want

7  any -- just anyone looking around.  Just to be safe we

8  decided that would be the best.

9      Q.   You said a detective came to your home in an

10  unmarked police car, correct?

11      A.   Yes.

12      Q.   And he was wearing a suit and tie, not a police

13  uniform, correct?

14      A.   Yes.

15      Q.   And he knocked on your door and came in?

16      A.   I came outside.

17      Q.   How did you know he was physically there?

18      A.   I met him in the car.  I saw him with my two eyes.

19      Q.   Let me ask the question.

20           THE COURT:  Hold it, Mr. Zerner.

21           Have you finished your answer, ma'am, with

22      regard to how you met Detective Toussaint when he came

23      to your home?

24           THE WITNESS:  Yes.

25      Q.   Did he call you and tell you he was on his way

S. Johnson - People - Cross                    579

1    there?

2         A.   Yes.

3         Q.   Did you tell him I would prefer you not walk up to

4    my door and knock on the door or ring the bell?

5         A.   I saw him and I went outside.

6         Q.   So is it fair to say you were looking out the front

7    window or the window of the door waiting for him to arrive?

8         A.   Yes.

9         Q.   Was your daughter home?

10        A.   Yes.

11        Q.   Was she similarly waiting with you looking out the

12   window?

13        A.   Yes, she was.

14        Q.   For how long were you looking out the window

15   waiting for Detective Toussaint?

16             MR. PERRI:   Objection.

17             THE COURT:   Sustained.

18        Q.   So Detective Toussaint arrived, you saw an unmarked

19   police car.  Did he pull into your driveway or in front of

20   your home?

21        A.   He was on the street.

22        Q.   So you stepped out of your home along with your

23   daughter?

24        A.   Yes.

25        Q.   And entered the police car?

S. Johnson - People - Cross                    580

1      A.    Yes.

2      Q.    It was an unmarked police car, right?

3      A.    Yes.

4      Q.    And it was Detective Toussaint by himself, correct?

5      A.    Yes.

6      Q.    Where in the police car did you sit?

7      A.    I sat in the front seat.

8      Q.    Where in the police car did your daughter sit?

9      A.    In the back seat.

10     Q.    And what did you tell Detective Toussaint to do at

11   that point?

12     A.    Can you clarify to do?

13     Q.    You told Detective Toussaint that you didn't want

14   to have this conversation in your home; is that fair to say?

15     A.    That discussion never came up.  We had a meeting

16   and I came out to the car, that's it.

17     Q.    Well, was there a meeting before you came out to

18   the car?

19     A.    No.

20     Q.    So the first time you saw Detective Toussaint eye

21   to eye was when he pulled up to your home, correct?

22     A.    Yes.

23     Q.    You saw a car pull up that you assumed was the

24   detective, right, yes or no?

25     A.    Okay, yes.

1        Q.   You and your daughter exited your home and got into

2   the car, correct?

3        A.   Yes.

4        Q.   And at that point in time you told him we're going

5   to have a conversation but not in my home, correct?

6        A.   I didn't use those words.

7        Q.   Tell us the words you used, ma'am.

8        A.   I didn't say that.  I introduced myself and we

9   continued on with the matter that we came to meet for.

10       Q.   Did Detective Toussaint ask you where you would

11   like to have this conversation?

12       A.   I told him that I would be more comfortable down

13   the road.

14       Q.   So where did you go?

15       A.   Down the street on my block.

16       Q.   Now, your street actually is right next to

17   Hempstead Lake State Park, correct, right next to it?

18       A.   It's in the proximity, some blocks away.

19       Q.   If you went to the eastern end of your street, the

20   street curves around and on the other side of that is

21   Hempstead Lake State Park, correct?

22       A.   Yes, it is.

23       Q.   So when you and your daughter were in the squad --

24   not the squad car, but the unmarked car with Detective

25   Toussaint, how far away from your home did you drive?

S. Johnson - People - Cross                    582

1        A.   Up the street.

2        Q.   Up the street a tenth of a mile, a mile?

3        A.   Not even a tenth of a mile, a few feet up.  A few

4   feet up from my house.

5        Q.   Did Detective Toussaint offer to go with you to his

6   police precinct?

7        A.   I can't be certain.

8        Q.   But you preferred to have this conversation in the

9   car down the block from your home, correct?

10       A.   Yes.

11       Q.   That was your decision, right?

12       A.   Yes.

13       Q.   So now you had a conversation with Detective

14   Toussaint and he took notes when he was having this

15   conversation, right?

16       A.   I can't be certain.

17       Q.   Did your daughter have an opportunity to speak with

18   Detective Toussaint directly?

19       A.   Yes, she did.

20       Q.   That was in front of you, correct?

21       A.   Yes.

22       Q.   Did Detective Toussaint ever ask you to exit the

23   vehicle so he could speak alone with your daughter?

24       A.   No.

25       Q.   So the three of you were together the entire time?

S. Johnson - People - Cross                    583

1         A.    Yes.

2         Q.    And he took notes as you were speaking, right?

3         A.    Yes.

4         Q.    And then at some point there was a document that

5    was typed up, correct?

6         A.    Not in my presence.  I don't know about -- no.

7         Q.    At some point you were asked to sign a document,

8    right?

9         A.    Yes.

10        Q.    And that document was typed?

11        A.    I can't be certain.

12              MR. ZERNER:  If this could be marked as

13        defense Exhibit A, perhaps this will refresh the

14        recollection of the witness.

15              THE COURT:  Please mark it Defense Exhibit A

16        for identification.

17              (Whereupon, Defendant's Exhibit A was. marked

18        for identification, only.)

19              COURT OFFICER:  Defense A marked for ID.

20              THE COURT:  You wish the witness to see it?

21              MR. ZERNER:  Yes, your Honor.

22              (Handed to witness.)

23              THE COURT:  Ms. Johnson, please take a look at

24        that and once you have finished reviewing it, please

25        look up.

1              THE WITNESS:  Okay.

2              (Pause in the proceedings.)

3              THE WITNESS:  Yes.

4              THE COURT:  Mr. Zerner.

5              MR. ZERNER:  Thank you.

6       Q.    So after reviewing Defense Exhibit A, does that

7   refresh your recollection of actually reviewing a document

8   that was prepared by Detective Toussaint?

9       A.    Yes.

10      Q.    And you did sign the bottom of that document,

11  correct?

12      A.    Yes, I did.

13             MR. ZERNER:  I would offer that into evidence

14      at this time.

15             MR. PERRI:  Objection.

16             THE COURT:  Sustained.

17      Q.    Now, Ms. Johnson, when you were speaking with

18  Detective Toussaint, he didn't have a typewriter with him,

19  correct?

20      A.    No.

21      Q.    And was there a computer in the police vehicle?

22      A.    I can't be certain.

23      Q.    Well, did you see him print out any documents?

24      A.    No.

25      Q.    But at some point the document I just showed you,

S. Johnson - People - Cross                    585

1    Defense Exhibit A, was shown to you, correct?

2         A.    Yes.

3         Q.    Where was it shown to you?

4         A.    In the vehicle when we met.

5         Q.    So is it your testimony that this document was

6    prepared before you met Detective Toussaint for the first

7    time?

8         A.    No, I can't say that.

9         Q.    Well, you told us before that the first time you

10   had ever laid eyes on Detective Toussaint was when he came to

11   your home and you exited your home and spoke to him in the

12   vehicle, right?

13        A.    Yes.

14        Q.    And it wasn't at that time that he showed you this

15   document or was it?

16        A.    I met with Detective Toussaint on more than one

17   occasion.

18        Q.    Well, did you ever meet with Detective Toussaint

19   without your daughter?

20        A.    I can't be certain.

21        Q.    How many times did you meet with Detective

22   Toussaint?

23        A.    At least two to three times, at least.

24        Q.    Let's break it down.  You said it was more than

25   once, correct?

1      A.    Yes.

2      Q.    You are sure about that?

3      A.    Absolutely.

4      Q.    So you met with him at least two times?

5      A.    Uh-huh.

6      Q.    Yes?

7      A.    Yes.

8      Q.    One of the times was outside of your home down the

9   street in the vehicle, right?

10     A.    Yes.

11     Q.    Where and when was the other time?

12     A.    Again, in the car down the street from my home.

13     Q.    And was that also within the same month?

14           THE COURT:   Same month of the first time?

15     Q.    Was it within 30 days of the first time?

16     A.    I couldn't be certain of the date.

17     Q.    On that second occasion were both you and your

18   daughter in the vehicle with him?

19     A.    Yes.

20     Q.    And on that second occasion was Detective Toussaint

21   there alone or were there other police personnel with him?

22     A.    Alone.

23     Q.    So both times he came and spoke to you and your

24   then 13-year-old daughter without any other female police

25   officer or female staff, correct?

S. Johnson - People - Cross                    587

1        A.   No.

2        Q.   It's not correct?

3        A.   Yes, yes, that is correct.

4        Q.   So again, it's just the three of you; you,

5   Detective Toussaint, yourself and your daughter, correct?

6        A.   Yes.

7        Q.   And on the second occasion he showed you the

8   statement and asked you to sign it?

9        A.   Yes.

10       Q.   He said to you if there are any mistakes in here,

11   anything you want to correct, you would have the opportunity

12   to correct it?

13       A.   No, he didn't say that.

14       Q.   He didn't say that.

15            Did he say that to you in front of your daughter?

16            MR. PERRI:  Objection.

17            MR. ZERNER:  I'll withdraw and rephrase.

18       Q.   He showed you this document and said please read it

19   and if it's correct, sign it?

20       A.   I don't know what was said.  I can't be certain,

21   but I viewed it and I signed it.

22       Q.   And who signed it first, you or your daughter?

23       A.   I can't be certain.

24       Q.   But you both signed it back to back with each other

25   in that vehicle?

1      A.   Yes.

2      Q.   One of you signed it and then the other one signed

3  it?

4      A.   Yes.

5      Q.   You don't know who signed it first?

6      A.   I don't.  I cannot be certain.

7      Q.   Do you remember your daughter reading this

8  document?

9      A.   Yes, I do.

10      Q.   Was she upset by it?

11      A.   Yes.

12      Q.   Was she crying?

13      A.   Yes.

14      Q.   Did Detective Toussaint ever say to her, just sign

15  the document?

16      A.   No.

17      Q.   No.

18           He gave her time to review it?

19      A.   Yes, he did.

20      Q.   And again, you don't remember who signed it first,

21  you or your daughter?

22      A.   Yes.

23      Q.   Do you remember Detective Toussaint stamping a

24  stamp on there talking about that if there are any lies in

25  here, they are punishable by perjury?

S. Johnson - People - Cross                    589

1          A.    I can't be certain.

2          Q.    Did you read the top of the document that states

3     any false statement is punishable by perjury?

4          A.    Yes.

5          Q.    You do remember that?

6          A.    Actually, I can't be certain.

7          Q.    So you don't remember?

8          A.    I can't be certain.

9          Q.    But it's your testimony that Detective Toussaint

10    showed up with this document and it was already typed on the

11    document 12/10/2014 1830 hours, right?

12         A.    On the second visit.

13         Q.    So on the second visit it was already typed?

14         A.    For the second visit, yes.

15         Q.    It wasn't typed in the car, right?

16         A.    No.

17         Q.    It was already prepared, right?

18         A.    Yes.

19         Q.    And again, at that point in time, December 10,

20    2014, Ray Ross was no longer living in that home, right?

21         A.    What date?

22         Q.    December 10, 2014.

23         A.    No.

24         Q.    But your sister was still living there, right?

25         A.    Yes.

S. Johnson - People - Cross          590

1    Q.    And one of your sister's children?

2    A.    Yes.

3    Q.    Now, there was only one television in the home,

4    right?

5    A.    Uh-huh.

6    Q.    Yes?

7    A.    Yes.

8    Q.    That television was in the room shared by Tara and

9    Ray?

10   A.    Yes.

11   Q.    And there were approximately 12 people living in

12   the home?

13   A.    Twelve?  Approximately I guess.  Hold it.  Let me

14   see.  Not at that time, no.

15   Q.    Let's focus -- forget about December of 2014.

16   Let's focus on May of 2014.  In May of 2014 is it fair to say

17   at 301 Coventry Road North you were living there with your

18   four children, correct?

19   A.    Yes.

20   Q.    That's five, right?

21   A.    Okay.

22   Q.    Ray and Tara makes seven, right?

23   A.    Uh-huh.

24   Q.    Yes?  You have to say yes or no.

25   A.    Yes.

S. Johnson - People - Cross                          591

```
 1          Q.   One of Tara's children, right?

 2          A.   Uh-huh.

 3          Q.   Yes?

 4          A.   Yes.

 5          Q.   And that makes eight.

 6          A.   Yes.

 7          Q.   Were there any nieces or nephews living there at

 8   that time?

 9          A.   I can't be certain at that time.

10          Q.   Fair to say that there were at least eight people

11   living in the home, right?

12          A.   Yes.

13          Q.   There was one television, right?

14          A.   Yes.

15          Q.   Is it fair to say that forgetting about your own

16   desires to watch TV, other people in the home liked to watch

17   TV also, correct?

18                    MR. PERRI:  Objection.

19                    THE COURT:  Sustained.

20          Q.   Do you know if your son ever watched TV in his Aunt

21   Tara's room?

22          A.   No.

23          Q.   You don't know?

24          A.   No, I don't know.

25          Q.   You don't know.
```

S. Johnson - People - Cross                              592

1            And your other children, do you know if they ever

2   watched television?

3                    THE COURT:   In Tara's room?

4                    MR. ZERNER:   The one television that was in

5       the home, which was in Tara's room.

6       A.   No.

7       Q.   You don't know?

8       A.   I can't say, like, if they ever glanced or ever saw

9   anything.  I can't be 100 percent that they never saw

10  anything, but not a regular basis.

11      Q.   Is it fair to say that Tara and Ray allowed other

12  people living in the home to watch the television in their

13  room, yes or no?

14      A.   I guess you could say yes.

15                   THE COURT:   Thank you, ma'am.

16                   Next question.

17                   MR. ZERNER:   Thank you, your Honor.

18      Q.   Now, the very first cell phone that your daughter

19  Millinia got was purchased by her father, Ray Mickens?

20      A.   Yes.

21      Q.   You do remember that?

22      A.   Yes.

23      Q.   Do you remember having a conversation with Ray --

24  I'm sorry, what's Mr. Mickens' first name?

25      A.   Rafael.

1          Q.    I'm sorry, Rafael.  Do you remember having a

2    conversation with Rafael Mickens about whether your daughter,

3    the daughter that the two of you shared, about whether she

4    should get a cell phone and, if so, when it would happen?

5          A.    Yes, he did get her a cell phone.

6          Q.    Before he got her a cell phone, did the two of you

7    have a conversation about if your daughter should have a cell

8    phone?

9          A.    If she should have a cell phone?  We agreed that

10   she could have a cell phone.

11         Q.    So you did have a conversation with Rafael Mickens,

12   Millinia's father, and now Millinia would have a cell phone,

13   right?

14         A.    Yes.

15         Q.    Do you remember the month and year that

16   conversation took place?

17         A.    The month and year.  No, I'm not certain.

18         Q.    Now, forgive me, a couple of preliminary questions.

19   The school that your daughter attended, did that school start

20   in sixth grade?  Was it like sixth, seventh, eighth grade or

21   did it start in seventh grade, like seventh, eight and ninth

22   grade?

23         A.    Sixth grade.

24         Q.    So she graduated from her previous school the end

25   of fifth grade?

S. Johnson - People - Cross                    594

1      A.    Yes.

2      Q.    Was that the point in time when Rafael Mickens

3 purchased a cell phone for your daughter?

4      A.    Yes.

5      Q.    Is it common in your neighborhood at Millinia's

6 school that many children would get a cell phone when

7 graduating from that school?

8                    THE COURT:   Sustained.

9                    Next question.

10     Q.    To the best of your knowledge, did your daughter

11 want to have a cell phone?

12     A.    Yes.

13     Q.    And was she pleased when her father got her a cell

14 phone?

15     A.    Yes.

16     Q.    Did you and Rafael discuss who would pay for the

17 cell phone?

18     A.    Yes.

19     Q.    Tell us about that discussion, ma'am.

20     A.    He said that he would get her a cell phone and

21 sustain the bill.

22     Q.    So he said he would physically get the actual phone

23 and that he would pay the month to month charges for that?

24     A.    Yes.

25     Q.    Did he ever ask you to contribute towards that?

S. Johnson - People - Cross                    595

1      A.   No.

2      Q.   So your daughter wanted a cell phone, Rafael said

3 that he would get it and pay for it and that was okay with

4 you?

5      A.   Yes.

6      Q.   So now did you notice your daughter frequently

7 using that cell phone?

8      A.   Frequently using the cell phone.  Frequently.

9      Q.   I'll rephrase the question.

10     Did you notice your daughter using the cell phone

11 on a daily basis?

12     A.   Yes.

13     Q.   Did you have your own cell phone?

14     A.   Yes.

15     Q.   And who paid for that cell phone?

16          MR. PERRI:  Objection.

17          THE COURT:  Overruled.

18     Q.   Please answer the question.

19          THE COURT:  I'll offer that, Mr. Zerner.

20          MR. ZERNER:  My apologies, your Honor.

21          THE COURT:  You had a cell phone, Ms. Johnson?

22          THE WITNESS:  Yes.

23          THE COURT:  Who paid the bill for that?

24          THE WITNESS:  I did.

25          THE COURT:  Next question.

S. Johnson - People - Cross                                    596

1        Q.    Do you have a cell phone now?

2        A.    Yes, I do.

3        Q.    Who pays for that?

4        A.    I do.

5                  MR. PERRI:  Objection.

6                  THE COURT:  Overruled.

7        Q.    Did the district attorney's office give you any

8   money towards your cell phone bill, yes or no, ma'am?

9        A.    Yes.

10       Q.    Your phone had been off recently, right?

11       A.    Yes.

12       Q.    But the DA paid money and now it's back on, yes or

13   no?

14                 THE COURT:  Is your phone active now, ma'am?

15                 THE WITNESS:  It is active.

16       Q.    It is active because the DA paid for the bill, yes

17   or no, ma'am?

18       A.    Not exactly.

19                 MR. PERRI:  Your Honor, objection at counsel

20       laughing.

21                 THE COURT:  Next question.  Overruled.

22       Q.    Looking back at Rafael Mickens when he first got

23   his daughter a cell phone, you were okay with that, correct?

24       A.    Yes.

25       Q.    Did there come a point in time when Mr. Mickens

S. Johnson - People - Cross                                  597

1   told you that the cost of that cell phone was becoming a

2   problem for him?

3        A.   No.

4        Q.   He never told you that?

5        A.   No, he did not.

6        Q.   But the cell phone was still on, right?  There was

7   never a point in time when Millinia's cell phone was turned

8   off, right?

9        A.   No.

10       Q.   Did there come a point in time when you learned

11  that instead of Rafael Mickens paying for that cell phone,

12  Ray Ross was paying for that cell phone?

13       A.   No.

14       Q.   You never learned of that?

15       A.   No.

16       Q.   Did there come a point in time when you took the

17  phone away from your daughter?

18       A.   When?

19       Q.   What month and year did you first take a cell phone

20  away from your daughter, if you ever did?

21       A.   It happened in August.

22       Q.   So in August of 2014 you took away your daughter's

23  cell phone; is that fair to say, yes or no?

24       A.   Yes.

25       Q.   Now, the phone, itself, did you return it to Rafael

S. Johnson - People - Cross                    598

1   Mickens?

2       A.   No.

3       Q.   What did you do with that physical phone?

4       A.   I confiscated it.

5       Q.   Right.  Did you stick it in a drawer, did you shut

6   it off, did you personally use it?  What did you do with the

7   cell phone?

8       A.   It was off.

9       Q.   You powered it off and just let it sit in a drawer?

10      A.   I turned it off.

11           THE COURT:  Did you keep custody of the phone?

12           THE WITNESS:  Yes.

13           THE COURT:  After you took it away from

14   Millinia?

15           THE WITNESS:  Yes, I did.

16           THE COURT:  Next question.

17      Q.   Where did you put it?

18           THE WITNESS:  Do I have to answer this?

19      A.   In the drawer.

20      Q.   In your room?

21      A.   Yes.

22      Q.   Did you tell your daughter that there was a certain

23   span of time that she could get the phone back?

24      A.   Nope.

25      Q.   Was she pleased when you took her phone away from

1    her?

2        A.   No.

3        Q.   Did she ask you could I get the phone back, please,

4    mom?

5        A.   No.

6        Q.   She never asked for the phone back?

7        A.   No.

8        Q.   Who's Denise Sawyer?

9        A.   A neighbor.

10        Q.   Do you get along with her?

11             MR. PERRI:  Objection.

12             THE COURT:  Overruled.

13        A.   A neighbor.

14        Q.   Right.  My question is do you get along with Denise

15    Sawyer?

16        A.   She's a neighbor.

17             THE COURT:  You have to answer the question,

18        ma'am.

19             THE WITNESS:  Do I get along with her?

20             THE COURT:  Yes, ma'am.  Are you friendly with

21        Ms. Sawyer, your neighbor?

22             THE WITNESS:  No, I'm not.

23             THE COURT:  Next question.

24        Q.   How long has she been your neighbor?

25        A.   I don't know.  Off and on several years, off and

S. Johnson - People - Cross                    600

1    on.

2        Q.   When you say off and on, is that because you moved

3    away from 301 Coventry or because she moved away?

4        A.   She moved away.

5        Q.   Do you remember when that was?

6        A.   Some years periodically.  I don't know.

7        Q.   But you weren't friends with her, right?

8        A.   No.

9        Q.   Did there come a point in time when she called

10   Child Protective Services about you?

11            MR. PERRI:  Objection.

12            THE COURT:  Ladies and gentlemen, we're

13       running about an hour now into our day of work so I'm

14       going to give you a break to take five minutes and

15       stretch your legs, use the facilities, okay.  Remember

16       my admonitions.

17            (Whereupon, the jury exited the courtroom.)

18            THE COURT:  Ms. Johnson, as you know, we're

19       going to take a break.  As you know, you are still

20       giving testimony, so you can't talk to anybody about

21       your testimony.  So, take a break and relax.

22            THE WITNESS:  Thank you.

23            (Whereupon, the witness exited the courtroom.)

24            THE COURT:  Mr. Zerner, where were you going

25       with Ms. Sawyer and her testimony?

S. Johnson - People - Cross                                601

1          MR. ZERNER:  It's my understanding that she is

2     a neighbor that lives across the street and is connected

3     to many of the items both that I have learned about from

4     speaking with witnesses, as well as what Mr. Perri has

5     provided.

6          THE COURT:  What are you talking about items?

7          MR. ZERNER:  Mr. Perri provided an Email a

8     couple of days ago telling us that there were a few

9     instances involving Child Protective Services and one of

10    those items is that there was a very small child found

11    on the street.

12         THE COURT:  Okay, so?  And you are asking to

13    inquire?

14         MR. ZERNER:  I'm asking to inquire.  I don't

15    know what she's going to say and I might call Ms. Sawyer

16    as a witness to rebut what she may or may not testify to

17    right now.

18         THE COURT:  What is the purpose for that line

19    of questioning?

20         MR. ZERNER:  There are several purposes.  One

21    of them is to discuss the credibility of the witness.

22    Another one of them is to discuss her reputation in the

23    community.  Another one of them is to show that she's

24    giving testimony that she can't sit in her own home and

25    speak to a police detective and wants to go down the

1     street.  I don't know if she went in front of

2     Ms. Sawyer's home or she purposefully went away from

3     Ms. Sawyer's home.  I don't know if she thinks

4     Ms. Sawyer was watching what she had going on or not.

5              Ms. Johnson was quite evasive precisely

6     whether they went -- whether it was light out or not,

7     et cetera, et cetera.  It was a line of inquiry I didn't

8     know she was going to talk about, precisely where, in

9     the car, not in the car, how many conversations she had

10    with the detective.

11             The prosecutor talked about in his opening, I

12    believe as well as voir dire, about what might have been

13    the failure to follow protocol by Detective Toussaint

14    about speaking with a minor female witness in the way

15    that he did.  These are the areas I'm going to get into,

16    your Honor.

17             THE COURT:  The Court is not going to allow

18    that line of questioning, invoking Ms. Sawyer and the

19    CPS records for those purposes.  So, I'm going to ask

20    you to move along that line of questioning.

21             People, you want to put anything on the

22    record?

23             MR. PERRI:  Yes, your Honor.  The Email that

24    defense just explicitly referenced, your Honor ruled on

25    all of those events, that they were not to be a line of

S. Johnson - People - Cross                      603

1    cross-examination at trial.  This is the second time

2    defense counsel has blatantly disregarded your ruling

3    from prior to trial when the People asked the Court to

4    limit cross-examination because they are not relevant

5    bad acts.  Defense counsel has now twice done that.

6            THE COURT:  With regard to that, the Court had

7    previously ruled after an in-camera review of the CPS

8    records that they were not to be disclosed because they

9    were confidential and the Court found that they had no

10   relevancy to the issues at trial here to include

11   exculpating Mr. Ross or to go to the credibility of any

12   witnesses at trial.

13           The Court also offered, to its surprise the

14   other day on the record, that the district attorney

15   would have drafted a memorandum to include those

16   incidents.  That being said, the Court reemphasized that

17   those records and those incidents and events would not

18   be subject to any type of inquiry here at trial.

19   Mr. Zerner, I think you heard that.  And now Mr. Perri

20   is accurate that twice now you have engaged in offering

21   material to the jury in the form of questions that the

22   Court had previously ruled was out of bounds.

23           Now, I won't go so far as to say, as the DA

24   says, that it's intentional, but I tell you now, sir,

25   you are on notice that if I make a prior ruling with

S. Johnson - People - Cross                              604

1    regard to issues or lines of inquiry, I expect those

2    rules and rulings to be adhered to and if they are not

3    in the future, then I can presume that it's done

4    intentionally.

5              MR. ZERNER:  Your Honor, just to make the

6    record clear, it's my understanding that your Honor made

7    a ruling months ago about Child Protective Services

8    records dealing directly with Mr. Ross from 2015.  That

9    is not what I'm trying to discuss right now and I will

10   drop this line of inquiry.  I have never tried purposely

11   to do anything to contradict or counter your rulings,

12   your Honor.

13             Now, on a different issue, I know I do have

14   some records from Detective Toussaint that were handed

15   over by the prosecutor.  I believe that there was also a

16   discussion of handwritten notes that were taken by ADA

17   Thurer.  I have, I believe, a one-page document and an

18   ECAB report that was taken in.  I don't believe I have

19   any handwritten notes from the ADA.  If I do, I expect

20   them to be turned over.  The same thing with Detective

21   Toussaint.

22             It sounds like, the way it's been described,

23   there was a phone conversation initially.  I do have

24   handwritten notes from Detective Toussaint.  They are

25   not dated.  I don't know if the conversation happened

1      before the first call, between the call and the meeting,

2      after the meeting, but I would ask your Honor to allow

3      me to make this inquiry with regards to Detective

4      Toussaint's time, place, dates and everything else,

5      because it's clear that this witness is having trouble

6      remembering things or having trouble being forthright

7      and answering the whole question.  And I anticipate

8      Detective Toussaint testifying, perhaps today, perhaps

9      next week, and I will have questions for him about those

10     same interactions.

11            THE COURT:  Okay.  I don't know what your

12     request is.

13            MR. ZERNER:  I want notes, handwritten, as

14     well as typed, if there is anything else.

15            THE COURT:  The People are under that

16     obligation throughout the trial, so, I anticipate that

17     the People will fulfill that obligation.

18            MR. ZERNER:  I anticipate that too, your

19     Honor, however, it seems now on day six of the trial

20     there have been many times that I have become aware of

21     something, asked for it and been told no, you are not

22     getting it or no, I looked for it, but I can't find

23     anything and if I could find anything, it wouldn't have

24     any relevance anyway.

25            THE COURT:  Mr. Perri, do you want to respond

S. Johnson - People - Cross                    606

1    to the request for Rosario material?

2         MR. PERRI:  Your Honor, the People have turned

3    over Rosario material.  The People have turned over the

4    entire file from the Complaint Bureau, which was not

5    lengthy and the People turned over the detective's case

6    jacket.  Everything that was contained in the case

7    jacket was turned over.

8         THE COURT:  Thank you.

9         Mr. Zerner, if anything comes out with regard

10   to your inquiry of Detective Toussaint that there is

11   something that's out there that hasn't been turned over,

12   we'll find that out at that time and the Court will deal

13   with it at that time.  But that being said, there is

14   nothing else for the Court to do.  The People have

15   represented they have turned over everything that they

16   have under their obligation of Brady, Rosario, Giglio

17   and any other case law or statute that requires them to

18   turn over such information.

19        Five-minute break for everyone, particularly

20   the court reporter so she can have her break as well.

21        (A recess was taken.)

22        THE CLERK:  Continued case on trial, People v.

23   Ray Ross.  All parties are present except the jury.

24   People ready?

25        MR. PERRI:  Yes, your Honor.

S. Johnson - People - Cross                      607

1              THE CLERK:  Counsel ready?

2              MR. ZERNER:  We are ready, thank you.

3              MR. PERRI:  Your Honor, the People would ask

4       for a curative instruction with regard to the CPS, that

5       the jury should not speculate and should disregard it

6       fully.

7              THE COURT:  There was an objection raised on

8       the question, so I'm going to tell the jury that the

9       objection was sustained and we're going to move on.

10             MR. PERRI:  Yes, your Honor.

11             (Whereupon the witness returned to the witness

12      stand and the jury entered the courtroom.)

13             THE CLERK:  Let the record reflect the

14      presence of the jury.

15             People ready?

16             MR. PERRI:  Yes, your Honor.

17             THE CLERK:  Defense ready?

18             MR. ZERNER:  We are.

19             THE COURT:  Welcome back, ladies and

20      gentlemen.  Before we broke there was a question posed

21      by counsel and an objection was raised to that question.

22      That objection was sustained or is sustained and we'll

23      go to the next question.

24             MR. ZERNER:  Thank you, your Honor.

25      BY MR. ZERNER:

S. Johnson - People - Cross                                608

1        Q.   Now, Ms. Johnson, is it fair to say that you made

2   the parenting decisions involving Millinia?

3        A.   On most occasions, yes.

4        Q.   Were there occasions that you looked to Rafael

5   Mickens for help?

6        A.   Definitely with the phone situation.

7        Q.   And, again, that phone was owned by Rafael Mickens,

8   right?

9        A.   For Millinia.  I can't be certain if he purchased

10  it for Millinia.  It wasn't his phone.  It was for Millinia.

11       Q.   But he paid the bill for it?

12       A.   Yes.

13       Q.   To the best of your knowledge?

14       A.   Yes.

15       Q.   Were you there when he gave her the phone?

16       A.   I'm not certain.

17       Q.   Did you discuss it with him when you took the phone

18  away from her?

19       A.   No.

20       Q.   You didn't discuss that with him?

21       A.   No.

22       Q.   How often on a monthly basis say would you talk to

23  Rafael Mickens?

24                 MR. PERRI:  Objection.

25                 THE COURT:  No, overruled.

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Cross                    609

1        A.    Sporadically.  From time to time.

2        Q.    He's active in her life, correct?

3        A.    Active as in present?

4        Q.    My question is, is Rafael Mickens active in your

5   mutual daughter's life, yes or no?

6        A.    To a degree.

7        Q.    Now, to the best of your knowledge -- scratch that.

8              Is there a house phone at 301 Coventry Road North?

9        A.    No.

10       Q.    So if Rafael Mickens wanted to speak directly to

11  his daughter, how would he do that?

12             MR. PERRI:  Objection.

13             THE COURT:  If you know.  Do you know if

14       Mr. Mickens would call Millinia directly?

15             THE WITNESS:  When she had the phone, he

16       would.  When she had that phone, he would.

17       Q.    So when you took that phone away from Millinia, is

18  it fair to say that you cut off --

19             MR. PERRI:  Objection.

20             THE COURT:  Hold it, sir.  Let him finish his

21       question.

22       Q.    Is it fair to say that when you took that phone

23  away from Millinia, you cut off Rafael's ability to speak to

24  his daughter?

25             MR. PERRI:  Objection.

S. Johnson - People - Cross                              610

1          THE COURT:  Overruled.

2     A.    No.

3     Q.    Did you tell Rafael Mickens you were taking the

4  phone away from your mutual daughter?

5          MR. PERRI:  Objection.

6          THE COURT:  Overruled.

7          You can answer, ma'am.

8     A.    Repeat the question.

9     Q.    When you took the phone away from Millinia, did you

10 tell her father that she no longer had a phone with which to

11 communicate with him?

12    A.    No.

13    Q.    Did you ever have a conversation with Rafael

14 Mickens about that phone?

15         MR. PERRI:  Objection.

16         THE COURT:  Sustained as to the generality of

17    the question.

18    Q.    In August of 2014 did you tell Rafael Mickens I

19 took the phone away from our daughter?

20    A.    No.

21    Q.    Did you offer to return that phone to Rafael

22 Mickens?

23    A.    No.

24    Q.    But it was Rafael Mickens' phone, right?

25         MR. PERRI:  Objection.

Kathi A. Fedden, Sr. Court Reporter

S. Johnson - People - Cross                    611

1              THE COURT:  Asked and answered.  Sustained.

2    Q.   Was that your phone?

3              THE COURT:  Sustained.

4              MR. ZERNER:  I would like this to be marked as

5    Defense Exhibit B, please, for identification purposes.

6              (Whereupon, Defendant's Exhibit B was marked

7    for identification, only.)

8              COURT OFFICER:  Defense B marked for ID.

9              MR. ZERNER:  If that can please be shown to

10   the witness.

11             (Handed to witness.)

12   Q.   Ma'am, have you seen that document before, what's

13   been marked as Defense Exhibit B for identification purposes?

14   A.   Yes.

15   Q.   When did you see it last, if you remember?

16   A.   I can't say certain.  There is a date here.

17   Q.   But you answered the question, you can't say

18   certain the last time you saw it.

19        Is your signature on that form?

20   A.   Yes, it is.

21   Q.   When you spoke with Detective Toussaint, did he ask

22   you for the phone?

23   A.   When I spoke to him?  I voluntarily gave it to him.

24   Q.   So in December of 2010 you had a conversation with

25   Detective Toussaint in his car, yes?

S. Johnson - People - Cross                    612

1      A.   Yes.

2           THE COURT:  I'm sorry, Mr. Zerner, excuse me.

3           Officer, can you take the document away,

4      please.

5      Q.   And you said to him would you like the phone?

6      A.   I gave him the phone.

7      Q.   Well, let's back up to when you were waiting at

8  your door looking out the window for Detective Toussaint to

9  arrive.  Did you have the phone in your hand at that point in

10 time?

11     A.   Yes, I did.

12     Q.   Now, that phone had been off since August, correct?

13     A.   Yes.

14     Q.   And it was sitting in a drawer in your room?

15     A.   Yes.

16     Q.   Was that drawer locked?

17     A.   Yes.

18     Q.   It was a locked drawer?

19     A.   Yes.

20     Q.   So as you saw Detective Toussaint coming, you had

21 the phone in your pocket?

22     A.   Yes.

23     Q.   Had you had a conversation on not that telephone,

24 on the telephone with Detective Toussaint before that day

25 about him taking possession of this phone?

S. Johnson - People - Cross                    613

1       A.   I can't be certain.

2       Q.   So you don't remember him asking you for the phone?

3       A.   No.

4       Q.   You volunteered to give him the phone?

5       A.   Yes, I did.

6       Q.   But that wasn't your phone to give.

7            MR. PERRI:  Objection.

8            THE COURT:  Sustained.

9       Q.   That phone was purchased by Rafael Mickens,

10  correct?

11      A.   Yes.

12      Q.   Okay.

13           Now, is it fair to say that your sister Tara was a

14  good aunt to your daughter?

15           MR. PERRI:  Objection.

16           THE COURT:  No, overruled.

17      A.   No.

18      Q.   Well, did Tara spend time with Millinia?

19      A.   No.

20      Q.   Did Tara speak with Millinia about school?

21      A.   No.

22      Q.   Did Tara ever take Millinia anywhere?

23      A.   Nil.

24      Q.   I'm not sure what that means, "nil."

25      A.   Seldom.  I don't recall them going out on dates.

S. Johnson - People - Cross                               614

1    She might have dropped her at school maybe once or twice in a

2    school year.

3         Q.   Did you ever bring your daughter to school?

4         A.   Yes.

5         Q.   Did you have a car?

6         A.   No.

7         Q.   How far away is the school?

8              MR. PERRI:   Objection.

9              THE COURT:   Overruled.

10        A.   One point eight miles, something like that.

11        Q.   So you would walk her to school?

12        A.   I have walked with her to school and she would walk

13   herself to school.

14             Let me see, my neighbor --

15        Q.   Ms. Sawyer?

16        A.   No.

17        Q.   What's the neighbor's name?

18        A.   Next door.  Her name is Iris.

19        Q.   What's her last name?

20        A.   Nieves.

21        Q.   What about Iris Nieves?

22        A.   Would give my girls rides on occasion.

23        Q.   Did you ever return the favor in helping Ms. Nieves

24   out with her children?

25             MR. PERRI:   Objection.

S. Johnson - People - Cross                              615

1                    THE COURT:  Sustained.

2           Q.    Would Ms. Nieves' children play at your home?

3                    MR. PERRI:  Objection.

4                    THE COURT:  Sustained.

5           Q.    Would your children play at Ms. Nieves' home?

6                    MR. PERRI:  Objection.

7                    THE COURT:  Sustained.

8           Q.    So it was kind of your sister to give your daughter

9      a ride instead of having to walk one point eight miles to

10     school; is that fair to say?

11                   MR. PERRI:  Objection.

12                   THE COURT:  Sustained.

13          Q.    If you know, did Ray and Tara regularly attend

14     church on Sundays while they were living in the same home?

15                   MR. PERRI:  Objection.

16                   THE COURT:  Overruled.

17          Q.    Answer the question, please.

18                   THE COURT:  Hold it, Mr. Perri.

19                   Mr. Zerner, if there is a delay, I'll inquire

20          as to why there is a delay, okay.

21                   MR. ZERNER:  Certainly.

22                   THE COURT:  Thank you.

23                   You can answer the question, ma'am.

24                   THE WITNESS:  And the question is?

25                   THE COURT:  Did Ray and Tara regularly attend

S. Johnson - People - Cross                616

1      church while they were living at the home, if you know?

2            THE WITNESS:  I can't be certain.

3      Q.  Did they ever take Tara's children with them to

4  church?

5            MR. PERRI:  Objection.

6            THE COURT:  Overruled.

7      A.  I can't be certain.

8      Q.  Did you and Rafael Mickens make a parenting

9  decision about religion in your daughter's life?

10            MR. PERRI:  Objection.

11            THE COURT:  Sustained.

12     Q.  Do you know whether your daughter ever accompanied

13  Ray and Tara to church?

14     A.  Her alone?  Millinia, herself, alone with Ray and

15  Tara?  Is that the question?

16            MR. ZERNER:  Perhaps the question could be

17      read back to her, your Honor.

18            THE COURT:  Did Ray and Tara ever take

19      Millinia to church, that's the question, at any time,

20      whether alone or with others?

21            THE WITNESS:  I can't be certain.

22     Q.  Now, under direct examination you told us about an

23  argument that you had with your daughter.  Do you remember

24  that on Tuesday you testified about that?

25     A.  Yes.

S. Johnson - People - Cross                        617

1      Q.   And at some point in time there was discussion

2   about jealousy, do you remember that discussion?

3      A.   Yes.

4      Q.   Were you jealous of your sister Tara?

5      A.   No.

6              MR. PERRI:  Objection.

7              THE COURT:  Overruled.

8      Q.   Now, you told us on Tuesday that you have had

9   multiple occasions to prepare for your testimony with ADA

10  Perri, correct?

11     A.    Multiple occasions?

12     Q.   Well, you said you were with him on Sunday,

13  February 7th.  You were with him on February 1st, do you

14  remember that?

15     A.   Yes.

16     Q.   And you were with him when you testified in the

17  grand jury back in the summer, right?

18     A.   Yes.

19     Q.   And before you testified in the grand jury,

20  Mr. Perri talked to you about what would happen in the grand

21  jury, right?

22     A.   I counseled with him.

23     Q.   And Mr. Perri had a similar conversation with your

24  daughter, right?

25     A.   We counseled with him, yes.

S. Johnson - People - Cross                          618

1      Q.   So there were times when it was the three of you in

2  the room; Millinia, yourself and ADA Perri?

3      A.   Yes.

4      Q.   Were there other people in the room also?

5      A.   I can't be certain.

6      Q.   Well, there is a victim's advocate that you spoke

7  with as well, right?

8      A.   Yes.

9      Q.   How many times did you speak with her?

10     A.   At least once.  I could say at least once.

11     Q.   At least once in February of 2016, right?

12     A.   February of 2016, yes.

13     Q.   You spoke with her today, right?

14     A.   When you say speak, like speak like say hello, good

15  morning, greet?

16          THE COURT:  She didn't understand your

17     question, Mr. Zerner.

18          MR. ZERNER:  I'll ask another one, Judge.

19          THE COURT:  Thank you.

20     Q.   Did you have a conversation with victim's advocate

21  today, yes or no?

22     A.   No.

23     Q.   Did you have a conversation with the victim's

24  advocate yesterday, yes or no?

25     A.   No.

S. Johnson - People - Cross                    619

 1          Q.    Did you exchange words with her today?

 2                THE COURT:   Sustained.

 3          Q.    What time did you arrive for Court today?

 4          A.    Approximately 9:00.

 5          Q.    How did you get here?

 6          A.    Cab.

 7          Q.    Who paid for the cab?

 8          A.    ADA.

 9          Q.    You come to Court yesterday?

10          A.    Yes, I did.

11          Q.    What time did you get here?

12          A.    Roughly 8:45, 9:00.

13          Q.    How did you get here?

14          A.    Cab.

15          Q.    Who paid for the cab?

16          A.    ADA Perri's office.

17          Q.    Did you come to Court on Tuesday and what time did

18   you get here?

19          A.    Roughly 8:45, 9:00.

20          Q.    How did you get here?

21          A.    Cab.

22          Q.    Who paid for the cab?

23          A.    ADA Perri's office.

24          Q.    Now, you also came to Court back in July, do you

25   remember me talking about that?   July of 2015 you testified

S. Johnson - People - Cross                    620

1    in the grand jury, right?

2         A.   Yes.

3         Q.   Did you come one day or more than one day?

4         A.   I can't be certain.

5         Q.   How did you get here?

6         A.   I can't be certain.  I can't be certain.

7         Q.   Well, you testified also that back in August of

8    2014 you came and spoke with ADA Thurer, do you remember

9    that?

10        A.   Yes.

11        Q.   How did you get here that day?

12        A.   I came on public transportation.

13        Q.   So there is public transportation that will get you

14   from West Hempstead to Mineola, correct?

15        A.   Yes.

16        Q.   So how come you didn't take public transportation

17   today?

18             MR. PERRI:  Objection.

19             THE COURT:  Sustained.

20        Q.   Now, you told us you took away your daughter's cell

21   phone in August of 2014, correct?

22        A.   Yes.

23        Q.   And you put that cell phone in a drawer and you

24   shut it off?

25        A.   Yes.

S. Johnson - People - Cross                    621

1          Q.   Then you discovered she had another cell phone in

2   October of 2014, correct?

3          A.   Yes.

4          Q.   Did you get her that cell phone?

5          A.   No.

6          Q.   When you discovered she had a cell phone, did you

7   have a conversation with her father, Rafael Mickens about

8   that?

9          A.   No, I did not.

10         Q.   In October of 2014, to the best of your knowledge,

11  did Rafael Mickens know that your daughter didn't have a cell

12  phone?

13                   MR. PERRI:   Objection.

14                   THE COURT:   Overruled.

15         A.   I don't know.

16         Q.   You never told him that you took away the cell

17  phone, right?

18                   MR. PERRI:   Objection.

19                   THE COURT:   Overruled.

20         A.   No.

21         Q.   So now in October of 2014 you took away a second

22  cell phone from your daughter, correct?

23         A.   Yes.

24         Q.   What was her reaction?

25         A.   She was upset.

S. Johnson - People - Cross                                622

1    Q.    Did you ask her how she got the cell phone?

2    A.    Yes, I did.

3    Q.    Did you ask Rafael Mickens about the cell phone?

4    A.    No, I didn't.

5    Q.    Did you punish your daughter when you took away her

6    cell phone and defying you about having the cell phone?

7    A.    Punish.   Punish.   Define punish.   Punish.

8              MR. ZERNER:   Your Honor, if I may rephrase the

9    question?

10             THE COURT:   Please.

11   Q.    When your children needed to be disciplined, how

12   would you discipline your children?

13             MR. PERRI:   Objection.

14             THE COURT:   Sustained.

15   Q.    In August of 2014 you made it clear to your

16   daughter that she could not have a cell phone, correct?

17   A.    Say the date again, please.

18   Q.    August of 2014.

19   A.    Yes.

20   Q.    Nevertheless, in October of 2014 you discovered

21   that she had a cell phone, correct?

22   A.    Yes.

23   Q.    So you took away that cell phone, correct?

24   A.    Yes.

25   Q.    Did you also take any other action against your

S. Johnson - People - Cross                           623

1    daughter?

2         A.    No.

3              MR. ZERNER:  If I can have one moment with my

4    client, your Honor.

5              THE COURT:  You may.

6              (Pause in the proceedings.)

7         Q.    The second cell phone that you took away from your

8    daughter in October of 2014, you didn't purchase it for her,

9    correct?

10        A.    No.

11        Q.    Nevertheless, you gave that to Detective Toussaint,

12   correct?

13        A.    Yes.

14        Q.    And you voluntarily gave it to Detective Toussaint,

15   correct?

16        A.    Yes.

17        Q.    He asked you to sign a form?

18        A.    Yes.

19        Q.    And you represented that it was your cell phone,

20   correct?

21        A.    Yes.

22              MR. ZERNER:  Nothing further at this time,

23   your Honor.

24              THE COURT:  Very good.  Thank you, Mr. Zerner.

25              Mr. Perri.

S. Johnson - People - Redirect                    624

```
 1                 MR. PERRI:  Very briefly, your Honor.
 2   REDIRECT EXAMINATION
 3   BY MR. PERRI:
 4       Q.   Ms. Johnson, you recall defense counsel asking you
 5   about receiving money for your phone from the district
 6   attorney's office?
 7       A.   Yes.
 8       Q.   Do you recall that?
 9       A.   Yes.
10       Q.   And how much money did the district attorney's
11   office give you for your phone?
12       A.   Forty dollars.
13       Q.   And did the entire $40 go to keeping your phone on
14   this month?
15       A.   Yes.
16       Q.   Did you return any change to the district
17   attorney's office?
18       A.   Yes, I did.
19       Q.   Approximately how much change did you return to the
20   district attorney's office?
21       A.   $7.41.
22                 MR. PERRI:  Nothing further, your Honor.
23                 THE COURT:  Mr. Zerner.
24                 MR. ZERNER:  No recross on that redirect, your
25       Honor, thank you.
```

S. Johnson - People - Redirect                    625

```
 1                THE COURT:  Ms. Johnson, your testimony is
 2        completed.  You are excused now.  Thank you very much.
 3                     (Whereupon, the witness was executed.)
 4                THE COURT:  Next witness, Mr. Perri.
 5                MR. PERRI:  Your Honor, may we approach just
 6        about scheduling?
 7                THE COURT:  Yes.
 8                     (Whereupon, a discussion was held off the
 9        record.)
10                MR. PERRI:  Your Honor, the People call
11        Detective Toussaint.
12  D E T.   R H U B E N S   T O U S S A I N T, Shield #1192,
13            assigned to the Major Case Bureau of the Nassau County
14            Police Department, having been called as a witness
15            on behalf of the People, having been duly sworn by the
16            Clerk of the Court, was examined and testified as
17            follows:
18                THE CLERK:  State your name, spell your last
19        name and give your shield number and command for the
20        record.
21                THE WITNESS:  Rhubens, R-H-U-B-E-N-S,
22        Toussaint, T-O-U-S-S-A-I-N-T.  Shield 1192.  I'm
23        currently assigned to the Major Case Bureau, Nassau
24        County Police Department.
25                THE COURT:  Good morning, sir.
```

1                    THE WITNESS:  Good morning.

2                    THE COURT:  Mr. Perri, your witness.

3                    MR. PERRI:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MR. PERRI:

6        Q.   Detective Toussaint, how many year have you been in

7    law enforcement?

8        A.   Eleven years.

9        Q.   How long have you been a detective?

10       A.   Six years.

11       Q.   You stated that your present assignment was with

12   the Major Case Division of the Nassau County Police

13   Department.  How long has that been your assignment?

14       A.   Three months.

15       Q.   Prior to that assignment, what was your assignment

16   in the police department?

17       A.   Fourth Squad.

18       Q.   If you can describe roughly what area does the

19   Fourth Squad cover?

20       A.   At that time we covered from South Floral Park all

21   the way down to Atlantic Beach and up to South Garden City,

22   all the way to Lido, including West Hempstead.

23       Q.   Does that also include the Lakeview neighborhood?

24       A.   Yes.

25       Q.   Detective, was that your assignment in 2014?

Det. Toussaint - People - Direct                  627

1          A.   Yes.

2          Q.   Detective, on or about October 21st, 2014 did you

3    become involved in an investigation into the suspected child

4    sex abuse?

5          A.   Yes.

6          Q.   And who was the alleged victim in that case?

7          A.   Millinia Johnson.

8          Q.   And who was the mother of the alleged victim?

9          A.   Ms. Sarita Johnson.

10         Q.   To your knowledge, how did that case originate?

11         A.   It was a referral from the district attorney's

12   office civilian complaint section.

13         Q.   Now, when you received that assignment, did your

14   supervisor give you any specialized instructions?

15         A.   No.

16         Q.   And when you received that assignment, was Sarita

17   Johnson present?

18         A.   No.

19         Q.   Was Millinia Johnson present?

20         A.   No.

21         Q.   What steps did you take upon receiving the

22   assignment to investigate the matter?

23         A.   I called in a case and created a police department

24   case number.

25         Q.   And what case number was assigned to this case?

Det. Toussaint - People - Direct                628

1       A.   2014 CR-49643.

2       Q.   And, Detective, after doing that, what other steps

3  did you take, if any?

4       A.   I called the complainant, Ms. Sarita Johnson.

5       Q.   And when you called her, did she pick up?

6       A.   No.  I left a voicemail.

7       Q.   Did there come a time approximately two weeks later

8  when you spoke with Ms. Johnson?

9       A.   Yes.

10           MR. ZERNER:  Objection; leading.

11           THE COURT:  Sustained.

12      Q.   Did there come a time when you spoke with

13  Ms. Johnson?

14      A.   Yes.

15      Q.   When approximately was that?

16      A.   It was about two weeks later from the initial phone

17  call.

18      Q.   What, if any, arrangements did you make during that

19  phone conversation?

20      A.   We had made arrangement for Ms. Johnson to come to

21  the station house to talk to me.

22      Q.   Did that meeting take place?

23      A.   No.

24      Q.   Did there come a time when you met Ms. Sarita

25  Johnson?

Det. Toussaint - People - Direct                    629

1       A.   Yes.

2       Q.   And how did that happen?

3       A.   I ended up finding her and I spoke to her on the

4    phone and we set up something where I would go to her instead

5    of her coming to me.

6       Q.   And where did you go in order to meet her?

7       A.   I went to her residence at 301 Coventry Road North

8    in West Hempstead.

9       Q.   Is that in Nassau County?

10      A.   Yes.

11      Q.   And was she at the address when you went there?

12      A.   Yes.

13      Q.   What day was that when you went to her residence?

14      A.   I don't remember the exact day.  It was December

15   10th.

16      Q.   And on December 10th what did you do when you

17   arrived at the residence?

18      A.   I let her -- I called and let her know I was

19   outside.  She came out.  We started speaking outside of her

20   house and then she asked me if I could move and go somewhere

21   else.  She would be more comfortable.  She didn't want to

22   continue speaking in front of the house.

23      Q.   And was she alone or accompanied by anyone?

24      A.   She was with her daughter.

25      Q.   What was her daughter's name?

Det. Toussaint - People - Direct                    630

1      A.    Millinia Johnson.

2      Q.    And, Detective, did you -- what did you do after

3   she said she would be more comfortable speaking somewhere

4   else?

5      A.    I left her block and drove about three or four

6   blocks away from her house in a parking lot.  It's an

7   elementary school.  Eagle Elementary School parking lot.

8      Q.    And when you drove away from the house to that

9   parking lot, who was in the car with you?

10     A.    Ms. Johnson and her daughter.

11     Q.    And what happened when you arrived at the parking

12  lot?  What did you do next?

13     A.    I continued speaking to Ms. Johnson.  I took her

14  complaint and then I asked her to speak with her daughter

15  alone and she -- I asked her to exit the vehicle.

16     Q.    Did you see Ms. Sarita Johnson exit the vehicle?

17     A.    Yes, she exited the vehicle.

18     Q.    And do you know where she went?

19     A.    Yes, she was -- she stayed in the parking lot in

20  the vicinity.

21     Q.    And what happened after Ms. Johnson exited the

22  vehicle?

23     A.    Then I spoke with the victim.

24     Q.    Without going into the substance of what -- I'm

25  sorry, when you say "victim," do you mean Millinia Johnson?

Det. Toussaint - People - Direct                    631

1     A.   Yes.

2     Q.   And without going into the substance of the

3   conversation you had with Millinia Johnson, what topic did

4   you talk about with her?

5     A.   We spoke about her account, you know, of what

6   happened during several trips that she made to Brooklyn with

7   the defendant.

8     Q.   Did you ask her questions while you were in the

9   car?

10    A.   Yes.

11    Q.   And did she answer those questions?

12    A.   Yes.

13    Q.   Without going into the substance of her answers to

14  your questions, could you please describe her demeanor as you

15  spoke with her?

16    A.   Well, she was a little embarrassed to answer some

17  of the questions when I asked her to give me details of what

18  happened.  She looked -- she was ashamed of what happened, a

19  little uncomfortable.  It took a little while.

20         I asked her questions.  She, you know, she paused,

21  she waited for a while and then, you know, eventually she

22  opened up and answered the questions.

23    Q.   And when she opened up and answered your questions,

24  could you describe her emotional state as she talked to you?

25    A.   She was -- she appeared upset and was not happy

Det. Toussaint - People - Direct                     632

1    with the experience that she had.

2         Q.   And was Sarita Johnson in the car present for that

3    conversation?

4         A.   No.

5         Q.   Were you working alone or with any other partner

6    that day?

7         A.   I was by myself.

8         Q.   After you spoke to Millinia Johnson what, if

9    anything, did you do next with your investigation?

10        A.   I collected two cell phones from her that she

11   showed me text message communication between Millinia and the

12   defendant, Mr. Ray Ross.

13        Q.   And when you say "her," who are you speaking of

14   there?

15        A.   Ms. Johnson.  Between her daughter Millinia and

16   Mr. Ross.

17        Q.   And what did you do with that property?

18        A.   I took it to our Electronics Squad.  They were able

19   to download the text messages on paper.

20        Q.   And then did you invoice that property?

21        A.   Yes.

22        Q.   And when you invoiced that property, those two cell

23   phones, what is that process like?  Could you please describe

24   what to invoice means?

25        A.   Invoicing means that I generate a voucher number

Det. Toussaint - People - Direct                    633

1    for my command and then I send it to our Property Bureau

2    which is at headquarters.  That's where they keep all the

3    property at some point in time.  This way it serves as a

4    point of reference when we need the property back, they know

5    exactly which command it goes back to.

6         Q.   And earlier you talked about a case number that was

7    generated for this case.  What, if anything, does the case

8    number have to do with invoicing the property?

9         A.   Well, the case number is what's used along with the

10   voucher number to keep track of property particular to that

11   case.

12        Q.   And did you voucher the two cell phones that Sarita

13   Johnson gave you under that case number?

14        A.   Yes.

15        Q.   Did you or any other members of law enforcement do

16   anything to alter those cell phones on the exterior?

17        A.   No.

18        Q.   Did you or any other members of law enforcement, to

19   your knowledge, do anything --

20             MR. ZERNER:  Your Honor, I'm going to object.

21        He doesn't know what any other member of law enforcement

22        did.  He can only answer for himself.

23             THE COURT:  With regard to the second

24        question, he used the caveat if you know.  Overruled.

25        Q.   To your knowledge, did you or any other members of

Det. Toussaint - People - Direct                     634

1    law enforcement alter, delete any of the data on those

2    phones?

3        A.    No.

4        Q.    Did you turn those two cell phones in their

5    envelopes over to the district attorney's office in

6    preparation for trial?

7        A.    Yes.

8        Q.    Up until you turned those cell phones over to the

9    district attorney's office in preparation for trial, did they

10   remain in the possession of the Nassau County Police

11   Department?

12       A.    Yes.

13       Q.    Was that from the time that Sarita Johnson gave you

14   those two cell phones?

15       A.    Yes.

16              MR. PERRI:  I ask this be marked as People's

17         12, your Honor.

18              (Whereupon, People's Exhibit 12 was marked for

19         identification, only.)

20              COURT OFFICER:  People's 12 marked for ID.

21              MR. PERRI:  I ask it be shown to the witness.

22              (Handed to witness.)

23       Q.    Detective Toussaint, do you recognize that

24   envelope?

25       A.    Yes.

Det. Toussaint - People - Direct                635

1        Q.    What do you recognize it to be?

2        A.    It's the Property Bureau envelope that I used to

3   invoice the cell phone.

4        Q.    And do you recognize any markings on that envelope?

5        A.    Yes, the case number is there, '14 CR-49643.

6        Q.    Is that the same case number that was assigned to

7   your investigation?

8        A.    Yes.

9        Q.    I'm going to ask you to look inside the envelope.

10              Detective, are there any items inside the envelope?

11       A.    Yes.

12       Q.    What's inside the envelope?

13       A.    It's the cell phone.

14       Q.    Can you please take that out.

15              Detective, collectively do you recognize those

16  items that you took out of the envelope?

17       A.    Yes.

18       Q.    And what do you recognize them to be?

19       A.    This is one of the cell phones that I got from Ms.

20  Sarita Johnson that night.

21       Q.    And, Detective, can you distinguish that phone from

22  the other phone you have testified about receiving from

23  Sarita Johnson?

24       A.    Yes, there were two phones.  This one is the older

25  one.  It has scratches on the back comparing to the other one

Det. Toussaint - People - Direct                636

1    which is a lot newer.  And the official part there is a

2    green -- the thumb has a green color at the bottom.

3         Q.   And, Detective, does that phone have a serial

4    number?

5         A.   Yes.

6              MR. PERRI:  I ask that be taken from the

7         witness for a moment, your Honor.

8              Your Honor, I ask the witness be shown

9         People's 10 in evidence subject to connection.

10             (Handed to witness.)

11        Q.   Detective, do you recognize People's 10?

12        A.   Yes.

13        Q.   What do you recognize it to be?

14        A.   It's the pictures of the text messages from the

15   older phone.

16        Q.   And now, Detective, when you took the phone from

17   Sarita Johnson, did you have an opportunity to look at the

18   text messages on the actual phone?

19        A.   Yes.

20        Q.   Did you have more than one opportunity to do that?

21        A.   Yes.

22        Q.   And when you looked at those text messages, did you

23   read the contents of the text messages?

24        A.   Yes.

25        Q.   So, Detective, you said that you recognized those

Det. Toussaint - People - Direct                637

1   to be the text messages from the older phone.  How do you

2   recognize those to be the text messages from the older phone?

3        A.   This is from the older phone.  On the older phone

4   the victim had --

5             MR. ZERNER:  Objection to the term victim.

6        It's complainant.

7             THE COURT:  Hold it, Mr. Zerner.  Thank you.

8             Detective Toussaint, when you are referring to

9        Millinia Johnson, you can call her Millinia or you can

10       call her the child or you can call her one of the

11       complaining witnesses, but you would have to identify or

12       distinguish her from Sarita Johnson, okay, but please

13       refrain from calling her victim, okay.

14            THE WITNESS:  Yes, sir.

15       Q.   Detective, how do you know those to be the text

16   messages from the older phone?

17       A.   The older phone lists Mr. Ray Ross as Ray Ray, his

18   phone number 516-537-6877.

19            THE COURT:  Detective, could you repeat the

20       phone number?

21            THE WITNESS:  516-537-6877 is listed as Ray

22       Ray on the contact.  That's the older phone.

23       Q.   And, Detective, do the photographs in that packet,

24   do they appear to be in the same format as they were on the

25   phone?

Det. Toussaint - People - Direct                638

1       A.   Yes.

2       Q.   Do the content of the text messages depicted in

3   those photographs, are they the same as they were on the

4   phone?

5       A.   Yes.

6       Q.   Are those fair and accurate depictions of the text

7   messages you viewed on the phone that Sarita Johnson turned

8   over to you?

9       A.   Yes.

10              MR. PERRI:  I ask that be taken from the

11          witness.

12              Your Honor, I ask that People's 12 be moved in

13          subject to connection through Millinia Johnson.

14              THE COURT:  Mr. Zerner.

15              MR. ZERNER:  If I can have a brief voir dire

16          about People's 12.

17              THE COURT:  You may.

18              MR. ZERNER:  If I can have People's 12,

19          please.

20              THE COURT:  You may.

21              (Handed to counsel.)

22   VOIR DIRE EXAMINATION

23   BY MR. ZERNER:

24       Q.   Now, Detective, you were handed People's 12 by the

25   ADA about eight, ten minutes ago, right?

Kathi A. Fedden, Sr. Court Reporter

Det. Toussaint - People - Direct                639

```
 1        A.   Yes.

 2        Q.   When he asked you to open it, did you have to

 3   unseal anything to open it?

 4        A.   No.

 5        Q.   It was already unsealed, right?

 6        A.   Yes.

 7        Q.   And that's the big white envelope, right?

 8        A.   Yes.

 9        Q.   And then inside of it was a smaller Manila colored

10   envelope, right?

11        A.   Yes.

12        Q.   And that was also already unsealed, correct?

13        A.   Yes.

14        Q.   Now, you're familiar with cell phones both in your

15   professional and in your personal life, right?

16        A.   Yes.

17        Q.   Fair to say many cell phones look the same?

18        A.   Yes.

19        Q.   In fact, you got two cell phones in this case,

20   right?

21        A.   Yes.

22        Q.   And who owned these cell phones?

23             MR. PERRI:  Objection.

24             THE COURT:  Sustained.

25        Q.   Did the two cell phones that you got in this case
```

1    look similar to each other?

2        A.    Yes, they were two Samsung phone.

3        Q.    And not just Samsung phones, but also the same

4    size, the same color, the same weight, correct?

5        A.    Yes.

6        Q.    So you know this phone to be the older phone

7    because you took notes back in 2014 that said this was the

8    older phone, right?

9              MR. PERRI:  Objection.

10             THE COURT:  Sustained.

11       Q.    When you first got these two phones, how did you

12   know which was the older and which was the newer?

13             MR. PERRI:  Objection.

14             THE COURT:  No objection?

15             MR. PERRI:  No, your Honor.

16             THE COURT:  You can answer.

17       A.    The older one obviously looked old because it

18   looked beat up.  It had scratches all over it.  And the new

19   one looks newer than the older one.

20       Q.    You were using your common sense about what they

21   looked like with regards to how much use they had?

22       A.    Yes, and also information from Ms. Sarita Johnson

23   who said --

24       Q.    So Sarita Johnson --

25       A.    Told me this was the older phone, correct.

Det. Toussaint - People - Direct                    641

1              THE COURT:  Mr. Zerner, hold it, because we

2        had cross talk there.

3              MR. ZERNER:  My apologies again, your Honor.

4        Q.    Now, Sarita Johnson told you this phone was the

5   older phone, correct?

6        A.    Yes.

7        Q.    When she handed you the phone, was the phone

8   charged?

9        A.    The older phone?  It was charged.  It has a little

10  bit of charge on it.

11       Q.    How do you remember that?

12       A.    I remember because I went through the text messages

13  with her in the car.

14             MR. PERRI:  Objection, your Honor.

15             THE COURT:  Detective, when you hear the word

16        objection or you see Mr. Perri stand up, just hold your

17        answer, okay.

18             THE WITNESS:  Yes.

19             THE COURT:  The objection is overruled, but,

20        Mr. Zerner, we're on voir dire here, okay.

21             MR. ZERNER:  I'll save some of it for cross,

22        your Honor.

23             THE COURT:  Thank you.  I hope so.

24       Q.    There is handwriting on the smaller Manila

25  envelope, correct?

1          A.   Yes.

2          Q.   Is it your handwriting?

3          A.   No.

4          Q.   Whose handwriting, is it?

5          A.   Electronics Squad.

6          Q.   How do you know that?

7          A.   I turn it to them for the download and they turn it

8     back to me with the Manila envelope.

9          Q.   Is there a signature on here?

10         A.   No.

11         Q.   Is there someone's badge number, squad, command

12    listed on this Manila envelope?

13         A.   No.

14         Q.   Weren't you taught, as all police officers and

15    detectives in Nassau County were taught, that that's the way

16    you identify items that you take?

17              MR. PERRI:  Objection.

18              THE COURT:  Sustained.

19         Q.   Why is there no signature or squad number or badge

20    number on here, if you know?

21              MR. PERRI:  Objection.

22              THE COURT:  Sustained.  Once again,

23         Mr. Zerner, you are on voir dire, not cross-examination.

24              MR. ZERNER:  Understood, your Honor.

25         Q.   On the larger white envelope there is an orange

Det. Toussaint - People - Direct                    643

1  sticker, correct?

2       A.   Yes.

3       Q.   Who put that orange sticker on there?

4       A.   Property Bureau.

5       Q.   Not you, right?

6       A.   No.

7       Q.   Do you know who from the Property Bureau did that?

8       A.   No.

9       Q.   Do you know when Property Bureau did that?

10      A.   No.

11      Q.   Did you have any conversations with Property Bureau

12  about that?

13      A.   No.

14      Q.   You personally had nothing to do with it, right?

15      A.   Well, I turned it into Property Bureau.  I don't

16  recall the exact date and who processed it when I sent it

17  over there.

18      Q.   And there is no signature or badge number or squad

19  or command on it?

20      A.   Not on the envelope.

21      Q.   When you say not on the envelope, there's another

22  place that it is?

23                MR. PERRI:  Objection.

24                THE COURT:  Sustained.

25                MR. ZERNER:  I object to this item being

Det. Toussaint - People - Direct                644

1          offered into evidence at this time, your Honor, and I

2          don't believe proper foundation has been laid by this

3          witness.

4                    THE COURT:  Thank you, Mr. Zerner.

5                    The objection is overruled.  The phone is

6          received in evidence.  That is subject to connection by

7          Millinia Johnson?

8                    MR. PERRI:  Yes, your Honor.

9                    (Whereupon, People's Exhibit 12 was received

10         in evidence.)

11                   COURT OFFICER:  People's 12 in evidence.

12                   MR. PERRI:  I ask it be returned to the

13         witness, please.  I also ask if the witness can be shown

14         People's 7.

15                   THE COURT:  At the same time?

16                   MR. PERRI:  Yes, your Honor, for comparison.

17         I ask the witness to look at People's 7 in evidence

18         subject to connection.

19    DIRECT EXAMINATION (Cont'd)

20    BY MR. PERRI:

21         Q.   Now, Detective, I ask you to look at the

22    photographs in People's 7.  Do you recognize those

23    photographs?

24         A.   Yes.

25         Q.   What do you recognize them to be?

Kathi A. Fedden, Sr. Court Reporter

Det. Toussaint - People - Direct                    645

1          A.    These are the pictures of the two cell phones that

2    I recovered from Ms. Sarita Johnson.

3          Q.    Now, Detective, is there a picture of a serial

4    number on that phone?

5          A.    Yes.

6          Q.    And I ask you to look at the serial number?

7                You located the serial number, Detective?

8          A.    Yes.

9          Q.    I ask you to compare that to the serial number on

10   the phone in People's 12?

11               What, if anything, do you discover when you compare

12   the two serial numbers?

13         A.    The same serial number on the phone is what's on

14   the picture here.

15               MR. PERRI:   I ask the items be removed from

16        the witness, your Honor.

17               I ask this be marked as People's 13.

18               (Whereupon, People's Exhibit 13 was marked for

19        identification, only.)

20               COURT OFFICER:   People's 13 marked for ID.

21               MR. PERRI:   I ask it be shown to the witness.

22               (Handed to witness.)

23         Q.    Detective Toussaint, do you recognize that

24   envelope?

25         A.    Yes.

Det. Toussaint - People - Direct                    646

1        Q.    What do you recognize it to be?

2        A.    It's the envelope that I used to invoice the second

3   cell phone.

4        Q.    And, Detective, what, if any, markings do you

5   recognize on that envelope?

6        A.    It has the case number 2014 CR-49643.

7        Q.    Does that correspond to the case report number

8   involving Millinia Johnson?

9        A.    Yes.

10       Q.    Detective, I'm going to ask you to look inside the

11  envelope?

12             What, if anything, do you see inside?

13       A.    It has a cell phone inside.

14       Q.    Could you please take that out.

15             Detective, those items collectively, do you

16  recognize them?

17       A.    Yes.

18       Q.    What do you recognize them to be?

19       A.    It's the second cell phone that I collected from

20  Ms. Sarita Johnson that night.

21       Q.    And can you distinguish that phone from the other

22  phone by looking at it?

23       A.    Yes.

24       Q.    And how can you do that?

25       A.    It looks a little newer than the first phone that

Det. Toussaint - People - Direct                    647

1    we looked at.

2         Q.   And does that phone have a serial number?

3         A.   Yes.

4              MR. PERRI:  I ask that be taken from the

5         witness, your Honor.

6              I ask that People's 11 be shown to the

7         witness.

8              (Handed to witness.)

9         Q.   Detective, do you recognize People's 11?

10        A.   Yes.

11        Q.   And what do you recognize it to be?

12        A.   It's photographs of text messages from the second

13   phone.

14        Q.   And when you received the second cell phone from

15   Ms. Sarita Johnson, did you have an opportunity to look at

16   the text messages on that phone?

17        A.   Yes.

18        Q.   And did you, in fact, look at those messages?

19        A.   Yes.

20        Q.   Did you look at them more than once?

21        A.   Yes.

22        Q.   Detective, when you looked at those messages on

23   that cell phone, did you read the contents of those messages?

24        A.   Yes.

25        Q.   Detective, does the format of those photographs,

Det. Toussaint - People - Direct                    648

1    the text messages in those photographs, does it match the

2    second cell phone?

3         A.    Yes.

4         Q.    And did the contents of the text messages in that

5    packet in People's 11, does it match the contents of the

6    messages that were on the second cell phone?

7         A.    Yes.

8         Q.    Are those fair and accurate depictions of the

9    messages that you viewed on the cell phone that you

10   physically just had in your possession?

11        A.    Yes.

12             MR. PERRI:  I ask that be taken from the

13        witness.

14             Your Honor, I ask that People's 13 be moved

15        into evidence subject to connection through Millinia

16        Johnson.

17             THE COURT:  Officer -- Mr. Zerner, you wish to

18        voir dire, correct?

19             MR. ZERNER:  Of course.

20             THE COURT:  You need the phone?

21             MR. ZERNER:  I would like it.

22             THE COURT:  You can have it.

23   VOIR DIRE EXAMINATION

24   BY MR. ZERNER:

25        Q.    Detective Toussaint, you didn't have to unseal the

Det. Toussaint - People - Direct                    649

1    white envelope for People's 13, correct?

2         A.    Correct.

3         Q.    And you didn't have to unseal the smaller Manila

4    envelope inside of People's 13, right?

5         A.    Yes.

6         Q.    They were both already unsealed?

7         A.    Yes.

8         Q.    Somebody else has been dealing with this phone,

9    right?

10        A.    Yes.

11        Q.    You don't know who, right?

12        A.    Be more specific.  It's either the police

13   department or the ADA.

14        Q.    Well, the DA has had the phone for a while now,

15   right?

16        A.    Yes.

17        Q.    And the district attorney's office has their own

18   investigators, right?

19        A.    Yes.

20        Q.    And the district attorney's office has their own

21   specialty squads, right?

22              MR. PERRI:  Objection.

23              THE COURT:  Sustained.

24        Q.    Now, again, the Manila envelope that was inside of

25   the larger white envelope has nobody's signature, nobody's

Kathi A. Fedden, Sr. Court Reporter

1    badge number, squad, command, nothing, right?

2        A.   Yes.

3        Q.   It has a handwriting on it?

4        A.   Yes.

5        Q.   But it's not your handwriting, correct?

6        A.   Correct.

7        Q.   In fact, it looks like there was a mistake made on

8    this envelope, right?

9                MR. ZERNER:  I would like -- I don't know if

10          we want to call this People's 13 sub A.  This is a

11          Manila envelope that can be handed back to Detective

12          Toussaint.

13                THE COURT:  Hold it, Mr. Zerner.  There is no

14          need to mark it in any other manner.

15                MR. ZERNER:  I want to make sure the record

16          was clear.

17                THE COURT:  It is the envelope that was part

18          of People's 13.  There is a marking on the envelope.

19          Mr. Zerner, your question.

20        Q.   You see that there is a cross-out on there?

21        A.   Yes.

22        Q.   Did you cross that out?

23        A.   No.

24        Q.   When you were taught how to take notes in the

25    police academy if there was a mistake, were you taught to

Det. Toussaint - People - Direct                651

1    initial the mistake?

2                   MR. PERRI:  Objection.

3                   THE COURT:  Sustained.

4        Q.   And you don't know whose handwriting that is,

5    right?

6        A.   No.

7        Q.   Now, the phone, itself that was inside of People's

8    13, is it fair to say it's the same make and model as the

9    phone we looked at before in People's 12?

10       A.   Yes.

11       Q.   And the serial number, have you memorized the

12   serial number?

13       A.   No.

14       Q.   Was there any need to memorize the serial number?

15       A.   No.

16       Q.   Did Sarita Johnson ever tell you she memorized the

17   serial number when you took possession of this item?

18                  MR. PERRI:  Objection.

19                  THE COURT:  Sustained.

20       Q.   Now, you were told by somebody this was cell phone

21   number two or the newer phone, right?

22       A.   Yes.

23       Q.   And you were told that by Sarita Johnson?

24       A.   Yes.

25       Q.   Did you take possession of this phone, the second

Det. Toussaint - People - Direct                652

1    phone at the same time as the first phone?

2        A.   Yes.

3        Q.   And this was in your unmarked squad car a few

4    blocks away from 301 Coventry Road North in West Hempstead?

5        A.   Yes.

6        Q.   And was there any charge left on that phone?

7        A.   Yes.

8        Q.   You're sure?

9        A.   Yes.

10       Q.   Did you look at the phone at that time?

11       A.   Yes.

12       Q.   Did Ms. Johnson tell you when she took that phone

13   away from her daughter?

14               MR. PERRI:  Objection.

15               THE COURT:  Sustained.

16               MR. ZERNER:  Your Honor, I have an objection

17       to these items coming into evidence.

18               THE COURT:  Thank you, Mr. Zerner.  The

19       objection is overruled and People's 13 is received in

20       evidence subject to connection by Millinia Johnson.

21               (Whereupon, People's Exhibit 13 was received

22       in evidence.)

23               COURT OFFICER:  People's 13 in evidence.

24               MR. PERRI:  I ask if that can be shown along

25       with People's 6 to the witness, your Honor, for

Det. Toussaint - People - Direct                    653

1          comparison.

2                    (Handed to witness.)

3     DIRECT EXAMINATION (Cont'd)

4     MR. PERRI:

5          Q.   Detective, if you could locate on People's 6 --

6     withdrawn, your Honor.

7               On People's 6, Detective, is there a serial number

8     in the photograph?

9          A.   Yes, there is.

10         Q.   Detective, I would like you to compare that serial

11    number to the serial number you said that was on the cell

12    phone contained in the envelope.  If you can do that, please.

13                    THE COURT:  In People's 13?

14                    MR. PERRI:  Yes, I apologize.

15         Q.   Detective, what, if anything, did you discover by

16    comparing those two serial numbers?

17         A.   They have the same serial number.

18         Q.   Thank you.

19                    MR. PERRI:  I ask both items be taken from the

20         witness, your Honor.

21         Q.   Now, Detective, you testified that you spoke with

22    Millinia Johnson without her mother present.  After speaking

23    with Millinia Johnson did there come a time that you reduced

24    the information that you received from her to writing?

25         A.   Yes.

Kathi A. Fedden, Sr. Court Reporter

Det. Toussaint - People - Direct                          654

1         Q.    And could you explain how you did that?

2         A.    I dropped them off, went to the station house, type

3    it up and then went back and gained the signatures.

4         Q.    So did you meet with them the same day?

5         A.    Yes.

6         Q.    And when you brought that typed written statement

7    back, who did you meet with?

8         A.    With both, Ms. Sarita Johnson and her daughter

9    Millinia Johnson.

10        Q.    Did they sign that statement?

11        A.    Yes.

12        Q.    And did Sarita Johnson sign that statement?

13               MR. ZERNER:  Objection; asked and answered.

14               THE COURT:  He just indicated they both signed

15        it.

16               MR. PERRI:  Sorry, your Honor.

17        Q.    Why did you have Sarita Johnson sign that

18   statement?

19        A.    Millinia is a child.  She's underage.  And also

20   Ms. Sarita Johnson was present when she read the statement

21   and I had her reading it as well as a parent.

22        Q.    Now, Detective, in your investigation, did there

23   come a time where you attempted to get any video

24   surveillance?

25        A.    Yes.



1      Q.   And what did you do to try to get video
2  surveillance?
3      A.   I drove by the parking lot of National Wholesale
4  Liquidators where Millinia Johnson told me the incidents took
5  place.  I looked around.  I didn't see any video cameras.
6      Q.   And, Detective, where was National Wholesale
7  Liquidators located?
8      A.   111 Hempstead Turnpike in West Hempstead.
9      Q.   Is that in Nassau County, New York State?
10     A.   Yes.
11     Q.   Detective, from the examination of the cell phones,
12  from your interview with Sarita Johnson and Millinia Johnson,
13  did you learn the cell phone number of the defendant?
14     A.   Yes.
15     Q.   And did there come a time where you called that
16  number?
17     A.   Yes.
18     Q.   And what was that number?
19     A.   516 number 537-6877.
20     Q.   And when you called that number, did anyone answer?
21     A.   Yes.
22     Q.   And did you identify yourself as a detective?
23     A.   Yes.
24     Q.   And did the person on the other end of the phone
25  identify themselves?

Det. Toussaint - People - Direct                    656

1          A.   Yes.

2          Q.   Who did they identify themselves to be?

3          A.   Ray Ross.

4          Q.   And after that phone call with the person that said

5     they were Ray Ross, did there come a time you met an

6     individual named Ray Ross?

7          A.   Yes.

8          Q.   Do you see that person present in the courtroom?

9          A.   Yes.

10         Q.   Could you identify him by pointing to him and

11    naming an article of clothing he's wearing?

12         A.   Yes.   He's sitting across from me wearing all

13    black.

14              MR. PERRI:  I ask the record reflect that the

15         witness has identified the defendant?

16              THE COURT:  So noted.

17         Q.   And, Detective, how did you come to know the

18    defendant?

19         A.   When he surrendered to the precinct.

20         Q.   And what happened after he surrendered himself to

21    the precinct?

22         A.   I processed him.   I got his pedigree information.

23         Q.   What is pedigree information?

24         A.   That's his name, date of birth, phone number.

25         Q.   And --

Det. Toussaint - People - Direct                    657

1        A.    And address.

2        Q.    Did you ask him for a contact phone number?

3        A.    Yes.

4        Q.    And did he give you an answer to that question?

5        A.    Yes.

6        Q.    What number did he give you?

7        A.    He gave me his cell phone number, 516-537-6877.

8        Q.    Is that the same number that Sarita Johnson gave

9   you?

10       A.    Yes.

11       Q.    Did that include -- did the pedigree information

12  include the defendant's date of birth?

13       A.    Yes.

14       Q.    Did you ask him for his date of birth?

15       A.    Yes.

16       Q.    Did he answer that question?

17       A.    Yes.

18       Q.    What did he give his date of birth to be?

19       A.    March 31st, 1959.

20       Q.    Prior to this investigation, did you know the

21  defendant?

22       A.    No.

23       Q.    Prior to this investigation had you ever had any

24  interactions with Sarita Johnson?

25       A.    No.

Det. Toussaint - People - Cross                    658

1        Q.    Prior to this investigation had you ever met or had

2   any interactions with Millinia Johnson?

3        A.    No.

4               MR. PERRI:   Nothing further, your Honor.

5               THE COURT:   Mr. Zerner.

6               MR. ZERNER:   Thank you, your Honor.

7   CROSS-EXAMINATION

8   BY MR. ZERNER:

9        Q.    Good afternoon, Detective.

10       A.    Hi, how are you.

11       Q.    Detective, we have met once before, right?

12       A.    Yes.

13       Q.    And that was in April of 2015?

14       A.    Yes.

15       Q.    And that was when I brought Ray Ross to your

16  precinct?

17       A.    Yes.

18       Q.    Now, you said that you asked Ray Ross for his phone

19  number, right?

20       A.    Yes.

21       Q.    And he voluntarily gave you his phone number,

22  correct?

23       A.    Yes.

24       Q.    He wasn't trying to hide the phone number, was he?

25       A.    No.

Det. Toussaint - People - Cross                     659

1          Q.   He didn't give you any kind of a story, well, about

2    I used to have this number and now it's a different number?

3          A.   No.

4          Q.   Now, your first knowledge that there was anything

5    to investigate took place in early December 2014; is that

6    fair to say?

7          A.   Yes.

8          Q.   And you were initially told to investigate this by

9    whom?

10         A.   By my boss.

11         Q.   So this is the head of this squad at the Fourth

12   Precinct?

13         A.   Yes.

14         Q.   And what's his name and rank?

15         A.   Detective Lieutenant Frank Decicco.

16         Q.   Is it fair to say just one day he told you hey,

17   Toussaint, go look into this; is that fair to say, something

18   like that?

19         A.   Yes.  As they come in, he assigns them to whoever

20   is catching cases for the day.

21         Q.   It just happened to be your day to catch this case?

22         A.   Yes.

23         Q.   Are there female detectives that were in the Fourth

24   Squad at that point in time?

25         A.   You mean assigned to the squad or was working?

Det. Toussaint - People - Cross                 660

1          Q.    Let's first talk about assigned.  I understand that

2    there is 24 hours a day detectives on duty, correct?

3          A.    Yes.

4          Q.    So in any 24 hour period in December of 2014, were

5    there female detectives?

6          A.    Yes.

7          Q.    Now, the day you got this case, do you remember the

8    particular day you got it?

9          A.    Not particular.

10         Q.    But it was early December 2014?

11         A.    It was actually October 30, 2014.

12         Q.    So we remember the exact date, October 30, 2014?

13         A.    Yes.

14         Q.    Okay.  And the first step you took was you made a

15   phone call to a number that was provided to you, right?

16         A.    Yes.

17         Q.    And that phone number, was that a cell phone number

18   or a house phone number or a landline?

19         A.    I had both.  I had a landline and a cell phone.

20         Q.    So you were given a landline and a cell phone

21   number that both belonged to Sarita Johnson?

22         A.    Yes.

23         Q.    Did you do any search in any kind of database that

24   you have access to confirm who owned these phones?

25         A.    No.

Det. Toussaint - People - Cross                                661

1       Q.   So you just got an assignment from a detective

2  lieutenant and on that piece of paper there were two

3  different phone numbers?

4       A.   Yes.

5       Q.   Do you remember those phone numbers?

6       A.   No.

7       Q.   So did you call both of those phone numbers?

8       A.   Yes.

9       Q.   Was there a voicemail on both of the phone numbers?

10      A.   I remember leaving a voicemail on her cell phone.

11      Q.   How did you know it was the cell phone?

12      A.   That's a good question.

13      Q.   Thank you.

14      A.   The one phone has the old, you know, the old

15  answering machine machine.

16      Q.   So you remember that there was a machine?

17      A.   And then the cell phone has the computerized

18  digital voice, so that's how I differentiate the cell phone.

19      Q.   The one that had the machine, do you remember what

20  the outgoing message was for that phone?

21              MR. PERRI:   Objection.

22              THE COURT:   Sustained.

23      Q.   So you left a message on the cell phone but not the

24  landline?

25      A.   On the cell phone, correct.

Kathi A. Fedden, Sr. Court Reporter

Det. Toussaint - People - Cross                    662

1        Q.    And this was late October 2014?

2        A.    Yes.

3        Q.    And when was the first time you actually had a

4   conversation back and forth with Sarita Johnson?

5        A.    Two weeks after that.

6        Q.    Was there an explanation as to the delay?

7        A.    No.  She said she meant to call me back and she

8   never got a chance to.

9        Q.    Did she explain what was keeping her busy during

10  those two weeks?

11              MR. PERRI:  Objection.

12              THE COURT:  Overruled.

13       Q.    Was there any explanation given to you?

14       A.    No.

15       Q.    So now you spoke to her, let's say, about November

16  13, November 14, 2014, yes?

17       A.    Yes, somewhere around there.

18       Q.    So you had this conversation and do you remember

19  what the substance of that conversation was?

20       A.    Yes.  I explained to her that I had the case and I

21  needed to sit down and talk to her and her daughter.

22       Q.    Did you invite her to come to your precinct, give

23  her the address, et cetera?

24       A.    Yes.

25       Q.    How far away -- now, this is the precinct on Dutch

Det. Toussaint - People - Cross                663

1     Broadway, right?

2         A.   Yes.

3         Q.   How far away in terms of tenths of miles, miles, is

4     the home at 301 Coventry Road North from your precinct on

5     Dutch Broadway?

6         A.   Maybe five miles.  I would say about ten, 15

7     minutes ride.

8         Q.   I think you can probably make it faster than ten or

9     15 minutes, right?

10        A.   If there is an emergency.

11            MR. PERRI:   Objection, your Honor.

12        Q.   Did you offer to go and pick her up and bring her

13    back to the precinct?

14        A.   Initially, no.

15        Q.   Did she offer to come to the precinct?

16        A.   Initially what I asked her was to come in and talk

17    to me in the precinct.

18        Q.   And did she say there would be any difficulty in

19    her doing that?

20        A.   At the time, no.

21        Q.   There are buses that run up and down Dutch

22    Broadway, right?

23        A.   Yes.

24        Q.   So now you had this phone conversation in

25    mid-November, but you didn't actually sit down and have a

Det. Toussaint - People - Cross                    664

1    conversation face to face until December 10th, is that

2    accurate?

3          A.    Yes.

4          Q.    What was that delay about?

5          A.    Well, we kept playing phone tag.  I finally was

6    able to set up a date on that day.

7          Q.    So there was no emergency to have this

8    conversation, right?

9                MR. PERRI:  Objection.

10               THE COURT:  Sustained as to the

11         characterization.

12         Q.    Did you rush to have this conversation?

13         A.    I attempted to contact her and sit down with her.

14         Q.    Right.  You did everything you could to make

15   yourself amenable to having this conversation, right?

16         A.    Yes.

17         Q.    And in December of 2014 were there any female

18   detectives working the same shift as you were?

19         A.    I don't remember.

20         Q.    Did you ever have a conversation with your

21   detective lieutenant about you, as a male detective, having a

22   conversation with an underaged female?

23         A.    No.

24         Q.    Had you ever done that before, investigated

25   something involving a child witness?

Det. Toussaint - People - Cross                665

1          A.    Yes.

2          Q.    Investigating something involving a female child

3     witness?

4          A.    Yes.

5          Q.    And there are rules and protocols for that, right?

6                     MR. PERRI:   Objection.

7                     THE COURT:   Overruled.

8          A.    No, not that I'm aware.

9          Q.    There are no rules about speaking to child

10    witnesses?

11         A.    No.   If they're a witness, they get interviewed.

12         Q.    You went to the Nassau County Police Academy?

13         A.    Yes.

14         Q.    For how long?

15         A.    Eleven years ago.

16         Q.    Right, but for six months?

17         A.    For six months.

18         Q.    And was there ever any training while you were at

19    the police academy about dealing with child witnesses?

20         A.    Yes.

21         Q.    You remember that?

22         A.    Yes.

23         Q.    Did you have like a binder and notes about that?

24         A.    No.

25         Q.    And when you became a detective, did you receive

Kathi A. Fedden, Sr. Court Reporter

Det. Toussaint - People - Cross                      666

1    any additional training?

2         A.   Yes.

3         Q.   And did that additional training deal with child

4    witnesses or with allegations of special victims?

5         A.   Yes.

6         Q.   Did you take notes about that?

7         A.   During training?

8         Q.   Yes.

9         A.   No.

10        Q.   Now, there was finally a decision to have a

11   conversation face to face with both Millinia and Sarita

12   Johnson, so you left your squad on Dutch Broadway and you

13   went to the home, correct?

14        A.   Yes.

15        Q.   And did you ever have any conversations with the

16   detective lieutenant about going by yourself or bringing

17   somebody with you?

18        A.   No.

19        Q.   So you decided to go.  You were working a four to

20   12 that night?

21        A.   It was a night tour.

22        Q.   During the week?

23        A.   Yes.

24        Q.   So you went there and did Sarita Johnson

25   specifically ask you to call as you were arriving at the

Det. Toussaint - People - Cross                    667

1    house?

2         A.   No.

3         Q.   So when you arrived at the house, had you, you

4    know, looked on a map before leaving the squad to go to

5    Coventry Road North?

6         A.   Yes.

7         Q.   Were you familiar with that street?  Had you ever

8    been there before?

9         A.   I have driven there.

10        Q.   It's a quiet street, right?

11        A.   Yes.

12        Q.   A little bit off the beaten path?

13        A.   A little.

14        Q.   But you were able to find your way there consulting

15   maps and looking at the different computer options there are

16   to find the place, right?

17        A.   Yes.

18        Q.   So you pulled up and do you recall Sarita Johnson

19   being at her door?

20        A.   No.  I actually called her.

21        Q.   Where were you when you made this call?

22        A.   In front of her house.

23        Q.   So you had stopped your police vehicle and you

24   called her sitting outside of her house?

25        A.   I don't remember if she was sitting.  I think she

Det. Toussaint - People - Cross                    668

 1    was inside.

 2         Q.   Where you were, you were sitting.

 3         A.   Oh, I was right in front of the house.

 4         Q.   Did you pull into the driveway or you were just

 5    parallel parked?

 6         A.   Outside on the street.

 7         Q.   And you were not driving a marked Nassau County

 8    police vehicle, correct?

 9         A.   Correct.

10         Q.   But was it an unmarked vehicle that even to the

11    untrained eye people know is probably a police vehicle?

12         A.   Yes.

13         Q.   You didn't have like the little cherry top on top

14    of the vehicle, right?

15         A.   No.

16         Q.   This was not an emergency situation, right?

17         A.   Yes.

18              MR. PERRI:   Objection.

19              THE COURT:   Overruled.

20         Q.   Could you tell us the make and model of your

21    vehicle?

22         A.   Crown Vic.

23         Q.   Now, did you have a computer in the vehicle?

24         A.   No.

25         Q.   You didn't have one of those laptops that kind of

Det. Toussaint - People - Cross                    669

1   sits?

2        A.   Unfortunately not.

3        Q.   So you didn't have one that was attached to the Vic

4   and you didn't have kind of a typical laptop that many people

5   would carry around for their jobs?

6        A.   No.

7        Q.   So fair to say you just had your little pad?

8        A.   Yes.

9        Q.   So you were just taking notes the same way a police

10  officer might have done 50 years ago, a hundred years ago,

11  fair to say?

12       A.   I guess.

13            MR. PERRI:   Objection.

14            THE COURT:   Overruled.

15            MR. ZERNER:   I'll move on, your Honor.

16       Q.   Now, you called Ms. Johnson, she was in the house

17  and did she invite you into the house?

18       A.   No.

19       Q.   Now, in your training, does that indicate anything

20  to you if somebody doesn't invite you into their house?

21            MR. PERRI:   Objection.

22            THE COURT:   Sustained.

23       Q.   Did it ever occur to you that perhaps there was a

24  reason she didn't want you in her home?

25            MR. PERRI:   Objection.

Det. Toussaint - People - Cross                    670

1              THE COURT:  Sustained.

2        Q.   So now, when Sarita and Millinia Johnson exited

3   their home, did they exit together?

4        A.   Yes.

5        Q.   Do you remember if it was light out or dark out?

6        A.   It was light out.

7        Q.   It was December 10th, right?

8        A.   Yes.

9        Q.   So some of the shortest days of the year?

10       A.   I guess.

11       Q.   It gets dark early around December 10th?

12       A.   Yes.

13       Q.   So do you remember what the weather was like that

14   day?

15       A.   It was clear.

16       Q.   Were they wearing jackets when they came out?

17       A.   Yes.

18       Q.   Were they carrying anything in their hands?

19       A.   Ms. Johnson, Ms. Sarita Johnson had her pocketbook

20   with her.

21       Q.   So Ms. Sarita Johnson had her pocketbook.  Did she

22   have her cell phone with her?

23       A.   I don't remember.

24       Q.   Do you remember if she had with her two other cell

25   phones with her?

Det. Toussaint - People - Cross                       671

1        A.    Well, she took them out her pocketbook when I asked

2    her for the cell phones.

3        Q.    Eventually when you talked about the cell phones,

4    she didn't have to go back inside to get them, she already

5    had them, right?

6        A.    Yes, she had them.

7        Q.    Do you remember what time they first exited their

8    home and came out to your vehicle?

9        A.    Somewhere around 6:30.

10        Q.    6:30 on December 10th?

11        A.    Yes.

12        Q.    So it would have been dark out at that point,

13    right?

14        A.    It wasn't dark yet.

15        Q.    So now you're sitting right outside her front door.

16    Do you remember where each person sat in the car?

17        A.    Yes.

18        Q.    Could you tell us where Sarita Johnson sat?

19        A.    She sat on the front passenger seat.

20        Q.    Can you tell us where Millinia Johnson sat?

21        A.    Millinia sat in the back behind Ms. Sarita Johnson.

22        Q.    Now, your vehicle is an unmarked police car.  Is

23    there any kind of barrier separating the front and back

24    seats?

25        A.    No.

Det. Toussaint - People - Cross                          672

1      Q.   Is there a removable barrier?

2      A.   No.

3      Q.   So now when, if ever, did Sarita Johnson tell you

4  that she wanted to have this conversation but not in front of

5  her home?

6      A.   We started to speak for maybe about five minutes

7  and then she asked me if I could -- she was a little

8  uncomfortable while we were conversing the first five

9  minutes.  Then she asked me if I could just drive somewhere

10  else, she'll be more comfortable to sit down and talk.  She

11  doesn't want people in her business.

12      Q.   Did you offer to drive her back to the precinct?

13      A.   No, I didn't.

14      Q.   Did you offer to take her to, you know, a coffee

15  shop or a restaurant?

16      A.   No.

17      Q.   So did she suggest a place where you could go

18  speak?

19      A.   No.

20      Q.   Did she tell you why you couldn't speak in the

21  home?

22           MR. PERRI:  Objection.

23           THE COURT:  Overruled.

24      A.   She said that she didn't want people in her

25  business.

Det. Toussaint - People - Cross                    673

```
 1        Q.   So how many minutes was this conversation?  You
 2   said five minutes right outside and then you went to this
 3   Eagle Avenue Elementary School.  How many minutes did you
 4   talk, the three of you, in the vehicle at Eagle Avenue
 5   Elementary?
 6        A.   Altogether?
 7        Q.   Well, I would like to break it down.  There was a
 8   point in time the three of you were in the vehicle.  Let's
 9   talk about that.  I'm going to ask you how many minutes that
10   was.  Then there is a point in time when it's just you and
11   Millinia.
12             When it's the three of you, how many minutes was
13   that?
14        A.   All estimates now.  About 15, 20 minutes with Ms.
15   Sarita Johnson, and Millinia, maybe a half an hour.
16        Q.   Did Sarita Johnson ever tell you that she witnessed
17   any untoward sexual act between Ray Ross and Millinia
18   Johnson?
19        A.   No.
20        Q.   She never witnessed anything?
21             MR. PERRI:  Objection.
22             THE COURT:  Well, as to the question, she
23        never told the detective?
24             MR. ZERNER:  I'll rephrase.
25             THE COURT:  Thank you.
```

Det. Toussaint - People - Cross                                           674

1      Q.   So Millinia was able to hear the entire

2   conversation that you were having with Sarita for those 15 to

3   20 minutes, correct?

4      A.   Yes.

5      Q.   Is it fair to say that Sarita was telling you about

6   her household?

7      A.   Just whatever was related to Millinia.

8      Q.   But she told you that her sister Tara lived in the

9   household, correct?

10      A.   Yes.

11      Q.   And she told you who else lived in the household,

12   correct?

13              MR. PERRI:   Objection, hearsay.

14              THE COURT:   No, overruled.

15      Q.   Please answer the question, Detective.

16      A.   Yes.  She said her sister lived in the house and

17   her sister had children in the house and she had other kids

18   in the house as well.

19      Q.   Did you do any searches before you had this meeting

20   looking up property records or driver's license or anything

21   like that to learn anything about that household?

22      A.   I looked up on Swift Justice, our police database,

23   just to see if there was any prior incident or anything like

24   that to see if I could get any information before then.

25   That's all I did.

Det. Toussaint - People - Cross                    675

1     Q.    What did you learn?

2                 MR. PERRI:  Objection.

3                 THE COURT:  Sustained.

4     Q.    So you spoke for 15 to 20 minutes.  Millinia heard

5  everything you were talking about and then at what point in

6  time did you determine that Sarita should exit the vehicle?

7     A.    When I was done speaking with Ms. Sarita, then I

8  asked her that I need to speak with the daughter.

9     Q.    So where did Sarita go while you were talking to

10 Millinia?

11    A.    She exited the car, but she stayed in the parking

12 lot.

13    Q.    So it was -- school hours were long over.  You are

14 at an empty parking lot of an elementary school?

15    A.    Yes.

16    Q.    It was the middle of December.  It was dark at that

17 point?

18    A.    It started to get dark.

19    Q.    So Sarita was just standing outside the vehicle?

20    A.    Yes.

21    Q.    Was there a bench or anyplace for her to sit?

22    A.    No.

23    Q.    How far from the vehicle was she standing while

24 this conversation continued?

25    A.    Maybe four, five feet.

Det. Toussaint - People - Cross                    676

1        Q.    Four or five feet.  So she was closer to the

2   vehicle than I am to you right now?

3        A.    Yes, at times.  She was outside walking, facing,

4   standing.

5        Q.    Fair to say I'm about 15 feet away from you right

6   now?

7        A.    Yes.

8        Q.    And she was closer?

9        A.    Yes, at times.

10       Q.    Were there times when she was leaning on the

11  vehicle?

12       A.    No.

13       Q.    Now, when you were having a conversation, just you

14  and Millinia, where was Millinia sitting?

15       A.    She was sitting in the back.

16       Q.    So she never left the back and came up front?

17       A.    No, she stayed in the back.

18       Q.    So if you can show us how were you sitting when you

19  were having this conversation with this 13-year-old girl in

20  the back?

21       A.    I just turn around just like that and I spoke to

22  her.

23       Q.    Are there bucket seats in the front of your

24  unmarked car?

25       A.    I'm sorry?

Det. Toussaint - People - Cross                    677

1    Q.   Are the seats -- is it a bench seat in the front of

2  your vehicle or are they separated from each other like with

3  an armrest or something in the middle?

4    A.   Separated with an armrest.

5    Q.   So you were able to turn your body about 90 degrees

6  to have this conversation?

7    A.   Yes.

8    Q.   That's fair to say?

9    A.   Yes.

10    Q.   When you initially were talking about Sarita

11  Johnson, were you taking notes in your pad?

12    A.   Yes.

13    Q.   And were you numbering those pages as you were

14  having those -- taking those notes?

15    A.   No.

16    Q.   And then you flipped through to a blank page and

17  kept on talking with Millinia?

18    A.   Yes.

19    Q.   And you were asking her questions and you were

20  writing at the same time?

21    A.   Yes.

22    Q.   Did you have a conversation specifically with

23  Millinia about when she first got a cell phone?

24    A.   Could you be more clear?

25    Q.   Yes.

1              MR. ZERNER:  If he can be shown --

2              MR. PERRI:  Objection.

3              MR. ZERNER:  -- People's 12.

4              THE COURT:  Hold it, Mr. Zerner.  Your

5      adversary is standing raising an objection.

6              The objection is overruled because the witness

7      answered that he didn't quite understand the question

8      and asked for a clarification.  Next question,

9      Mr. Zerner.

10             MR. ZERNER:  Thank you, your Honor.

11     Q.   If People's 12 -- you know what, let's make it --

12     scratch that.

13             You were given two cell phones that night, correct?

14     A.   Yes.

15     Q.   Who owned those cell phones?

16     A.   I didn't ask who owned them.

17     Q.   You didn't ask who owned them, but you had a

18     consent to search form filled out, correct?

19     A.   Yes.

20     Q.   When did you provide this consent to search form?

21     A.   When I went back -- the same night.

22     Q.   So you had this conversation, you take handwritten

23     notes, then you drop the two women back off at the home.  You

24     went back on Dutch Broadway to your precinct?

25     A.   Yes.

Det. Toussaint - People - Cross                    679

1          Q.    Filled out forms and when you returned, you

2    returned with blank consent to search forms for the cell

3    phones?

4          A.    Yes.

5          Q.    And how many blank forms did you bring with you?

6          A.    Two.

7          Q.    You don't typically keep them with you in your car?

8          A.    Sometimes.

9          Q.    But you specifically brought two pages with you,

10   right?

11         A.    Yes.

12         Q.    So when you were having this conversation, let's

13   break this down, first with Sarita Johnson, did Sarita

14   Johnson tell you who owned the older cell phone?

15                    MR. PERRI:  Objection.

16                    THE COURT:  Asked and answered.  He said he

17         didn't ask.

18         Q.    You didn't ask and you weren't told, correct?

19                    MR. PERRI:  Objection.

20                    THE COURT:  Overruled.

21         A.    The first cell phone?

22         Q.    Let's talk about the older cell phone first, yes.

23         A.    No.  She handed it to me.  She said this was

24   Millinia's cell phone.

25         Q.    So Sarita Johnson told you that this was Millinia

Det. Toussaint - People - Cross                        680

1   Johnson's phone, right?

2        A.   Yes.

3        Q.   And did you ever search any records from any

4   company to determine who paid for that cell phone?

5        A.   No.

6        Q.   And you accepted the representation being given to

7   you that this was a phone that was owned and controlled by

8   Sarita Johnson, correct?

9        A.   By Millinia, yes.

10        Q.   Millinia told you that was her phone, right?

11        A.   Yes.

12        Q.   And you made an assumption that it was given to her

13   by her mother?

14             MR. PERRI:  Objection.

15             THE COURT:  Sustained.

16        Q.   Did you ever come to learn that that phone was

17   actually bought for her by her father?

18        A.   No.

19        Q.   Have you ever spoken with Rafael Mickens?

20        A.   Who?

21        Q.   You don't know who Rafael Mickens is, do you?

22        A.   No.

23        Q.   Rafael Mickens is Millinia Johnson's father.  Have

24   you ever learned that?

25             MR. PERRI:  Objection.

Det. Toussaint - People - Cross                    681

1                    THE COURT:  Sustained as to the form of the

2       question.

3       Q.    Did you ever do any investigation as to who the

4       father of this child was?

5       A.    No.

6       Q.    To this date, that first time you heard that name

7       was just now, correct?

8       A.    Yes.

9       Q.    All right.

10              Now, eventually you took possession of these two

11      different phones, right?

12      A.    Yes.

13      Q.    And did you know what cell phone provider these

14      phones were connected to?

15                   THE COURT:  When?  At what time?

16                   MR. ZERNER:  I'm sorry.  Let me take that

17      away.  That's probably the worst question I ever asked.

18      Q.    Sprint, Verizon, these different cell phones

19      companies are attached to phones, correct?

20      A.    I guess.

21      Q.    Well, every cell phone needs a company to provide

22      it service; is that fair to say, if you know?

23      A.    I'm afraid I don't know.

24      Q.    To the best of your knowledge, these two cell

25      phones were both able to be used on December 10, 2014 when

Det. Toussaint - People - Cross                682

1   they were handed to you, correct?

2       A.   No, they were disconnected, I believe.  I don't

3   think there was service on them.

4       Q.   Well, how do you know?

5       A.   The mother told me they were disconnected.

6       Q.   So that was her representation to you?

7       A.   Yes.

8       Q.   And again, is it fair to say that you made the leap

9   that the mother actually had purchased this cell phone?

10               MR. PERRI:  Objection.

11               THE COURT:  Sustained.

12      Q.   Now, you told us that you spoke to the mother and

13  daughter together for approximately 45 minutes; is that fair

14  to say?

15      A.   Yes.

16      Q.   And then did you drop them off back at their home?

17      A.   Yes.

18      Q.   Did you offer to take them with you back to your

19  precinct on Dutch Broadway?

20      A.   No.

21      Q.   Why not?

22      A.   I just wanted to drop them off home and then went

23  back in case something came up I had to do for that night.  I

24  was working.

25      Q.   So you dropped them off back at 301 Coventry?

Det. Toussaint - People - Cross                    683

1        A.    Right.

2        Q.    And you drove yourself back to Dutch Broadway?

3        A.    Yes.

4        Q.    And you did some typing and some work on these

5    cases?

6        A.    Yes.

7        Q.    But you didn't contact any kind of database to see

8    who owned these cell phones, right?

9        A.    No.

10       Q.    You have access to information to do that though,

11   right?

12       A.    I can subpoena them, yes.

13       Q.    Well, you can get records like that faster than a

14   subpoena, can't you?

15             MR. PERRI:  Objection.

16             THE COURT:  Sustained.

17       Q.    Did you have a conversation with your detective

18   lieutenant about the case when you got back to your squad?

19       A.    No.

20       Q.    So you typed up some documents, took some blank

21   documents and went back to the home?

22       A.    Yes.

23       Q.    When you went back to the home, did you bring a

24   female officer with you?

25       A.    No.

Det. Toussaint - People - Cross                    684

1        Q.    You told us there were no female detectives working

2   that night?

3        A.    I don't remember.

4        Q.    But there was certainly female police officers

5   working that night, right?

6        A.    Maybe, I don't know.

7        Q.    What percentage of the Nassau County Police

8   Department would you say is female right now?

9              MR. PERRI:   Objection.

10             THE COURT:   Sustained.

11       Q.    So you took the information that you were given by

12  Sarita Johnson and you said you drove to National Wholesale

13  Liquidators?

14       A.    Yes.

15       Q.    Was that the same night or a different night?

16       A.    The same night.

17       Q.    What are the hours of National Wholesale

18  Liquidators?

19       A.    I don't know.

20       Q.    Do you know who runs National Wholesale

21  Liquidators?

22       A.    No.

23       Q.    Did you ever make any efforts to find out?

24       A.    No.

25       Q.    And you said you just looked around the parking

Det. Toussaint - People - Cross                    685

1   lot?

2       A.   Yes.

3       Q.   And just with the naked eye you were looking around

4   to see if you could find any surveillance cameras?

5       A.   Yes.

6       Q.   In 2014, 2016, is it fair to say there are small

7   cameras around?

8       A.   Yes.

9       Q.   It's fair to say it's not always obvious when there

10  are surveillance cameras?

11            MR. PERRI:   Objection.

12            THE COURT:   Overruled.

13      A.   Yes.

14      Q.   But you looked around, didn't find any and you

15  didn't contact the headquarters of the company to find out

16  about surveillance, right?

17      A.   I have had dealings with Wholesale Liquidator

18  before and I know for a fact that they don't have cameras in

19  the parking lot.

20      Q.   When was that information gathered by you?

21      A.   In the past from a prior dealing that I had with

22  them.

23      Q.   So you have been on the job since 2005?

24      A.   Four.

25      Q.   So 11 and a half years ago, so from 2004 until late

Det. Toussaint - People - Cross                           686

1    2014 it was your understanding that there were no cameras at

2    National Wholesale Liquidators?

3        A.   Yes.

4        Q.   But you are aware that these cameras have become

5    less and less expensive over the years, correct?

6             MR. PERRI:   Objection.

7             THE COURT:   Sustained.

8        Q.   You are aware that it's possible that just because

9    a place didn't have cameras in 2004 doesn't mean that they

10   wouldn't have gotten cameras into 2013, 2014, correct?

11            MR. PERRI:   Objection.

12            THE COURT:   Sustained.

13       Q.   So in 2014 you never went inside of National

14   Wholesale Liquidators in connection with your investigation

15   in this case?

16       A.   No.

17       Q.   Where is the Western Beef?

18       A.   It's on Hempstead Avenue.

19       Q.   And was it open, you know, an active open business

20   at the end of 2014?

21       A.   I don't know what the relationship to National

22   Wholesale Liquidators.

23       Q.   So your conversations with Sarita and Millinia

24   Johnson, there was never any allegation that Mr. Ross did

25   anything at the Western Beef parking lot?

Det. Toussaint - People - Cross                    687

1              MR. PERRI:  Objection, hearsay.

2              THE COURT:  No, overruled.

3       A.   No.

4       Q.   So if Sarita Johnson said something about Western

5  Beef in this courtroom this week, she never said it to you

6  before?

7              MR. PERRI:  Objection.

8              THE COURT:  Sustained.

9              MR. ZERNER:  If I can just have a moment with

10      my client, Judge.

11             (Pause in the proceedings.)

12      Q.   You were earlier on shown photographs of a cell

13 phone, right?  I believe that's People's 6 and 7, right?  You

14 were shown those photographs, Detective?

15      A.   Yes.

16      Q.   And did you take those photographs?

17      A.   No.

18      Q.   Did you print those photographs?

19      A.   No.

20      Q.   Had you ever seen that photograph of a cell phone

21 before today?

22      A.   Yes, I have.

23      Q.   You saw it when you testified in the grand jury?

24      A.   I don't remember if I saw them at grand jury, but I

25 saw them prior to today.

Det. Toussaint - People - Cross                    688

1       Q.    But you don't remember when?

2       A.    Yeah.

3             MR. ZERNER:  I don't have anything else for

4       this witness at this time, your Honor.

5             THE COURT:  All right, ladies and gentlemen,

6       it's a good time to break, so enjoy your lunch.

7       Remember my admonitions.  Forget about the case until

8       you come back here 2:00 p.m. to continue testimony on

9       the trial, okay.

10            (Whereupon, the jury exited the courtroom.)

11            THE COURT:  Detective, I am going to ask you

12      to come back at 2:00 p.m.  Go out and enjoy your lunch.

13      Please don't talk to anybody about your testimony while

14      you are on break.

15            THE WITNESS:  Okay, Judge.

16            (Whereupon, the witness exited the courtroom.)

17            THE COURT:  Mr. Perri, with regard to the

18      Detective Toussaint, do you anticipate having some

19      redirect?

20            MR. PERRI:  Possibly, your Honor, but

21      extremely brief.

22            THE COURT:  It's okay.  We had to break at

23      12:30.

24            MR. PERRI:  I understand.

25            THE COURT:  You will have another witness this

Det. Toussaint - People - Cross                                689

1      afternoon?

2              MR. PERRI:  Yes, your Honor.

3              THE COURT:  How long is that witness?

4              MR. PERRI:  I don't anticipate him -- I would

5      assume my questions will take approximately a half hour.

6              THE COURT:  That's one witness and that's the

7      phone record witness?

8              MR. PERRI:  Yes, your Honor.

9              THE COURT:  Very good.

10             MR. PERRI:  Thank you, your Honor.

11             THE COURT:  See you at two.

12             (A luncheon recess was taken.)

13             (Whereupon, the following was recorded and

14     transcribed by Wendy Silas, Senior Court Reporter.)

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2          (People's Exhibits 14A through 14D and 15

3      through 17 marked for identification.)

4          THE CLERK:  Continued case on trial People v.

5      Ray Ross, all parties present except for the jury.

6          People ready?

7          MR. PERRI:  Yes, your Honor, ready.

8          THE CLERK:  Defense ready?

9          THE COURT:  Is the defense ready?

10         MR. ZERNER:  I'm ready subject to some

11     premarkings going on.

12         I just want to know what's being premarked,

13     for the record.

14         THE COURT:  Okay, so in an effort to be more

15     efficient the Court generally asks counsel to premark

16     exhibits with the court reporter.

17         So, Mr. Perri, what are you premarking?

18         MR. PERRI:  Your Honor, in anticipation of

19     the testimony of Kelly Walker, a custodian of records

20     of the Sprint Corporation, the People have premarked

21     the cell phone records of the defendant.  They are from

22     March 1st of 2013 through October 17th of 2014, a CD of

23     these records was provided to counsel prior to jury

24     selection, that these are just the printed-out copies

25     that were on the CD and Excel spreadsheets as well as

                                                        ws

Proceedings                691

1    pdf documents that were provided to the District

2    Attorney's Office from the Sprint Wireless Corporation

3    and that's 14A through D.

4              15, 16 and 17 are merely duplicates of the

5    call detail reports as well as the call record reports

6    that are part of this, with the only difference being

7    that they have the number 516-514-4438 highlighted on

8    them.

9              THE COURT:  So they're the records of --

10             MR. PERRI:  The defendant --

11             THE COURT:  -- of use of the phone?

12             MR. PERRI:  Yes, your Honor.

13             THE COURT:  For a certain period of time?

14             MR. PERRI:  Yes, your Honor.

15             THE COURT:  From when to when?

16             MR. PERRI:  From March 1st of 2013 through

17   October 17th of 2014, which would encompass the time

18   period of the course of conduct.

19             THE COURT:  But it has every phone call made,

20   you're saying, and received, I guess.

21             MR. PERRI:  Yes, your Honor.

22             THE COURT:  And it couldn't be limited in any

23   other way?

24             MR. PERRI:  For the actual business records

25   from Sprint, no, your Honor, they will not testify or

ws

Proceedings                          692

1    authenticate altered records.  They will only --

2              THE COURT:  I'm just asking could it have

3    been provided in a more limited fashion, to your

4    knowledge.  We'll get the testimony.

5              MR. PERRI:  To my knowledge, no, your Honor.

6    From what I was told they could not -- they will not

7    authenticate altered or minimized records.

8              THE COURT:  We'll deal with that later.

9              All right, so, Mr. Kerner, you understand

10   what's being premarked?

11             MR. KERNER:  I do.

12             THE COURT:  All right, we're ready?

13             MR. PERRI:  Yes, your Honor.

14             THE COURT:  Please have him come in.

15             MR. PERRI:  Your Honor, the People don't have

16   any redirect.

17             THE COURT:  Well, we have to dismiss him.

18             MR. PERRI:  I understand.

19             (Witness resumes the stand.)

20             (Jury enters.)

21             THE CLERK:  Let the record reflect the

22   presence of the jury.

23             Detective, you're still under oath.

24             Are the People ready?

25             MR. PERRI:  Yes, your Honor.

ws

Proceedings                          693

1          THE CLERK:  Defense ready?

2          MR. KERNER:  We are.

3          THE COURT:  Okay, ladies and gentlemen,

4     welcome back.

5               When we broke for lunch the cross-examination

6     of the witness was concluded.

7               Now the People have the opportunity, but not

8     a requirement, to have a redirect examination of the

9     witness, so we're going to put the question to

10    Mr. Perri.

11         Any redirect?

12         MR. PERRI:  Your Honor, the People do not

13    require any redirect of this witness, thank you.

14         THE COURT:  All right, detective, thank you,

15    your testimony is concluded.  You may leave.

16         THE WITNESS:  Thank you, Judge.

17         THE COURT:  Have a good day.

18         THE WITNESS:  Thank you.

19         (Witness excused.)

20         THE COURT:  Okay, ladies and gentlemen, I was

21    informed that one of you might want to take notes.

22              Understanding that I've already instructed

23    you that no note taking is permitted, I cannot allow

24    you to take notes on your own, okay?

25              If note taking was going to be permitted, you

ws

Proceedings                    694

1    would have taken your notes during the course of the

2    testimony while you were sitting here in the courtroom

3    and at the end of each day the court officer would

4    collect those notebooks, okay?

5            Now, remember the reasons why.  You can't

6    make any final conclusions or determinations until the

7    end of the case when you go back into the jury room and

8    start your deliberations, okay?

9            If there's anything that you need to have

10   read back, any type of testimony whatsoever, all you

11   have to do is, once you're released to deliberations,

12   have a note, have the jury foreperson sign the note and

13   it will be given to me and we'll make that happen,

14   okay?

15           So just in your mind if there's a point that

16   you would have taken a note on, hold it in your mind.

17   You'll be able to do that and we'll get the entire

18   issue resolved through the readback of the particular

19   testimony or issue that needs to be refreshed for you,

20   okay?

21           All right, Mr. Perri, next?

22           MR. PERRI:  Your Honor, the People call

23   Mr. Kelly Walker.

24

25

                                                    ws

Walker - People - direct          695

1    K E L L Y   W A L K E R, a witness called on behalf of the

2          People, having been first duly sworn by the clerk of

3          the court, was examined and testified under oath as

4          follows:

5                    THE CLERK:  Please have a seat.

6                    State your name, spell your last name, give

7          your place of business.

8                    THE WITNESS:  Kelly Walker, W-a-l-k-e-r, and

9          I work for Sprint Corporation.

10                   THE COURT:  Mr. Perri?

11                   MR. PERRI:  Thank you, your Honor.

12   DIRECT EXAMINATION

13   BY MR. PERRI:

14         Q.   Good afternoon, Mr. Walker.

15         A.   Good afternoon.

16         Q.   Mr. Walker, you testified -- you just stated that

17   you work for the Sprint Corporation.

18              How long have you worked for Sprint?

19         A.   Six years.

20         Q.   And what's your current position with Sprint?

21         A.   Records custodian.

22         Q.   Could you please explain to the jury what the

23   responsibilities are of a records custodian for Sprint?

24         A.   What we do is we responded to legal demands such

25   as subpoenas, court orders and search warrants, provide the

ws

Walker - People - direct                    696

1    information as well as what we do today, show up and

2    authenticate that information.

3         Q.   And before coming here today to testify did you

4    have an opportunity to review Sprint records with respect to

5    a subscriber Ray Ross at 516-537-6877?

6         A.   Yes.

7         Q.   And are you a records custodian with respect to

8    those records?

9         A.   Yes.

10        Q.   And are you familiar with the types of services

11   Sprint offers its subscribers?

12        A.   Yes.

13        Q.   And are you familiar with basic technology

14   underlying the services Sprint offers with respect to its

15   wireless subscribers?

16        A.   Yes.

17        Q.   Could you please explain briefly how a cell phone

18   works for the jury?

19        A.   Pretty much with the network, once you put in the

20   digits, dial the digits on the keypad of however your device

21   is set up, and then whether it's a text message or a call

22   once you hit send and then once it connects and contact the

23   network, that's when the information is stored and when your

24   caller text is being sent or received to the other device.

25             MR. PERRI:  Your Honor, I ask that what's

Walker - People - direct                 697

1        been marked for identification as People's 14A through

2        D be shown to the witness.

3                    (Shown to witness.)

4        Q.   And, Mr. Walker, take a look at the documents in

5    that pile.

6                    (Pause in the proceedings.)

7        A.   Okay.

8        Q.   Now, Mr. Walker, do you recognize those documents?

9        A.   Yes.

10       Q.   And what do you recognize them to be?

11       A.   Subscriber information, the letter that provides

12   the subscriber information on an account, copies of a bill

13   on the billing on the account as well as the actual call and

14   text message transactions for that phone number.

15       Q.   And does this reflect information with respect to

16   that account from March 1st of 2013 through October 17th of

17   2014?

18       A.   Yes.

19       Q.   And are the documents that you've been handed and

20   you said you recognize, are they made in the regular course

21   of Sprint's business?

22       A.   Yes.

23       Q.   And is it in the regular course of the business

24   practices of Sprint to keep those records?

25       A.   Yes.

ws

1      Q.    Are those documents made at or about the times the

2    events indicated therein are recorded?

3      A.    Yes.

4      Q.    And is Sprint under a business duty to accurately

5    create and to maintain those records?

6      A.    Yes.

7              MR. PERRI:  Your Honor, I ask that those

8         records be moved into evidence.

9              THE COURT:  Mr. Zerner?

10             MR. KERNER:  Brief voir dire, your Honor?

11             THE COURT:  You may.

12             MR. KERNER:  If I may, please?

13             I'll help you if you need to.

14             (Shown to counsel.)

15   VOIR DIRE EXAMINATION

16   BY MR. KERNER:

17     Q.    Mr. Walker, when were these printouts created?

18     A.    I would need that -- the letter to look at it.

19     Q.    You're asking me back for 14A for ID?

20     A.    Yes.

21             (Shown to witness.)

22     A.    This doesn't have the front page on there.

23             It would have been sometime towards the end of

24   last year would be when they was printed up and sent out.  I

25   don't have the actual date.  The first page is not on there

1    that would show the actual date.

2         Q.   So you're saying there was a page that was created

3    for these records that isn't among those thousands of pages

4    of documents that are 14A, B, C and D?

5         A.    The cover page.

6         Q.   Have you ever seen a cover page?

7         A.   Yes, it's on the CD.

8         Q.   Did you print out these documents?

9         A.   No.

10        Q.   Who printed out these documents?

11        A.   The District Attorney.

12             MR. PERRI:  Your Honor, it sounds like

13        there's a page we need.

14             THE COURT:  Okay, Mr. Perri, is there a --

15             (Shown to counsel.)

16             MR. ZERNER:  I still have more questions, but

17        that's the first one.

18             THE COURT:  Ladies and gentlemen, I'm going

19        to give you a five-minute break, okay?

20             Please follow the direction of the court

21        officer.

22             (Jury exits.)

23             THE COURT:  Mr. Walker, I'm going to give you

24        a five-minute break, okay?

25             THE WITNESS:  Yes.

ws

Walker - People - direct                    700

1              THE COURT:  Please step outside, relax.

2              Don't chat with anyone about your testimony.

3              (Witness steps down.)

4              THE COURT:  All right, can I see counsel for

5       a second?

6              (Discussion held at the bench, off the

7       record.)

8              THE COURT:  We stand in recess for five

9       minutes.

10              (Recess taken in the proceedings.)

11              THE CLERK:  Remain seated, come to order,

12       court is reconvened.

13              All parties present, Judge, except the jury.

14              THE COURT:  Please bring the jury back --

15       witness first, then the jury.

16              (Witness resumes the stand.)

17              (Jury enters.)

18              THE CLERK:  Let the record reflect the

19       presence of the jury, all parties present.

20              People ready?

21              MR. PERRI:  Yes, your Honor.

22              THE CLERK:  Defense ready?

23              MR. ZERNER:  Yes, thank you.

24              THE COURT:  Welcome back, ladies and

25       gentlemen.

ws

Walker - People - direct                701

1          Mr. Perri, do you ask to add one page to your

2     Exhibit 14A for identification?

3                THE PERRI:  Yes, your Honor.

4                THE COURT:  All right, that will be so added.

5                MR. KERNER:  Do we want to staple this on,

6     your Honor?

7                THE COURT:  You can.

8                (Shown to witness.)

9                THE COURT:  Mr. Zerner, you may continue your

10    voir dire.

11               MR. KERNER:  Thank you, your Honor.

12    Q.   Mr. Walker, you said you needed another page to

13    help you understand about the records.

14         I believe that's been provided to you?

15    A.   Yes.

16    Q.   So taking a look at the People's 14A for

17    identification with the new page, my question to you is who

18    asked for these records to be provided?

19    A.   Nora, if I'm pronouncing it right, Ammirati.

20    Q.   And did she ask you personally for those records?

21    A.   No, it was Sprint.

22    Q.   And Sprint's located where?

23    A.   Overland Park, Kansas.

24    Q.   And is that where your office is personally, sir?

25    A.   Yes.

                                                        ws

Walker - People - direct                    702

1     Q.   And is your name in that letter?

2     A.   No.

3     Q.   It is Chad Howell?

4     A.   Yes.

5     Q.   Who is Chad Howell?

6     A.   He's a subpoena specialist.

7     Q.   And is he the same level as you in the company?

8     A.   No, he's a notch up under me.

9     Q.   He's under you?

10    A.   Yes.

11    Q.   Okay, so who determined that you personally would

12   come here?

13              MR. PERRI:  Objection.

14              THE COURT:  Yeah, sustained.

15    Q.   When was the first time that you personally saw

16   these records?

17    A.   Today.

18    Q.   Today?

19    A.   Um-hum.

20    Q.   Do you know how many pages People's B, C and D are

21   in total?

22    A.   A lot.

23    Q.   Have you personally looked at each and every one

24   of these pages?

25    A.   Through it, yes.

1    Q.   Did you look at each one of these pages?

2    A.   Yes, when we go through it.

3    Q.   Today you did that?

4    A.   Yeah, I looked at those and I looked at the CD.

5    Q.   Where did you do that?

6    A.   At the District Attorney's Office.

7    Q.   When did you fly in, sir?

8    A.   Today.

9    Q.   You flew in today?

10        When are you flying out?

11   A.   Today.

12   Q.   And who pays for that?

13   A.   I guess the state.  I don't know.

14   Q.   It wasn't Sprint, right?

15   A.   No.

16   Q.   In fact, your letter says that if anybody wants

17   you to come in that they have to pay for you to come in,

18   correct?

19            MR. PERRI:  Your Honor, objection.

20            THE COURT:  Overruled.

21   Q.   So Sprint's not paying for you and you personally

22   are not paying for it, right, Mr. Walker?

23   A.   I mean, we pay what we do in the office and the

24   state, county, whoever, they do what they do as well.

25   Q.   Understood.

                                                        ws

1          So today is the first day you looked at these

2     pages and you flipped through each one of these pages?

3          A.   Um-hum.

4          Q.   What are you looking for when you flip through

5     these pages?

6          A.   Making sure that it is the information that we

7     provided, making sure that it's Sprint documents.

8          Q.   Well, how would you know if Page 75 in People's B

9     for identification -- People's 14B for identification was

10    right or wrong?

11         A.   Because based on the Sprint and based on the

12    information that is requested it comes from our database so

13    that information is kept in the regular course of business

14    based on the accuracy that Sprint has to do that in order to

15    bill the customer.

16         Q.   Who keeps your database?

17         A.   Sprint maintains that.

18         Q.   Where?

19         A.   It's in Lee Summit, Missouri, Minnesota, several

20    places.

21         Q.   Well, where was the one that was involving this

22    phone for this trial?

23         A.   I don't know.

24              MR. PERRI:   Objection.

25              THE COURT:   Overruled.

1    Q.   So you don't know and you personally don't have

2    anything to do with the keeping of those records, right?

3    A.   No, I'm just here to authenticate what you have.

4    Q.   Right, somebody told you to fly out and they gave

5    you an address to come to, right?

6    A.   Well, when we got the subpoena that comes to

7    Sprint to require and request us to show up to court, that's

8    what we go by.

9    Q.   And then you got a phone call from somebody in the

10   Nassau County District Attorney's Office last week and they

11   told you please come in on a particular date and time?

12   A.   No, Sprint.

13   Q.   Right, not you personally, but Sprint as a

14   corporation got that call, right?

15   A.   Correct, our department.

16   Q.   And when did somebody tell you that you

17   personally, Mr. Walker, were coming?

18   A.   Yesterday.

19   Q.   So yesterday did you have access to this

20   information?

21   A.   Yes.

22   Q.   But you didn't look at it yesterday?

23   A.   No.

24   Q.   You looked at it this morning?

25   A.   Yes.

1    Q.    And you flipped through each and every one of

2    these pages and you're confident that every one of these

3    pages is accurate?

4    A.    Absolutely.

5    Q.    How do you know if there's a mistake in any of

6    these?

7    A.    Because Sprint doesn't do that.

8    Q.    Sprint doesn't make mistakes?

9    A.    No, everything is based on accuracy, like I say,

10   in order for the customer to be billed.

11   Q.    Okay, Sprint doesn't make mistakes?

12         MR. PERRI:  Objection.

13   Q.    You said that --

14         THE COURT:  Hold it Mr. Zerner, there's an

15   objection raised to your offhand comment and that

16   objection is sustained.

17   Q.    Now, when Mr. Perri was showing you the various

18   bound documents he showed you C and D and I believe you said

19   that they are phone calls and texts, right?

20   A.    Correct.

21   Q.    Are they intermingled or is C phone calls and D

22   texts?

23   A.    They're all together.

24   Q.    They're all intermingled?

25   A.    Yes.

ws

1    Q.    Do these records show whether the phone receiving

2  the call or the text are Sprint phones?

3              MR. PERRI:   Your Honor, objection, this is

4       beyond the scope of voir dire.

5              THE COURT:   Sustained.

6              It's voir dire, Mr. Zerner.

7    Q.    Did you or a representative of Sprint bind these

8  documents?

9    A.    No.

10   Q.    Were they like this, bound, before you got here

11 today?

12   A.    Yes.

13   Q.    You heard Mr. Perri state that the time frame

14 we're talking about is from March 1st, 2013 until October of

15 2014, right?

16   A.    Correct.

17   Q.    All right, take a look at first People's B.   This

18 is Page 1.

19             Tell us what date it starts on, Mr. Walker?

20             MR. PERRI:   Your Honor, objection.

21             THE COURT:   Objection is sustained.   This is

22      voir dire, Mr. Zerner.

23             MR. KERNER:   All right, I'll ask a different

24      question.

25   Q.    Are these records in chronological order?

                                                        ws

Walker - People - direct                     708

1     A.    Yes.

2     Q.    Starting with March 1st, 2013?

3     A.    Yes.

4     Q.    How do you know that?

5     A.    When you go through there and look at the dates.

6     Q.    All right, so take a look and please tell me what

7     the first date on the first page is, sir?

8          MR. PERRI:  Objection.

9          THE COURT:  Objection sustained.

10          Mr. Zerner, this is voir dire.  It's to

11     authenticate business records.

12     Q.    Did you personally create the CD that was used to

13     print these documents?

14     A.    No.

15     Q.    Did you ever see the original CD that created

16     these documents?

17     A.    Yes.

18     Q.    Did you supervise the person that created it?

19     A.    No.

20     Q.    Describe how it was created.

21          MR. PERRI:  Objection.

22          THE COURT:  Yeah, sustained.

23     Q.    When was that CD created, sir?

24     A.    I believe the date on there was March of 2015.

25          I need to see that letter again, sorry.

ws

1                    (Shown to witness.)

2          A.    September 28, 2015.

3          Q.    And did you see that request on September 28th,

4     2015 personally?

5          A.    Nope.

6          Q.    When was the first time you personally saw that

7     request?

8                    MR. PERRI:  Objection.

9                    THE COURT:  Again, sustained, Mr. Zerner.

10                   MR. ZERNER:  I object to these documents

11         coming into evidence, your Honor.

12                   THE COURT:  Objection is overruled.

13                   14A through D received in evidence over

14         defense objection.

15                   (People's Exhibits 14A through 14D received

16         in evidence.)

17                   MR. PERRI:  Your Honor, I ask that People's

18         14A be returned to the witness.

19                   (Shown to witness.)

20    DIRECT EXAMINATION CONT'D

21    BY MR. PERRI:

22         Q.    Mr. Walker, can you explain what People's 14A is?

23         A.    It's the letter that we send out to get the

24    subscriber information on the account.

25         Q.    And can you explain what the second page, the type

Walker - People - direct                710

1    of information that's contained on the second page?

2        A.   It gives you the date range, the subject number,

3    the account details.

4        Q.   And can you tell us based on these records who the

5    account holder is with respect to all these records, who

6    that person is?

7        A.   It shows Ray Ross.

8        Q.   And, Mr. Walker, can I ask you what phone number

9    are these records with respect to?

10       A.   516-537-6877.

11       Q.   And, Mr. Walker, I'm asking you today -- and what

12   information, sorry, what information contained on that page

13   is there about the account associated with 516-537-6877?

14       A.   It gives you -- under account details it gives you

15   the billing account number, the account-established date,

16   whether the account is closed or cancelled, account billing

17   addresses.

18       Q.   So, Mr. Walker, can I ask based on the records

19   contained in People's 14A, was that account active from

20   October of 2013 to October of 2014?

21       A.   Yes.

22       Q.   And what was the billing address for that time

23   period?

24            Did it change?

25       A.   Yes.

ws

Walker - People - direct                    711

1      Q.   And what's the current billing address?

2      A.   It shows it as PO box 354, West Hempstead, New

3  York, 11552.

4      Q.   And what was the previous billing address?

5      A.   301 Coventry, if I'm pronouncing that correctly,

6  Road North in West Hempstead, New York, 11552.

7      Q.   And when did that billing address change?

8      A.   October 28th of 20 -- I mean, sorry, it changes in

9  October 6th of 2014.

10          MR. PERRI:   If I could have that taken from

11     the witness?

12          (Shown to counsel.)

13          MR. PERRI:   Offering People's 14B, ask that

14     be shown to the witness.

15          (Shown to witness.)

16     Q.   And, Mr. Walker, do you recognize People's 14B?

17     A.   Yes.

18     Q.   And what do you recognize it to be?

19     A.   Those are the actual bills that would have been

20  sent or were asked for the customer to get access to.

21     Q.   And if you look at the first page what is the bill

22  period for the first page of this set of records?

23     A.   You mean like 1 through 43 or the actual bill

24  period.

25     Q.   The bill period?

Walker - People - direct                712

1      A.   It shows it as October 8th through November 7th.

2      Q.   And if you could flip to the back --

3            THE COURT:  Of what year, sir?

4            THE WITNESS:  2013.

5      Q.   And if you could flip to the last page of the

6    document?

7            What bill period is contained on the last bill

8    period of this document?

9      A.   March 8th through April 7th of 2014.

10     Q.   And what kind of information is contained with

11   respect to the bills contained in this document?

12     A.   Only the calls.  It's just going to show you the

13   incoming and outgoing calls.

14     Q.   And from the information in these documents as

15   People's 14B can you tell me who -- what customer these are

16   with respect to?

17     A.   Customer is Ray Ross.

18     Q.   And what cell phone number are these with respect

19   to?

20     A.   516-537-6877.

21     Q.   And from these records can you tell the date of

22   each phone call made?

23     A.   Yes.

24     Q.   Can you tell the time of each phone call made?

25     A.   Yes.

Walker - People - direct          713

1       Q.    Does it contain the incoming and outgoing phone

2   numbers?

3       A.    Yes.

4       Q.    And does it tell you how long the phone calls have

5   lasted?

6       A.    Yes.

7           MR. PERRI:  Ask if People's 15 could be shown

8       to the witness - marked for identification - and

9       compared with the previous document.

10          (Shown to witness.)

11      Q.    Mr. Walker, do you recognize People's 15?

12      A.    Yes.

13      Q.    And what do you recognize it to be?

14      A.    A copy of what we just went over.

15      Q.    And are there any differences between the copy

16  that you currently have as opposed to the one that you were

17  just viewing?

18      A.    Yes, there's some highlighted -- highlights on

19  there.

20      Q.    And is there anything specifically highlighted?

21      A.    It's showing a specific call on a specific date

22  and time.

23      Q.    And is there a specific phone number highlighted?

24      A.    The first one, it is showing 516-514-4438.

25      Q.    And did you have an opportunity before coming here

ws

Walker - People - direct                714

1    to review People's 15?

2         A.   Yes.

3         Q.   And other than highlighting are there any other

4    alterations made to that document?

5         A.   No.

6         Q.   You had a chance to compare that to People's 14B?

7         A.   Yes.

8         Q.   And other than the highlighting are there any

9    other alterations?

10        A.   No.

11             MR. PERRI:  Okay, your Honor, I ask that

12        People's 15 be moved into evidence subject to

13        connection through Millinia Johnson as demonstrative

14        evidence.

15             THE COURT:  Could you show the exhibit to

16        adversary counsel, please?

17             (Shown to counsel.)

18             MR. KERNER:  If I may, your Honor?

19             THE COURT:  You may.

20   VOIR DIRE EXAMINATION

21   BY MR. KERNER:

22        Q.   How many pages total is People's 15?

23        A.   I don't know.

24        Q.   Is it fair to say that it's well over a hundred?

25        A.   Could be.

1    Q.   Fair to say it's well over 200?

2    A.   I don't know.

3    Q.   When did you go page by page comparing 14B and 15?

4    A.   Today.

5    Q.   And how long did it take you to go page by page to

6    compare these?

7    A.   Probably about no more than five, ten, minutes.

8    Q.   So in five or ten minutes you were able to compare

9    a 200-page document with another 200-page document?

10   A.   I didn't say it's 200 pages, but I was able to

11   compare the documents.

12   Q.   All right, well, Mr. Walker here.

13        Take a look at this and tell us how many pages

14   People's 15 is?

15             MR. PERRI:   Objection.

16             THE COURT:   Mr. Zerner, he's already answered

17        the question that he doesn't know how many pages there

18        are.

19             Next question.

20   Q.   Is it fair to say it's approximately 200 pages?

21   A.   I couldn't say.   I don't know.   It's a lot.

22   Q.   Would looking at the document help you decide how

23   many pages it is.

24   A.   No.

25   Q.   On the top right of these pages it says in bold

ws

Walker - People - direct                716

1    print A1 of 30?

2        A.   Correct.

3        Q.   What does that mean?

4        A.   That's just how many pages it is on there for that

5    A.

6        Q.   All right, so we got 30 pages there and then it

7    starts up again.

8             Are you aware of that?

9        A.   Yes.

10       Q.   When you reviewed this you reviewed every bit of

11   information on every one of these pages, right?

12       A.   Yes.

13       Q.   Because otherwise there's no way to know they're

14   exactly the same, right?

15            MR. PERRI:   Objection.

16            THE COURT:   No, overruled.

17       A.   Yeah.

18       Q.   And then it starts again at A31 and there's

19   another counting, right?

20       A.   Um-hum, yes.

21       Q.   Where does that one stop?

22       A.   I don't know.

23       Q.   Right, the first one goes to 30, the second one to

24   31, the third one to 29.

25            Do you have any idea why?

ws

1            MR. PERRI:  Objection.

2      A.   Because that's the numbering of pages.

3            THE COURT:  Excuse me, overruled.

4      Q.   These are your records, right?

5           Sprint makes these records, correct?

6      A.   Correct.

7      Q.   There's no formula as to how to make these

8  records, correct?

9      A.   I don't know what you mean by that.

10     Q.   Why are some of theme 30, some 29, some 31?

11          Why are they kept this way?

12     A.   Because it's based on the --

13            MR. PERRI:  Objection.

14            THE COURT:  Hold it.

15            Sustained.

16     Q.   These records show that there was a connection

17  between phones, but not necessarily between the person who

18  owns the phone, correct?

19     A.    It only gives phones transactions.  I don't know

20  anything about the persons.

21     Q.   Do you know the type of phone that was connected

22  to this by looking at these records?

23            MR. PERRI:  Objection.

24            THE COURT:  Sustained.

25            MR. KERNER:  Your Honor, I object at this

ws

Walker - People - direct                      718

1    time to People's 15.

2            I don't have any idea how many highlightings

3    there were.

4            I don't believe that Mr. Walker knows how

5    many highlightings there were and there's no indication

6    that he's had the opportunity to actually compare and

7    contrast hundreds of pages of documents in what he said

8    was maybe five to ten minutes.

9            THE COURT:  Mr. Perri, do you have anything

10   to say?

11           MR. PERRI:  Your Honor, with respect to the

12   People's application to move it into evidence, although

13   the witness has testified that he compared them, the

14   only difference is highlighting, as an officer of the

15   court the only highlights made on that page -- on the

16   pages of this document were executed by the People for

17   demonstrative purposes to aid the jury in their

18   assessment of the evidence, that no other alterations

19   to the document were made.

20           I personally made those highlights and we're

21   asking them to be accepted as demonstrative evidence

22   for the jury, subject to connection through Millinia

23   Johnson.

24           THE COURT:  Defense objection is overruled.

25           People's 15 received in evidence over

                                                          ws

Walker - People - direct                719

1       objection.

2                    (People's Exhibit 15 received in evidence.)

3                    MR. PERRI:  If I could have that back?

4                    (Shown to witness.)

5                    MR. PERRI:  Your Honor, I'm asking if the

6       witness could leave the stand to be able to see the

7       screen to help explain to the jury?

8                    THE COURT:  Mr. Walker, you can step down.

9       Follow the directions of the court officer.

10                   THE WITNESS:  Sure.

11                   (Witness steps down.)

12                   (People's Exhibit 15 displayed at this time.)

13      DIRECT EXAMINATION CONT'D

14      BY MR. PERRI:

15      Q.   Mr. Johnson (sic), could you please explain to the

16      jury with respect to the different information appearing on

17      this page, specifically under customer, what is the column

18      or the area of customer?

19                   What information does that contain?

20                   THE COURT:  Mr. Walker, before you answer,

21      can we identify the exhibit you're putting up?

22                   MR. PERRI:  I'm sorry, this is the same

23      exhibit, I'm sorry, People's 15.

24                   THE COURT:  Now you can answer.

25      Q.   So under customer and there's a name Ray Ross,

                                                            ws

Walker - People - direct                720

1    what does that signify according to these records?

2        A.   That's the name that was provided on the account.

3        Q.   And on the left side of the page under call

4    details there appears to be a ten-digit number.

5             What is that number?

6        A.   516-537-6877.

7        Q.   And what does that signify?

8        A.   That's the primary number on the account.

9        Q.   And with respect to below it, in the column date,

10   what does that signify?

11       A.   That's the date of the actual call transaction.

12       Q.   And the numbers 1 through 20 on the screen

13   presently, what does each of those numbers signify?

14       A.   That's just a number for that line on the bill,

15   that's all.

16       Q.   And why are there different lines on the bill that

17   are different colored, gray and white?

18       A.   That's just so you can -- it helps you to be able

19   to see the numbers and the different lines.  That's all.

20       Q.   And in your third column -- sorry in the second

21   column it has time and what is that with respect to?

22       A.   That's the time that the actual call was recorded.

23       Q.   And is that the time for the call in Line 1?

24       A.   Yes.

25       Q.   With respect to the third column where it says

ws

1   phone number, what information is contained there?

2       A.   That's going to give you the phone numbers for the

3   incoming and outgoing calls.

4               MR. KERNER:  Your Honor, if we could save

5           some time I'm happy to stipulate that call destination

6           means call distinction and minutes used means minutes

7           used.  I don't know that it's necessary to go through

8           each and every column about what's plainly stated on

9           the screen, your Honor.

10              THE COURT:  Thank you, Mr. Zerner.

11              Mr. Perri, can you continue.

12              MR. PERRI:  Thank you, your Honor.

13      Q.   Now, with respect to call destination, what

14  information would be contained in the column for call

15  destination?

16      A.   Just letting you know whether it's incoming call

17  or outgoing, where that call -- where that number is

18  destined to be, their calling area.

19      Q.   And when you see the term incoming in this column

20  under call destination what does that signify?

21      A.   That the call is coming in to the number of the

22  6877.

23      Q.   And when you see incoming -- when you do not have

24  incoming but rather terms such as Garden City, New York,

25  what does that mean?

Walker - People - direct                722

1      A.   That's 6877 calling that number, so it's an

2   outgoing call.

3      Q.   So with respect to Line 18 on this page --

4      A.   Um-hum.

5      Q.   -- what happened on Line 18 of this page?

6      A.   It was an incoming call from the 4438 number.

7      Q.   And at what time did that call occur?

8      A.   6:47 a.m.

9      Q.   P.m.

10          Mr. Walker?

11              MR. PERRI:  Your Honor, the witness may

12   retake their seat, if you don't mind.  Thank you.

13              THE COURT:  You can have your seat back.

14              (Witness resumes the stand.)

15              MR. PERRI:  Your Honor, I ask that the

16   witness be shown 14C and D.

17              (Shown to witness.)

18      A.   Okay.

19      Q.   Mr. Walker, do you recognize 14C and D?

20      A.   Yes.

21      Q.   And what do you recognize it to be?

22      A.   The actual call and text message transactions.

23      Q.   And how are 14C and D different from 14B?

24      A.   It actually has the text message transaction

25   included.

Walker - People - direct                723

1      Q.   And what number -- what wireless number are these

2    records connected to?

3      A.   516-537-6877.

4           MR. PERRI:  Your Honor, I would ask that the

5      witness be also shown 17 -- 16 and 17, your Honor.

6           (Shown to witness.)

7      Q.   Now, Mr. Walker, do you recognize People's 16 and

8    17?

9      A.   Yes.

10     Q.   And what do you recognize it to be?

11     A.   The same thing.  It's the call and text message

12   transactions.

13     Q.   And is there anything different about People's 16

14   and 17 in comparison to People's 14C and D?

15     A.   The highlighted transactions.

16     Q.   And what is highlighted on that page?

17     A.   Several transactions.  It's looking like it's

18   between the target phone number which is the 6877 number and

19   516-514-4438.

20     Q.   And other than those highlights are there any

21   differences between those records and People's 14C and D?

22     A.   No.

23          MR. PERRI:  Your Honor, I ask that People's

24     16 and 17 be accepted into evidence as demonstrative

25     evidence with respect to 14C and D, your Honor, subject

ws

Walker - People - direct                724

1    to connection through Millinia Johnson.

2                 THE COURT:  All right, please allow

3    Mr. Zerner the opportunity to see the records.

4                 (Shown to counsel.)

5                 MR. PERRI:  Your Honor, prior to that it

6    would be with the same basis as the People's previous

7    application for demonstrative evidence.

8                 The only alteration in the copies were made

9    by the District Attorney's Office and solely to

10   highlight the same cell phone number as in the other

11   copy.  No other alterations were made.

12   VOIR DIRE EXAMINATION

13   BY MR. KERNER:

14        Q.   Mr. Walker, did you look at every single page and

15   every single bit of information of these 520 pages?

16        A.   When I thumbed through it.

17        Q.   Did you look at every single page of all 520

18   pages, sir?

19        A.   No.  If you're asking me if I took actual time to

20   look at every single page in there, no.  We thumb through it

21   to look at it because that's what we do.

22                 MR. KERNER:  Same objection.

23                 THE COURT:  Very well, objection is

24   overruled.  So noted for the record.

25                 Received in evidence, People's 16 and 17.

                                                      ws

1          (People's Exhibits 16 and 17 received in

2     evidence.)

3          MR. PERRI:  And, your Honor, the same

4     application for the witness to be able to leave the

5     stand so I can use the presenter.

6          THE COURT:  You can step down, Mr. Walker.

7          MR. PERRI:  Thank you, your Honor.

8          (Witness steps down.)

9          (People's Exhibit 17 displayed at this time.)

10    Q.   Now, Mr. Walker --

11         THE COURT:  What exhibit are you referring

12    to?

13         MR. PERRI:  Sorry, your Honor.

14         This is People's 17, your Honor.

15         MR. KERNER:  Can we know what page we're

16    talking about?

17         MR. PERRI:  Page 331 of 520.

18    Q.   Mr. Walker, can you please explain at the top of

19    Column 1 or the first column on this page the word calling

20    underscore NBR appears.

21         What does that stand for?

22    A.   Calling number and that's the number that's

23    actually placing the call.

24    Q.   With respect to the second column, called

25    underscore NBR, what does that signify?

                                                    ws

1        A.    Called number and that's the number that is being

2    called.

3        Q.    And with respect to the third column which says

4    dialed underscore digits, can you explain what that means?

5        A.    That is the actual numbers being pressed on the

6    keypad of the actual device.

7        Q.    With respect to the third (sic) column, M

8    underscore R underscore, what does that stand for?

9        A.    That gives you the type of call, whether it's the

10   inbound or outbound or routed or undetermined.  Let's you

11   know the type of call that was on that transaction.

12       Q.    And can you please explain what a routed call

13   means, the term?

14       A.    Routed call is one of two things.  It's meaning

15   that the call was actually routed to the voicemail and it

16   will give you a code to let you know that it was routed to

17   voicemail or it can be that the call was just being routed

18   through the network in order to reach the device.

19       Q.    Next column, moving the same exhibit, same page

20   over, you see the column entitled start date.

21            What information is contained in that column?

22       A.    Start date gives you the date and time in military

23   time of the actual transaction.

24       Q.    Could you please explain to the jury just briefly

25   what military time means?

1      A.   24-hour, so say like, for example, looking at the

2   second line right there that shows 1708 you would convert

3   that to standard time which would be 5:08.

4                THE COURT:  A.m. or p.m., sir.

5                THE WITNESS:  P.m., sorry.

6      Q.   With respect to the column that says end

7   underscore date, what does that signify?

8      A.   Same thing, just giving you the date and the time

9   that that transaction ended on the network.

10      Q.   And with respect to duration?

11      A.   Just gives you the length of the call in seconds.

12      Q.   And the last column, NEID?

13      A.   Network element identifier, just to let you know

14   the area, the towers, that are being used.

15      Q.   Just to go back to the first three columns, now,

16   when in the dialed digits column, please explain what it

17   means when that area is blank?

18      A.   That's a text message.

19      Q.   And when there are numbers that appear on that

20   column what does that signify?

21      A.   An actual call.

22                MR. PERRI:  I ask if the witness could return

23          to the stand, your Honor.

24                THE COURT:  Go ahead.  Mr. Walker.

25                (Witness resumes the stand.)

                                                          ws

1          MR. PERRI:  Nothing further, your Honor.

2          THE COURT:  Mr. Zerner?

3   CROSS-EXAMINATION

4   BY MR. KERNER:

5          Q.   Mr. Walker, how long have you worked for Sprint?

6          A.   Six years.

7          Q.   And have you always worked for Sprint in this

8   capacity?

9          A.   No.

10         Q.   How long have you been traveling around the

11  country authenticating documents?

12         A.   Since of last year, May of 2015.

13         Q.   Was that a welcomed change to your duties?

14         A.   Yes.

15         Q.   It was a promotion?

16         A.   Yes.

17         Q.   Now you get to travel, right?

18         A.   Yes.

19         Q.   You've only been doing this for about nine months,

20  but in those nine months approximately how many trips have

21  you taken?

22         A.   Over 50.

23         Q.   So fair to say you're traveling every week now?

24         A.   Yes.

25         Q.   What kind of training did you receive when you got

ws

Walker - People - cross                    729

1    this promotion?

2        A.   Well, I was doing it beforehand where -- producing

3    the documents so we had classroom training as well as

4    on-the-job training.

5        Q.   How long was the classroom training?

6        A.   I believe it was six weeks.

7        Q.   And was this on Sprint's campus?

8        A.   Yes.

9        Q.   And who gives that training?

10       A.   Our training department.

11       Q.   Was it one particular teacher or professor or a

12   whole team of them?

13            How did that work?

14       A.   Well, in my class it was just two of them.

15            THE COURT:  Two instructors?

16            THE WITNESS:  Two instructors, yes.

17       Q.   And how many people have your current job title at

18   the Sprint corporation?

19       A.   Four.

20       Q.   Do you cover a certain portion of the United

21   States?

22       A.   No, we just go wherever we're needed.

23       Q.   Are the other three people also just crisscrossing

24   the country coming to court?

25       A.   Yes.

ws

1    Q.    Okay.   What's the next promotion above this job?

2              MR. PERRI:   Objection.

3              THE COURT:   Overruled.

4    Q.    Please answer the question.

5    A.    Whatever I want it to be, depending on just where

6  I want to go.

7              So if I want to be a supervisor, if I want to look

8  at manager, if I want to look at a completely different

9  department, it's my option.

10    Q.    You're anticipating spending your whole career

11  with the corporation?

12    A.    With Sprint?

13              Yes, as long as I can.

14    Q.    Sounds like you enjoy your job?

15    A.    Yes, I do.

16    Q.    And you were glad to take the trip to come here?

17    A.    Absolutely.

18    Q.    And the company is fine with that also, it doesn't

19  cost them anything, right?

20    A.    I mean, I don't deal with that part of it.   I just

21  do what I'm supposed to do.   I do my job.

22    Q.    Okay.   Did somebody from the DA's Office pick you

23  up at the airport?

24    A.    No.

25    Q.    Took a cab?

1      A.    Yes.

2      Q.    Submitted a receipt to the DA's Office?

3      A.    I didn't handle that.

4      Q.    Okay.   When was the first time you spoke with

5   ADA Perri?

6      A.    I believe it was yesterday.

7      Q.    And prior to yesterday, to the best of your

8   knowledge, had he spoken with somebody else in your

9   department?

10      A.    I would say yes.

11      Q.    And then yesterday you had a conversation with

12   Mr. Perri.

13            Were you in Overland Park, Kansas yesterday?

14      A.    Yes.

15      Q.    At headquarters?

16      A.    Yes.

17      Q.    Now, do you remember what time of day it was?

18      A.    Afternoon.

19      Q.    Okay, so you're in Kansas.

20            The first time you hear anything about this case

21   was less than 24 hours ago and is it fair to say that he

22   gave you the phone number that he was talking about?

23      A.    No, I can look it up, but we went into more of

24   just making sure that we can get me here today so we can get

25   everything just taken care of.

Walker - People - cross                    732

1        Q.    And then when you got here today he told you what

2    phone number was important to him, right?

3        A.    Correct.

4        Q.    And did he tell you anything about who was the

5    recipient of any of these phone calls and texts that he's

6    discussed in --

7                    MR. PERRI:   Objection.

8                    THE COURT:   Overruled.

9        A.    No, because, I mean, whoever that is, it really

10   doesn't pertain to me.

11       Q.    So you don't know whether that 514-4438 number is

12   also a Sprint number?

13       A.    Yeah, I know it's a Sprint number because that's

14   why I'm here.

15       Q.    So both numbers were Sprint numbers, right?

16             Both the 537-6877 as well as the 514-4438, right?

17       A.    I don't know about the 4438, I just know the 6877.

18       Q.    All right, and you didn't look up to see whether

19   4438 was also a Sprint number?

20       A.    No.

21       Q.    And do you know who pays the bill on that 4438

22   number?

23       A.    No.

24       Q.    And would you know if both of those numbers were

25   connected to each other?

ws

1       A.   No.

2       Q.   Do you have, and you'll excuse my ignorance, I'm

3   not a Sprint customer and I apologize, do you have like a

4   friends and family plan with Sprint?

5       A.   We do -- we used to.  That's the actual title of

6   it.

7       Q.   Okay, so you don't have that now?

8       A.   Right now we have a what's called everything data

9   plans.

10      Q.   And back in 2013, 2014, did you have a friends and

11  family plan?

12      A.   I don't remember exactly.

13      Q.   Would those --

14      A.   I know we had some that was grandfathered in, so

15  if we go by them being grandfathered in we would say yes, we

16  had them.

17      Q.   Would those records that you were reviewing before

18  indicate whether the phones were in the same plan?

19      A.   Only if we would have looked up both numbers.

20      Q.   And you didn't?

21      A.   No.

22      Q.   And you didn't because Mr. Perri didn't direct you

23  to do it?

24      A.   Well, the subpoena didn't.

25      Q.   Right, and the subpoena was prepared by somebody

ws

1   from Mr. Perri's office?

2       A.   From the District Attorney's Office.

3       Q.   And that subpoena, it's not by a judge it's by the

4   DA?

5                MR. PERRI:  Objection.

6       A.   I --

7                THE COURT:  Sustained.

8       Q.   Aside from looking up exactly what the DA told you

9   to look up did you or anybody at Sprint Corporation do a

10  more thorough search of either of these phones?

11               MR. PERRI:  Objection.

12               THE COURT:  No, overruled.

13      A.   When you say more of a thorough search, what are

14  you meaning?

15      Q.   Well, you already told you us you didn't look up

16  anything involving the 4438 number as far as who the billing

17  customer was, right?

18      A.   Right.

19      Q.   Because nobody asked you to?

20      A.   Correct.

21      Q.   And you didn't look up to see the customer name on

22  that phone, right?

23      A.   Correct.

24      Q.   You didn't look up to see when it was established,

25  right?

1        A.    Correct.

2        Q.    And you didn't look up to see if it was ever shut

3    off, right?

4        A.    Correct.

5        Q.    You could get that information, right?

6        A.    If someone gave us a legal demand we could.

7        Q.    Right, but the DA didn't ask you for that in this

8    case, right?

9        A.    No.

10       Q.    Did you ever hear the name Rafael Mickens before?

11       A.    No.

12                MR. ZERNER:  I have nothing further.

13                THE COURT:  Any redirect, Mr. Perri?

14                MR. PERRI:  Nothing further.

15                THE COURT:  Mr. Walker, thank you for coming

16       in from Kansas.

17                Probably more cold here than it is in Kansas.

18                THE WITNESS:  No, it's the same.

19                THE COURT:  Have a safe trip back.

20                THE WITNESS:  Thank you.

21                (Witness excused.)

22                THE COURT:  Can I see counsel for a second,

23       please?

24                (Discussion held at the bench, off the

25       record.)

                                                        ws

Proceedings                           736

1        THE COURT:  Mr. Perri?

2        MR. PERRI:  Your Honor, the People have an

3    application with respect to two documents that we ask

4    to be -- that have already been marked 8 and 9 for

5    identification.  They are two orders of protection.

6    They are certified documents, sealed and signed by the

7    clerks of the Family Court of the State of New York for

8    Nassau County.

9        Pursuant to Civil Practice Law Rule 4540, we

10   ask that they be admitted into evidence as

11   authenticated official records of the State of New

12   York, your Honor.

13       THE COURT:  Mr. Zerner?

14       MR. KERNER:  Your Honor, I object.  He's

15   trying to bootstrap another court's ruling into this

16   court.  There's no reason for it and I object to it.

17       THE COURT:  Thank you, sir.

18       The objection is overruled and the two

19   documents received in evidence as People's 8 and 9.

20       (People's Exhibits 8 and 9 received in

21   evidence.)

22       THE COURT:  Okay, ladies and gentlemen,

23   that's going to conclude our work for today and, as you

24   know, tomorrow is Friday and then we have the weekend

25   and of course Monday comes after the weekend.

ws

Proceedings                737

1          Friday and Monday are holidays, either local

2     or national or both, so there's no work for you in

3     court on Friday or Monday.

4          Then on Tuesday, because of a conflict, we

5     won't have any court testimony either.

6          So the next time we'll see you is Wednesday

7     morning at 9:30 to continue testimony.

8          Now, I told you the schedule was that we

9     should be completed before the end of February and I

10    think we're still on track for that schedule, okay?

11         Remember my admonitions.

12         Don't do anything with the case on your own,

13    okay?

14         Forget about it, enjoy your long weekend.

15    Stay warm, stay safe and we'll see you Wednesday

16    morning, okay?

17              (Jury exits.)

18              THE COURT:  Mr. Perri, anything for the

19    record?

20              MR. PERRI:  No, your Honor.

21              THE COURT:  Mr. Zerner, anything for the

22    record?

23              MR. KERNER:  Just have a nice weekend.

24              THE COURT:  Very good.

25              You, too, sir.

                                              ws

Proceedings                    738

1        My admonitions to you both are the same as to

2   the jurors, stay safe, okay, stay warm and we'll see

3   you on Wednesday morning.

4        MR. PERRI:  You, your Honor.

5        THE CLERK:  Having no further business, court

6   stands adjourned.

7        (Proceedings adjourned to Wednesday,

8   February 17, 2016 at 9:30 a.m.)

9        (Kathi Fedden relieves Wendy Silas as

10  official court reporter.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        ws