COPY



1   SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF NASSAU :  PART 47
2   ---------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK
3

4           -against-                    Indictment No. 1050N/15

5                                        JURY TRIAL

6   RAY ROSS,

7                       DEFENDANT.
    ---------------------------------------x

8                       Mineola, New York
                        February 17, 2016
9

10  B E F O R E:   HON. TERENCE P. MURPHY
                   Acting Supreme Court Justice
11

12  A P P E A R A N C E S:
13

14          (Same as previously noted)
15

16

17              Kathi A. Fedden
                Official Court Reporter
18

19          *              *              *
20

21          THE CLERK:  Continued case on trial, People v.
22  Ray Ross.  The jury is not present at this time.  All
23  parties are present, however.
24          THE COURT:  Good morning.
25          MR. PERRI:  Good morning.

Kathi A. Fedden, Sr. Court Reporter

1            MR. ZERNER:  Good morning.

2            THE COURT:  Mr. Zerner, you brought something

3    to the Court's attention you wanted to put on the

4    record.

5            MR. ZERNER:  I do, your Honor.  I provided to

6    both the Court and to the prosecutor several pages that

7    were faxed to me at 10:10 last evening.  You may recall

8    that when Sarita Johnson testified on Thursday of last

9    week, the most recent day that we had testimony in this

10   case, I asked her about a Denise Sawyer.

11           It's my understanding that Ms. Johnson

12   contacted the Nassau County police and brought a

13   complaint, I suppose a trespassing complaint, against

14   Denise Sawyer.  Denise Sawyer contacted me, denied that

15   this ever happened and I asked her whether the Nassau

16   County police made an arrest and she told me they did

17   not.

18           Denise Sawyer was quite upset and I told her

19   you can avail yourself of any and all of the law

20   enforcement community in Nassau County and simply tell

21   them the truth.  It's my understanding that she did do

22   that.  She spoke to an ADA Wright.  There is a document

23   in the paperwork that I provided to both your Honor and

24   ADA Perri.  I don't know whether ADA Wright generated

25   any other paperwork.

1           It's my understanding that no charges were

2      brought in either direction up to now.  It sounds that

3      Ms. Sawyer is quite concerned for her own safety.  I

4      believe she lives at 308 Coventry Road North which is

5      across the street from 301 where Ms. Johnson lived,

6      currently still lives and is the focus of many of the

7      pieces of testimony that we've received and will

8      continue to receive in this case.

9           As an officer of the Court, it seemed my

10     obligation to bring this forward, which I did at my

11     first available opportunity.  I do anticipate calling

12     Ms. Sawyer as a witness.  She was not on my original

13     list of potential witnesses, but certainly given what we

14     have now, I am anticipating doing that.

15          Additionally, your Honor, I believe that the

16     prosecutor does have an obligation to investigate what

17     we have just put on the record.  It is his district

18     attorney's office, it is the police department that is

19     instrumental in this case that is also investigating

20     these matters.  I believe it's also the same precinct,

21     the Fifth Precinct that's been involved here and, again,

22     it's my understanding that Ms. Sawyer did personally

23     physically go to both 272 Old Country Road and speak to

24     an assistant district attorney and did go to the Fifth

25     Precinct on Dutch Broadway and/or spoke to police at her

1    residence in West Hempstead, all, of course, Nassau

2    County.  Thank you, your Honor.

3              THE COURT:  Thank you, Mr. Zerner.

4              Mr. Perri, you want to put anything on the

5    record?

6              MR. PERRI:  Your Honor, the People were made

7    aware by Ms. Johnson that the person she was questioned

8    about, Ms. Sawyer, had, according to her, been in her

9    backyard.  She did notify us that she called the police

10   and reported that information to the police.

11             THE COURT:  Okay.

12             MR. ZERNER:  Your Honor, just to follow up,

13   it's interesting to me if there was any paperwork that

14   was generated as a result of that, Mr. Perri has not

15   provided it.

16             THE COURT:  Mr. Perri, you are reminded of all

17   your obligations under the law with regard to

18   investigations and service of documents to adversary

19   counsel.

20             MR. PERRI:  Your Honor, the People were

21   notified of this this morning.  It's a collateral

22   matter.  It has nothing to do with the present case.

23             THE COURT:  Mr. Perri, do you acknowledge all

24   your requirements under the law?

25             MR. PERRI:  Yes, your Honor.

1                    THE COURT:  Thank you.

2                    Anything else for the record?

3                    MR. PERRI:  No, your Honor.

4                    THE COURT:  Can we have the jury in, please?

5                    (Whereupon, the jury entered the courtroom.)

6                    THE CLERK:  Let the record reflect the

7        presence of the jury.

8                    Are the People ready?

9                    MR. PERRI:  Yes, your Honor.

10                   THE CLERK:  Defense ready?

11                   MR. ZERNER:  Yes, we are.

12                   THE COURT:  Good morning, ladies and gentlemen

13       of the jury, welcome back.  I hope you had a good

14       weekend.  It looks like spring is on its way, so we're

15       going to get started right away with continued testimony

16       at trial.

17                   Mr. Perri.

18                   MR. PERRI:  Your Honor, the People call

19       Millinia Johnson.

20   M I L L I N I A   J O H N S O N, residing in the County of

21          Nassau, having been called as a witness on behalf of

22          the People, having been duly sworn by the Clerk of the

23          Court, was examined and testified as follows:

24                   THE CLERK:  State your name and spell your

25       last name.  Give your county of residence.

1              THE WITNESS:  Millinia, M-I-L-L-I-N-I-A,

2        Johnson, J-O-H-N-S-O-N.  Nassau County.

3              THE COURT:  Ms. Johnson, if you want to move

4        your chair up a little bit, you can speak into the

5        microphone, that might help your voice carry so the jury

6        can hear your testimony, okay.

7              MR. PERRI:  Thank you, your Honor.

8              THE COURT:  You're welcome.

9              Ms. Johnson, just as a matter of instruction,

10       Mr. Perri is going to be asking you some questions,

11       okay.  You have to give answers to those questions and

12       then Mr. Zerner will be asking you questions.  If you

13       hear the word objection, just stop talking, okay, and

14       then I'll give you further instructions.  Do you

15       understand?

16             THE WITNESS:  Yeah.

17             THE COURT:  Mr. Perri.

18             MR. PERRI:  Thank you, your Honor.

19  DIRECT EXAMINATION

20  BY MR. PERRI:

21       Q.   Good morning, Ms. Johnson.  How old are you today?

22       A.   Fifteen.

23       Q.   And what's your date of birth?

24       A.   December 30, 2000.

25             THE COURT:  I didn't understand.  Could you

M. Johnson - People - Direct                    745

1        say it again?

2                THE WITNESS:  December 30, 2000.

3        Q.   And where do you live?

4        A.   301 Coventry Road North.

5        Q.   What town is that in?

6        A.   West Hempstead.

7        Q.   And what county?

8        A.   Nassau.

9        Q.   Is that in New York State?

10       A.   Yes.

11               THE COURT:  Hold on, Mr. Perri.

12               Ms. Johnson, you are going to have to speak

13       into the microphone, okay.

14               THE WITNESS:  Okay.

15               THE COURT:  Because even I can't hear you and

16       understand you.

17       Q.   And could you please describe the setup of your

18  house at 301 Coventry Road where you live?

19       A.   There is two stories and there is an upstairs and

20  downstairs.

21       Q.   Where do you live at the house?

22       A.   I sleep downstairs.

23       Q.   And do you live with your family at that location?

24       A.   Yes.

25       Q.   Who lives there?  Which family members live there

```
1    with you?

2         A.    My mom.

3         Q.    What's your mom's name?

4         A.    Sarita.

5         Q.    Who else lives with you?

6         A.    My brother.

7         Q.    What's his name?

8         A.    Malik.

9         Q.    And how old is Malik?

10        A.    Twenty-two.

11        Q.    Does anyone else live with you and your family?

12        A.    Yes.

13        Q.    Who else lives with you?

14        A.    My two sisters.

15        Q.    What are their names?

16        A.    Sherima and Mercedes.

17        Q.    And how old are Sherima and Mercedes?

18        A.    Sherima is eight and Mercedes is 18.

19        Q.    And where do your sisters, where do they live

20   inside the house?

21        A.    Downstairs.

22        Q.    And where does your brother Malik live?

23        A.    Upstairs.

24        Q.    And could you explain the setup downstairs in your

25   house where you sleep?
```

M. Johnson - People - Direct                                  747

```
 1        A.    It's two beds, a chair.

 2        Q.    And who do you share a bed with?

 3        A.    My sister.

 4        Q.    Which sister?

 5        A.    Mercedes.

 6              THE COURT:  Who is that?

 7              THE WITNESS:  My older sister.

 8              THE COURT:  Mercedes?

 9              THE WITNESS:  Yes.

10        Q.    And do you know your grandmother?

11        A.    Yes.

12        Q.    And what's her name?

13        A.    Pauline.

14        Q.    Where does she live?

15        A.    She lives --

16        Q.    Currently.

17        A.    At a townhouse.

18        Q.    Does she live at 301 Coventry Road?

19        A.    No.

20        Q.    Now, did you live in the same house back in 2013?

21        A.    Yes.

22        Q.    And when you were living in the house in 2013, was

23   there anyone else -- withdrawn.

24              When you were living in that house in 2013, were

25   the family members you have already mentioned, were they
```

M. Johnson - People - Direct                    748

1   living there with you?

2       A.   Yes.

3       Q.   And was there anyone else living with you in 2013

4   in that house that you haven't mentioned yet?

5       A.   Yes.

6       Q.   Who else was living with you in 2013 at 301

7   Coventry?

8       A.   My aunt.

9       Q.   What's your aunt's name?

10      A.   Tara.

11      Q.   And who else aside from your aunt, if anyone?

12      A.   Ray.

13      Q.   And does Ray have a last name?

14      A.   Yes.

15      Q.   What's Ray's last name?

16      A.   Ross.

17      Q.   Do you see Ray Ross in the courtroom presently?

18      A.   Yes.

19      Q.   And could you please identify him by pointing at

20   him and naming an article of clothing he's wearing?

21      A.   Green sweater.

22          MR. PERRI:  Your Honor, may the record reflect

23      the witness has identified the defendant?

24          THE COURT:  So noted.

25          MR. PERRI:  Thank you, your Honor.

1          Q.   Now, back in 2013 where did the defendant live

2     inside of your house?

3          A.   Upstairs.

4          Q.   And did he live with anyone?

5          A.   Huh?

6          Q.   Did he live with anyone?

7          A.   Yes.

8          Q.   Who did he live with?

9          A.   My aunt.

10         Q.   Is that your Aunt Tara?

11         A.   Yes.

12         Q.   And how did you know the defendant back in 2013?

13              THE COURT:  Hold it, Mr. Perri.  I don't know

14    if the witness knows Mr. Ross as the defendant, so can

15    you refer to him as Mr. Ross or at least establish who

16    you are referring to?

17              MR. PERRI:  Your Honor, the witness identified

18    the defendant, Ray Ross to be the defendant.

19              THE COURT:  I understand that, okay.  She

20    identified Mr. Ross as the person she knew, okay.

21              MR. PERRI:  Yes, your Honor.

22              THE COURT:  Ms. Johnson, Mr. Ross is sometimes

23    known in this proceeding as the defendant, okay.  So if

24    Mr. Perri references the defendant or if Mr. Zerner

25    references the defendant, it simply means Mr. Ross.  Do

1          you understand that?

2                    THE WITNESS:  Yeah.

3                    THE COURT:  Thank you, Mr. Perri.  Continue.

4                    MR. PERRI:  Thank you, your Honor.

5     BY MR. PERRI:

6          Q.   Ms. Johnson, how did you know Mr. Ross?

7          A.   He was my aunt's boyfriend.

8          Q.   And, to your knowledge, was Mr. Ross -- had he been

9     married?

10         A.   Yes.

11         Q.   And did you meet his wife?

12         A.   Yes.

13         Q.   And did Mr. Ross have any children?

14         A.   Yes.

15         Q.   Did you meet his children?

16         A.   Yes.

17         Q.   And where did they live?

18         A.   Brooklyn.

19                   THE COURT:  Who is "they"?

20                   MR. PERRI:  The children and Mr. Ross'

21    children and his wife.

22         A.   Brooklyn.  In Brooklyn.

23                   THE COURT:  Brooklyn you said?

24                   THE WITNESS:  Yeah.

25                   THE COURT:  Please speak up.

M. Johnson - People - Direct                     751

1              THE WITNESS:  Okay.

2         Q.   Have you gone to Brooklyn to visit these people?

3         A.   Yes.

4         Q.   Would your Aunt Tara go with you when you would

5    visit Mr. Ross' family?

6         A.   No.

7         Q.   Now, Ms. Johnson, are you in school right now?

8         A.   Yes.

9         Q.   And what grade are you in?

10        A.   Ninth.

11        Q.   And what are some of your favorite classes in ninth

12   grade?

13        A.   Math.

14        Q.   Who is your math teacher?

15        A.   Mr. Furman.

16        Q.   Now, last school year, 2014-2015 did you go to the

17   same school as you go now?

18        A.   No.

19        Q.   Where do you go now to school?

20        A.   Right now?

21        Q.   Right now.

22        A.   Malverne.

23        Q.   And what kind of school is that, what level?

24             THE COURT:  Hold it.  Malverne?

25             THE WITNESS:  Malverne High School.

M. Johnson - People - Direct                    752

1          Q.   And so last year what school did you go to?

2          A.   Middle school.

3          Q.   What was the name of your middle school?

4          A.   Howard T. Herber.

5                    THE COURT:   Can the jury hear the witness's

6     testimony?

7                    (Whereupon, the sworn jury of twelve and the

8     alternates answered in the affirmative.)

9          Q.   And were you at Howard T. Herber for seventh grade

10   also?

11         A.   Yes.

12         Q.   Were you at Howard T. Herber for sixth grade?

13         A.   Yes.

14         Q.   Millinia, have you ever skipped a grade?

15         A.   No.

16         Q.   Have you ever been left back?

17         A.   No.

18         Q.   And have you ever taken off a long period of time

19   from school during the school year?

20         A.   No.

21         Q.   So, Millinia, I want to ask you to think about

22   sixth grade during the 2012-2013 school year.   Who were some

23   of your teachers in sixth grade back in 2012-2013?

24         A.   Ms. Medley.

25         Q.   What did she teach?

Kathi A. Fedden, Sr. Court Reporter

1    A.    Science.

2    Q.    What other teachers do you remember, if any?

3    A.    Mr. Hammond.

4    Q.    What did Mr. Hammond teach?

5    A.    Social studies.

6    Q.    Do you recall any other teachers?

7    A.    Ms. Lynch.

8    Q.    What did Ms. Lynch teach?

9    A.    Band.

10   Q.    Millinia, when you were in sixth grade, on December

11   30th of 2012 how old did you turn?

12   A.    Twelve.

13   Q.    Now, drawing your attention and asking you to think

14   about March of 2013 when you were still in sixth grade, did

15   there come a time when you were in a talent show?

16   A.    Yes.

17   Q.    And what did you do in the talent show?

18   A.    Dance.

19   Q.    And did you dance alone or with a partner?

20   A.    With a partner.

21   Q.    And did you dance to a song?

22   A.    Yes.

23   Q.    What song did you dance to?

24   A.    I Want You Back by Cher Lloyd.

25   Q.    Where was the talent show?

M. Johnson - People - Direct                        754

1      A.    Howard T. Herber.

2      Q.    And was it at night or during the day?

3      A.    At night.

4      Q.    Did your mother go to the talent show?

5      A.    Yes.

6      Q.    Now, before that talent show in March of 2013, was

7   the defendant living with you at 301 Coventry?

8      A.    Yes.

9      Q.    Before that talent show, did you have any problems

10  with the defendant, any arguments?

11     A.    No.

12     Q.    Before that talent show in 2013, did you spend time

13  alone with the defendant?

14     A.    Yes.

15     Q.    Did you ever go anywhere with him?

16     A.    No.

17     Q.    Before that talent show in 2013 -- withdrawn.

18           Now, Millinia, I'm going to ask you to think about

19  while you were in sixth grade, that same year, but after the

20  talent show in March of that year of your sixth grade year.

21  After the talent show, sometime after the talent show that

22  year, did your relationship with the defendant change?

23                MR. ZERNER:  Objection.

24                THE COURT:  Overruled.

25     A.    Yes.



1      Q.   Could you please explain to the jury in the months

2   after the talent show how your relationship with Mr. Ross

3   changed?

4      A.   We started hanging out more.

5      Q.   And what would you do when you started hanging out

6   more?

7      A.   We would go to Brooklyn, go out to eat, got ices.

8      Q.   Other than ices -- withdrawn.

9           Did you start to do anything with the defendant at

10  home that was different?

11     A.   Yeah.

12     Q.   What did you start to do with the defendant at

13  home?

14     A.   (No response.)

15          THE COURT:  Mr. Perri, why don't you ask

16     another question, please.

17          MR. PERRI:  Yes, your Honor.

18     Q.   Millinia, back in 2013 when you were in sixth

19  grade, did you watch television?

20     A.   Yeah.

21     Q.   And after the talent show that you talked about,

22  where would you watch television?

23     A.   In Mr. Ross' room.

24     Q.   And when you would go to watch television in

25  Mr. Ross' room after that talent show in 2013, was there

M. Johnson - People - Direct                          756

1    anyone else there with you?

2         A.   No.

3         Q.   And did there come a time when you were watching

4    television -- sorry, withdrawn.

5              Where would you watch television with Mr. Ross?

6         A.   In his room.

7         Q.   And did there come a time when you were watching

8    television with Mr. Ross in his room after the talent show in

9    2013 where you did anything that made you feel uncomfortable?

10                  MR. ZERNER:   Objection.

11                  THE COURT:   Sustained.

12        A.   Yes.

13                  MR. ZERNER:   Objection.

14                  THE COURT:   Hold it, Ms. Johnson.

15                  Next question, Mr. Perri.

16        Q.   What, if anything, happened while you were alone

17   with the defendant watching television in his room?

18                  MR. ZERNER:   Objection; vague.

19                  THE COURT:   As to the form of the question.

20        Q.   What would you watch with the defendant in the room

21   on television?

22        A.   Wrestling.

23        Q.   And what, if anything, happened after the talent

24   show in March of 2013 when you were watching wrestling with

25   the defendant?

M. Johnson - People - Direct                    757

1        A.   Could you repeat the question?

2        Q.   What, if anything, happened while you were watching

3   wrestling with the defendant alone in his room after the

4   talent show in March of 2013?

5        A.   He would touch me.

6             THE COURT:  He would what?

7             THE WITNESS:  Touch me.

8             THE COURT:  Touch you?

9             THE WITNESS:  Yes.

10       Q.   Ms. Johnson, I want you to think about the first

11  time you remember the defendant touching you.  Could you

12  please describe what happened the first time?

13            MR. ZERNER:  Objection.  Assumes facts not in

14       evidence.

15            THE COURT:  No, overruled.

16       Q.   Could you please explain what happened the first

17  time, Ms. Johnson?

18       A.   I would be sitting on the bed, he would be sitting

19  next to me and watching TV and as I'm watching TV, he takes

20  his hand and puts it down my pants and touches my butt.

21       Q.   Now, when you say the defendant took his hand and

22  put it down your pants and touched your butt, was that on top

23  of or underneath underwear?

24       A.   Underneath.

25       Q.   Could you please describe what, if anything,

M. Johnson - People - Direct                                  758

1    Mr. Ross did while he was touching your butt under underwear?

2        A.   He would grab it.

3        Q.   And when the defendant grabbed your butt, did you

4    say anything?

5        A.   Yes.

6        Q.   What did you say?

7        A.   I said, What are you doing?

8        Q.   And what, if anything, did the defendant, Mr. Ross

9    say after you said what are you doing?

10                   MR. ZERNER:   Objection.

11                   THE COURT:   No, overruled.

12       A.   He said, Nothing.   What are you doing?

13       Q.   When the defendant was touching your butt and

14   saying this, was there anyone else in the room?

15       A.   No.

16       Q.   Does the bedroom have a door?

17       A.   Yes.

18       Q.   Was the door opened or closed?

19       A.   Closed.

20       Q.   And who closed the door?

21       A.   He did.

22       Q.   Ms. Johnson, do you remember what you were wearing?

23       A.   No.

24       Q.   Do you remember what the defendant was wearing?

25       A.   Boxers and a shirt.

M. Johnson - People - Direct                    759

1          THE COURT:  I'm sorry, you said a shirt.  What

2    else did you say?

3          THE WITNESS:  Boxers.

4          THE COURT:  His boxers?

5          THE WITNESS:  Yes.

6    Q.   And Ms. Johnson, what happened after the defendant

7    said, Nothing.  What are you doing?

8    A.   I got up and left.

9          MR. PERRI:  I'm sorry, your Honor, I can't

10   hear her.

11         THE COURT:  Could you repeat the answer,

12   please?

13   A.   I got up and left.

14   Q.   Did you tell anyone about what happened?

15   A.   No.

16   Q.   Now, before summer vacation, so when you were still

17   in sixth grade, did you go back into the defendant's room

18   after this incident you just described?

19   A.   Yes.

20   Q.   Did you go back once or more than once?

21   A.   More than once.

22   Q.   When you went back into the room these other times,

23   could you please describe to the jury what, if anything else,

24   would happen?

25   A.   He would still touch my bottom.

M. Johnson - People - Direct

1    Q.   And other than still touching your bottom, did the

2    defendant do anything else when you would go back to his

3    room?

4    A.   (No response.)

5              THE COURT:   There are some tissues there.   You

6    want to use the tissue?

7              Ladies and gentlemen, I think it's probably an

8    appropriate time to take a five-minute break and get

9    your legs stretched and be able to use the facilities.

10   We'll be back in five minutes.

11             (Whereupon, the jury exited the courtroom.)

12             THE COURT:   Millinia, you can take a break,

13   okay.   Don't talk about your testimony, but you go out

14   and take a break and catch your breath, okay.   You are

15   excused.

16             (Whereupon, the witness exited the courtroom.)

17             THE COURT:   Two minutes, let the witness

18   regain her composure.

19             (A recess was taken.)

20             (Whereupon, People's Exhibits 18 through 22

21   were pre-marked for identification outside the presence

22   of the Court and the jury.)

23             (Whereupon, the witness returned to the

24   witness stand.)

25             THE CLERK:   People ready at this time?

M. Johnson - People - Direct                    761

1          MR. PERRI:  Yes, your Honor.

2          THE CLERK:  Defense ready?

3          MR. ZERNER:  We are, thank you.

4          THE CLERK:  The jury is not present at this

5     time.

6          THE COURT:  So, Millinia, we're just going to

7     ask you to try to talk into the microphone, okay.  So

8     you don't have to yell, but your voice will be able to

9     carry so that the jurors can hear your testimony, okay?

10         THE WITNESS:  Okay.

11         MR. ZERNER:  Your Honor, before the jury gets

12    brought in if I can put something on the record.

13         THE COURT:  We have the witness here.

14         MR. ZERNER:  I think with the witness.

15         THE COURT:  Come on up here, please.  Come

16    into the well.

17         (Whereupon, a discussion was held off the

18    record.)

19         (Whereupon, the jury entered the courtroom.)

20         THE CLERK:  Let the record reflect the

21    presence of the jury.  Again, are the People ready?

22         MR. PERRI:  Yes, your Honor.

23         THE CLERK:  Is the defense ready?

24         MR. ZERNER:  We are, thank you.

25         THE COURT:  Mr. Perri, you may continue.

1          MR. PERRI:  Thank you, your Honor.

2   BY MS. PERRI:

3          Q.  Millinia, you testified that you went back into the

4   defendant's room more than once after the incident you just

5   described.

6              When you went back into the defendant's room after

7   the first incident, did the defendant's conduct change?

8          A.  Yes.

9          Q.  Could you describe to the jury what happened that

10  was different when you went back into the defendant's room?

11         A.  He started touching my breasts.

12         Q.  And would he touch your breasts over or under your

13  clothes?

14         A.  Under.

15         Q.  And what, if anything else, would the defendant be

16  doing while he was touching your breasts?

17         A.  He would touch himself.

18         Q.  And when you say he would touch himself, where

19  would he touch himself?

20         A.  His penis.

21         Q.  And was his penis outside or inside of his clothes?

22         A.  Inside.

23         Q.  And what, if anything, would he do when he was

24  touching his penis?

25         A.  Could you repeat the question?

M. Johnson - People - Direct                    763

1      Q.   What would he do?  Could you describe how he would

2   touch his penis?

3      A.   Can I gesture it?

4           THE COURT:  I didn't understand what you said

5      either.  Can you speak into the microphone a lit bit?

6      A.   Can I gesture it?

7           THE COURT:  Can you gesture it?

8           THE WITNESS:  Yes.

9           THE COURT:  So Mr. Perri asked you to describe

10     what Mr. Ross would do and you wanted to describe it

11     through a gesture?

12           THE WITNESS:  Yes.

13           THE COURT:  You may.

14     A.   Like that (indicating.)

15           MR. PERRI:  Your Honor, may the record reflect

16     that the witness gestured her hand going up and down

17     cupped in a circular fashion?

18           THE COURT:  The record so notes.

19           MR. PERRI:  Thank you, your Honor.

20     Q.   And when you were in the defendant's room and this

21   was happening, was there anyone else present in the room?

22     A.   No.

23     Q.   Was the door open or closed?

24     A.   Closed.

25     Q.   Where were you in the room when this was happening?

1      A.   On the bed.

2      Q.   And how were you on the bed?

3      A.   Sitting.

4      Q.   And where would the defendant be when you were on

5   the bed?

6      A.   Next to me.

7      Q.   And would he be sitting up or laying down?

8      A.   Sitting up.

9      Q.   So as you were finishing the sixth grade, before

10   the summer of 2013, how often would what you just described

11   happen?

12      A.   Once or twice a week.

13      Q.   Millinia, I'm going to ask you to start thinking

14   about the summer after sixth grade.   Once you started the

15   summer after sixth grade, did Mr. Ross continue to have you

16   go to his room?

17             MR. ZERNER:   Objection.

18             THE COURT:   Sustained.

19      Q.   Did you go back to Mr. Ross' room at the start of

20   the summer of sixth grade?

21             MR. ZERNER:   Objection.

22             THE COURT:   Overruled.

23      A.   Yes.

24      Q.   And was the sexual conduct you described, was it

25   still happening?

M. Johnson - People - Direct                                765

1                    MR. ZERNER:  Objection.

2                    THE COURT:  Sustained.

3          Q.    And what would happen when you would go back to

4    Mr. Ross' room at the start of the summer after sixth grade?

5          A.    The same thing would happen.

6          Q.    And how often would that happen when you started

7    the summer after sixth grade?

8                    THE COURT:  Until when, sir?  Give it a time

9          period, please.

10         Q.    At the start of the summer, in June and July of

11   2013, how often, approximately, was this happening?

12         A.    At least once or twice a week.

13         Q.    Now, that summer did there come a time on weekends

14   when you started going anywhere with the defendant?

15                   MR. ZERNER:  Objection.

16                   THE COURT:  Sustained.

17         A.    Yes.

18                   THE COURT:  No, hold it.  When you hear the

19         word objection, you just have to wait, okay.

20                   THE WITNESS:  Okay.

21                   THE COURT:  Next question, Mr. Perri.

22         Q.    During the summer of 2013, what, if anything, would

23   you do with the defendant, Mr. Ross?

24         A.    I would go with him.

25         Q.    Where would you go?

M. Johnson - People - Direct                    766

1          A.    To Brooklyn.

2          Q.    And how would you get to Brooklyn?

3          A.    He would drive his white truck.

4                MR. PERRI:  I'm sorry, your Honor, I couldn't

5          hear.

6                THE COURT:  Ask the witness to repeat her

7          answer.

8          Q.    Could you please repeat your answer?

9          A.    He would drive his white truck.

10         Q.    And what color was his truck?

11         A.    White.

12         Q.    And how many rows of seats did the truck have?

13         A.    Two.

14         Q.    And when would you go to Brooklyn with Mr. Ross?

15         A.    Almost every weekend.

16         Q.    And would anyone else go with you?

17         A.    No.

18         Q.    And what would you do when you would go to Brooklyn

19    with Mr. Ross?

20         A.    I visit his wife and kids.

21               THE COURT:  You have to speak a little bit

22         louder.  I didn't understand what you said.

23               THE WITNESS:  I would visit his wife and kids.

24               MR. ZERNER:  Objection, your Honor.  It's not

25         his wife.

M. Johnson - People - Direct                    767

```
 1              THE COURT:  Okay.  Overruled.  Next question.

 2              MR. PERRI:  Thank you, your Honor.

 3         Q.   When you started going to Brooklyn with Mr. Ross,

 4    did you like going to Brooklyn with Mr. Ross?

 5         A.   Yes.

 6         Q.   And at the same time, the summer of 2013, did your

 7    mother or older siblings take you anywhere that summer?

 8         A.   No.

 9         Q.   How would you normally get back from Brooklyn to

10    301 Coventry?

11         A.   He would drive us back.

12         Q.   Would you spend the night in Brooklyn?

13         A.   No.

14         Q.   And what time of day would you get back from

15    Brooklyn?

16         A.   Around nine or ten.

17         Q.   At the beginning of the summer of 2013, what, if

18    anything, would happen when you would come home from

19    Brooklyn?

20         A.   What do you mean?

21         Q.   Would anything happen on the way home from Brooklyn

22    at the start of the summer of 2013?

23         A.   No.

24         Q.   Did that ever change?

25         A.   Yes.
```

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Direct                    768

1      Q.   And did that change -- when did that change happen?

2      A.   Later on.

3      Q.   In that same summer of 2013?

4      A.   Yes.

5      Q.   And what was that change?  What happened?

6      A.   We would stop.

7      Q.   Where would you stop?

8      A.   At the Wholesale Liquidators parking lot.

9      Q.   Where is Wholesale Liquidators?

10     A.   In West Hempstead.

11     Q.   Is that in Nassau County?

12     A.   Yes.

13          MR. PERRI:  Your Honor, I ask the witness be

14     shown what's marked for ID as People's 19.

15          (Handed to witness.)

16     Q.   Ms. Johnson, do you recognize what's marked for

17     identification as People's 19?

18     A.   Yes.

19     Q.   What do you recognize it to be?

20     A.   The parking lot.

21     Q.   Which parking lot is that?

22     A.   Liquidators.

23     Q.   And is that where you just testified you would

24     stop?

25     A.   Yes.

M. Johnson - People - Direct                    769

1      Q.   Is that a fair and accurate depiction of the layout

2   of Wholesale Liquidators, as far as the buildings and the

3   parking lots go?

4      A.   Yes.

5      Q.   And did Wholesale Liquidators appear in

6   substantially the same condition today as it did in 2013?

7      A.   Yes.

8           MR. PERRI:   Your Honor, I ask that that be

9      moved into evidence.

10           THE COURT:   Mr. Zerner?

11           MR. ZERNER:   Thank you.   If I can have a brief

12      voir dire, your Honor?

13           THE COURT:   You may.

14   VOIR DIRE EXAMINATION

15   BY MR. ZERNER:

16      Q.   Good morning, Ms. Johnson.

17      A.   Good morning.

18      Q.   Ms. Johnson, you were just shown a photograph by

19   Mr. Perri?

20      A.   Yes.

21      Q.   Did you take this photograph?

22      A.   No.

23      Q.   Were you with the person who took the photograph?

24      A.   No.

25      Q.   When was the first time you saw this photograph?

M. Johnson - People - Direct                            770

1          A.    The first time?

2          Q.    Yes.   When was the first time you saw this

3   photograph?

4          A.    I don't remember.

5          Q.    When was the most recent time that you went to this

6   parking lot?

7          A.    A couple of months ago.

8          Q.    A couple of months ago, is that what you said?

9          A.    Yes.

10          Q.    Did you look at it from this angle that the

11   photograph is showing?

12          A.    No.

13          Q.    Did you go inside of the building?

14          A.    Yes.

15          Q.    Did you walk around the parking lot?

16          A.    No.

17          Q.    Does this photograph show any car that you

18   recognize?

19          A.    No.

20               MR. ZERNER:   Your Honor, I object.

21               THE COURT:   Thank you, Mr. Zerner.

22               The objection is overruled.   The photograph is

23      received in evidence.

24               (Whereupon, People's Exhibit 19 was received

25      in evidence.)

M. Johnson - People - Direct                    771

```
 1                    COURT OFFICER:  People's 19 in evidence.
 2                    MR. PERRI:  Your Honor, may I place People's
 3         19 on the presenter?
 4                    THE COURT:  You may.
 5                    MR. PERRI:  Thank you.
 6    DIRECT EXAMINATION (Cont'd)
 7    BY MR. PERRI:
 8         Q.   Now, Millinia --
 9                    THE COURT:  Can you see the picture from where
10         you are sitting?
11                    THE WITNESS:  No.
12                    THE COURT:  Follow the direction of the court
13         officer.
14         Q.   Ms. Johnson, when you would go to National
15    Wholesale Liquidators, what's depicted in People's 19 on the
16    presenter, would you go inside -- sorry.
17              When you would go with the defendant to National
18    Wholesale Liquidators that's on the presenter, would you go
19    inside the building?
20         A.   No.
21         Q.   Would you go shopping?
22         A.   No.
23         Q.   Where would you go when you went to National
24    Wholesale Liquidators?
25         A.   What do you mean?
```

1            MR. PERRI:  Your Honor, the witness can go

2       back.  I'll remove it from the presenter.

3       Q.   Ms. Johnson, what, if anything, would happen when

4  you would go with the defendant to National Wholesale

5  Liquidators on the way home from Brooklyn?

6       A.   We would stop at the parking lot.

7       Q.   After you stopped in the parking lot, what would

8  happen next?

9            MR. ZERNER:  Objection.

10           THE COURT:  If anything?

11           When you stopped in the parking lot, what

12      happened after you stopped, if anything?

13           THE WITNESS:  Oh.  I would get in the back

14      seat.

15      Q.   Why would you get in the back seat?

16      A.   Because he told me to.

17      Q.   Who told you to?

18      A.   Mr. Ross.

19      Q.   And what would happen, if anything, when you went

20  into the back seat?

21      A.   He would go back there with me.

22      Q.   And --

23           THE COURT:  Millinia, I'm just going to ask

24      you please lean forward into the microphone a little

25      bit, okay, or pull your chair up a little bit.

M. Johnson - People - Direct                          773

1      Q.   What, if anything, would happen when he would go

2  back there with you?

3      A.   He would touch me.

4      Q.   Where would he touch you?

5      A.   My breasts, my butt, my vagina.

6      Q.   Would he touch your breasts, your butt and your

7  vagina over or under your clothing?

8      A.   Under.

9      Q.   What, if anything, would happen with your pants?

10     A.   He would pull them down halfway.

11     Q.   Did the defendant, Mr. Ross, did he remain clothed?

12     A.   No.

13     Q.   What would happen with his clothing, if anything?

14     A.   He would also pull his pants down halfway.

15     Q.   When he would do this, would you see his penis?

16     A.   Yes.

17     Q.   And what, if anything, would he do with his penis

18  in the back of the truck once his pants were pulled down

19  halfway?

20     A.   He would touch it.

21     Q.   And how would he touch it?

22     A.   He would rub it.

23     Q.   And could you describe how he would rub his penis?

24     A.   Up and down.

25     Q.   And what, if anything, would happen while he was

M. Johnson - People - Direct                    774

1    rubbing his penis up and down?

2         A.   It would get bigger.

3         Q.   And what, if anything else, would happen other than

4    it getting bigger?

5         A.   It would go up.

6         Q.   Now, you testified that the defendant would touch

7    your breasts, your bottom, your butt and your vagina.   What

8    would he touch you with?

9         A.   His hands.

10        Q.   And while you were in the back of the car with

11   Mr. Ross, what, if anything else, did he touch you with?

12        A.   His mouth.

13        Q.   Where did he touch you with his mouth?

14        A.   My vagina.

15        Q.   And what, if anything, did the defendant, Mr. Ross

16   do with his mouth when he was touching your vagina with it?

17        A.   He would lick it.

18        Q.   Would the defendant kiss you while he was touching

19   you?

20        A.   Yes.

21        Q.   Could you please describe how he would kiss you and

22   where?

23        A.   On my neck.

24        Q.   And what, if anything -- would the defendant say

25   anything as this was happening?

M. Johnson - People - Direct                          775

1      A.   Yes.

2      Q.   What would the defendant say?

3      A.   He would say --

4               THE COURT:  Millinia, would you remember what

5      Mr. Ross would say when he was kissing you, yes or no?

6               THE WITNESS:  Yes.

7               THE COURT:  What would he say?

8               THE WITNESS:  I want to smash.

9      Q.   What did it mean, I want to smash?  What did you

10     take that to mean?

11     A.   Have sex.

12     Q.   What did you understand the term to have sex to

13     mean?

14     A.   A penis going into a vagina.

15     Q.   During the summer of 2013, did the defendant,

16     Mr. Ross ever place his penis in your vagina?

17     A.   No.

18     Q.   During the summer of 2013 did the defendant ever

19     place his penis in your mouth?

20     A.   No.

21     Q.   While you were in the back of the truck with

22     Mr. Ross, did you ever place your hands on any part of his

23     body?

24     A.   Yes.

25     Q.   And where did you place your hands?

M. Johnson - People - Direct                    776

1       A.   On his penis.

2       Q.   Why did you place your hands on his penis?

3       A.   He took my hand.

4       Q.   And what would you do when your hand was touching

5  his penis?

6       A.   I would rub it.

7       Q.   What, if anything, would eventually happen at the

8  end of the sexual conduct you just described?

9       A.   He would cum.

10      Q.   What do you mean by the term cum?

11      A.   White liquid, warm white liquid would come out of

12 his penis.

13      Q.   Would the defendant say anything when he would cum?

14      A.   He would say shit or fuck.

15      Q.   Did what you just described, did that happen once

16 or more than once?

17      A.   More than once.

18      Q.   During the summer of 2013 before you started the

19 seventh grade, how often would it happen?

20      A.   Almost every weekend.

21      Q.   During that same summer of 2013 did there ever come

22 a time when you weren't in the defendant's truck where you

23 saw him cum?

24      A.   Yes.

25      Q.   Where was that?

M. Johnson - People - Direct                    777

1          A.    In his room.

2          Q.    Is that the same room you were talking about

3    earlier?

4          A.    Yes.

5          Q.    Inside of your house?

6          A.    Yes.

7          Q.    And what would happen?  Could you please explain to

8    the jury what would happen in Mr. Ross' room when you would

9    see him cum?

10         A.    He would continue to touch me.

11         Q.    Where would you be when he was touching you?

12         A.    On the bed.

13         Q.    Could you describe how you were on the bed?  Were

14   you sitting up or laying down?

15         A.    Laying down.

16         Q.    Where was the defendant while you were laying down

17   on the bed?

18         A.    On top of me.

19         Q.    And were you facing up or facing down?

20         A.    Facing down.

21         Q.    And were you wearing your clothes?

22         A.    My pants were pulled down.

23         Q.    What was the defendant wearing?

24         A.    A shirt and boxers.

25         Q.    And were you able to see his penis?

M. Johnson - People - Direct                         778

1           THE COURT:  I'm sorry, Mr. Perri.

2           You said shirt?

3           THE WITNESS:  And boxers.

4    Q.    Would you be able to see his penis?

5           MR. ZERNER:  Objection; leading.

6           THE COURT:  Overruled.

7           You can answer the question.

8    A.    Yes.

9    Q.    And what, if anything, would the defendant be doing

10   while he was on top of you with his penis?

11   A.    He would touch me with it.

12   Q.    Could you please describe how he would touch you

13   with his penis?

14   A.    He would put it on my butt cheeks and rub it there.

15   Q.    Can you please explain how he would rub it on your

16   butt cheeks?

17   A.    In circular motions.

18   Q.    Was there anyone else in the room when this was

19   happening?

20   A.    No.

21   Q.    Was the door open or closed?

22   A.    Closed.

23   Q.    And what would eventually happen after the

24   defendant would rub his penis on your butt cheeks?

25   A.    He would cum.

M. Johnson - People - Direct                    779

1          Q.   And where would he cum?

2          A.   On me.

3          Q.   And can you please describe what, if anything, you

4    felt when he would cum on you?

5          A.   Warm liquidy stuff.

6          Q.   Millinia, I want you to think about and focus on

7    the start of seventh grade.  So, after the summer we were

8    just talking about.

9               What school were you in for the start of seventh

10   grade?

11         A.   Howard T. Herber.

12         Q.   And who were some of your teachers in seventh grade

13   at Howard T. Herber?

14         A.   Ms. McGowan.

15         Q.   What did she teach?

16         A.   English.

17         Q.   Who else did you have?

18         A.   Mr. Johnson.

19         Q.   What did Mr. Johnson teach?

20         A.   Band.

21         Q.   And how about one more teacher, please?

22         A.   Ms. Banek, B-A-N-E-K.

23         Q.   And what did Ms. Banek teach?

24              THE COURT:  You spelled it B-A-N-E-K,

25   Ms. Banek?

1              THE WITNESS:  Yes.

2      Q.   What did Ms. Banek teach?

3      A.   Science.

4              MR. PERRI:  I ask that the witness be shown

5      what's been marked People's 18 for identification.

6              (Handed to witness.)

7      Q.   Ms. Johnson, do you recognize People's 18?

8      A.   Yes.

9      Q.   What do you recognize it to be?

10     A.   Me and my best friend.

11     Q.   And is that a picture?

12     A.   Yes.

13     Q.   And who took that picture?

14     A.   She did.

15             THE COURT:  Who did?

16             THE WITNESS:  My friend.

17             THE COURT:  The friend that is in the picture

18     or another friend?

19             THE WITNESS:  The friend that is in the

20     picture.

21             THE COURT:  Is that what's known as a selfie?

22             THE WITNESS:  Yes.

23     Q.   And is that picture a fair and accurate depiction

24     of how you looked at the start of your seventh grade year at

25     Howard T. Herber?

M. Johnson - People - Direct                781

1      A.   Yes.

2      Q.   How old are you in that picture?

3      A.   Thirteen.

4           MR. PERRI:  Your Honor, I ask that that

5      picture be moved into evidence.

6           THE COURT:  Mr. Zerner.

7           MR. ZERNER:  If I can take a look at it.

8           (Handed to counsel.)

9           MR. ZERNER:  No objection, your Honor.

10          THE COURT:  Very good.  Received in evidence

11     without objection.

12          (Whereupon, People's Exhibit 18 was received

13     in evidence.)

14          COURT OFFICER:  People's 18 in evidence.

15          MR. PERRI:  If I can place it on the presenter

16     for the jury.

17          THE COURT:  You may.

18          MR. PERRI:  Thank you.

19          (Whereupon, People's Exhibit 18 in evidence

20     was published to the jury.)

21     Q.   Ms. Johnson, when you met the teachers you were

22     just talking about at the start of seventh grade, were you

23     still going to Brooklyn with the defendant on the weekends?

24     A.   Yes.

25     Q.   And how often would you go to Brooklyn in September

M. Johnson - People - Direct                                    782

1    of 2013 when you started seventh grade?

2         A.   Almost every weekend.

3         Q.   And what, if anything, would happen on the way back

4    from going to Brooklyn when you started seventh grade in

5    September of 2013?

6         A.   We would stop at the Liquidators.

7         Q.   What would happen when you would stop at the

8    Liquidators?

9         A.   He would continue to touch my bottom, breasts and

10   vagina.

11        Q.   And as you started the seventh grade and met these

12   teachers, did you ever go to the defendant's room?

13        A.   Yes.

14        Q.   And in September of 2013, what, if anything, would

15   happen when you would go to the defendant's room?

16        A.   He would still continue to touch me.

17        Q.   Now, Ms. Johnson, I'm going to ask you to think

18   about seventh grade again.  Did there come a time in October

19   of your seventh grade year when you got a new phone?

20        A.   Yes.

21        Q.   Who bought you the phone?

22        A.   He did.

23        Q.   And who is "he"?

24        A.   Mr. Ross.

25        Q.   And how did you get the phone?

M. Johnson - People - Direct                          783

1        A.    He bought it for me.

2        Q.    And what kind of phone was it?

3        A.    Like a Galaxy.

4        Q.    Now, how often did you use the new phone that you

5   received from Mr. Ross?

6        A.    Very often.

7        Q.    Did you use it every day?

8        A.    Yes.

9        Q.    And how often would you use it each day?

10                THE COURT:  Would you use it all day?

11                THE WITNESS:  Yes.

12                THE COURT:  Next question.

13                MR. PERRI:  Thank you, your Honor.

14        Q.    And how often did you have that phone that Mr. Ross

15   got you with you?

16        A.    All the time.

17                MR. PERRI:  Your Honor, I'm going to ask that

18        the witness be shown People's 12.

19                (Handed to witness.)

20        Q.    Ms. Johnson, do you recognize the envelope that is

21   part of People's 12?

22        A.    Yes.

23        Q.    And do you recognize what the officer just took out

24   of the envelope?

25        A.    Yes.

1     Q.   What do you recognize the items that the officer

2  took out, what do you recognize them to be?

3     A.   The first phone.

4     Q.   How do you recognize that to be your first phone?

5     A.   It has a scratched up back and a blue button.

6     Q.   And do you recognize the scratches on the back?

7     A.   Yes.

8     Q.   And did you have an opportunity to examine this

9  phone in the district attorney's office?

10     A.   Yes.

11     Q.   And was it inside that envelope when you did

12  examine it at the district attorney's office?

13     A.   Yes.

14     Q.   And did you have an opportunity to power that phone

15  on?

16           THE COURT:  When?

17     Q.   When you were at the district attorney's office,

18  did you have an opportunity to power that phone on?

19           MR. ZERNER:  Your Honor, objection.  When was

20     she in the district attorney's office, coupled with your

21     objection?

22           THE COURT:  Sustained.

23     Q.   In January when you were at the district attorney's

24  office of this year, did you have an opportunity to power

25  that phone on?

M. Johnson - People - Direct                               785

1        A.    Yes.

2        Q.    And did you recognize any of the data or

3    information on that phone?

4        A.    Yes.

5        Q.    What did you recognize?

6        A.    The messages.

7        Q.    When you say the messages, what do you mean?

8        A.    The messages between me and Mr. Ross.

9        Q.    And what kind of messages were there?

10       A.    Text messages.

11       Q.    And did you read those text messages?

12       A.    Yes.

13             MR. PERRI:  Your Honor, I ask that People's 12

14       be moved into evidence.

15             THE COURT:  Mr. Zerner.

16             MR. ZERNER:  If I may have a brief voir dire

17       with the item?

18             THE COURT:  You may.

19   VOIR DIRE EXAMINATION

20   BY MR. ZERNER:

21       Q.    Ms. Johnson, the last time you saw this phone was

22   in January of this year?

23       A.    Yes.

24       Q.    Do you remember what day it was in January?

25       A.    No.

M. Johnson - People - Direct                    786

1     Q.   Was it early January?

2     A.   I don't remember.

3     Q.   When you saw the phone, you were with Mr. Perri?

4     A.   Yes.

5     Q.   Was anybody else there?

6     A.   Kara.

7     Q.   Kara, the victim's advocate?

8     A.   Yes.

9     Q.   Was anybody else there?

10    A.   No.

11    Q.   Your mother wasn't there?

12    A.   No.

13    Q.   And you were with Mr. Perri on February 1st also,

14    right?

15    A.   Yes.

16    Q.   So there was a day in late January and a different

17    day, February 1st of this year, yes?

18    A.   Yes.

19    Q.   Now, when Mr. Perri showed you this envelope, the

20    white envelope with the orange sticker on it that's been

21    marked as People's 12 for identification purposes, was the

22    envelope sealed?

23    A.   No.

24    Q.   The white envelope was not sealed, right?

25    A.   No.

M. Johnson - People - Direct                    787

1        Q.    And it wasn't sealed just now when he gave it to
2   you, right?
3        A.    No.
4        Q.    And it was not tied with this red string either,
5   correct?
6        A.    No.
7        Q.    And inside of that envelope was a smaller Manila
8   colored envelope too, correct?
9        A.    Yes.
10        Q.    And it has handwriting on the envelope?
11        A.    Yes.
12        Q.    Is that your handwriting on the envelope?
13        A.    No.
14        Q.    Was it sealed when Mr. Perri gave you this
15   envelope?
16        A.    No.
17        Q.    And it wasn't sealed just now when he gave it to
18   you either, right?
19        A.    No.
20        Q.    So you saw this envelope in January of 2016, right?
21        A.    Yes.
22        Q.    Did you also see this envelope in the summer of
23   2015?
24        A.    Repeat the question.
25        Q.    Did you also see these envelopes in the summer of

M. Johnson - People - Direct                    788

1   2015?

2        A.   Yes.

3        Q.   At that point in time you were also with Mr. Perri?

4        A.   Yes.

5        Q.   And Mr. Perri showed you these envelopes and told

6   you what was inside of them?

7        A.   Yes.

8        Q.   Prior to the summer of 2015, when was the last time

9   you had seen the contents of these envelopes?

10       A.   What do you mean?

11       Q.   In December of 2014, is it true that you gave one

12  or more telephones to Detective Toussaint?

13       A.   Yes.

14       Q.   That is true, correct?

15       A.   Yes.

16       Q.   Do you remember where you were when you gave

17  Detective Toussaint these telephones?

18              MR. PERRI:  Objection.

19              THE COURT:  Sustained.  This is voir dire,

20       Mr. Zerner.

21       Q.   How many telephones did you give Detective

22  Toussaint in December of 2014?

23       A.   Two.

24       Q.   And were those two telephones the same as each

25  other?

M. Johnson - People - Direct                    789

1        A.    No.

2        Q.    They weren't the same make and model?

3        A.    No.

4        Q.    They were not?

5        A.    No.

6        Q.    What was the difference between those two

7   telephones?

8        A.    The first one was a more beat up version.  Like a

9   more beat up, like it looked really dingy.

10       Q.    So there are two phones, one is older and one is

11  newer, correct?

12       A.    Yes.

13       Q.    But were they both Samsung phones?

14       A.    Yes.

15       Q.    Were they both gray and black in color?  Gray and

16  black?

17       A.    No.

18       Q.    What color was the first one?

19       A.    The first one was gray.  The second one was black.

20       Q.    So the first one was just gray.  The only color on

21  it was gray, is that what you are saying?

22                   MR. PERRI:  Objection.

23                   THE COURT:  Sustained.

24       Q.    You are saying that the second phone was just

25  black, no other color on it?

M. Johnson - People - Direct                790

 1              MR. PERRI:  Objection.

 2              THE COURT:  Sustained.

 3      Q.   Are you saying that the two phones were different,

 4 besides the age of the phones?

 5      A.   Yes.

 6      Q.   How were they different?

 7      A.   One -- the second phone, the camera had a more

 8 circular hole and the first one it was more square.

 9      Q.   I would like you to take a look at an item that was

10 inside of People's 12 marked for identification and tell us

11 the description of this camera that you are talking about

12 just now in your testimony.

13              MR. PERRI:  Objection.

14              THE COURT:  Sustained.

15      Q.   It's your testimony that the two phones are

16 different in that the camera portion is different, is that

17 your testimony?

18      A.   Yes.

19      Q.   And what distinguishes the phone in your hand from

20 the other phone that you once owned?

21              MR. PERRI:  Objection.

22              THE COURT:  Ladies and gentlemen, it's

23          probably time to take a break, okay, give you a couple

24          of minutes just to stretch your legs, okay.  Please

25          remember my admonitions.

M. Johnson - People - Direct                    791

1           (Whereupon, the jury exited the courtroom.)

2           THE COURT:  Millinia, I'm going to allow you

3    to take a five-minute break.  You are not allowed to

4    talk to anybody about your testimony, but you can go

5    outside and relax a little bit, okay.

6           THE WITNESS:  Okay.

7           (Whereupon, the witness exited the courtroom.)

8           THE COURT:  There was an objection with regard

9    to the last question or line of questioning under this

10   voir dire inquiry.  The Court sustains the objection.

11          Mr. Zerner, this is simply limited in scope

12   and fashion with regard to the identification of this

13   particular piece of evidence.  The witness has

14   identified it as her phone, knowing that it was

15   scratched and had a blue button on it.  So, I don't know

16   why we're going afield with your questioning.

17          I will give you the opportunity to respond.

18          MR. ZERNER:  Thank you, your Honor.  From the

19   way Mr. Perri asked questions of Detective Toussaint

20   when he first marked these items last week, it was clear

21   to me that he was attempting to distinguish the two

22   phones that one was quote, unquote "older," one was

23   newer.  There is actually a mark made on one of the

24   documents that indicates that.

25          I believe I'm entitled to go into the two

Kathi A. Fedden, Sr. Court Reporter

1    different phones.  I believe that the two different

2    phones -- Mr. Perri is going to make an attempt to put

3    the other phone into evidence in the same way, shape and

4    form and I believe that what Mr. Perri is doing is

5    leading the witness and assuming facts not in evidence

6    and he's getting this witness --

7              THE COURT:  In regard to the phone you are

8    talking about?

9              MR. ZERNER:  Well, yes.  I'm limiting --

10             THE COURT:  Limit it to that.

11             MR. ZERNER:  I'm limiting my comments to the

12   phone right now.  I don't believe he's laid the proper

13   foundation.  I don't believe that the envelopes

14   themselves were kept properly in the ordinary course of

15   business either by the DA's office or by the police

16   department or the combination of them.  And I believe

17   that I'm entitled to explore what the situation was with

18   those items.  I explored it to some extent with

19   Detective Toussaint.  I'm exploring it again now with

20   the witness that is on the stand.

21             My concern is that Mr. Perri is going to put

22   this item into evidence and then, because we're talking

23   about an either/or situation, now he's going to rely on

24   his leading questions to enter number 12 as the older

25   phone and then he's going to get the other side of the

M. Johnson - People - Direct                    793

1       coin, so to speak, in with People's 13, which I expect

2       is his next item of business.

3                    THE COURT:  My --

4                    MR. ZERNER:  I believe I'm entitled to this

5       voir dire.

6                    THE COURT:  My recollection of testimony was

7       that Mr. Perri asked the witness if she recognized what

8       the item was and the witness testified that it's my

9       first phone and then it was followed up with how do you

10      recognize it to be your first phone and she explained

11      that it had a scratched up back and blue button.

12                   So, I'm going to limit your inquiry on voir

13      dire.  It's the Court's understanding that it's a very

14      limited inquiry and the Court won't allow this

15      anticipatory attack, if you will, with regard to the

16      different phones.  She's testified this is her first

17      phone and she's identified it as such through various

18      markings on the phone.

19                   So, I'm going to limit your line of

20      questioning and prohibit the line of questioning that

21      you were just moving down.  Your exception is noted for

22      the record.

23                   MR. ZERNER:  Just so it's clear, you are

24      limiting that at this point in time on voir dire, but

25      when it's cross-examination I will have the opportunity

1      to fully go into these topics?

2              THE COURT:  Well, we'll see about that,

3      whether or not it's a proper area for cross-examination

4      when the time comes.

5              The witness, please, and then the jury.

6              (Whereupon the witness returned to the witness

7      stand and the jury entered the courtroom.)

8              THE CLERK:  Let the record reflect the

9      presence of the jury.  All parties are present.  Are the

10     People ready?

11             MR. PERRI:  Yes, your Honor.

12             THE CLERK:  Defense?

13             MR. ZERNER:  We are, thank you.

14             THE COURT:  Ladies and gentlemen, there was a

15     question that was posed, an objection was interposed and

16     that objection is sustained.  So, we'll move on.

17             Mr. Zerner.

18             MR. ZERNER:  Nothing further on this issue at

19     this time, your Honor.  I do object to this item if it's

20     being offered into evidence at this time.

21             THE COURT:  Thank you, Mr. Zerner.  That

22     objection is overruled.  Your exception is noted for the

23     record and the item is received in evidence as People's

24     12.

25             MR. ZERNER:  Thank you, your Honor.

M. Johnson - People - Direct                    795

1          MR. PERRI:  Your Honor, with respect to the

2    marking of the exhibits, with respect to People's 7 and

3    People's 12, they were previously in subject to the

4    connection.  The People would like the record to reflect

5    the connection has been made through Millinia Johnson.

6          THE COURT:  We were talking about 12.

7          MR. PERRI:  People's 12 was the photograph of

8    the phone, your Honor.

9          MR. ZERNER:  I think he has it backwards, your

10   Honor.

11         MR. PERRI:  I apologize, your Honor, People's

12   7.

13         THE COURT:  So People's 12 is the phone that

14   was offered to be received in evidence.  The Court

15   allows that.

16         MR. PERRI:  Thank you, your Honor.

17         THE COURT:  Because it was offered subject to

18   connection.  It's now in evidence.

19         Now, Mr. Perri, you have made mention of

20   People's 7.

21         MR. PERRI:  Yes, your Honor, which is a

22   photograph of the same object.  I would just ask that

23   the record reflect that the connection has been made.

24   It was in evidence subject to connection through

25   Millinia Johnson, your Honor.

1          THE COURT:  Okay.  Well, has Ms. Johnson had

2     the opportunity to view that exhibit?

3          MR. ZERNER:  Your Honor, I do object.  I don't

4     think he actually laid the foundation that he actually

5     laid.

6          THE COURT:  Why don't you present the exhibit

7     to the witness.

8   DIRECT EXAMINATION (Cont'd)

9   BY MR. PERRI:

10      Q.   Ms. Johnson, please take a look at People's 7.

11           (Handed to witness.)

12      Q.   Do you recognize People's 7, Ms. Johnson?

13      A.   Yes.

14      Q.   What do you recognize it to be?

15      A.   The first phone.

16      Q.   Is that a photograph --

17           THE COURT:  I'm sorry, Mr. Perri.

18           Ms. Johnson, I have to ask you to speak into

19     the microphone, okay, because even I am having trouble

20     hearing you and we have to have the jurors in the last

21     seat in the jury box be able to hear you, okay.  So, you

22     have to speak up.

23           THE WITNESS:  Okay.

24           MR. ZERNER:  Your Honor, if Mr. Perri could

25     return to the lectern, he makes a better door than a

M. Johnson - People - Direct                          797

1          window.  I can't see through him.

2                    MR. PERRI:  Your Honor, may we approach?

3                    THE COURT:  No, sir.  As you continue your

4          questions, I ask you stand at the lectern.

5                    MR. PERRI:  Yes, your Honor.

6    BY MR. PERRI:

7          Q.   Ms. Johnson, do you recognize that photograph, that

8    two-page document?

9          A.   Yes.

10         Q.   What do you recognize it to be?

11         A.   The first phone.

12         Q.   Now, Ms. Johnson --

13                   MR. PERRI:  I ask the witness be shown

14         People's 12.

15                   (Handed to witness.)

16         Q.   Ms. Johnson, can you take the items out of People's

17   12?  Could you look at the back of the phone that is part of

18   People's 12.  And do you see numbers on the back of the

19   phone?

20         A.   Yes.

21         Q.   And with respect to People's 7, are there numbers

22   on People's 7?

23         A.   Yes.

24         Q.   And, Ms. Johnson, could you please compare the

25   numbers in People's 12 to People's 7?

M. Johnson - People - Direct                    798

1      A.   They look exactly the same.

2            MR. PERRI:  Your Honor, I ask People's 7 be

3      received in evidence so that the connection has been

4      completed.

5            THE COURT:  Any objection, Mr. Zerner?

6            MR. ZERNER:  No objection.

7            THE COURT:  Very good.  Received in evidence.

8      Q.   Ms. Johnson, did you have a phone before People's

9      12, the phone you were just discussing?

10     A.   Yes.

11     Q.   And who got you that phone?

12     A.   My uncle on my dad's side.

13     Q.   Who was paying for that phone?

14     A.   My uncle.

15     Q.   Now, with respect to the new phone, People's 12, to

16     your knowledge, who was paying for that new phone month to

17     month?

18     A.   The first phone?

19     Q.   The first phone, People's 12 you were just

20     examining.

21     A.   Mr. Ross.

22     Q.   And how did you know that Mr. Ross was paying for

23     the phone?

24     A.   He would tell me.

25     Q.   Did you speak with Mr. Ross on that phone?

M. Johnson - People - Direct                    799

```
 1        A.   Yes.

 2        Q.   Did you text with Mr. Ross on that phone?

 3        A.   Yes.

 4        Q.   And was the defendant, Mr. Ross' contact

 5   information, was it stored in that phone?

 6        A.   Yes.

 7        Q.   And how was his contact information stored in that

 8   phone?  Under what name was that contact information stored

 9   in that phone?

10        A.   Ray Ray.

11             THE COURT:  You have to speak up, okay.

12             THE WITNESS:  Okay.

13        Q.   What was the cell phone number associated with that

14   contact, Ray Ray?

15        A.   516-537-6877.

16        Q.   And did you ever call that number on that phone?

17        A.   Yes.

18        Q.   And who would pick up when you called that number?

19        A.   He did.

20        Q.   When you say "he," who do you mean?

21        A.   Mr. Ross.

22        Q.   And did you recognize the voice that picked up?

23        A.   Yes.

24        Q.   And whose voice was it?

25        A.   His voice.
```

M. Johnson - People - Direct                    800

1      Q.    And did you text the defendant, Mr. Ross?

2      A.    Yes.

3                  MR. ZERNER:  Your Honor, I'm going to object

4      to the leading.

5                  THE COURT:  Overruled.

6      Q.    And what number would you text the defendant

7  Mr. Ross at?  What cell phone number would you use?

8      A.    To text him?

9      Q.    Yes.

10     A.    I don't understand.

11     Q.    Would you use the same number that you would call?

12                 MR. ZERNER:  Objection; leading.

13                 THE COURT:  Overruled.

14     A.    Yes.

15     Q.    How often would you call the defendant once you

16  received the phone from him?

17     A.    Very often.

18     Q.    Did you call him every day?

19     A.    Yes.

20     Q.    Would you text the defendant?

21     A.    Yes.

22     Q.    And how often would you text the defendant?

23     A.    All day.

24     Q.    Is that multiple times in a day when you say all

25  day?

M. Johnson - People - Direct                    801

1        A.    Yes.

2        Q.    And what was your cell phone number for that phone?

3        A.    516-514-4438.

4        Q.    So after you received the phone from the defendant

5    in October of 2013, what, if anything, did the defendant tell

6    you about how he felt about you?

7        A.    He said that he loves me.

8        Q.    What, if anything, did the defendant say about your

9    future?

10       A.    He said that we will live in a house and he would

11   buy me a car.

12       Q.    At the time that you received the cell phone from

13   the defendant, Mr. Ross, were you still going to Brooklyn?

14       A.    Yes.

15       Q.    And how often would you go to Brooklyn with the

16   defendant?

17       A.    Every weekend.

18       Q.    And did anyone else go with you on these trips?

19       A.    No.

20       Q.    Did your Aunt Tara go with you on these trips?

21       A.    No.

22             MR. ZERNER:  Objection.

23             THE COURT:  Overruled.

24       Q.    Did any of your siblings go on these trips?

25             MR. ZERNER:  Objection.

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Direct                    802

1              THE COURT:  Overruled.

2      A.   No.

3      Q.   Now, in October of 2013 when you were in seventh

4  grade, what, if anything, would happen on the way home from

5  these trips to Brooklyn between you and the defendant,

6  Mr. Ross?

7      A.   We would stop at Liquidators.

8      Q.   And what, if anything, would happen when you would

9  stop at Liquidators?

10     A.   He would park the truck and told me to get in the

11 back seat.

12     Q.   And what would happen when you would park the truck

13 and get in the back seat in October of 2013?

14     A.   He would go back there with me and he would pull my

15 pants down halfway.

16     Q.   And what, if anything, would happen after that in

17 October of 2013?

18     A.   He would touch me.

19     Q.   Where would he touch you?

20     A.   My breasts, my bottom, my vagina.

21     Q.   Did this continue into November of 2013?

22     A.   Yes.

23     Q.   Did this continue in December of 2013?

24     A.   Yes.

25     Q.   Now, after the defendant got you the phone in

M. Johnson - People - Direct                           803

1   October, did you ever go again to his room at 301 Coventry?

2        A.   Yes.

3        Q.   Approximately how often would that happen in

4   October of 2013?

5        A.   Almost every day.

6        Q.   And what, if anything, would happen when you would

7   go to the defendant's room?

8        A.   He would touch me.

9        Q.   Can you please explain how he would touch you?

10       A.   What do you mean?

11       Q.   Could you please describe how the defendant would

12   touch you when you would go into his room in October of 2013?

13   What would happen?

14       A.   He would rub my breasts and my bottom.

15       Q.   And what, if anything else, would he do?

16       A.   (No response.)

17            THE COURT:  Would you like the question

18       repeated?

19            THE WITNESS:  Yes.

20       Q.   When you would go to the defendant's room in

21   October of 2013, you testified that he would touch your

22   breasts and your vagina.  What, if anything else, would

23   happen when you would go to the defendant's room in October

24   of 2013?

25       A.   (No response.)

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Direct                    804

1           THE COURT:  Mr. Perri, why don't you ask

2     another question, please.

3     Q.    When you would go into the room of the defendant in

4     October of 2013, would there be anyone else there?

5     A.    No.

6     Q.    And where would you be when you would go into the

7     defendant's room in October when you were in seventh grade?

8     A.    On his bed.

9     Q.    And where would the defendant be in October of

10    seventh grade when you would go into his room?

11    A.    On the bed.

12    Q.    And what, if anything, would happen -- sorry,

13    withdrawn.

14          Could you explain where you would be in relation to

15    one another on the bed?  Where on the bed would both of you

16    be?

17    A.    At the edge.

18    Q.    And what, if anything, would happen once you were

19    both at the edge of the bed?

20    A.    I would be watching TV and he would touch me.

21    Q.    And where would he touch you?

22    A.    My bottom, my breasts.

23    Q.    And what, if anything, would happen after that?

24    A.    He would touch himself.

25    Q.    And when he would touch your bottom and your

M. Johnson - People - Direct                              805

1    breasts, what would he touch your bottom and your breasts

2    with?

3         A.   His hand.

4         Q.   And in October 2013 after you got the phone, did

5    the defendant touch you with any other parts of his body?

6         A.   Yes.

7         Q.   What would he touch you with?

8         A.   His --

9         Q.   Ms. Johnson, you testified that he would touch you

10   with parts of his body other than his hand.  What do you mean

11   by that?  What other parts of his body would he touch you

12   with?

13                  MR. ZERNER:  Objection; leading.

14                  THE COURT:  Overruled.

15                  You can answer the question, ma'am.

16        A.   (No response.)

17                  THE COURT:  Next question, Mr. Perri.

18        Q.   Did this continue into November of seventh grade?

19                  MR. ZERNER:  Objection; vague.

20                  THE COURT:  Sustained.

21        Q.   Did the conduct you already described, did it

22   continue into November of seventh grade?

23                  MR. ZERNER:  Same objection.

24                  THE COURT:  Sustained, Mr. Perri.

25        Q.   Ms. Johnson, you stated the defendant would touch

M. Johnson - People - Direct                    806

1    your breasts and would touch your vagina in October of 2013

2    while you were in seventh grade.  Did this continue into

3    November of 2013 while you were in seventh grade?

4                    MR. ZERNER:  Objection; leading.

5                    THE COURT:  No, overruled.

6         A.   Yes.

7         Q.   Did it continue into December while you were in

8    seventh grade?

9         A.   Yes.

10        Q.   Did you tell anyone, Ms. Johnson, about what was

11   happening?

12        A.   No.

13        Q.   While it was happening, why didn't you tell anyone?

14        A.   I was scared.

15        Q.   Why were you scared?

16        A.   He said he would call social services on my mom.

17        Q.   And at that time through -- withdrawn.

18             At that time did you want to keep going on trips

19   with the defendant?

20        A.   Yes.

21        Q.   At that time did you still want the defendant to

22   pay for things?

23        A.   Yes.

24        Q.   Drawing your attention to December 30th of 2013,

25   was there anything special about that date?

M. Johnson - People - Direct                                          807

1          A.   Yes.

2          Q.   What's special about that date?

3          A.   It's my birthday.

4          Q.   And how old did you turn on that day?

5          A.   Thirteen.

6          Q.   And do you remember that birthday when you turned

7     13?

8          A.   Yes.

9          Q.   What did you do that day?

10         A.   I helped his daughter watch her kids.

11         Q.   And when you say "his," who is the he in that

12    sentence?

13         A.   Mr. Ross.

14         Q.   And who was his daughter, what's her name?

15         A.   Kelly.

16         Q.   And you say that you helped her watch her kids.

17    What do you mean by that?  What did you do?

18         A.   I helped them with laundry.

19         Q.   And where did you help them with the laundry?

20         A.   At a laundromat.

21         Q.   Where is the laundromat?

22         A.   Valley Stream.

23         Q.   How did you get to the laundromat in Valley Stream?

24         A.   He drove me there.

25         Q.   When you say "he," who drove you there?

M. Johnson - People - Direct                     808

1       A.   Mr. Ross.

2       Q.   And did you go anywhere after it, after being at

3   the laundromat?

4       A.   Yes.

5       Q.   Where did you go?

6       A.   To Brooklyn.

7       Q.   And where did you go when you went to Brooklyn?

8       A.   To his wife's house.

9       Q.   When you say "his," who do you mean in that

10   sentence?

11       A.   Mr. Ross.

12       Q.   Did you stay there overnight?

13       A.   No.

14       Q.   What did you do then later that day?

15       A.   After I went to Brooklyn?

16       Q.   Yes.

17       A.   I went home.

18       Q.   How did you get home?

19       A.   His wife drove me.

20       Q.   And --

21            MR. ZERNER:   Your Honor, I didn't quite hear

22       that last response.

23            THE COURT:   Can you repeat it, Ms. Johnson?

24   Please speak into the microphone.

25            THE WITNESS:   His wife drove me.

M. Johnson - People - Direct                        809

1        Q.    And when you got home, what, if anything, happened

2    when you got home that day?

3        A.    There was a party.

4        Q.    Where was the party?

5        A.    At my house.

6        Q.    Who was there?

7        A.    My family.

8        Q.    And when you say your family, who do you mean?

9        A.    My mom, brother, sisters and cousins.

10       Q.    And what time of day was that birthday party?

11       A.    Nighttime.

12       Q.    So after your 13th birthday in January of 2014,

13   would you go to Brooklyn with the defendant Mr. Ross?

14       A.    Yes.

15       Q.    How often would you go with Mr. Ross to Brooklyn

16   after you turned 13?

17       A.    Every weekend.

18       Q.    And when you would go to Brooklyn -- sorry,

19   withdrawn.

20             When you would come back from Brooklyn, would the

21   same conduct as you have already described continue at

22   National Wholesale Liquidators?

23             MR. ZERNER:   Objection; vague.

24             THE COURT:   Sustained as to the same type of

25       conduct.

1          MR. PERRI:  Yes, your Honor.

2      Q.   With respect to the sexual conduct you have already

3  testified about in the back of the truck between yourself and

4  the defendant, Mr. Ross, did that continue when you would

5  come home from going to Brooklyn in January of 2014?

6      A.   Yes.

7      Q.   Did that continue in February of 2014?

8      A.   Yes.

9      Q.   And in April -- sorry, March of 2014?

10     A.   Yes.

11     Q.   And in April of 2014?

12     A.   Yes.

13     Q.   In May of 2014?

14     A.   Yes.

15     Q.   And did that continue in June of 2014?

16     A.   Yes.

17     Q.   Now, after your 13th birthday, did there ever come

18  a time where you and the defendant parked somewhere other

19  than National Wholesale Liquidators on your way home from

20  Brooklyn?

21     A.   Yes.

22     Q.   And where did you park?

23     A.   The old Western Beef.

24     Q.   Where is the old Western Beef?

25     A.   West Hempstead.

M. Johnson - People - Direct                                    811

1              MR. PERRI:  I ask the witness be shown

2       People's 20 for ID.

3              (Handed to witness.)

4       Q.   Ms. Johnson, do you recognize People's 20 for

5    identification?

6       A.   Yes.

7       Q.   What do you recognize it to be?

8       A.   The old Western Beef.

9       Q.   And is this the location you just testified you

10   parked at?

11      A.   Yes.

12      Q.   Is there another Western Beef located in West

13   Hempstead?

14      A.   Yes.

15      Q.   Now, is this photograph a fair and accurate

16   depiction of the layout of the parking lot and the building

17   at this location?

18      A.   Yes.

19              THE COURT:  When?

20              MR. PERRI:  Today.

21      A.   Yes.

22      Q.   And did that location appear different in 2013?

23      A.   Yes.

24      Q.   And how is it different in 2013?

25      A.   It had a big Western Beef sign on the building.

1     Q.   And other than not having a sign on the building,

2   is it a fair and accurate depiction of the layout of that

3   location both today and in 2013?

4     A.   Yes.

5             MR. PERRI:  Your Honor, I ask that that be

6       received into evidence.

7             THE COURT:  Please show it to adversary

8       counsel.

9             (Handed to counsel.)

10            MR. ZERNER:  Brief voir dire, your Honor.

11            THE COURT:  You may.

12  VOIR DIRE EXAMINATION

13  BY MR. ZERNER:

14    Q.   Ms. Johnson, did you take this photograph?

15    A.   No.

16    Q.   Were you with the person who took the photograph?

17    A.   No.

18    Q.   Do you know what street this is on?

19    A.   Yes.

20    Q.   Is there anything on the photograph that indicates

21  what street it's on?

22    A.   No.

23            MR. PERRI:  Objection.

24            THE COURT:  The witness answered.  She said

25      no.

M. Johnson - People - Direct                    813

1          Q.   When was the last time you were at this parking

2     lot?

3          A.   At that parking lot or passed it?

4          Q.   When was the last time that you looked at this

5     parking lot from the view that is shown in this photograph?

6          A.   A couple of weeks ago.

7          Q.   I'm sorry, I didn't hear you, the door was opening.

8          A.   A couple of weeks ago.

9          Q.   So in early February of 2016 you went there?

10         A.   Yes.

11         Q.   Who did you go there with?

12         A.   My brother.

13         Q.   Your brother took you to this parking lot?

14         A.   Well, there is a laundromat over there, so.

15         Q.   Well, there is a laundromat to the left or to the

16    right?

17                    MR. PERRI:  Objection.

18                    THE COURT:  Overruled.

19                    Do you need to look at the photograph, ma'am?

20                    THE WITNESS:  Yes.

21         Q.   Take a look at what's been marked as People's 20

22    for identification purposes and tell us if you see a

23    laundromat in the photo.

24                    (Handed to witness.)

25         A.   Well, the laundromat is not in the photo.

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Direct                                814

1      Q.   I'm sorry, the laundromat is not in the photo?

2      A.   No.

3      Q.   I'm sorry, if I can have that back.

4           So a few weeks ago your brother took you to the

5  laundromat and the laundromat is near the old Western Beef?

6                MR. PERRI:   Objection.

7                THE COURT:   Overruled.

8      A.   Yes.

9      Q.   How near?

10     A.   I don't know.  It's like basically right next to

11  it.

12     Q.   But not pictured in the photograph?

13     A.   Yeah.

14     Q.   On the same side of the street?

15     A.   Yes.

16     Q.   And when you went with your brother to the

17  laundromat, was anybody else with you?

18     A.   My sister.

19     Q.   Just one sister?

20     A.   Yes.

21     Q.   So the three of you went to do laundry?

22     A.   Yes.

23     Q.   When you were driving there, did you talk about the

24  Western Beef parking lot?

25                MR. PERRI:   Objection.

M. Johnson - People - Direct                          815

1              THE COURT:  Sustained.

2       Q.    Have you ever been to this location with any law

3  enforcement official?

4              THE COURT:  What do you mean?

5              MR. PERRI:  Objection.

6       Q.    Have you ever been there with a member of the

7  district attorney's office?

8              THE COURT:  Overruled.

9       A.    No.

10      Q.    Have you ever been there with any police officer?

11      A.    No.

12      Q.    Have you ever been there with any detective?

13      A.    No.

14      Q.    Now, it's your testimony that this is the old

15  Western Beef parking lot, correct?

16      A.    Yes.

17      Q.    Is there anything in this photograph that has the

18  words Western Beef on it?

19      A.    No.

20      Q.    And when you were there a couple of weeks ago, it's

21  your testimony that there was nothing that said Western Beef

22  on it, correct?

23      A.    Yes.

24      Q.    And you have lived in this neighborhood your whole

25  life, right?

1        A.    Yes.

2        Q.    And it's your testimony that at some earlier date

3   you have been to that parking lot?

4        A.    Yes.

5        Q.    And did the parking lot -- withdrawn.

6              Do you know what time of day this photograph was

7   taken?

8        A.    No.

9        Q.    Do you know what year this photograph was taken?

10       A.    No.

11       Q.    But you know that there is nothing that indicates

12  Western Beef, correct?

13       A.    Yes.

14       Q.    Nothing indicates Western Beef on this photograph?

15       A.    Nothing.

16       Q.    Have you been shown a photograph that shows what

17  this place looked like if it looked differently in 2014?

18       A.    No.

19       Q.    Or in 2013?

20       A.    No.

21       Q.    Or in 2011?

22       A.    No.

23              MR. PERRI:   Objection.

24              THE COURT:   The witness answered.

25              MR. ZERNER:   Your Honor, I object to this

M. Johnson - People - Direct                817

1      coming into evidence.   There is no foundation for it.

2                    THE COURT:   Thank you, Mr. Zerner.   The

3      objection is overruled.   The photograph is received in

4      evidence.

5                    (Whereupon, People's Exhibit 20 was received

6      in evidence.)

7                    COURT OFFICER:   People's 20 in evidence.

8                    MR. PERRI:   Your Honor, People's 20 is on the

9      presenter.   Sorry, I forgot to ask permission, your

10     Honor.

11                   THE COURT:   Okay.   Continue.

12     DIRECT EXAMINATION (Cont'd)

13     BY MR. PERRI:

14          Q.   Ms. Johnson, you testified that you went to that

15     location, the old Western Beef parking lot, on the way back

16     from Brooklyn with the defendant.   Do you know why you went

17     there instead of National Wholesale Liquidators?

18          A.   There were too many people at Liquidators.

19                   MR. ZERNER:   I don't know what she just said,

20     your Honor, I'm sorry.

21                   THE COURT:   Can you repeat your answer, ma'am?

22          A.   There were too many people at Liquidators parking

23     lot.

24          Q.   Did you say that?

25          A.   Yes.

M. Johnson - People - Direct                        818

1        Q.   And who decided there was too many people at the

2   National Wholesale Liquidators parking lot?

3        A.   Mr. Ross.

4        Q.   And when you parked at the Western Beef parking

5   lot, what, if anything, happened when you parked there with

6   the defendant?

7        A.   (No response.)

8        Q.   Ms. Johnson, did you remain in the front seat?

9        A.   No.

10            MR. ZERNER:  Objection.  It's leading, your

11       Honor.

12            THE COURT:  Sustained.

13       Q.   Ms. Johnson, what, if anything, happened in the

14  car -- in the truck with the defendant at the Western Beef

15  parking lot?

16       A.   I would get in the back seat.

17            MR. ZERNER:  Your Honor, I object.  He asks a

18       leading question, it's sustained and then he already

19       indicated what he wants the witness to say.

20            THE COURT:  There is an objection, Mr. Zerner?

21            MR. ZERNER:  Yes.

22            THE COURT:  The objection is overruled.

23            You can answer the question, Ms. Johnson.

24            Can you tell the Court and the jury what

25       happened when you stopped at the old Western Beef

Kathi A. Fedden, Sr. Court Reporter

1        parking lot?

2              THE WITNESS:  We would both get in the back

3        seat and he would pull down my pants halfway and

4        continue to touch my bottom, breasts and vagina.

5        Q.    Did he touch your bottom, breasts and vagina with

6   his hands?

7        A.    Yes.

8        Q.    Did he touch you with any other parts of his body?

9        A.    Yes.

10       Q.    What did he touch you with?

11       A.    His mouth.

12       Q.    Where did he touch you with his mouth?

13       A.    My vagina.

14       Q.    And did the defendant remain fully clothed?

15       A.    No.

16       Q.    What did he do with his clothes?

17       A.    He pulled down his pants halfway.

18       Q.    And what, if anything, did he do with his pants

19   halfway down?

20       A.    He would touch himself.

21       Q.    And what, if anything, would happen after the

22   defendant would touch himself eventually?

23       A.    He would cum.

24       Q.    Now, in February of 2014 did you continue to go to

25   Brooklyn?

M. Johnson - People - Direct                    820

1      A.    Yes.

2      Q.    Did you continue to go to Brooklyn in March?

3            MR. ZERNER:   Objection; asked and answered.

4            THE COURT:   Sustained.

5      Q.    How often each month would you go to Brooklyn

6   during the second half of your seventh grade year?

7      A.    Almost every weekend.

8      Q.    During the second half of your seventh grade year,

9   did you go back to the defendant's room?

10     A.    Yes.

11     Q.    And how often would you go to the defendant's room?

12     A.    Almost every day.

13     Q.    And would there be anyone else in the room when you

14  were with the defendant?

15     A.    No.

16     Q.    And would the door be opened or closed?

17     A.    Closed.

18     Q.    Would your Aunt Tara be home?

19     A.    No.

20           MR. ZERNER:   Your Honor, objection.  It's so

21     vague.  We don't know when we're talking about any of

22     these things.

23           THE COURT:   The objection is sustained.

24     Please try to frame your questions to a particular

25     period of time.

M. Johnson - People - Direct                              821

1          Q.   When you were in the defendant's room alone with

2     him with the door closed during the second half of your

3     seventh grade year, would your Aunt Tara be home at those

4     times?

5                    MR. ZERNER:  Objection.  If the door was

6          closed, how could she know?

7                    THE COURT:  Hold it, Mr. Zerner.  Please just

8          stand and indicate there is an objection.  I don't need

9          a reason.

10                    Mr. Perri, please, you're offering in the

11         premise of your questions numerous times, so please

12         frame your questions to the particulars with regard to a

13         time, a place and/or a point and then if you have to ask

14         multiple questions, ask multiple questions.

15         Q.   In February of 2014 when you were with the

16    defendant in his room alone with the door closed, would your

17    Aunt Tara be home?

18                    MR. ZERNER:  Objection.

19                    THE COURT:  If you know.

20         A.   No.

21         Q.   In March --

22                    THE COURT:  No, you don't know or no, she

23         wouldn't be home?

24                    THE WITNESS:  No, she wouldn't be home.

25                    MR. ZERNER:  Your Honor, we're talking about a

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Direct                         822

1          28 day period.

2                   THE COURT:  Thank you, Mr. Zerner.

3          Q.   In March when would you be alone with the defendant

4    in his room with the door closed, to your knowledge, would

5    your aunt be home?

6          A.   No.

7          Q.   In April would you go to the defendant's room?

8    April 2014 would you go to the defendant's room?

9                   MR. ZERNER:  Objection; vague.

10                  THE COURT:  Overruled.

11         A.   Yes.

12         Q.   And would there be anyone else in the room when you

13   would go there to see the defendant?

14         A.   No.

15         Q.   And would the door be opened or closed?

16         A.   Closed.

17         Q.   And in April of 2014, to your knowledge, would your

18   Aunt Tara be home when you would go see the defendant alone

19   in his bedroom?

20         A.   No.

21         Q.   Did this continue into May of 2014?

22         A.   Yes.

23         Q.   And did this continue into June of 2014?

24         A.   Yes.

25         Q.   Millinia, I'm going to ask you to think about June

M. Johnson - People - Direct                    823

1    and July, right at the end of your seventh grade year, June

2    and July of 2014.  Could you please describe to the jury your

3    relationship with your mother at that time after you finished

4    your seventh grade year?

5         A.   It wasn't good.

6         Q.   Could you please explain what you mean by it wasn't

7    good?  What was happening?

8         A.   We would get into a lot of verbal fights.

9         Q.   What were you fighting about?

10        A.   About being able to go to Brooklyn.

11        Q.   Why wouldn't you be able to go to Brooklyn?

12        A.   Because she said so.

13        Q.   Did you want to go to Brooklyn?

14        A.   Yes.

15        Q.   And when you say go to Brooklyn, is that with the

16   defendant?

17        A.   Yes.

18        Q.   So when your mother told you you couldn't go with

19   the defendant to Brooklyn anymore, how did that make you feel

20   at the time?

21        A.   Bad.

22        Q.   Were you allowed to spend time with the defendant

23   otherwise after you finished seventh grade?

24        A.   What do you mean?

25        Q.   Would your mother allow you to spend time with the

M. Johnson - People - Direct                                824

1    defendant at other times once you finished seventh grade?

2    Were you allowed to spend time with him?

3        A.   No.

4        Q.   And did your mother tell you that verbally?

5        A.   Yes.

6        Q.   Was the defendant present for when your mother told

7    you you couldn't spend time with him?

8        A.   No.

9        Q.   Going back before this happened, Millinia, before

10   you finished seventh grade but after your 13th birthday, were

11   you ever alone in the defendant's room when your mother found

12   you there?

13       A.   Yes.

14       Q.   And could you please explain to the jury what

15   happened when your mother found you alone in the defendant's

16   room?

17       A.   She told me to get out and I'm not allowed to be

18   around him no more.

19       Q.   And was the defendant there when she said that?

20       A.   Yes.

21            MR. ZERNER:  I'm sorry, your Honor, I didn't

22       hear the last answer.

23            THE COURT:  Could you read back the answer?

24            (Whereupon, the penultimate answer was read

25       back by the reporter.)

M. Johnson - People - Direct                    825

1       Q.   When you went into the defendant's room that day,

2  was the door opened or closed?

3       A.   Closed.

4       Q.   And when your mom came to the room, was the door

5  opened or closed?

6       A.   When she came in?

7       Q.   Did she have to open the door?

8       A.   Yes.

9            MR. ZERNER:  Your Honor, I object to the

10      witness asking --

11           THE COURT:  Hold it, Mr. Zerner.  The witness

12      asked you to clarify your question.

13           MR. PERRI:  I'm sorry, I didn't hear it that

14      way, your Honor.

15           THE COURT:  She said when she came in?  So

16      please clarify your question.

17      Q.   When your mom came to the room, was the door opened

18  or closed?

19      A.   It was open.

20      Q.   What happened when your mom came into the room?

21      A.   She told me to get out.

22      Q.   Where were you when your mother entered the room?

23      A.   At the edge of the bed.

24      Q.   And where was the defendant?

25      A.   Laying down.

M. Johnson - People - Direct                    826

 1        Q.   Did your mother have to knock to come into the

 2   room?

 3        A.   Yes.

 4        Q.   Now, after that happened during the summer, did

 5   there come a time where you met up with the defendant in

 6   Hempstead Lake State Park?

 7                    MR. ZERNER:   Objection; leading.

 8                    THE COURT:   Overruled.

 9        A.   Yes.

10        Q.   And could you please explain to the jury --

11   withdrawn.

12             What were you doing in Hempstead Lake State Park

13   that day?

14        A.   At the park.

15        Q.   What were you doing at the park?

16        A.   Playing with my cousins.

17        Q.   How did you get there?

18        A.   Walked.

19        Q.   And what was happening when you met up with the

20   defendant?

21                    MR. ZERNER:   Objection; assumes facts not in

22        evidence.

23                    THE COURT:   Sustained as to the form of the

24        question.

25        Q.   Did the defendant arrive at the park?

M. Johnson - People - Direct                              827

 1               MR. ZERNER:  Objection; leading.

 2               THE COURT:  Sustained.

 3      Q.   Did there come a time when you saw Ray Ross that

 4  day?

 5      A.   Yes.

 6      Q.   And where did you see Ray Ross, the defendant that

 7  day?

 8      A.   At the park.

 9      Q.   Where was he in the park?

10      A.   He was by the entrance in his truck.

11      Q.   What, if anything, happened after you saw the

12  defendant by the entrance in his truck?

13      A.   He gave me an icy.

14      Q.   Did you speak with the defendant?

15      A.   Yes.

16      Q.   Did he speak with you?

17      A.   Yes.

18               MR. ZERNER:  Your Honor, objection.  I believe

19       that there was a question in front of the witness and

20       then we read back her previous answer, but she never

21       answered the question that was asked, which I believe

22       was, was anybody else there.

23               THE COURT:  Ladies and gentlemen, I know it's

24       a little bit early for lunch, but I have other matters

25       that I have to attend to not associated with the trial.

M. Johnson - People - Direct                          828

1      I'm going to take care of those now.  This is probably a

2      pretty good time to break.

3                  With regard to Mr. Zerner's inquiry, we'll

4      have the court reporter read back a couple of those

5      questions after lunch, okay, and answers, of course.

6      So, enjoy your lunch.  Remember my admonitions.  Please

7      be back by 2:00 so we can get started right away, okay.

8                  (Whereupon, the jury exited the courtroom.)

9                  THE COURT:  Millinia, you are allowed to break

10     for lunch now, okay.  Don't talk to anybody about your

11     testimony, all right?

12                 THE WITNESS:  Okay.

13                 THE COURT:  Just go out and enjoy your lunch

14     and we'll see you at 2:00.

15                 (Whereupon, the witness exited the courtroom.)

16                 THE COURT:  Gentlemen, I have other matters I

17     have to attend to.  See you back here at 2:00.

18                 With regard to Mr. Zerner's, objections, as I

19     indicated to the jury, I'll have the court reporter, if

20     she would, just read back that short period of

21     testimony.

22                 (A luncheon recess was taken.)

23                 AFTERNOON SESSION

24                 THE CLERK:  Continued case on trial, People v.

25     Ray Ross.  The jury is not present.  All parties are

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Direct                    829

```
 1        present.  Are the People ready?

 2                    MR. PERRI:  Yes, your Honor.

 3                    THE CLERK:  Defense ready?

 4                    MR. ZERNER:  We are, thank you.

 5                    (Whereupon, the witness returned to the

 6        witness stand.)

 7                    COURT OFFICER:  Jury entering.

 8                    (Whereupon, the jury entered the courtroom.)

 9                    THE CLERK:  Let the record reflect the

10        presence of the jury.

11                    Are the People ready?

12                    MR. PERRI:  Yes, your Honor.

13                    THE CLERK:  Defense ready?

14                    MR. ZERNER:  We are, thank you.

15                    THE COURT:  Good afternoon, ladies and

16        gentlemen of the jury.  We're going to continue now.  As

17        you recall, I informed you that just before the break

18        we're going to have the court reporter read back the

19        last couple of questions and answers because it got a

20        little bit jumbled.

21                    (Whereupon, the requested testimony was read

22        back by the reporter.)

23                    THE COURT:  Mr. Perri, please continue.

24                    MR. PERRI:  Thank you, your Honor.

25
```

1   DIRECT EXAMINATION (Cont'd)

2   BY MR. PERRI:

3        Q.   Now, Millinia, before the break you testified that

4   you went to the park with your cousins, to Hempstead Lake

5   State Park, you went there with your cousins and the

6   defendant, while you were at the park, gave you an icy.

7             Did the defendant give anyone else an icy that was

8   with you when you were in the park?

9        A.   No.

10       Q.   And at about this time after your mom said you

11  couldn't see the defendant, the same time as you saw the

12  defendant in the park, were you still seeing the defendant?

13       A.   Yes.

14       Q.   Would you go to his room?

15       A.   Yes.

16       Q.   Now, Millinia, did there come a time in August of

17  2014 when you no longer had the cell phone that you have

18  already testified about and identified?

19       A.   Yes.

20       Q.   And could you please explain to the jury what

21  happened to that cell phone?

22       A.   My mom took it away from me.

23       Q.   Could you please explain in more detail to the jury

24  exactly how did your mom take it away from you?

25       A.    While I was sleeping, she took it from under my

1    pillow.

2        Q.   And how did you become aware -- how did you know

3    your mom took the phone from you?

4        A.   I couldn't find it anywhere.

5        Q.   And did you speak to your mom about that?

6        A.   Yes.

7        Q.   And what, if anything, did your mother do with that

8    cell phone?

9        A.   She took it.

10       Q.   And after she took it and had it, what, if

11   anything, did she do with it?

12               MR. ZERNER:  Objection; asked and answered.

13               THE COURT:  No, overruled.

14       A.   She took it to a detective.

15       Q.   And before she took it to the detectives and when

16   you spoke to her about it, what, if anything, happened with

17   respect to the phone before she took it to the detectives and

18   after she told you she had the phone?

19       A.   What do you mean?

20               MR. PERRI:  Withdrawn, your Honor.

21               Your Honor, I ask the witness be shown what's

22       in evidence, subject to connection, as People's 10.

23               (Handed to witness.)

24       Q.   Ms. Johnson, do you recognize People's 10?

25       A.   Yes.

M. Johnson - People - Direct                    832

1        Q.   And what do you recognize it to be?

2        A.   Text messages.

3        Q.   And could you look through that packet, please?

4             (Witness complied.)

5        Q.   When you say --

6             THE COURT:   Hold it.

7             MR. PERRI:   Sorry.

8        Q.   Ms. Johnson, when you say those are text messages,

9   where are those text messages from?

10       A.   My first phone.

11       Q.   And who were those text messages between?

12       A.   Me and Mr. Ross.

13       Q.   And did you have an opportunity to go through that

14  packet before today?

15       A.   Yes.

16       Q.   And did you go through that packet at the district

17  attorney's office?

18       A.   Yes.

19       Q.   And could you please look at the back of that

20  packet?

21            Do you recognize any markings in the back of that

22  packet?

23       A.   Yes.

24       Q.   What do you recognize?

25       A.   Signatures.

M. Johnson - People - Direct                          833

1      Q.   And do you recognize the signatures?

2      A.   Yes.

3      Q.   And whose signatures do you recognize?

4      A.   Mine and my mom's.

5      Q.   Now, before you signed that packet, did you have a

6  chance to look through each and every page of that packet?

7      A.   Yes.

8      Q.   Before you signed that packet did you have an

9  opportunity to compare those photographs contained in that

10 packet with the text messages on your first cell phone?

11     A.   Yes.

12     Q.   And when you compared the images contained in that

13 packet with the text messages on your cell phone, what did

14 you determine, if anything?

15     A.   They were the same.

16     Q.   And are the images in that packet fair and accurate

17 depictions of all the text messages on your phone when your

18 mom took it from you?

19     A.   Yes.

20     Q.   And does that packet appear to be in the same

21 condition as when you -- same or similar condition as when

22 you signed it?

23     A.   Yes.

24          MR. PERRI:  Your Honor, I ask that that packet

25     of photographs be moved into evidence.

M. Johnson - People - Direct                                834

 1                    THE COURT:  Please show adversary counsel.

 2                    (Handed to counsel.)

 3                    MR. ZERNER:  Brief voir dire, your Honor?

 4                    THE COURT:  You may.

 5   VOIR DIRE EXAMINATION

 6   BY MR. ZERNER:

 7        Q.   Ms. Johnson, did you transfer the images from your

 8   phone onto paper?

 9                    MR. PERRI:  Objection.

10                    THE COURT:  Sustained as to the form of the

11        question, Mr. Zerner.

12        Q.   Ms. Johnson, did you make this packet of

13   photographs of text messages that is 75 pages long?

14        A.   Did I make it?

15        Q.   Did you make it, yes?

16        A.   No.

17        Q.   Somebody else made it, right?

18        A.   Yes.

19        Q.   And when was the first time you saw it, as far as

20   pages of paper?

21        A.   What do you mean?

22        Q.   When was the first time you saw it in this form as

23   pages of paper rather than images on a cell phone?

24        A.   I don't remember.

25        Q.   Did you first see this in 2014?

M. Johnson - People - Direct                    835

1      A.    No.

2      Q.    Did you first see it in 2015?

3      A.    Yes.

4      Q.    Do you remember if it was in the summer of 2015?

5      A.    I don't remember.

6      Q.    Who first showed you this sheath of papers?

7      A.    Anthony.

8      Q.    Anthony Perri, the assistant district attorney?

9      A.    Yes.

10     Q.    And he showed it to you in his office?

11     A.    Yes.

12     Q.    Did he show you one sheath of papers or multiple

13   sheaths of paper?

14     A.    Multiple.

15     Q.    He showed you this as well as how many others?

16     A.    What do you mean?

17     Q.    Well, did he show you any other printouts of text

18   messages, yes or no?

19                MR. PERRI:  Objection.

20                THE COURT:  Sustained.  Next question.

21     Q.    When he showed you these pages in his office, did

22   he tell you anything about these pages?

23                MR. PERRI:  Objection.

24                THE COURT:  Overruled.

25     A.    What do you mean?

M. Johnson - People - Direct                    836

1      Q.    Did he tell you why it was important?

2            MR. PERRI:  Objection.

3            THE COURT:  Sustained.

4      Q.    What did he tell you about these pages?

5            MR. PERRI:  Objection.

6            THE COURT:  Overruled.

7      A.    That they were text messages.

8      Q.    He told you they were text messages?

9      A.    No.  Well, I saw that they were text messages.

10     Q.    Did he tell you they were a complete set of text

11   messages?

12     A.    Yes.

13     Q.    How do you know they're a complete set of text

14   messages?

15           MR. PERRI:  Objection.

16           THE COURT:  Overruled.

17     Q.    Please answer the question.

18     A.    Because I compared them with the phone and the

19   pictures.

20     Q.    So the phone was given to Detective Toussaint back

21   in December of 2014; is that fair to say?

22           MR. PERRI:  Objection.

23           THE COURT:  Sustained.

24     Q.    And then you didn't see the phone again until the

25   summer of 2015; is that fair to say?

M. Johnson - People - Direct                    837

1              MR. PERRI:  Objection.

2              THE COURT:  Sustained.

3         Q.   You personally compared each and every text message

4    from the cell phone to this sheath of papers?

5         A.   What do you mean?

6         Q.   The first time you saw these pages of paper,

7    Anthony Perri showed it to you, correct?

8         A.   Yes.

9         Q.   That was in the district attorney's office in 2015,

10   correct?

11        A.   Yes.

12        Q.   Was that in the summer of 2015?

13             MR. PERRI:  Objection.

14             THE COURT:  If you know.  Do you recall?

15             THE WITNESS:  I don't recall.

16        Q.   Do you remember was this the same time you

17   testified in the grand jury?

18        A.   Yes.

19        Q.   So now when you were in the room with Anthony

20   Perri, who else was there?

21             MR. PERRI:  Objection.

22             THE COURT:  Mr. Zerner, we're trying to limit

23        this as to a voir dire inquiry.

24             MR. ZERNER:  That's exactly what I'm asking

25        about here, Judge.

M. Johnson - People - Direct                    838

1              THE COURT:  Objection sustained.

2        Q.    How long did you spend comparing text messages that

3    are physically on a cell phone to the pages that are printed

4    out in People's 10 for identification purposes?

5        A.    I don't remember.

6        Q.    You said earlier on that you texted on a daily

7    basis, correct?

8                   MR. PERRI:  Objection.  Beyond the scope of

9          voir dire, your Honor.

10                  THE COURT:  Sustained.

11       Q.    Would it surprise you if there were multiple days

12   that passed between texts on these pages and the next text on

13   these pages?

14                  MR. PERRI:  Objection.

15                  THE COURT:  Sustained.

16       Q.    Is it your testimony that every single text message

17   between yourself and Ray Ross were printed out on these 75

18   pages that are People's 10 for identification purposes?

19                  MR. PERRI:  Objection.

20                  THE COURT:  Sustained as to the form of the

21         question.

22                  MR. ZERNER:  If I can rephrase then, your

23         Honor.

24       Q.    Ms. Johnson, you had the opportunity to physically

25   have the cell phone in one hand, correct?

M. Johnson - People - Direct                    839

1        A.    Yes.

2        Q.    It was powered up?

3        A.    Yes.

4        Q.    And it was handed to you by ADA Perri?

5        A.    Yes.

6        Q.    And he said to you take a look at the text messages

7   on the phone and compare them with the pages in this sheath

8   of papers, correct?

9        A.    Yes.

10        Q.    And you went one by one and compared?

11        A.    Yes.

12        Q.    And you are saying that each and every text message

13   that was in the phone is also on these pages?

14        A.    Yes.

15        Q.    None were skipped?

16        A.    No.

17        Q.    None were duplicated?

18        A.    No.

19        Q.    You checked each and every one?

20        A.    Yes.

21        Q.    And you did this in a room, just you and Mr. Perri?

22        A.    With Kara too.

23        Q.    I'm sorry, I didn't hear what you said.

24        A.    With Kara too.

25        Q.    Kara, the victim's advocate?

M. Johnson - People - Direct                                840

```
 1          A.   Yes.

 2          Q.   Was your mom in the room also?

 3          A.   No.

 4          Q.   It was just the three of you in the room?

 5          A.   Yes.

 6          Q.   All right.  And then Mr. Perri had you sign the

 7   back of this document?

 8          A.   Yes.

 9          Q.   But the date on the signature on this document is

10   February 1st, 2016, correct?

11          A.   Yes.

12          Q.   So when did you sign this in the summer of 2015?

13               MR. PERRI:  Objection.

14               THE COURT:  Sustained.

15          Q.   Did you sign it in the summer of 2015?

16               MR. PERRI:  Objection.

17               THE COURT:  Sustained.

18               MR. ZERNER:  Your Honor, I'll get more into it

19          on cross, but I object to this being admitted into

20          evidence at this time.

21               THE COURT:  The objection is overruled.

22          People's 10 received in evidence subject to connection,

23          so it's fully in evidence.

24   DIRECT EXAMINATION (Cont'd)

25   BY MR. PERRI:
```

M. Johnson - People - Direct                    841

1         Q.    Millinia, Ms. Johnson, did your mother look at the

2    text messages that are contained in People's 10, this packet

3    that you just identified?

4         A.    I don't know.

5         Q.    What, if anything, happened between you and your

6    mother after your mother took the phone from you?

7         A.    I was mad.

8         Q.    And why were you mad?

9         A.    She took the phone.

10        Q.    Did you have an argument?

11        A.    Yes.

12        Q.    And at that time was the defendant still living

13   with you at 301 Coventry?

14        A.    Yes.

15        Q.    And was your aunt still living with you?

16        A.    Yes.

17        Q.    And after that argument, were you allowed to spend

18   any additional time with the defendant, Mr. Ross?

19        A.    No.

20        Q.    I'm asking you to think about now September of 2014

21   when you entered eighth grade.  Was the defendant still

22   living with you at that time?

23        A.    Yes.

24        Q.    And was your aunt still living with you?

25        A.    Yes.

M. Johnson - People - Direct                              842

1          Q.   And in September, the start of eighth grade,

2     September of 2014, at that time did you have a cell phone

3     that you could use?

4          A.   No.

5          Q.   And at that time were you going to Brooklyn with

6     Mr. Ross, the defendant?

7          A.   No.

8          Q.   And at that time were you going to Mr. Ross, the

9     defendant's bedroom?

10         A.   No.

11         Q.   And during that time when you didn't have a cell

12    phone that you were allowed to use, were you texting or

13    calling Mr. Ross, the defendant?

14         A.   No.

15         Q.   So, Ms. Johnson, I'm now asking you to think about

16    October, the next month, 2014 when you are in eighth grade.

17    Did there come a time where you got another cell phone?

18         A.   Yes.

19         Q.   And how did you get another cell phone?

20         A.   He gave it to me.

21         Q.   When you say he gave it to you, who is the "he" in

22    that sentence?

23         A.   Mr. Ross.

24         Q.   And where did he give you that cell phone?

25         A.   In my house.

M. Johnson - People - Direct                    843

1              MR. PERRI:  Your Honor, I ask that the witness

2        be shown People's 13.

3                    (Handed to witness.)

4        Q.   Now, Ms. Johnson, do you recognize People's 13, the

5   envelope that's part of People's 13?

6        A.   Yes.

7        Q.   What do you recognize it to be?

8        A.   The second phone.

9        Q.   And the contents that were inside that envelope

10  that the officer took out and put in front of you, do you

11  recognize those items?

12       A.   Yes.

13       Q.   And collectively, what do you recognize them to be?

14       A.   Wait, what's the question?

15       Q.   Collectively, those items that came out, if you put

16  them together, what do you recognize those items to be?

17       A.   A phone.

18       Q.   And which phone is that?

19       A.   The second phone.

20       Q.   And is that the phone you just testified about?

21       A.   Yes.

22       Q.   And is that the phone that the defendant gave you

23  in October of 2014?

24       A.   Yes.

25       Q.   Ms. Johnson, I'm going to ask you to put the phone

M. Johnson - People - Direct                    844

```
 1    together, if you would.  Put the battery inside.

 2                    (Witness complied.)

 3        Q.   Ms. Johnson, I'm going to ask you to turn the phone

 4    on.  Is it turning on?

 5        A.   It is.

 6        Q.   If you can just let me know when it actually is on,

 7    Ms. Johnson, thank you.

 8        A.   It's on.

 9        Q.   Ms. Johnson, could you open the phone or activate

10    and enter into the phone?

11        A.   Yeah.

12        Q.   Could you please do that?

13                    (Witness complied.)

14        Q.   Could you please look at the messages on that phone

15    or, Ms. Johnson, are there messages on that phone?  Text

16    messages.

17        A.   Yes.

18        Q.   Could you please open the location of the text

19    messages?

20                    (Witness complied.)

21        Q.   Ms. Johnson, could you look at the text messages

22    that are on that phone?  Look through some of them.

23                    (Witness complied.)

24        Q.   Ms. Johnson, do you recognize the text messages

25    that are on that phone?
```

1       A.    Yes.

2       Q.    And do you recognize the other contents and the

3   appearance of that phone?

4       A.    Yes.

5       Q.    And what do you recognize that phone to be?

6       A.    The second phone.

7       Q.    And, Ms. Johnson, how do you know that that's not

8   the first phone that you were shown?

9       A.    Because it looks more newer and the camera is more

10  circular.

11            THE COURT:   The camera is more what?

12            THE WITNESS:   Circular.

13            THE COURT:   Please speak into the microphone.

14      Q.    And who -- the text messages on that phone that you

15  looked at, who are they addressed to?

16      A.    What do you mean?

17            MR. PERRI:   I'm sorry, I couldn't hear, your

18      Honor.

19            THE COURT:   What do you mean?

20      Q.    The text messages on that phone, who were they sent

21  to?  Who is receiving them that were sent to that phone?

22            MR. ZERNER:   Objection; vague.

23            THE COURT:   Overruled.

24      A.    My family.

25      Q.    Do you recognize who those people are on that

M. Johnson - People - Direct                    846

1    phone?

2        A.   Yes.

3             MR. PERRI:   Your Honor, I ask that phone be

4        received into evidence.

5             THE COURT:   Please show adversary counsel.

6             (Handed to counsel.)

7             MR. ZERNER:   Brief voir dire, your Honor?

8             THE COURT:   You may.

9    VOIR DIRE EXAMINATION

10   BY MR. ZERNER:

11       Q.   Ms. Johnson, when was the last time you handled

12   this phone that it was on and activated like it is now?

13       A.   I don't remember.

14       Q.   Well, you were in the DA's office on February 1st,

15   right?

16       A.   Yes.

17       Q.   Was the phone put together and turned on on

18   February 1st, 2016?

19       A.   Yes.

20       Q.   It was?

21       A.   Yeah.

22       Q.   And have you done that -- today is February 17th.

23   Have you done it any time between February 1st and today?

24       A.   No.

25       Q.   I'm sorry?

M. Johnson - People - Direct                              847

1          A.   No.

2                THE COURT:   You have to speak into the

3     microphone and raise your voice a little bit.

4          Q.   So on February 1st you were at the DA's office,

5     right?

6          A.   Yes.

7          Q.   You were in Mr. Perri's office?

8          A.   Yes.

9          Q.   And he showed you this white external envelope

10    which has an orange sticker on it and it's marked People's 13

11    for identification purposes, right?

12         A.   Yes.

13         Q.   And it was unsealed, correct?

14         A.   Yes.

15         Q.   It wasn't sealed either with the gummy substance or

16    with the red string on it, right?

17         A.   No.

18         Q.   It was already open, right?

19         A.   Yes.

20         Q.   And your name doesn't appear on this white folder,

21    right?

22         A.   No.

23         Q.   And then inside of that was this Manila colored

24    smaller envelope, correct?

25         A.   Yes.

1          Q.    And it's not your handwriting on this envelope,

2    correct?

3          A.    No.

4          Q.    And this envelope also is not sealed?

5          A.    No.

6          Q.    Now, the phone was in three pieces, right?

7          A.    Yes.

8          Q.    And Mr. Perri told you to put it together?

9          A.    Yes.

10         Q.    And he told you to turn it on?

11         A.    Yes.

12         Q.    And there are multiple text messages on this phone,

13   correct?

14         A.    Yes.

15         Q.    And you have texted with more than one person,

16   correct?

17         A.    Yes.

18         Q.    And who are some of the other people you texted

19   with?

20               MR. PERRI:  Objection.

21               THE COURT:  Sustained.

22         Q.    When you got this phone in October of 2014, you had

23   the same phone number on this phone as the phone number on

24   the previous phone?

25         A.    Yes.

M. Johnson - People - Direct                849

 1          Q.   And this phone was slightly newer and slightly

 2   better?

 3          A.   Yes.

 4          Q.   It had a better camera on it?

 5          A.   Yes.

 6          Q.   You were glad to get this phone, right?

 7          A.   Yes.

 8          Q.   Now, do you know if this phone has been used to

 9   send or receive text messages in 2016?

10                   MR. PERRI:  Objection.

11                   THE COURT:  Sustained.

12          Q.   Do you know if this phone was used to send or

13   receive text messages in 2015?

14                   MR. PERRI:  Objection.

15                   THE COURT:  Sustained.

16          Q.   Did you personally speak with any members of either

17   the district attorney's office or the Nassau County Police

18   Department dealing with their technical unit?

19                   MR. PERRI:  Objection.

20                   THE COURT:  Sustained.

21          Q.   Do you know the serial number to this phone?

22          A.   No.

23          Q.   Do you know the serial number to this phone?

24          A.   No.

25          Q.   Do you know the serial number to the older phone?

1          MR. PERRI:  Objection.

2          THE COURT:  Sustained.

3          MR. ZERNER:  Your Honor, I object to this

4     being moved into evidence.

5          THE COURT:  The objection is overruled.  The

6     exhibit is received in evidence.  People's 13.

7          COURT OFFICER:  So marked.

8          MR. PERRI:  Your Honor, I ask if the witness

9     can be shown People's 6 in evidence subject to

10    connection.

11          (Handed to witness.)

12 DIRECT EXAMINATION (Cont'd)

13 BY MR. PERRI:

14    Q.   Ms. Johnson, do you recognize People's 6?

15    A.   Yes.

16    Q.   And what do you recognize it to be?

17    A.   The second phone.

18    Q.   And, Ms. Johnson, are there any numbers on that

19 photograph, the second phone?

20    A.   Yes.

21    Q.   And is it a fair and accurate depiction of your

22 second phone?

23    A.   Yes.

24          MR. PERRI:  Your Honor, I ask the witness also

25    be shown People's 13 in evidence.

1                    (Handed to witness.)

2          Q.   Ms. Johnson, could you please take the phone apart.

3                    (Witness complied.)

4          Q.   Ms. Johnson, inside the phone, are there any

5    numbers?

6          A.   Yes.

7          Q.   And could you please compare the numbers on the

8    actual phone to those in the photograph?

9          A.   They're the same.

10         Q.   I'm sorry, when you compare those two numbers, did

11   you determine anything?

12         A.   That they are exactly the same.

13         Q.   Thank you.

14              MR. PERRI:  Your Honor, I ask that the record

15         just reflect that the connection has been made in the

16         photographs in People's 7, your Honor.

17              THE COURT:  Was the jury able to hear the

18         witness's last answer?

19              A JUROR:  Yes.

20              THE COURT:  Please show adversary counsel.

21              MR. ZERNER:  No objection to the photograph,

22         your Honor.

23              THE COURT:  Very good.  People's 6 in

24         evidence.

25              MR. PERRI:  Thank you, your Honor.

M. Johnson - People - Direct                    852

1          Q.   Now, Ms. Johnson, with respect to the second phone

2     you were just looking at, after receiving that phone in

3     October of 2014 from Mr. Ross, did you communicate with him

4     on that phone?

5          A.   Yes.

6          Q.   And did you call him on that phone?

7          A.   Yes.

8          Q.   Did you text with him on that phone?

9          A.   Yes.

10         Q.   Now, on voir dire you said that that phone had the

11    same number as your previous phone; is that correct?

12         A.   Yes.

13         Q.   And did the defendant's phone number change?

14         A.   No.

15         Q.   And how often would you use that phone when you had

16    it?

17         A.   Very often.

18         Q.   Would you use it every day?

19         A.   Yes.

20         Q.   Now, Ms. Johnson, did there come a time where that

21    phone was taken from you?

22         A.   Yes.

23         Q.   And could you please explain to the jury how that

24    phone, the second phone was taken from you?

25         A.   My mom took it away from me.

M. Johnson - People - Direct                 853

```
 1        Q.   Now, when you first received the phone, did you

 2   tell your mom you got a second phone?

 3        A.   No.

 4        Q.   Did your mother know that you had a second phone,

 5   to your knowledge?

 6        A.   No.

 7        Q.   So how did your mother come to be aware that you

 8   had a second cell phone?

 9        A.   I called her.

10        Q.   And why did you call her?

11        A.   Because I had missed the school bus for school.

12        Q.   And what, if anything, happened when you called

13   her?

14        A.   She told me to come home.

15        Q.   And did you go home?

16        A.   Yes.

17        Q.   And what happened once you came home?

18        A.   She took my phone.

19        Q.   And after your mother took the phone, what, if

20   anything, happened next?

21        A.   She told me to open it.

22        Q.   And did you, in fact, open it?

23        A.   Yes.

24        Q.   And after you opened the phone, what, if anything,

25   happened after that?
```

M. Johnson - People - Direct                          854

1        A.    She looked through the messages.

2              MR. PERRI:   Your Honor, I ask that the witness

3        be shown People's 11.

4              (Handed to witness.)

5        Q.    Ms. Johnson, I'm going to ask you to look through

6    that packet, that's People's 11, and look up when you are

7    done examining it.

8              (Pause in the proceedings.)

9        Q.    Ms. Johnson, do you recognize the documents that

10   are in that packet?

11       A.    Yes.

12       Q.    And what do you recognize them to be?

13       A.    Text messages.

14       Q.    And when you say text messages, which text messages

15   are you talking about?

16       A.    Between me and Mr. Ross.

17       Q.    And where were those text messages?

18       A.    In the phone.

19       Q.    And which phone were those text messages contained

20   in that packet on?

21       A.    The second phone.

22             THE COURT:   What phone?

23             THE WITNESS:   The second phone.

24       Q.    Now, before coming to Court today, did you have an

25   opportunity to look through that packet of photographs?

Kathi A. Fedden, Sr. Court Reporter

1       A.   Yes.

2       Q.   The documents?

3       A.   Yes.

4       Q.   And did you go through each and every page of that

5  packet?

6       A.   Yes.

7       Q.   Did you read the contents of the text messages

8  contained in that packet?

9       A.   Yes.

10      Q.   Before coming to Court today, did you have an

11  opportunity to compare the photographs in that packet to the

12  actual second cell phone when it was powered and turned on?

13      A.   Yes.

14      Q.   And after making that comparison, what were you

15  able to determine about the photographs in that packet and

16  the second cell phone when it was turned on?

17                MR. ZERNER:   Objection; leading.

18                THE COURT:   Overruled.

19      A.   They were exactly the same.

20      Q.   And could you please look at the back of the

21  packet?

22           Do you recognize anything on the back of the

23  packet?

24      A.   Yes.

25      Q.   What do you recognize?

M. Johnson - People - Direct                        856

1        A.    Signatures.

2        Q.    And which signatures do you recognize?

3        A.    My mom's and I.

4        Q.    And is that packet in the same or substantially

5   similar condition as when you signed the back of that packet?

6        A.    Yes.

7        Q.    And did you sign that packet after going through it

8   and comparing it to the phone?

9        A.    Yes.

10            MR. PERRI:   Your Honor, I ask that that packet

11       be received into evidence.

12            THE COURT:   Please show adversary counsel.

13            MR. ZERNER:   Brief voir dire, your Honor?

14            THE COURT:   You may.

15   VOIR DIRE EXAMINATION

16   BY MR. ZERNER:

17       Q.    Ms. Johnson, you didn't create this packet,

18   correct?

19       A.    No.

20       Q.    And you looked at this packet on February 1, 2016?

21       A.    Yes.

22       Q.    You did that at Mr. Perri's office?

23       A.    Yes.

24       Q.    And you did it at the same time as you went through

25   the other packet of text messages?

M. Johnson - People - Direct                         857

1          A.   Yes.

2          Q.   And he told you to sign the back of it and put the

3     date on it?

4          A.   Yes.

5          Q.   Who signed it first, you or your mom?

6          A.   I did.

7          Q.   Was your mom there the same date when you were

8     going through these and signing it?

9          A.   What do you mean?

10         Q.   Was your mom with you at the district attorney's

11    office on February 1st when you looked through these text

12    message?

13         A.   No.

14         Q.   She wasn't with you?

15         A.   She wasn't with me.

16         Q.   How did you get to the DA's office?

17         A.   Do you mean was I in the office with her or was she

18    just in the building?

19         Q.   The first question is was your mother with you in

20    the building of the district attorney's office on February 1,

21    2016, yes or no?

22         A.   Yes.

23         Q.   And was she also physically on the same floor in

24    the building when you were speaking with Mr. Perri?

25         A.   Yes.

M. Johnson - People - Direct                    858

1          Q.    Was there one point in time when your mother,

2    yourself, Mr. Perri were all in the room at the same time?

3          A.    No.

4          Q.    You were never in the room at the same time?

5          A.    Yes, we were.

6          Q.    So you were in the room at the same time?

7          A.    Well, a room, not in the room.

8          Q.    Was there ever any room in the district attorney's

9    office on February 1, 2016 that included yourself, your

10   mother and Mr. Perri, yes or no?

11               MR. PERRI:   Objection.

12               THE COURT:   Sustained.

13         Q.    Were you shown this packet before February 1st,

14   2016?

15         A.    I don't remember.

16         Q.    Were you shown a packet like this in 2015?

17         A.    I don't remember.

18         Q.    Do you remember testifying in the grand jury?

19         A.    Yes.

20         Q.    That was in the summer of 2015?

21         A.    Yes.

22         Q.    Before you testified in the grand jury in the

23   summer of 2015, you met with Mr. Perri?

24               MR. PERRI:   Objection.

25               THE COURT:   Overruled.

M. Johnson - People - Direct                        859

1        Q.    Please answer the question, Ms. Johnson.

2        A.    Yes.

3        Q.    And when you met with Mr. Perri, he showed you a

4    similar packet of pages, correct?

5        A.    Yes.

6        Q.    Just like People's 11 for identification purposes,

7    right?

8                    MR. PERRI:   Objection.

9                    THE COURT:   Mr. Zerner, this is voir dire, so

10          I'm going to limit your inquiry with regard to different

11          packets.  We're talking about this particular packet.

12       Q.    On February 1st, 2016 did you have the opportunity

13   to power up the phone that we were just looking at and

14   compare and contrast all of the cell phone text messages in

15   that cell phone with all 30 pages that are contained in

16   People's 11?

17       A.    Yes.

18       Q.    And you looked through one by one?

19       A.    Yes.

20       Q.    And there was nothing added?

21       A.    No.

22       Q.    And there was nothing omitted?

23       A.    No.

24       Q.    Meaning left out.

25       A.    No.

M. Johnson - People - Direct                860

1      Q.   Now, the previous packet you had, you're the name

2    of the receiving person on these text messages, correct?

3                MR. PERRI:  Objection.

4                THE COURT:  Sustained.

5      Q.   Is there a name of who was receiving these text

6    messages in this packet of pages?

7                MR. PERRI:  Objection.

8                THE COURT:  Sustained.

9      Q.   Were you in the room, were you present when the

10   photos of these text messages were taken?

11               MR. PERRI:  Objection.

12               THE COURT:  No, overruled.

13               You can answer.

14     A.   No.

15     Q.   So you were given this packet of pages and told to

16   look at them, correct?

17     A.   Yes.

18     Q.   Did Mr. Perri give you any packets of pages that

19   were not relevant to the case?

20               MR. PERRI:  Objection.

21               THE COURT:  Sustained.

22     Q.   Did you look through any text messages that were

23   sent or received by anybody besides Ray Ross?

24               MR. PERRI:  Objection.

25               THE COURT:  Sustained.

M. Johnson - People - Direct                    861

1      Q.   Was your mother physically in the room with you as

2   you went through the text messages one by one?

3                 MR. PERRI:   Objection.

4                 THE COURT:   Sustained.

5                 MR. ZERNER:   Your Honor, I object to these

6        being admitted into evidence.

7                 THE COURT:   The objection is overruled.

8        People's 11 received in evidence.

9                 You may continue, Mr. Perri.

10                 MR. PERRI:   I ask if the witness can step down

11       so she can view the presenter.

12                 THE COURT:   Millinia, just follow the

13       direction of the court officer.

14   DIRECT EXAMINATION (Cont'd)

15   BY MR. PERRI:

16      Q.   Ms. Johnson, I placed on the stand what's in

17   evidence as People's 11.  Is this a photograph of the second

18   cell phone that you received from the defendant?

19      A.   Yes.

20      Q.   And whose number appears at the top?  Whose cell

21   phone number appears at the top?

22      A.   His.

23      Q.   When you say "his," who do you mean?

24      A.   Mr. Ross.

25      Q.   And can you just explain to the jury by color which

M. Johnson - People - Direct                862

 1    text messages are you receiving and which text messages are

 2    going out?

 3         A.   I'm receiving the yellow ones and I'm sending the

 4    blue ones.

 5         Q.   Ms. Johnson, I'm going to ask you to stay right

 6    there for one more moment.

 7              MR. PERRI:  Your Honor, may I just place on

 8         the presenter People's 10 for identification -- People's

 9         10 in evidence?

10         Q.   Now, Ms. Johnson, do you recognize the text

11    messages on this page?

12         A.   Yes.

13         Q.   And what phone are these text messages from?

14         A.   The first one.

15         Q.   And could you please explain to the jury which text

16    messages, by their location either coming from the right side

17    or coming from the left side, which text messages are going

18    in and which text messages are going out?

19         A.   The text messages on the right side are going out

20    and the text messages on the left side are coming in.

21         Q.   And at the top where you see the name, the words

22    Ray Ray, can you explain what that means?

23         A.   It's his contact name.

24         Q.   Whose contact name when you say he?

25         A.   Mr. Ross.

M. Johnson - People - Direct                              863

1      Q.    And the number below that, do you recognize that?

2      A.    Yes.

3      Q.    And whose number is that?  Whose cell phone number?

4      A.    Mr. Ross.

5      Q.    Thank you.

6            MR. PERRI:  Your Honor, the witness can go

7      back, thank you.

8      Q.    Now, Ms. Johnson, did there come a time after your

9  mother discovered the second cell phone and took it from you

10 when the defendant, Mr. Ross, moved out of the house?

11     A.    What was the question?

12     Q.    Did there come a time after your mom took from you

13 the second cell phone when the defendant, Mr. Ross, moved out

14 of the house?

15     A.    I don't understand.

16     Q.    When your mom took that cell phone, the second cell

17 phone, when your mom took that second cell phone from you,

18 was the defendant still living with you at 301 Coventry?

19     A.    Yes.

20     Q.    Did there come a time later where he no longer was

21 living with you?

22     A.    Yes.

23     Q.    Now, the days after your mother found the second

24 cell phone, on or about October 20, 2014, did you go to the

25 district attorney's office with her?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Direct                    864

1       A.   Yes.

2       Q.   And did you want to go?

3       A.   No.

4       Q.   While you were at the district attorney's office,

5    did you give a written statement?

6       A.   Yes.

7       Q.   Did you put everything that happened to you in your

8    written statement?

9       A.   No.

10       Q.   Why not?

11       A.   Because it was awkward and I was embarrassed.

12       Q.   At that point when you went to the district

13    attorney's office with your mother, how did you feel about

14    your mother at that point?

15       A.   What do you mean?

16       Q.   Emotionally, how did you feel when you went to the

17    district attorney's office?

18       A.   (No response.)

19            THE COURT:  Why don't you rephrase the

20       question, Mr. Perri?

21            MR. PERRI:  Yes, your Honor.

22       Q.   Were you happy to go to the district attorney's

23    office?

24       A.   No.

25       Q.   And were you happy that your mother brought you to

M. Johnson - People - Direct                    865

1     the district attorney's office?

2          A.    No.

3          Q.    Drawing your attention to December of 2014, did

4     there come a time where you met a Detective Toussaint of the

5     Nassau County Police Department?

6          A.    Yes.

7          Q.    And at that time was the defendant living with you

8     at 301 Coventry?

9          A.    No.

10         Q.    Were you in contact with the defendant when you met

11    with Detective Toussaint?

12         A.    No.

13         Q.    Where did you meet Detective Toussaint?

14         A.    His car.

15         Q.    Is Detective Toussaint a man or a woman?

16         A.    A man.

17         Q.    And when you met with Detective Toussaint in his

18    car, was your mother there?

19         A.    Yes.

20         Q.    Did there come a time where you spoke with

21    Detective Toussaint in the car?

22         A.    Yes.

23         Q.    Were there any other female detectives or police

24    officers with Detective Toussaint?

25         A.    No.

M. Johnson - People - Direct                    866

1        Q.   And when you spoke with Detective Toussaint, did

2   your mother stay in the car?

3        A.   Yes.

4        Q.   Did there come a time where your mother left the

5   car?

6        A.   Yes.

7        Q.   After your mother left the car, did Detective

8   Toussaint continue to speak with you?

9        A.   Yes.

10        Q.   Did he ask you questions?

11        A.   Yes.

12        Q.   Did you answer his questions?

13        A.   Yes.

14        Q.   Did you want to answer his questions?

15        A.   No.

16        Q.   Why not?

17        A.   It was really awkward.

18        Q.   Did you tell Detective Toussaint everything that

19   happened to you?

20        A.   No.

21        Q.   Why didn't you?

22        A.   I didn't want to.

23        Q.   Did there come a time that day when you signed a

24   typewritten statement with Detective Toussaint?

25        A.   Yes.

M. Johnson - People - Direct                    867

1       Q.   Did you type that statement?

2       A.   No.

3       Q.   Did you sign that statement?

4       A.   Yes.

5       Q.   Did you read the statement before you signed it?

6       A.   Yes.

7       Q.   When you signed that statement, was your mother

8   with you?

9       A.   Yes.

10      Q.   While you were with Detective Toussaint that day,

11  did your mother give the detective anything?

12      A.   Yes.

13      Q.   What did your mother give the detective?

14      A.   The two phones.

15      Q.   And when you say the two phones, which two phones?

16      A.   The first and second phone.

17      Q.   Now, are those the phones that you testified to

18  about here today?

19      A.   Yes.

20      Q.   Drawing your attention to July of 2015, did there

21  come a time when you met with the district attorney's office?

22      A.   Yes.

23      Q.   And when you came to the district attorney's office

24  that time, did you want to go to the district attorney's

25  office?

1      A.    No.

2      Q.    And did you have to testify that day?

3            MR. ZERNER:  Objection; leading.

4            THE COURT:  Overruled.

5      A.    Yes.

6      Q.    And did you want to testify?

7      A.    No.

8      Q.    And when you met with the district attorney's

9 office, who did you meet with?

10     A.    You.

11     Q.    And was there anyone else there?

12     A.    Kara.

13     Q.    And is Kara a man or a woman?

14     A.    A woman.

15     Q.    And when you came to the district attorney's

16 office, was your mother in the same building?

17     A.    Yes.

18     Q.    And when you met with Kara and I, was your mother

19 in the room?

20     A.    No.

21     Q.    Was your mother in the grand jury with you?

22     A.    No.

23           MR. PERRI:  Nothing further, your Honor.

24           THE COURT:  Mr. Zerner.

25           MR. ZERNER:  Thank you, your Honor.

M. Johnson - People - Cross                           869

1                    THE COURT:  Before you start, ladies and

2          gentlemen, everybody okay?  No one needs a break.

3                    Okay, continue, Mr. Zerner.

4                    MR. ZERNER:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. ZERNER:

7          Q.    Ms. Johnson, please describe your mother's reaction

8    in October of 2014 when she caught you with that cell phone?

9          A.    She was mad.

10         Q.    Please describe how mad she was.

11         A.    Angry like.

12         Q.    Sorry, say that again?

13         A.    Angry, like really mad.

14         Q.    I'm sorry, I can't hear you.

15         A.    Angry.  Really mad.

16         Q.    She was angry?

17         A.    Yes.

18         Q.    On a scale of one to ten, how angry was she?

19         A.    Like a seven.

20         Q.    A seven?

21         A.    Yes.

22         Q.    Has she punished you in the past when she was

23    angry?

24                   MR. PERRI:  Objection.

25                   THE COURT:  No, overruled.

M. Johnson - People - Cross                    870

1          A.    What do you mean?

2          Q.    When you misbehave, does your mother punish you,

3     yes or no?

4                    MR. PERRI:  Objection.

5                    THE COURT:  Sustained.

6          Q.    Is your mother the person that disciplines you?

7                    MR. PERRI:  Objection.

8                    THE COURT:  Overruled.

9          Q.    Please answer the question.

10         A.    Yes.

11         Q.    And how does she punish you when she disciplines

12    you?

13                   MR. PERRI:  Objection.

14                   THE COURT:  No, Mr. Perri, overruled.

15         A.    Like sometimes I can't hang out with my friends.

16         Q.    So sometimes the punishment is that you cannot hang

17    out with your friends, is that what you said?

18         A.    Yes.

19         Q.    What kind of offense had you done when your

20    mother's punishment was you could not hang out with your

21    friends?

22                   MR. PERRI:  Objection.

23                   THE COURT:  Sustained.

24         Q.    Has your mother ever disciplined you in a physical

25    way?

M. Johnson - People - Cross                              871

```
 1                    MR. PERRI:  Objection.

 2                    THE COURT:  Sustained.

 3        Q.    Aside from punishing you and not letting you hang

 4   out with your friends, what other punishments would your

 5   mother give to you when you misbehave?

 6                    MR. PERRI:  Objection.

 7                    THE COURT:  Overruled.

 8        A.    She --

 9                    THE COURT:  Why don't you offer another

10        question, Mr. Zerner.

11                    MR. ZERNER:  Your Honor, I think it's

12        important that this one be answered.  If she can have it

13        read back to her, please.

14                    THE COURT:  Mr. Zerner, I'm asking you to

15        offer a new question.

16                    MR. ZERNER:  Sorry, your Honor, I'll come back

17        to that one.

18        Q.    Ms. Johnson, who is Robert Jones?

19                    MR. PERRI:  Objection.

20                    THE COURT:  Sustained.

21        Q.    Ms. Johnson, who is Rafael Mickens?

22                    MR. PERRI:  Objection.

23                    THE COURT:  Sustained.

24        Q.    Ms. Johnson, what's your father's name?

25        A.    Rafael Mickens.
```

M. Johnson - People - Cross                           872

1        Q.   Does Rafael Mickens have a brother?

2        A.   Yes.

3        Q.   What's his first name?

4        A.   George.

5        Q.   It's your Uncle George?

6        A.   Yes.

7        Q.   Are they both in your life?

8        A.   What do you mean?

9        Q.   Do you have contact with them?

10       A.   No.

11       Q.   You have no contact with your father, Rafael

12   Mickens?

13       A.   No.

14       Q.   When was the last time you saw your father, Rafael

15   Mickens?

16                 MR. PERRI:   Objection.

17                 THE COURT:   Sustained.

18       Q.   Now, on direct testimony you described two

19   different cell phones that Mr. Perri showed you.  Do you

20   remember that?

21       A.   Yes.

22       Q.   One is older and one is newer?

23       A.   Yes.

24       Q.   But you actually had a phone before the old phone,

25   correct?

M. Johnson - People - Cross                873

1       A.   Yes.

2       Q.   So actually these phones should be phone number two

3   and phone number three, correct?

4            MR. PERRI:  Objection.

5            THE COURT:  No, overruled.

6       Q.   Please answer the question, ma'am.

7            THE COURT:  If you were going to describe the

8       phones, did you have a phone earlier than the one that

9       you have described as your first phone?

10           THE WITNESS:  Yes.

11      Q.   Who got you that phone, Ms. Johnson?

12      A.   My uncle.

13      Q.   Your Uncle George?

14      A.   Yes.

15      Q.   Your father Rafael's brother, right?

16      A.   Yes.

17      Q.   Is George married?

18           MR. PERRI:  Objection.

19           THE COURT:  Sustained.

20      Q.   Are you George's only niece?

21           MR. PERRI:  Objection.

22           THE COURT:  Sustained.

23      Q.   Do you remember the day that George Mickens got you

24  your first phone?

25           MR. PERRI:  Objection.

M. Johnson - People - Cross                    874

1              THE COURT:  Overruled.

2    Q.    Please answer the question.

3              MR. PERRI:  Your Honor, I would ask if the

4    Court could please direct the witness, as opposed to

5    defense counsel, as you previously instructed.

6              THE COURT:  Thank you, Mr. Perri.

7    A.    March.

8    Q.    I can't hear you, ma'am?

9    A.    March.

10   Q.    I'm sorry, are you saying the month of March?

11   A.    Yes.

12   Q.    I'm sorry, you said you got the phone in March of

13   what year?

14   A.    2011 I want to say.

15   Q.    In March of 2011 your uncle got you a phone?

16   A.    Yes.

17   Q.    This is Uncle George Mickens?

18   A.    Yes.

19   Q.    Your father's brother?

20   A.    Yes.

21   Q.    Do you remember physically where you got that

22   phone?

23              MR. PERRI:  Objection.

24              THE COURT:  Sustained.

25   Q.    Do you remember going with your father and your

M. Johnson - People - Cross                              875

1    uncle to a cell phone store in Jamaica, Queens and getting a

2    phone for the first time, yes or no?

3                MR. PERRI:  Objection.

4                THE COURT:  Sustained.

5        Q.    Could you please tell us about that first phone

6    that you got in 2011?

7                MR. PERRI:  Objection.

8                THE COURT:  Sustained.

9        Q.    When you got your first phone in 2011, to the best

10   of your knowledge, did your uncle or your father discuss that

11   with your mother before getting it for you?

12               MR. PERRI:  Objection.

13               THE COURT:  Overruled.

14       A.    I don't remember.

15       Q.    When you brought that phone home, did you show it

16   to your mother?

17       A.    Yes.

18       Q.    Did your tell your mother what the cell phone

19   number was?

20       A.    Yes.

21       Q.    At that point in time did your mother have a cell

22   phone?

23       A.    Yes.

24       Q.    At that point in time were you glad to have this

25   cell phone?

M. Johnson - People - Cross          876

1       A.   Yes.

2       Q.   Is it fair to say you were one of the youngest of

3    your friends to get a cell phone?

4            MR. PERRI:  Objection.

5            THE COURT:  Sustained.

6       Q.   So you started using that phone in March of 2011,

7    correct?

8       A.   Yes.

9       Q.   And to the best of your knowledge, the bill was

10   being paid by your Uncle George Mickens?

11      A.   Yes.

12      Q.   And did there come a point in time when your Uncle

13   George or your dad, Rafael Mickens told you that they would

14   no longer be able to pay for the phone?

15      A.   Yes.

16      Q.   I'm sorry, what did you say?

17      A.   Yes.

18      Q.   And when were you told that?

19      A.   I don't remember.

20      Q.   Was it later in 2011?

21      A.   Yes.

22      Q.   So later in 2011 you were told that that phone

23   would no longer be paid for by either George or Rafael

24   Mickens, right?

25      A.   Yes.

M. Johnson - People - Cross                877

1      Q.    But the phone still worked, right?

2      A.    Yes.

3      Q.    Who started paying for the phone then?

4      A.    Mr. Ross.

5      Q.    So Ray Ross started paying for that phone, right?

6      A.    Yes.

7      Q.    This is long before any talent show that you danced

8  in in March of 2013, right?

9      A.    Yes.

10     Q.    It was in 2011, right?

11     A.    Yes.

12     Q.    So the phone was being paid for and it was still on

13 and you could still use it to text your friends and call your

14 friends, right?

15     A.    Yes.

16     Q.    That was a good thing, right?

17     A.    Yes.

18     Q.    Was there ever a point in time when you were living

19 at 301 Coventry Road North that your mother was not living in

20 that house?

21              MR. PERRI:   Objection.

22              THE COURT:   Overruled.

23     A.    No.

24     Q.    Your mother lived in that house every month of

25 every year of your life, is that your testimony?

M. Johnson - People - Cross                    878

1       A.   Yes.

2       Q.   There was never a point in time when she lived with

3  Sherman Roberts in Queens?

4              MR. PERRI:   Objection.

5              THE COURT:   Sustained.

6       Q.   Do you know who Sherman Roberts is?

7              MR. PERRI:   Objection.

8              THE COURT:   Sustained.

9       Q.   You have a little sister, right?

10      A.   Yes.

11      Q.   What's her name?

12      A.   Sherima.

13      Q.   Who is her father?

14             MR. PERRI:   Objection.

15             THE COURT:   Sustained.

16      Q.   It's true that Sherman Roberts is the father of

17  your little sister?

18             MR. PERRI:   Objection.

19             THE COURT:   Sustained.

20             Mr. Zerner, please move on from that line of

21      questioning.

22      Q.   Was there ever a point in time in your life that

23  you did not personally live at 301 Coventry Road North, you

24  personally?

25             MR. PERRI:   Objection.

M. Johnson - People - Cross                    879

1                THE COURT:  Overruled.

2        A.   No.

3        Q.   I'm sorry?

4        A.   No.

5        Q.   So you always lived in that house, right?

6        A.   Yes.

7        Q.   And there was some points in time when your

8   grandmother lived there and some points in time when she

9   didn't, right?

10        A.   Yes.

11        Q.   And there was some points in time when your big

12   brother lived there and some points in time when he didn't,

13   right?

14        A.   No.

15        Q.   No?  Your big brother always lived there?

16        A.   Yes.

17        Q.   What about your dad, Raefie Mickens, did he

18   sometimes live there and sometimes not?

19        A.   Yes.

20        Q.   And there was sometimes when Robert Jones lived

21   there and sometimes when he didn't?

22                THE COURT:  Sustained.

23        Q.   Were there sometimes when Sherman Roberts lived

24   there and sometimes when he didn't?

25                THE COURT:  Sustained.

M. Johnson - People - Cross                    880

1        Q.    Has there ever been a point in time when your

2    mother was looking to discipline you, she was angry at you

3    and she punished you?

4                    MR. PERRI:   Objection.

5                    THE COURT:   Overruled.

6        A.    What do you mean?

7        Q.    Have you ever misbehaved in the house?

8                    MR. PERRI:   Objection.

9                    THE COURT:   Sustained as to the form of the

10   question.

11       Q.    Have there ever been times when your mother has

12   disciplined you for misbehaving?

13                   MR. PERRI:   Objection.

14                   THE COURT:   Overruled.

15       A.    Yes.

16       Q.    Could you tell us an example of how your mother

17   disciplined you?

18                   MR. PERRI:   Objection.

19                   THE COURT:   That was asked and answered

20       earlier, Mr. Zerner.

21                   MR. ZERNER:   I think this is when I was told

22       to move on, your Honor.   I'm trying to get back to that

23       line of questioning.

24                   THE COURT:   Sustained.   Next question.

25       Q.    Who is Tara Johnson?

M. Johnson - People - Cross                              881

1        A.   My aunt.

2        Q.   And is it fair to say that she lived with you at

3   301 Coventry Road North from as early as you can remember

4   until the end of 2015?

5        A.   Yes.

6        Q.   She's your mother's sister?

7        A.   Yes.

8        Q.   She's a nice lady?

9        A.   Yes.

10       Q.   And she helps you out with things?

11       A.   Yes.

12            THE COURT:  The answer was yes.  Next

13       question.

14       Q.   What were some of the things that Tara Johnson

15   would help you with?

16       A.   What do you mean?

17       Q.   I'll ask you this:  Were there times when you were

18   upset with your mother?  You described earlier, when

19   Mr. Perri was asking you questions, there were times when you

20   and your mother didn't get along.  Those times would you go

21   to Aunt Tara and talk to her?

22            MR. PERRI:  Objection.

23            THE COURT:  Overruled.

24       A.   No.

25       Q.   You never talked to your Aunt Tara when you and

M. Johnson - People - Cross                          882

1    your mother were not getting along?

2        A.   Yes.

3        Q.   And what were some of the things that she would

4    help you with?

5             MR. PERRI:   Objection, your Honor.

6             THE COURT:   No, overruled.

7        A.   She wouldn't really help me, she would just talk to

8    me.

9        Q.   And talking to you wasn't helpful?

10            MR. PERRI:   Objection.

11            THE COURT:   Sustained.

12       Q.   Were there times that you would talk to your father

13   when you were not getting along well with your mother?

14            MR. PERRI:   Objection.

15            THE COURT:   Overruled.

16       A.   No.

17       Q.   So when you weren't getting along with your mother,

18   who would you turn to to talk to, if anybody?

19            MR. PERRI:   Objection.

20            THE COURT:   Sustained.

21       Q.   You described earlier on that in August of 2014 you

22   and your mother were not getting along, correct?

23       A.   Yes.

24       Q.   And you said that your mother took away your cell

25   phone, right?

M. Johnson - People - Cross                    883

1        A.    Yes.

2        Q.    And you were sleeping with your cell phone under

3   your pillow?

4        A.    Yes.

5        Q.    Was it plugged in while you were sleeping with it

6   under your pillow?

7        A.    Yes.

8        Q.    Now, you described earlier on that the way the

9   layout was at 301 Coventry Road North, that you would sleep

10  downstairs along with your sister?

11       A.    Yes.

12       Q.    Or was it both sisters?

13       A.    My sister.

14       Q.    One sister or both sisters?

15       A.    One sister.

16       Q.    And your mother slept downstairs, right?

17       A.    Yes.

18       Q.    And sometimes you would keep late hours, right?

19       A.    What do you mean?

20       Q.    Well, we saw some of the text messages would be at

21  2:30 in the morning, 3:00 in the morning, right?

22       A.    Yes.

23       Q.    Is that fair to say?

24       A.    Yes.

25       Q.    You did that even when you had school the next

M. Johnson - People - Cross                884

1    morning?

2         A.    No.

3         Q.    You only did that on the weekends and holidays?

4         A.    Yeah.

5         Q.    You never made phone calls during the week?

6         A.    What do you mean?

7         Q.    Well, wouldn't you make late night phone calls or

8    late night text messages during the school week during the

9    school year?

10        A.    No.

11        Q.    But you slept with the phone underneath your

12   pillow, right?

13        A.    Yes.

14        Q.    Did your mother know that?

15        A.    Yes.

16        Q.    She knew you were sleeping with the phone under

17   your pillow?

18        A.    Yes.

19        Q.    Was she happy about that?

20             MR. PERRI:  Objection.

21             THE COURT:  Sustained.

22        Q.    Do you remember your mother's reaction when she

23   knew that you had a phone under your pillow?

24             MR. PERRI:  Objection.

25             THE COURT:  Sustained.

M. Johnson - People - Cross                    885

1        Q.    Did your mother have a cell phone in 2014?

2               MR. PERRI:   Objection.

3               THE COURT:   Overruled.

4        A.    Yes.

5        Q.    She did?

6        A.    Yes.

7        Q.    Who paid for that phone?

8               MR. PERRI:   Objection.

9               THE COURT:   Sustained.

10       Q.    Were there times when your mother's cell phone was

11   turned off?

12       A.    No.

13       Q.    You never remember your mother losing service on

14   her cell phone?

15       A.    Yes, she did.

16       Q.    You do remember that?  Yes?

17       A.    Yes.

18       Q.    And did she ever take your cell phone to use when

19   her cell phone was turned off?

20       A.    No.

21       Q.    She never did that?

22       A.    No.

23       Q.    She never borrowed your cell phone?

24       A.    No.

25       Q.    Did you ever offer to let her use your cell phone?

M. Johnson - People - Cross                      886

1       A.   No.

2       Q.   Was there a house phone at 301 Coventry Road North?

3       A.   No.

4       Q.   There was no phone, like a landline in the house,

5  right?

6       A.   No.

7       Q.   And there were many different people living there

8  and many of them had their own cell phones, right?

9       A.   Yes.

10      Q.   So like your big brother's 22 years old, he had his

11  own cell phone, right?

12      A.   Yes.

13      Q.   And your Aunt Tara had a phone, right?

14      A.   Yes.

15      Q.   And you had some cousins living there from time to

16  time, right?

17      A.   Yes.

18      Q.   And they had phones?

19      A.   Yes.

20      Q.   So your mother was okay with you having a phone

21  sometimes and other times she used it as a punishment,

22  correct?

23      A.   Yes.

24           MR. PERRI:   Objection.

25           THE COURT:   The witness answered the question.

M. Johnson - People - Cross                                887

1              Next question.

2         Q.    How many television sets were there at 301 Coventry

3    Road North?

4         A.    What do you mean?

5         Q.    How many television sets were in the structure, the

6    home that you have lived in your whole life?

7         A.    Throughout the whole house?

8         Q.    Yes, throughout the whole house.

9         A.    Six.

10        Q.    There are six televisions in the house right now?

11        A.    No.

12        Q.    How many are there right now?

13        A.    Four.

14        Q.    And how many of them are connected where they can

15   actually receive programming?

16              THE COURT:  Can you rephrase your question,

17        Mr. Zerner?

18              MR. ZERNER:  Yes, thank you, your Honor.

19        Q.    It's your testimony that right now at your home

20   there are four television sets, yes or no?

21        A.    Yes.

22        Q.    Of those four television sets, how many of them are

23   operating where you can look at and watch television shows?

24        A.    All of them.

25        Q.    All of them are receiving.  Is there cable TV or

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                888

1   satellite TV?

2        A.   Yes.

3        Q.   Which one is it, cable or satellite?

4             MR. PERRI:  Objection.

5             THE COURT:  If you know.

6        Q.   If you know.

7        A.   I don't know.

8        Q.   Now, in 2013 how many televisions were receiving

9   programming in that home?

10       A.   One.

11       Q.   One, right?

12       A.   Yes.

13       Q.   And that was physically located where?

14       A.   In Ray's room.

15       Q.   Well, when you say Ray's room, Ray and Aunt Tara

16   shared a home, correct?

17       A.   Yes.

18       Q.   And there was only one television that worked and

19   that was located in their room, correct?

20       A.   Yes.

21       Q.   Is it fair to say that many people that lived in

22   the house would watch TV in Ray and Tara's room, yes or no?

23       A.   Yes.

24       Q.   You like watching TV, right?

25       A.   Yes.

M. Johnson - People - Cross                    889

1        Q.    And your brother likes watching TV?

2        A.    No.

3        Q.    Your brother doesn't like to watch TV?

4        A.    Not in there.

5        Q.    Well, if there was only one TV in the house and he

6    wanted to watch TV, that was the only place he could go in

7    the house, correct?

8                    MR. PERRI:  Objection.

9                    THE COURT:  Overruled.

10       A.    At that time he didn't watch TV.

11       Q.    In 2013 your brother didn't watch TV, is that your

12   testimony?

13       A.    Yes.

14       Q.    Now, in 2013 did your little sister like to watch

15   TV?

16       A.    Yes.

17       Q.    And when she wanted to watch TV, there was only one

18   TV in the house, correct?

19       A.    Yes.

20       Q.    So she would watch TV in Aunt Tara's room?

21       A.    Yes.

22       Q.    How about your older sister, did she like to watch

23   TV in 2013?

24       A.    Yes.

25       Q.    And there would be times when she would watch TV in

M. Johnson - People - Cross                          890

1    Aunt Tara and Uncle Ray's room?

2        A.   Yes.

3        Q.   Did you call him Uncle Ray or Ray Ray?   How did you

4    refer to my client?

5        A.   Ray Ray.

6        Q.   You called him Ray Ray, right?

7        A.   Yes.

8        Q.   And Ray Ray would sometimes buy you ices?

9        A.   Yes.

10       Q.   And sometimes he would buy everybody ices, right?

11       A.   Yes.

12       Q.   And sometimes he would buy everyone ice cream,

13   right?

14       A.   Yes.

15       Q.   And sometimes he would buy everybody dinner, right?

16       A.   No.

17       Q.   You never saw Ray Ray buy everybody dinner?

18       A.   Not everybody.

19       Q.   You never saw that happen?

20            MR. PERRI:   Objection.

21            THE COURT:   Sustained.

22            Next question.

23       Q.   Did you ever see Aunt Tara buy everybody dinner?

24            MR. PERRI:   Objection.

25            THE COURT:   Who is everybody, Mr. Zerner?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                              891

```
 1                  MR. ZERNER:  I'll break that down.

 2        Q.   Did your Aunt Tara every buy you and your siblings

 3    dinner?

 4                  MR. PERRI:  Objection.

 5                  THE COURT:  Sustained as to Aunt Tara.  It's

 6        irrelevant.  Next question.

 7                  MR. ZERNER:  I'm sorry, Judge, I didn't catch

 8        that.

 9                  THE COURT:  Irrelevant, Aunt Tara, so next

10        question.

11        Q.   Did Ray Ross ever buy you and your siblings dinner?

12        A.   Yes.

13        Q.   Yes, right?

14        A.   Yes.

15        Q.   On more than one occasion, right?

16        A.   Yes.

17        Q.   So now you spoke on direct examination about trips

18    that you would take into Brooklyn, do you remember that?

19        A.   Yes.

20        Q.   And now you know that Ray Ross is divorced from

21    Paula Ross, correct?

22        A.   Yes.

23        Q.   So when you refer to Paula Ross, Paula Ross is his

24    ex-wife, not his wife, correct?

25        A.   Yes.
```

M. Johnson - People - Cross                                          892

1          Q.   And, in fact, Ray Ross has been in a relationship

2     with your Aunt Tara since before you were born, right?

3          A.   Yes.

4          Q.   Your whole life you will remember Ray and Tara

5     being in a relationship, right?

6          A.   Yes.

7          Q.   And so now Ray Ross still gets along with his

8     ex-wife Paula, right?

9          A.   Yes.

10         Q.   And you would see Paula on these trips to Brooklyn,

11    right?

12         A.   Yes.

13         Q.   And these trips to Brooklyn would generally be on

14    Saturdays, right?

15         A.   Yes.

16         Q.   And they would never be overnight trips, correct?

17         A.   No.

18         Q.   And, in fact, on Sundays Ray and Aunt Tara would go

19    to church, correct?

20              MR. PERRI:   Objection.

21              THE COURT:   Overruled.

22              If you know.

23         A.   Sometimes, yeah.

24         Q.   Well, sometimes you would go to church with them,

25    right?

M. Johnson - People - Cross                          893

```
 1        A.   With them?  Not with them.  With Aunt Tara, not
 2   with him.
 3        Q.   Well, Aunt Tara and Ray went to the same church,
 4   correct?
 5        A.   Yes.
 6        Q.   Do you know the name of the church?
 7        A.   No.
 8        Q.   But you have been there, right?
 9        A.   Yes.
10        Q.   So you are saying that sometimes you would
11   physically go to church, you and Aunt Tara, and then you
12   would see Ray at church?
13        A.   Yes.
14        Q.   That's what you are saying?
15        A.   Yes.
16        Q.   And if you know, approximately how many times a
17   month did Aunt Tara go to church?
18                  MR. PERRI:  Objection.
19                  THE COURT:  Sustained.
20        Q.   About how many times a month did Ray go to church?
21                  MR. PERRI:  Objection.
22                  THE COURT:  Sustained.
23        Q.   About how many times a month did you go to church?
24                  MR. PERRI:  Objection.
25                  THE COURT:  Sustained.
```

M. Johnson - People - Cross                    894

1         Q.    Now, on Saturdays when you would go to Brooklyn,

2    did your mother ever tell you in 2013 that she doesn't want

3    you to go to Brooklyn, in 2013?

4                    MR. PERRI:   Objection.

5                    THE COURT:   No, overruled.

6         A.    I don't remember.

7         Q.    In 2013 did you ever tell your mother I don't want

8    to go to Brooklyn, I want to stay home with you?

9         A.    No.

10        Q.    And when you went to Brooklyn, you would spend time

11   with Ray's children, correct?

12        A.    Yes.

13        Q.    And how many children does Ray have?

14        A.    Three.

15        Q.    And is it a son and two daughters?

16        A.    Yes.

17        Q.    And you got along with them, right?

18        A.    Yes.

19        Q.    You cared for them?

20        A.    Yes.

21        Q.    And they cared for you?

22        A.    Yes.

23        Q.    And, in fact, earlier on when Mr. Perri was showing

24   you the text messages from your second phone, it seemed like

25   the very first thing you asked for when you had a second

M. Johnson - People - Cross                                        895

1    phone was for the phone numbers for Justyn and Jasmyn and

2    Kelly Ross; is that correct?

3         A.   Yes.

4         Q.   So you cared for them, right?

5         A.   Yes.

6         Q.   And they cared for you?

7         A.   Yes.

8         Q.   And you would spend time with them in Brooklyn?

9         A.   Yes.

10        Q.   And Paula Ross would be there also, right?

11        A.   Yes.

12        Q.   Is it fair to say that Paula Ross would sometimes

13   style your hair?

14        A.   Yes.

15        Q.   And is it fair to say she would frequently style

16   your hair?

17                    MR. PERRI:  Objection.

18                    THE COURT:  No, overruled.

19        A.   Yes.

20        Q.   And that was important to you?

21        A.   Yes.

22        Q.   You were glad for Paula to do this for you?

23        A.   Yes.

24        Q.   Did your mother ever give you any money to give to

25   Paula to thank her for doing your hair?

M. Johnson - People - Cross                    896

1          A.    No.

2          Q.    Did you ever make her a card or make her a little

3     present to thank her for doing your hair?

4          A.    No.

5          Q.    But did you thank her verbally for doing your hair?

6          A.    Yes.

7          Q.    And you were glad for that, right?

8          A.    Yes.

9          Q.    If you had to pay for that, it would be expensive,

10    right?

11         A.    Yes.

12         Q.    And it was nice of Paula to do this for you?

13         A.    Yes.

14                    THE COURT:  Ladies and gentlemen, we're going

15         to take a break now.  We've been going for a good hour,

16         hour and 30 minutes.  The court reporter needs a break

17         and I'm sure everyone else needs a couple of minutes.

18         So, five minutes.  We'll call you right back because we

19         have a full day of testimony.

20                    (Whereupon, the jury exited the courtroom.)

21                    THE COURT:  Millinia, you can take a short

22         break, too.  Remember not to talk to anybody about your

23         testimony while you are on break, okay?

24                    THE WITNESS:  Okay.

25                    (Whereupon, the witness exited the courtroom.)

M. Johnson - People - Cross                              897

1                    THE COURT:  Five minutes.

2                    (A recess was taken.)

3                    (Whereupon, the witness and the jury entered

4         the courtroom.)

5                    THE CLERK:  Continued case on trial, People v.

6         Ray Ross.  All parties are present, as is the jury.

7         Ms. Johnson, you are still under oath.

8                    THE COURT:  Welcome back, ladies and

9         gentlemen.  I'm sure the court reporter thanks you for

10        the indulgence.

11                   Mr. Zerner, you may continue.

12                   MR. ZERNER:  Thank you, your Honor.

13   BY MR. ZERNER:

14        Q.   Ms. Johnson, today is not the first time you have

15   met with ADA Perri, correct?

16        A.   Yes.

17        Q.   It is the first time you have met with ADA Perri?

18        A.   No.

19        Q.   You have met him many times?

20        A.   Yes.

21        Q.   Do you remember the first time you met him?

22        A.   No.

23        Q.   Do you remember whether Mr. Perri was the first ADA

24   you have met or was there somebody before him?

25        A.   I don't know.

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                           898

1        Q.   You don't remember an ADA named Thurer that you met

2   with?

3        A.   No.

4        Q.   So Mr. Perri asked you some questions before about

5   the first time you came to the DA's office.  That would have

6   been in the fall of 2014?

7        A.   Yes.

8        Q.   Is that right?  You remember that?

9        A.   Yes.

10       Q.   And you came here with your mom?

11       A.   Yes.

12       Q.   And it wasn't in this building, but one of the

13   other buildings in this complex, right?

14       A.   Yes.

15       Q.   And you and your mom came here.  How did you get

16   here?

17            If you remember, did you take a bus, take a cab?

18       A.   I don't remember.

19       Q.   All right.  And you spoke to an ADA, but not

20   Mr. Perri that day, right?

21       A.   I don't know.

22       Q.   Now, did there come a point in time after that when

23   you met with anybody from the Nassau County Police

24   Department, including Detective Toussaint?

25       A.   I don't remember.

M. Johnson - People - Cross                 899

1          Q.    So Detective Toussaint might have been the first

2     Nassau County police official that you personally spoke with?

3          A.    Yes.

4          Q.    Now, the date that Detective Toussaint came to your

5     home, do you remember talking to your mother and her telling

6     you that somebody was going to come and talk with you, yes or

7     no?

8          A.    No.

9          Q.    You don't remember her telling you that?

10         A.    No.

11         Q.    And there came a point in time when you and your

12    mom were home and your mother said come outside with me?

13         A.    No.

14         Q.    Well, do you remember Detective Toussaint knocking

15    on your door?

16         A.    No.

17         Q.    Do you remember Detective Toussaint ringing the

18    bell at 301 Coventry Road North?

19         A.    No.

20         Q.    Do you remember if Detective Toussaint ever

21    actually entered your home?

22         A.    He never.

23         Q.    He never came in the house, right?

24         A.    No.

25         Q.    Do you remember why he didn't come in the house?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                    900

1          A.    No.

2          Q.    Is it fair to say your mother doesn't have a lot of

3     guests in the home?

4               MR. PERRI:   Objection.

5               THE COURT:   Sustained.

6          Q.    So there was some day when your mother told you

7     hey, come on outside with me; is that right?

8               MR. PERRI:   Objection.

9               THE COURT:   Sustained.

10         Q.    You remember there was a day in December of 2014

11    when you and your mom spoke with Detective Toussaint in his

12    car, right?

13         A.    Yes.

14         Q.    And do you remember whether that car was a marked

15    police car or an unmarked police car?

16         A.    I don't remember.

17         Q.    But you do remember talking with him in his car?

18         A.    Yes.

19         Q.    Do you remember whether it was light out or dark

20    out?

21         A.    It was dark out.

22         Q.    It was dark out, right?

23         A.    Yes.

24         Q.    It was around December 10th and the sun goes down

25    pretty early that time of year, right?

M. Johnson - People - Cross                                     901

```
 1        A.   Yes.

 2        Q.   So you remember going into his car and you sat in

 3   the back, right?

 4        A.   Yes.

 5        Q.   Was it one of those police cars where, you know,

 6   you couldn't exit the vehicle because the doors didn't have

 7   handles on it?  Do you remember that?

 8        A.   No.

 9        Q.   Did it have a barrier between where you were

10   sitting in the back and the driver and the front passenger

11   compartment?

12        A.   I don't remember.

13        Q.   You don't remember.

14             But your mother sat in the front, right?

15        A.   Yes.

16        Q.   And Detective Toussaint was sitting in the driver's

17   seat?

18        A.   Yes.

19        Q.   Right.

20             And you were sitting in the back?

21        A.   Yes.

22        Q.   And did you speak with Detective Toussaint right

23   outside of your home?

24        A.   No.

25        Q.   Was there a driveway at your house?
```

M. Johnson - People - Cross                    902

1       A.    Yes.

2       Q.    And was there a car in the driveway?

3             MR. PERRI:   Objection.

4             THE COURT:   Sustained.

5       Q.    So, when you and your mother were in Detective

6   Toussaint's car, did he drive away from the front of your

7   house?

8       A.    Yes.

9       Q.    Do you remember why?

10      A.    No.

11      Q.    You don't remember your mother telling him that she

12  wanted to speak somewhere else?

13            MR. PERRI:   Objection.

14            THE COURT:   Overruled.

15      A.    Yes, I do.

16      Q.    I couldn't hear you.

17      A.    Yes, I do.   I remember that.

18      Q.    So you remember your mother telling Detective

19  Toussaint please drive away, I don't want the neighbors

20  knowing what's going on?

21            MR. PERRI:   Objection.

22            THE COURT:   Sustained.

23      Q.    What do you remember your mother telling Detective

24  Toussaint?

25            MR. PERRI:   Objection; hearsay.

1           THE COURT:   Overruled.

2      A.   Like can we drive, like can you drive up the block.

3      Q.   And he cooperated and drove up the block, right?

4      A.   Yes.

5      Q.   And you live very close to Hempstead Lake State

6   Park, right?

7      A.   Yes.

8      Q.   The street actually ends at the park, correct?

9      A.   Yes.

10      Q.   Did the detective speak with you inside the park?

11      A.   No.

12      Q.   Where did he drive to, if you remember?

13      A.   I don't remember.

14      Q.   Do you know the name of the elementary school that

15   you went to?

16      A.   Maurice W. Downing.

17      Q.   Do you know what street that is on?

18      A.   No.

19      Q.   Was it in the parking lot of that school that you

20   had this conversation with Detective Toussaint?

21      A.   No.

22      Q.   But it was in the parking lot of a different

23   school, correct?

24      A.   No.  Oh, wait.  Yes, yes, yes, actually.  Yes, it

25   was.

M. Johnson - People - Cross                                904

1      Q.   So you were in a dark parking lot, it was after

2  sundown on December 10th and there was first a conversation

3  between yourself, your mother and Detective Toussaint,

4  correct?

5      A.   Yes.

6      Q.   And the three of you spoke about Ray Ross?

7      A.   Yes.

8      Q.   And did it feel like it was important to your

9  mother to tell Detective Toussaint what was going on?

10              MR. PERRI:   Objection.

11              THE COURT:   Sustained.

12     Q.   At that point in time Ray Ross was no longer living

13  in your home, correct?

14     A.   Yes.

15     Q.   Yes, he was no longer living in your home, right?

16     A.   Yes.

17              THE COURT:   Correct.

18              MR. ZERNER:   Thank you, Judge.

19     Q.   So Tara was still living in the house at that

20  point, right?

21     A.   Yes.

22     Q.   And your grandmother was not living in the house,

23  right?

24     A.   No.

25     Q.   Now, did there come a point in time when the three

M. Johnson - People - Cross                    905

```
 1   of you were in the vehicle, it was Detective Toussaint, your

 2   mother and you, the three of you were talking and Detective

 3   Toussaint was taking notes?

 4        A.   I don't remember.

 5        Q.   You don't remember if he had kind of a pad where he

 6   was jotting down notes?

 7        A.   No.

 8        Q.   You don't remember?

 9        A.   I don't remember.

10        Q.   Maybe he was, maybe he wasn't?

11             MR. PERRI:   Objection.

12             THE COURT:   The witness said she doesn't

13   remember.   Next question.

14        Q.   So did there come a point in time when Detective

15   Toussaint asked your mother to leave the vehicle?

16        A.   Yes.

17        Q.   And do you remember what he said?

18        A.   He asked me if it would be better if my mom was not

19   in the car with us.

20        Q.   And what did you say?

21        A.   I said yes.

22        Q.   So you thought it was better to speak with

23   Detective Toussaint one on one?

24        A.   Yes.

25        Q.   And at that point in time you had the opportunity
```

M. Johnson - People - Cross                                    906

1    to tell Detective Toussaint anything and everything you

2    wanted to tell him, right?

3         A.   Yes.

4         Q.   And there was no time limit on how long you would

5    speak, right?

6         A.   No.

7         Q.   Did Detective Toussaint offer to take you back to

8    the precinct?

9         A.   Huh?

10        Q.   Did Detective Toussaint offer to take you back to

11   the police precinct that he was based out of?

12        A.   No.

13        Q.   Did Detective Toussaint offer to take you to a

14   coffee shop or a restaurant to have this conversation?

15        A.   No.

16        Q.   Where in the car was Detective Toussaint when it

17   was just you and him in the vehicle?

18        A.   In the driver's seat.

19        Q.   He was still in the driver's seat?

20        A.   Yes.

21        Q.   And did you move up into the front seat?

22        A.   Yes.

23        Q.   You moved up into the front seat?

24        A.   Yes.

25        Q.   Did he suggest you move into the front seat?

M. Johnson - People - Cross                    907

1          A.   Yes.

2          Q.   So he said come on up here?

3          A.   He said, I can't hear you back there.  Can you come

4     to the front seat?

5          Q.   Oh.  And you did come up to the front seat, right?

6          A.   Yes.

7          Q.   So then you sat where your mother had previously

8     been sitting?

9          A.   Yes.

10         Q.   Do you remember where your mother was as the two of

11    you were having this conversation?

12         A.   She was in the parking lot.

13         Q.   Was she close to the car or far from the car?

14         A.   She was kind of far.

15         Q.   She was kind of far?

16         A.   Yes.

17         Q.   So she couldn't hear you having a conversation in

18    the car with Detective Toussaint, right?

19         A.   Yes, she couldn't.

20         Q.   Right.  So you had the opportunity to tell

21    Detective Toussaint whatever you wanted to tell him at that

22    point in time and he was taking notes as you had this

23    conversation, right?

24         A.   Yes.

25         Q.   He had a pad at that point in time?

 1        A.   I don't remember.

 2        Q.   Well, he was writing things down, right?

 3              MR. PERRI:  Objection.

 4              THE COURT:  Sustained.  The witness said she

 5   doesn't remember.

 6        Q.   Do you remember how long you had this conversation

 7   with Detective Toussaint?

 8        A.   No.

 9        Q.   How did that conversation end?

10        A.   I don't remember.

11        Q.   Well, there came a point in time when your mother

12   got back into the vehicle, right?

13        A.   Yes.

14        Q.   Where did your mother sit?

15        A.   In the back seat.

16        Q.   So your mother got into the back seat and Detective

17   Toussaint drove you and your mother back to your home?

18        A.   Yes.

19        Q.   And later that evening he came back to the house?

20        A.   No.

21        Q.   Did there come a point in time when you were shown

22   a typed written document?

23        A.   Yes.

24        Q.   Was it later that night?

25        A.   No.

M. Johnson - People - Cross                    909

1        Q.    Was it the next day?

2        A.    I don't remember, but I know it was during that

3   time frame.   It was a different day, but I don't know if it

4   was the next day.

5        Q.    So later on Detective Toussaint came back with a

6   typed written document for you to look at?

7        A.    Yes.

8        Q.    And where did you look at this document?

9        A.    In the car.

10        Q.    Well, did he knock on the door to let you know that

11   he was back?

12        A.    No.

13        Q.    Did he ring the bell to tell you he was back?

14        A.    No.

15        Q.    How did you know Detective Toussaint had returned?

16        A.    My mom told me.

17        Q.    And did you exit the house and go with your mother

18   back to Detective Toussaint's car?

19        A.    Yes.

20        Q.    And did you sit in the car?

21        A.    Yes.

22        Q.    And was it dark out?

23        A.    No.

24        Q.    It wasn't dark out when he returned?

25        A.    No.

M. Johnson - People - Cross                910

1       Q.    And you are saying it was a different day?

2       A.    Yes.

3       Q.    And was your mother in the car also?

4       A.    Yes.

5       Q.    Did your mother read the one page statement that

6    Detective Toussaint had typed up?

7       A.    Yes.

8       Q.    Who read it first, you or your mother?

9       A.    I don't remember.

10      Q.    At some point in time you read that statement,

11   right?

12      A.    Yes.

13      Q.    And did Detective Toussaint say to you if there is

14   anything you want to correct, let me know?

15      A.    Yes.

16      Q.    And did he say to you if there is anything you want

17   to add, let me know?

18      A.    Yes.

19      Q.    And did you add or correct anything to that

20   statement?

21      A.    No.

22      Q.    And you had the opportunity to read it.  He wasn't

23   rushing you, was he?

24      A.    No.

25      Q.    But you didn't make any corrections or additions,

M. Johnson - People - Cross                                911

1    right?

2         A.    No.

3         Q.    And after you told Detective Toussaint that this

4    statement was what you wanted it to be, he told you to sign

5    it?

6         A.    Yes.

7         Q.    And who signed it first, you or your mom?

8         A.    I don't remember.

9         Q.    But both of you signed it, right?

10        A.    Yes.

11        Q.    Now, you told us earlier on that there were two

12   cell phones that were given from your mother to Detective

13   Toussaint, remember that?

14        A.    Yes.

15        Q.    Now, Detective Toussaint had you sign a form when

16   those phones were given to him, correct?

17        A.    Yes.

18        Q.    Who owned those phones?

19        A.    I did.

20        Q.    I'm sorry?

21        A.    I did.

22        Q.    You owned both of those phones?

23        A.    Yes.

24        Q.    Now, the first phone was actually given to you by

25   Ray Ross, right?

M. Johnson - People - Cross                    912

1        A.   Yes.

2        Q.   And then the phone was taken away from you by your

3    mother, right?

4        A.   Yes.

5        Q.   And then another phone was given to you by Ray

6    Ross, right?

7        A.   Yes.

8        Q.   Was that a bad thing when he gave you the second

9    phone?

10                  MR. PERRI:   Objection.

11                  THE COURT:   Sustained.

12       Q.   Were you happy to get a phone?

13       A.   Yes.

14       Q.   Had you, in fact, asked him to replace the previous

15   phone?

16       A.   No.

17       Q.   You didn't ask him to get another phone?

18       A.   No.

19       Q.   Now, in 2011 when you got your first phone, you

20   were one of the youngest kids in your grade to get a phone,

21   correct?

22                  MR. PERRI:   Objection.

23                  THE COURT:   Sustained.

24       Q.   But in 2014 when you didn't have a phone, most of

25   your friends actually had one, correct?

M. Johnson - People - Cross                913

1              MR. PERRI:  Objection.

2              THE COURT:  No, overruled.

3        A.   What was the question?

4        Q.   In 2014 you no longer had a cell phone, correct?

5        A.   Yes.

6        Q.   And most of your friends did have a cell phone,

7   correct?

8        A.   Yes.

9        Q.   There was no house phone at your home, correct?

10       A.   Yes.

11       Q.   So now there was no house phone and you had no cell

12  phone, so it was exceedingly difficult for you to communicate

13  with your friends, right?

14       A.   Yes.

15       Q.   Did you ever tell your mom I need a cell phone,

16  it's 2014, everybody has a cell phone?

17       A.   Yes.

18       Q.   And what did she say to you?

19              MR. PERRI:  Objection.

20              THE COURT:  Overruled.

21       A.   I don't remember.

22       Q.   Well, was she pleased when you asked her for a cell

23  phone?

24       A.   No.

25       Q.   Did she say yes, I'm going to get you a replacement

M. Johnson - People - Cross                          914

1   cell phone?

2        A.   I don't remember.

3        Q.   Did you ever speak to your father about your need

4   for a cell phone in 2014?

5        A.   No.

6        Q.   You never asked Rafael Mickens could you please get

7   me a cell phone?

8        A.   No.

9        Q.   How about his brother George who had gotten you the

10  first cell phone?  When you were without a cell phone in late

11  2014, did you ever call your Uncle George and say, Uncle

12  George, please get me a cell phone?

13              MR. PERRI:  Objection.

14              THE COURT:  Sustained.

15       Q.   You told us earlier on sometimes you would

16  baby-sit, right?

17       A.   Yes.

18       Q.   Did you ever get paid to baby-sit?

19       A.   Yes.

20       Q.   Do you ever do other -- do you have a job in any

21  way, shape or form to earn a little money, spending money?

22       A.   Besides baby-sitting?

23       Q.   Baby-sitting is one thing.

24            How much do you charge to baby-sit per hour?

25              MR. PERRI:  Objection.

M. Johnson - People - Cross                                   915

```
 1                    THE COURT:  Sustained.

 2         Q.    You get paid to baby-sit, right?

 3         A.    Yes.

 4         Q.    Aside from baby-sitting, what else do you do to

 5   make money?

 6         A.    That's it.

 7         Q.    Did you ever say to your mother, mom, please I'll

 8   pay for the cell phone out of my baby-sitting money if you

 9   will allow me to replace the cell phone?

10                    MR. PERRI:  Objection.

11                    THE COURT:  Sustained.

12         Q.    After Ray Ross moved out of the house, was there a

13   TV in the house?

14         A.    Yes.

15         Q.    There was a TV in the house?

16         A.    Yes.

17         Q.    One TV in Aunt Tara's room?

18         A.    No.

19         Q.    No?

20         A.    No.

21         Q.    Where was the TV after that point?

22         A.    My brother had a TV.

23         Q.    Your brother got a TV after Ray Ross moved out?

24         A.    And I had a TV.

25         Q.    You got a TV?
```

M. Johnson - People - Cross                    916

```
 1        A.   Yeah.

 2        Q.   At the end of 2014?

 3        A.   Yes.

 4        Q.   Where did you get a TV?

 5             MR. PERRI:  Objection.

 6             THE COURT:  Overruled.

 7        Q.   Please answer the question.

 8             MR. ZERNER:  I'm sorry, your Honor, if she can

 9        be directed to answer the question.

10        A.   My mom got it.

11        Q.   Your mom bought you a TV after she took the phone

12   away from you?

13        A.   No.

14        Q.   When did your mom get you a TV?

15        A.   She didn't get it just for me.

16        Q.   Well, tell us what month and what year your mother

17   got a TV.

18        A.   I don't remember.

19        Q.   Did your mom also get a provider, whether it was

20   Cable, satellite so the TV could be watched?

21             MR. PERRI:  Objection.

22             THE COURT:  Sustained.

23        Q.   Was the TV located on the lower level of 301

24   Coventry Road North?

25        A.   Yes.
```

M. Johnson - People - Cross                917

1    Q.    Were you glad to get a TV?

2    A.    Yes.

3    Q.    Did you watch a lot of TV?

4    A.    Yes.

5    Q.    Did your sister watch TV, your younger sister?

6    A.    Yes.

7    Q.    Did your older sister watch TV?

8    A.    Yes.

9    Q.    And you said your brother now was watching TV?

10   A.    Yes.

11   Q.    Earlier on when you said your brother didn't watch

12   TV, sometimes he likes to watch TV?

13   A.    He had a laptop, so he didn't need a TV.

14         THE COURT:  Did the jury get to hear the

15   answer of the witness?

16         (Whereupon, the sworn jury answered in the

17   affirmative.)

18   Q.    So it's fair to say that there was no objection to

19   watching entertainment in the house, it was just a question

20   of whether people watched on a TV or a laptop or an iPad; is

21   that fair to say, Ms. Johnson?

22         MR. PERRI:  Objection.

23         THE COURT:  Sustained.

24         Next question.

25   Q.    So now you told us that you spoke with Detective

M. Johnson - People - Cross                           918

1    Toussaint at the end of 2014 and then there came a point in

2    time when you had a conversation with ADA Perri, remember

3    that, the first time you spoke with ADA Perri?

4         A.   Yes.

5         Q.   Did he come to the house?

6         A.   No.

7         Q.   Did he have you come to the DA's office?

8         A.   Yes.

9         Q.   Do you remember how you got to the DA's office?

10        A.   No.

11        Q.   You don't remember a cab coming picking you up and

12   bringing you to the DA's office?

13        A.   No.

14        Q.   When you first came to the DA's office, did you

15   come by yourself or with your mom?

16        A.   My mom.

17        Q.   Was it just you and your mom?

18        A.   Yes.

19        Q.   Do you remember what month and year that was?

20        A.   No.

21        Q.   You don't remember?

22        A.   No.

23        Q.   All right.

24             Now, there came a point in time when you went to

25   ADA Perri's office, right?

M. Johnson - People - Cross                        919

1      A.   Yes.

2      Q.   And you had a conversation about how it would work

3  when you testified in the grand jury?

4      A.   Yes.

5      Q.   And he described everything to you?

6      A.   Yes.

7      Q.   You had never testified in the grand jury before

8  that day, right?

9      A.   No.

10     Q.   And he prepared you for that, right?

11     A.   Yes.

12     Q.   And he showed you the empty grand jury room?

13     A.   Yes.

14     Q.   He showed you around.  He told you you are going to

15  sit here and there will be a court reporter over there and

16  there will be about 23 people in the room?

17     A.   Yes.

18     Q.   He told you all that, right?

19     A.   Yes.

20     Q.   And he told you that there would be no Judge in the

21  room, right?

22              MR. PERRI:  Objection.

23              THE COURT:  Sustained.

24     Q.   And he told you that you could go into the grand

25  jury room with Kara, right?

M. Johnson - People - Cross                    920

1                    MR. PERRI:  Objection.

2                    THE COURT:  Sustained.

3      Q.   Well, did you go into the grand jury room just with

4  Mr. Perri or was somebody else with you?

5                    MR. PERRI:  Objection.

6                    THE COURT:  Sustained on this line of

7          questioning, Mr. Zerner.

8                    MR. ZERNER:  That's fine, Judge, I'll move on

9          and just note my exception.

10                    THE COURT:  Thank you.

11     Q.   So now, Ms. Johnson, before you testified in the

12  grand jury, Mr. Perri prepared you about what kinds of

13  questions he planned to ask, right?

14     A.   Yes.

15     Q.   And your mother was not in the room with you,

16  right?

17     A.   Yes.

18     Q.   But your mother also testified in the grand jury

19  that day, right?

20                    MR. PERRI:  Objection.

21                    THE COURT:  Sustained.

22     Q.   Did your mother tell you that it was important when

23  you testified in the grand jury?

24                    MR. PERRI:  Objection.

25                    THE COURT:  Sustained.

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                                921

1         Q.   Did it feel like it was important to your mother

2    when you went to testify in the grand jury, yes or no?

3                   MR. PERRI:   Objection.

4                   THE COURT:   Sustained.

5         Q.   Now, you described earlier that in August of 2014

6    you and your mother were not getting along well, right?

7         A.   Yes.

8         Q.   And were you not getting along in July of 2014, yes

9    or no?

10        A.   Yes -- no.

11        Q.   So in July of 2014 you were getting along okay?

12        A.   No, I wasn't.

13        Q.   So in July of 2014 you and your mother were

14   fighting?

15        A.   Yes.

16        Q.   So before she had any knowledge of any cell phone,

17   what were the two of you arguing about?

18        A.   What do you mean?

19        Q.   You told us that you and your mother weren't

20   getting along, correct?

21        A.   Yes.

22        Q.   What was the substance of the conflict between you

23   and your mother?

24        A.   Sometimes it was over little things like having to

25   clean up all the time and like, I don't know, like I just got

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                        922

1    really mad at everything.  Like my temper was really short.

2    I had a short temper.

3         Q.   So you're saying that you, personally had a strong

4    temper?

5         A.   Yeah.

6         Q.   Do you ever feel you got that strong temper from

7    your mom?

8                    MR. PERRI:  Objection.

9                    THE COURT:  Sustained.

10                    I'm sorry, was your answer that you had a

11         short temper or a strong temper?

12                    THE WITNESS:  Short.

13                    THE COURT:  Short temper?

14                    THE WITNESS:  Yes.

15                    THE COURT:  Did you say in your answer that

16         you had a strong temper?

17                    THE WITNESS:  No.

18                    MR. ZERNER:  My mistake, Judge.

19                    THE COURT:  That's all right.

20         Q.   Ms. Johnson, so is it fair to say that when you

21    exhibited your short temper, your mother was displeased by

22    that?

23         A.   Yes.

24         Q.   Did your mother ever say to you I'm the mother,

25    you're the child?

M. Johnson - People - Cross                              923

1        A.    Yes.

2        Q.    She would say that a lot?

3        A.    Yes.

4        Q.    Did she ever say do as I say, not as I do?

5              MR. PERRI:   Objection.

6              THE COURT:   Sustained.

7        Q.    So when you exhibited your short temper, what type

8   of punishment would your mother give you?

9              MR. PERRI:   Objection.

10             THE COURT:   Sustained.

11       Q.    Would your mother punish you for exhibiting a short

12  temper, yes or no?

13             MR. PERRI:   Objection.

14             THE COURT:   Sustained.

15       Q.    So you and your mother were already not getting

16  along well in July of 2014 and then she discovered that you

17  were sleeping with a cell phone under your pillow; is that

18  fair to say?

19       A.    I always slept with my phone in my pillow.

20       Q.    You always slept with the phone under the pillow

21  until one morning you woke up and the phone was gone,

22  correct?

23       A.    Yes.

24       Q.    Is it fair to say the moment you would wake up you

25  would grab for this cell phone and check the cell phone?

M. Johnson - People - Cross                                    924

```
 1          A.   Yes.

 2          Q.   And then one morning you woke up and you grabbed

 3     and there was no cell phone, right?

 4          A.   Yes.

 5          Q.   Was the charger still there?

 6          A.   Yes.

 7          Q.   So you grabbed the charger and there was nothing on

 8     the end of it, right?

 9          A.   Yes.

10          Q.   So what was the first thing you did when you

11     discovered that your cell phone was gone?

12          A.   I started looking for it.

13          Q.   So you looked around for it.

14          A.   Yes.

15          Q.   Do you remember what time of day that was when you

16     discovered the phone was gone?

17          A.   In the morning.

18          Q.   Was it early in the morning, like before sunrise?

19          A.   No.

20          Q.   So when you woke up was your mother still asleep on

21     that same level of the house?

22          A.   She was gone.

23          Q.   She was on your cell phone?

24               THE COURT:  No, she was gone.

25          Q.   I thought you said on.
```

M. Johnson - People - Cross                              925

```
 1              So you woke up and your mother was gone?

 2        A.    Yes.

 3        Q.    So you searched the house for your cell phone?

 4        A.    Yes.

 5        Q.    Is it fair to say this was the most important thing

 6   in the world to you?

 7        A.    Yes.

 8        Q.    Is it fair to say you figuratively turned the house

 9   upside down looking for the phone?

10        A.    Yes.

11        Q.    Was there anybody else in the house when you were

12   looking for the phone?

13        A.    Yes.

14        Q.    Who else was in the house?

15        A.    My sister.

16        Q.    Your older sister?

17        A.    Yeah.

18        Q.    Does your older sister have a cell phone?

19        A.    Yes.

20        Q.    Did you ever say to your older sister please call

21   my cell phone so we can maybe hear it buzzing so we can find

22   it?

23        A.    Yes.

24        Q.    You did that?

25        A.    Yes.
```

M. Johnson - People - Cross                          926

1        Q.   And the phone wasn't found, right?

2        A.   No.

3        Q.   Did anybody answer the phone when you called that

4   phone?

5        A.   No.

6        Q.   Do you know where your mother was when you woke up

7   and she was gone and your cell phone was gone?

8        A.   No.

9        Q.   Do you remember what time she came home?

10       A.   It was early afternoon.

11       Q.   When she came home early afternoon, what was the

12   first thing you asked her?

13       A.   If she saw my phone.

14       Q.   So when she walked into the house, did she say to

15   you I've got your phone or did you ask her hey, do you know

16   where my phone is?

17       A.   I asked her.

18       Q.   Okay.

19            Now, up to that point, to the best of your

20   knowledge, was your mother aware that you had a cell phone?

21       A.   Yes.

22       Q.   She knew you had a cell phone?

23       A.   Yes.

24       Q.   But you slept with it under your pillow?

25       A.   Yes.

M. Johnson - People - Cross                927

1        Q.    And she was already angry with you?

2        A.    Yes.

3        Q.    And she took your cell phone away from you?

4        A.    Yes.

5        Q.    What did you say to her?

6        A.    I asked her where it was.

7        Q.    And what did she say to you?

8        A.    She said she doesn't know where it is.

9        Q.    So she said she didn't know where it was?

10       A.    Yes.

11       Q.    Did you later find out that the truth was she had

12   taken your cell phone away?

13       A.    Yes.

14       Q.    Was there a point in time that you had a

15   confrontation with her about that?

16       A.    What do you mean?

17       Q.    Was there a point in time when the two of you

18   argued about this?

19       A.    No.

20       Q.    You never argued with your mother about your cell

21   phone?

22       A.    No.

23       Q.    You never demanded the cell phone be returned to

24   you?

25       A.    No.

M. Johnson - People - Cross                    928

1      Q.    You never begged for the cell phone to be returned

2   to you?

3      A.    No.

4      Q.    Did your mother ever tell you I'm keeping your cell

5   phone and you are never getting it back?

6      A.    No.

7      Q.    Tell us about the conversation that resulted in you

8   realizing you were not getting the cell phone back?

9      A.    It wasn't really a conversation.

10     Q.    What was it?

11     A.    It was just like you're not getting the cell phone

12  back and I just didn't continue with the talking.

13     Q.    It was clear to you that your mother had made a

14  decision you weren't getting the phone back?

15     A.    Yes.

16     Q.    And was it clear to you that arguing with her

17  wasn't going to get you the result you wanted?

18     A.    Yes.

19     Q.    Did you ask her would there be a time frame where

20  you would get the phone back?

21     A.    Yes.

22     Q.    Sometimes when your mother had punished you, she

23  would say you can't go out after school for a week; is that

24  fair to say?

25     A.    Yes.

M. Johnson - People - Cross                929

1      Q.   Sometimes there would be punishments that would

2   have a time frame on them?

3      A.   Yes.

4      Q.   Like maybe you would have to clear the dishes after

5   dinner every day for a month, right?

6      A.   Yes.

7      Q.   Did you ask your mother is there a time frame when

8   I can get this phone back, yes or no?

9                MR. PERRI:   Objection.

10                THE COURT:   Overruled.

11                You can answer it.

12      A.   No.

13      Q.   You never asked her and she never told you an

14   amount of time?

15      A.   No.

16      Q.   So you accepted that you weren't getting that phone

17   back ever?

18      A.   Yes.

19                THE COURT:   Sustained.

20                Next question.

21      Q.   Did you ever express to anybody in that household

22   your desire to get a phone?

23                MR. PERRI:   Objection.

24                THE COURT:   Sustained as to --

25                MR. ZERNER:   I'll rephrase it.

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                                   930

1      Q.   Did you ever say to your Aunt Tara, Aunt Tara, it's

2   embarrassing, I'm almost 14 years old, I need a replacement

3   cell phone, yes or no?

4             MR. PERRI:  Objection.

5             THE COURT:  Overruled.

6             You can answer.

7      A.   No.

8      Q.   Did you ever say to Ray, Ray please, I need a cell

9   phone, would you please get me a new cell phone?

10     A.   No.

11     Q.   You never asked him for a new cell phone?

12            MR. PERRI:  Objection.

13            THE COURT:  Sustained.

14     Q.   And you never asked your Uncle George or your dad,

15   Raefie Mickens, right?

16            MR. PERRI:  Objection.

17            THE COURT:  Sustained.

18     Q.   But there did come a point in time when a new cell

19   phone literally found its way into your possession, right?

20            THE COURT:  Sustained as to the form of the

21       question.

22            MR. ZERNER:  I'll rephrase it.

23     Q.   What day did you get the replacement cell phone?

24     A.   I don't remember.

25     Q.   You don't remember the exact day?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                    931

1        A.   No.

2        Q.   It was after the school year started, right?

3        A.   Yes.

4        Q.   Is it fair to say it was in early October of 2014?

5        A.   Yes.

6        Q.   And do you remember who gave you the cell phone?

7        A.   Yes.

8        Q.   Who gave you the cell phone?

9        A.   Ray.

10       Q.   You never asked for the cell phone, but he just

11  gave you the cell phone?

12       A.   Yes.

13       Q.   Were you glad that you got the replacement cell

14  phone?

15       A.   Yes.

16       Q.   It had the same phone number, right?

17       A.   Yes.

18       Q.   And now you were able to text with your friends?

19       A.   Yes.

20       Q.   And you were able to text with your family members?

21       A.   Yes.

22       Q.   Not with your mother though, right?

23       A.   No.

24       Q.   You knew that if your mother found out that you had

25  a cell phone, there was going to be trouble, correct?

M. Johnson - People - Cross                      932

1          A.    Yes.

2          Q.    You were already in trouble in July and then she

3    took the phone away in August and it was clear to you you

4    weren't getting a replacement cell phone, but you got one in

5    early October, right?

6          A.    Yes.

7          Q.    And it was very important that your mother, Sarita

8    Johnson, not find out you had a new cell phone, right?

9          A.    Yes.

10         Q.    Where did you sleep with the new cell phone?

11               THE COURT:  Where was the new phone when you

12         were sleeping?

13               MR. ZERNER:  Thank you, Judge.

14               THE WITNESS:  I would hide it.

15         Q.    I'm sorry, I didn't hear under the circumstances.

16         A.    I would hide it.

17         Q.    Where would you hide it?

18         A.    Sometimes in a little bin.  Like I had a little

19    bin, so I hid it in there.

20         Q.    What else was in the little bin?

21         A.    My stuff.

22         Q.    Was it clothing, books, toys?

23         A.    Like my lotion.

24         Q.    Toiletries?

25         A.    Yeah.

M. Johnson - People - Cross                    933

1        Q.    So you would keep lotion and you would keep your

2   cell phone?

3        A.    Yes.

4        Q.    Would you keep it off or on vibrate?

5        A.    Off.

6        Q.    And physically where was this bin located?

7        A.    Near my bed.

8        Q.    And how far was that bin from your mother's bed?

9        A.    Pretty far.

10        Q.    Well, your mother described that there were three

11   different beds in the lower level of the house.  Is that

12   accurate?

13        A.    Yes.

14        Q.    You shared one bed with your older sister?

15        A.    Yes.

16        Q.    And then your mother had a separate bed?

17        A.    Yes.

18        Q.    And your little sister had a separate bed?

19        A.    Yes.

20        Q.    But the three beds were pretty close to each other

21   in the lower level of the house?

22        A.    Yes.

23        Q.    Was there any privacy separating one bed from the

24   other?

25        A.    No.

M. Johnson - People - Cross                                  934

1          Q.   So if that cell phone -- withdrawn.

2               When the cell phone was in the bin, was it off or

3    was it on vibrate?

4                    MR. PERRI:  Objection.

5                    THE COURT:  Asked and answered.

6                    MR. ZERNER:  I'm sorry.

7                    THE COURT:  Earlier she said off.

8                    MR. ZERNER:  Thank you, Judge.

9                    THE COURT:  That's the testimony I recollect.

10         Q.   So school was in session in October of 2014, right?

11         A.   Yes.

12         Q.   Regular time of the school year, correct?

13         A.   Yes.

14         Q.   And are there any rules at your school?  I know you

15   are at a different school now.  Were there any rules at the

16   school you were attending in October 2014 about kids having

17   cell phones with them at school?

18                   MR. PERRI:  Objection.

19                   THE COURT:  Sustained.

20         Q.   Did you bring the cell phone with you to school on

21   a regular basis?

22         A.   Yes.

23         Q.   So when you would leave the house --

24                   THE COURT:  Was that a yes?

25                   THE WITNESS:  Yes.

M. Johnson - People - Cross                    935

1      Q.    When you would leave the house, you would put the

2  cell phone in your book bag?

3      A.    Yes.

4      Q.    And would you then power it on?

5      A.    Yes.

6      Q.    And how far away was the bus stop from your home?

7      A.    Up the block.

8      Q.    So is it fair to say less than a full block away?

9      A.    No.

10     Q.    More than a full block away?

11     A.    Yeah.  It was like two blocks.

12     Q.    Two blocks away?

13     A.    Yeah.

14     Q.    Do you know how far?

15            THE COURT:  I'm sorry, the bus stop was on

16  Coventry Road?

17            THE WITNESS:  On Woodfield.

18            THE COURT:  On Woodfield?

19            THE WITNESS:  Yes.

20            THE COURT:  Next question.

21     Q.    And you needed to take the bus to school because it

22  was far.  Too far to walk, correct?

23     A.    Yes.

24     Q.    Is it accurate to say that your school was almost

25  two miles away from your home?

M. Johnson - People - Cross                    936

1        A.    Like a mile.

2        Q.    You say a mile.  If your mom said one point eight

3   miles, she would be wrong?

4              MR. PERRI:  Objection.

5              THE COURT:  Sustained.

6        Q.    So would you sometimes walk to school?

7        A.    Yes.

8        Q.    On a weekly basis, how many days a week would you

9   walk to school?

10             MR. PERRI:  Objection.

11             THE COURT:  You can answer it.  Overruled.

12       A.    Like now?

13       Q.    In October of 2014, in a five day school week, how

14  many times would you walk to school out of the five days?

15       A.    Three days.

16       Q.    So you would walk to school about three out of five

17  days a week?

18       A.    Yes.

19       Q.    So it wasn't that far, you could walk to school,

20  right?

21             MR. PERRI:  Objection.

22             THE COURT:  Sustained.

23       Q.    And in October of 2014 the weather was fairly

24  decent, correct?

25             MR. PERRI:  Objection.

M. Johnson - People - Cross                    937

1              THE COURT:  Sustained.

2         Q.   So now there was a morning in October of 2014 when

3    you missed the bus, right?

4         A.   Yes.

5         Q.   And that day you didn't want to walk to school?

6         A.   No.

7         Q.   Do you remember why?

8         A.   It was a far walk.

9         Q.   But you would walk it three out of five days a week

10   you just said.

11        A.   Because I had to.

12              MR. PERRI:  Objection.

13              THE COURT:  Overruled.

14        A.   Because I had to.

15        Q.   I'm sorry, because you had to?

16        A.   Yes.

17        Q.   So the day in question you called your home number,

18   correct?

19        A.   What do you mean?

20        Q.   You used your cell phone -- withdrawn.

21              When you missed the bus on the day in question in

22   October of 2014, who did you call?

23        A.   My mom.

24        Q.   And your mom had a cell phone at that point in

25   time?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                     938

1          A.    Yes.

2          Q.    And you had programmed your mom's cell phone number

3     into your new cell phone?

4          A.    Yes.

5          Q.    And was it listed under mom?

6          A.    No.

7          Q.    Who was it listed under?

8          A.    It was just a phone number.

9          Q.    So you knew your mom's phone number, correct?

10         A.    Yes.

11         Q.    And you called your mom's cell phone number, right?

12         A.    Yes.

13         Q.    And she picked up the phone?

14         A.    Yes.

15         Q.    And what's the first thing you remember her saying

16    to you when she picked up that phone?

17         A.    She said, Who is this?

18         Q.    And what did you say?

19         A.    I said, It's me.

20         Q.    You said, It's me.

21               What did she say?

22         A.    She said, Come home.

23         Q.    To the best of your knowledge, did she understand

24    that "me"?   I understand she has four kids, three of them

25    girls.   Do you think that she knew "me" meant Millinia

1    Johnson?

2                    MR. PERRI:  Objection.

3                    THE COURT:  Overruled.

4                    Did she know it was you?

5                    THE WITNESS:  Yes.

6        Q.    So you did go home, right?

7        A.    Yes.

8        Q.    And what happened when you got home?

9        A.    She told me to give her the phone.

10       Q.    How did she ask for the phone?

11       A.    She said, Where is the phone?  And then she said,

12   Give it to me.

13       Q.    Could you tell us, tell the jury the way your

14   mother said give me the phone?

15       A.    It was kind of demanding.

16       Q.    It was kind of demanding?

17       A.    Yes.

18       Q.    Did she raise her voice?

19       A.    A little, yeah.

20       Q.    She made it clear that you were going to give her

21   that phone?

22       A.    Yes.

23       Q.    Did she express any displeasure that you had lied

24   to her?

25                    MR. PERRI:  Objection.

M. Johnson - People - Cross                          940

1            THE COURT:  Sustained as to the form of the

2       question.

3       Q.   You knew that your mother said you could not have a

4  cell phone, correct?

5       A.   Yes.

6       Q.   But you did have a cell phone, correct?

7       A.   Yes.

8       Q.   And you were caught red handed now, right?

9            MR. PERRI:  Objection.

10           THE COURT:  Sustained as to the

11      characterization.

12      Q.   There was no denying at this point in time that you

13 had violated her rule that you were not to have a cell phone,

14 correct?

15      A.   Yes.

16      Q.   And she punished you by taking that cell phone away

17 from you, correct?

18      A.   Yes.

19      Q.   And that's the point in time when you told your

20 mother this whole story about Ray Ross, correct?

21           MR. PERRI:  Objection.

22           THE COURT:  Overruled.

23      A.   Yes.

24      Q.   You were in trouble and now you told her something

25 else to take her mind away from you lying to her and

1    disobeying her about the cell phone, correct?

2                    MR. PERRI:  Objection.

3                    THE COURT:  Overruled.

4        A.    No.

5        Q.    What did you say?

6        A.    No.

7                    MR. ZERNER:  I don't know what she said.

8                    THE COURT:  No.  She said no.

9                    MR. PERRI:  Your Honor.

10       Q.    Well, this is the first time you ever told anybody

11   that anything was going on with Ray Ross, correct?

12       A.    No.  What do you mean?

13       Q.    The first time you ever told anybody in the whole

14   wide world that Ray Ross had ever touched you was the same

15   day that your mother caught you with a cell phone you weren't

16   supposed to have, correct?

17       A.    Yes.

18       Q.    That was the day you did that, right?

19       A.    Yes.

20       Q.    You said earlier that on a scale of one to ten,

21   your mother was angry like a seven?

22       A.    Yes.

23       Q.    Was that day maybe she was a little bit angrier

24   than a seven, maybe closer to a nine or a ten?

25       A.    Yes.

M. Johnson - People - Cross                    942

1      Q.    She was very angry with you, correct?

2      A.    Yes.

3      Q.    It's not easy to deal with your mother when she's

4   angry, correct?

5                  MR. PERRI:  Objection.

6                  THE COURT:  Sustained.

7      Q.    Now, you told us earlier on that you met with ADA

8   Perri in the summer of 2015, right?

9      A.    Yes.

10     Q.    And then after that were there points in time when

11  you had conversations with him on the phone?

12     A.    No.

13     Q.    To the best of your knowledge, were there times

14  when your mother would tell you that she had had a

15  conversation with Mr. Perri and told you that we're going to

16  go meet with him or we're going to talk with him?  Do you

17  remember any of those things?

18     A.    Yes.

19     Q.    And that happened fairly often, correct?

20     A.    Yes.

21     Q.    And that happened throughout the end of 2015,

22  right?

23     A.    Yes.

24     Q.    And there were times that you came back to Mineola

25  to meet with Mr. Perri?

M. Johnson - People - Cross                           943

1       A.    Yes.

2       Q.    Right.

3             And there were times when Mr. Perri would send a

4   cab to come pick you up or a police car to come pick you up?

5       A.    A cab, yeah.

6       Q.    Right.

7             So the cab would come pick you up, right?

8       A.    Yes.

9       Q.    And there were points in time when your mother's

10  cell phone was turned off, right?

11      A.    Yes.

12      Q.    But Mr. Perri made sure the DA's office had it

13  turned back on, correct?

14      A.    Yes.

15      Q.    And there were points in time when you didn't have

16  clothing to wear to various Court meetings, correct?

17                  MR. PERRI:  Objection.

18                  THE COURT:  Sustained.

19      Q.    Were you ever given any clothing from the district

20  attorney's office or the police department?

21      A.    Yes.

22      Q.    You were.

23            So now there came a point in time when you used to

24  take these trips to Brooklyn with Ray Ross, right, that's

25  your testimony?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                    944

1      A.   Yes.

2      Q.   And they were never overnight trips, right?

3      A.   No.

4      Q.   And you would go there to get your hair done,

5  correct?

6      A.   Yes.

7      Q.   And you would have a meal when you were there?

8      A.   Yes.

9      Q.   Sometimes two meals?

10     A.   Yes.

11     Q.   And your mother wasn't paying for those meals,

12 right?

13     A.   No.

14     Q.   And were there some times when you would go as a

15 group with Ray and Paula and Jasmyn, Justyn and Kelly or a

16 combination of those people to a movie?

17     A.   Yes.

18     Q.   That happened more than once, right?

19     A.   Yes.

20     Q.   Sometimes you would go to the movies?

21     A.   Yes.

22     Q.   And Ray would pay for the movies?

23     A.   Yes.

24     Q.   And there were also points in time when you would

25 go to a museum as a whole group?

M. Johnson - People - Cross                          945

1        A.   No.

2        Q.   You never went to a museum with a whole group of

3   people in the Ross family?

4        A.   No.

5        Q.   Were there points in time when your Aunt Tara would

6   also come with you to Brooklyn?

7        A.   No.

8        Q.   You don't remember a single time when Aunt Tara

9   came to Brooklyn?

10       A.   No.

11       Q.   Aunt Tara works at a bank, right?

12       A.   Yes.

13       Q.   And Aunt Tara's bank is open on Saturdays?

14       A.   I don't know.

15       Q.   She works a partial day on Saturdays, if you know?

16            MR. PERRI:   Objection.

17            THE COURT:   Sustained.

18       Q.   Now, is it fair to say on some of these Saturdays

19   when you would go to Brooklyn, that sometimes your younger

20   sister would spend time with her father?

21            MR. PERRI:   Objection.

22       Q.   If you know.

23            THE COURT:   Sustained.

24       Q.   And is it fair to say that sometimes on the weekend

25   you would spend time with your father?

M. Johnson - People - Cross                    946

1      A.    No.

2            THE COURT:   In what time frame, sir?

3      Q.    Let's talk about through the calendar year of 2013.

4  Is it fair to say that some weekends you would spend time

5  with your father, Raefie Mickens?

6      A.    No.

7      Q.    You would never see your father, Raefie Mickens

8  through the entire calendar year of 2013, is that your

9  testimony?

10           MR. PERRI:   Objection.

11           THE COURT:   Sustained.

12     Q.    How about in 2012, were there times you would spend

13  weekend days with your father, Raefie Mickens?

14           MR. PERRI:   Objection.

15           THE COURT:   No, overruled.

16     A.    Yes.

17     Q.    So you would see him in 2012?

18     A.    Yes.

19     Q.    And in 2011 also?

20           MR. PERRI:   Objection.

21           THE COURT:   Sustained.

22     Q.    Was there a point in time when something changed

23  that you started seeing your father less after, let's say,

24  2012?

25           MR. PERRI:   Objection.

1          THE COURT:  Sustained.

2     Q.   Do you know what kind of relationship your mother

3  had with your father?

4          MR. PERRI:  Objection.

5          THE COURT:  Sustained.

6     Q.   Did you ever observe your mother's --

7          MR. PERRI:  Objection.

8          THE COURT:  Hold it, Mr. Perri.  Patience,

9     please.

10         MR. PERRI:  Yes, your Honor.

11         THE COURT:  Please finish your question.

12         MR. ZERNER:  Thank you so much, your Honor.

13    Q.   Did you ever observe your mother's relationship

14  with her sister, Aunt Tara?

15    A.   What do you mean?

16    Q.   You lived in the same house with your mother and

17  your aunt, right?

18    A.   Yes.

19    Q.   Did you ever notice the two of them talking with

20  each other?

21    A.   No.

22    Q.   They very rarely spoke with each other, right?

23    A.   Yes.

24    Q.   And were there ever times that you would observe

25  your mother having conversations with Sherman Roberts?

M. Johnson - People - Cross                                       948

1            MR. PERRI:  Objection.

2            THE COURT:  Sustained.

3       Q.   Did you ever see Sherman Roberts come to pick up

4   your little sister and spend time with her?

5            MR. PERRI:  Objection.

6            THE COURT:  Sustained.

7       Q.   Did you ever go clothes shopping with Paula Ross?

8       A.   No.

9       Q.   You never went clothes shopping with Paula Ross?

10      A.   I don't remember.

11      Q.   Did you ever go clothes shopping with Jasmine Ross?

12      A.   No.

13      Q.   Did you ever go clothes shopping with Kelly Ross?

14      A.   No.

15      Q.   Did you ever go clothes shopping with Sarita

16   Johnson?

17      A.   Yes.

18      Q.   You did go clothes shopping with your mother from

19   time to time?

20      A.   Yes.

21      Q.   When was the last time you did that?

22           THE COURT:  Sustained.

23      Q.   Did you ever go clothes shopping with your Aunt

24   Tara?

25      A.   No.

M. Johnson - People - Cross                      949

1       Q.    You have never gone clothes shopping with your Aunt

2   Tara?

3                   MR. PERRI:   Objection.

4                   THE COURT:   Sustained.

5       Q.    Now, you told us earlier that your mother made it

6   clear to you in August of 2014 that you were not to spend any

7   time with Ray Ross, right?

8       A.    Yes.

9       Q.    Nevertheless you still spent time with Ray Ross,

10  right?

11      A.    Yes.

12      Q.    You chose to spend time with him, correct?

13      A.    Yes.

14      Q.    And sometimes in the summertime Ray Ross would buy

15  all of the kids in the house ices, right?

16      A.    Yes.

17      Q.    And that was good, right?

18      A.    Yes.

19      Q.    You didn't want to be excluded when everyone else

20  got ices, right?

21                  MR. PERRI:   Objection.

22                  THE COURT:   Overruled.

23                  You are speaking of the year 2014, sir?

24      Q.    August of 2014.   We'll talk about the icies in

25  2014.

M. Johnson - People - Cross                    950

1            Do you remember August 2014 when your mother told

2    you not to spend time with Ray Ross?

3         A.   Yes.

4         Q.   You remember that, right?

5         A.   Yes.

6         Q.   But Ray Ross sometimes would buy a bunch of icies

7    for everybody, correct?

8         A.   Yes.

9         Q.   And you didn't want to be excluded from getting the

10   icies, right?

11        A.   No.

12        Q.   So you got icies, right?

13        A.   Yes.

14        Q.   Did you say thank you when you got the icies?

15        A.   Yes.

16        Q.   And Hempstead Lake State Park is within walking

17   distance of your house, right?

18        A.   Yes.

19        Q.   Is it fair to say you spent time there especially

20   in the summers?

21        A.   Yes.

22        Q.   You didn't go to any kind of day camp, right, so

23   you spent time at the park, right?

24        A.   No.  I mean yes.

25        Q.   So you spent time at the park with your friends and

M. Johnson - People - Cross                    951

```
 1    your cousins and your siblings, right?

 2         A.   Yes.

 3         Q.   And this was a good thing, right?

 4         A.   Yes.

 5         Q.   Your mother let you go to the park, right?

 6         A.   Yes.

 7         Q.   Is it fair to say that many people that lived on

 8    your block and in your neighborhood would go to Hempstead

 9    Lake State Park?

10         A.   Yes.

11         Q.   And sometimes Ray Ross would go to Hempstead Lake

12    State Park, right?

13         A.   What do you mean?

14         Q.   I mean sometimes Ray Ross would go to the park at

15    the end of your street, right?

16              THE COURT:  When, Mr. Zerner?

17         Q.   In August 2014.

18         A.   Often?

19         Q.   Were there times, even one time in August of 2014

20    when Ray Ross -- you would observe Ray Ross at the park at

21    the end of your street?

22         A.   Yes.

23         Q.   And you spent many days in Hempstead Lake State

24    Park in August of 2014, right?

25         A.   Yes.
```

M. Johnson - People - Cross                    952

1          Q.   So there might be times when you would cross paths,

2     right?

3                    MR. PERRI:  Objection.

4                    THE COURT:  No, overruled.

5          Q.   Please answer the question.

6                    THE COURT:  Hold it, Mr. Perri.

7          A.   No.

8          Q.   So it's your testimony you never crossed paths in

9     August of 2014 in Hempstead Lake State Park with Ray Ross?

10                   MR. PERRI:  Objection.

11                   THE COURT:  Overruled.

12         A.   Yes, we did.

13         Q.   And was that once or more than once?

14         A.   Once.

15         Q.   And on that one occasion he bought you icies along

16    with everybody else, right?

17         A.   No.

18         Q.   He didn't buy you icies?

19         A.   He only bought me an icy.

20         Q.   He only bought you icies?

21         A.   Yes.

22         Q.   And that was nice, right?

23         A.   Yes.

24         Q.   Did you notice him asking anybody else if they

25    wanted icies?

M. Johnson - People - Cross                                953

1      A.   No.

2      Q.   Was there an ice cream truck there?

3      A.   No.

4      Q.   Was there a guy selling ices out of a cooler?

5      A.   No.

6      Q.   Where did the ices come from?

7      A.   Ralph's.

8      Q.   Ralph's Ices is like a store, right?

9      A.   Yes.

10     Q.   And did Ray have ices for himself too?

11     A.   No.

12     Q.   So he bought you ices, right?

13     A.   Yes.

14     Q.   That was a good thing, right?

15     A.   Yes.

16     Q.   Did you tell your mother about it?

17     A.   No.

18     Q.   You hid that from your mother, right?

19     A.   Yes.

20     Q.   You didn't want her to find out, right?

21     A.   No.

22     Q.   Because she was already angry with you, right?

23     A.   Yes.

24     Q.   And she told you not to spend any time with Ray,

25   right?

M. Johnson - People - Cross                954

1       A.    Right.

2       Q.    And she wanted Ray to move out of the house, right?

3             MR. PERRI:  Objection.

4             THE COURT:  Sustained.

5       Q.    Did you ever hear her talking with Ray or Aunt Tara

6    about who should move out of the house?

7             MR. PERRI:  Objection; hearsay.

8             THE COURT:  Sustained.

9       Q.    So you still live in that house today, right?   In

10   2016 you still live at 301 Coventry Road North, right?

11      A.    Yes.

12      Q.    But Aunt Tara doesn't live there and Ray doesn't

13   live there anymore, right?

14      A.    No.

15      Q.    Who uses their room?

16      A.    No one.

17      Q.    No one uses their room?

18      A.    No.

19      Q.    The room is just empty?

20      A.    Yes.

21      Q.    Is it used for storage?

22      A.    No.

23      Q.    It's just an empty room sitting there?

24            MR. PERRI:  Objection.

25            THE COURT:  Sustained.  Asked and answered.

M. Johnson - People - Cross                    955

1        Q.    Now, you testified that National Wholesale

2   Liquidators is a store near your home?

3        A.    Yes.

4        Q.    Have you ever shopped in that store?

5        A.    Yes.

6        Q.    It's a big store, right?

7        A.    Yes.

8        Q.    Still open today, right?

9        A.    Yes.

10       Q.    And who have you gone shopping there with?

11             MR. PERRI:  Objection.

12             THE COURT:  Sustained.

13       Q.    So it's your testimony that -- withdrawn.

14             Is there a washing machine and a dryer in your home

15   at 301 Coventry Road North?

16             MR. PERRI:  Objection.

17             THE COURT:  No, overruled.

18       A.    No.

19       Q.    You testified earlier that you went to the

20   laundromat sometimes, right?

21       A.    Yes.

22       Q.    That was necessary to go clean the clothes, right?

23       A.    Yes.

24       Q.    And sometimes you would do the laundry for your own

25   clothes and sometimes for other people's clothes in the home?

M. Johnson - People - Cross                956

```
1                    MR. PERRI:  Objection.

2                    THE COURT:  Sustained.

3        Q.   Who would pay -- withdrawn.

4             The laundromat that you went to, you had to pay

5   with quarters, right?

6        A.   No.

7        Q.   How did you pay at the laundromat?

8                    MR. PERRI:  Objection.

9                    THE COURT:  Sustained.

10       Q.   What laundromat would you go to?

11                   MR. PERRI:  Objection.

12                   THE COURT:  Sustained.

13                   MR. ZERNER:  If People's 12 can be shown to

14       the witness, please?

15                   (Handed to witness.)

16       Q.   Please put the various parts of the phone together

17   and power it up.

18                   (Witness complied.)

19       A.   It's not turning on.

20                   THE COURT:  It's not turning on, okay.  Is the

21       battery in right?

22                   THE WITNESS:  Yeah.

23       A.   It's not turning on.

24       Q.   The phone won't turn on?

25       A.   No.
```

M. Johnson - People - Cross                              957

1              MR. ZERNER:  Just for the record, the witness

2      has attempted to power up People's 12 in evidence and it

3      was unable to be powered up.

4              THE COURT:  Correct.

5              MR. ZERNER:  Thank you, your Honor.

6              THE COURT:  So now, Mr. Zerner, this is

7      probably an appropriate time to break.  You are starting

8      a new line of questioning.  It's 4:30.

9              We have to break at 4:30, ladies and

10     gentlemen, due to union rules.  So please remember my

11     admonitions.  Don't speak with anyone about the case at

12     all.  Forget about it until tomorrow morning.  We're

13     going to try to get started 9:30 tomorrow morning, so

14     please be here ready to be called to come down to Court,

15     okay.  Have a good night.  We'll see you tomorrow.

16             (Whereupon, the jury exited the courtroom.)

17             THE COURT:  Okay, Millinia, you are free to go

18     for today.  Hold on, let me finish.  So don't talk about

19     your testimony at all with anyone, all right.  We'll see

20     you tomorrow morning.

21             THE WITNESS:  Okay.

22             THE COURT:  Good night.

23             (Whereupon, the witness exited the courtroom.)

24             THE COURT:  Counsel, anything for the record

25     before we break?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                    958

1          MR. ZERNER:  Nothing from the defense.  Thank

2     you, Judge.

3          MR. PERRI:  No, your Honor.

4          THE COURT:  We're adjourned until tomorrow

5     morning.

6          (Whereupon, the trial was adjourned to

7     February 18, 2016.)

8

9              *              *              *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
          COUNTY OF NASSAU :   PART 47
 2   --------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
             -against-                    Indictment No. 1050N/15
 4

 5   RAY ROSS,

 6                        DEFENDANT.
     --------------------------------------x
 7
                         Mineola, New York
 8                       February 18, 2016

 9

     B E F O R E:   HON. TERENCE P. MURPHY
10                  Acting Supreme Court Justice

11

12   A P P E A R A N C E S:

13
                (Same as previously noted)
14

15
                 TESTIMONY AT TRIAL
16

17
                 Kathi A. Fedden
18               Official Court Reporter

19
             *            *            *
20

21           THE CLERK:  Continued case on trial, People v.

22   Ray Ross.  The jury is not present.  All parties are

23   present.

24           THE COURT:  We're going to get started right

25   away, but I want to ask about the phone.  Any luck with
```

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                    960

1        the phone?

2               MR. PERRI:  Your Honor, I attempted with two

3        different charges that did work on the other phone that

4        did not work on this phone.  Defense counsel also

5        attempted this morning to charge the phone.  The

6        batteries are not interchangeable.  You can't put the

7        battery from one into the other.  The battery doesn't

8        heat up when you are feeling it.  I don't know anything

9        further.

10              THE COURT:  Mr. Zerner.

11              MR. ZERNER:  I did make an attempt, your

12       Honor, with the charger that I brought from my home and

13       it did not seem to have any impact on charging the

14       phone.

15              THE COURT:  I don't know what happened to it.

16       We'll move on from there.

17              MR. ZERNER:  Sure.

18              THE COURT:  Mr. Zerner, you are still in the

19       middle of cross-examination of Millinia Johnson.

20              MR. ZERNER:  I don't know if I'm on pace with

21       still being in the middle.

22              MR. PERRI:  I believe there is also an

23       application with respect to the indictment.

24              THE COURT:  I want to get the jury in.  We

25       don't have to deal with that now.

1              (Whereupon, the witness returned to the

2        witness stand.)

3                   COURT OFFICER:  Jury entering.

4                   (Whereupon, the jury entered the courtroom.)

5                   THE CLERK:  Let the record reflect the

6        presence of the jury.  All parties are present.

7                   Ms. Johnson, please be reminded you are still

8        under oath.

9                   THE WITNESS:  Okay.

10   M I L L I N I A   J O H N S O N, residing in the County of

11        Nassau, having been previously called as a witness on

12        behalf of the People, having been previously duly

13        sworn by the Clerk of the Court, was examined and

14        testified further as follows:

15                   THE COURT:  Good morning, ladies and gentlemen

16        of the jury.  We'll get started right away.

17                   Mr. Zerner.

18                   MR. ZERNER:  Thank you, your Honor.

19                   THE COURT:  Mr. Zerner, I just want to put one

20        thing on the record.

21                   Ladies and gentlemen, before we broke

22        yesterday there was an issue with the telephone as you

23        know.  Well, we've tried to get it started or activate

24        it.  It just didn't work, so we're going to move on,

25        okay.

1              MR. ZERNER:  May I?

2              THE COURT:  Yes, sir.

3    CROSS-EXAMINATION (Cont'd)

4    BY MR. ZERNER:

5         Q.   Good morning, Ms. Johnson.

6         A.   Good morning.

7         Q.   Ms. Johnson, you are still residing at 301 Coventry

8    Road North, right?

9         A.   Yes.

10        Q.   That's where you were between last time you

11   testified yesterday and today, right?

12        A.   Yes.

13        Q.   And your mother still lives there also, right?

14        A.   Yes.

15        Q.   And you saw your mother last night and this

16   morning, right?

17        A.   Yes.

18        Q.   Did you talk to her about your testimony here?

19        A.   No.

20        Q.   She didn't ask you how it went?

21        A.   No.

22        Q.   She didn't ask you do you have to go back today?

23        A.   No.

24        Q.   There was no conversation about your testimony?

25        A.   No.

M. Johnson - People - Cross                    963

```
 1        Q.   Do you know that she testified last week, right?

 2        A.   Yes.

 3        Q.   Did you ever talk to her about that?

 4        A.   No.

 5        Q.   You never were curious and said to her, how did it

 6   go?

 7             MR. PERRI:  Objection.

 8        A.   No.

 9             THE COURT:  Move on, Mr. Zerner.

10        Q.   Now, you were away last week, right?

11        A.   Yes.

12        Q.   You took a trip?

13        A.   Yes.

14        Q.   Where did you go?

15             MR. PERRI:  Objection.

16             THE COURT:  Sustained.

17        Q.   Now, do you play an instrument?

18        A.   Yes.

19        Q.   What instrument do you play?

20        A.   The clarinet.

21        Q.   Where have you been learning to play the clarinet?

22        A.   Malverne.

23             THE COURT:  I'm sorry?

24        Q.   Malverne High School?

25        A.   Yes.
```

M. Johnson - People - Cross                    964

1        Q.   And prior to Malverne High School you took clarinet

2    at your middle school?

3        A.   Yes.

4        Q.   Tell us the name of that middle school again.

5        A.   Howard T. Herber.

6        Q.   Was the clarinet provided for you by the school?

7        A.   Yes.

8        Q.   And was it provided free of charge?

9        A.   Yes.

10       Q.   There was no payment that needed to be made to the

11   school?

12       A.   No.

13       Q.   Did you have a clarinet at school and another one

14   at home?

15       A.   No.

16       Q.   Well, you had the opportunity to review text

17   messages between yourself and my client, right?

18       A.   Yes.

19       Q.   And some of those text messages are about the

20   clarinet, right?

21       A.   Yes.

22       Q.   And my client said that he's not paying for the

23   clarinet anymore, right?

24       A.   Yes.

25       Q.   Why would he have to pay for the clarinet if you

M. Johnson - People - Cross                965

1    were getting it for free at school?

2         A.   Well, we had to buy our own clarinet and I didn't

3    know that until my mom asked them if she can borrow a

4    clarinet from the school.

5         Q.   So when did your mom ask about borrowing a

6    clarinet?

7         A.   After I gave it back to Mr. Ross.

8         Q.   Well, the clarinet belonged to Mr. Ross, right?

9         A.   Yes.

10        Q.   And he was loaning it to you, right?

11        A.   Yes.

12        Q.   And then he moved out of the house at 301 Coventry

13   Road North, right?

14        A.   Yes.

15        Q.   And he took his clarinet with him, right?

16        A.   Yes.

17        Q.   So now do you recall what month and year your

18   mother asked for a clarinet to be provided by the school?

19        A.   No.

20        Q.   You don't remember?

21        A.   No.

22        Q.   Well, in October of 2014 Mr. Ross moved out of the

23   house, right?

24        A.   Yes.

25        Q.   And was there a gap in time when you didn't have a

1    clarinet to play?

2         A.   I don't remember.

3         Q.   Now, were there times that your Aunt Tara would go

4    to the school?

5         A.   What do you mean?

6         Q.   Were there times that Aunt Tara would go to your

7    school that you were attending, first Herber -- it's not

8    Herbert Hoover, it's Herbert T -- could you please tell me

9    the last name of the school?

10        A.   Howard T. Herber.

11        Q.   My apologies for confusing it with a president.

12             So Howard T. Herber school you attended and while

13   you were attending the school, did your Aunt Tara ever go to

14   the school to talk to your teachers?

15             MR. PERRI:   Objection.

16             THE COURT:   Sustained.

17        Q.   Was there ever a situation when you were attending

18   that school where a parent had to come to the school?

19             MR. PERRI:   Objection.

20             THE COURT:   Overruled.

21   A.   No.

22        Q.   There was never an occasion in three years of

23   attending that school that a parent was needed to come to the

24   school?

25        A.   No.

M. Johnson - People - Cross                    967

```
 1        Q.   And there was never a time when there were

 2   parent-teacher conferences?

 3        A.   Yes.

 4        Q.   And at parent-teacher conferences did sometimes

 5   your aunt attend the parent-teacher conferences?

 6        A.   No.

 7        Q.   Were there times that Mr. Ross attended the

 8   parent-teacher conferences?

 9        A.   Yes.

10        Q.   Were there times that your father, Rafael Mickens

11   attended the parent-teacher conferences?

12              MR. PERRI:   Objection.

13              THE COURT:   Sustained.

14        Q.   Now, you told us yesterday that there were times

15   when you and your mother had a bad relationship, right, those

16   were your words?

17        A.   Yes.

18        Q.   And you said that it was especially bad in August,

19   September, October of 2014?

20        A.   Yes.

21        Q.   And then it got even worse when she caught you with

22   the cell phone, right?

23        A.   Yes.

24        Q.   All right.  So that was October of 2014.

25              How has your relationship been with her since?
```

M. Johnson - People - Cross                    968

1              MR. PERRI:  Objection.

2              THE COURT:  No, overruled.

3      A.   All right.

4      Q.   It's been all right?

5      A.   Yes.

6      Q.   Has your father been in your life for the last

7  year-and-a-half?

8              MR. PERRI:  Objection.

9              THE COURT:  Sustained.

10     Q.   When was the last time you spoke with your father?

11             MR. PERRI:  Objection.

12             THE COURT:  Easy, Mr. Perri.

13             MR. PERRI:  Yes, your Honor.

14             THE COURT:  Sustained.

15     Q.   In August of 2014 your mother told you to not have

16  any contact with my client, Mr. Ross, right?

17     A.   Yes.

18     Q.   But you disobeyed her, right?

19     A.   Yes.

20     Q.   And it was clear that your mother would have

21  preferred Mr. Ross no longer living in the home, correct?

22     A.   Yes.

23             MR. PERRI:  Objection.

24             THE COURT:  Sustained as to the form of the

25      question.

1              Millinia, I'm just going to ask you to try and

2        speak into the microphone, okay.

3              THE WITNESS:  Okay.

4        Q.   Did you observe your mother's relationship with

5   Mr. Ross?

6        A.   What do you mean?

7        Q.   Did you see the two of them interact with each

8   other?

9        A.   No.

10       Q.   You never saw the two of them talk?

11       A.   No.

12       Q.   Did you ever see your Aunt Tara talk with your

13   mother?

14       A.   No.

15       Q.   Everybody lived together, but you never saw anybody

16   talking to each other?

17       A.   No.

18       Q.   Do you recall in the middle of October of 2014 when

19   my client, Mr. Ross moved out of the house, do you remember

20   your mother's reaction to that?

21       A.   No.

22       Q.   You don't remember her being pleased that Mr. Ross

23   moved out?

24              MR. PERRI:  Objection.

25              THE COURT:  Overruled.

M. Johnson - People - Cross                    970

1        A.   No.

2        Q.   Now, who owns the house, if you know, at 301

3   Coventry Road North?

4        A.   I don't know.

5        Q.   You don't know who owns the house?

6        A.   No.

7        Q.   You do know that your mother and your aunt grew up

8   in that house, right?

9        A.   Yes.

10       Q.   The room that Aunt Tara and Ray Ross shared, was

11  that the childhood room, if you know, of your Aunt Tara?

12       A.   No.

13       Q.   Do you know whose room that was when your mother

14  and aunt were kids, if you know?

15            MR. PERRI:   Objection.

16            THE COURT:   Sustained.

17       Q.   You told us yesterday about your 13th birthday

18  party, remember?

19       A.   Yes.

20       Q.   And the party was in your home?

21       A.   Yes.

22       Q.   And were any guests that were in that home

23  non-relatives?

24       A.   No.

25       Q.   You had no friends at your birthday party?

M. Johnson - People - Cross                    971

1                    MR. PERRI:  Objection.

2                    THE COURT:  Overruled.

3                    You can answer.

4        A.    No.

5        Q.    Why didn't you have any friends at your birthday

6    party?

7                    THE COURT:  Sustained.

8        Q.    You told us yesterday that you were in a talent

9    show in March of 2013 with a friend, right?

10       A.    Yes.

11       Q.    Did you invite that friend to your birthday party?

12                   MR. PERRI:  Objection.

13                   THE COURT:  Sustained.

14       Q.    Now, when we spoke yesterday you told us that when

15   you went on these trips to Brooklyn they were generally on

16   Saturdays, right?

17       A.    Yes.

18       Q.    And they were not overnight trips, right?

19       A.    No.

20       Q.    And it was your testimony that sometimes you were

21   aware of my client and your Aunt Tara attending church,

22   right?

23       A.    Yes.

24       Q.    Do you know the name of the church?

25                   THE COURT:  Sustained.

M. Johnson - People - Cross                                972

1          Q.   Had you ever attended not that church, a different

2     church, whether it was with Mr. Ross or your Aunt Tara or

3     anybody else?

4                    MR. PERRI:   Objection.

5                    THE COURT:   Sustained.

6          Q.   Now, aside from trips to Brooklyn, would you also

7     go on trips other places on Long Island with Mr. Ross and

8     your Aunt Tara?

9          A.   Yes.

10         Q.   Tell us where some of those trips were taken.

11         A.   Like to a fair.

12         Q.   Do you remember what town that fair was in?

13         A.   No.

14         Q.   Do you remember what month or what year it was?

15         A.   No.

16         Q.   So you went to the fair.  Did your mother accompany

17    you to the fair?

18         A.   No.

19         Q.   Did your mother ever go with you to places like a

20    fair or a museum?

21         A.   No.

22         Q.   Now, did you also go to the aquarium out in

23    Riverhead with your aunt and Ray Ross and some of the other

24    kids?

25         A.   Not with my aunt.

M. Johnson - People - Cross                973

1          Q.   So you went to the aquarium with your sister,

2    right?

3          A.   My sister?

4          Q.   Did your sister go to the aquarium with you?

5          A.   No.

6          Q.   Did Ray Ross' children go to the aquarium?

7          A.   Yes.

8          Q.   When you got to the aquarium, who paid for the

9    aquarium?

10         A.   Mr. Ross.

11         Q.   Your mother didn't give you money to pay your share

12   of the aquarium cost, right?

13         A.   No.

14         Q.   Mr. Ross treated you and his kids and sometimes his

15   ex-wife would come also?

16         A.   Yes.

17         Q.   And you liked Paula Ross, right?

18         A.   Yes.

19         Q.   She was nice to you, right?

20         A.   Yes.

21         Q.   She would sometimes do your hair?

22         A.   Yes.

23         Q.   More than sometimes, she would regularly do your

24   hair, right?

25              THE COURT:  Sustained.  Asked and answered.

M. Johnson - People - Cross                    974

1                    MR. PERRI:  Objection.

2          Q.  Mr. Ross has grandchildren also, right?

3          A.  Yes.

4          Q.  Do you know their names?

5          A.  Elijah and Silas.

6                    THE COURT:  Can you say those names out loud,

7          please.

8                    THE WITNESS:  Elijah and Silas.

9          Q.  And about how old were they when you were spending

10    time with them in 2014 or so?

11         A.  Like two and one was a baby.

12         Q.  And they would also go on some of these trips?

13         A.  Yes.

14         Q.  Sometimes they would accompany you guys to the

15    aquarium?

16         A.  Yes.

17         Q.  Or to the fair?

18         A.  Yes.

19         Q.  Were these two children -- were they cousins?

20    Withdrawn.

21              Who is their parent?

22                    MR. PERRI:  Objection.

23                    MR. ZERNER:  Just to clarify, your Honor.

24              THE COURT:  Overruled.

25              Do you know who their mom was or dad was?

M. Johnson - People - Cross                        975

1              THE WITNESS:  Kelly.

2      Q.    Kelly Ross?

3      A.    Yes.

4      Q.    And Kelly Ross is one of Ray Ross' daughters,

5  right?

6      A.    Yes.

7      Q.    So sometimes you would go on this family trip to a

8  place like an aquarium or a fair and it wouldn't be just you

9  and Ray, it would be you along with one or more of Ray's

10 children, one or more of Ray's grandchildren, correct?

11     A.    Yes.

12     Q.    And you liked going on these trips, right?

13     A.    Yes.

14     Q.    You never told your mother you didn't want to go on

15 these trips, right?

16     A.    No.

17     Q.    You never told Ray you didn't want to go on these

18 trips, right?

19     A.    No.

20     Q.    In October of 2014 your mother took your cell phone

21 away.  Did you ever get a replacement cell phone?

22     A.    Yes.

23     Q.    You have a phone now, right?

24     A.    Yes.

25     Q.    Who got that for you?

Kathi A. Fedden, Sr. Court Reporter

M. Johnson - People - Cross                    976

1          A.    My mom.

2          Q.    When?

3          A.    I don't remember.

4          Q.    Was it -- today is February 18, 2016.  Was it in

5     2016?

6          A.    No.

7          Q.    Was it in 2015?

8          A.    No.

9          Q.    So in 2014 your mother got you a replacement cell

10    phone?

11         A.    Yes.

12         Q.    And you were happy to get that, right?

13         A.    Yes.

14         Q.    So she was happy with you after you brought these

15    charges, correct?

16                  MR. PERRI:  Objection.

17                  THE COURT:  Sustained.

18         Q.    Did she treat you better or worse after you brought

19    this allegation up?

20                  MR. PERRI:  Objection.

21                  THE COURT:  Sustained.

22         Q.    You talked to her about this, right?

23                  MR. PERRI:  Objection.

24                  THE COURT:  About what, sir?

25                  MR. ZERNER:  I'll withdraw that and ask

M. Johnson - People - Cross                977

1       another question.

2       Q.   After your mother caught you with a cell phone you

3  weren't supposed to have, that's when you brought up

4  something that possibly happened with Ray Ross, correct?

5                 MR. PERRI:  Objection; asked and answered.

6                 THE COURT:  Sustained as to the form.

7       Q.   To the best of your knowledge, are there any video

8  surveillance cameras at National Wholesale Liquidators

9  parking lot?

10      A.   I don't know.

11      Q.   To the best of your knowledge, are there any video

12 cameras at the old Western Beef parking lot?

13      A.   I don't know.

14               MR. ZERNER:  If I can see People's 20 in

15      evidence, please?

16               (Handed to counsel.)

17      Q.   Do you remember yesterday when Mr. Perri had you

18 take a look at a document?

19      A.   Which one?

20      Q.   It was a photograph of a parking lot.

21      A.   Yes.

22      Q.   Now, yesterday he did that with you in Court,

23 right?

24      A.   Yes.

25      Q.   But he also prepared you for this by speaking about

M. Johnson - People - Cross                    978

1    this in his office, correct?

2         A.   Yes.

3         Q.   He told you that he was going to ask you certain

4    questions and he told you what you should say, right?

5                   MR. PERRI:  Objection.

6                   THE COURT:  Sustained as to the form of the

7         question.

8         Q.   Well, People's 20 in evidence is a photograph,

9    right?

10        A.   Yes.

11                  THE COURT:  Can she see it, Mr. Zerner?

12                  MR. ZERNER:  That was my next statement.

13        Q.   Why don't you take a look at this.  This is

14   People's 20 in evidence.

15                  (Handed to witness.)

16        Q.   You saw it yesterday, right?

17        A.   Yes.

18        Q.   Before seeing it yesterday, when was the previous

19   time you had seen it?

20        A.   A photo.

21        Q.   That photo on that piece of paper, when was the

22   last time you saw that before seeing it in Court yesterday?

23        A.   Two weeks ago.

24        Q.   Two weeks ago on Super Bowl Sunday you came to the

25   DA's office, right, on February 7, 2016?

M. Johnson - People - Cross                979

1      A.    Yes.

2      Q.    You remember that, right?

3      A.    Yes.

4      Q.    How did you get to the DA's office that day?

5      A.    I took a cab.

6      Q.    You took a cab.

7            Do you know who paid for the cab?

8      A.    No.

9      Q.    Did you see your mom pay for the cab?

10     A.    No.

11           MR. PERRI:  Objection.

12           THE COURT:  Hold it, sir.  The witness

13     answered.  Overruled.

14     Q.    How many hours did you spend with Anthony Perri

15     that day?

16           MR. PERRI:  Objection.

17           THE COURT:  No, overruled.

18     A.    I don't know.

19     Q.    What time did you arrive?

20     A.    I don't remember.

21     Q.    Was it before lunch or after lunch?

22     A.    Before lunch.

23     Q.    And did you leave before dinner or after dinner?

24     A.    Before.

25     Q.    Did you get fed a meal while you were here?

M. Johnson - People - Cross                    980

1          A.   Yes.

2          Q.   You got a meal while you were at the DA's office on

3     Sunday, February 7th?

4          A.   Yes.

5          Q.   Did your mother get a meal also?

6          A.   Yes.

7          Q.   Did you take a cab home?

8          A.   Yes.

9          Q.   Do you know who paid for the cab?

10         A.   No.

11         Q.   Now, when you were here with Anthony Perri, who

12    else was there besides you and your mother and Anthony Perri,

13    who else was there?

14         A.   Kara.

15         Q.   And Kara's the victim's advocate?

16         A.   Yes.

17         Q.   So now the four of you sat and talked about Court,

18    right?

19         A.   No.

20         Q.   You didn't talk about Court the whole time?

21         A.   Not with my mom.

22         Q.   So was there a point in time when your mom left the

23    room and it was just you, the advocate and Mr. Perri?

24         A.   Yes.

25         Q.   And at that point in time Mr. Perri told you you

M. Johnson - People - Cross                    981

1   are going to go to Court on a certain day and this is what I

2   expect from you, right?

3                   MR. PERRI:  Objection.

4                   THE COURT:  Sustained as to the

5       characterization.

6       Q.   Did Mr. Perri tell you you were going to testify in

7   Court, yes or no?

8       A.   Yes.

9       Q.   Did he show you the courtroom at some point in

10  time?

11      A.   Yes.

12      Q.   Was it that day?  Was it Sunday, February 7th?

13      A.   I don't remember.

14      Q.   It was probably a different day, right?

15      A.   Yes.

16      Q.   Do you remember when that was?

17      A.   No.

18      Q.   And he told you that he was going to show you

19  different documents and you were to say you recognized them,

20  right?

21                  MR. PERRI:  Objection.

22                  THE COURT:  Sustained.

23      Q.   Mr. Perri showed you a bunch of different

24  documents, right?

25      A.   Yes.

M. Johnson - People - Cross                    982

1      Q.   Some of those documents were like 75 pages of bound

2  text messages, right?

3      A.   Yes.

4      Q.   And he told you I'm going to ask you about these

5  text messages when you testify, right?

6      A.   Yes.

7      Q.   And you knew what he expected you to say, right?

8              MR. PERRI:   Objection.

9              THE COURT:   Sustained.

10     Q.   Did you ask him what do I say?

11             MR. PERRI:   Objection.

12             THE COURT:   No, overruled.

13     A.   No.

14     Q.   You have never testified before in Court, right?

15     A.   No.

16     Q.   Did you ever go to Court with your mom?

17     A.   No.

18     Q.   Did you ever go to Court with your dad?

19     A.   No.

20     Q.   Did you ever go shopping for back-to-school clothes

21  with any of Ray Ross' sisters?

22     A.   Yes.

23     Q.   I'm sorry, I didn't hear you.

24     A.   Yes.

25     Q.   You remember going shopping for back-to-school

M. Johnson - People - Cross                983

1    clothes with Ray's sisters?

2         A.   Yes.

3         Q.   What are their names?

4         A.   Laurie and Keisha.

5         Q.   The two of them, Laurie and Keisha?

6         A.   Well, Laurie.

7         Q.   And you spent time with Laurie, right?

8         A.   Yes.

9         Q.   And she's nice to you, right?

10        A.   Yes.

11        Q.   And she bought you back-to-school clothes?

12        A.   Yes.

13        Q.   That was a nice thing to do, right?

14        A.   Yes.

15        Q.   Did your mother ever buy you back-to-school

16   clothes?

17        A.   No.

18        Q.   You never went back-to-school shopping with your

19   mother?

20        A.   I did.

21        Q.   But not recently?

22        A.   No.

23        Q.   Did you ever go shopping -- withdrawn.

24             Did you ever go to the movies with Ray Ross'

25   sisters or children?

M. Johnson - People - Cross                          984

```
 1        A.   Yes.

 2        Q.   More than once?

 3        A.   Yes.

 4        Q.   And sometimes Ray wouldn't be there, right?

 5        A.   No.

 6        Q.   So you went to the movies with Ray and his sisters

 7   and his kids and his grandkids, right?

 8        A.   Yes.

 9        Q.   He included you as part of his family?

10        A.   Yes.

11        Q.   To the best of your knowledge, does your mother

12   have a particularly excellent memory?

13                  MR. PERRI:  Objection.

14                  THE COURT:  Sustained.

15        Q.   Have you ever known your mother to memorize 15

16   digit numbers?

17                  MR. PERRI:  Objection.

18                  THE COURT:  Sustained.

19        Q.   When was the last time you spent time with your

20   grandmother?

21                  MR. PERRI:  Objection.

22                  THE COURT:  Overruled.

23        A.   I don't remember.

24        Q.   Do you know where your grandmother lives now?

25        A.   A townhouse.
```

M. Johnson - People - Cross                    985

1      Q.   Do you know what -- is that in Nassau County?

2      A.   Yes.

3      Q.   Do you know what community or hamlet, village

4   within Nassau County that is?

5      A.   Hempstead.

6      Q.   In Hempstead.  So not very far from where you live

7   in West Hempstead, right?

8      A.   Right.

9      Q.   And she's been living there for about five years?

10     A.   I don't know.

11     Q.   But you can't remember the last time you visited

12   her?

13     A.   No.

14     Q.   Have you ever visited her there?

15              MR. PERRI:  Objection.

16              THE COURT:  Sustained.

17     Q.   Now, you told us yesterday that your school is

18   within walking distance from -- withdrawn.

19              The school that you attended, Howard T. Herber, do

20   I have that right?

21     A.   Yes.

22     Q.   Howard T. Herber was the middle school?

23     A.   Yes.

24     Q.   You attended that school sixth, seventh and eighth

25   grade, right?

1     A.   Yes.

2     Q.   And that was walking distance, right?

3     A.   Yes.

4     Q.   And you said you would walk there about three out

5  of five mornings on a regular five day school week?

6     A.   Yes.

7     Q.   And how about coming home, how would you get home?

8     A.   Walk.

9     Q.   And would you walk also about three days a week?

10    A.   Well, I walked every day.

11    Q.   You walked home every day?

12    A.   Yes.

13    Q.   And did you walk home with other kids or alone?

14    A.   With my friends.

15    Q.   You would walk home with your friends?

16    A.   Yes.

17    Q.   Now, were there certain times when you would ask

18  for a ride home?

19    A.   Only when it's really cold outside.

20    Q.   When it was cold outside you wouldn't take the bus,

21  you would call and ask for a ride?

22    A.   Yes.

23    Q.   And when you needed a ride home, who would you ask?

24    A.   My friends.

25    Q.   Your friends were old enough to drive or your

M. Johnson - People - Cross                                987

1    friends' parents?

2        A.   No, my friends' parents.

3        Q.   So you would ask your friends' parents and

4    sometimes you will get a ride home that way?

5        A.   Yes.

6        Q.   Did you ever ask any of your adult family members

7    for a ride home?

8        A.   No.

9        Q.   You have a brother that is old enough to drive,

10   right?

11       A.   Yes.

12       Q.   He was old enough to drive at that point in time

13   also, right?

14       A.   Yes.

15       Q.   But you never asked him for a ride home?

16       A.   He didn't have a car.

17       Q.   How about your mom, would you ever ask her for a

18   ride home?

19                  MR. PERRI:  Objection.

20                  THE COURT:  Sustained.

21                  MR. ZERNER:  If I can just have one moment

22       with my client, your Honor.

23                  (Pause in the proceedings.)

24       Q.   Most days when you were in school, would you bring

25   lunch with you?

M. Johnson - People - Cross                    988

1          A.   No.

2                    MR. PERRI:  Objection.

3                    THE COURT:  The witness answered.

4                    Next question.

5     Q.   Were there times when you asked somebody to bring

6  you lunch at school?

7          A.   No.

8          Q.   I'm sorry, I didn't hear you.

9          A.   No.

10     Q.   You have never asked anybody to bring you lunch at

11  school?

12          A.   No.

13          Q.   Did you ever use the school phone to call home

14  during the day?

15          A.   No.

16                    MR. PERRI:  Objection.

17                    THE COURT:  Sustained.

18          Q.   You told us yesterday that when your mom caught you

19  with the cell phone in October of 2014, she was angry on a

20  scale of one to ten about a seven, right?  Do you remember

21  testifying to that?

22          A.   Yes.

23          Q.   When was the last time you saw her angry on a scale

24  of ten?

25                    MR. PERRI:  Objection.

M. Johnson - People - Cross                    989

```
 1                    THE COURT:  Sustained.

 2        Q.   Had you ever seen her more angry than when she

 3   caught you with that cell phone?

 4                    MR. PERRI:  Objection.

 5                    THE COURT:  No, overruled.

 6        A.   Yes.

 7        Q.   Now, aside from taking away that cell phone from

 8   you, what else did she do to punish you?

 9        A.   Nothing.

10        Q.   Now, you told us that Hempstead Lake State Park is

11   just down the street from your house, right?

12        A.   Yes.

13        Q.   And you were allowed to go to the park by yourself,

14   correct?

15        A.   No.

16        Q.   You weren't allowed to go to the park alone?

17        A.   No.

18        Q.   You were allowed to walk to and from school which

19   was further away, but you weren't allowed to go to the park

20   by yourself, is that your testimony?

21        A.   I didn't walk to school by myself.

22        Q.   Sometimes you would be late for school, right?

23        A.   Yes.

24        Q.   And you would miss the school bus?

25        A.   Yes.
```

M. Johnson - People - Cross                    990

```
 1          Q.   And the other kids that you might have walked with

 2    got on the school bus, correct?

 3          A.   Yes.

 4          Q.   So you had to hustle to get to school, right?

 5          A.   But I walked with my sister.

 6          Q.   Well, your sister didn't go to the middle school,

 7    right?

 8          A.   Yeah, but --

 9                    MR. PERRI:  Objection.

10                    THE COURT:  Overruled.

11          A.   But the middle school and the high school are right

12    across the street from each other.

13          Q.   This is your older sister?

14          A.   Yes.

15          Q.   There were days when you were both late?

16          A.   Yes.

17          Q.   Was it the same bus you would have taken or two

18    different buses?

19                    MR. PERRI:  Objection.

20                    THE COURT:  Sustained.

21          Q.   Were there times when you would go to Hempstead

22    Lake State Park with your sister?

23          A.   Yes.

24          Q.   And that was allowed, right?

25          A.   Yes.
```

M. Johnson - People - Cross                          991

1      Q.   And you would run into people that you knew when

2  you were at the park, right?

3      A.   Yes.

4      Q.   It was your neighborhood park, right?

5      A.   Yes.

6      Q.   I mean, it's a big state park, but it's just down

7  the street from you, right?

8      A.   Yes.

9      Q.   So you remember clearly when you first got your

10 first cell phone from your Uncle George and your dad, Rafael

11 Mickens, right?

12     A.   Not clearly.

13     Q.   You don't remember that clearly?

14     A.   No.

15     Q.   But you do remember that's who gave you your first

16 cell phone, right?

17     A.   Yes.

18     Q.   You told us that whenever you had a cell phone, you

19 used it on a daily basis, correct?

20     A.   Yes.

21     Q.   And you were using it to call and to text many

22 people, correct?

23     A.   Yes.

24     Q.   One of those people was sometimes Ray Ross, right?

25     A.   Yes.

M. Johnson - People - Cross                           992

1        Q.   But you also texted and called other friends and

2   relatives, right?

3        A.   Yes.

4        Q.   So when ADA Perri had you take a look at text

5   messages that were printed out from your cell phone, did it

6   include all of the text messages that you had made back and

7   forth with all of the friends and relatives?

8        A.   No.

9        Q.   He told you to look at the text messages from Ray

10  Ross, right?

11       A.   Yes.

12       Q.   So he focused what you should be looking at,

13  correct?

14       A.   Yes.

15       Q.   There were some people like your close friends that

16  you would text with on a daily basis as well, correct?

17       A.   Yes.

18       Q.   And you were using the cell phone at all hours of

19  the day, correct?

20       A.   Yes.

21       Q.   And your mother didn't want you using the cell

22  phone at that point in time because you weren't supposed to

23  have one, right?

24       A.   Yes.

25       Q.   In fact, she took the cell phone away from you

1    twice, right?

2        A.    Yes.

3                    MR. ZERNER:  I have nothing further at this

4        time.

5                    THE COURT:  Very good.  Thank you, Mr. Zerner.

6                    Mr. Perri, redirect examination?

7                    MR. PERRI:  No redirect, your Honor.

8                    THE COURT:  Very good.

9                    Millinia, thank you for your testimony.  It's

10       concluded, so you are free to go now.  Please follow the

11       direction of the court officer.

12                   (Whereupon, the witness was excused.)

13                   THE COURT:  Your next witness, Mr. Perri.

14                   MR. PERRI:  Your Honor, the People call Joshua

15       Hanson.

16   J O S H   H A N S O N, residing in the County of Queens,

17           having been called as a witness on behalf of the

18           People, having been duly sworn by the Clerk of the

19           Court, was examined and testified as follows:

20                   THE CLERK:  State your name, spell your first

21       and last name and give us your county of residence.

22                   THE WITNESS:  My name is Josh, J-O-S-H,

23       Hanson, H-A-N-S-O-N.  My county of residence is Queens

24       County.

25                   THE COURT:  Mr. Perri, your witness.

Hanson - People - Direct                    994

1              MR. PERRI:  Thank you, your Honor.

2   DIRECT EXAMINATION

3   BY MR. PERRI:

4       Q.   Good morning, Mr. Hanson.

5       A.   Good morning.

6       Q.   Mr. Hanson, are you currently employed?

7       A.   I am.

8       Q.   What do you do for a living?

9       A.   I'm the director of the Nassau County Child

10  Advocacy Center.

11      Q.   Could you please explain what your job duties and

12  responsibilities are as the director of the Child Advocacy

13  Center?

14      A.   Yes.  So the Nassau County Child Advocacy Center is

15  a partnership between Nassau County Police Special Victim's

16  Squad, Nassau County Child Protective Services, Nassau County

17  Medical Center and a number of other partners to collaborate

18  and investigate allegations of child abuse and to provide

19  services for victims of child abuse.

20              My role there is to facilitate our team response.

21  So, to provide trainings and education to our partners, to

22  ensure that cases are investigated in accordance with

23  established best practices and to resolve any conflicts that

24  arise within the team.

25      Q.   When did you become the director of the Child

1    Advocacy Center?

2         A.   I started in September of 2013.

3         Q.   And prior to that position, what did you do before

4    becoming a director?

5         A.   I was a forensic interviewer at Safe Horizons

6    Brooklyn Child Advocacy Center.

7         Q.   What is Safe Horizons?

8         A.   Safe Horizons is a not-for-profit victim advocacy

9    agency that runs the child advocacy centers in the five

10   boroughs of New York.

11        Q.   And what were your responsibilities as a forensic

12   interviewer?

13        A.   My primary responsibility was to conduct forensic

14   interviews pursuant to allegations of abuse pursuant to cases

15   for Nassau County -- excuse me, New York Police Departments,

16   Brooklyn Child Abuse Squad, ACS, Brooklyn Child Abuse Squad

17   and extra jurisdictional partners.  So, I did interviews

18   there for Homeland Security, ICE, the FBI and the postal

19   inspector.

20        Q.   And how long were you at Safe Horizons?

21        A.   I was there for a little under four years.

22        Q.   Now, prior to your position with Safe Horizons did

23   you hold another position?

24        A.   Yes, I was a clinician with South Bay Children's

25   Mental Health.

Hanson - People - Direct                                996

1        Q.    Could you please explain what your responsibilities

2    were at South Bay Children's Mental Health?

3        A.    I was a trauma clinician there, so I provided

4    counseling services for primarily child victims of trauma,

5    but also some adults, and I did some group work in

6    residential programs for adolescents, primarily adolescents.

7        Q.    Mr. Hanson, could you please explain your

8    educational background?

9        A.    I have a Master's Degree in Counseling Psychology

10   from Lesley University and a Bachelor's of Business

11   Management from Bentley College.

12       Q.    Have you received any specialized training with

13   regards to forensic interviewing of children?

14       A.    I have attended state and national trainings in

15   forensic interviewing, advanced forensic interviewing and a

16   number of other modalities.

17       Q.    Do you have any training with regard to child

18   sexual abuse?

19       A.    I do, yes.  I have attended, at this point, a

20   couple of dozen state and national conferences regarding

21   child abuse and forensic interviewing.

22       Q.    And do you have any education or training with

23   respect to sexual perpetration?

24       A.    I do, yes.  That's a part of the trainings in child

25   sexual abuse.  A part of that is the dynamics of

Hanson - People - Direct                          997

1    perpetration.

2         Q.    During your career have you completed forensic

3    interviews of children?

4         A.    I have, yes.

5         Q.    And were these children that were suspected of

6    being sexually abused?

7         A.    Yes.

8         Q.    Could you explain to the jury first what, just

9    briefly, sum and substance, a forensic interview entails?

10        A.    A forensic interview is a structured conversation

11   as it relates to child sex abuse.  A forensic interview is a

12   structured conversation with a child pursuant to an

13   allegation or a concern of abuse.  It proceeds through a

14   number of stages.

15             You know, there is an initial rapport building

16   stage, a stage in which you go through the rules of the

17   forensic interview because it is a unique conversation.  The

18   conversation should be conducted in a way that's open-ended.

19   We're not asking leading questions.  We're asking open-ended

20   questions.  It should also be done in a way that is

21   developmentally appropriate.  So, we would ask a

22   four-year-old different questions or we would question a

23   four-year-old in a different way than say a 14-year-old.

24        Q.    Approximately how many forensic interviews have you

25   conducted?

Hanson - People - Direct                                    998

1        A.   I can't give an exact number, but at this point

2   it's well over a thousand.

3        Q.   And have you ever trained other interviewers?

4        A.   I have.  I provide trainings at the local, state

5   and national level both on forensic interviewing and the

6   Child Advocacy Center response.

7        Q.   And have you ever taught courses or seminars with

8   regard to forensic interviewing of children on child sexual

9   abuse?

10       A.   I have, yes, at the local, state and national

11  level.

12       Q.   Do these trainings that you conducted include

13  sexual perpetration issues?

14       A.   Yes.  As a matter of helping interviewers and

15  investigators understand child abuse, it's really important

16  that they have an understanding of the dynamics and the

17  patterns by which offenders gain access to children.

18       Q.   Have you ever testified in Court as an expert

19  witness?

20       A.   I have, yes.

21       Q.   And what courts have you testified in as an expert?

22       A.   I testified in Brooklyn Family Court, Queens Family

23  Court and in Nassau Criminal Court.  Nassau County Criminal

24  Court.

25       Q.   And approximately how many times have you testified

Hanson - People - Direct                                999

1    in Nassau County Criminal Court as an expert?

2         A.   At this point, more than a half dozen times.

3         Q.   Now, in County Court, have you been deemed an

4    expert in forensic interviewing, child sexual abuse and child

5    sexual perpetration?

6         A.   I have, yes.

7              THE COURT:   Could you say the three of those

8         again?

9              MR. PERRI:   Yes, your Honor, I apologize.

10             THE COURT:   Slowly.

11             MR. PERRI:   Forensic interviewing, child

12        sexual abuse and sexual perpetration.

13             THE COURT:   Thank you.

14        Q.   Mr. Hanson, have you been deemed to be an expert in

15   those areas?

16        A.   I have, yes.

17        Q.   Has the Court ever failed to find you to be an

18   expert witness in these areas?

19        A.   No.

20             MR. PERRI:   Your Honor, I ask the Court to

21        deem the witness an expert in the fields of forensic

22        interviewing, child sexual abuse and sexual

23        perpetration.

24             THE COURT:   Okay, I have your application.   I

25        have a question for Mr. Hanson.

Hanson - People - Direct                                1000

1              Now, with regard to sexual perpetration, is

2      that a term of art, yes or no?

3              THE WITNESS:  I'm sorry, I don't understand

4      term of?

5              THE COURT:  Art.

6              THE WITNESS:  It would be spoken of in a

7      number of different ways, but the patterns of

8      perpetration is the way that we encapsulate offender

9      behaviors, yes.

10             THE COURT:  Is there a definition of sexual

11     perpetration or could you give me that?

12             THE WITNESS:  Sexual perpetration is the

13     pattern of behaviors in which offender engages to gain

14     access to and sexually abuse a child.

15             THE COURT:  Mr. Zerner, do you have any voir

16     dire?

17             MR. ZERNER:  I do.

18     VOIR DIRE EXAMINATION

19     BY MR. ZERNER:

20     Q.   Good morning, Doctor.

21             MR. PERRI:  Objection.

22             THE COURT:  Hold on one second.  Overruled.

23             You can answer the question.  He said good

24     morning, Doctor.

25     A.   I'm not a doctor, but good morning.

Hanson - People - Direct                    1001

1        Q.    Thank you.

2              So you don't hold a doctorate of any kind?

3        A.    I do not.

4        Q.    And you never attended medical school, right?

5        A.    I have not.

6        Q.    You said on direct examination you went to what

7    college?

8        A.    Lesley University.

9        Q.    Where is that located?

10       A.    Cambridge, Massachusetts.

11       Q.    It's not Harvard, it's not M.I.T., it's Lesley?

12             MR. PERRI:  Objection.

13             THE COURT:  Sustained.

14       Q.    You said another school after that.

15       A.    Yup, Bentley College.  Now Bentley University.

16       Q.    Where is that?

17       A.    In Waltham, Massachusetts.

18       Q.    Now, you said in college you received a Bachelor's

19   of Business?

20       A.    Business management, correct.

21       Q.    That had nothing to do with anything involving the

22   topics we're talking about here now, right?

23       A.    Not really, no.

24       Q.    And then did you work for a while after college

25   before attending graduate school?

Hanson - People - Direct                               1002

1          A.   Yes, I served in the military and then I worked at

2     a school for multi disability children.

3          Q.   How many years was that gap?

4          A.   I was in the military for four years and I worked

5     at Perkins High School for the Blind for four or five years.

6          Q.   So that was about a nine year gap between the time

7     you graduated college and the time you went back to school?

8          A.   That's fair to say.

9          Q.   How many years was your degree at Lesley?

10         A.   Two years.

11         Q.   Two years.

12              Now, you testified a few moments ago that you were

13    found as an expert in Nassau Criminal Court, right?

14         A.   Correct.

15         Q.   Those are misdemeanors, right?

16         A.   The cases that I testified to?

17         Q.   Right.

18         A.   I believe they were --

19              THE COURT:  Hold it.  Sustained.

20         Q.   Well, in the five boroughs, the lower level of

21    courts are called criminal courts, right, and the higher

22    level is supreme?

23              MR. PERRI:  Objection.

24              THE COURT:  Sustained.

25         Q.   Well, you said you testified in the city in Family

Hanson - People - Direct                        1003

1    Court, right?

2        A.    That's correct.

3        Q.    But not in Criminal Court?

4        A.    That's correct.

5        Q.    And you said you testified in Nassau County

6    Criminal Court, right?

7        A.    That's correct.

8        Q.    In Nassau County there is District Court and then

9    there is County Court, right?

10                THE COURT:  Sustained.

11       Q.    Have you ever testified --

12                THE COURT:  Sustained.  Hold on.

13                Mr. Hanson, with regard to your testimony in

14       Nassau County, were they in regard to criminal

15       proceedings or civil proceedings?

16                THE WITNESS:  Criminal proceedings, your

17       Honor.

18                THE COURT:  Next question.

19       Q.    How many times?

20       A.    More than half a dozen at this point.

21       Q.    And that was in Hempstead?

22       A.    That was yeah, physically here, yeah.

23       Q.    In Hempstead?

24       A.    No, it was physically here in I guess we're in

25    Garden City.

1      Q.   How many times have you testified here in Mineola
2  as I'll call it?
3      A.   More than half a dozen times.
4      Q.   So have you ever testified before for Mr. Perri?
5      A.   I have, yes.
6      Q.   You have.  Multiple times?
7      A.   I think I have.  I think this is the second or
8  third occasion that I'm testifying for Mr. Perri.
9      Q.   How long ago was the first time you testified in
10  Mineola?
11      A.   I would say two to two-and-a-half years ago.
12      Q.   And prior to that you had never testified in
13  Criminal Court anywhere in the State of New York?
14      A.   That's correct.
15           MR. ZERNER:  Nothing further at this time,
16      Judge.
17           THE COURT:  Thank you.
18           With regard to the People's application to
19      deem Mr. Hanson an expert in the field of forensic
20      interviewing, child sexual abuse and sexual
21      perpetration, that application is granted.
22           Ladies and gentlemen, in my instructions
23      before the trial I told you that you are to evaluate all
24      witnesses in the same particular manner and you can take
25      into consideration training, experience, education, and

1        such.  So, in your evaluation of Mr. Hanson, I instruct

2        you that you evaluate Mr. Hanson's testimony in the same

3        manner as you do any other witness.

4               MR. PERRI:  Thank you, your Honor.

5   DIRECT EXAMINATION (Cont'd)

6   BY MR. PERRI:

7        Q.   Mr. Hanson, are you familiar with the term

8   disclosure in the context of child sexual abuse?

9        A.   I am, yes.

10       Q.   And could you please explain what the term

11  disclosure means?

12       A.   What we would consider disclosure is positive

13  statements of abuse by a child.  So, in other words, a child

14  stating that abuse has occurred.

15       Q.   Are there patterns and dynamics of disclosure in

16  child sexual abuse cases?

17       A.   There are.  One of the important considerations is

18  what we would call the posture of the child to the

19  allegation.  You know, we would consider how the disclosure

20  came about.

21            So I use the terms when I'm training that you have

22  children who are active disclosers, which means they sought

23  someone out to tell them about it, whether a family member, a

24  teacher or another trusted person.

25            There are kids who I would say are ambivalent

Hanson - People - Direct                                    1006

1    disclosers and often when these children disclose, they're

2    sort of testing the waters to see.  They'll tell a friend at

3    school and see if it is a normal thing that's happening.  Is

4    it happening to you as well?

5           The third are what I call reluctant disclosers.

6    They are kids who haven't made statements to anybody, but

7    there are concerns of abuse, whether it's a caregiver that

8    has a suspicion or whether there's a medical finding or

9    something else, they are brought in to have an interview

10   conducted.  They tend to be the most challenging kids to

11   interview because often they're not ready to disclose.

12   They're not actively disclosing.

13       Q.   And when you say they are not actively disclosing,

14   could you please explain that term?

15       A.   So when we say they are not actively disclosing,

16   they haven't -- the investigation wasn't triggered by their

17   statements of abuse, it was triggered by another mechanism.

18   Again, that could be there is medical findings, someone has

19   concerns, things like that.

20       Q.   Mr. Hanson, are you familiar with the term grooming

21   in the context of child sexual abuse?

22           MR. ZERNER:  Objection; leading.

23           THE COURT:  Overruled.

24       A.   I am, yes.

25       Q.   Could you please explain the term grooming?

Hanson - People - Direct                    1007

1      A.   Grooming is the pattern of behaviors that an

2   offender engages in to gain access to a child.  We tend to

3   think of sex abuse as the final act.  We think of the sexual

4   act against the child.  But, in reality, there is a pattern

5   of behaviors that offenders engage in generally in order to

6   gain access.

7           So, through interviews with caregivers we have

8   heard them talk about -- I'm sorry, through interviews with

9   offenders, we've heard them talk about they refer to it as

10  seduction behavior.  So, it's not just gaining access to the

11  child, but sort of ingratiating themselves to the family so

12  they have access to that child.  So, developing a

13  relationship in which they are trusted both by the caregivers

14  and the child.

15     Q.   Mr. Hanson, are you familiar with the term boundary

16  incursions?

17     A.   I am, yes.  It's the process by which the caregiver

18  socializes the child into the sexual relationship.  So, it

19  can be things like normalizing the behavior in front of

20  caregivers.  So, perpetrators will talk about how they will

21  brush up against a child, you know, in order to elicit a

22  reaction from a child that the non-offending caregiver will

23  then say calm down, you are being too sensitive.  He touched

24  you accidentally.  So it reenforces for the child this is a

25  normal thing.  This isn't something someone is going to

1   protect you from.

2          Another boundary incursion generally occurs when

3   the relationship switches from a positive sort of, you know,

4   the ingratiation stage into the sexualization of the

5   relationship.  So it can be things like showing pornography,

6   finding opportunities to see the child in various states of

7   undress and starting to introduce physical touching to the

8   relationship.

9       Q.  Now, according to your training and experience, are

10  the patterns of disclosure affected by any relationship that

11  might exist between the abuse and the abuser?

12              MR. ZERNER:  Objection; vague.

13              THE COURT:  Overruled.

14      A.  Yes.  What we know from the research, the closer

15  the relationship is, the less likely the child will disclose.

16  So when it's a family member, when it's a trusted family

17  friend, it's less likely that that child is going to disclose

18  than if it's a stranger, than if it's someone they don't

19  know.  It also affects the actual disclosure and interview

20  process.

21          What we tend to see is that often -- I always use

22  the analogy of dipping your toe in the pool -- that a kid

23  will sort of test the waters and not tell everything

24  initially, but will maybe give a little bit and then down the

25  line the disclosure sort of trickles out as they feel more

1    comfortable or they feel that they are believed.

2        Q.    Mr. Hanson, does the voluntariness or

3    involuntariness of a disclosure affect the disclosure?

4        A.    Yes.  I mean, as we talked about before, so if a

5    kid hasn't initiated or made statements of abuse, then it's

6    less likely that they will disclose in an interview and more

7    likely that they might minimize or make a partial disclosure

8    in an interview.

9        Q.    Mr. Hanson, according to your training and

10   experience, is voluntary disclosure at the same time abuse is

11   occurring, is that common or uncommon?

12       A.    So what we would talk about is delayed disclosures.

13   Often the disclosures that we tend to get are down the line

14   from when the actual abuse has occurred and certainly down

15   the line if it is more chronic.  If it's abuse that occurs

16   over time, then often it will have been going on for a period

17   of time before a child will disclose.  A lot of that has to

18   do with the relationship that the offender has with the

19   child.

20            Again, generally it's someone that has ingratiated

21   themselves into the family and someone that has developed a

22   modicum of trust with the family and with the child and yeah,

23   yeah, yeah.

24       Q.    Would the context or location of the interview,

25   does that affect a child's disclosure?

Hanson - People - Direct                    1010

1        A.   So I guess I can speak to what we try and do at the

2   Child Advocacy Center and one of our goals is to create a

3   child friendly and family friendly environment where

4   caregivers and children can feel safe.  We want to reduce

5   anxiety.  Anxiety is the enemy of good interviews.

6             So, you know, a situation that might arouse anxiety

7   in a child, certainly we want to avoid.  We want to help them

8   feel as comfortable as possible.  That's the reason we do an

9   initial rapport building phase and we don't just jump into

10  were you abused, yes or no?

11       Q.   Mr. Hanson, are you familiar with the clinical term

12  pedophile?

13       A.   I am, yes.

14       Q.   And could you please define that term and when it's

15  clinically used?

16       A.   So the clinical definition of a pedophile is

17  someone who is solely sexually attracted to prepubescent

18  individuals, boys or girls.  Again, it's important to know

19  that their sole attraction is to prepubescent boys and girls.

20            We use pedophile colloquial for anybody that

21  sexually abuses a child, but in reality, the number of

22  pedophiles in society is pretty low.  By the clinical

23  definition, the number is pretty low; somewhere on the order

24  of one to one-and-a-half percent, according to the research.

25  In reality, it's much more common for people to have -- for

1    people who have sexual attraction, sexual inclination towards

2    children, to also have sexual feelings towards adults.

3         Q.   And could you then contrast the term sexual

4    perpetrator with pedophile?

5         A.   Yes.  So not all pedophiles are sexual perpetrators

6    because there are people who have inclinations that they

7    don't act on and not all perpetrators are pedophiles.  In

8    fact, the minority of perpetrators are pedophiles because the

9    vast majority of offenders will also have relationships,

10   sexual relationships with adults.  And, in fact, that's one

11   of the strategies that perpetrators talk about using to gain

12   access to a child.  So, you know, identifying a child who

13   doesn't have a strong support system, maybe a single parent

14   household, and developing a relationship with that caregiver

15   in order to gain access to the child and often that is a

16   partner relationship or a sexual relationship.

17        Q.   According to your training and experience, is

18   sexual abuse of a child by a stranger, is that a common

19   occurrence?

20        A.   It's far less common than abuse by someone that the

21   child knows.  What we know from the research is that 90

22   percent of child sexual abuse --

23             MR. ZERNER:  Your Honor, I'm going to object.

24        This is not responsive to the question.

25             THE COURT:  Overruled.

1      A.    What we know from the research is that 90 percent

2   of child sexual abuse is perpetrated by someone the child

3   knows.   Sixty percent of it is by a family member.

4      Q.   Mr. Hanson, is religiosity relevant in determining

5   whether a subject is a sexual perpetrator?

6      A.    It's not a useful criteria to assess whether or not

7   someone would abuse children.   We know that virtually every

8   faith tradition has had a sex abuse scandal.   We know the

9   Catholic church, the Mormon church, Orthodox, Jewish faith.

10  Virtually every religious faith has had sex abuse scandals.

11         So, to use that as sort of a barometer to assess if

12  someone who is religious would abuse a child is not terribly

13  useful.   And, again, what we know from interviews with

14  convicted perpetrators is that often they'll use those

15  certain activities and certain almost cloak themselves in

16  certain things in able to be a more trusted member of the

17  community.

18         So, we know that while most coaches, most religious

19  folks are wonderful people, there are a subset of people who

20  will join those communities as a way of building trust within

21  the communities and to have access to the children that they

22  want to offend against.

23     Q.   Mr. Hanson, is kindness towards children, is that

24  incompatible with being a sexual perpetrator?

25     A.    It's something we hear a lot.   Well, this person is

1    such a nice guy.  Kids love him.

2                    MR. ZERNER:  Your Honor, I'm going to object.

3          It was a yes or no question.  He is just wound up and

4          talks.

5                    THE COURT:  Thank you, Counsel.

6                    Sustained as to the question.

7    Q.    Could you please explain your answer, Mr. Hanson?

8                    THE COURT:  He didn't answer, so why don't you

9          repeat your question.

10   Q.    Is whether a person -- withdrawn.

11         Is kindness towards children incompatible, that

12   characteristic, is it incompatible with being a sexual

13   perpetrator?

14   A.    No.

15   Q.    Could you please explain your answer?

16   A.    So, again, if we think about perpetrating behavior

17   as goal oriented, the goal is to have access to a child.  We

18   don't tend to let our children around the creepy guy in the

19   trench coat on the corner.  We tend to let our children

20   around people that are trusted coaches, people of our

21   religious denomination.  People who seem to be kind to

22   children.

23         We know again from interviews with convicted

24   perpetrators that this is a strategy they use.  The initial

25   stages of the relationship are very normal.  It's developing

1   a relationship with a family.  It's developing a relationship

2   with a child and that in the initial stages, that

3   relationship isn't sexual.

4           So, you know, it's again, similar to religiosity.

5   It's not a terribly useful yardstick as to whether or not

6   someone would offend against a child.

7                   MR. PERRI:  Thank you, your Honor, nothing

8       further.

9                   THE COURT:  Mr. Zerner.

10                  MR. ZERNER:  Thank you, your Honor.

11  CROSS-EXAMINATION

12  BY MR. ZERNER:

13      Q.   Mr. Hanson, you seem to be relying on some studies

14  where perpetrators talk about their behavior?

15      A.   There is a number of studies, yeah.

16      Q.   Well, you're testifying right now and you said

17  well, the perpetrators talk about this and this is where you

18  are getting your information from, right?

19      A.   Some of the information, yes.

20      Q.   Is it fair to say that people who have been

21  convicted of these crimes are eager to talk to you or people

22  that are doing these studies?

23      A.   I don't know.  I don't conduct the studies, so I

24  wouldn't think they would be eager to speak about these

25  things.

Hanson - People - Cross                                    1015

1      Q.   Have you published any papers on this?

2      A.   I haven't, no.

3      Q.   Have you read papers on this?

4      A.   I have, yes.

5      Q.   Is it fair to say there is some confusion about

6  whether or not you should be able to rely on what these

7  perpetrators say because they have an ulterior motive?

8      A.   I wouldn't say that, no.

9      Q.   These are people you are telling us in society were

10  devious and were perpetrating offenses against children,

11  right?

12     A.   Correct.

13     Q.   And then they were caught and then incarcerated?

14     A.   Correct.

15     Q.   And then these people were given some type of

16  incentive to talk to a doctor or some type of a therapist,

17  right?

18               MR. PERRI:  Objection.

19               THE COURT:  Overruled.

20     A.   I'm not aware of any incentive that was provided.

21  Generally what happens is people who are convicted for these

22  crimes are engaged about would you be willing to talk about

23  what you did.  It's often a part of their therapeutic

24  process, but there is no reduced sentence.  There is no

25  incentive I'm aware of to speak to the interviewers.

Hanson - People - Cross

1016

1    Q.   If you are not aware of an incentive, how are you

2  aware there is no incentive?

3    A.   Well, because the methodology of the studies

4  describes that they were engaged, as I said, to talk about

5  the patterns of perpetration.

6    Q.   Right.  But these studies would have to indicate to

7  you whether there was any kind of incentive given to the

8  people participating, correct?

9    A.   They should, yes.

10    Q.   They should, but they don't always, do they?

11    A.   I mean, I can't speak to that.  I didn't

12  participate in the interviews.

13    Q.   You don't know because you have never been

14  published, right?

15    A.   True.

16    Q.   So now you told us earlier on that your first job

17  out of graduate school was up in the Boston area?

18    A.   It was, yes.

19    Q.   And you started off there as a trauma clinician?

20    A.   That's correct.

21    Q.   And is that an entry level job for someone with

22  your education and background?

23    A.   It's an entry level fee-for-service counseling job,

24  yes.

25    Q.   And that was your start of your career path, right?

Hanson - People - Cross                    1017

1        A.    In this field, correct.

2        Q.    Well, this is the field you are still involved in,

3    correct?

4        A.    Yes.

5        Q.    You started that in June of 2005?

6        A.    Yes.

7        Q.    And you have been on this career path for the last

8    ten plus years, right?

9        A.    Correct.

10       Q.    How do you advance within that career?

11       A.    How do you advance within that career?  I don't

12   understand the question.

13       Q.    Well, you started off you were a trauma clinician,

14   right?

15       A.    Uh-huh.

16       Q.    Yes?

17       A.    Yes.

18       Q.    You can't say uh-huh.

19       A.    Understood.

20       Q.    So now you started off there and were you ever

21   deemed as an expert while you were working in Brockton,

22   Massachusetts?

23       A.    I was never asked to testify.

24       Q.    Did you observe your bosses testify?

25       A.    No.

Hanson - People - Cross                          1018

1          Q.    You never went to Court before 2009?

2          A.    No.

3          Q.    And how did you get the job in the Brooklyn Child

4     Advocacy Center?

5          A.    I moved to Brooklyn and I applied for a job at the

6     Brooklyn Child Advocacy Center.

7          Q.    You sent out a resume?

8          A.    Yes.

9          Q.    Had an interview?

10         A.    Yes.

11         Q.    And at that point in time you were put into a

12    different title, right?  You were then a clinical forensic

13    specialist?

14         A.    That's correct.

15         Q.    So that was a career advancement, right?

16         A.    No, it's more of a lateral move.

17         Q.    It was a lateral move, but you just had a fancier

18    title?

19         A.    Yeah, that's what they called the position that I

20    worked in.

21         Q.    Was there extra money?

22         A.    It's sort of apples and oranges, because

23    fee-for-service you are paid based on the number of clients

24    that you see.  It ended up being that I made more money, but

25    that was largely a function of my client load when I was in

Kathi A. Fedden, Sr. Court Reporter

Hanson - People - Cross                                    1019

1    Brockton, so it's hard to compare the two.

2         Q.   Now, when you were working in Brooklyn, who was

3    your boss?

4         A.   I worked for the director of clinical and forensic

5    services at the Safe Horizons Brooklyn Child Advocacy Center.

6         Q.   And is that connected with other CACs or child

7    advocacy centers in the five boroughs?

8         A.   Yes.  Safe Horizons is the umbrella agency for, at

9    the time, the CACs in four of the five boroughs.  Now they

10   have opened the Bronx CACs, so five of the five boroughs.

11        Q.   Is there a director for all five of the boroughs?

12        A.   There is someone that oversees the Child Advocacy

13   Center component which oversees a number of different

14   programs.  Each Child Advocacy Center has its own executive

15   director.

16        Q.   Who's the executive director in Brooklyn when you

17   were working there?

18        A.   Jenna Diacomanolis.

19        Q.   And is she still there?

20        A.   Yes.

21        Q.   Now, that's a higher title within the organization

22   than the title that you had, correct?

23        A.   That's correct.

24        Q.   So she advanced further in her career?

25        A.   Yes.

Hanson - People - Cross                          1020

1        Q.    And you were looking to advance your career, right?

2        A.    Yes.

3        Q.    So now as of August of 2013, had you ever testified

4   in Court and been qualified as an expert?

5        A.    Yes.

6        Q.    How many times?

7        A.    I would say between ten and 15 times.

8        Q.    How many times in Criminal Court?

9        A.    None.

10       Q.    None in Criminal Court?

11       A.    None in Criminal Court prior to 2013.

12       Q.    Now, prior to 2013, had you ever been paid to be an

13  expert in any Court, whether it's Family Court or Criminal

14  Court?

15       A.    No.

16       Q.    You had never been paid to be an expert?

17       A.    No.

18       Q.    Were any of your colleagues at the CAC called as

19  expert witnesses?

20       A.    No.  Most people were reluctant to testify, so I

21  was the one that ended up testifying as an expert.

22       Q.    When?

23       A.    I'm sorry, when?

24       Q.    You just told us that you did testify as an expert.

25       A.    Yes, when I worked at the Brooklyn CAC I

Hanson - People - Cross                                    1021

1    testified -- Brooklyn Child Advocacy Center I testified as an

2    expert in Family Court.

3         Q.   In Family Court, right?

4         A.   Yes.

5         Q.   Who paid you to go to Family Court?

6         A.   Nobody paid me to go.  I didn't receive -- I went

7    as part of my regular job responsibilities as part of my

8    regular -- in the course of my regular shift.  I didn't

9    receive additional compensation.

10        Q.   So now before testifying in those occasions did you

11   review the transcripts of other people who had testified?

12        A.   No, I did not.

13        Q.   You never reviewed any transcripts?

14        A.   No.

15        Q.   Did you ever speak with the attorneys involved

16   before you testified?

17        A.   Yes.

18        Q.   So now in August of 2013 you left this job in

19   Brooklyn and you got a higher job in Nassau County, right?

20        A.   Correct.

21        Q.   That was a career advancement?

22        A.   Correct.

23        Q.   This is something that you sought out?

24        A.   Yes.

25        Q.   You applied for the position?

Hanson - People - Cross                                    1022

1      A.   Yes.

2      Q.   It was more money?

3      A.   Yes.

4      Q.   You applied to get and you were glad to get the

5  position?

6      A.   Yes.

7      Q.   You work exclusively in Nassau County now, right?

8      A.   Primarily in Nassau County.  I would say 95 percent

9  of my responsibilities are within Nassau County.

10      Q.   Well, from September of 2013 until today, have you

11  ever testified in any Court outside of Nassau County, New

12  York?

13      A.   Yes.

14      Q.   Where?

15      A.   I testified in Queens Family Court and in Brooklyn

16  Family Court pursuant to cases that I had been involved in or

17  that they needed an expert and other people weren't willing

18  to testify.

19      Q.   So those were holdover cases?

20      A.   Essentially, yes.

21      Q.   Those were cases that you had dealt with prior to

22  August of 2013 and the case didn't advance to Court until

23  after you had personally moved on to Nassau County, right?

24      A.   Yes.

25      Q.   In the last year, have you testified outside of

Hanson - People - Cross                                    1023

1    Nassau County?

2        A.    I have not.

3        Q.    When you first came in September of two thousand --

4    withdrawn.

5              Before you were hired in September of 2013 in

6    Nassau County, who did you meet with as part of the

7    interviewing process?

8        A.    I met with the executive directors of the Safe

9    Center.

10       Q.    Okay.  Where is that located?

11       A.    In Bethpage.

12       Q.    Did you also meet with any law enforcement

13   personnel?

14       A.    No.

15       Q.    You never met with anybody from the district

16   attorney's office?

17       A.    No.

18       Q.    Have you since met with people in the district

19   attorney's office?

20       A.    Yes.

21       Q.    Have you since met with the bureau chief of the

22   Special Victim's Unit in the Nassau County District

23   Attorney's Office?

24       A.    Yes.

25       Q.    How often?

Hanson - People - Cross                                    1024

1      A.   We meet for bi-weekly case review, meaning every

2    other week.  She attends that regularly.  And then we have ad

3    hoc meetings, I would say, on a quarterly basis.

4      Q.   So is it fair to say that in an average year you

5    meet at least 30 times?

6      A.   Yeah, that's fair to say.

7      Q.   Now, you personally oversee how many people at the

8    Nassau CAC?

9      A.   I directly supervise 15 people.  I don't directly

10   supervise the law enforcement or child protective or medical

11   components of the CAC, but I have responsibility for

12   facilitating their day-to-day operations.

13     Q.   And you give advice to the people that you work

14   with, whether it's law enforcement, district attorney's

15   office, medical people, right?

16     A.   Yes.

17     Q.   And have you gone to hospitals to talk to SANE

18   nurses?

19     A.   I generally don't as part of my responsibilities,

20   no, but I have spoken to our partner, the SANE nurse through

21   the Nassau University Medical Center regularly, yeah.

22               THE COURT:  I'm sorry.

23     Q.   Would you please define what a SANE nurse is?

24     A.   A SANE nurse is a sexual assault nurse examiner.

25   That's what SANE stands for.  It's the ones who -- well, it's

Hanson - People - Cross                          1025

1   part of the medical response through our child advocacy

2   center.  They handle the emergent cases which is to say where

3   abuse is alleged to have occurred within the last 96 hours

4   and they conduct medical exams pursuant to those cases.

5       Q.   So you personally give advice and counsel to SANE

6   nurses, to district attorneys, assistant district attorneys,

7   law enforcement officials, correct?

8       A.   Yes.

9       Q.   You understand what the proper procedures are to

10  investigate these types of cases, right?

11      A.   I do, yes.

12      Q.   You have been doing this long enough that you can

13  give advice and counsel, right?

14      A.   Yes.

15      Q.   Now, have you ever met Millinia Johnson?

16      A.   No, I don't believe so.

17      Q.   You personally have never met Millinia Johnson?

18      A.   I don't think so, no.

19      Q.   Did you ever observe her being sexually abused by

20  anybody?

21      A.   No.

22      Q.   Did you ever meet with Sarita Johnson?

23      A.   I don't believe so, no.

24      Q.   Are you familiar with the name?

25      A.   I'm not.  It doesn't -- I don't recognize the name.

1    Q.   So you have had nothing to do with any of the

2    people involved with this case that this jury is dealing

3    with, correct?

4    A.   That's correct.

5    Q.   You are just speaking on a general basis?

6    A.   That's correct.

7    Q.   Have you personally ever dealt with the mothers of

8    complainants?

9    A.   Yes.

10   Q.   And, in fact, you have been using the term victim

11   but, in fact, when people first bring an allegation, the

12   proper term is complainant, right?

13   A.   We use alleged victim at that point.

14   Q.   But complainant would be another term you could

15   use?

16   A.   They are essentially synonymous, yes.

17   Q.   So now you personally have dealt with complainants'

18   mothers in the past, right?

19   A.   Correct.

20   Q.   And is it fair to say they fall into several

21   different categories?

22   A.   It's fair to say.

23   Q.   Have you ever noticed complainants' mothers that

24   were goal driven?

25   A.   Yes.

Hanson - People - Cross                    1027

1        Q.    Have you ever seen some of these complainants'

2   mothers being goal driven towards inappropriate goals?

3        A.    Yes.

4        Q.    Have you ever seen some of those goals as being

5   self centered?

6        A.    Yes.

7        Q.    Financially based?

8        A.    I'm unaware of cases where the basis was financial.

9        Q.    But you are aware of the possibility, correct?

10       A.    Yes, that could be a possibility, yes.

11       Q.    The very allegation in and of itself is value

12   latent, correct?

13             MR. PERRI:  Objection.

14             THE COURT:  I didn't hear the last part of

15       your question, so could you repeat your question?

16             MR. ZERNER:  Absolutely.

17       Q.    The very fact of an allegation of a sexual crime

18   towards a child is value latent, correct?

19             MR. PERRI:  Objection.

20             THE COURT:  Sustained as to the form of the

21       question.

22       Q.    You have worked in Family Court you said, right?

23       A.    I have testified in Family Court.

24       Q.    And you have observed in Family Court, perhaps you

25   have observed in Family Court parents litigating or fighting

Hanson - People - Cross                    1028

 1    over custody issues, correct?

 2         A.   That hasn't been my role within Family Court, no.

 3         Q.   But you are aware that it happens?

 4         A.   Yes.

 5         Q.   In testifying in various cases, you have spoken to

 6    attorneys in those cases, right?

 7         A.   That's correct.

 8         Q.   And sometimes those attorneys would tell you things

 9    about what their client's goal is and what the adversary's

10    goal is?

11              MR. PERRI:   Objection.

12              THE COURT:   Sustained.

13         Q.   Do you know -- withdrawn.

14              Did anybody affiliated with the Nassau County Child

15    Advocacy Center, to the best of your knowledge, have a

16    conversation with Millinia Johnson?

17         A.   I don't know.

18         Q.   You have been there since September of 2013, right?

19         A.   Yes.

20         Q.   You have been in charge since September of 2013?

21         A.   Yes.

22         Q.   You're aware that the allegation in this case

23    happened in October of 2014, right?

24         A.   I wasn't aware of the date of the allegation.

25         Q.   You did prepare with ADA Perri before coming here

Hanson - People - Cross                      1029

1    today, right?

2        A.   I did.

3        Q.   Did you speak about the specifics of this case?

4        A.   Very superficially.  We didn't speak about the

5    dates.  We didn't speak in any great depth.

6        Q.   So you are just here to speak in a general sense

7    about how these types of cases take place, correct?

8        A.   Yes.

9        Q.   But you don't know anything about the people

10   involved in this indictment, in this jury trial, right?

11       A.   No, I can't speak specifically to that.

12            MR. ZERNER:  Just one second, your Honor.

13            (Pause in the proceedings.)

14       Q.   You said you testified in the past for ADA Perri?

15       A.   That's correct.

16       Q.   How much time did he spend preparing you for your

17   testimony here today?

18       A.   We spoke for maybe 15 minutes on the phone last

19   night and then we spoke this morning for another probably 15

20   minutes.

21       Q.   But you have testified before, right?

22       A.   I have.

23       Q.   And he told you to come in here and testify like

24   you have in the past?

25       A.   He gave me the basic questions he was going to ask

Hanson - People - Cross                                    1030

1   and asked that I provide testimony to the best of my

2   knowledge about those subjects.

3        Q.   There is a script that is used, right?

4             MR. PERRI:  Objection.

5             THE COURT:  Sustained.

6        Q.   And, again, you have no personal knowledge of

7   anything that took place, if anything took place, between

8   Millinia Johnson and my client, right?

9             MR. PERRI:  Objection.

10            THE COURT:  Sustained; asked and answered.

11            MR. ZERNER:  Nothing further.

12            THE COURT:  Any redirect, Mr. Perri?

13            MR. PERRI:  No, your Honor.

14            THE COURT:  Very good.

15            Mr. Hanson, thank you for your testimony.

16       It's concluded.  You are free to go.

17            THE WITNESS:  Thank you, your Honor.

18            (Whereupon, the witness was excused.)

19            THE COURT:  Ladies and gentlemen, I think it's

20       an appropriate time to take a break.  Five minutes,

21       stretch your legs, use the facilities.  Stretch your

22       fingers for those of you who are using your fingers.

23            (Whereupon, the jury exited the courtroom.)

24            (A recess was taken.)

25            THE CLERK:  The jury is not in the courtroom

Proceedings                                          1031

1    at this time.  All parties are present, Judge.

2              THE COURT:  People, is there an application

3    with regard to the indictment?

4              MR. PERRI:  Yes, your Honor.  With respect to

5    the indictment in count one, the People have an

6    application pursuant to CPL section 200.70(1) to amend

7    the indictment where presently count one reads deviant

8    sexual intercourse.  The statute had been changed,

9    amended in 2003 to whereas previously deviant sexual

10   intercourse was the subject of a definition defining it

11   as oral sexual contact and sexual contact.  The count,

12   the charge of course of conduct in the first degree

13   under sub B was amended to remove the term deviant

14   sexual intercourse and replace it with oral sexual

15   contact and sexual contact.

16             The People would ask the Court to make this

17   amendment to the indictment.  It does not materially

18   change the People's case or the theory of the case.  It

19   does not prejudice the defendant in any way.  It is a

20   ministerial Scribner's error of using language that had

21   been replaced, but the only replacement was to remove

22   the step of having to look up the definition of sexual

23   deviant intercourse.  As there is no prejudice to the

24   defendant, the People make the application to have the

25   indictment amended, your Honor.

Proceedings                                    1032

1          THE COURT:  You said the law was changed in

2     2003.

3          MR. PERRI:  Yes, your Honor.

4          THE COURT:  It's now what year?

5          MR. PERRI:  It's now 2016, your Honor.

6          THE COURT:  I'll hear the defense, but can you

7     bring a direct message?

8          MR. PERRI:  I have already.

9          THE COURT:  Your office.

10         MR. PERRI:  Yes, your Honor.

11         THE COURT:  Mr. Zerner.

12         MR. ZERNER:  Your Honor, you ably anticipated

13    what the start of my discussion was going to be.  I

14    don't know why 13 years after whatever change Mr. Perri

15    is talking about, the Nassau County District Attorney's

16    Office is only after nine days of trial finding what

17    they, in quite a conclusory way, is saying is not

18    prejudicial to my client.

19         Your Honor, back when we were first dealing

20    with this indictment during the summer of 2015, I made

21    an application to dismiss the indictment based on a

22    number of different factors and I received a decision

23    from your Honor denying that request.  The People have

24    always been vague in how they have charged this case.

25    The felony complaint barely matches up with the

Proceedings                          1033

1   indictment.  The indictment calls on this long months,

2   nine ten month period of time for two different counts.

3   Two different nine or ten-month periods of time.  It's

4   been very Did I to prepare a defense for this case and

5   if now at this very late date, as the People apparently

6   intend to rest their case over the next few minutes, are

7   now trying to amend the indictment, it does prejudice my

8   client.  I would ask you dismiss that charge at this

9   time.

10              THE COURT:  The Court notes defense counsel's

11  argument, but the bottom line is is that the amendment

12  sought by the People is one that is permitted under the

13  law, particularly CPL Section 200.70.  The Court may

14  order the amendment of an indictment with respect to

15  defects, errors or variances from the proof relating to

16  matters of form, time, place, names of persons and the

17  like when such an amendment does not change the theory

18  or theories of the prosecution as reflected in the

19  evidence before the grand jury.  And the circumstances

20  presented to the Court do not fall into the category

21  under subdivision two of that same statutory section

22  which would not allow the indictment to be amended.

23  Therefore, the People's application is granted to the

24  extent that the first count of the indictment is amended

25  to read instead of deviant sexual intercourse, as I

Proceedings

1  indicated, instead of deviant sexual intercourse to read

2  oral sexual contact.

3  MR. PERRI:  Your Honor, I believe in the Penal

4  Law it's conduct.  Oral sexual conduct and sexual

5  conduct.

6  THE COURT:  Oral sexual conduct or sexual

7  conduct.  It's amended to read in place instead of

8  deviant sexual intercourse, oral sexual conduct sexual

9  conduct and then continue or aggravated sexual contact.

10  Okay, bring them in.

11  (Whereupon, the jury entered the courtroom.)

12  THE COURT:  Mr. Perri, before the jury comes

13  in, with regard to Mr. Zerner's production of a

14  complaint interview sheet and other ancillary documents

15  regarding the complainant Denise Sawyer, the Court

16  reminded you of your obligations under the law.  Is

17  there anything that you wish to put on the record with

18  regard to receipt of that?

19  MR. PERRI:  No, your Honor.

20  THE COURT:  Mr. Zerner, do you wish to put

21  anything on?

22  MR. ZERNER:  Very briefly, your Honor.  I came

23  into Court yesterday, provided papers that I received at

24  10:10 p.m. the day before which would have been February

25  16th.  It's crystal clear that there were at least two

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                    1035

1    different police interactions between the prosecution's

2    witness Sarita Johnson and Denise Sawyer.  There was at

3    least one assistant district attorney that was contacted

4    by the parties involved here.  There has to be

5    paperwork.  There has to be generated police

6    documentation of this and I don't believe Mr. Perri has

7    answered the question.  He's busy like I'm busy, like

8    we're all busy trying this case, but there are hundreds

9    of other assistant district attorneys and personnel that

10   clearly can and should provide whatever information

11   there was about this incident.  It has an actual

12   tangible impact on the rest of this trial.

13              THE COURT:  Thank you, Mr. Zerner.

14              Any response, Mr. Perri?

15              MR. PERRI:  Your Honor, the People would like

16   to note defense counsel has not cited, pursuant to any

17   section of the discovery statute or any findings by the

18   courts, as to why these documents, were they to exist,

19   would be either discoverable or be required to be turned

20   over pursuant to either Brady, Rosario, Giglio and their

21   progeny.  All the People are informed of is there is one

22   police report not leading to an arrest, a trespass in

23   the back property of one of the alleged witnesses, it's

24   alleged, after she completed her testimony and that

25   person who is alleged to have trespassed filed a

1   complaint with the district attorney's office.  The

2   People don't see how they're in violation of any of

3   their requirements.

4           THE COURT:  The record has been established

5   with regard to this issue.  The Court finds no need to

6   add to the record on that issue.

7           (Whereupon, the jury entered the courtroom.)

8           THE CLERK:  Let the record reflect the

9   presence of the jury.  All parties are present.

10          People ready?

11          MR. PERRI:  Yes, your Honor.

12          THE CLERK:  Defense ready?

13          MR. ZERNER:  We are, thank you.

14          THE COURT:  Welcome back, ladies and gentlemen

15   of the jury.

16          Mr. Perri.

17          MR. PERRI:  Your Honor, the People have an

18   application to have five items published to the jury so

19   that they may be allowed to view them.  They would be

20   People's 10, People's 11, and then People's 15, 16 and

21   17, your Honor.  These would be the text messages and

22   the phone records.

23          THE COURT:  Ladies and gentlemen, what's going

24   to happen is because these exhibits have been received

25   in evidence, you are certainly entitled to view them and

Proceedings                                                    1037

1      the assistant district attorney wishes that you view

2      them at this point.  Obviously once you begin your

3      deliberations, should you wish any of the evidence in

4      the jury room, you will simply write a letter asking for

5      the exhibits and they will be provided to you.

6              So, at this point I'm just going to ask the

7      sergeant to hand an item to individual jurors and you

8      will circulate them among yourselves, okay.

9              Mr. Perri, the phone records were what

10     exhibits?

11             MR. PERRI:  Fifteen, 16 and 17, your Honor.

12             THE COURT:  With regard to the phone records,

13     you will see some markings.  The People offered those

14     markings on those exhibits as demonstrative for you to

15     be able to readily look at the documents, okay.  They

16     are copies of what exhibits?

17             MR. PERRI:  They are copies of People's 14B

18     through D.

19             THE COURT:  The People assert that they are

20     copies of the items just noted.

21             (Whereupon, the above-mentioned exhibits were

22     published to the jury.)

23             (Pause in the proceedings.)

24             THE COURT:  Ladies and gentlemen, has everyone

25     had the opportunity to at least peruse the exhibits?

Proceedings                                          1038

1          A JUROR:  No.

2          THE COURT:  I remind you, ladies and

3    gentlemen, you will get a full opportunity, if you so

4    desire, to view those exhibits during your deliberations

5    simply by asking for them through a letter.

6          (Pause in the proceedings.)

7          THE COURT:  Okay, ladies and gentlemen, those

8    exhibits were shown to you just as other exhibits were

9    shown to you on the projector.  Obviously it would have

10   been impractical to do it that way and that's why the

11   Court allowed you to peruse them while we're sitting

12   here.

13          Now, I do have to instruct you in accordance

14   with your obligations and your promises to be fair and

15   impartial jurors, each of you must keep an open mind

16   throughout the trial and reach your conclusions and your

17   ultimate decisions only during your final deliberations.

18          So, you have seen the exhibits, just as you

19   have heard testimony and everything, but you are not to

20   make any premature decisions or determinations, right.

21   You will make your ultimate decisions only during your

22   final deliberations after listening carefully to all the

23   evidence or viewing documentary evidence, the summations

24   of counsel and then my instructions to you on the law

25   and then only after exchanging views and reasoning

1    together with other members of the jury.  You are not

2    allowed to do that now.  That's only after -- that's the

3    final step once you are released to your deliberations,

4    okay, just as a cautionary note.

5              Mr. Perri?

6              MR. PERRI:  Your Honor, at this time the

7    People rest.

8              THE COURT:  Thank you, Mr. Perri.

9              What that means, ladies and gentlemen, is that

10   the People have concluded their case.  Now it's

11   anticipated that Mr. Zerner will be putting on a defense

12   case and that will begin tomorrow morning.  I have

13   obligations unassociated with the trial that I have to

14   tend to this afternoon, so you get the benefit of

15   enjoying this beautiful almost spring like day while I'm

16   here working.  Enjoy.  I hold no grudge against you.

17             Yes, sir?

18             THE FOREPERSON:  Could you clarify what voir

19   dire means?

20             THE COURT:  Thank you, and I'll deal with that

21   at a later point in time, okay.  So for now, I just want

22   to remind you of the admonitions.  Very simply, forget

23   about the case until tomorrow morning.

24             Don't reach any decisions, determinations or

25   conclusions until you have reached the point that I have

Proceedings                                    1040

1        just spoken about.

2                Don't talk about the case.  Don't read about

3        it.  Don't visit any of the places mentioned.  Don't do

4        any research about it.

5                Report to me if anyone tries to improperly

6        influence you and we'll see you all tomorrow again at

7        9:30 a.m.  Have a good day.

8                (Whereupon, the jury exited the courtroom.)

9                THE COURT:  Mr. Zerner, I'll handle any

10       motions not now, but tomorrow morning before the jury

11       comes in.

12               MR. ZERNER:  Okay.

13               THE COURT:  Simply because we're late now and

14       we're supposed to close at 12:30.

15               MR. ZERNER:  Understood.  I want to put one

16       quick thing on the record and we'll deal with the

17       motions tomorrow morning.

18               THE COURT:  Yes.

19               MR. ZERNER:  Your decision that you issued

20       September 16, 2015 clearly states the district attorney

21       is reminded of their continuing obligations and it's not

22       limited to what is outlined in there.

23               THE COURT:  Understood.

24               MR. ZERNER:  It's my understanding with

25       regards to this incident that took place between Sarita

1     Johnson and Denise Sawyer in the last couple of days,

2     it's exactly on point to this situation where we have a

3     situation where a prosecution witness now released from

4     her testimony but living with another of the prosecution

5     witnesses gets into an interaction -- gets into an

6     altercation with a potential witness for the defense.

7     There has to be the possibility that there is

8     exculpatory evidence in there where one of their

9     witnesses is trying to intimidate one of my witnesses.

10             THE COURT:  Thank you, Mr. Zerner.  The People

11     understand their continuing obligation under Brady.  I

12     have reinforced that on a number of occasions.

13             MR. PERRI:  Yes, your Honor.

14             THE COURT:  Okay, 9:30 tomorrow morning.

15     We'll see you then.

16             With regard to the juror's question about voir

17     dire, I'll deal with that tomorrow morning after

18     conference with counsel.

19             (Whereupon, the trial was adjourned to

20     February 19, 2016.)

21

22             *               *               *

23

24

25

Kathi A. Fedden, OCR