SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU : PART 47

-------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

-against- Ind. No. 1050N/15

JURY TRIAL

RAY ROSS,

DEFENDANT.

-------------------------------------x

Mineola, New York
February 19, 2016

B E F O R E: HON. TERENCE P. MURPHY
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

Kathi A. Fedden
Official Court Reporter

* * *

THE CLERK: Continued case on trial, People very Ray Ross. The jury is not present at this time. All parties are present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you and good morning.

THE COURT: Good morning, Counsel. A couple of things before the jury comes in. One, I'll give Mr. Zerner the opportunity to make any motions that you deeply appropriate at this particular time, since the People have concluded their case in chief.

MR. ZERNER: Thank you, your Honor. I do have a motion to dismiss all counts in this indictment at this time. The People have put on their case. Among other things, that the People have failed to do is the People have failed to show the actual date of birth of the complainant.

You will recall that there was no exhibit, despite the fact that I believe 20 exhibits were put into evidence, there is no birth certificate that was put into evidence, no school records put into evidence. All we have is, frankly, it's hearsay. It's one of those things you learn in law school is that you don't really know when you were born. You were told by somebody else when you were born. That person that told you might have been your mother or father. You might later on, when you are old enough to read documents and

understand dates and years and math, now know how old you are. All you had elicited testimony was the word of the complainant as to the day she was born. I didn't even get that question of the mother. The mother maybe would have been in the position to state that. And the fact that there was no birth certificate put into evidence and that the age of the complainant is an element in all of the counts on Indictment 1050N as in Nassau in 2015, should lead your Honor to dismiss each and every one of these counts.

Beyond that argument, your Honor, you also have clearly testimony that was elicited. Frankly there were five witnesses that you heard from. Four of them admitted that they had absolutely no knowledge of anything happening with regard to the counts in the indictment. I believe the prosecutor is trying to bootstrap in, frankly, the last counts, the endangering the welfare of a child counts.

I believe his theory is that the number of texts, the sheer volume of texts, as well as phone calls that he got into evidence through the representative of the phone company, somehow is, to his mind, on its face, harmful to the welfare of the complainant that we have heard from.

As far as any kind of sexual acts that took

place, all you have is the word of the complaining witness. We don't know her age. We don't know beyond even in the light most favorable to the People, we don't have the age of that person on the record to any type of extent that we can take that to be accurate. Frankly, there are records. There are records that were available to the prosecutor. The prosecutor has the power of the state. Frankly it seems to me it would have been a very simple thing to get, but he failed to do that, therefore, I ask you dismiss each and every count of this indictment at this time.

THE COURT: Thank you, Mr. Zerner.

You want to respond?

MR. PERRI: Yes, your Honor. The People oppose defense counsel's application. During this trial the People did have the mother of the child testify as to her age and current age and date of birth. The child, herself testified to her age and date of birth. Although previously in New York State and along with other jurisdictions did not allow People to testify about their own dates of birth and their ages, the courts in New York have dispensed that and do allow People to testify as to their own age.

With respect to the allegations in this case, your Honor, the People have made out a prima facie case

in the light most favorable to the People. The complainant in this case, Millinia Johnson testified that during the time period when she was 12 years of age and during which the defendant was 53 and 54 years of age, according to the testimony of the Detective Toussaint, where the defendant gave his own age at the time of his arrest and his date of birth, the defendant did engage in a course of sexual conduct that included multiple acts of both touching the intimate areas of Millinia Johnson, having her touch the intimate parts of the defendant, including his penis, including the defendant touching his penis to her and that he did engage in oral sexual contact with her, placing his mouth on her vagina and licking it, as she testified to it, at the National Wholesale Liquidators parking lot in West Hempstead, Nassau County, New York State. And that occurred on multiple occasions throughout the summer of 2013 and continuing into her seventh grade year up until and surpassing her birthday on December 30, 2013 where she turned 13 years of age.

Therefore, your Honor, as the People did present testimony that satisfies each and every element of counts one and two of the indictment, the People would oppose dismissal of those counts, one, two, three.

With respect to count four, the endangering

the welfare of a child charge, that count is not solely based upon text messages, although they do corroborate access and contact between the defendant not only during the period where the complainant was over 13 years of age, but during the time period where she was under 13 years of age starting in October of 2013.

The text messages, themselves, the nature of the conversations, the language used, the fact that the defendant does reference wanting to smash as the complainant testified was a word that indicated sexual intercourse, that they corroborate the complainant's testimony that there was an inappropriate relationship that was ongoing and the endangering the welfare charge encompasses that relationship, the ongoing sexual contact the witness testified to, as well as the amount of contact and the nature of the text messages themselves, your Honor.

As the People put forth this evidence to the Court, we have met our burden at this stage of the trial. A prima facie case has been presented and the case should continue, your Honor.

THE COURT: The Court reserves decision on those defense motions.

With regard to the inquiry of the jury foreperson before close of business yesterday, in regard

to the definition or meaning of voir dire, presumably in light of defense counsel's voir dire of witnesses with regard to authentication of evidence, as well as the expert witness, the Court has drafted a short instruction that it intends to give to the jury, unless there is an objection by counsel.

It simply defines what voir dire means in that context and then the application, if you will, of that concept.

In terms of the Court having to make a legal decision with regard to the evidence or testimony or qualification of the witness, and then with regard to the truth, accuracy and importance of that evidence that was allowed in, it's the jury's responsibility as judges of the facts. So you have the copy of what the Court plans to offer and I'll hear each counsel on that point.

MR. PERRI: The People have no opposition.

MR. ZERNER: I have reviewed this and I rely on your Honor's good judgment.

THE COURT: Thank you all. So, I'll give that definition as soon as the jury comes in.

Now, Mr. Zerner, I understand that you will be putting on a case?

MR. ZERNER: Certainly, your Honor.

THE COURT: And what witnesses do you have

scheduled for today?

MR. ZERNER: Rafael Mickens, George Mickens, Paula Ross, Jasmine Ross and Justyn Ross. We may have one other witness who had to visit the hospital last night. We're waiting to hear back from her. We should probably hear back from her during the course of the morning and I'll know for certain at the lunch break whether she is physically able to make it.

THE COURT: Very good.

With regard to Rafael Mickens, can you just, for the record, give the Court an offer of proof as to what the context of his testimony is going to be?

MR. ZERNER: Certainly, your Honor, and just for the record, I have already provided this information to Mr. Perri yesterday.

THE COURT: Held in an informal chambers conference with my law secretary.

MR. ZERNER: Just putting that on the record, your Honor, yes.

Rafael Mickens is the father of Millinia Johnson and he will testify about various aspects of their relationship, as well as his relationship with her mother, Sarita Johnson who is another witness that the prosecutor called during the course of the prosecution's case.

It's my understanding that certain things that he will testify to will directly contradict items that were testified about by both Sarita and Millinia Johnson. This will undermine the credibility of those witnesses. I believe it's completely within my purview putting on a defense case that I'm able to do that.

THE COURT: Could you be a little more specific? Because I heard what you said, but I didn't get much out of it.

MR. ZERNER: Okay, your Honor, and again, I'm happy to put this on the record. What I'm not looking to do is turn over every card and explain to the prosecutor every way I plan on asking every question of every witness on my list. Rafael Mickens is the father of the complaining witness here. For example, the complaining witness stated that she had not spoken to her father in years. That's not true.

There is an issue about the telephone that was a line through the entirety of the prosecution's case. There were multiple phones. There are phones in evidence. There are literally hundreds, if not thousands of pages worth of phone records that are in evidence. And there are issues about the first phone that she got, how she got the phone, who paid for the phone, where she got the phone and both Rafael and

George Mickens will testify about that.

THE COURT: How does that go to the issue of whether or not your client engaged in the crimes charged?

MR. ZERNER: It goes to the credibility of both the complainant, as well as her mother. One of the defense theories of the case is that Sarita Johnson coached, instructed, concocted these charges and got her daughter to give these statements and this goes to the theory behind that as to why Sarita Johnson may have done that.

You will recall that -- I don't believe this was put on the record previously -- there is an allegation right now within the last few days that Sarita Johnson attempted to intimidate somebody who may or may not be a defense witness in this case. That's crucially important. It goes exactly to the heart of the defense case. This did not happen. My client is not guilty. My client did not give a statement that needs to be contradicted now. This is a complete and total work of fiction that was written by Sarita Johnson and my defense, in part, relies on my opportunity to show that she was less than truthful when she testified for the prosecutor.

THE COURT: People want to be heard?

MR. PERRI: Yes, your Honor. The People would oppose the calling of this witness. As defense counsel just explained, the whole purpose of calling this witness is --

MR. ZERNER: Objection. Not the whole purpose.

MR. PERRI: The purpose proffered.

THE COURT: Please let the assistant district attorney finish his argument and then you can clarify or correct his argument on reply.

MR. PERRI: Your Honor, the reason proffered by the defense for calling this witness is wholly for the purpose of providing collateral evidence to impeach non-material issues as to the testimony of both Sarita Johnson and Millinia Johnson in this case.

Rafael Mickens, although the father of Millinia Johnson, is not a fact witness in any way. The defense has not called them as a character witness for the defense. He does not have relevant testimony with regard to any material aspect of this case.

And just to clarify, when defense counsel is saying the first phone, he is not referring to either of the two phones that are in evidence in this case, he's referring to a phone that Rafael and George Mickens provided, allegedly, Millinia Johnson in 2011. That was

the testimony that was discussed in chambers yesterday with regard to these two witnesses. As this is entirely collateral, according to case law that I will hand to defense and to the Court, along with what is explicitly written in Prince Richardson. Collateral impeached evidence where the sole purpose of the testimony is to contradict non-material issues to which an opposing witness has testified, both counsels are bound by the answers a witness has given and they are not allowed to introduce a secondary matter into the trial that would be both distracting to the jury and result in trial after trial before the jury on ancillary issues that do not go to the heart of the matter of the defendant's guilt or innocence in this case.

Richardson also says that extrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground.

THE COURT: How do you respond to that, given Mr. Zerner's argument suggesting that's part of the inquiry?

MR. PERRI: Your Honor, yes, Prince Richardson does say actual evidence with respect to the possibility that a witness has a motive to fabricate and/or hostility of that witness to the opposing party is never an extraneous issue. However, both the Court of Appeals

and the First Department, the same law has been applied in the Second Department. The first case, People v. Ruiz, 18 A.D.3d 220, 2005 applied in the Second Department by People v. Lyons in the Queens Criminal Court, 918 N.Y.S.2d 399 states that although that is the general rule, the Court must make a determination as to whether or not there is a rational connection between the defenses theory and the applicability to this case and the evidence that is before the jury in this case.

The fact that Millinia Johnson was given a phone in 2011 has nothing to do with the hostility that either she or her mother may have towards the defendant and any relationship that she may have to Rafael Mickens and George Mickens, the father and the uncle to her child, Millinia Johnson, the complainant in this case.

It has no relevance with respect to a conspiracy that there is no evidence in the record of to fabricate evidence in this case, to falsify testimony or coercion of Millinia Johnson by Sarita Johnson. And that is not the theory that's been offered by the defense, your Honor.

MR. ZERNER: Your Honor, it's been exceedingly difficult for me to offer theories and, frankly, I don't have to turn over every theory that I am considering before Mr. Perri and then have Mr. Perri rule on that.

THE COURT: Hold it, Mr. Zerner. You don't have to do anything for Mr. Perri. What you do have to do is respond to the Court's inquiry on an offer of proof.

MR. ZERNER: That's exactly what I'm doing.

THE COURT: And to hold in your pocket, if you will, areas of inquiry that you feel are relevant, quite frankly puts the Court in a very difficult position.

MR. ZERNER: Your Honor, I am not holding any of these items in my pocket. In fact, I am the person when we found out about Denise Sawyer being --

THE COURT: Let's not go back to Ms. Sawyer.

MR. ZERNER: But it's connected, your Honor.

THE COURT: We're talking about Mr. Mickens.

MR. ZERNER: But it's connected because this was behavior that was engaged in with Sarita Johnson with regards to many different people in her life over long periods of time, including the period of time that we're talking about here.

The period of time we're talking about here, as defined by the prosecutor, starting in March of 2013. Well, this is her father. Rafael Mickens is her father. George Mickens is her uncle. They have had contact with her.

THE COURT: Here's what I'm going to do,

Mr. Zerner, so we don't engage in a circular argument. The district attorney has laid out his opposition to your witnesses. Quite frankly, I don't know how the witnesses are going to present themselves, so I'm going to allow you to call these witnesses, but if I find that the line of inquiry is inappropriate or cumulative or collateral or irrelevant and non-material, I'll let you know about that either by way of responding to an objection raised by the People or on the Court's own motion with regard to that line of questioning. That's the best I can do in giving you the opportunity to connect these individuals to material issues at trial.

MR. ZERNER: I will certainly do that, your Honor, and I appreciate your ruling.

Just to finish up my point before, Mr. Perri is somehow saying that well, anything that happened before two thousand --

THE COURT: That was argument. I made my ruling. I don't need further discussion of it. If there is an objection, I'll rule on the objection. If I deem it to be inappropriate questioning, I'll rule on it independently if needed.

Now, that being said, I would expect that you be direct and to the point with these particular witnesses and not unnecessarily prolong this particular

trial, as is in the Court's discretionary authority to control.

MR. ZERNER: Your Honor, just so it's clear for the record, I don't think that there is any indication that I have done anything to prolong anything in this trial.

THE COURT: Mr. Zerner, I'm talking about these pointed witnesses that you are bringing in or intend to bring in that you have indicated in informal conferencing that they're offered for particular purposes and that's all I'm asking you and telling you.

MR. PERRI: Your Honor, the People would like the Court to admonish defense counsel your ruling still stands with respect to all the collateral issues regarding CPS and CPS interaction with 301 Coventry and these witnesses are not permitted to be questioned about any of those instances and/or the alleged petit larcenies by the complainant's mother in this case. That ruling still holds.

THE COURT: I'm sure Mr. Zerner is well aware of the Court's rulings and as an officer of the Court will abide by that. If there is an issue that is raised, the Court will deal with it at that particular time.

MR. PERRI: Thank you, your Honor.

THE COURT: But I don't warn you preemptively and I'm not going to warn Mr. Zerner preemptively. As you are both officers of the Court, I expect you to conduct yourselves and comport yourselves in that manner, as advocates and adversaries, but professionals as well. So, everyone is fully aware of the Court's prior rulings.

Anything else for the record from either counsel?

MR. PERRI: Not at this time, your Honor, thank you.

MR. ZERNER: No, thank you, your Honor.

THE COURT: Gentlemen, I have a matter that I have to tend to because I have counsel waiting and before I bring the jury in, I want to take care of this. It's been adjourned a number of times because I have been on trial.

(A recess was taken.)

THE CLERK: Continued case on trial, People very Ray Ross. The jury is not present. All sides and parties are present.

THE COURT: Mr. Zerner, who is your first witness?

MR. ZERNER: Rafael Mickens.

THE COURT: Mr. Zerner, you said Rafael

Mickens?

MR. ZERNER: Yes, sir.

THE COURT: Then who?

MR. ZERNER: George Mickens.

THE COURT: Then who?

MR. ZERNER: Paula Ross.

THE COURT: Mr. Zerner, with regard to George Mickens, what's your offer of proof?

MR. ZERNER: There were multiple issues that came out about telephones. One of those issues under the complainant's testimony was about when she got a phone, whether it was phone number one, phone number two. I elicited testimony she's actually had four phones over the course of her time of owning phones. The first phone that she got was bought by George Mickens. There is a whole litany of information about that phone. It's important. It's crucial.

THE COURT: Crucial to what, sir?

MR. ZERNER: Crucial to my case.

THE COURT: How?

MR. ZERNER: Showing several things. Thing number one is that the credibility of both the complainant and her mother are at issue here and I have to be able to have the opportunity to show what the --

THE COURT: You elicited from her that her

Uncle George bought the first phone. The real number one phone.

MR. ZERNER: That's one piece of this, yes.

THE COURT: What's the other pieces? That issue is resolved and the Court will not allow that witness to come on the witness stand and testify to that as it's collateral and it's going to prolong this trial.

MR. ZERNER: Your Honor, if I may, the testimony from this person will probably take less time than our discussion about whether there will be testimony from this person.

THE COURT: That doesn't mean the Court should allow it.

MR. ZERNER: Of course not, your Honor. What I'm saying is I don't think that I have to give a complete and total --

THE COURT: To me you do, sir. To me you do. Because I have to find out whether the Court's going to allow it.

MR. ZERNER: Yes, your Honor, yes. So what George Mickens will testify, in addition to what I have already put on the record, is that George was with Rafael and with Millinia when the phone was received. There were several things that happened about the payment of the phone, about the permissibility of

Millinia having the phone. Sarita's reaction to the phone. Whether the phone was properly kept.

The number of text messages is something that comes up constantly in the People's case. I have to have an opportunity to respond to that. About what type of communication there was between the different people involved. Who paid for the phone and then was there a change in who was paying the phone when the phone was paid for and what the reactions were of the people involved that have already testified.

THE COURT: But, Mr. Zerner, that has nothing to do, nothing about with whether or not your client engaged in the charged conduct.

MR. ZERNER: My client did not engage in this charged conduct, so for me to prove a negative, one of the things I have to be allowed to do is show the bias and to show the angle that's being dealt with.

THE COURT: And I'm trying to let you, but I don't see it with George Mickens giving Millinia the first phone and she using it as any kid would.

MR. ZERNER: But there is more to then how any kid would. A lot of the testimony that was brought out by the prosecutor was about the number of text messages, the time of day phone calls were made. Whether the phone was allowed to be held on to.

THE COURT: Two years before the incident?

MR. ZERNER: Starting two years before, leading into the time frame that the incident supposedly happened.

This is the thing: There is a continuum of information and a continuum of time. The prosecutor has charged what has gone on from March of 2013 through October of 2014. What I am going to elicit testimony about goes right into the heart of that time frame. But that's not the only thing that I should be allowed to get into because if something needs to be explained to the jury so it's not taken out of context so they understand when the phone was bought.

THE COURT: Well, that belies your argument, sir, that the testimony or the direct testimony of Mr. Mickens would take less time than the argument you are presenting now.

MR. ZERNER: I apologize, your Honor.

THE COURT: It seems to me you would be going on and on and on in ad nauseam with regard to a phone that has nothing to do with the case.

MR. ZERNER: Your Honor, as an officer of the Court, having not called any witnesses so far, having devised a legal strategy to defend my client, I'm simply asking to be allowed to defend my client.

THE COURT: I'm going to let you have the father and see where that goes, okay, but I don't see how George -- isn't the father going to testify to essentially the same matters?

MR. ZERNER: Your Honor --

THE COURT: Yes or no?

MR. ZERNER: First of all, the answer is maybe. I don't know exactly what people are going to testify to.

THE COURT: What you anticipate, sir. It's your witness.

MR. ZERNER: It is.

And secondly, your Honor, it's my understanding that the complainant testified in the grand jury that this phone was bought for her by her father. Then there was testimony on the witness stand in front of your Honor that the phone was bought by her uncle. It's my understanding that the three people were together and that the phone was actually purchased by the uncle and that there was a certain amount of kindness that was shown as far as who had the phone, who provided the phone.

THE COURT: Kindness is not a defense, sir.

MR. ZERNER: Exactly. It's certainly not an offense.

THE COURT: Defense.

MR. ZERNER: It's something you need to have context about what went on and how it went on with regards to the phone. It is an issue in this case.

THE COURT: The jury is waiting outside. At this juncture we'll break after Rafael Mickens' testimony. At this juncture the Court is not going to allow it. If you want to continue your argument at the break, I will let you for a short while if you have any additional information.

With Paula, I'm going to allow it, Mr. Zerner.

MR. ZERNER: Thank you, your Honor.

THE COURT: At least on a limited basis and we'll see where that goes. But I'm giving you the full breath of the benefit of the doubt in trying to put a case on. I don't see anyway how Mr. Mickens, Mr. George Mickens should be allowed.

MR. ZERNER: Well, I do have more to talk to you about that and I will respectfully accept your representation that after the conclusion of Rafael Mickens we will discuss it further.

THE COURT: Very good, we will.

Please call the jury in.

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE CLERK: Let the record reflect the presence of the jury. All parties are present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you.

THE COURT: Good morning, ladies and gentlemen. I asked for your indulgence this morning. We have been delayed a little bit, but it's only because I was taking care of matters unassociated with this trial that were scheduled and I had to take care of it.

So now we're ready to continue. The defense will be putting on a case and we'll hear from the defense witnesses in just a minute. But there was a question from the jury foreperson yesterday before we left as to the meaning of voir dire.

Now, you will recall that during jury selection I told you voir dire meant to speak the truth and that is the definition of that in that context. In this context here at trial, it means a preliminary examination of a witness. So you will recall Mr. Perri engaged in direct examination of a witness and offered evidence -- offered an exhibit to be introduced into evidence. Under the law, the voir dire of the witness, the opposing counsel has the right to question or

preliminary exam that witness to raise some question about or to test the admissibility of the evidence or the competency of a witness offered by the proponent.

You will know in that case it's with regard to Mr. Hanson as an expert witness. So, it's a very limited and directed examination going to the specific point as to whether the evidence should be introduced -- whether the exhibit should be introduced into evidence or, in the other regard, whether Mr. Hanson should have been qualified as an expert witness.

So, that was my job as judge of the law to make those legal determinations. And Mr. Zerner was absolutely permitted to make that inquiry as it's done on almost all occasions.

So, voir dire may be requested when the opponent wishes to challenge the foundation for the introduction or exclusion of evidence and including the qualifications of a witness whom the proponent seeks to have testify as an expert witness. It has its limited purpose and scope and it's not a substitute or compliment to cross-examination, it's only for the specific purpose I have told you.

So I told you that was a legal issue for me to decide. And you know my rulings. The evidence was received. The exhibits were received in evidence. And

Mr. Hanson was qualified as an expert witness.

They are legal rulings that I made. The truthfulness and accuracy of the testimony and/or the weight or importance you give, if any, to that testimony or to those exhibits received in evidence is based on your independent evaluation and determination as judges of the facts. So you received that information. Now it's up to you to independently evaluate it; the worth of it, the importance of it, the truthfulness and accuracy of it as judges of the facts.

I'll instruct you further on this issue when I give you my final jury instructions at the close of trial. I hope that explains it to you and it's just part of the process.

Mr. Zerner, who is your first witness, sir?

MR. ZERNER: The defense first witness is Rafael Mickens.

THE COURT: Very good.

R A F A E L M I C K E N S, residing in the County of Nassau, having been called as a witness on behalf of the Defendant, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name and spell your first and last name. Give us your county of residence.

THE WITNESS: Rafael Mickens, R-A-F-A-E-L

M-I-C-K-E-N-S. Nassau County.

THE COURT: Mr. Mickens, before we get started, I'm going to ask you to speak slowly and speak into the microphone in answering the questions, okay, so that the jury can hear you and that the court reporter can take down your testimony.

THE WITNESS: Yes, sir.

THE COURT: Your witness, Mr. Zerner.

MR. ZERNER: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ZERNER:

Q. Good morning, Mr. Mickens.

A. Good morning.

Q. Mr. Mickens, could you tell us what do you do for work?

A. Right now I'm not working right now.

Q. When you do work, what do you do?

A. I do maintenance. Janitorial.

Q. Where is that?

A. It was in Roosevelt Field.

Q. Now, do you know a woman named Sarita Johnson?

A. Yes, sir.

Q. When did you first meet her?

A. 8/29/1998.

Q. You remember the exact date?

A. Yes, sir.

Q. What was significant about that date?

MR. PERRI: Objection.

THE COURT: Overruled.

A. It was all right, but it was, you know, I dated her for about -- I dated eight years I dated her.

Q. Did there come a point in time while you were dating that you decided to live together?

A. Yes, sir.

Q. And was that -- withdrawn.

Do you have any children with Sarita Johnson?

A. Yes, sir.

Q. How many?

A. One.

Q. And did you start living with Ms. Johnson before or after the child was born?

MR. PERRI: Objection.

A. Before.

THE COURT: Overruled.

Q. You said before?

A. Yes, sir.

THE COURT: I'm sorry, Mr. Zerner.

Sir, Mr. Mickens, if you hear the word objection, I'm going to ask you to stop or don't start your answer until I make a ruling and then I'll tell you

whether or not you can answer the question or I'll tell counsel to move on to the next question.

THE WITNESS: Yes, sir.

Q. And when you lived with Sarita Johnson and the child you had together, where were you living?

A. I was living with Sarita Johnson.

Q. Can you tell us the address?

A. 301 Coventry Road South.

Q. And in what town is that?

A. That's Lakeview.

Q. Lakeview in West Hempstead?

A. New York, yes.

Q. Do you remember approximately the month and year you started living there?

A. I would say about October. October 21st, somewhere around there.

Q. Of what year?

A. '98.

Q. You started living with her in October of '98?

A. Yes, sir.

Q. And you lived with her for about eight years you said?

A. Yes, sir.

Q. Did there come a point in time that you had a child together?

A. Yes, sir.

Q. And do you remember when that was?

A. It was in 2000.

Q. What's that's child's name?

A. Millinia Johnson.

Q. Now, you said there came a point in time when you no longer lived with Sarita and Millinia, correct?

A. Yes, sir.

Q. Approximately what month and year was that?

A. That was in September 2006.

Q. And what changed that resulted in you moving out?

MR. PERRI: Objection.

THE COURT: Overruled.

Q. You can answer the question.

Why did you move out?

A. We got into like a big argument.

Q. Do you remember what that was about?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. And when you moved out, your daughter was almost six-year-old; is that fair to say?

A. Yes, sir.

Q. And at the time were you involved in your daughter's life?

A. Oh, yes.

Q. Since moving out, have you been involved in your daughter's life?

A. Yes, sir.

Q. Have there been any impediments to that?

MR. PERRI: Objection.

THE COURT: Sustained as to the form of the question.

Q. Could you describe some of the ways you are still involved in your daughter's life?

A. I seen her, last time I seen her was October. October 13th.

Q. Of last year, 2015?

A. Yes, sir.

Q. And do you speak with her on the phone?

A. Yes, sir.

Q. What other ways do you communicate with your daughter?

A. I see her -- I really don't see her that much. I see her when I get a chance to.

Q. Do you see her as often as you would like?

A. No.

Q. Why?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Can you describe your relationship with Sarita

Johnson?

MR. PERRI: Objection.

THE COURT: Presently, sir?

MR. ZERNER: I'll define it by a time frame, if I'm allowed to, your Honor.

Q. So in October or September, October of 2006, you no longer were living with Sarita Johnson; is that fair to say?

A. Yes, sir.

Q. And from that point until today, is it accurate to say you have never lived with Sarita Johnson again?

A. No, no, sir.

Q. So it is accurate to say you have not lived with her since that time frame in late 2006?

A. Yes, sir.

Q. And from 2006 to the present, could you describe your relationship with Sarita Johnson?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Well, you are raising a child together with her, right?

A. Yes, sir.

Q. Could you describe how that's gone?

MR. PERRI: Objection.

THE COURT: As to the form of the question, Mr. Zerner.

Q. Are you active in your daughter Millinia's school?

A. Yes, sir.

Q. Have you ever gone to her school for parent-teacher conference?

A. No, sir.

Q. Have you ever gone to her school for any type of sports or musical events?

A. Yes, sir.

Q. Could you describe some of them?

A. She had like a Christmas concert and then she had -- she did graduated from the middle school.

Q. And you attended the middle school graduation?

A. Yes, sir.

Q. Do you remember the approximate month and year that was?

A. No, sir.

Q. Fair to say it would have been summertime, June?

A. Yes.

Q. Perhaps last June?

A. Yes, sir.

Q. Now, do you personally have a cell phone?

A. Yes, sir.

Q. Do you remember the first time your daughter Millinia got a cell phone?

A. Back in two thousand, I would say, fourteen.

Q. Well, 2014 you got her a cell phone?

A. No, sir.

MR. PERRI: Objection.

A. No, sir.

THE COURT: Hold it. The witness answered, so it's overruled.

Mr. Zerner, you are on direct examination, okay.

MR. ZERNER: Of course.

Q. So just so it's clear for the jury, if you recall, were you with your daughter when she got her first ever cell phone?

A. No, sir.

Q. You were not with her?

A. No, sir.

Q. Do you know who was with her? Who got her her cell phone?

A. My brother.

Q. What's your brother's name?

A. George Mickens.

Q. And if you know the approximate month and year when your daughter first got her first ever cell phone?

A. I don't remember that.

Q. So now when your daughter first got her first cell phone, did somebody tell you that she got a phone and what

the number was for the phone?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. How did you find out that your daughter got a cell phone?

A. My brother told me. He said he was going to buy it for her so I can keep contact with her.

Q. And to the best of your knowledge, did your brother buy your daughter a cell phone?

A. Yes, sir.

Q. Why did your brother buy it?

A. Because he wanted me to keep in contact with her.

Q. And this was a positive thing?

A. Yes, sir.

MR. PERRI: Objection.

THE COURT: Overruled.

Mr. Mickens, I'm going to ask you if you hear that word objection, just kind of stand fast so I can make a decision, okay.

THE WITNESS: Yes, sir.

THE COURT: Next question.

Q. When you communicated with your daughter after the time that she got this cell phone, how would you communicate with your daughter?

A. I just see how she's doing, you know.

Q. When you would communicate with her, would it be in person or by phone or by letter, how would you communicate with your daughter?

A. Phone, then person.

Q. And when, if it was by phone, was it by a house phone, like a landline, or was it on a cell phone?

A. Cell phone.

Q. Was it the cell phone you are describing that your brother George had bought for her?

A. Yes, sir.

Q. Now, you said you would see her in person as well?

A. Yes, sir.

Q. And was that on a regular basis?

A. Yes, sir.

Q. Could you describe that regular basis?

A. Well, last --

MR. PERRI: Objection, your Honor.

THE COURT: With regard to a time frame, Mr. Zerner.

Q. Let's talk about in 2013. Do you remember during the calendar year of 2013 did you see your daughter on a regular basis?

A. Yes, sir.

Q. And could you describe what a regular basis would have been?

A. Well, summertime I used to take her to go see my brother in Harlem.

Q. And approximately how often would you get together with your daughter?

A. Mostly like twice out of the month.

Q. And would you pick up your daughter?

A. Yes, sir.

Q. And where would you pick her up?

A. On the corner of Coventry Road South.

Q. And do you have any reason why you would pick her up on the corner?

MR. PERRI: Objection.

THE COURT: Overruled.

Q. Please answer the question.

A. I'm not comfortable around going to the house.

Q. Could you describe why?

MR. PERRI: Objection.

THE COURT: Overruled.

Q. You can answer.

A. Because I'm not comfortable around Sarita.

Q. Could you tell us why you feel that way?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Could you describe the relationship that you had with Sarita Johnson in 2013?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Repeat that again.

Q. Could you describe your relationship with Sarita Johnson, the mother of your child, in the calendar year of 2013?

A. There is no relationship. I mean, I'm just not comfortable around her.

Q. What makes you feel that way?

MR. PERRI: Objection.

THE COURT: Overruled.

Q. Please answer.

A. Because I don't like her ways.

Q. Specifically what do you mean by that?

MR. PERRI: Your Honor, objection.

THE COURT: Overruled.

A. I'm gonna say it like this, I did nothing wrong to her. All I did was very good to her. She thinks that I was --

MR. PERRI: Your Honor, objection. May we approach?

THE COURT: No, thank you.

Mr. Mickens, thank you for your answer.

Next question.

MR. ZERNER: Thank you, your Honor.

Q. Do you know my client, Ray Ross?
A. Yes, sir.
Q. Do you remember when you first met him?
A. Back in two thousand, I would say, 2006.
Q. So in 2006, the beginning of 2006 you were still living at 301 Coventry Road North?
A. I had just moved out.
Q. And was there ever a point in time when you and Ray Ross both lived in the house at the same time?
A. No, sir.
Q. And where did you first meet Ray Ross?
A. I met him around my other cousin's house.
Q. Who is this other cousin?
A. Howard Rutherford.
Q. And geographically where is that house?
A. That's in 300 Landing Boulevard.
Q. Is that also in Lakeview?
A. Rockville Centre.
Q. So not very far away?
A. No, sir.
Q. Do you know what the allegation is in this trial, correct?
A. Yes, sir.
Q. Has your daughter talked to you about this allegation?

A. No, sir.

Q. Have you had any conversations with Sarita Johnson about this allegation?

A. No, sir.

Q. Do you have any feelings about the validity of this allegation?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Now, you have described that your brother bought a cell phone for your daughter?

A. Yes, sir.

Q. And fair to say that was approximately in 2011?

A. Yes, sir.

Q. And to the best of your knowledge, was there a point in time when that phone was no longer in service?

A. Yes, sir.

Q. And do you recall when that was?

A. That would be in 2011.

Q. In 2011 that phone stopped working?

A. Yup. I couldn't get no contact with her.

Q. So if you couldn't contact your daughter by her cell phone, what other means would you use to get in contact with her?

MR. PERRI: Objection.

THE COURT: Overruled.

Q. Please answer.

A. I would go to the house.

Q. And were you comfortable going to the house?

MR. PERRI: Objection.

THE COURT: Sustained.

A. Not really.

THE COURT: Hold it, sir.

Next question.

Q. Were you in a position financially to be able to restore service to that cell phone when it got turned off?

A. Yes, sir.

Q. And did you, personally turn that phone back on?

A. No, sir.

Q. Why not?

A. Because I wasn't allowed to.

Q. Who didn't allow you to?

A. Sarita.

MR. PERRI: Objection.

THE COURT: Overruled.

Next question.

Q. Did you consider turning on the cell phone regardless of Sarita's opinion about that?

MR. PERRI: Objection.

THE COURT: Sustained.

MR. ZERNER: I have nothing further at this point in time.

THE COURT: Very good.

Mr. Perri.

MR. PERRI: Yes, your Honor.

CROSS-EXAMINATION

BY MR. PERRI:

Q. Mr. Mickens, when was the last time you worked?

A. 2014.

Q. And where do you currently live?

A. 239 Terrace Avenue, Hempstead, New York.

Q. Who asked you to come here today?

A. Ray Ross.

Q. And did you discuss the case with Mr. Ross?

A. No, sir.

Q. So why did you come here today?

A. I'm a witness.

Q. And --

A. I'm a witness that he's innocent.

MR. PERRI: Your Honor, I ask that that be stricken.

THE COURT: Overruled.

Next question.

MR. ZERNER: Thank you, your Honor.

Q. Did you discuss your testimony with Mr. Ross, what

you were going to say?

MR. ZERNER: Objection; asked and answered.

THE COURT: No, overruled.

A. Yeah, he's innocent.

THE COURT: Mr. Mickens, you have to answer the question that's posed to you, okay, and the question was did you speak with Mr. Ross about your testimony that you were going to give today? Yes or no?

THE WITNESS: Yes, sir.

Q. How many times did you discuss your testimony with Mr. Ross?

A. About twice.

Q. Did you speak with the defense attorney?

A. Yes, sir.

Q. And you spoke about what you were going to say today?

A. Yes, sir.

Q. How many times did you speak with the defense attorney?

A. I spoke to him like four times.

Q. So you were asked to come here today to say the defendant was innocent?

A. Yes, sir.

Q. But you were never alone in a truck with Mr. Ross and Millinia Johnson at National Wholesale Liquidators

parking lot, correct?

A. No, sir.

Q. And you were never at a room at 301 Coventry Road in Mr. Ross' bedroom with Millinia Johnson, correct?

A. No, sir.

Q. And you're friends with the defendant, correct? You're friends with the defendant?

A. My friend?

Q. Are you friends with Mr. Ross?

A. That's my cousin.

Q. How are you related to Mr. Ross?

A. On my aunt's side.

Q. Are you close with him?

A. Yes, sir.

Q. You like him?

A. Yes, sir.

Q. And you want to help him, correct?

A. Why not? Yes, sir.

MR. PERRI: Nothing further, your Honor.

THE COURT: Any redirect, Mr. Zerner.

MR. ZERNER: Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. ZERNER:

Q. And you love your daughter?

A. I love my daughter.

MR. PERRI: Objection; beyond the scope, your Honor.

THE COURT: Overruled.

A. I love my daughter. I'm very close to her. Very close.

MR. ZERNER: Thank you. Nothing further.

THE COURT: Any recross?

MR. PERRI: No, your Honor.

THE COURT: Mr. Mickens, thank you for your testimony. It's concluded. You are free to go.

THE WITNESS: Thank you, sir.

(Whereupon, the witness was excused.)

THE COURT: Okay, ladies and gentlemen, I have to take a break, okay, so I'm going to ask you to please indulge me with your patience. I'll call you back in about 15 minutes, okay.

(Whereupon, the jury exited the courtroom.)

THE COURT: Mr. Zerner, I'll allow you to complete making your record with regard to Mr. George Mickens, but at this point the Court will not allow him to testify based on what's been previously argued.

MR. ZERNER: Yes, your Honor, thank you.

Your Honor, just for the record, I believe that the entirety of Rafael Mickens' testimony was less than 20 minutes start to finish. You may have observed

that he's a relatively unsophisticated witness and as a result of that, there may be items that he can testify to and some that he can't testify to.

THE COURT: Are we talking about Rafael or George?

MR. ZERNER: I'm talking about Rafael, the only person we have seen in this courtroom so far.

THE COURT: All I know is that you had the opportunity to inquire of him. You did, he answered your questions. So if there is something that he can't testify to, that's pure speculation.

MR. ZERNER: That's right. And coupled with that, sometimes I can't ask witness one a question because he's not qualified to answer. So sometimes witness two needs to answer the question so the jury gets a full and complete picture about what's happening and what's not happening and when it's happening.

THE COURT: What's your offer of proof, sir, with regard to George Mickens that's different than what you previously argued?

MR. ZERNER: It's different now because we heard from witness number one. Witness number one testified slightly differently to what I anticipated him testifying to about the time and place where the first cell phone was first acquired and as far as the specific

point in time when the phone was acquired and as far as the specific point in time when the phone was turned off and turned back on.

THE COURT: So you are trying to impeach your own witness --

MR. ZERNER: No, no.

THE COURT: With the calling of another witness?

MR. ZERNER: No, I'm not trying to impeach my own witness, your Honor. What I'm trying to do is let the jury understand who bought the phone, why was the phone turned off. When was the phone turned off. I tried to ask these questions of Rafael Mickens because your Honor made it clear to me before he testified that there was a very real possibility that you would not allow George Mickens to testify. So I'm trying to ask questions of Rafael Mickens because I'm trying to both educate the jury, inform the jury, give the jury a full and complete picture of what was going on with regard to a particular issue. The issue in this case involving the cell phone.

I believe George Mickens could answer a few questions. He's in the hallway. It will clarify exactly what the story was, when it was, et cetera, et cetera. I honestly don't see the harm in him

testifying. I, despite my efforts and despite my prep and despite my abilities, I cannot put words into my witness's mouth and my witnesses are going to testify how they are going to testify. Sometimes there are going to be objections raised to what they are testifying about and while I respect each and every one of your rulings, sometimes it would be my opinion that had this question been answered, then perhaps another witness might not be necessary.

But absorbing and accepting the rulings that are, made sometimes that will then, in my opinion, which obviously could be wrong, in my opinion necessitate the asking of a particular question from the next witness.

THE COURT: Mr. Perri, you want to respond?

MR. PERRI: Your Honor, the People have opposed all of these witnesses.

THE COURT: We're not talking about all of these witnesses, Mr. Perri, we're talking about Mr. George Mickens. So let's confine our responses to Mr. Mickens.

MR. PERRI: Yes, your Honor. With respect to Mr. Mickens, the People would oppose his testimony as it is collateral and cumulative, your Honor.

THE COURT: Five-minute break.

(A recess was taken.)

THE CLERK: The jury is not present. All parties are present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: Yes, we are, thank you.

THE COURT: Mr. Zerner, other than Mr. George Mickens and Ms. Paula Ross, do you have any other anticipated witnesses ready to testify today?

MR. ZERNER: Yes, I do. Your Honor.

THE COURT: Who do you have?

MR. ZERNER: I have Justyn Ross and Jasmyn Ross and I may have Kelly Ross. I'm waiting for a phone call back from her.

THE COURT: So is Ms. Paula Ross here?

MR. ZERNER: She is.

THE COURT: You said Jasmyn and Justyn?

MR. ZERNER: Yes, sir.

THE COURT: And Kelly maybe this afternoon?

MR. ZERNER: Yes.

THE COURT: Who is Lorigai?

MR. ZERNER: She's a sister and she may or may not be called to testify, but not today.

I'm sorry, your Honor, it sounds like I was unable to read my own handwriting and I carried forward

a mistake. I believe the proper spelling of that women's first name is L-O-R-I-G-A-I. I probably wrote it down incorrectly a year ago.

THE COURT: We have it. Bring the witness in. Mr. Mickens will be allowed to testify.

MR. ZERNER: Thank you, Judge.

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE CLERK: Let the record reflect the presence of the jury. All parties are present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defendant ready?

MR. ZERNER: We are, thank you.

THE COURT: Okay. Mr. Zerner, next witness, please.

MR. ZERNER: The next witness is George Mickens, your Honor.

G E O R G E M I C K E N S, residing in the County of Bronx, having been called as a witness on behalf of the Defendant, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name, spell your first and last name and give just your county of residence.

THE WITNESS: George Mickens, M-I-C-K-E-N-S.

I reside in a men's shelter in the Bronx.

THE COURT: Mr. Mickens, I'm just going to ask you to speak slowly and speak into the microphone so the court reporter can get all your testimony.

If you hear the word objection, stop your answer or don't start your answer so I can make a legal ruling and then I'll give you further instructions.

Mr. Zerner.

DIRECT EXAMINATION

BY MR. ZERNER:

Q. Good morning, Mr. Mickens.

A. Good morning.

Q. Do you currently work?

A. Yes, I do.

Q. Could you tell us what you do for work?

A. I clean houses. I clean brownstones off the books in Manhattan, Harlem, New York.

Q. Do you have any brothers or sisters?

A. I have a brother, one brother, that's it.

Q. What's his name?

A. Rafael Mickens.

Q. Do you have any children?

A. No, sir.

Q. Does your brother have any children?

A. Yes, sir.

Q. And could you tell us the child's name and gender?

A. Millinia. We call her Patty. She's a female. She's in high school. She's doing well. Fifteen, 16.

THE COURT: That's all, sir.

Q. Is she your only niece?

A. Yes.

Q. Do you have any nephews?

A. No, sir.

Q. Now, I want to direct your attention to 2011. In 2011 do you know how old Patty was then?

A. I don't remember. Oh, man. 2011 she was like -- what is she now? I don't remember. I don't remember.

Q. Did there come a point in time in 2011 when you decided to purchase a cell phone for your niece?

A. Yes.

Q. Could you tell us about that decision?

A. Yes, sir. I remember it was her birthday, something like that. She was doing good in honors. She's in honor roll. Since she was doing good in honor roll, I said if you continue to the next grade in the honor roll, I will buy you a cell phone. I will also pay for the bill as long as I can.

Q. Do you remember what her reaction to that was?

A. She was very happy. She was excited.

Q. Did you have a conversation with her father about

purchasing Patty a cell phone?

A. Yes.

Q. And do you remember whether he approved or disapproved?

A. He approved. He said it would be good for her so we'll have more communication with her.

Q. Did you have an opportunity to speak with Patty's mother, Sarita Johnson about your decision to get her a cell phone?

A. Yes, sir.

Q. And do you remember what her reaction was?

A. She said it's nice, that's good. I can only also talk to her too more.

Q. Now, do you remember geographically what county you were and when I refer to Patty, Patty and Millinia is the same person, right?

A. Yes.

Q. Do you remember where you were when you purchased this cell phone for Patty?

A. Jamaica Avenue.

Q. In Queens, New York?

A. Yes, yes.

Q. And were you alone with Patty?

A. It was me, her father and we purchased the phone together at the same time because she picked it out. I had

her pick it out.

Q. So Patty picked out the phone?

A. Yes, sir.

Q. And you paid for it?

A. Yes, sir.

Q. And now you said something about the service plan as far as being able to actually use the phone. Describe what you did about that.

A. All right. The service plan was special for me. If I have two open lines, I get a special price. So I got two service -- two phones on one line, which I was paying for two phones, all right.

So now I came to a point where I could no longer pay the bill no more. I paid the bill for like two years. So I told her then. She was saddened and she came back and said Ray Ray is going to turn on the phone. Somebody else is going to help me. I said all right, good.

He tried to turn the phone on. He couldn't do it. So I had to somehow connect him with my account, with my account number to my phone to give him so he can turn her phone on. They can zero out my account and as a new phone he can open up a new account for her and turn the phone on for her.

Q. Do you remember approximately how much time passed from the time you got her the phone until this change as far

as who was paying for the phone?

A. I don't remember. How much time has passed? Wow.

Q. Let's first of all, when you first bought her the phone, is it accurate to say that was in 2011?

A. You can say that, yes.

Q. And do you remember approximately how long you were paying for the bill for that phone?

A. Two years.

Q. So is it fair to say in 2013 is when this change took place?

A. Yes.

Q. Now, when you informed Patty that you would no longer be able to pay for the phone, did you also have a conversation at that time with her father, your brother?

A. Yes.

Q. And did you discuss the possibility of your brother paying for that cell phone?

A. Yes.

Q. And do you remember what that conversation was?

A. Yeah. He said he couldn't afford it and nobody could afford it. He said she needs a phone. I was mad I lose one of my jobs. I had the one job. I said find a way to pay for the phone and he said he couldn't do it.

Q. Now, at that same point in time did you personally have a conversation with Sarita Johnson, with Patty's mother

about that?

A. Yes, yes.

THE COURT: Hold it, Mr. Zerner. Hold it, Mr. Perri.

Mr. Mickens, I'm going to ask you to wait for the attorney, Mr. Zerner to finish his question because the reporter has to take the question down and then she has to take your answer down.

THE WITNESS: All right.

THE COURT: Mr. Zerner, please ask your question again.

MR. ZERNER: Certainly, your Honor, thank you.

Q. When this issue about payment of the phone came up, did you personally have a conversation with Sarita Johnson about that?

A. Yes.

Q. And could you tell us about that?

MR. PERRI: Objection, hearsay.

THE COURT: Overruled.

Did you have a conversation with Sarita Johnson?

THE WITNESS: Yes, I did.

THE COURT: What did you say to Sarita Johnson?

THE WITNESS: I can't afford the bill no more.

I want to keep her phone on. She said, if you can't afford it, you can't afford it.

Q. Then you described at some point in time you had a conversation with Ray Ross about this phone?

A. Yes.

Q. And do you remember what that conversation was about?

A. I can't afford the phone bill no more. I wanted her phone on. Somehow we can find a way to put her phone back on so we can all in Manhattan can continue to talk to her and communicate.

Q. Did there come a point in time, to the best of your knowledge, when Ray Ross started paying for this phone?

A. Yes. I don't remember the exact date, but I had to talk to him, yes, over the same date I spoke to him over the phone because I had to give him my code to unlock that phone and to clear it all out and for him to turn it on with a different code.

Q. Do you remember which cell phone company it was?

A. Yes, sir, Metro PCS.

MR. ZERNER: Thank you. Nothing further.

THE COURT: Very good.

Mr. Perri.

CROSS-EXAMINATION

BY MR. PERRI:

 Q. Good morning, Mr. Mickens.

A. Good morning, sir.

Q. Mr. Mickens, as you testified here today you are a convicted felon, correct?

A. Yes, sir.

Q. And you have been convicted of multiple felonies, correct?

A. Yes, sir.

Q. And you have been convicted of ten other crimes that weren't felonies, correct?

A. Yes, sir.

Q. You were convicted in 2010 of criminal sale of a controlled substance in the fifth degree, correct?

A. Yes, sir.

Q. You were convicted of criminal sale of a controlled substance in the fourth degree in 1998, correct?

A. Yes, sir.

Q. And you were convicted of attempted criminal possession of a controlled substance on February 19, 1992, correct?

A. Yes.

Q. And that was also --

THE COURT: Can we move on, Mr. Perri, please.

Q. Mr. Mickens, did someone ask you to come here to testify today?

A. Yes.

Q. Who asked you to come and testify?

A. My brother and the gentleman here.

Q. By the gentleman there, who do you mean?

A. Scott. I can't pronounce his name.

Q. You are speaking about defense counsel?

A. Yes, the gentleman right here.

Q. Did you speak with the defense attorney about your testimony here today?

A. Yes and no. I just -- yes, I did, yes, sir.

Q. And how many times did you speak with defense counsel about your testimony?

A. One time.

Q. When was that?

A. This morning.

Q. And did you ever speak to the defendant, Mr. Ross about your testimony?

A. No.

Q. Did you ever speak to your brother, Rafael Mickens about your testimony?

A. No, sir.

Q. Mr. Mickens, you were never present at the National Wholesale Liquidators parking lot with the defendant and Millinia Johnson, correct?

A. No, sir.

Q. And did you ever drive from Brooklyn to 301 Coventry Road with the defendant and Millinia Johnson in a truck?

A. No, sir.

Q. And have you ever been alone in the bedroom at 301 Coventry Road where the defendant previously lived with Millinia Johnson and Mr. Ross?

A. No, sir.

MR. PERRI: Nothing further, your Honor.

THE COURT: Any redirect, Mr. Zerner?

MR. ZERNER: Can I have one moment alone with my client, your Honor?

THE COURT: You may.

(Pause in the proceedings.)

MR. ZERNER: Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. ZERNER:

Q. Mr. Mickens, you made no attempt to hide that you have a criminal record, correct?

A. Yes, sir.

Q. And Sarita Johnson is aware of that, right?

MR. PERRI: Objection.

THE COURT: Sustained.

You don't have to answer, sir.

THE WITNESS: Yes, sir.

THE COURT: Next question.

Q. Your brother's aware of your criminal record?

A. Yes, sir.

Q. You love your niece?

A. Yes.

MR. PERRI: Objection.

THE COURT: Overruled.

Q. You're a good uncle?

MR. PERRI: Objection.

THE COURT: Sustained.

A. Yes, I am.

THE COURT: Hold on, Mr. Mickens, you have to wait when you hear the word objection.

That objection is sustained with regard to being a good uncle. Ladies and gentlemen, please disregard the question and the answer.

MR. ZERNER: That's all I have.

THE COURT: Any recross?

MR. PERRI: Nothing.

THE COURT: Mr. Mickens, thank you for your testimony. It's concluded. You are free to go.

THE WITNESS: Thank you.

(Whereupon, the witness was excused.)

THE COURT: Mr. Zerner, your next witness.

MR. ZERNER: The defense calls Paula Ross,

your Honor.

P A U L A R O S S, residing in Kings County, having been called as a witness on behalf of the Defense, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name, spell your first and last name and give your county of residence.

THE WITNESS: Paula, P-A-U-L-A, Ross, R-O-S-S. Brooklyn.

THE COURT: Mr. Zerner.

DIRECT EXAMINATION

BY MR. ZERNER:

Q. Good morning, Ms. Ross.

A. Good morning.

Q. Ms. Ross, have you ever been married?

A. Yes.

Q. And who were you married to?

A. Ray. Ray Ross.

Q. You see him in the courtroom?

A. Yes.

Q. Can you point him out by an article of clothing?

A. Right there (indicating).

THE COURT: With the black and gray sweater on, ma'am?

THE WITNESS: Yes, black and gray.

MR. ZERNER: If the record can so reflect, your Honor?

THE COURT: So noted.

MR. ZERNER: Thank you, your Honor.

Q. When did you get married to Ray Ross?

A. We were married, let's see, like about in 2000. Maybe earlier than. No, let's see. I can't remember dates. We got married '86. 1986.

Q. So you got married to Ray Ross in 1986?

A. Yes, 1986.

Q. You may have anticipated my next question.

Did there come a time when you were separated from Ray Ross?

A. Yes. This had to be around, like around 2000.

Q. Do you have any children with Mr. Ross?

A. Yes, I have three.

Q. Could you tell us their names?

A. Jasmyn, Justyn and Kelly.

Q. Now, Ms. Ross, do you work?

A. Yes, I do.

Q. Where do you work?

A. I work at Green Acres Mall sales associate for 15 years, yes.

Q. Which store?

A. At Green Acres Mall.

Q. Is there a particular store in Green Acres Mall?
A. Macy's, I'm sorry.
Q. Are you a little bit nervous, ma'am?
A. Yes, I am. I am very nervous.
Q. Now, you said you live in Brooklyn?
A. Yes.
Q. Who do you live there with?
A. My daughter and my son.
Q. And which daughter?
A. Kelly and Justyn.
Q. And do either of your children have children?
A. Yes, Kelly do have two boys, which are my grandkids, yes.
Q. How old are they?
A. They're four and two.
Q. Could you tell us their names?
A. Elijah and Sylas.
Q. Would you be kind enough to spell them?
A. Elijah is E-L-I-J-A-H, and Sylas S-Y-L -- wait a minute. I get confused. Excuse me about that, okay. I get confused about that. S-Y-L -- I think it's S-Y-L-A-C-E. I'm thinking. I'm not sure because the kids, the names are spelled so differently than what I used to do. I mean, you know, spell my kids' names, just easy names.
Q. This younger generation spells the name

differently?

A. Yes, yes. It's really different.

Q. Thank you, Ms. Ross.

Now, specifically what do you do at Macy's?

A. I'm a sales associate.

Q. Is it in a particular department?

A. Yes, Coach handbags.

Q. Now, aside from working at Macy's, do you have any other skills that you do to sometimes earn extra money?

A. Yes, I do hair on the side, yes, I do.

Q. Could you tell us approximately how many steady customers you have as far as doing hair?

A. Sometimes I could have up to maybe ten. Sometimes, you know, one. It all depends on like around Easter, the holidays and things like that, you know, different occasions, you know people going to weddings may ask me to do their hair or something like that.

Q. In addition to having customers that you do hair for, do you also sometimes do that for friends and relatives?

A. Of course, all the time, all the time.

Q. Now, you and Ray Ross got separated around the year 2000?

A. Yeah, around that time, yes.

Q. And did there come a point in time when you became aware of him being in a new relationship?

A. Of course, yes.

Q. And do you know who that person is?

A. Yes, Tara Johnson.

Q. Could you describe your relationship with Tara Johnson?

A. Well, we became friends. I let her know that she has nothing to worry about. You know, Ray is -- him and I are just friends and I like to keep in contact with him because the kids love their father. So I just like to have a relationship with him because the kids, you know, they loved him and they like being around him and everything like that, so.

Q. And at the time you separated from Ray Ross, if you remember, what were the ages of your three children?

A. They were about -- Kelly had to be about, let me see, how old was Kelly? Kelly had to be about maybe nine and maybe the twins were about let me -- she might have been older and the twins could have been about six, something like that.

Q. Justyn and Jasmyn are twins?

A. Yes, they are twins.

Q. Is it fair to say your divorce from Ray Ross was amicable, that you got along with him?

A. Yes. I mean, yes.

Q. Now, after the year 2000 were there ever times when

you personally visited with Ray Ross at 301 Coventry Road North in West Hempstead?

A. Yes.

Q. And could you describe how frequently those visits would be?

A. Yes.

Well, I used to go over there like the weekends and, you know, take the kids over to, you know, let them see their dad or leave them there, and things like that and I would go back home. Sometimes he would bring them back or sometimes I'll go back and get them because they wanted to go over there and there was other kids there. There was a lot of kids there.

Q. Could you describe for the jury approximately how many kids were living there? Let's focus on approximately 2011.

A. Let me name them. It had to be about -- it could have been maybe like about nine kids could have been.

Q. So about nine kids were living there. And that doesn't include your children, right, because your children were living with you in Brooklyn?

A. Yes, it doesn't include my kids.

Q. Do you know a young woman by the name of Mercedes Johnson?

A. Yes, I do.

Q. Who is she?

A. That's Tara's niece.

Q. Do you know another young lady by the name of Millinia, sometimes with a nickname Patty Johnson?

A. Yes.

Q. Who is she?

A. Tara's niece as well.

Q. Do you know where those two girls live?

A. Yes, 301 Coventry Drive.

Q. Now, aside from knowing them as Tara's nieces, did you ever have any kind of personal relationship with them?

A. Yes. I used to go over there. I made like food and things and take over there to the kids and things like that. I did their hair for them and things like that.

Q. Now, when you say you did their hair, were you doing their hair on a regular basis?

A. Yes. Yes, I was.

Q. So now focusing, let's say, on 2013.

A. Yes.

Q. Were there times in 2013 when you would personally do hair for both Mercedes and Patty Johnson?

A. Absolutely.

Q. And did it always happen at the home in West Hempstead or did it sometimes happen in other places?

A. No. I did it in Brooklyn as well.

Q. Now, when you say you did it in Brooklyn, where in Brooklyn?

A. 683 Pennsylvania Avenue.

Q. That's your home address?

A. Yes.

Q. That's where you have lived for a while with your three children?

A. Yes.

Q. I'm sorry, now you only live their with two of your children; is that right?

A. Yes.

Q. In 2013 there were sometimes when Mercedes and Patty would come to your home?

A. Yes, absolutely.

Q. Do you remember how they would get there?

A. I would pick them up sometimes again or Ray would bring them, you know, like that.

Q. And were there sometimes when in addition to the two girls coming that sometimes Tara would come to your house?

A. Tara? I don't think Tara ever came to the house. No, she didn't.

Q. But you do have a decent relationship with her?

A. Of course, yes, we do.

Q. Now, in addition to doing Mercedes and Patty's hair

at your home, were there times at your home in Brooklyn when you would have family outings?

A. Yes. Well, we used to, like Patty, Jasmyn, myself, we used to have our nails done, our feet done. You know, just have a great time. Because you know the days I was off I made sure I did fun things with, you know, my youngest daughter or my son sometimes. So we always did little things like that.

Q. Now, these times when there were manicures and pedicures, was that quote, unquote "girls" outing?

A. Yes, it was. I mean, we enjoyed it. We really enjoyed that.

Q. So there would be times when the group would just include the girls or women, so that would exclude Ray and your son?

MR. PERRI: Objection.

A. Yes.

THE COURT: Ms. Ross, I'm just going to ask you if you hear the word objection, just stop your answer or don't begin your answer. I have to make a ruling, okay.

THE WITNESS: Okay, no problem.

THE COURT: The witness answered the question. Overruled.

Next question.

Q. Were there also family outings that involved the entire group?

A. Yes.

Q. Could you describe those, please?

A. Well, we went to Red Lobster. We went to Coney Island. We went to -- where else did we go? Well, myself, I didn't go, but all the kids and Patty, they went to a zoo in Long Island. Very nice zoo. They went to different places, to the movies. They went a lot of places.

Q. And when these family outings would happen and speaking to the ones that you personally went to, who would pay the cost of whether it was the zoo or the movies or the restaurant, who would pay?

A. Ray, he would pay for everything.

Q. Was that every time?

A. Yeah, every time.

Q. And to the best of your knowledge, did either Mercedes or Patty ever offer to contribute money to the cost of these?

A. No.

Q. Now, when you had been to 301 Coventry Road North, had you ever personally interacted with Sarita Johnson?

A. I have talked to her. You know, I have talked to her on different occasions, you know, yes.

Q. Would you describe what you observed of her as a

mother?

THE COURT: Hold it, ma'am.

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Now, as a hair dresser, are there certain times when you would develop a relationship with the -- excuse my presumptiveness -- is it fair to say that all of the people's hair that you do are women?

A. Women and men.

Q. Women and men, okay. Obviously when I say women, also young women, girls?

A. Yes, yes.

Q. And do you have the equipment in your home at the various -- excuse my ignorance.

A. I have a dryer. I have all the things to do the hair; dryers, blow dryers, curlers, things of that, yeah, to do hair.

Q. Do you have one of those big dryers like you see sometimes in the cartoons?

A. It's not a big one. It's one that sits on a table, but it's kind of big. It's not the tall one that stands up and rolls. You can put a chair there and sit there.

Q. So the record is clear, this is something that would encompass all the way around a person's head?

A. Yes.

MR. PERRI: Objection.

THE COURT: Overruled. Next question.

Q. Now, is it fair to say sometimes when you are doing a person's hair that you chat with them?

A. Of course. Of course.

Q. And over the course of time, is this something that continues with various clients of yours?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Could you describe your personal relationship with Mercedes Johnson?

MR. PERRI: Objection.

THE COURT: Overruled.

Mercedes Johnson? Sustained.

Next question.

Q. Could you describe your relationship personally with Patty Johnson?

A. Well, Patty, I took her as a daughter, you know. I did the same things I would do for her as if, you know, she was my real daughter. You know what I'm saying. We went to have nails and everything done. I cook all the time. So I always fed her. I always sent food home.

Q. Why would you send food home?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Tell us about the relationship that you had with Patty.

A. It was a very nice relationship. We talked, you know. Talked like she was my daughter, you know what I'm saying. She would tell me how she's doing in school. I would say keep it up. She told me she was on the cheerleading team. She played an instrument that Ray had helped her get. So, you know, I was very proud of her. I was very, very proud of her.

Q. Did she ever confide anything in you?

THE COURT: You can answer.

A. She used to always say Paula, I wish you was my mom. I wish you was my mom. I said, no, Patty, don't say that. You have a mom. So she always used to say that to me.

Q. Do you have any inclination as to why she felt that way?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Did she ever tell you that she had any problems at all with Ray?

THE COURT: Sustained.

Next question.

Q. To the best of your knowledge, what was her

relationship like with your daughters?

A. Oh, very nice. They got along great. They did, they got along great.

Q. Is it fair to say your daughters are a little bit older than Patty?

A. Yes. They treated her like a little sister. They enjoyed being around her and the other kids as well when they were around them.

MR. ZERNER: If I can have one moment with my client, your Honor.

THE COURT: Yes, sir.

(Pause in the proceedings.)

Q. Were there ever times when Patty would communicate directly with you?

A. Yeah, there was times, yes.

Q. And to the best of your knowledge, did you have phone conversations with her calling you directly?

A. She would call me and ask are we going out this weekend. What are we going to do or something like that, you know. So, she would ask me that.

Q. Fair to say it appeared to you she looked forward to spending time with you?

A. She did. She really did.

MR. ZERNER: Nothing further at this time, your Honor.

THE COURT: Very good.

Mr. Perri.

MR. PERRI: Yes, your Honor.

CROSS-EXAMINATION

BY MR. PERRI:

Q. Ms. Ross, you testified that you spent a lot of time with Millinia Johnson, Patty, correct?

A. Yes.

Q. And that was in Brooklyn for the most part?

A. Yeah. Yes, and over to the house as well.

Q. Is it fair to say the majority of the time you spent together that you just described on direct took place either in Brooklyn, at your house or other locations in Brooklyn?

A. I believe I said that we went over there a lot and we also went to Brooklyn.

Q. What would you do when you would go over there?

A. Over to Coventry?

Q. Yes.

A. I would do hair or I would sit in the car while the kids go in and have a great time. I'm like, I'm tired. Sometimes I would go after work. So I would go over there and let the kids go in and go play and things like that while I sit in the car. Sometimes I wouldn't go in. Sometimes I would go in. Sometimes I wouldn't go in, but the kids would

always go in.

Q. So you would go after work?

A. Yeah, sometimes after work, yes.

Q. Was that mostly during the week?

A. It could be on weekends. It was weekends, sometimes, like maybe like if my daughter needed to get something from her father.

Q. Well, you testified you would go out and get your nails done with Millinia, with your daughters. She felt she was one of your family members, correct?

A. Yes.

Q. And when you would go out to get your nails done with Millinia who you thought of as your daughter, that would be in Brooklyn, correct?

A. No, in Queens.

Q. Patty has been to your apartment, correct?

A. Yes, she has.

Q. She's been there multiple times, correct?

A. Yes, she has.

Q. And most of those times would be on Saturdays, correct?

A. Not always Saturdays. Like I said, it could be during the week. A lot of times like on Saturdays, but sometimes during the week she would come. It all depends on when she asked me to do her hair. She would call me and say

could you do my hair over. I said sometimes, Patty, you just had your hair done.

Q. The only times you saw Millinia Johnson is when you did her hair?

A. No, no.

THE COURT: Hold it, Mr. Perri. Please let the witness finish her answer.

A. Sometimes during the week she would call me a little earlier, maybe she's having something done. I mean like something at school that she could be having and she wanted to, I guess, freshen up, look nice like the young girls like to do. So she would ask me a little extra. I would be oh, Patty, I just did your hair.

She was like, I just want to look nice because she was cheerleading or something like that and I did her hair.

Q. All the equipment you have to do hair is at your apartment, correct?

A. Yes. Or sometimes I would bring it to their house and do hair. When I go do hair, I go to -- I can go to your house or you can come to my house.

Q. So you move all your equipment each time someone wanted you to do their hair?

A. Yeah, I do. I take my equipment with me.

Q. You said that Patty would call you and you would call her?

A. She would call me and she would just ask me, you know, are we going to go out this weekend. What are we going to do? I said, we'll find out. Sometimes Jasmyn would say tell her we're going to go to the zoo. Basically my youngest daughter talked to her the most. So, you know, I would talk to Patty and Patty would call me and say -- I would say can you go out this weekend?

She said, yeah, I want to come with you guys. I want to come with you guys. So she knew she was going somewhere. We always had something planned.

Q. So you didn't call Patty?

A. I did call her, like maybe a couple of times I did.

Q. This is over the course of years of knowing her?

A. Yeah. Yeah, because I saw them more so than just like talking on the phone. Like I work over in Queens, so going over there is not far from my job. So I saw her a lot like that. So calling her, I didn't have to do that because I always saw Patty and the kids.

Q. And did you text with Millinia Johnson?

A. I'm not a big texter, no.

Q. When you would call her, would you call her after 11 p.m. or she would call you and she would speak --

MR. PERRI: I'll withdraw the question.

THE COURT: Thank you.

MR. PERRI: Thank you, your Honor.

Q. When Millinia Johnson would call you, would that be after 11 p.m. at night?

A. No.

Q. Would she call you before 7:00 a.m. in the morning?

A. She could, yeah, if she wants to go somewhere.

Q. How would that happen?

A. It would be like on the weekends she would call, you know, what are we going to do this weekend? And I'm like oh, Patty, I'm not doing anything this weekend. You know, find out what Jasmyn is going to do, maybe talk to her dad and you guys can go somewhere or whatever, you know what I'm saying. Things like that.

Q. Did she call you before 6:00 a.m.?

A. I can't recall 6:00 a.m. I can't recall that, but she called.

Q. How old are you currently?

A. Myself?

Q. Yes.

A. I will be 52 Wednesday.

Q. And you say that you separated from the defendant in 2000, but it was amicable and you are friends and you have a good relationship. Why did you separate from the defendant?

A. Basically we, you know, we had our differences as far as like him staying out. I'm not a party person. I like

to stay home. You know, he liked to go out, have a good time. I'm just not that way, so we fought about that a lot.

Q. So you were fighting a lot when you got separated?

MR. ZERNER: Objection.

A. Not fighting.

THE COURT: Hold it, ma'am. Sustained.

Q. Millinia Johnson had a good relationship with you, correct?

A. I'm sorry?

Q. Did Millinia Johnson have a good relationship with you?

A. Yes.

Q. Did you enjoy spending time with Millinia Johnson?

A. Yes.

Q. You testified that the defendant, Ray Ross did a lot of nice things for Millinia Johnson, correct?

A. For all the children.

Q. But that included Millinia Johnson?

A. Absolutely. All the kids.

Q. And when you say all the kids, that would be all of your kids and Millinia Johnson, correct?

A. And her sisters and brothers as well.

Q. All her sisters and brothers would come?

A. Yes. Because when I used to go over there, I can recall a time Ray would buy the whole block ice cream,

including the little one. Everybody had ice cream.

Q. This is the entire block of Coventry Road Ray Ross bought -- so the defendant, Ray Ross, you were there when he bought the entire block on Coventry Road ice crime?

A. I'm not going to say the entire block.

THE COURT: Wait a minute, Mr. Perri. You should know better. I cautioned you a couple of times let the witness finish her answer.

Ms. Ross, I have to instruct you again, okay. You have to be patient and let the attorney finish his question and then you can answer.

THE WITNESS: Okay.

THE COURT: It's back and forth, okay.

THE WITNESS: Sorry about that.

THE COURT: Mr. Perri.

Q. You testified that he did buy the entire block ice cream, correct?

A. When I say the entire block, meaning the children that was out there at the time he bought ice cream. If they wanted ice cream, you know, he was you want ice cream, you want ice cream? That's just how he is. He would buy them ice cream.

Q. And when did that occur?

A. That was maybe 2013. I remember back then, you know, when he used to buy everybody, not just her.

Q. And you also testified the defendant would pay for Millinia Johnson to have meals with your family?

A. He would pay for everybody. I mean, I don't know if you are saying just paying for her. I don't understand the question, what you are asking me.

Q. You testified that the defendant would pay for Millinia Johnson along with others to go out to dinner to restaurants?

A. Yes, as he always did.

Q. What restaurants would you go to?

A. Like we went to -- well, everybody had a turn of picking where they wanted to go. So it could be Jasmyn's day. If they went out, she could call Red Lobster. So Patty could say oh, I want to go here. You know what I'm saying, to the Pancake House. Kelly could say she want to go to Regina's Pizza. So always everybody had a turn, even the grandkids. Not the grandkids, but now the grandkids when he asked them what you want to do, they both have turns in picking where they want to go.

Q. So the people you just named, Jasmyn is your daughter, correct?

A. Yes.

Q. And Kelly is your daughter, correct?

A. Yes.

Q. Those were the two people?

THE COURT: Ma'am, you just have to wait. Let him finish his thought and his question and then you can answer.

Q. So you stated that Jasmyn would go out to dinner with you and she's your daughter?

A. Correct.

Q. And Kelly would go out to dinner and pick restaurants and she's also your daughter?

A. Yes.

Q. And you stated that Justyn would also get to choose a restaurant?

A. Yes.

Q. Is he also your son?

A. Yes.

Q. And you also named Millinia Johnson, Patty as the other person who got to choose restaurants the defendant would pay for?

A. Yes.

Q. To your knowledge, was the defendant paying for Millinia Johnson's cell phone at that time?

THE COURT: At what time, sir?

MR. PERRI: 2013, your Honor.

A. That I don't recall. I don't recall. But I know he was paying for Justyn's phone bill.

Q. Ms. Ross, did you ever observe any arguments or

fights between the defendant and Millinia Johnson?

A. Ray and Millinia?

Q. Yes.

A. Never. Never.

Q. Were they close?

A. I mean, she liked Ray Ray as a father figure, yes.

Q. And Ray Ray, that's the defendant's nickname?

A. Yes, it is, I'm sorry.

Q. And Mr. Ross, the defendant he used to work for the sanitation department, correct?

A. Yes.

Q. And he's out on disability, correct?

A. Yes.

Q. How long has he been out on disability?

A. He's been out for a while now. Let's see, I can't remember. I can't even remember. Ray's been out a long time.

THE COURT: Next question.

Q. Was the defendant on disability and no longer working for the sanitation department in 2013?

A. Was he? I'm not sure. I'm not sure.

Q. He's been out on disability a long time is your testimony?

A. Yeah, I believe he was out.

Q. Who asked you to come in today, ma'am?

A. Who asked me to come?

Q. Yes.

A. Well, I came in because I wanted to come in.

Q. So no one asked you to come here today?

A. Well, my daughter, you know, had asked me to come in.

Q. Had you ever spoken to the defendant about the allegations here today?

A. I have talked about it.

Q. When have you talked about it?

A. A while ago we had talked about it.

Q. Did you only talk about it one time?

A. Yeah, I did with him. He explained it to me and everything and I told him, you know, just got to put it in God's hands.

Q. Other than that one conversation, you never discussed the allegations in this case or your testimony with the defendant ever again?

A. We probably did, but not all the time.

Q. And how often did you speak to your daughter about coming to Court today?

THE COURT: When you say daughter, who do you mean?

Q. Which daughter did you speak to?

A. Jasmyn.

Q. How many times did you speak with Jasmyn about coming to Court today?

A. Well, a lot because she, you know, she's taking it hard because --

THE COURT: That's it, ma'am.

Next question.

THE WITNESS: Sorry.

Q. Have you spoken to the defense attorney in this case?

A. Yes.

Q. And how many times have you spoken to the defense attorney?

A. Many times.

THE COURT: I'm sorry, you said many times?

THE WITNESS: Yeah. Maybe three or four times, yes.

Q. Ms. Ross, you are still close with the defendant?

A. Well, since everything happened -- I still love her and everything like that.

THE COURT: No, no, I'm sorry, ma'am. The question was are you close to the defendant, meaning Mr. Ross?

THE WITNESS: Oh, I'm sorry.

A. Yes, I am.

Q. Does the defendant have a cell phone?

A. Ray, yes.

Q. And did he have a cell phone in 2013?

A. Yes.

Q. And in 2014?

A. Yes.

Q. And did you ever look on his cell phone?

A. No.

Q. Did you ever go through his text messages?

A. No.

Q. Did you ever look at his call history?

A. No.

Q. You didn't ride back from your apartment with the defendant and Millinia Johnson in his white truck alone, did you, over the last two years?

A. Did I ride back?

Q. Yes.

A. Alone with her?

Q. Her and the defendant, Ray Ross.

A. Sometimes I would take her home and sometimes he would take her home.

Q. When the defendant would take her home, you wouldn't go with him on Saturday nights?

A. Like I said, sometimes I would take her home and sometimes I would go pick her up and bring her.

Q. Ms. Ross, it would be one of the two of you; is

that correct?

A. Yes.

Q. And in 2013, 2014 were you in Mr. Ross' bedroom in 301 Coventry Road?

A. I have been there.

Q. You have been there with Millinia Johnson watching TV alone with the defendant?

A. Yeah, all the kids.

Q. Have you ever been there where it's just been Millinia Johnson with Mr. Ross?

A. Yes, I have been there with her and several other kids and they would be sitting on the bed. When I'm talking to my daughter, the other kids would be all on the bed talking to him.

Q. So my question again is have you ever been there without all the other children and Mr. Ross and Millinia Johnson?

A. No, because every time -- no.

Q. Do you care about the defendant, Mr. Ross?

A. Yes.

Q. And do you want to help him?

A. Of course.

MR. PERRI: Nothing further, your Honor.

THE COURT: Any redirect, Mr. Zerner?

MR. ZERNER: Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. ZERNER:

Q. Did anybody ask you to lie for Mr. Ross?

MR. PERRI: Objection.

THE COURT: Overruled.

A. No.

Q. Are you lying for Ray Ross?

MR. PERRI: Objection.

A. No.

THE COURT: Hold it. Sustained.

Next question.

MR. ZERNER: Nothing further.

THE COURT: Any recross?

MR. PERRI: No, your Honor.

THE COURT: Ms. Ross, thank you for your testimony. It's concluded. You are free to go.

THE WITNESS: Okay, thank you so much.

(Whereupon, the witness was excused.)

THE COURT: Ladies and gentlemen of the jury, I'm going to allow you to break for lunch now. I know it's an extended lunch period. There are some matters I have to attend to and by the time I get finished with them it will be time to break for lunch, so you get the benefit of that or the curse of that, depending upon how long you like to spend for lunch. We'll see you back

here ready to go again at 2:00 p.m. sharp. Very good, thank you. Remember my admonitions.

(Whereupon, the jury exited the courtroom.)

THE COURT: Mr. Zerner, who are your next witnesses?

MR. ZERNER: Jasmyn Ross and Justyn Ross and I have to receive a phone call about Kelly Ross.

THE COURT: With regard to Jasmyn Ross, what's your offer of proof?

MR. ZERNER: There is testimony about her spending time with the complainant, as well as spending time with my client, as well as spending time at 301 Coventry, spending time going on these family outings in Brooklyn and I hope it's clear now from the prior witnesses that there is a certain through line in the time frame that's on this indictment, as well as the different people that were at various places at various times that the prosecutor has put into issue here.

THE COURT: Are you going to -- is it anticipated you are going to elicit specific time periods and frames and different incidents where different individuals were with these individuals?

MR. ZERNER: Yes, your Honor. And again, I can't prove a negative. All I can do is --

THE COURT: Well, how is the testimony not

cumulative when Ms. Ross says they all went out to different venues on occasion and from what you say Jasmyn Ross is going to say the same thing, yeah, we all got together and went out on trips to different venues on different occasions?

MR. ZERNER: That's one of the things she's going to testify about, but she's also going to testify about her observations with my client with the complainant; about her relationship with the defendant; about her childhood. It seems to me that one of the things that the prosecutor tried to put into evidence by using his expert was grooming and talking about age categories and talking about how a defendant might try to at a certain point in time engage in these untoward activities.

He's made a great issue of some dance recital in March of 2013 that I think Mr. Perri is trying to show was some type of a turning point or some type of a change in this relationship.

THE COURT: Are the witnesses here?

MR. ZERNER: Jasmyn and Justyn Ross are in the hallway. Kelly Ross I'm waiting for a phone call. She had to take her children to the hospital overnight. As soon as I can turn on my phone I'll know whether or not she's going to be available to testify today.

THE COURT: Mr. Perri.

MR. PERRI: Your Honor, the People oppose these two witnesses as both testifying to collateral issues and as cumulative. The complainant, herself in this case has testified on direct and on cross that she spent time while in Brooklyn or with the Ross family with all the Ross children, the grandchildren, Ms. Paula Ross, along with the defendant. That this isn't even an issue in dispute in this trial that this was going on during the time frame that the People are alleging in the indictment that the course of sexual conduct and endangering the welfare of a child was also occurring.

That these matters are collateral, ancillary and not even in dispute that this relationship existed and there is no new information that is going to be brought out other than that these people were, as this witness just testified and as the complainant testified, together on these outings with the Ross family.

MR. ZERNER: Your Honor, there is new information. There is information about Mercedes Johnson also being on these trips. There is information about what other things these people did together such as manicures, such as going to Coney Island, going to an aquarium. The testimony that's elicited isn't only from my preparation of the witnesses. Other information

comes out in the skill of cross-examination of Mr. Perri. Sometimes he brings out other information that it's completely in keeping with another witness testifying about. Sometimes the prosecutor has to actually think that the defense is allowed to put on a case and just because he's had a witness on his case in chief --

THE COURT: Mr. Zerner, please, I don't need ad homonym remarks with regard to what the assistant district attorney needs to anticipate or do.

MR. PERRI: Your Honor, there is one.

THE COURT: What?

MR. PERRI: I just ask for one.

The second argument that defense counsel raised that he wants the children to testify with respect to their childhoods with the defendant is completely collateral, not relevant at all to this proceeding and that their testimony would be improper character witness testimony and evidence that should not be before the jury. They should not be able to talk about how great a father the defendant was to them.

THE COURT: Mr. Zerner, if you do hear from Ms. Kelly Ross over the lunch hour, please call chambers and let my law secretary know.

MR. ZERNER: If I can take the best number to

call because sometimes I get a general number when I received calls.

MS. DODDATO: 493-3565.

MR. ZERNER: I will call as soon as I hear.

THE COURT: Adjourned to 2:00 sharp.

MR. PERRI: Yes, your Honor.

(A luncheon recess was taken.)

AFTERNOON SESSION

THE CLERK: Continued case on trial, People v. Ray Ross. The jury is not present. All parties are present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you.

THE COURT: Mr. Zerner, did you hear from Ms. Ross?

MR. ZERNER: I never heard back from Kelly Ross. I have to go with the assumption she would be unavailable this afternoon. Depending on your Honor's ruling, I could speak to her over the weekend and hope that she is available on Monday.

THE COURT: Well, who do you have for Monday?

MR. ZERNER: I'm sorry, who am I planning to call on Monday?

THE COURT: Yeah.

MR. ZERNER: I'm planning to call Tara Johnson. I'm planning to call Denise Sawyer. I'm planning to call Kelly Ross, subject to your ruling, and I have not made a decision as of right now about either of the sisters and my last contact I had with Ms. Hobbs was that she was only available on Tuesday. And then, of course, Mr. Ross.

THE COURT: You want to put your proffer on with regard to Reverend Hobbs?

MR. ZERNER: Sure, your Honor. Reverend Hobbs has been the pastor at my client's church for about four years. Prior to that she was the assistant pastor for about ten or 12 years before that. There has been a lot of testimony with regards to weekend trips. I believe that the jury is entitled to hear about the fact that my client attended church on Sundays, just about every Sunday so that these trips were certainly not overnight trips. That the trips, when they did happen, were generally on Saturdays.

I would like to elicit testimony about the times who else attended with Mr. Ross. I believe that some of the Johnsons attended and some of the Johnsons did not and the regularity of attendance and the breadth of attendance. I think that's all important for the

jury to understand, both the time frame that's the subject of the indictment that I'm defending, as well as to get a picture of the various people involved and what would go on on weekends.

I mean, the prosecutor put forward various testimony, mostly from each of the Johnsons, Sarita and Millinia Johnson, and I don't believe it's an accurate picture. I don't believe it's a clear picture and I believe that one of the duties I have and one of the responsibilities that I have is to defend my client and show the jury what was going on on these various weekends. I think it's quite vague right now.

I have always thought that the indictment, itself was vague and in defending my client I'm entitled to clarify that picture.

THE COURT: People.

MR. PERRI: Your Honor, the People would oppose calling Reverend Hobbs. The People never put at issue the defendant's attendance to church, participation in church or any witnesses membership of any church in this case. The People have not disputed that the defendant could have been at church on Sundays and that the testimony is not contradicted.

None of the testimony in the People's case in chief is contradicted about whether or not the defendant

went to church on Sunday at any time period. It's a collateral issue on who went to church with them. It's an attempt to impugn Millinia or Sarita Johnson for not going to church enough or to bolster Tara and Ray, that they did go to church more often. It's not material to the case and it has no relevance. The People ask the witness be precluded.

THE COURT: With regard to the sisters, Mr. Zerner, whose names have, to my recollection, have not been mentioned at all in this trial? I'm asking? I'm trying to work out a schedule here.

MR. ZERNER: Me too, your Honor, and I appreciate us going through this and I certainly want to line the ducks up and I'm happy to answer your questions, your Honor. The sisters have also had interplay with the complainant in this case, as well as observed the complainant with my client. I believe again, without --

THE COURT: This is not trial by ambush either by the prosecution or by the defense.

MR. ZERNER: It is absolutely not ambush. The last thing I'm doing --

THE COURT: I'm talking about Ms. Monique Flores and Lorigai Ross. How are they relevant to this trial?

MR. ZERNER: They're relevant in that they are part of the family. You have heard tons of testimony about family get togethers. The way that that testimony has been molded by the prosecutor has shown one picture. However, I'm allowed to defend that and one of the ways to defend that is to call other witnesses who observed other interactions between the people, whether it was with regards to the hair being done, whether it was with regards to shopping, whether it was with regards to family outings, to museums, to movies, to Coney Island. No one of these witnesses was there for every interaction. Therefore, I hope I have demonstrated to the Court that the witnesses who have testified so far I have asked relatively small number of questions.

THE COURT: You are moving on to a different point, sir. I'm talking about Monique and Lorigai. I understand your position with regard to them.

MR. PERRI: Your Honor, I don't know if you are going to ask about Ms. Sawyer. The People ask for an offer of proof with regard to Ms. Sawyer's testimony on Monday.

MR. ZERNER: Your Honor, it's crystal clear to me no matter who I bring forward the prosecutor is going to try to argue I should not be able to let them testify. Denise Sawyer was the subject of intimidation

by the complaining witness's mother, Sarita Johnson. The prosecutor knows that, A, because one of his colleagues investigated it. B, because he was told about it over a long weekend. And C, because I provided him with paperwork about that two days ago.

There was an incident between Denise Sawyer who lives on the same block across the street, has lived there for about 45 years across the street from Sarita Johnson. This is someone who has to be allowed to testify to give the jury an understanding of what we're talking about here.

THE COURT: Wait. Hold it, Mr. Zerner. Let me try to get an understanding about what we're talking about. What does Ms. Sawyer have to do with this case?

MR. ZERNER: Several things.

THE COURT: Other than impugn Sarita Johnson?

MR. ZERNER: Several things. Thing number one, we just heard a description before the lunch break of a time when Mr. Ross purchased ice cream for multiple people on that block. Ms. Sawyer is someone who lives on that block. Maybe she witnessed that occasion. Maybe she witnessed other occasions like that.

There has been testimony about the block, itself. About the situation where Ms. Sarita Johnson claims that her neighbors are in her business and,

frankly, I mentioned Denise Sawyer when I cross-examined Sarita Johnson on Thursday of last week. We broke Friday. Saturday, Sunday, Monday, Tuesday and in that time frame there was an incident between these two women and I believe it's completely on point that shows that Sarita Johnson is trying to use the criminal justice system for her own gains, for her own goals.

You heard testimony from the expert witness that the prosecutor put forward that sometimes complaining witness's mothers or parents will have their own agenda. Will have their own methods to try and go towards their goals. It's completely and totally in keeping with this.

I still haven't seen any paperwork from the prosecutor that he has access to about these incidents over the weekend and, frankly, it was minus two degrees over the weekend and Sarita Johnson claims that Denise Sawyer was in her backyard trespassing on her property and I'm entitled to deal with that issue right here, right now and, frankly, it seems to me that I have no doubt that Mr. Perri had nothing to do with that, but I do believe when Sarita Johnson heard the name Denise Sawyer on her cross-examination, she saw red and decided that she was going to do something to punish Denise Sawyer for even considering testifying for the defense

in this case.

Frankly, I wasn't planning to call her as a witness necessarily, but now it's completely and totally in keeping with my defense strategy.

THE COURT: People.

MR. PERRI: Your Honor, as the defense just conceded, if he wasn't planning on calling Denise Sawyer as a witness for any other purpose except to go into the allegation that there was a trespass and her denying there was a trespass, where she has no other relevant testimony to provide the Court and at no point did the People inform her she was going to be a witness for the defense. There was no testimony or even questioning by defense that suggested she was going to be a witness. To then speculate that the reporting a trespass violation of someone being in a backyard is witness intimidation because one party says it happened and the other party says it didn't, that is a separate issue.

If there is ever an arrest in that case, it would be handled in a separate proceeding. It's not proper to handle whether or not there was a trespass in Sarita Johnson's backyard during the defense case in this proceeding, your Honor.

THE COURT: Thank you. I don't need anymore argument, Mr. Zerner, thank you.

With regard to your request a day off on the 24th, the Court certainly indicated that it would accommodate you for that. My question though is it something that you can adjourn as we would be ready, I think, to sum and charge on that date?

MR. ZERNER: Your Honor, unfortunately, I already had moved my 18b day in Suffolk County from early February until that day and I have other matters that are on that same day in Central Islip.

THE COURT: Very good, thank you.

MR. ZERNER: Thank you, your Honor.

THE COURT: Who is your next witness?

Excuse me, can we bring the jury in?

MR. PERRI: Your Honor, just to be clear, did the Court make a ruling that the defendant's children are being allowed to be called as fact witnesses in this case?

THE COURT: For the record, the Court is going to allow Mr. Zerner to call Jasmyn and Justyn Ross.

MR. PERRI: Your Honor, with respect to the defense's proffer that they would also be asked questions about their childhood with the defendant, the People would just ask that line of testimony not be permitted.

THE COURT: I'm not going to prejudge

anything. If there is an objectionable question, I'll rule on it.

MR. PERRI: Thank you, your Honor.

MR. ZERNER: Thank you, your Honor.

THE COURT: I caution both counsel that with regard to their questions, keep it within the time frame that we're speaking about here. I don't need the entire history. I won't permit the entire history of relationships. As part of a foundation question, maybe, but please take note of that.

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE CLERK: Let the record reflect the presence of the jury. All parties are present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you.

THE COURT: Good afternoon, ladies and gentlemen of the jury.

Mr. Zerner, your next witness, sir.

MR. ZERNER: Yes, your Honor, our next witness is Jasmyn Ross.

(Witness crying)

THE COURT: Are you okay?

THE WITNESS: I'm fine.

THE COURT: Do you want to go out and come back in again? Let's try that.

(Whereupon, the witness exited the courtroom.)

COURT OFFICER: Witness entering.

J A S M Y N R O S S, residing in the County of Nassau, having been called as a witness on behalf of the Defendant, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name and spell your first and last name and give your county of residence, please.

THE WITNESS: My name is Jasmyn Ross, J-A-S-M-Y-N R-O-S-S. Valley Stream, Long Island, New York.

THE COURT: Mr. Zerner.

MR. ZERNER: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ZERNER:

Q. Good afternoon, Ms. Ross.

A. Good afternoon.

Q. Ms. Ross, could you tell us what do you do for work?

A. I'm a store manager at The Body Shop in SoHo.

Q. So that's in Manhattan?

A. Yes.

Q. How long have you been there?

A. I have been working there since last year November.

Q. And where did you work before that?

A. I was working for Elizabeth Arden in Herald Square in Macy's.

Q. How long had you had that position?

A. For two-and-a-half years.

Q. Where did you work before that?

A. Before that I was working at Clinique at another Macy's in Kings Plaza, Brooklyn, New York.

Q. And for how long had you had that job?

A. Maybe like three years.

Q. Could you tell us a little bit about where you live?

A. Yes. I live in Valley Stream on Long Island with my father.

Q. How long have you lived there?

A. We just recently moved there.

Q. And besides you and your father, does anybody else live there?

A. Tara.

Q. And who is Tara?

A. My stepmother.

Q. And what's her last name?

A. Johnson.

Q. And you have lived there since when?

A. Last summer.

Q. Summer of 2015?

A. Yes.

Q. And before you were living in Valley Stream, where were you living?

A. Brooklyn.

Q. Where in Brooklyn?

A. Linden Boulevard.

Q. And how long had you lived in that spot in Brooklyn?

A. A while. Maybe for years; eight, nine years.

Q. Is that where you lived when you were a child?

A. I lived with my father. I grew up with my father. I just moved over there after.

Q. Okay. So what's your mother's name?

A. Paula Ross.

Q. And are your parents still together?

A. No.

Q. And if you know, what year did they split up?

A. They split up a while ago.

Q. Is it accurate to say that they split up somewhere around the year 2000?

A. Yes, around 2000, 2001.

Q. How old would you have been at that point in time?

A. I guess maybe like around nine, ten.

Q. When your parents split up, where did you live?

A. Before they split up or after they split up?

Q. Let's talk about before they split up.

A. Laurelton.

Q. And then after they split up where did you live?

A. After I went to Brooklyn.

Q. Is it that spot in Brooklyn that you lived?

A. Yes.

Q. When you were living in Brooklyn, who else lived there?

A. My brother and my sister.

Q. And what's your brother's name?

A. Justyn Ross.

Q. Is that your twin brother?

A. Yes.

Q. What's your sister's name?

A. Kelly Ross.

Q. And with your mother Paula Ross also?

A. Yes.

Q. Now, please describe your relationship with your father after the divorce.

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Was your father in your life after the divorce?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Tell us how often you would see your father after the divorce.

MR. PERRI: Objection.

THE COURT: Sustained.

Q. In 2010 -- withdrawn.

In 2013 who did you live with?

A. 2013 I lived with my mom.

Q. And also with your brother and sister?

A. Yes.

Q. And would you see your father on a regular basis?

A. Yes, all the time.

Q. Please describe that for the jury.

MR. PERRI: Objection.

THE COURT: Overruled.

A. My dad used to always come to the house to pick us up. I always called my father and say can you pick me up, can you pick me up.

THE COURT: Jasmyn, you have to slow down a little bit because the court reporter has to take down every word that you are speaking, okay. So just slow down, take your time, take a deep breath and then answer, okay.

Q. If you need to take a moment, you have tissues in front of you, water in front of you.

A. My dad used to always come to the house and pick us up and we used to go places. We used to go to the movies, restaurants.

Q. When your dad would pick you up and take you to these places, could you give us, in general, who would be with you when you would go on these outings?

A. My brother, my sister.

Q. And did --

A. In 2013?

Q. Let's talk about 2013.

A. Patty was with us all the time.

Q. Do you know Patty's last name?

A. Johnson.

Q. And is Patty a nickname?

A. Patty is a nickname we used to always call her.

Q. Do you know this person's given name?

A. Yes, Millinia.

Q. So your father would come pick you guys up in 2013 and go on family outings. Aside from Patty, would he bring anybody else with him?

A. Sometimes it was Mercedes, Malik. Most of the time it was more Mercedes, the sister.

Q. Who is Mercedes?

A. Mercedes is Millinia's sister.
Q. And is it Mercedes Johnson?
A. Yes.
Q. And to the best of your knowledge, is she an older sister or younger sister?
A. She's the older sister.
Q. So when the Johnson sisters would come out, as well as the Ross kids, you started to describe some places that you would go. Please tell the jury where some of these family outings would be?
A. Restaurants, movie theatres. We went to Coney Island, amusement parks. We went to swimming pools. We went to the swimming pool at a time where my dad lived next to. The swimming pool in Lakeview. We used to always go together all of us.
Q. So you described sometimes your father would come to Brooklyn, you would have outings in Brooklyn?
A. Yes.
Q. Now, were there also some outings in the Lakeview area of Long Island?
A. Yes.
Q. So focusing on the Lakeview outings, could you tell us who some of the people would be on those trips or those outings?
A. It was always myself, my brother, sometimes my

sister. It was Patty, it was Malik, Mercedes. Most of the time it was just Patty, my sister, my brother and I.

Q. Would Tara Johnson sometimes be on these outings?

A. Not really.

Q. Would Sarita Johnson sometimes be on these outings?

A. No.

Q. Now, would your mother always come on these outings or some of the time?

A. Some of the time she would come.

Q. Now, do you know what your mother does for work?

A. Yes.

Q. What does your mother do for work?

A. She works for Coach handbags in Valley Stream.

Q. Aside from working retail, do you know if your mom does anything else on the side for money?

A. She does hair.

Q. Could you describe where she would do hair for people?

A. She would do hair at Millinia's house because she used to do hair over there, but the house was really so dirty and had a lot of animal feces and stuff, so she told him --

MR. PERRI: Objection.

THE COURT: You can continue your answer.

A. So she told him that they can come to our house.

Q. So there were times that you went to 301 Coventry

Road North?

A. Yes.

Q. And that was visiting your father and perhaps going to the park in Lakeview?

A. Yes.

Q. And there came a point in time when there were more of the visits in Brooklyn; is that fair to say?

A. Yes.

Q. So with regards to your mother doing hair, did there come a point in time when your mother was doing Mercedes and/or Millinia's hair in Brooklyn?

A. Yes.

Q. Tell us what you recall about that.

A. Well, we felt so uncomfortable with going over to that house.

MR. PERRI: Objection.

THE COURT: So, Ms. Ross, listen to the question as posed to you by Mr. Zerner, okay, and then answer the question that's posed, okay.

Sustained.

Next question.

MR. ZERNER: Yes, your Honor.

Q. Did you ever observe your mother doing Mercedes and Millinia's hair in Brooklyn?

A. Yes.

Q. And was that done on a regular basis?

A. All the time.

Q. Did you observe Millinia interacting with your mom?

A. Yes.

Q. Could you describe that?

A. Millinia and my mom interacting with each other?

Q. Please.

A. She used to do her hair. My mom always used to give her clothes and food and, of course, they interacted like that.

Q. Did you ever observe Millinia interacting with your father?

A. Yes.

Q. Could you describe that?

A. My father used to drive her to our house or that's it. We used to all go out together, so we was always around each other all the time.

Q. Can you describe how your father treated Millinia?

A. Like a father figure. Like he treated us when we was young and still now.

Q. Did your father ever molest you?

MR. PERRI: Objection.

THE COURT: Don't answer.

Sustained.

Q. You have heard what the charges are in this case,

correct?

A. Yes.

Q. How do you feel about that?

MR. PERRI: Objection.

THE COURT: Sustained.

You don't answer. Sustained.

MR. ZERNER: Can I just have a moment with my client?

THE COURT: Sure.

(Pause in the proceedings.)

Q. Now, Jasmyn, you described that your father would treat Patty as a daughter, correct?

A. Yes.

Q. And how did you treat her?

A. Like a sister.

Q. And could you describe your relationship with her?

MR. PERRI: Objection.

THE COURT: As a sister. Next question.

Q. Would you ever confide in her?

MR. PERRI: Objection.

THE COURT: Overruled.

Q. You can answer.

A. Yes.

Q. Did she ever confide in you?

A. Yes.

MR. ZERNER: I have nothing further at this time.

THE COURT: Very good.

Any cross-examination?

MR. PERRI: Yes, your Honor.

CROSS-EXAMINATION

BY MR. PERRI:

Q. Ms. Ross, you testified that most of the time during 2013 that you would go out to dinner with Mr. Ross, your father, it would be with your sister, your brother and Patty; is that correct?

A. Yes.

Q. And you testified that your father would drive Patty home; is that correct?

A. Yes.

Q. Your father owns a white truck; is that correct?

A. Yes.

Q. And the house, you testified about that at 301 Coventry that you said had lots of animal feces around, that's the home your father lived in, correct?

A. Yes.

Q. That was the home, as of 2013, 2014, your father lived with Tara Johnson for years, correct?

A. Yes.

Q. Ms. Johnson, [sic] you testified that you currently

live with the defendant, correct?

A. Yes.

Q. And with Tara Johnson?

A. Yes.

Q. And do you pay all the expenses of where you are living?

A. No.

Q. Who pays for the expenses where you are living currently?

A. My dad.

Q. Who asked you to come here today?

A. Who asked me to come here today?

Q. Yes.

A. I came here to support my father.

Q. Have you ever discussed the allegations with your father?

A. Of course.

Q. How many times have you discussed the allegations with your father?

A. I don't know.

Q. More than ten times?

A. I'm not sure.

Q. More than 20 times?

A. I don't know. It's a personal question. I don't know.

Q. Did you discuss your testimony today with your father, what you were going to say?

A. No.

Q. Did you speak with the defense attorney?

A. Yes.

Q. And how many times did you speak with the defense attorney?

A. The first time.

Q. And how many times would that be? When was that first time?

A. Today.

Q. And prior to today you never spoke to the defense attorney?

A. One other time over the phone when I was actually going to meet him.

Q. When did you meet the defense attorney?

A. Today. I spoke to him when I was going to meet him and today is the first day.

Q. And you never observed any problems or difficulties after 2013 between your father and Millinia Johnson, correct?

A. Yes.

Q. There were no difficulties, correct?

A. There were no difficulties.

Q. And you testified most of the time that your mother did Millinia's hair, that was in Brooklyn, correct?

A. Yes.

MR. PERRI: Nothing further, your Honor.

THE COURT: Very good.

Any redirect?

MR. ZERNER: Yes, your Honor, thank you.

REDIRECT EXAMINATION

BY MR. ZERNER:

Q. Do you recall the last time you were at 301 Coventry Road North in West Hempstead?

A. Maybe like 2014.

Q. And when you were there, were you in your father's room?

A. Yes.

Q. Was your father's room filthy?

A. No.

Q. Was your father's room significantly different from the rest of the house?

A. Yes.

MR. PERRI: Objection.

THE COURT: Overruled. The witness answered.

MR. ZERNER: Nothing further.

THE COURT: Any recross?

MR. PERRI: No, your Honor.

THE COURT: Ms. Ross, thank you for your testimony. It's concluded. You are free to go.

(Whereupon, the witness was excused.)

THE COURT: Mr. Zerner.

MR. ZERNER: The defense calls Justyn Ross, please.

J U S T Y N R O S S, residing in Kings County, having been called as a witness on behalf of the Defendant, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name, spell your first and last name and give us your county of residence.

THE WITNESS: Justyn, J-U-S-T-Y-N, Ross, R-O-S-S. Brooklyn, New York.

THE COURT: Mr. Zerner will ask you some questions. You can address him.

MR. ZERNER: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. ZERNER:

Q. Good afternoon, Mr. Ross.

A. Good afternoon.

Q. What do you do for work?

A. I do sanitation. I do environmental work. I help out, do dog walking. I do a lot of things.

Q. I see that you have your arm in a sling?

A. Yeah. I got hurt at work, unfortunately.

Q. How long ago was that?

A. December 23, 2015 I dislocated my left shoulder and fractured my left shoulder.

Q. Do you hope to get back to work soon?

A. Yeah, absolutely, if the body heals. Hopefully physically therapy goes well, I'll be back to normal.

Q. Did you ever work with your father?

A. Yes, I did. He's a good worker.

MR. PERRI: Objection.

THE COURT: Thank you, Mr. Perri.

When Mr. Zerner asks you a question, you have to answer the question that's asked of you, okay. Don't offer any other information other than what's asked for in the question.

THE WITNESS: Okay. I'm sorry, your Honor.

THE COURT: No problem.

Q. Mr. Ross, you said you have been living in Brooklyn?

A. Yes.

Q. Who do you live with?

A. My mom.

Q. Anybody else live there now?

A. No.

Q. How long have you been living in that place in Brooklyn?

A. For a while. Since I was young, about 13.

Q. So is it fair to say that since you were 13 other people have also lived in that house in Brooklyn?

A. No.

Q. There wasn't ever a time that your twin sister lived there?

A. As far as family, yes. My sisters, they lived there. The whole family, Jasmyn, my twin sister, Kelly. We all lived there.

Q. And your mom, Paula Ross?

A. Yes, Paula Ross.

Q. Are your parents together or have they split up?

A. They are not together, but they are good friends.

Q. And you have observed them interacting with each other?

A. Yes.

Q. And during the course of your childhood would your father visit you in Brooklyn?

A. Yes, absolutely.

MR. PERRI: Objection.

THE COURT: Overruled.

Q. And could you describe some of the visits?

MR. PERRI: Objection.

THE COURT: Sustained as to the time frame, Mr. Zerner.

Q. In 2013 would your father visit you in Brooklyn?

A. Yes.

Q. And who else was living with you in Brooklyn in 2013?

A. Jasmyn, Kelly, my mother.

Q. And when your father would visit you in Brooklyn, would he sometimes not come alone?

A. Yes.

Q. And when he would bring other people with him, could you tell us who some of those people were?

A. Yes, he would bring Patty, he would bring Mercedes, he'll bring friends of mine from middle school. All types of people.

Q. So now when you say friends from middle school, where did you attend middle school?

MR. PERRI: Objection.

THE COURT: Overruled.

You can answer the question.

A. 132. PS 132 in Queens.

Q. And -- withdrawn.

When your father would visit you in Brooklyn, let's talk about in 2013, what were some of the things that you would do?

A. We would go see the movies. I'm a big Marvel fan. We would go see Spiderman, X-men. We would go out to eat. I love to eat.

Q. Were there times that the family would go out as a large group?

A. Yes, absolutely. My dad is a family person.

Q. Were there also times that there would be like a girls get together that you would be excluded from?

A. Yes.

Q. And if you know, do you know who the women or the girls were that would go and have their activities?

A. My sister, my mom, my sister Kelly, my twin sister Jasmyn, my mom, Patty, friends. My sister's friend Octavia. It would be a girls night. Girls day.

Q. Now, did you ever personally interact with Patty?

A. Yes, absolutely.

Q. Could you tell us a little bit about your relationship with Patty?

A. Patty is Sarita's daughter. That's Tara's niece. And she was a household member. I would see her all the time since I was young. Since I was probably about 12, like ten. It's a really long time. I knew her since I was really young.

Q. How would you treat her?

A. Like a sister. I knew Patty when she was a little baby. I grew up with her.

Q. Did you ever observe your father interacting with her?

A. Yeah.

Q. How would your father treat her?

A. He treated her like a father figure. He made sure she had everything.

Q. You mentioned Tara Johnson?

A. Yes.

Q. How do you know her?

A. That's my dad's girlfriend.

Q. When you say girlfriend, to the best of your knowledge, how long have they been in a relationship?

A. They have been together for a really long time.

Q. Sometimes we use the term girlfriend. Do you know is she approximately in the same age range as your father?

A. Yes.

Q. And could you describe your relationship with Tara?

MR. PERRI: Objection.

THE COURT: Sustained.

MR. ZERNER: Can I have just one moment?

(Pause in the proceedings.)

Q. In 2014 did there come a time when your father began living with you?

A. Yes.

Q. And at that point in time did you have regular communication with Patty, Millinia Johnson?

A. No.

Q. Before that, was there a point in time when you would call or text with her?

A. Yes. She would text a lot. She was like a little sister to me. She was like hey, what's up. When do you want to hang out? You guys are so much fun. I love you guys. You guys are family. She would always want to be with us.

Q. Did it seem to your view of what was going on that Patty was glad to spend time with you?

A. Absolutely. She was happy to spend time with us. She never really wanted to be home.

Q. And thinking about a 52 week year, if you had to estimate of the 52 weekends in a year, about how often would Patty come visit you in Brooklyn?

A. She would come over on the weekends. A lot of times I would be out with my friends. Sometimes when I'm home I would see Patty. My mom would be doing her hair. The girls would be going out getting their nails done, going out to eat. Most of the time, I'm older, I would be with my friends skating and stuff like that.

MR. ZERNER: Nothing further, your Honor.

THE COURT: Any cross-examination?

MR. PERRI: Yes, your Honor.

CROSS-EXAMINATION

BY MR. PERRI:

Q. Mr. Ross, who asked you to come here today?

A. My dad and attorney.

Q. And have you discussed this case with your father?

A. Yes.

Q. And how many times have you discussed this case with your father?

A. Since it started.

Q. And so is that more than 20 times?

A. I'm here to help him, so.

Q. So you are here to help him. So you want to help him, that's why you are here today?

A. Yes.

Q. You look up to your father?

A. Yes, absolutely. He's my hero.

Q. And did you speak with the defense attorney?

A. Yes.

Q. And how many times did you speak with the defense attorney?

A. Defense attorney meaning?

THE COURT: Mr. Zerner, the man who is sitting next to your dad.

THE WITNESS: Sorry, this is new to me.

A. I speak to him quite frequently.

Q. How often?

A. Probably like on days like that I need to know information or how my dad is doing, just to keep me like not

in the dark of what's going on because it's my dad, so I want to know what's going on with him. Make sure he's all right.

Q. What information would you need to know?

A. Like how did the Court date go. Like I can't wait until this is finished so my dad can be free. He's a good man and I feel like my dad is like a super hero to me. Anybody that needs his help --

MR. PERRI: Your Honor, I ask that the witness be directed.

THE COURT: It was your question, Mr. Perri.

MR. PERRI: It was not responsive.

THE COURT: Overruled.

Did you finish your answer, sir?

A. Like I said, my dad was a super hero to me and he always helped. And I love my dad to death like.

THE WITNESS: I'm finished, your Honor.

THE COURT: Next question.

Q. And when you named the people that would go on the girls days, the girl outings, you named your mom, Patty and your sisters and some of your sister's friends; is that correct?

A. Yes.

Q. Now, would you ride with Patty and your father back to Nassau County after he would be in Brooklyn?

A. Yes.

Q. How often would you do that?

A. When I wanted to go to my dad's house after.

Q. And you would stay overnight at 301 Coventry?

A. Yes.

Q. And how often would you do that?

A. It depends. Like, I resided in Brooklyn. I had a job in Brooklyn, so it will be really far for me to go all the way back. Just on days I wanted to get comfortable on Long Island and spend time over there.

Q. When you were asked by defense counsel about 52 weeks in a year and the number of times you would see Patty, you said it was a lot. It was weekends you would see Patty?

A. Yes.

Q. And how often would you stay in Lakeview after you would ride back alone with your father and Patty?

A. Most times I would go for a really long time, but I always make sure I come back because I always had work in Brooklyn. On the days I had off, I would stay at my dad's house because it's too far to commute and I don't have a car.

Q. And in a given month, how often would that happen in 2013, 2014?

THE COURT: That he would stay on Long Island?

MR. PERRI: Yes, your Honor.

A. I can't give you an exact answer.

Q. You didn't have any problems with Millinia Johnson,

correct?

A. Absolutely not.

Q. And, to your knowledge, did your father have any difficulties or problems with Millinia Johnson?

A. Absolutely not.

MR. PERRI: Nothing further, your Honor.

THE COURT: Any redirect, Mr. Zerner?

MR. ZERNER: Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. ZERNER:

Q. Mr. Ross, are you lying today about your father?

MR. PERRI: Objection.

A. Absolutely --

THE COURT: Hold it, Mr. Ross. The objection is sustained.

Next question, Mr. Zerner.

You don't have to answer the question, Mr. Ross.

Q. Who do you live with now in Brooklyn?

MR. PERRI: Objection.

THE COURT: Sustained. Outside the scope of redirect.

Q. Did your father ever ask you to help him with this case?

A. Just my dad only asked me to be with him as a whole

family, just to be with each other when times is going hard and I'm with my dad through the whole thing.

Q. You are here because you love him, right?

A. Yeah, absolutely.

MR. ZERNER: Nothing further.

THE COURT: Any recross, Mr. Perri?

MR. PERRI: No, your Honor.

THE COURT: Mr. Ross, thank you for your testimony. It's concluded. You are free to go.

THE WITNESS: Thank you very much. Enjoy the rest of your day.

THE COURT: You too.

(Whereupon, the witness was excused.)

THE COURT: Can I see counsel for one second?

(A discussion was held off the record.)

THE COURT: So, ladies and gentlemen, that's all the witnesses we have today to offer testimony to you. Sometimes scheduling prevents them from being here when we need them, if you will, but it's okay because we're going to be back on Monday.

So, remember my admonitions. Enjoy your weekend. Forget about the case. Don't do any of the things I told you you are not allowed to do while you are outside of the courtroom. See you Monday morning, 9:30.

(Whereupon, the jury exited the courtroom.)

THE COURT: Okay, for scheduling, on Monday the 22nd, you will have all your witnesses available except for Reverend Hobbs, is that my understanding, Mr. Zerner?

MR. ZERNER: Yes, that's my understanding, Judge.

THE COURT: Without the Court having made any ruling. And in that regard, you will have, just to shortcut, Tara; is that correct?

MR. ZERNER: Yes.

THE COURT: And who else?

MR. ZERNER: Denise Sawyer, potentially Kelly Ross, potentially Sherman Roberts and potentially the sisters.

THE COURT: You want to offer your offer of proof on Sherman Roberts?

MR. ZERNER: Sure, your Honor. Sherman Roberts is the father of Sarita Johnson's youngest child Sherima I believe is her name. I believe she's seven or eight years old. There was testimony from both Sarita and Millinia Johnson that there was never a point in time where Sarita Johnson left the household at 301 Coventry Road North and lived elsewhere and was not involved in the care and parenting of her children.

Sherman Roberts will testify to the contrary.

THE COURT: Have them all ready, I'll make my rulings on Monday morning.

MR. ZERNER: Certainly, your Honor.

THE COURT: People want to put their position on the record?

MR. PERRI: Your Honor, the proffered reason defense counsel just gave is completely collateral. That it's barred by the collateral impeachment rule. It's wholly to contradict non-material testimony and to improperly impugn the character of the People's witnesses. It should not be permitted and it should be precluded.

THE COURT: I have your respective positions. I'll give you my rulings Monday. Have all your witnesses here so there is no delay.

The 24th we'll be off, but I anticipate that, if anything, Mr. Ross would testify on Tuesday. Was that your expectation?

MR. ZERNER: I anticipate Reverend Hobbs and Ray Ross testifying on Tuesday, yes, Judge.

THE COURT: Please be prepared to have Mr. Ross ready to testify on Monday if it works out that way. You will have to call Reverend Hobbs last if she's not available until Wednesday. I don't know how it's

going to work out, but I'm moving this along.

MR. ZERNER: Just for the record, you just said Wednesday, but I think you meant Tuesday. I know what you meant, but I don't think it's what you said, your Honor, with all due respect.

THE COURT: Have your client ready to testify Monday if there is openings for testimony.

MR. ZERNER: I understand completely and obviously I reserve my own decision making about whether I will call Reverend Hobbs at all.

THE COURT: Understood, but I can't delay waiting on Reverend Hobbs.

MR. ZERNER: Judge, the only reason there was a delay today was because Kelly Ross had to go to the hospital.

THE COURT: I understand. This is fine. We're on schedule.

MR. ZERNER: I'm doing my best, your Honor. I put on five witnesses today. I was trying to bring six and I'm going to try to do the same thing on Monday.

THE COURT: Sum and charge on Thursday. Please speak with my law secretary with respect to the charge conference, if there are any requests.

MR. PERRI: Thank you, your Honor.

MR. ZERNER: Thank you, your Honor.

Justyn Ross - Defense - Redirect 1176

(Whereupon, the trial was adjourned to February 22, 2016.)

* * *

Kathi A. Fedden, OCR

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU : PART 47

-------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK

-against- Ind. No. 1050N/15

JURY TRIAL

RAY ROSS,

DEFENDANT.

-------------------------------------x

Mineola, New York
February 22, 2016

B E F O R E: HON. TERENCE P. MURPHY
Acting Supreme Court Justice

A P P E A R A N C E S:

(Same as previously noted)

Kathi A. Fedden
Official Court Reporter

* * *

THE CLERK: This is continued case on trial, People v. Ray Ross. The jury is not present. All parties are present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you.

THE COURT: Good morning, all.

Mr. Zerner, what potential witnesses do you have lined up for today?

MR. ZERNER: For today we have Sherman Roberts, Denise Sawyer, Tara Johnson. We're still waiting to hear back from Kelly Ross, but I'm pessimistic she will be able to testify today.

It's not Diane Sawyer, the famous journalist, it's Denise Sawyer and I have been making efforts to not do that exact same thing, your Honor.

THE COURT: Anybody else?

MR. ZERNER: No, your Honor.

THE COURT: With regard to these witnesses, I will permit Tara Johnson to testify.

With regard to Denise Sawyer, do you have anything else, Mr. Zerner, to put on the record with regard to why she should be able to testify?

MR. ZERNER: Sure, your Honor. There are a multitude of reasons why Denise Sawyer should be able to testify. She's been a long time neighbor of the home at 301 Coventry Road North. I believe her address is 308 Coventry Road North. She's familiar with the people and

the parties involved.

Mr. Ross had a lot of interaction with her and with her family. There is a situation with regards to this incident last weekend which I believe is perfectly relevant. In fact, it goes exactly towards the defense theory of the case, that Sarita Johnson is manipulating her daughter and putting her daughter up to saying X, Y and Z about Ray Ross and the fact that she has intimidated a person that is a witness in this case that's a neighbor, that is a long time person familiar to her, goes exactly to the defense theory of the case.

I believe it's black letter law that I be allowed to bring this witness to show bias of Sarita Johnson. To show animus, to show Sarita Johnson's background, perhaps even her reputation in the community.

THE COURT: Mr. Perri?

MR. PERRI: Your Honor, the People would oppose calling either Sherman Roberts or Denise Sawyer. I'm handing up and handing to defense a copy of People versus Seabrook, 76 A.D.3d 606 from the Second Department of the Appellate Division.

Your Honor, as defense counsel conceded last week when last we discussed this topic, Ms. Sawyer was not a witness until she allegedly had this interaction

where there was or was not a trespass after Sarita Johnson's testimony was concluded, days later in the backyard. She has no relevant testimony with respect to this case.

Just stating that she's going to this place into the theory of the defendant's case without a reasonable explanation as to what she's going to say to show actual hostility or bias or a motive to lie against the defendant, not any hostility between her and Ms. Sawyer, does not satisfy the requirements to get beyond the collateral impeachment rule, your Honor. This would require the Court to have a separate trial with regards to the trespass violation and whether or not it happened and I don't understand how it could be witness intimidation if, until it happened, Ms. Sawyer was not going to be a witness.

With respect to Mr. Roberts, your Honor.

THE COURT: I didn't get that far.

MR. PERRI: Sorry, your Honor. Thank you.

MR. ZERNER: Your Honor, Ms. Sawyer was always a potential witness when we started discussing about limiting my witnesses, despite the fact that I was against the possibility of me being limited in the witnesses that I would call.

THE COURT: No one limited your potential

witnesses. I don't know what you mean by that.

MR. ZERNER: It seems that there is a constant back and forth with Mr. Perri that he thinks any witness I call is going to be cumulative. He started before I called witness one, he objected to me calling witness one. Now I'm talking about three witnesses today and he's already on his feet talking that two of them shouldn't be called and I think finally we've gotten to the point where even Mr. Perri has to concede I'm allowed to put on a defense. That's the issue, Judge.

The issue is it's crystal clear that Ms. Sarita Johnson testified before your Honor on Thursday, February 11th. We then have a four day weekend. During that four day weekend it's our theory that Sarita Johnson made an attempt to intimidate one of my potential witnesses. That's completely in keeping with my need, my duty to show the animus and bias of Sarita Johnson.

THE COURT: Based on a --

MR. ZERNER: In part --

THE COURT: Hold it. Based on a separate and distinct and post action incident, alleged incident between these two individuals?

MR. ZERNER: First of all, when you say post, I guess it's post the allegation that the indictment

has.

THE COURT: Post the start of the trial.

MR. ZERNER: It's during the trial, your Honor. Frankly, Denise Sawyer was a potential witness for me.

THE COURT: To testify to what, sir?

MR. ZERNER: About my client's relationship in the community with her family, with him living at the location. There were issues about Child Protective Services that your Honor ruled on. However, Denise Sawyer was a witness to several of those incidents and you precluded me from getting into that, therefore, Denise Sawyer was dropping off of my witness list.

It seems clear to me that every witness I potentially look to call, Mr. Perri seeks to not allow me to call, so I'm being very careful about who --

THE COURT: Let me cut you off right there to make this point. Mr. Perri could do whatever he believes is necessary to do to prosecute the case. All he's doing is making argument, just as you are making argument now. It's up to the Court to make decisions. And the Court makes decisions when it hears argument from the People or argument from the defense. And, quite frankly, with regard to all these arguments, I found in your favor to give your client as fair and just

trial as I possibly can with regard to a number of these witnesses. And, quite frankly, I think if it went up on an appeal and I didn't allow those witnesses, I would be affirmed. But I want you and your client to have the best possible opportunity to put on a defense to this case as you so choose.

So, stop talking about what Mr. Perri is doing and just tell me how and why Ms. Denise Sawyer is not a collateral witness here.

MR. ZERNER: She's not a collateral witness for several reasons. Reason number one is she can speak to Mr. Ross' reputation in the community, as well as Sarita Johnson's reputation in the community. She's known Sarita Johnson for 40 plus years. She's known Tara Johnson 40 plus years. They are familiar to each other from their mutual childhoods in the same neighborhood in the same homes.

In addition, an issue has arisen with regards to the attempted intimidation of a witness. I provided the Court with documentation of that the minute we returned to trial. What I'm concerned about is that Mr. Perri, who does have an obligation to seek justice, not just to prosecute my client, has at every turn sought to limit each and every thinking he could limit starting with the CPS records that I brought forward

months and months ago, that my client's case was unfounded, but I have been precluded from getting into that.

Mr. Perri conversely has been allowed to put into evidence orders of protection that were from Family Court, which is an ancillary issue. When it suits Mr. Perri, he has no problem arguing to your Honor to broaden issues, frankly, in order to make my client look worse. That's what he's done. Except he has a bigger job than I do. His job is to seek justice. He represents the People of the County of Nassau and the People of the State of New York. I am defending my client and, your Honor, I have accepted every ruling you have made.

Some of those rulings, especially with regards to CPS records, especially with regards to Mr. Perri failing to follow up with the NYSIS records and with the records about Sarita Johnson's arrests have put me into a bind. And one of the things that I can do now when I'm defending my client zealously as I'm doing is to be able to show why Sarita Johnson and who Sarita Johnson is and what's she's done.

So the fact I could not cross-examine Sarita Johnson about her priors, and the fact that we still to this day do not know the specifics of the multiple petit

larcenies she was involved with in this county, those were prosecuted by this district attorney's office and I think and I don't know because Mr. Perri again has refused to turn over these records, that at least one of those misdemeanor charges was pending at the same time as Ms. Sarita Johnson brought these phony allegations to the same district attorney's office.

I believe Sarita Johnson knows the expression the best defense is a good offense and what she's doing is she's pushing before she gets pushed.

THE COURT: The Court finds -- are you finished, Mr. Zerner, with regard to Ms. Sawyer?

MR. ZERNER: Thank you, yes.

THE COURT: The Court finds Ms. Sawyer to be a collateral witness without any meaningful testimony to be given based on the arguments of defense counsel and the responses of the People, therefore, the Court precludes the defense from bringing Ms. Sawyer as your witness.

Mr. Zerner, with regard to Mr. Roberts, what does he have to offer?

MR. ZERNER: Your Honor, Sherman Roberts is the father of the youngest child of Sarita Johnson. Sarita Johnson testified that she never stopped living at 301 Coventry Road North and moved to Queens.

Mr. Sherman Roberts will contradict that.

Mr. Sherman Roberts is the father of that child. They lived together in Queens. I brought that forward at the very beginning of this case. In fact, one of the things that I was trying to encourage Mr. Perri to find and my private investigator looked into this, well, it's my understanding there were incidents in Queens that involved Sarita Johnson as a defendant. I don't have the documentation so I'm not going to be asking about that, but what I did say is that Sherman Roberts will be able to testify about that.

That goes exactly to Sarita Johnson's credibility and I'm going to argue to the jury in falsus in uno that she lied about one thing, she lied about multiple things. She lied multiple times on the stand and I have to have the opportunity to show that to the jury and Sherman Roberts is one way I'm going to do that. And, frankly, I take the exception to the greatest extent that I possibly can on your ruling just now about Denise Sawyer and I would like an opportunity when we're done talking here to go into the hallway and explain to Ms. Sawyer thank you for coming, but you won't have the opportunity to testify. If your Honor is amenable after hearing Sherman Roberts testify and perhaps after hearing Tara Johnson testify, you will

revisit your ruling.

Your Honor, Sherman Roberts is a witness to many, many things in that house, around that house, dealing with his child, dealing with the father of the complainant in this case, dealing with the mother of the complainant in this case. It's not collateral, it's all on point. It's all necessary.

THE COURT: People.

MR. PERRI: Your Honor, the People oppose the calling of this witness. This isn't even the father of the complainant in this case, Millinia Johnson. It's the father of her younger sister. Defense counsel has failed to provide the Court with any direct explanation with regards to material issues in this case as to what Sherman Roberts would testify to.

People v. Seabrook specifically stands for where the issue is not material to the issues that the jury must decide. And the jury does not have to decide whether or not Sarita Johnson lived in Queens years ago with Sherman Roberts and the jury does not have to decide whether or not she's a good mother. The jury has to decide whether or not this defendant is guilty of the crimes charged in the indictment. And in that case, even where the defense witnesses were going to testify about whether or not the People's witnesses were drug

dealers in a case that dealt with the defendant being accused of dealing drugs, the Court found there was a provident exercise of discretion to exclude those witnesses on the collateral issue of whether or not the People's witnesses who committed other crimes or bad acts that were not essential to the case at hand.

The People would oppose calling this witness, your Honor.

THE COURT: Mr. Zerner, in regard to the People's recitation in People v. Seabrook 76 A.D. 3d 606, Second Department case of 2010 which he's quoted in part and the Second Department found the defendant may be precluded from introducing extrinsic evidence of collateral matters when the sole purpose of offering such evidence is to impeach credibility, which is what you referenced Mr. Roberts anticipated testimony to do. And then you went on to talk about his familiarity with the family and such and the family living arrangements.

And the First Department, People versus Ruiz, First Department Appellate Division, 18 A.D. 3d 220, 2005 case referenced with approval, trial courts precluding of evidence concerning the details of certain interconnected family relationships which tended to establish a motive for the child victims to give false testimony. It is remote and speculative, which I think

you have also argued that Mr. Roberts might give some testimony on that point.

The Appellate Divisions are telling me that I'm right in having a real problem offering -- allowing you to offer this type of evidence to the jury as remote, speculative, collateral and immaterial to the issue at hand and that is whether or not your client engaged in an inappropriate sexual conduct with a minor.

MR. ZERNER: Your Honor, I believe both cases say that the trial Court may, first of all. So, I hope that you haven't decided yet what you are going to do and we've spent a lot of time talking about these issues and these witnesses would take less time to actually testify start to finish than these arguments.

THE COURT: You have made that argument before and that's not a valid argument.

MR. ZERNER: It's just one thing I'm putting on the record, your Honor. I have submitted a list of potential witnesses before the prosecutor called his witnesses, not knowing precisely what they would say or how they would say it.

Sarita Johnson has lied on the stand and I have to have the opportunity, it's black letter law, that I am able to show that she has lied on the stand.

THE COURT: Not through collateral evidence.

MR. ZERNER: It's not collateral evidence. What we're talking about is an 18 month vague period of time that the prosecutor has in his indictment. During that period of time multiple incidents took place. In fact, one of them that I would like to put on the record now that I haven't already put on the record is that there was a Sweet 16 in November of 2013 that Sherman Roberts attended, that his daughter attended, that other people attended, that Sarita Johnson had an issue about that goes exactly to the heart of Sarita Johnson's credibility.

The problem here, being forced to give an offer of proof on each and every witness that I have called, which has been the case so far, then puts me in a position of telling Mr. Perri exactly what I'm doing and how I'm doing it. I'm not trying to do anything by ambush, but I don't have to give him my entire theory of the case. I'm allowed to put on a defense to defend my client who has never been convicted of jay walking, 55 years old. He's fighting for his life here, your Honor. And while you may be allowed to exclude certain witnesses and I'll respect whatever ruling you have, and I know in some part we're both looking towards the possibility that if there is a conviction, that then there will be appeals, but why not allow these witnesses

to testify. You can always afterwards exclude it if you want to exclude it. I'm telling --

THE COURT: Exclude what is the evidence?

MR. ZERNER: Exclude any testimony, if that's the way you choose to do it, your Honor.

I am trying to put on witnesses here and now. Some of them -- your Honor, for you to exclude both of these individuals is hamstringing my case.

THE COURT: Five-minute recess. We have everybody ready to go?

THE SERGEANT: Yes, Judge.

(A recess was taken.)

THE CLERK: All parties are present. The jury is not.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you.

THE COURT: All right, the Court has already ruled on Ms. Denise Sawyer's eligibility, if you will, to be called as a witness at the trial by the defense. The Court declined to allow that.

With regard to Mr. Sherman Roberts, the Court also declines defense counsel's request to have Mr. Roberts testify at trial. Based on the People's

opposition, the offer of proof that's been presented and the case law that's been cited by the Court with regard to collateral issues, collateral issue witnesses testifying for the sole purpose of impeaching credibility, but also with regard to Mr. Roberts, under People v. Ruiz.

Ms. Tara Johnson will be allowed to be called.

Mr. Zerner, your exceptions are noted for the record.

MR. ZERNER: Thank you, your Honor. I just wanted to state for the record that I believe you have misstated my arguments and that this is actually a mistaken ruling. I understand, obviously, and I will respect your decision. I would like an opportunity to go into the hallway and tell those two individuals thank you for coming in and that they can leave.

THE COURT: Okay. So ten minutes.

With regard to mistaken interpretations of argument, the Court finds that the witnesses would be collateral to the issues at trial, that their testimony would be irrelevant and immaterial to those issues that the jury must decide.

10:34, the next session.

(A recess was taken.)

THE CLERK: All parties are present. The jury

is not.

People ready?

MR. PERRI: People are ready.

THE CLERK: Defense ready?

MR. ZERNER: Defense is ready, thank you.

THE COURT: Do we have the jury ready?

Counsel, the Court is going to make that documentation provided by Mr. Zerner with regard to the complaint of Ms. Sawyer against Ms. Johnson as a Court exhibit.

MR. ZERNER: Just so it's clear for the record, that's against Sarita Johnson that was provided by the defense to the Court a week ago. That is part of the reason that I think that it's crystal clear that Denise Sawyer should be able to testify here and today and a copy was provided immediately to Mr. Perri when we reconvened in Court last week after the long weekend.

THE COURT: Thank you, Mr. Zerner.

THE CLERK: Court Exhibit IX, Judge.

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE CLERK: Let the record reflect the presence of the jury.

Again, are the People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: Defense ready, thank you.

THE COURT: Good morning, ladies and gentlemen of the jury.

Mr. Zerner, your next witness, please.

MR. ZERNER: The next witness is Tara Johnson, your Honor.

T A R A J O H N S O N, residing in the County of Nassau, having been called as a witness on behalf of the Defendant, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: Please state your name and spell your first and last name and give us your county of residence.

THE WITNESS: My name is Tara Johnson, T-A-R-A J-O-H-N-S-O-N. I reside in Nassau County.

THE COURT: Good morning, Ms. Johnson.

THE WITNESS: Good morning.

THE COURT: I'm going to ask you to speak into the microphone which you have and that's perfect. And then if you hear the word objection, please stop your answer or don't start your answer so I can make a ruling.

THE WITNESS: Okay.

THE COURT: Mr. Zerner.

DIRECT EXAMINATION

BY MR. ZERNER:

Q. Good morning, Ms. Johnson.

A. Good morning.

Q. Ms. Johnson, could you tell us specifically where you live?

A. Right now I currently live in Valley Stream. 87 Lotus Oval South, Valley Stream, New York 11581.

Q. How long have you lived there, ma'am?

A. Since October.

Q. October of 2015?

A. Correct.

Q. Prior to that, where did you live?

A. 301 Coventry Road North, West Hempstead, New York 11552.

Q. How long had you lived there?

A. All my life. Since I was seven years old.

Q. Now, focusing specifically on 2013. Who else was living at 301 Coventry Road North in West Hempstead in 2013?

A. I had a niece with five children, my daughter with one child in 2013 -- two children 2013. And oh, just 2013. And then when my niece left with the five children, her sister came with two children.

Q. What's the name of that niece with the five children?

A. Shantae Johnson.

Q. Whose daughter is she?

A. She's my deceased sister's daughter, Deirdre Johnson, who passed away June 29, 2013.

Q. I'm sorry for your loss.

Aside from that sister Deirdre Johnson, what other siblings do you have?

A. Anthony Johnson, who is my brother, and Sarita Johnson.

Q. And Anthony Johnson, where does he live?

A. He's currently in Glen Cove.

Q. Where in Glen Cove is he?

A. I'm not sure of the exact address. I want to say it's off Highland Avenue. He's in a state program because my brother suffers from schizophrenia.

Q. Now, aside from those two siblings that you reference, you said you have another sister?

A. Yes, the one that is deceased.

Q. Do you have any living sisters?

A. Other than Sarita, no, it's just the three of us now.

Q. But Sarita Johnson is your sister?

A. Yes, she is.

Q. And are your parents alive?

A. My mother's alive. She resides at Hempstead Park

Nursing Home and my father has been dead since 1987.

Q. Again, I'm sorry for your loss.

A. Thank you.

Q. Where -- withdrawn.

When did your mother move into that nursing home you just described?

A. I would say approximately 2009.

Q. And what condition resulted in her moving into this nursing home?

A. She had a stroke. My sister Sarita was getting too much for her to handle.

MR. PERRI: Objection.

A. And the day that she had the stroke.

THE COURT: Ma'am, when you hear that word objection you just have to stop. I have to make a ruling. Thank you for your answer.

Next question, Mr. Zerner.

MR. ZERNER: Thank you, your Honor.

Q. Who owns the home at 301 Coventry Road North?

A. Pauline Johnson, my mother.

Q. And is there anybody that has power of attorney?

A. I do.

THE COURT: Okay. Hold on a second, Mr. Zerner.

You have to wait for the attorney to ask his

question and then you can answer because the court reporter has to write it all down. So just take a second, listen to the question and then you can provide an answer.

THE WITNESS: Okay.

Q. How many bedrooms are there at 301 Coventry Road North?

A. Four.

Q. Focusing on 2013, could you tell us who was residing in each of those four bedrooms?

A. Downstairs -- it's a high ranch home. Downstairs is an open area. My sister Sarita was in an open area with mattresses on the floor and her children. Ray and I were upstairs in a bedroom and my daughter was in the other bedroom and my mother wasn't there, so Malik, Sarita's son was in my mother's old bedroom. And my niece and her children were in the second bedroom downstairs.

Q. Just for clarity sake, what's your daughter's name?

A. Taqiyya Birch.

Q. And you said that Sarita had four children?

A. Yes, she does.

Q. Could you tell us those children's name?

A. Yes, it's Malik, Mercedes, Millinia and Sherima.

Q. Does Millinia go by any kind of nickname?

A. Patty.

Q. And you discussed Ray Ross living in that house with you. Do you remember what year Ray moved into the house with you?

A. It was the same year of 9/11, because he came the week of 9/11.

Q. So he moved their September of 2001?

A. That is correct.

Q. And you share a bedroom with him at the home you just described?

A. Yes.

Q. Do you have any children with Ray Ross?

A. No.

Q. Is it accurate to say you have been in a committed relationship with him since September of 2001?

A. We've been together since 1998.

Q. Now, starting once your mother moved out of the home in 2009, could you tell us who was paying for the upkeep and maintenance of the home?

A. Ray and I paid all the upkeep and maintenance of the home.

Q. And how was it determined that the two of you would make these payments?

A. We were the only working ones.

Q. Was there ever any conversation with any of the other adults living in the house about them contributing?

A. No, except when my niece came, the second niece came, she asked me could she live there for two months. I told her yes, but to give me $75 for the month. Not a week, just for the month and she has never paid me anything either since then.

Q. And again, that niece's first name is?

A. August Johnson.

Q. And her mother's name?

A. Deirdre Johnson.

Q. Is it accurate to say you and Ray were paying the bills in the house from 2009 straight through to 2014?

A. Correct.

Q. Was there ever any tension about that?

A. After Ray left there was.

Q. Now, could you describe how many refrigerators there were in the house?

A. Two.

MR. PERRI: Objection.

THE COURT: Overruled.

Q. And was the refrigerator shared by the family members or was there any segregation of the food in the refrigerator?

MR. PERRI: Objection.

THE COURT: Overruled. You can answer the question.

A. The refrigerator upstairs, which was the one to the main house was broken and when my niece came, she bought a refrigerator that was downstairs that they used.

Q. So focusing on 2013, how many working refrigerators were in the house then?

A. One.

Q. And was that shared by everybody in the house?

A. Yes.

Q. And who would purchase the food that would end up in the refrigerator?

A. They purchased their own food.

Q. When you say "they," who are you talking about?

A. My daughter purchased her food. My niece purchased her food. Sarita, she wasn't there a lot, so we all chipped in feeding her children.

Q. Now, was there ever a point in time when your sister Sarita was not living at 301 Coventry Road?

A. Yes.

MR. PERRI: Objection.

THE COURT: Overruled.

Q. And do you remember that time frame?

A. Well, there was a few times that she left, came back, left, came back.

Q. Describe the first time that happened.

MR. PERRI: Objection.

THE COURT: Overruled.

A. Well, she would leave -- back when Sherima was born, she moved out with Sherima to live with Sherima's father.

Q. What's Sherima's father's name?

A. Sherman.

Q. What's his last name?

A. I'm not sure actually.

Q. Might it have been Sherman Roberts?

A. Yes, Sherman Roberts, that's it.

Q. When was your niece Sherima born?

A. Sherima is eight years old now, so eight years ago. I'm getting old. I can't remember all the years. There is a lot of them.

Q. Just for clarification for the record, would it be fair to say she was born around the calendar year of 2007?

A. Yes.

Q. So is it your testimony that leading up to the point when this niece of yours was born, that your sister Sarita was not living at 301 Coventry Road North?

MR. PERRI: Objection.

A. That is correct.

THE COURT: Ms. Johnson, you have to wait. Let me offer another sign for you to hold off on your answer until I speak. If you see the gentleman standing

up at the front table, just don't answer.

THE WITNESS: Okay.

THE COURT: Until I say you can answer the question.

The objection is overruled. Next question.

MR. ZERNER: Thank you, your Honor.

Q. Now, you said that wasn't the only time that your sister left the house, correct?

A. Correct.

Q. And when your sister moved out of the house, did she bring with her her three older children?

A. No, she did not.

MR. PERRI: Objection.

THE COURT: Overruled.

Q. Who was caring for her three older children when she moved out of the house?

MR. PERRI: Objection.

THE COURT: Overruled.

A. My mother took care of her children all their lives.

Q. Now, in addition to your mother, did anybody else provide parenting to and this is we're talking about Malik, Mercedes and Patty?

MR. PERRI: Objection.

THE COURT: Overruled.

You can answer.

A. Yes, Ray and I.

Q. And what roles would you and Ray play in those children's lives?

A. Whatever they needed we supplied them with. I helped my mother with the children because I felt she was too old and I just, you know, helped with whatever was needed to take care of the children.

Q. Did that include going to the children's schools?

A. Yes.

Q. And what types of things would you and Ray do at the children's schools?

MR. PERRI: Objection.

THE COURT: Overruled.

Q. You can please answer the question.

A. Parent-teacher conference. I didn't really go to the parent-teacher conference, Ray, my mother and Robert Jones would go to all the parent-teacher conferences.

Q. Who is Robert Jones?

A. Robert Jones is Mercedes and Malik, the two oldest dad and he, in conjunction with my mother, were the caretakers of those children.

Q. So is it accurate to say Robert Jones was at one point an active parent in his children's lives?

MR. PERRI: Objection.

THE COURT: Sustained.

Don't answer the question.

Next question.

Q. Did there come a time when Robert Jones was no longer, if there was a time, actively in his children's lives?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question, please.

Q. Now, in addition to going to the children's schools, what else would you and Ray do to help parent these children when their mother was living outside of the house?

A. We helped with homework. We clothed them. We did activities. Especially Ray, he would. They would go to amusement parks. They would go out for ice cream, for pizza and it was all of the kids. They loved Ray.

Q. Now, what do you do for work, Ms. Johnson?

A. I'm an assistant branch manager for HSBC Bank.

Q. And how long have you been working for HSBC Bank?

A. May 1st will be 27 years.

Q. Wow. It hasn't HSBC the whole time, correct?

A. Correct.

Q. It's had many different mergers and incarnations?

A. That's correct.

Q. So when you first started working with the bank and

I'm going to try to do my math, we're talking about maybe 1988?

A. I started May 1st, '89.

Q. What was the name of the bank at that time?

A. Marine Midland.

Q. Which branch were you working at?

A. I worked at several. I started out one year in the Lynbrook office. I worked ten years in the West Hempstead office; nine years in the Franklin Square office; two years between Port Washington and Great Neck; four years in Levittown and now since July of last year I'm back in Port Washington.

Q. And what was your title when you first started working at the Marine Midland branch back in 1989?

MR. PERRI: Objection.

THE COURT: You can answer the question, but can we move this along.

A. I was a teller.

Q. What's your title now?

A. I'm an assistant branch manager.

Q. Thank you, Ms. Johnson.

What are your general hours of work?

A. 8:30 to 5:00.

Q. Monday through Friday?

A. Monday through Friday.

Q. Are there times when you need to work on Saturdays?

A. No longer because a lot of our branches no longer have Saturday hours.

Q. But is it fair to say during the course of your career there were times when your business hours included at least partial days on Saturdays?

A. That is correct.

Q. And that perhaps was the case at various times over the last three or four years?

A. Yes.

Q. Thank you.

Now, what does Ray Ross do for a living?

A. Private sanitation.

Q. And what were his hours?

A. He worked different hours. He had times when he worked nights and he had times when he worked days.

Q. And focusing on 2013, 2014, if you know, what were Ray's hours, if you know?

A. At night. I believe he worked -- no, days, days.

Q. Now, again, focusing on the time when your mother was no longer living there and that Sarita was no longer living there, who would be home when the kids came home from school?

A. Ray.

Q. Were there any other consistent adult presences in

the kids' lives in the afternoons when they came home from school?

A. My daughter might have been there sometimes, but primarily Ray.

Q. And how old is your daughter now?

A. My daughter will be 34 March 12.

Q. And what does she do for work?

A. Right now she's not working, but she used to work for the Department of Immigration in Garden City.

Q. And when she was working, what were her business hours?

A. 9:00 to 5:00.

Q. Thank you.

Now you described that you shared a bedroom at 301 Coventry Road North with Ray Ross, correct?

A. That is correct.

Q. And was there a television in that room?

A. Yes, there was.

Q. And was it hooked up to any satellite or cable provider?

A. Yes.

Q. And what was the provider?

A. Cablevision.

Q. And who would pay that bill?

A. Ray.

Q. To the best of your knowledge, in 2013, 2014 were there any other working televisions in the home?

A. No.

Q. Could you describe times, if there were any, when other members of your family, the extended family you have described, would watch television in your room?

A. Absolutely.

Q. Could you tell us a little bit about who would come and go watching television?

A. The little ones, my nieces, my nephews. Sometimes if it was something like a concert or an awards show, the older ones would come in and want to watch, but it was pretty much the five; my niece's five, Patty and that was it. Pretty much the smaller ones.

Q. Was there a specific policy about who could come and go in your room?

A. No, except for when we weren't home, I kept it locked.

Q. Why did you keep the door locked when you weren't home?

A. Because my sister would steal.

Q. What would she steal from you?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Where do you get your mail -- withdrawn.

In 2013 and 2014 where did you get your mail delivered?

A. My mail was delivered to the house.

Q. And to the best of your knowledge, was there another place that people received mail?

A. Yes, we got a --

MR. PERRI: Objection.

A. A safe deposit box for my mother.

THE COURT: She's answered the question.

Next question.

Q. When you say safe deposit box?

A. I'm sorry, a P.O. Box.

Q. And at what branch, if you know?

MR. PERRI: Objection.

A. At the West Hempstead post office.

THE COURT: Overruled.

Q. And why did you get a P.O. Box?

MR. PERRI: Objection.

THE COURT: Hold it, ma'am. Sustained.

Mr. Zerner, can we move it along, please.

MR. ZERNER: Of course, your Honor, of course.

Q. Could you tell us about your relationship personally with your sister Sarita?

MR. PERRI: Objection.

THE COURT: Overruled.

A. It was strained.

Q. Tell us why.

A. Because she violated me a lot throughout my life. She's robbed me blind.

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Now, you have lived in the same house with your sister, the house that you both grew up in except when she had departed the house for many years; is that fair to say?

A. That is correct.

Q. And could you tell us on a daily basis about your general interactions together?

A. There was very little interaction. Sometimes we would speak, sometimes we would not speak. I just pretty much stayed out of her way and I didn't deal with her unless I had to deal with her.

Q. To the best of your knowledge, was she working in 2013, 2014?

A. No.

Q. Did you let the tension between yourself and your sister impact the relationship you had with her children?

A. Absolutely not.

Q. Could you tell us how you treated her children?

A. I loved her children then. I love her children now and they love me.

Q. You described earlier a man Robert Jones who was the father of the two oldest children?

A. Correct.

Q. Were there times when you facilitated him being able to see his children?

MR. PERRI: Objection.

THE COURT: Hold it. Sustained.

Q. To the best of your recollection, was Robert Jones a positive force in his children's lives?

MR. PERRI: Objection.

THE COURT: Hold it, ma'am. Sustained.

Q. Could you tell us some of the things that you and Ray would typically do on the weekends?

A. Well, me on a --

THE COURT: I'm sorry, can I interrupt? I'm going to sustain that as to the form of the question, Mr. Zerner. Can we get a time frame, please?

MR. ZERNER: I'll focus the time frame, yes, your Honor, thank you.

THE COURT: The attorney is going to ask you another question.

Q. Focusing on 2013 and 2014, specifically, first of all, would you describe yourself as a morning person?

A. Yes and no.

Q. What do you mean by that, ma'am?

A. Yes, I'm a morning person, but on the weekend I like to sleep in.

Q. And how would you describe Ray Ross in that capacity?

A. An early riser.

Q. Now, focusing on your weekends in 2013 and 2014, let's focus on a typical Saturday. What would be going on on a typical Saturday?

A. He would want to get up. Let's do something with the kids. He would want to go to an amusement park. Let's go to Adventureland. And I never wanted to go.

Q. And again, during this time frame is it fair to say that some of those Saturdays you actually had to get up and go to the bank?

A. Yes.

Q. For work purposes, not for personal banking purposes, right?

A. Yeah. And a few times I went with them whether I wanted to or not, for the kids' sake.

Q. Could you tell us about some of the occasions when you went on these trips?

A. We went to an amusement park at St. Thomas in West Hempstead together. We used to go to ice cream at Ralph's

because the kids love ice cream so I would go because Ray would get annoyed with me. He's like you never want to go with us. It was my time, being in a house full, when he took everybody away, for me to have time for myself.

Q. Now, what would you and Ray typically do on Sunday?

A. I go to church every Sunday.

Q. Does Ray also accompany you to church?

A. Yes, Ray goes to church.

Q. Which church?

A. St. Paul A.M.E.

Q. And geographically where is that located?

A. It's in Rockville Centre.

Q. Close by to your home in West Hempstead?

A. Absolutely. We're in Lakeview. Even though they call it Rockville Centre, we call it the other side of Lakeview. Literally you could walk.

Q. Do you sometimes walk?

A. Yes.

Q. Now, you said every Sunday you go to church?

A. Yes, I do.

Q. With Ray?

A. Yes. We don't go together every Sunday. Some Sundays Ray have to work, but pretty much yes, we go to church every Sunday.

Q. So if Ray wasn't working on Sunday, he was going to

church on Sunday?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes.

THE COURT: The question was answered.

Q. Would you sometimes bring other family members to church?

A. Yes.

MR. PERRI: Objection.

THE COURT: Overruled.

Q. And who would go to church?

MR. PERRI: Objection.

THE COURT: Overruled. You can answer the question.

A. The kids, because I'm a praise dancer, so a lot of times I was involved in programs and they would come to church. The kids would come to church and Sherima would come with me almost every Sunday for a certain amount of time.

Q. And just for the education of the jury and maybe for myself as well, could you tell us what a praise dancer is?

A. A praise dancer is someone who expresses themselves musically to gospel music. We dance.

Q. That's one of the things that you do?

A. Yes, it is.

Q. And you said that the kids would accompany you to church. You mentioned specifically Sherima. Could you tell us what other kids would sometimes go to church?

MR. PERRI: Objection.

A. My niece's five children and Patty and Mercedes and sometimes Malik.

THE COURT: The objection is overruled.

MR. ZERNER: Thank you.

Q. I want to remind you, like the judge said --

THE COURT: I'll remind her, Mr. Zerner.

THE WITNESS: I'm sorry, I get caught up in wanting to explain. I apologize.

THE COURT: All right. Next question, please.

Q. Now, do you recall going to a Sweet 16 for a friend of yours, Destiny Williams?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. You described that you would frequently keep the bedroom door of the bedroom you shared with Ray locked, is that accurate?

MR. PERRI: Objection.

THE COURT: No, overruled. You can answer the question, ma'am.

A. If we were home, it was unlocked. If we were not

home, it was locked.

Q. Were there ever any times that the door was locked but somebody entered anyway?

A. Yes.

Q. Could you describe those times?

MR. PERRI: Objection.

THE COURT: Sustained as to the form of the question.

Q. Did that ever happen in the time frame of 2013, 2014?

A. Yes.

Q. Could you describe that, please?

MR. PERRI: Objection.

THE COURT: Hold it, ma'am.

Overruled.

A. My sister would break into my room and steal things. Steal things that belonged to me.

MR. PERRI: Objection.

THE COURT: Overruled.

Next question.

Q. What were some of those items that she stole?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Now, could you describe the condition of your bedroom?

A. It was pretty maintained.

Q. And could you describe the condition of the rest of the house?

A. Not maintained very well.

Q. Could you describe what you mean by that?

A. No sense of value, so a lot of the stuff was destroyed.

Q. What types of things were destroyed?

A. The floor, the fridgerator, the stove, the window, the screens in the window. Just a lot of different things weren't maintained properly.

Q. Were there any pets in the house?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Did you personally have any pets?

MR. PERRI: Objection.

A. No.

THE COURT: Overruled.

Next question.

Q. Could you describe specifically your relationship with your niece Millinia?

A. It was a normal relationship. She was closer to Ray than she was to I in the sense that, you know what I'm saying, they did a lot of things together. But we had a

great relationship. She was always like Aunt Tara. When I started talking about us moving two years ago, she said she wanted to move with us.

Q. And aside from her wanting to continue living with you, were there ever times when you had outings with her, just you and her?

A. No.

Q. And why not?

A. It just didn't -- I just wasn't that type of person to get up Saturday morning and say let's go do all these children things. You know, I would plan it and then we would go this Saturday, but not every Saturday. That's Ray's thing.

Q. To the best of your knowledge, did some of your nieces sometimes accompany Ray to visit his children in Brooklyn?

A. Yes.

Q. And is it fair to say that some of those times were Mercedes along with Patty?

A. Yes.

Q. And some of the times would be just Mercedes?

A. Yes.

Q. And some of the times would be just Patty?

A. Yes.

Q. To the best of your knowledge, would some of those

trips result in your nieces coming home with new school clothes?

A. Yes.

Q. And what was your nieces' reactions when they would come home with new school clothes?

A. They were very excited.

Q. Do you remember your sister's reaction when her daughters would come home with new clothes?

MR. PERRI: Objection.

THE COURT: Overruled.

A. In the beginning my sister never had a problem with people doing anything monetarily. It wasn't until the end that she began to get resentful of anybody doing anything for Millinia.

Q. Describe how you knew your sister was resentful.

A. Well, one time I actually heard her. This was the week before he was escorted, I heard her tell, say to Millinia -- let me get it exactly right -- I cannot give you the things that Ray can give you, but I'm your mother and I love you.

And Patty's response was you are not gonna do anything. And my sister got lit and said, I'm not having it, you're not going to talk to me that way.

MR. PERRI: Objection.

THE COURT: Hold it.

Next question.

MR. ZERNER: Thank you, your Honor.

Q. Do you recall when it was that you had this conversation with Patty about moving out?

A. It was more than once, but between 2013, 2014 because it was the past two years that we started talking about moving.

Q. And why were you looking to move away from your childhood home?

A. It was time to move on. We wanted a better life. We were paying for everything and we were living in a box. Everybody else was benefiting. My quality of life wasn't what it was. I was praying for restoration to have my life organized the way it used to be and I wanted that back. It was just time. It was time to move forward.

Q. So now in October of 2014 Ray Ross moved out of the house, correct?

A. That is correct.

Q. And you didn't move out for another year, correct?

A. That is correct.

Q. Why not?

A. Well, I was there. I was actually the person overseeing the house, but it was my intent, we had looked for a year to move, so it was time for us to go and it took me, pretty much me, miss picky, that long to find a place that I

thought was suitable for us to live in.

Q. During that year, is it fair to say that Ray was living in Brooklyn and you were still living in the house?

A. That is correct.

Q. But you were looking for a new place to live?

A. That is correct.

Q. And you found that place in Valley Stream, that's where you live now?

A. That is correct.

Q. And who else lives with you and Ray in Valley Stream?

A. Ray's daughter Jasmyn.

Q. How do you get along with Jasmyn?

A. I get along great with his kids.

Q. How have you observed Ray getting along with his kids?

MR. PERRI: Objection.

THE COURT: Overruled.

A. He has a great relationship with his kids.

Q. Now, you described earlier that you had a good relationship with Patty, correct?

A. Yes.

Q. And aside from confiding in you that she wanted to live with you and Ray, were there other times that she would confide in you?

A. Yes. There was one time she and I were in the bathroom. There is a bathroom we have. It's like a community bathroom with a double sink and she said to me Aunt Tara, I'm ugly.

MR. PERRI: Objection, your Honor, hearsay.

THE COURT: Thank you, Ms. Johnson.

Next question, please.

Q. Is it fair to say that your niece would confide in you from time to time?

A. Yes.

Q. Now, the typical morning in 2013, let's say, were you home when the kids were leaving for school?

A. Yes.

Q. And did you have any interaction as far as the kids lunches for school?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Ray would leave Millinia's lunch money with me. Millinia came to me every morning for her lunch money.

Q. So is it fair to say that the kids didn't bring lunch with them?

A. They did not.

Q. And again, why were you and Ray providing lunch money for the kids instead of her mother?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Now, you said that on a daily basis Ray would leave behind lunch money for the kids?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes.

Q. And why couldn't you just leave the money out for the kids to use for lunch?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. To the best of your knowledge, did there come a point in time when your niece Patty got a cell phone?

A. Yes.

Q. And do you remember who gave her her first cell phone?

A. I believe George, her Uncle George gave her the first cell phone.

Q. And what's George's last name?

A. I'm not sure.

Q. But you have met George multiple times?

A. Yes, he's come to the house with her father Rafael.

Q. So Rafael Mickens is Patty, Millinia's father?

A. That's correct.

Q. And George is Rafael's brother?

A. That is correct.

Q. So you recall a time when George Mickens bought a cell phone for his niece Patty?

THE COURT: Assuming facts not in evidence. She doesn't know George Mickens. She knows Uncle George.

MR. ZERNER: Fair enough, your Honor.

Q. To the best of your knowledge, was there a point in time when the person you have described as Uncle George purchased a cell phone for his niece?

A. Yes.

Q. Do you remember approximately when that was?

A. Maybe 2012.

Q. And at that point in time do you recall your sister having a reaction to that, your sister Sarita?

A. No.

Q. And did there come a point in time, if you know, when anything about that cell phone changed?

A. Yeah, there came a point in time when George could no longer afford the bill and Ray took it over because at that time that's when, you know, he was the primary caretaker for Patty.

Q. And aside from caring for Patty, who else did Ray care for?

MR. PERRI: Objection; leading.

THE COURT: Overruled.

You can answer, ma'am.

A. Mercedes. The primary one was Patty, but if Mercedes wanted things, she would get also. As a matter of fact, Mercedes also asked for a cell phone. I said no, it's too much.

Q. So there was a point in time when the younger sister Patty had a cell phone, but the older sister Mercedes did not?

A. Well, yes. Mercedes had a cell phone, but, you know, they would get cut off, so yes, at that time Mercedes had her own cell phone. I'm not sure if Bob -- I think Bob paid for that, Robert Jones, but there was a time after Rob was out of the picture that she didn't have a cell phone consistently. And I remember after she didn't have a cell phone, she asked Ray Ray would he also buy her a cell phone.

Q. And you started to say what your thought process was about Ray also paying for a cell phone for Mercedes?

A. Well, we did so much and I said no, because --

MR. PERRI: Objection.

THE COURT: Yeah. Can you rephrase the question, Mr. Zerner?

MR. ZERNER: Certainly, your Honor. Let me withdraw that and back it up.

Q. What's the age difference between Mercedes and Patty?

A. Patty I believe is 14 and Mercedes is 18.

Q. And they have different fathers?

A. Yes.

Q. And you stated earlier that Bob?

A. Yes.

Q. Bob is Robert Jones?

A. Yes.

Q. And he was the father of Mercedes?

A. Correct.

Q. And was there a point in time when Bob would provide various financial support for his children and the other children?

MR. PERRI: Objection.

A. Absolutely.

THE COURT: Sustained.

Q. Now, was there any tension about the younger sister Patty having a working cell phone and the older sister Mercedes not having a cell phone?

A. Not that I'm aware of.

Q. Was there any tension at that point in time in 2013 between your sister Sarita and Ray surrounding the fact that Ray was now paying for this cell phone?

A. No.

Q. Is it fair to say that Sarita was pleased to have Ray spending money on this?

A. Yes.

Q. And if you know, at that point in time did your sister Sarita have a cell phone?

A. Not that I'm aware of.

Q. Was there a landline in the house?

A. My landline.

Q. And could you describe where it was kept?

A. In my room.

Q. So were there other extensions from that landline?

A. No.

Q. And could you tell us why that was?

MR. PERRI: Objection.

THE COURT: Overruled. Excuse me, sustained. Next question.

MR. ZERNER: Yes, your Honor.

Q. Were you aware of any time in the course of 2013, into 2014 when your sister Sarita expressed any change in her opinion about this cell phone?

A. Yes.

Q. Could you describe that for the jury.

A. There came a point where she -- well, Patty's affections towards Ray Ray were more than toward her. She resented it. She separated them and told him not to have

anymore doings with Patty.

Q. Now, when you say affections, was there anything untoward or inappropriate about what you observed between your niece and Ray?

A. Could you repeat that question?

Q. Was there anything inappropriate in the affections between Ray and your niece Patty?

A. Not that I saw.

Q. What did you see?

A. I saw the same thing I seen in the past two years. They went out together a lot. He would spend a lot of time with Ray's children, her children. I was actually present twice when Ray got in his truck and Patty got in the truck and he said you can't go today, Patty and Patty said, I'm going. She wouldn't get out the truck. And she would get excited. She always wanted to be with him. She would make him things. She would say, Aunt Tara, make sure he wears that or Aunt Tara makes sure he does that. She started to give my sister push back and my sister was not having it.

Q. Can you describe what you observed about this push back?

A. She would say things to Patty. Patty would tell her she's not going to do anything. Or she would just answer her back and my sister would say I'm not having it. You are not gonna talk to me that way.

Q. Focusing on the summer of 2014, did you notice any change in the relationship between your sister Sarita and your niece Patty?

A. Yes.

Q. What did you observe?

A. It's hard to say because to me they weren't that close to begin with. But that was it, pretty much that she would talk back. Not really that bad. She would just tell her no or, you know, if her mother would say something, she would kind of let her mother know, you know, that she knew what was going on.

So then my sister forbid her, because we would be in the bedroom sometimes watching TV, and my sister would come and tell Patty get out, get out now. It was, to me, it was sudden. It was right before the start of school 2014 and she was abiding, but when her mother wasn't home, Patty would come ask me could she call Ray and I would let her call him. She would call him right in front of my face.

Q. To the best of your knowledge, was there any sexual relationship between Ray and your niece Patty?

A. No.

Q. Was there ever any allegation of that?

MR. PERRI: Objection.

THE COURT: Hold it.

Q. During the summer of 2014?

THE COURT: Sustained.

Q. Now, to the best of your knowledge, did there come a point in time when your sister Sarita, not having a cell phone of her own, took away your niece Patty's cell phone?

A. There were times when Patty's cell phone was missing and she would say where is my cell phone and we would tell her, Patty, you know your mother has your cell phone and then it would turn back up, disappear, turn back up.

Then the last time when she severed the relationship with her and Ray Ray, I really don't know what happened to the cell phone.

MR. ZERNER: Can I have one moment with my client, your Honor?

(Pause in the proceedings.)

Q. Do you recall going to Verde's in Westbury?

A. Yes.

Q. And would that have been somewhere around the fall of 2013?

A. That is correct.

Q. And could you describe why you were there?

A. I was the primary caretaker of Sherima at that time and my best friend, her daughter was having a Sweet 16.

MR. PERRI: Objection.

A. And Sherima was in the court.

THE COURT: Overruled.

Q. When you say Sherima was in the court?

A. She was part of the court. The court is equivalent to a bridal party in the wedding in the Sweet 16. So instead of being a ring bearer, she carried the shoe.

Q. Could you describe what carrying the shoe means?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question, Mr. Zerner.

Q. So was this event on a weekend?

A. Yes, it was.

Q. And you say you were the primary caregiver for Sherima and did there come a point in time when Sherima's father arrived?

MR. PERRI: Objection.

A. Yes.

THE COURT: Hold it, ma'am. Now you had two signs; one the word objection and two, the attorney was standing up. So you have to refrain from answering, okay.

THE WITNESS: Okay.

THE COURT: The objection is sustained.

Ladies and gentlemen, disregard the question and the answer.

Next question.

Q. Was there ever a point when you had a physical

altercation with your sister?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. As adults in 2013, 2014 did you and your sister Sarita ever have any type of altercation?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes.

Q. Could you describe that for the jury.

A. The night -- the day after the Sweet 16.

Q. Tell us what happened.

A. Sherima's father wanted to come see Sherima at the Sweet 16. I agreed to let him come see her, but I told him he couldn't stay because it was a catered event and it was paid for, but he wanted to see his daughter. He came to the event.

MR. PERRI: Objection.

THE COURT: Overruled.

A. He took Sherima because that was his daughter and I was caught between a rock and a hard place because she came with me, but at the same time he was her dad.

THE COURT: That's it, ma'am, thank you.

Q. Did there come a point in time when Sarita expressed to you her dissatisfaction at you bringing her daughter?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. To the best of your knowledge, was there an argument about this situation between Sarita and Sherman Roberts?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Did there come a point in time when Sarita confronted you about this?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes.

Q. Could you describe that for the jury.

MR. PERRI: Objection.

THE COURT: Overruled.

A. I explained to her what had happened. She demanded I take her over to Sherman's house. She went in, came out, told me I didn't know what she had to go through for her to get her out.

THE COURT: Hold it, ma'am.

MR. PERRI: Objection.

THE COURT: Thank you for your answer.

Next question.

Q. When your sister exited Sherman Roberts' house,

what happened?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. When you drove your sister to Sherman Roberts' house, geographically where was that?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Hempstead.

Q. So not very far from your home in West Hempstead?

A. Correct.

Q. When you say that your sister demanded that you drive her over there, what was your response?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. So after you drove your sister to this home in Hempstead, you described that your sister exited the home with her daughter?

MR. PERRI: Objection.

A. Correct.

THE COURT: Overruled.

Q. And which daughter was that?

A. Sherima.

Q. And describe what happened next.

MR. PERRI: Objection.

THE COURT: Overruled.

A. She got in the car.

THE COURT: That's all, ma'am.

Next question.

Q. And physically where in the car did your sister sit?

MR. PERRI: Objection.

THE COURT: Overruled.

A. In the passenger seat next to me.

Q. In the front of the car?

A. In the front of the car.

Q. Where did your niece sit?

A. In the back seat.

Q. And how long was the drive from Hempstead back to West Hempstead?

A. Less than ten minutes.

Q. And describe what happened.

MR. PERRI: Objection.

THE COURT: Ladies and gentlemen, it's about time for a break. We've been going almost an hour now. I'm going to give you a five-minute break, stretch your legs and use the facilities. Remember my admonitions.

(Whereupon, the jury exited the courtroom.)

THE COURT: Ms. Johnson, you can take a break as well. Don't talk to anybody about your testimony,

okay.

THE WITNESS: Okay.

THE COURT: Call you back in five minutes.

(Whereupon, the witness exited the courtroom.)

THE COURT: Mr. Zerner, where are you going with this?

MR. ZERNER: Your Honor, there was a physical altercation between these two sisters. The jury has a right to know about the tension that was between these two sisters during the exact time frame that's in this indictment. It's completely and totally on point to the defense theory of the case that there was a motive for Sarita Johnson to lie, for Sarita Johnson --

THE COURT: Because she had a physical altercation with her sister, because she was mad at her sister for allowing her daughter to go with the father?

MR. ZERNER: Well, I'm expecting after you hear exactly what happened, that perhaps you will see that this is something that ripples through the rest of their relationship. This was a fistfight in a moving vehicle with a child in the back of the vehicle. This is not collateral. This is not anything but within the exact time frame.

Mr. Perri puts forward an indictment dealing with 19 months of time. The jury needs to know what was

going on between the people involved in this household in this relationship during that time frame.

Sarita Johnson made these charges up how out of whole cloth in large part due to this altercation, this fistfight between these two adult grown sisters and the jury has a right to know about it. I anticipated calling multiple witnesses to talk about this, but your Honor made a ruling which I'm abiding by, that Sherman Roberts cannot and will not testify.

Sherman Roberts had a lot to say about this incident that, again, in keeping with the jury knowing and understanding about this, knowing about the relationships between the people involved, knowing about the finances of the people involved, knowing about who was playing what role in this family and this is another topic that's completely in keeping with the same narrative of the same story.

Mr. Perri put on witness after witness to talk about a period of time, leading witnesses about what was going on in June of 2013, June of 2014.

THE COURT: Mr. Zerner, again, I caution you stop asserting issues towards Mr. Perri. You make your legal argument and don't worry about what Mr. Perri did.

My inquiry to you is where you were going with this because you are taking an awful slow route to get

where you are going.

MR. ZERNER: Your Honor, I'm trying to make sure it's understood and, unfortunately, my witness has occasionally rambled in her answers. So understanding the Court and understanding my own desires, this tenth day of trial, I'm trying to chop it up and go through, but sometimes there is an objection and sometimes it's sustained and sometimes that means that it's more difficult to ask the next question.

You know what, I'm not even going to finish up with that.

THE COURT: Thank you.

MR. ZERNER: There is an element of fairness, your Honor. I'm simply asking for the jury to hear what was going on in this household. This is an incident in the time frame that they need to know about.

THE COURT: Mr. Perri.

MR. PERRI: Your Honor, the People would oppose this line of questioning. It is related to one of the custody and visitation issues that was part of the People's disclosure that your Honor already ruled was precluded from this trial; that whether or not there was a physical altercation between this witness and Sarita Johnson is completely collateral to whether or not this defendant committed these crimes.

Although defense counsel repeatedly asserts that it's crystal clear that this leads both Millinia and Sarita Johnson to both lie and then to fabricate phone records and then, I guess, also the text messages, just isn't a reasonable interpretation of the evidence. This isn't a reasonable theory.

It's not just that, it's labeled by defense counsel to be hostility and bias. The Court has to make a determination as to whether or not the theory is reasonable to decide whether or not the collateral impeachment rule applies.

THE COURT: Mr. Zerner, with regard to this physical altercation, what else are you trying to elicit from the witness?

MR. ZERNER: Your Honor, it has nothing to do with Child Protective Services.

THE COURT: I'm not asking about that. I'm asking you after the altercation, what else are you trying to elicit from the witness?

MR. ZERNER: About what the relationship was between the two women after that. About what the relationship was in the household after that. How that led to certain changes in the household which led to this lying fabrication from Sarita Johnson because she made the decision that she didn't want Ray and Tara

living in the house anymore. This was her lever. This was her avenue.

THE COURT: Two-minute break so that the court reporter can have her break.

(A recess was taken.)

THE CLERK: Case on trial, People v. Ray Ross. All parties are present. The jury is not.

THE COURT: Mr. Zerner, with regard to this witness, get to your points and move on, okay. I'll give you the opportunity to make your points as you have offered them on the record, but I'm not going to allow any further digression with regard to this witness.

Bring them in.

(Whereupon, the witness returned to the witness stand and the jury entered the courtroom.)

THE CLERK: Let the record reflect the presence of the jury. All parties are present.

Are the People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you.

THE CLERK: Ms. Johnson, you are still under oath.

THE COURT: Ladies and gentlemen of the jury, there was an objection to a question that was posed by

Mr. Zerner. The objection is overruled, but I'm going to ask Mr. Zerner to repeat his question.

MR. ZERNER: If it can please be read back to the witness by the court reporter.

THE COURT: Can you do that?

(Whereupon, the last two questions and answer were read back by the reporter.)

BY MR. ZERNER:

A. She and I got into an altercation. She punched me in my face while I was driving because she proceeded to explain to me what happened, what she had to go through to get Sherima out. She went in with a box cutter.

MR. PERRI: Objection.

THE COURT: Thank you, ma'am.

Next question, Mr. Zerner.

Q. While you were operating a motor vehicle, your sister punched you in the face?

MR. PERRI: Objection.

THE COURT: Overruled.

MR. PERRI: Leading.

A. Yes.

Q. What did you do next?

A. I continued to drive. Right prior to me pulling into my driveway, I put the car in park and bashed her back in her face.

Q. And what happened next?

A. We were fighting in my car.

Q. Where was your niece at this point?

A. In the back seat.

Q. That was your sister's daughter?

A. That's correct.

Q. And the first physical contact was your sister punching you?

MR. PERRI: Objection; leading.

A. That's correct.

THE COURT: Next question.

Q. How did the fight end?

A. She went in the house and told everybody she couldn't believe I fought her.

Q. What do you think she meant by that?

MR. PERRI: Objection.

THE COURT: Overruled.

Excuse me, I'm sorry, sustained.

Q. Do you recall the reaction in the household?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Describe your relationship with your sister after that physical fight?

A. The way it's always been.

Q. Describe it.

A. It was never a strong relationship.

MR. PERRI: Your Honor, I was going to object to defense counsel. When the witness answered, defense counsel then repeated his question. I was objecting to defense counsel repeating his question after an answer was given.

THE COURT: Overruled.

Next question, Mr. Zerner.

Q. At that point in time had you made a decision about moving out?

A. No.

Q. Was it soon thereafter that you decided to move out?

A. Yes, it was coming around to that. I pretty much stayed for the children's sake, but I couldn't do it. It was getting to the point I couldn't do it anymore.

Q. Now, you described in October of 2014 Ray Ross moved out of the household, correct?

A. Yes.

Q. And at that point in time was Ray Ross contributing monetarily to the upkeep of the household at 301 Coventry Road North?

A. He wanted to, but I forbid him to.

Q. Why did you do that?

A. Because of what she was doing, she was going to suffer. She was going to see what it felt like. Everyone that took care of her she hurt.

Q. Now, at that point in time did you have enough money to keep up the household at 301 Coventry Road North by yourself?

A. Yes, but I chose not to.

Q. Describe that for us.

A. There was no heat. I would not put heat in the house. I told them when Ray left if everybody wants to live in here, they better come up with some money and everybody was contributing because I wasn't doing it by myself.

Q. Now, we're talking about the winter of 2014 into the beginning of 2015; is that correct?

A. That is correct.

Q. So at that point in time did your sister Sarita contribute monetarily to the upkeep of the house?

A. No.

Q. Who else besides yourself was contributing to the upkeep of that house?

A. Her son.

Q. And that's Malik?

A. Yes.

Q. What does he do for work?

A. He works for the animal shelter in Wantagh. I

 think it's Nassau County Animal Shelter.

Q. So now aside from yourself and Malik Johnson, was anybody else contributing to the upkeep?

A. No.

Q. Could you describe aside from the fact that there was no heat, what other impact that had on the household?

A. You know, the kids didn't have too much; lunch money, you know, clothing. They never really did get back to school clothing. Malik would look out for his sisters a little bit, as much as he could.

Q. Now, at that point in time what was your relationship like with Ray?

A. It was the same. I saw Ray every weekend. I saw him sometimes during the week. We had a location where we would meet up. We would talk and then on the weekends, you know, we would go out to eat, things like that. Go by his sister's house.

Q. And at that point in time is it fair to say you also continued to go to church together every Sunday?

A. Yes.

Q. And at that point in time were you still in a committed long-term relationship with Ray Ross?

A. Yes.

Q. Now, you have heard the allegations in this case, correct?

A. Uh-huh.

Q. Yes?

THE COURT: You have to say yes or no.

A. Yes.

Q. What's your opinion about them?

MR. PERRI: Objection.

THE COURT: I didn't hear the question.

Q. What's your opinion about the allegations?

A. I never --

THE COURT: Hold it, ma'am.

Sustained.

Next question.

Q. What's the status of the house at 301 Coventry Road North in West Hempstead now?

A. I'm still carrying my belongings out. I believe the last time I went there was two weeks ago. There was no heat. It's the same as the way it's been. They did clean up the upstairs because a lot of my stuff was around up there because I was moving. They kind of moved that out in a way. But to me, pretty much the same, but there was no heat.

Q. Now, in addition to there being no heat, do you know what the status of the house is with the bank?

MR. PERRI: Objection.

THE COURT: Overruled.

A. It's in foreclosure.

Q. Is it accurate to say that the house, itself was the greatest asset that your family had?

MR. PERRI: Objection.

A. Yes.

THE COURT: Overruled.

Next question.

Q. Just so it's clear for the record, that was the biggest asset that your family had?

A. Yes.

Q. What's happening to that asset now?

A. It's just going to go.

Q. What do you mean it's just going to go?

THE COURT: Sustained. The house is in foreclosure.

Next question.

MR. ZERNER: I wanted to make sure that was understood for the jury, your Honor, thank you.

Q. What was your relationship like with your niece Patty after Ray moved out?

A. Well, my sister didn't allow the kids to talk to me, so when her mother was around she wouldn't say anything. When her mother wasn't around, it was hi, Aunt Tara, bye Aunt Tara like always.

Q. Did your niece ever confide in you?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Did your niece confide in you after October of 2014?

A. No.

Q. Did she ever tell you that Ray Ross molested her?

MR. PERRI: Objection.

THE COURT: I didn't hear the question because the objection was posed before the question was asked. What is your question?

Q. Did your niece Millinia Johnson ever tell you that Ray Ross molested her?

THE COURT: Hold it, ma'am.

Is there an objection?

MR. PERRI: Yes, your Honor.

THE COURT: Sustained.

Next question.

A. Can I correct something, because she did say something to me regarding that?

THE COURT: You can only answer questions that are posed to you.

Q. Ms. Johnson, was there ever anything that your niece told you about this?

MR. PERRI: Objection.

THE COURT: Overruled.

A. I asked her had Ray Ray molested her. She told me

no.

MR. PERRI: Objection, objection.

THE COURT: Overruled.

Next question.

Q. So Patty told you that Ray never molested her?

MR. PERRI: Objection.

THE COURT: Mr. Zerner, the question is sustained on the objection.

MR. ZERNER: The scrapings of the chairs.

THE COURT: Next question.

Q. When did Patty tell you this?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

MR. ZERNER: Nothing further at this time, your Honor.

THE COURT: Mr. Perri.

MR. PERRI: Yes, your Honor.

CROSS-EXAMINATION

BY MR. PERRI:

Q. Ms. Johnson, in 2013, 2014 did you have friends?

A. Did I have friends?

Q. Yes.

A. Yes.

Q. And did you go out with your friends?

A. I can't say that we went out, but I would go to my girlfriend's house.

Q. And when you would go to your girlfriend's house, would the defendant go with you?

A. Did Millinia go with you?

Q. No, would the defendant, Mr. Ross, go with you when you would go to your girlfriend's house?

A. Who?

Q. Mr. Ross, the defendant, Mr. Ray Ross.

A. No, not all the time.

Q. In 2013, 2014, would the defendant go to Brooklyn on Saturdays to visit his family?

A. Yes.

Q. And would Millinia go with him?

A. Yes.

Q. Ms. Johnson, you said you have power of attorney over the house, correct?

A. Yes.

Q. You have power of attorney over all your mother's assets, correct?

A. Yes.

Q. And you said you allowed in 2014 the heat to be turned off in the house; is that correct?

A. Yes.

Q. And that was when your daughter was still living

there?

A. She still lives there.

Q. That was when your grandchildren were living there, correct?

A. Yes.

Q. And that's when your dead sister's children were living there, correct?

A. Yes.

Q. And you did that to get back at your sister, correct?

A. Not to get back at her, but Ray was the one that was willing to do anything. I'm more of the tough love. I wanted them to contribute. God doesn't want me to do things for people that they are not willing to do for themselves. I love my daughter dearly, but I also wanted her to rise up and do what she needed to do. But they were comfortable. She was in the warmest room in the house.

Q. The warmest room in the house with the heat turned off, correct?

A. With the heat turned off, but that room holds heat. That room doesn't get as cold as the rest of the house.

Q. Where would the heat come from in the room?

A. It's baseboard heat. That would come around. Where it was located, it held heat.

Q. This was the time when the heat to the house was

turned off?

A. That is correct.

Q. When you say that the adults had to learn, it was okay for the children to be exploited for that, correct?

A. Yes.

Q. And when the house went into foreclosure, you had power of attorney over the house?

A. Yes.

Q. And you had control over your mother's other assets, correct?

A. Yes.

Q. And you never took any legal process to remove these people from the home, correct?

A. No.

Q. When you described in 2013, 2014 the house falling into horrible disrepair, the screens being knocked out, the refrigerator being broken, it being dirty, outside of your room, this was when you still had power of attorney over the whole house?

A. Yes.

Q. This is when your daughter was living in the house?

A. Yes.

Q. And when your niece, your deceased sister's daughter was also living in the house?

A. Yes.

Q. Now, you testified about in October of 2014, do you recall the defense attorney asking you about when the defendant moved out in October of 2014?

A. Yes.

Q. And that when first asked about that you responded he was escorted out, correct?

A. Yes.

Q. And he was escorted out by the sheriff's, correct?

A. It was police officers to me.

Q. And he didn't voluntarily leave that day, did he?

A. Yes, he did.

Q. With the police officers?

A. Yes, he did.

Q. But before that, he hadn't vacated the house?

A. No. Why would he?

Q. Have you ever gone through Millinia Johnson's cell phone, her text messages?

A. No.

Q. Have you ever gone through the defendant, Ray Ross' cell phone and looked through his text messages?

A. No.

Q. Are you aware in October of 2014 the defendant purchased a second cell phone for Millinia Johnson?

A. Yes. I'm the one that turned it on because Ray doesn't know how to work Smartphones.

Q. He used a Smartphone though, correct?
A. No.
Q. He text messaged?
A. He uses an old fashioned flip phone.
Q. Does it have the ability to text message?
A. Yes. Patty's the one that taught him how to text.
Q. Would the defendant text message with Patty?
A. Yes.
Q. When the defendant went to Brooklyn with Patty, Millinia Johnson, you didn't go with them, correct?
MR. ZERNER: Objection; vague.
A. No.
THE COURT: Overruled.
Next question.
MR. PERRI: Thank you, your Honor.
Q. Now, you testified when the children would get home from school in 2013, 2014 the only adult home would be Ray Ross, the defendant?
A. Yes, or my daughter. It's hard to pinpoint who was there at any time. With that many people, there was pretty much someone there at all times. So to say who was here at this time or that time is very difficult with a house full, but it was very rare it was empty.
Q. On direct when you were asked that question you answered Ray Ross was home when the children got home.

A. There was a year, because he was out on disability, that he was home when the children got home.

Q. Was that 2013 into 2014?

A. I guess two thousand -- he had knee disability. It was hard. Sometimes he was home. Sometimes he worked at home. Yes, he was home at times.

Q. But when on direct you were asked that question, you said he was home when the children got home, correct?

A. Yes, yes.

Q. And you currently live with the defendant?

A. Yes, I do.

Q. And you love the defendant?

A. Yes, I do.

Q. Who did you come here today with?

A. I came today -- I came by myself.

Q. You drove yourself here?

A. Yes, I did.

Q. Did you discuss the case with the defendant before coming here today?

A. We've discussed the case from the beginning.

Q. How often would you talk about it?

A. We talked about it in the beginning and then we just kind of let it go until now when the trial was coming. Now we talk about it more because we're going through the trial.

Q. Leading up to the trial, would you talk about it every day?

A. No.

Q. Would you talk about it at least once a week?

A. No.

Q. How often would you talk about it then?

A. There were times we didn't talk about it at all. We kind of got past it. We knew the trial was coming. He came once a month to the Court to see. We would talk about it that day and then we would just go on.

Q. Did you speak with the defense attorney before you came here today?

A. Yes, I did.

Q. How many times did you speak with him?

A. I don't know, two or three times.

Q. Did you discuss your testimony with him?

A. He just asked me questions and I answered his questions. And he just prepared me for that you would ask questions and just to tell the truth.

Q. Were the questions he asked similar to the ones he asked you today?

A. Yes, a lot of them.

Q. Did you ever observe the defendant and Patty, Millinia Johnson having any fights in the summer of 2014?

A. A fight?

Q. A fight.
A. No.
Q. Any disagreements between Millinia Johnson and the defendant?
A. I never witnessed that that summer.
Q. Then you testified that even after the incident you alleged, the physical incident you alleged between you and your sister, that after that there was no change in your relationship, that was your testimony, correct?
A. Yes.
MR. PERRI: Nothing further, your Honor.
THE COURT: Mr. Zerner, any redirect?
MR. ZERNER: Yes, your Honor.

REDIRECT EXAMINATION

BY MR. ZERNER:

Q. After the heat was turned off the end of 2014, was there any other heating source in the house in 301 Coventry Road North?
A. I purchased a kerosene heater.
Q. Where was that kerosene heater kept?
A. I had it in the dining room because it was an open space. It's dangerous if you have it in close spaces, so that's where I housed it. I only got to use it once.
Q. And did that provide some heat for your grandchildren and your nieces and the other children in the

house?

A. Yes, it did, but my grandchildren were fine and my daughter understood why I was doing what I was doing.

Q. Was there ever a point in time when you had a conversation with your sister about the lack of heat in the house?

A. The only time was when I made a broad statement throughout the entire household that if they want heat, everyone is going to have to pitch in money and contribute.

Q. That was an example of tough love?

A. Yes, because Ray and my mother were enablers.

Q. And in reality when you told the other people in the house they needed to contribute for the heat, is it accurate to say they did not contribute?

A. They did not.

MR. ZERNER: One moment, your Honor.

(Pause in the proceedings.)

MR. ZERNER: Nothing further on redirect, your Honor.

THE COURT: Thank you, sir.

Mr. Perri.

MR. PERRI: No, your Honor, no, thank you.

THE COURT: Ms. Johnson, your testimony is concluded. Thank you very much. You are free to go.

THE WITNESS: Thank you.

(Whereupon, the witness was excused.)

THE COURT: Can I see counsel for one second?

(A discussion was held off the record.)

THE COURT: Ladies and gentlemen of the jury, we're not going to have anymore proceedings on the trial this morning, so I'm going to give you lunch for two hours. I have some things I have to do, but you get that benefit. So, we'll see you right here 2:00 so we get a 2:00 sharp start.

Remember my admonitions.

(Whereupon, the jury exited the courtroom.)

THE COURT: Okay, 2:00 we'll continue.

(A luncheon recess was taken.)

AFTERNOON SESSION.

THE CLERK: All parties are present. The jury is not present.

People ready?

MR. PERRI: Yes, your Honor.

THE CLERK: Defendant ready?

MR. ZERNER: We are, thank you.

THE COURT: Before the jury comes in, Mr. Zerner, who is your lineup consisting of?

MR. ZERNER: Ray Ross will be my next witness and potentially my final witness.

THE COURT: That being said, today is Monday.

You anticipate your testimony of Mr. Ross going for the afternoon?

MR. ZERNER: Yes, your Honor.

THE COURT: Your direct I'm suggesting. Then we'll have -- we'll finish up Mr. Ross tomorrow and would counsel be prepared to sum up tomorrow?

MR. ZERNER: Yes, your Honor.

MR. PERRI: Yes, your Honor.

THE COURT: And then I'll charge the jury Thursday morning.

MR. ZERNER: Whatever you think, your Honor.

MR. PERRI: Your Honor, if Mr. Ross completes his testimony today, then I would see no problem.

THE COURT: Well, I don't know.

MR. PERRI: I understand, but if Mr. Ross completes his testimony today, then I would see no problem with having closing statements and then charging the jury, but since we are not going to be here on Wednesday, to have the gap between summations and then deliberations, People would ask to avoid that, if then to do closings on Thursday rather than to have such a significant gap between closings and actual deliberations, your Honor.

THE COURT: Be prepared to give your closings tomorrow.

 MR. PERRI: Yes, your Honor.

THE COURT: We'll see how it plays out.

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom.)

THE CLERK: Let the record reflect the presence of the jury. All parties are present.

Again, People ready?

MR. PERRI: People are ready.

THE CLERK: Is the defense ready?

MR. ZERNER: We are, thank you.

THE COURT: Good afternoon again, ladies and gentlemen of the jury. We're going to get started right away.

Mr. Zerner, your next witness, please.

MR. ZERNER: The defense calls Ray Ross to the stand.

R A Y R O S S, residing in the County of Nassau, having been called as a witness on behalf of the Defendant, having been duly sworn by the Clerk of the Court, was examined and testified as follows:

THE CLERK: State your name, spell both first and last name and give county of residence, please.

THE WITNESS: Ray Ross, R-O-S-S.

THE CLERK: County of residence?

THE WITNESS: Nassau County.

 THE COURT: Your witness, Mr. Zerner.

MR. ZERNER: Thank you very much, your Honor.

DIRECT EXAMINATION

BY MR. ZERNER:

Q. Good afternoon, Mr. Ross.

A. Good afternoon.

Q. Mr. Ross, what do you do for work?

A. Drive a tractor trailer truck for private sanitation.

Q. How long have you done that?

A. Since I was 17.

Q. How old are you now?

A. Fifty five.

Q. Have you worked for the same company throughout?

A. The companies, yes.

Q. And what hours were you working, let's focus on 2013?

A. Night.

Q. When you say night, tell us what your shift would be.

A. Overnight. I go in the night. I go in like 10:00, 11 o'clock at night and then it would change, it would be in the morning. Sometime I would -- I do different type of work, roll-off work, dumpsters.

Q. When you would work a morning shift, what would

those hours be?

A. Oh, I go in 6:00 in the morning.

Q. And you would work until when?

A. 6:00 at night. By the time to get back home, 6:00 at night. It varies, that's why I can't tell you exactly those days.

Q. And geographically where were you doing the sanitation work?

A. Brooklyn. I pull out of Brooklyn.

Q. You would pull out of Brooklyn.

Would the work also be in Brooklyn?

A. No, Manhattan.

Q. Now, Mr. Ross, have you ever been married?

A. Yes.

Q. And who were you married to?

A. Paula Ross.

Q. And when did you marry Paula Ross?

A. I married Paula Ross in 1986.

Q. And do you have any children with Ms. Ross?

A. I certainly do.

Q. Could you tell us their names and their ages?

A. I have three. I had -- the first one I had passed away from crib death. That was James Ross. Then after him I had Kelly, Jasmyn and Justyn, which are my twins.

Q. Now, how old is Kelly today?

A. Kelly was born in '87. Kelly is approximately 28.
Q. And does Kelly have any children?
A. Yes, she do.
Q. And tell us how many and what their ages are.
A. Kelly has two kids. Those are my grandkids. Two and four, Elijah and Sylas.
Q. And do either Jasmyn or Justyn have children?
A. No, they don't.
Q. Now, could you describe your relationship now with your ex-wife, Paula Ross?
A. Very good friends. We have been friends all along.
Q. Could you tell us what led to the end of your relationship with Paula Ross?
A. Well, I'm a musician. I play bass guitar besides my job and I wasn't there. I wasn't home, so I felt bad, so I figured we break up. We separated. Then we got the divorce in 2012. That's when it went through. We were separated all that time.
Q. When you say you were separated all that time, what year did you separate from Paula Ross?
A. I separated from Paula in '98, '97.
Q. And after that period of time '97, '98 did you start a relationship with another woman?
A. Yes.
Q. And after your marriage was over?

A. After the marriage.

Q. Who was the other person that you started a relationship with?

A. Tara Johnson.

Q. And is that the person you're still in a relationship with?

A. I certainly am.

Q. And now in 1998 when you separated from Paula Ross, where were you living?

A. I was living in Brooklyn. I'm sorry, when I separated from Paula Ross, I was in Brooklyn as of 2001.

Q. As of 2001 did there come a time when you started living with Tara Johnson?

A. Yes.

Q. And where did you start living with Tara Johnson?

A. I started living with Tara Johnson around 2001.

Q. Right, but geographically what was the address?

A. Oh, Brooklyn. 683 Pennsylvania Avenue.

Q. 683 Pennsylvania Avenue is where you lived before you started living with Tara Johnson?

A. No. I lived in Laurelton.

Q. Mr. Ross, are you a little bit nervous?

A. No, I'm not.

Q. Let me just focus you for a second. We're talking about 2001. Did there come a point in time when you started

living with Tara Johnson?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes.

Q. What was the address of the place you lived with Tara Johnson?

A. 301 Coventry Road North, West Hempstead, New York 11552.

Q. Now, in 2001, if you recall, who else was living in that house?

A. Tara's nieces, Tara's nephews, the dogs, the cats, me and Tara.

Q. And who is Pauline Johnson?

A. The grandmother. She was there.

Q. Is Pauline Johnson Tara Johnson's mother?

A. Yes, she is.

Q. And in 2001 Pauline Johnson was living there?

A. Yes, she was.

Q. Now, in 2001 was Sarita Johnson living there?

A. Yes, sir.

Q. Did any of your children, the children that you had with Paula Ross, did any of those children live at the address on Coventry Road North at that point in time?

A. No.

Q. Now, does Tara Johnson have any children?

A. Yes.

Q. And could you tell us how many?

A. She has one daughter.

Q. And what's that daughter's name?

A. Taqiyya. Taqiyya Ianna Birch.

Q. Was Taqiyya living at that address in West Hempstead back in 2001?

A. Yes, she was.

Q. And does she still live there now?

A. Yes, sir.

Q. Do you know if she has any children?

A. Yes, she do.

Q. And how many children and what are their ages?

A. There are three kids now. It's a very young one, approximately six, seven months. There is one five, close to the age of five and then there is another one I think approximately three. Two or three.

Q. Now, during this period of time from the time you started living in West Hempstead until the present day, where have you been working?

A. Private sanitation.

Q. And was there ever a point in time when you suffered any type of injury on the job?

A. I certainly did.

Q. Could you tell us when that was and what the injury

was?

A. It was my back, my knees, my elbow. I fell off the tractor trailer I was driving. I popped my wrists. I have artificial wrist, a fused wrist, artificial elbow. My knees are shot. I have knee replacements. My back, artificial knees, naval, grown a naval hernia, artificial elbow, fused wrists where I can't bend. I can only move my fingers. All that happen from the period of my work.

Q. Was there a particular point in time when these injuries resulted in a change of how you were working?

A. Yes.

Q. Could you tell us the approximate month and year?

A. Approximate month was around 2009. Then I went to maybe to 2010, but I could do light duties because I'm not that type of person to stay home and do nothing. So I would go to my therapist and go see my doctors and stuff like that.

Q. Could you tell us what light duty entails in your job at private sanitation?

A. I'm a supervisor. It wasn't no back work or nothing. I just drive, go look at the routes and see what stops wasn't picked up, what was picked up. Madison Square Garden, see if they need their compact dumpsters dumped and stuff like that.

Q. For what period of time were you doing light duty?

A. From 2010 to 2014.

Q. And did there come a point in time in 2014 when you stopped doing light duty?

A. Yes. I went back to full duty. I got off disability.

Q. And while you were on light duty, was there any regularity to the hours you were working?

A. Meaning?

Q. Were you working steady nights, steady days?

A. Yeah, I was constantly working. I never broke that chain. It was just I wasn't doing the physical work I was doing. I was always working.

Q. Understood, Mr. Ross, but with regards to the hours that you worked, while you were out on light duty, while you were doing light duty between 2010 and 2014, were you working steady hours or were the hours changeable?

A. They changed.

Q. And during that time frame when you were on light duty, could you tell us what were the hours you typically worked?

A. They were mornings. When there would be night, then they switch to morning. Morning 5:00 in the morning. I leave the house about 5:00 in the morning and I'm back about 1:00, 2:00 in the afternoon.

Q. And was that the typical hours you worked during that time frame?

A. Yeah. And it depends on the pain and stuff that I had, that was going through my body, because I suffer very bad even to today, so I do what I can when I can, but I always worked. My time changed, but I have always worked.

Q. Now, focusing on 2013, at that point in time where were you living?

A. 301 Coventry Road North, West Hempstead, New York 11552. I'm not nervous either, I'm just speaking fast.

Q. In 2013 who else was living at that address?

A. 2013, Tara, Tara's daughter, Tara's two kids. I don't believe the third one was born yet. Tara's niece with five kids, Tara's sister with four kids.

Q. When you say Tara's sister, what's her name?

A. Sarita.

Q. And could you give us the names of those kids?

A. Yes, you have Malik Johnson, Millinia Johnson, Sherima Johnson and Mercedes Johnson.

Q. Now, aside from those kids, you said that another one of Tara's nieces was living there?

A. Yes, sir.

Q. And what was her name?

A. August Johnson.

Q. The woman's name was August Johnson?

A. Yes, that's the deceased's daughter. Tara's sister's daughter.

Q. Is August Johnson deceased or alive?

A. August mother's deceased. Tara's sister.

Q. What's August mother's name?

A. Pauline Johnson. Wait a minute. August mother's name is Deirdre Johnson, I'm sorry.

Q. Deirdre Johnson's mother was Pauline Johnson?

A. Yes, I'm sorry.

Q. And Pauline Johnson is still alive?

A. Pauline Johnson is still alive.

Q. Where does Pauline Johnson live?

A. She's in a nursing home.

Q. When did she go to the nursing home?

A. Approximately 2009.

Q. Could you tell us anything about your interactions with Pauline Johnson?

A. Yes. I took care of Pauline Johnson as my mother. Even before she got sick, I would take her out when I get home in the morning. My shift, before my knees and back went out, I would take her out in the morning to a breakfast to eat. I would take her to the store and buy her things and take her, see if she needed things in the house.

MR. PERRI: Objection.

THE COURT: Overruled.

Next question.

Q. Now, what year did Pauline Johnson move into a

nursing home?

A. I can't pinpoint, but I'm pretty much sure around 2009.

Q. And do you visit her regularly?

A. I certainly do, at least three days out of the week or three nights out of the week.

Q. Focusing back on 2013, if you recall, what were the typical hours you were working in 2013?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Now, is it fair to say you worked regularly Monday through Friday in 2013?

A. Yes.

Q. Now, in 2013 -- withdrawn.

Do you know somebody named Robert Jones?

A. I certainly do know Robert.

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes, I certainly do know Robert Jones.

Q. Who is Robert Jones?

MR. PERRI: Objection.

THE COURT: You can answer the question. Overruled.

THE WITNESS: Thank you, Judge.

A. He's the parent, the father of Mercedes and Malik Johnson.

Q. And was there a point in time when Robert Jones was very active in his children's life?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. In 2013 was Robert Jones frequently at the house at 301 Coventry Road North?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Now, focusing on 2013 -- withdrawn.

Do you know someone by the name of Rafael Mickens?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes, I do.

Q. Who is Rafael Mickens?

A. Rafael Mickens is Millinia Johnson's dad.

Q. And in 2013 could you describe Rafael Mickens' interactions at the house at 301 Coventry Road North?

MR. PERRI: Objection.

THE COURT: Sustained as to form.

Q. In 2013 would you often see Rafael Mickens at the house at 301 Coventry Road North?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes.

Q. How often would you see him?

A. He would come to the door to see his daughter.

Q. And approximately how often?

A. Many times.

MR. PERRI: Objection.

THE COURT: Overruled.

A. Many times during the week, but Sarita would say --

MR. PERRI: Objection.

THE COURT: Hold it, Mr. Ross. You have answered the question.

Next question, please.

Q. So in an average month, about how often would you see Rafael Mickens at the house?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Per month?

Q. Yes.

A. At least two or three days out of the week.

Q. So is it fair to say about ten or 12 times a month?

A. Yes. He didn't come in the house because she wouldn't let him in the house.

MR. PERRI: Objection.

THE COURT: Hold it. Sustained.

Ladies and gentlemen, please disregard the

added comments of the witness to the answer.

THE WITNESS: I'm sorry, Judge.

THE COURT: That's all right.

Next question, please.

Q. Now, in 2013, to the best of your knowledge, did Millinia Johnson have a cell phone?

A. 2013? Yes, she did.

Q. And, to the best of your knowledge, how did she obtain her first cell phone?

A. Through her Uncle George Mickens, which is Rafael's brother.

Q. Were you with Rafael or George or Millinia Johnson when Millinia Johnson got this first cell phone?

A. The first time, no. When she -- at the end when he couldn't pay for that phone anymore, I was called in.

Q. So let's talk about that.

Now, there came a point in time when -- and Millinia Johnson was also known as Patty Johnson?

A. That's correct.

Q. So Patty Johnson got her first cell phone in 2011, is that accurate?

A. Yes.

Q. Did there come a point in time where somebody contacted you to talk about the continued payment of the bill on that cell phone?

A. Yes, sir.

Q. Could you tell us what happened?

A. Her uncle -- Patty wanted to keep the phone on because her cousin had a phone on which is a little younger than her. He said he could not keep the phone. He couldn't afford it. Ray Ray, can you step in and get the phone, keep the phone on for Patty, which I did. I never changed anything from Metro. It's always start off at Metro PCS and it ended right to the day before my son had me shut it down in Metro PCS.

Q. Mr. Ross, do you recall the approximate month and year that George Mickens contacted you about his inability to pay for that cell phone to stay in operation?

A. Somewhere around September, maybe 2012.

Q. September of 2012, Mr. Ross?

A. Roughly, yes.

Q. And how did George Mickens get in touch with you to talk to you about it?

A. He called me. First of all, he called me when I was home at my house and he said Ray, I have a problem. I can't keep the phone on. Patty is going to lose her service. Can you go and continue the service of the phone for her?

Q. Now, Mr. Ross, to the best of your knowledge, was there ever a conversation between George Mickens and Rafael Mickens about this?

A. Yes, there was.

Q. To the best of your knowledge, was there any problem between Sarita Johnson and either of the Mickens keeping the phone in operation?

MR. PERRI: Objection.

THE COURT: Overruled.

A. No, not at all. She was pleased for that phone.

Q. Sarita Johnson was pleased that the phone was staying on?

A. Yes. I'm under oath. Yes.

Q. So now you started paying for the service on Patty Johnson's cell phone towards the fall of 2012?

A. Yes, immediately. It was never cut off.

Q. And do you remember how you changed the records with regards to who was paying for that cell phone?

A. Yes. I walked into the store on Old Country Road and I had -- he had to call in. He called in when I got there.

Q. When you say "he," we're talking about George Mickens?

A. We're speaking about George Mickens. Because he had to get his name off the account. I said that's not a problem. She's like a daughter to me, I'll take care of it. I'll make it my responsibility and I did.

Q. So in September of 2012 you began paying for that

cell phone?

A. That's correct.

Q. Now, did there come a point in time when Sarita Johnson told you that she didn't want you to pay for a cell phone for her daughter?

A. No. Sarita Johnson did not know where the phone was.

Q. Well, let's focus on the end of 2012. To the best of your knowledge, did Sarita Johnson have her own cell phone at that point in time?

A. She had a phone, yes, but it was -- she had a phone sometimes. Sometimes she didn't have a phone. She used Patty's phone that I bought Patty. I was going to take it away.

Q. Tell us what you observed about that.

A. I asked Patty, I said Patty, where is your phone? She said, it's downstairs. I said go get your phone. She said okay. She comes back upstairs and said, my mother has it.

MR. PERRI: Objection. What time frame are we talking about, your Honor?

THE COURT: Overruled.

Next question.

Q. Did it become a source of tension between yourself and Sarita and Patty Johnson about who was using this phone?

A. Yes, it was.

Q. Could you describe that for the jury?

A. I didn't want her using it because it's Patty's phone. She's supposed to have her own phone. She's a mother.

THE COURT: Let me interrupt you, Mr. Ross.

So, Mr. Zerner, going back to the earlier objection, time frame, please. Put a time frame on it so he can move this along.

THE WITNESS: I'm sorry, Judge.

THE COURT: That's all right.

MR. ZERNER: Absolutely, your Honor.

Q. Was there a point in time in 2013 when you were paying for Patty Johnson's cell phone when the fact that Patty Johnson had a cell phone was a source of tension between yourself and Sarita Johnson?

THE COURT: Yes or no?

A. No.

Q. In 2014 was there a point in time when the fact that you were paying for Patty Johnson's cell phone became a source of tension between yourself and Sarita Johnson?

A. Yes.

Q. Could you describe that for the jury?

A. It was towards the end. It happened when the phone could not be found. I said okay. I know who took the phone.

And after it came back up again, the phone was taken by her mom. So I said I'll buy you another phone. Nobody knew where this phone was. Then it turned up later. When Patty keep the phone under her pillow, all of a sudden after I bought the phone, the phone was found again later on. That's why I got another phone. It wasn't I was being sneaky, nothing like that. Nobody knew where the phone was.

Q. Could you tell us the approximate month and year that this interaction we're talking about took place?

A. Maybe fall. Maybe September.

Q. Fall of 2014?

A. September, October, something like that. September, October.

Q. Of 2014?

A. '14, yes.

Q. Now, in that same time period, around the late summer, early fall of 2014, could you describe your relationship with Sarita Johnson?

A. From what you say, from coming out the summer into the fall?

Q. Yes.

A. Yes, it was changing. She was starting to change. She was acting funny.

Q. Your relationship with Sarita Johnson, describe that for the jury.

A. It was distant. It was like -- she knew she wanted me to take her here, she wanted me to do this and all of a sudden she stepped away.

Q. So you and Sarita Johnson had a distant relationship in late summer, early fall of 2014?

MR. PERRI: Objection; leading.

THE COURT: Overruled.

A. Yes, with the kids. That's the kind of relationship we had. She needed me to get them food or buy them food and that's the relationship me and her had.

Q. Focusing on your relationship with Patty Johnson, you have known Patty Johnson since she was a baby?

A. Very young, yes.

Q. Now, focusing on 2013, right, could you describe your relationship with Patty Johnson in 2013?

A. Just like before. The same as my daughter. She needed anything, just like they needed, I was that father figure for everybody there, not just pointing out Patty.

Q. So in 2013 were there times that you took trips to Brooklyn?

A. Yes, sir.

Q. And in 2013 when you took these trips to Brooklyn, would sometimes other people come with you to Brooklyn?

A. Yes.

Q. Could you describe who some of those people would

be?

A. Millinia Johnson would come. Mercedes Johnson would come with me. My kids would meet me when they go to the mall. They said dad, we're in the mall, come get us. They go back to Brooklyn and do the child's hair and hang out with the child.

THE WITNESS: I'm saying too much?

THE COURT: No.

Q. When you said the child?

A. Millinia.

Q. Would the child sometimes be Mercedes Johnson?

A. Yes.

Q. Would the child sometimes be Millinia Johnson?

A. Yes.

Q. Now, you said something about doing the child's hair, right?

A. Okay.

Q. Now, when you took these trips to Brooklyn, who would be doing either of these girls' hair?

A. My ex-wife, Paula Ross and my daughters, Kelly and Jasmyn Ross.

Q. So first of all, could you tell us generally what day of the week you would take these trips to Brooklyn?

A. On the weekend. Like a Saturday and then if they had an occasion, if the girls had an occasion, their hair was

never done at all, it would really look bad, they asked me could I take them and I would call Paula and Paula would say bring them over. I would leave there, come back and pick them up.

Q. Is it fair to say that the primary hairdresser for both Millinia and Mercedes Johnson was your ex-wife?

A. That's correct.

Q. And when you would go to Brooklyn, what were some of the things that you would do in Brooklyn?

A. We would go to Brooklyn. Paula would feed her. We have food, go out and eat. Go to Nellie Bly Park is a park in Brooklyn off the Belt Parkway down by Coney Island. We do things because it's the weekend. I take everybody. My kids go, my grandkids, all of us would go together.

Q. When you went on these trips in Brooklyn, who would pay the bills for these trips?

A. I would.

Q. Were you ever offered any money by Sarita Johnson to pay for admissions to the movies or to museums for her daughters, Mercedes and Millinia who were accompanying you?

A. No, sir.

Q. There was never any offer?

A. Never an offer.

Q. Did you ever ask for any money?

A. No.

Q. Now, Mr. Ross, you heard the allegations against you, correct?

A. Yes, terrible. Yes, I did.

Q. Have you ever molested a child?

A. Never, ever. Never will.

Q. Have you ever had any sexual contact with Millinia Johnson?

A. None whatsoever. Never, ever and I won't. Will not.

Q. Have you ever pulled into a parking lot in Hempstead, West Hempstead or anywhere to sexually molest anybody?

A. Not at all. Never, no. No, never, ever, ever in my life.

Q. That never happened?

A. Never, ever happened. I'm under oath.

MR. PERRI: Objection.

THE COURT: Hold it all.

So, Mr. Ross, you have to wait for the question to be asked. That's point one. You have to slow down in answering. And we all know and seen that you have taken an oath to tell the truth here at Court.

THE WITNESS: I'm sorry.

THE COURT: Next question.

MR. ZERNER: Thank you, your Honor.

Q. What do you do most Sundays?

A. I go to church and after I go to church on Sundays, me and Tara go out to Red Lobster and stuff like that. I'm an outgoing person. I like to 2go out.

Q. Now -- withdrawn.

You have heard an allegation that there was molestation taking place in your room at 301 Coventry Road North. Have you ever sexually molested anybody; Millinia Johnson, Mercedes Johnson in your bedroom or anywhere at 301 Coventry Road North?

A. No, sir, never, ever. Never.

Q. Did you do that in March of 2013?

A. I have never done that.

Q. Was there ever any time between March 2013 and October of 2014 that you did that?

A. No, sir, never.

Q. Now, you have seen multiple text messages that have been put into evidence during the trial, correct?

A. Okay.

Q. Now, could you tell us about the texting you would do back and forth with Patty Johnson?

A. Yes, I heard something. I text Patty like 3:00 or 4:00 in the morning. I text Patty. That wouldn't go through no school nights. That was on a Saturday. I could back up everything I say. Nobody would be downstairs with her. I

say, Are you all right. Everything all right, blah, blah, blah, blah, blah.

Q. Did you ever text Patty naked pictures?

A. No. She's a child.

Q. Did she ever text you naked pictures?

A. No. I wouldn't stand for that. She wouldn't do that. I never had that kind of relationship with her. I don't even think like that.

Q. Now, there was some text messages that seemed to --

THE COURT: Hold it, Mr. Zerner. Sustained. Don't offer your own interpretation of what it seemed to be.

MR. ZERNER: You're right, your Honor. I'll withdraw that.

Q. Did you ever text to Patty that you loved her?

A. Yes, I do, just like I do my other kids.

Q. What do you mean by that when you tell Patty Johnson you love her?

A. Someone cares about her. She didn't have that in that house.

Q. Describe what you mean that Patty Johnson didn't have that in the house.

A. Patty Johnson -- Patty was the one that had to watch her baby sister all the time. The other kids were older, they went about their way. These responsibilities

were put upon that child. That child had no esteem. I brought that child's esteem up, that's all.

Q. Were there ever any times that you were concerned about Patty harming herself?

MR. PERRI: Objection.

THE COURT: Sustained as to the question.

Next question.

Q. In 2014 did you observe any difference in Patty Johnson's behavior?

A. 2014.

THE COURT: What year?

Q. In the summer of 2014 was there an occasion for you to observe a change in Patty Johnson's behavior?

A. Yes, in the beginning when -- 2014, yes, I did. I felt I saw something different.

Q. Can you describe what you observed?

A. I was told to stay away from her. When I was told to stay away from her, that was like my daughter. That hurt me. I was told to stay away from her. But it was turned around something crazy and she resented that.

Q. And did there come a point in time that you were concerned for Patty hurting herself?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Now, in 2014 who told you to stay away from Patty

Johnson?

A. The mother.

Q. Sarita Johnson?

A. In that room, yes.

Q. And could you describe what that was about?

A. I didn't understand. I didn't know. I didn't know why.

Q. Now, we've heard testimony about a television at 301 Coventry Road North. During 2013 and 2014 how many working television sets were in the home?

A. One.

Q. Where was that located?

A. In my bedroom.

Q. And who paid for the television set and for the service?

A. I did.

Q. You did?

A. Yes, sir.

Q. Now, is there a lock on your room at 301 Coventry Road North?

A. Yes, there is a lock on there.

Q. When was the door locked?

A. Whenever me and Tara leave, that's the only time. That door was never locked no other time.

Q. So when you or Tara were home, was the door locked?

A. No.

Q. Was there any kind of policy or rule about who could go in your room and watch TV?

A. No, not at all.

Q. Is it fair to say there were often times when various people of the household would watch TV in your room?

A. I had all 19 people in there packed. Nineteen people live in that house.

Q. In addition to there being times when the room was packed, is it fair to say there were also times when various combinations of those people would be in the room?

A. Yes, sir.

Q. Now, was there ever a time when you were in that room alone with Patty Johnson and you were molesting her?

A. No.

Q. Did you ever masturbate while Patty Johnson was in your room with you watching TV?

A. No, sir, never, ever.

Q. Did you ever touch her private parts?

A. Never, ever.

Q. Did you ever touch her vagina?

A. No, sir.

Q. Did you ever touch her breasts?

A. No, sir.

Q. Did you ever do that in your truck?

A. No.

Q. Did you ever do that anywhere?

A. No.

Q. Now, in addition to there being a lock on your room -- withdrawn.

Why is there a lock on your room at 301 Coventry Road North?

MR. PERRI: Objection.

THE COURT: Overruled.

You can answer the question.

A. Because Sarita would come in there and steal, rob Tara's stuff and my stuff.

MR. PERRI: Objection.

A. And nobody know what happened until somebody would come and tell us.

THE COURT: Hold it. When you see Mr. Perri stand up, you have to stop.

THE WITNESS: I know better too, Judge. Sorry.

THE COURT: Ladies and gentlemen, disregard Mr. Ross' answer to that question.

Q. Where do you get your mail?

MR. PERRI: Objection.

THE COURT: Overruled.

A. I used to get my mail at 301 Coventry Road North.

Q. Did there come a point in time when you stopped getting your mail there?

MR. PERRI: Objection.

THE COURT: Sustained.

Next question.

Q. Do you have a post office box?

MR. PERRI: Objection.

THE COURT: Overruled.

A. I certainly do.

Q. Why did you get a post office box?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Was there ever a point in time when you were concerned about the safety of the mail you were receiving at 301 Coventry Road North?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. When did you first get your P.O. box?

MR. PERRI: Objection.

THE COURT: Overruled.

A. When I found out my mail was missing and when Pauline's mail was missing.

MR. PERRI: Objection, your Honor.

THE COURT: The objection is sustained.

Ladies and gentlemen, please disregard the

answer that the witness just gave.

THE WITNESS: I'm sorry, I'm too fast, I'm sorry.

Q. Now, you heard Tara Johnson testify, right?

A. Yes, sir.

Q. And you heard Tara Johnson talk about tough love?

A. Yes.

Q. Did you ever discuss with Tara Johnson holding back resources for paying for expenses at 301 Coventry Road North?

A. Yes, after I left there.

Q. Well, before you left there, did you ever have a conversation let's say in the summer of 2014 with Tara Johnson about money that was being spent on the household?

A. Yes, sir.

Q. And could you tell us what that entailed?

A. That was we were paying everything and it just keep coming and coming. It was squatting. People were squatting and didn't appreciate it. They want us to keep paying and paying. Enough is enough.

Q. Was there a point in time in 2013 and 2014 when anybody besides yourself and Tara Johnson contributed to the expenses at the household at 301 Coventry Road North?

A. No, sir.

Q. Now, in two thousand -- withdrawn.

In August 2014 Sarita Johnson told you that she

didn't want you to provide a cell phone for her daughter?

A. Yes.

Q. Now, at some point later in 2014 you did provide a cell phone for her daughter?

A. Yes.

Q. Why did you do that?

A. I provided the cell phone for her daughter when -- because I didn't know that she took the other phone. That's why I gave her the phone in 2014, because I was never told that she had the phone. After I got the phone --

Q. When you say she had the phone, tell the jury who we're talking about.

A. Sarita Johnson.

Q. So is it fair to say at some point in the summer of 2014 it came to your attention that the cell phone that you were paying for was taken by Sarita Johnson?

MR. PERRI: Objection; leading.

THE COURT: Overruled.

A. Yes.

Q. How did you find that out?

A. Patty told me.

Q. And do you remember the approximate month and year?

A. This is that first phone before I got that second one, correct?

Q. Yes.

A. When I got this phone, I didn't know where the first phone was, so I went and got Patty another phone. In 2014 I told Patty don't tell nobody where your phone is because they're gonna take it again.

Q. In two thousand -- in the later part of 2014 Patty was approaching her 14th birthday, is that accurate?

A. I suppose so, yes.

Q. And at that point in time you said that a younger cousin living in the house already had a cell phone?

A. Yes.

Q. Who was that?

A. Brianni. I can't remember the last name. She was living there. That's Tara's niece.

Q. And to the best of your knowledge, who was paying for that phone?

A. Her mother.

Q. Now, when you bought a replacement cell phone for Patty Johnson, did you talk to the cell phone company about the service on the previous cell phone?

A. Yeah. I never changed anything. I just went from one phone to the other. So it's all in that same plan, same company, same everything.

Q. Now, at that point in time how would you generally communicate with Patty Johnson?

A. When she got the phone?

Q. Yes, when she got the phone.

A. I communicate with her or she would call me from school. 3025 was the last four digits on my phone come up.

Q. So now, focusing on calls from school. How often would Patty Johnson call you from school?

A. Every day around 3:30.

Q. And to the best of your recollection, what were those calls about?

A. To see if she's going home now, make sure she's okay. Go home or if she had practice. I took that child as my daughter just like my kids.

Q. Now, in 2013 and 2014 were there ever occasions when you attended parent-teacher conferences?

A. Yes, sir, all of them. All the kids.

Q. When you say all of them, could you tell us which children you went to parent-teacher conferences for?

MR. PERRI: Objection.

THE COURT: Overruled.

A. All four of Sarita Johnson's kids. Even the young one to a separate school, I went for her. A lot of time I would walk. It would be snowing. I would leave my car or truck home and walk.

Q. When your kids were young, meaning Jasmyn, Justyn and Kelly, would you also attend parent-teacher conferences?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes, I would.

Q. Now, when you were attending parent-teacher conferences for Mercedes and Patty and Sherima, did you ever discuss that with Sarita, their mother?

A. Yes.

Q. And were there times when Sarita also attended these parent-teacher conferences?

MR. PERRI: Objection.

THE COURT: Overruled.

A. No. She would say Ray, can you go for me? I said I'm going to have to go anyway, you're not going.

Q. Was that a source of tension between yourself and Sarita?

A. I knew she wasn't going to go anyway. She just wanted to look like somebody took care of them.

MR. PERRI: Objection.

THE COURT: Overruled.

Next question.

Q. Would you ever provide any type of lunch or lunch money to any of the kids?

A. All of them.

MR. PERRI: Objection.

THE COURT: Mr. Zerner, the objection is overruled, but remember you are on direct examination.

MR. ZERNER: Of course, your Honor, thank you.

Q. So you would provide lunch money for them?

A. Yes, sir.

Q. Would you give them their lunch money directly?

MR. PERRI: Objection.

THE COURT: Overruled.

A. Yes, I would.

Q. Were there ever times that you gave money to Tara Johnson and Tara Johnson would provide that money to the kids?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Did you ever give money to Sarita Johnson for her to provide lunch money to the kids?

A. Yes.

MR. PERRI: Objection.

THE COURT: Hold it, Mr. Ross.

Sustained.

Next question.

Q. Was there a time that you insisted on Patty Johnson returning a clarinet?

A. Yes.

Q. Could you tell us why you did that?

A. I wasn't appreciated for what I was doing. I told her let your mother take care of it.

Q. Was that part of the tough love that you and Tara were talking about?

A. Yes.

Q. Now, there was a point in time when it was made clear to you that Sarita Johnson didn't want the second cell phone to remain on; is that fair to say?

A. Yes.

MR. PERRI: Objection.

THE COURT: Sustained as to the form of the question.

Q. When the second cell phone was being turned off, what, if anything, did you do to let Patty Johnson know that the phone was going to be turned off?

A. Can you --

Q. I'll withdraw the question and ask another question.

A. I didn't understand.

THE COURT: Hold it. There is no question. Next question.

Q. Did you ever text Patty about the fact that the cell phone was going to be turned off?

A. Yes.

Q. Do you recall her reaction?

A. Yes.

Q. What was that reaction?

A. She didn't want the phone off.

Q. And was there ever any discussion about who, if anybody, could pay to keep the phone on?

A. No.

Q. When you were texting back and forth with Patty, were you doing it to harm her emotional welfare?

MR. PERRI: Objection.

THE COURT: Sustained.

Q. Did you text with Patty Johnson anymore than you did with your other children?

A. No, same.

Q. And did you ever sexually molest Patty Johnson?

A. I certainly didn't. Never did, never would. I'm a parent. I don't live like that.

Q. Did you ever sexually molest Millinia Johnson anywhere, any time?

A. No, sir, no way, no how.

MR. ZERNER: That's all I have at this time, your Honor.

THE COURT: Very good.

Mr. Perri, your witness.

MR. PERRI: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. PERRI:

Q. Mr. Ross, your birthday is March 31st, 1959,

correct?

A. Yes.

Q. And your cell phone number in 2013, 2014 was 516-537-6877, correct?

A. That's correct.

Q. And you were -- your cell phone was through the Sprint corporation?

A. That's right.

Q. You would call Millinia Johnson on your cell phone, correct?

A. That's correct.

Q. And you would text her on your cell phone?

A. Yes, sir.

Q. And you said you would text Millinia Johnson the same you would text your own kids?

A. That's right.

Q. You text your own kids at 1:00 in the morning?

A. Yes, I would. Yes, I do.

Q. You would call them at 4:00 a.m.?

A. That's right I do.

Q. On a regular basis?

A. When needed.

Q. How often is when needed?

A. I can't answer that. Whenever I should call them. I'm a parent.

Q. How often do you call your son Justyn?
A. A lot. Many times.
Q. In a month, please estimate.
A. Over a hundred times in a month.
Q. You call your son Justyn over 100 times in a month?
A. That's correct.
Q. How many times do you call your daughter Kelly?
A. Same.
Q. Over 100 times?
A. That's right, every single day.
Q. Is that multiple times a day?
A. Yes.
Q. How often do you text Kelly, Justyn and Jasmyn?
A. I text them many times per day when they can't talk because they work. When they see the text, they call me back.
Q. So, Mr. Ross, with your three adult children, you text them every day multiple times a day. You call each of them every day multiple times a day for a total of more than hundreds of times each per month?
A. Calling them at least a hundred times a month.
Q. Each of your children?
A. Yes.
Q. How about your wife -- Paula, your ex-wife, how often do you call her?

A. I call Paula about at least four, five times out of the week.

Q. So approximately four to five times a week.

How often do you call Tara?

A. Every day.

Q. How many times a day?

A. All day; lunchtime, morning time, when she's on her way home.

Q. So at least three times a day?

A. At least.

Q. Do you text with Tara?

A. No.

Q. You call Tara approximately three times a day?

A. Yes.

Q. Every day?

A. Yes.

Q. And you currently live with Tara?

A. Yes.

Q. And this is on top of all the texting and calling we discussed with your adult children?

A. Yes, that's right, every day.

Q. During 2013 and 2014, on top of those hundreds of calls and hundreds of texts to your children, calls to Tara, you were also texting Millinia Johnson?

A. Yes.

Q. And you were also calling Millinia Johnson?
A. Yes.
Q. And you were calling and texting at all hours of the day either Millinia Johnson or your own children?
A. Calling or texting, yes.
Q. All hours of the day?
A. Any time of day I feel like it, that's when I do it.
Q. Morning or night. You call your adult children any time?
A. Any time I feel like it.
Q. And during 2013 and 2014 you would be off of work by the time Millinia would come home, correct?
A. It depends. It depends on what I have to do.
Q. You testified that you got off of work at approximately 2:00 during that time period?
A. Right. I also testified I get off in the morning too. I work overnight.
Q. And so would you on average during a week be home when Millinia Johnson came home?
A. Yes.
Q. Thank you.
Do you own a white pick-up?
A. I certainly do.
Q. Does it have front seats and back seats?

A. Yes, it does.

Q. And you don't play the clarinet, correct?

A. No, I don't, but I'm a musician.

Q. Going to smash someone, that means you are going to have sex with them, correct?

A. No, I don't know that.

Q. You don't know what it means to smash someone?

A. I'm older. I don't know that. No, I don't understand that. I didn't say anything about smashing. I don't know that.

Q. You never texted Millinia Johnson about smashing?

A. No, never texted her about smashing, no.

Q. And you talked about that you left 301 Coventry in October of 2014. You left because you were escorted out of the home, correct?

A. That's correct.

Q. That was by the Sheriff's Department, correct?

A. No, it wasn't by the sheriff's.

Q. Police department?

A. Police department. No sheriff. I know the difference.

Q. You didn't pay for Mercedes Johnson to have a phone, correct?

A. Yes, I did.

Q. You did pay for Mercedes -- in 2013, 2014 you were

paying for Mercedes Johnson to have a cell phone?

A. I have paid for hers because she had a different type of phone. She needed when you go buy the minutes in the store. I go to the gas station and buy them on a card.

Q. Did you tell Tara Johnson you were doing that?

A. Yes, Tara knows. Mother knows too. Sarita knows also.

THE WITNESS: Am I speaking out of turn? I'm sorry, Judge.

THE COURT: Next question.

Q. Now, when you testified about going to Brooklyn in 2013 and 2014, you testified about "the child" and "her" and "she." Who was with you and your family? That's Millinia Johnson, correct?

A. That's correct.

Q. And Millinia would often go with you to Brooklyn to be with your family?

A. Yes.

Q. And she would ride in your white truck, correct?

A. Yes.

Q. And you would drive her home, correct?

A. Yes.

Q. And most of the time it was just the two of you on the way home, correct?

A. Many times.

Q. And you have been in your room at 301 Coventry alone with Millinia Johnson, correct?

A. Yes.

Q. And you have watched TV with her, correct?

A. Yes.

Q. You have watched wrestling; is that correct?

A. Yes, and other shows, correct.

Q. Your name is not on the deed at 301 Coventry Road, correct?

A. No, sir.

Q. And you are not married to Tara Johnson, correct?

A. No, I'm not.

Q. You don't have any children in common?

A. No.

Q. Mr. Ross, you have no legal claim on her family's property, correct?

A. No.

Q. And Millinia Johnson, you would characterize her as a good kid, correct?

A. Very good. She's an honor student now because of me.

Q. And because of you. Why is it because of you?

A. Because I took the time. I got her into music. I took her, I went to school and I got her involved in things like a kid should because she wasn't doing those things

before.

Q. So you testified that there came a point though where you had to take away her clarinet because she wasn't respecting you?

A. No, that's not the reason why. Her mother didn't acknowledge -- her mother didn't appreciate me doing these things.

Q. So because you were angry with her mother, you were going to take her clarinet away?

A. That's correct.

Q. And so although you believed it was a good thing for her to be in music, to punish Sarita you were going to take her clarinet away?

A. She had nothing to do with it. This is the mother. While I'm doing everything else is good, but when it come down to the line, I'm not that way.

Q. Did Sarita Johnson use the clarinet?

A. No, she don't play clarinet. She would go to the games though with us.

Q. The only person that used the clarinet was Millinia Johnson?

A. Yes.

Q. You were going to take it away, but not because Millinia did anything wrong?

A. Correct. Millinia didn't do anything.

Q. Millinia never did anything wrong that would make you want to take her phone away, correct?

A. That's right.

Q. You said you texted Millinia the same as you text your own children?

A. That's right.

Q. Do you curse at your own children?

A. Yes, I do.

Q. Do you use the F word with them?

A. Probably.

Q. How old are your children?

A. My children are grown now.

Q. How old are they?

A. Twenty-eight, 29. One's 29, 24.

Q. And so they were approximately ten years older than Millinia was in 2013, 2014?

A. Yes.

Q. You said you would talk the same to your 20 year old children as you would to Millinia Johnson?

A. Yes.

MR. PERRI: I ask the witness be shown People's 12.

(Handed to witness.)

Q. Mr. Ross, please open the envelope that is People's 12 and look inside.

Mr. Ross, do you recognize that item?

A. Yes.

Q. What do you recognize it to be?

A. It's a phone.

Q. By her phone, whose phone?

A. It's the phone that I bought for Patty.

Q. And by Patty, you mean Millinia Johnson?

A. That's correct, that's who we talking about.

MR. PERRI: I ask People's 12 please be taken away.

A. But you know what -- can I say something?

THE COURT: Hold it.

MR. PERRI: I ask People's 13 been shown to the witness.

(Handed to witness.)

Q. Please look inside, Mr. Ross.

Do you recognize what was inside People's 13?

A. Yes.

Q. What do you recognize that to be?

A. A phone.

Q. By her phone --

THE COURT: No, he said a phone.

MR. PERRI: Oh.

Q. You said a phone. Do you recognize which phone it is?

A. Yes, it's a Samsung.
Q. Do you know whose phone it is?
A. No. I made a mistake with the other one. That could be anybody's phone. I don't remember how phones look. I'm not a phone person, but I bought two phones.
Q. Is that phone, People's 13 that is in front of you there, is that consistent with the second phone you bought Millinia Johnson?
A. I don't know. I bought two phones. Metro PCS, that's all I know.
Q. What brand was the second phone?
A. I don't know.
Q. Was it a Smartphone?
A. I don't know.
Q. You purchased the phone?
A. I purchased it, yes, for her. She knew that, I didn't. I don't know that. I'm not a phone person like that. I receive and make calls. I don't know. She the one that taught me about texting.
Q. Mr. Ross, you did purchase the second phone, correct?
A. Correct.
Q. You purchased it at a store, correct?
A. Both of them. Same store.
Q. Same store?

A. That's right.
Q. In person?
A. In person.
Q. But what you are testifying today is that you don't know even what kind of phone it was that you purchased?
A. It's a Smartphone, but what kind it was, I don't know.
Q. So you just testified that you didn't know whether it was a Smartphone or not?
A. Well, this is a Smartphone. I don't know these things like that. I don't know.
Q. You don't know what brand it was that you purchased?
A. I wouldn't even know if it was a Samsung, tell you the truth. I'm under oath. I bought the phone, that's all I know. She wanted a new phone and I got her another phone.
Q. So you purchased a random phone at a store that you have no idea what it was?
A. That's correct. That's the truth.
MR. PERRI: I ask People's 13 be taken from the witness.
A. That's for the other phone too, I didn't know.
THE COURT: Hold it, Mr. Ross.
THE WITNESS: I'm sorry.
MR. PERRI: I ask that the witness be shown

People's 15.

(Handed to witness.)

Q. Mr. Ross, I'm asking you to look at People's 15 at the top of the page. There is a cell phone number listed at the top of that page. Do you recognize that number?

A. Sure.

THE COURT: Mr. Perri, I ask you to go back to the podium.

MR. PERRI: Yes, your Honor.

Q. Do you recognize that number, Mr. Ross?

A. I certainly do.

Q. Whose number is that?

A. That's my number forever.

Q. And do you recognize those records?

A. Yes. What about them?

Q. And what do you recognize those records to be?

A. Phone calls.

Q. Are those phone calls to your phone and coming out of your phone?

A. Yes, I see incoming. Yes, there is a lot of numbers on here.

Q. And the number that's highlighted in pink, do you recognize that phone number?

A. Yes, I do.

Q. Whose number is that?

A. That's the phone that I had for Patty. My other phone.

MR. PERRI: I ask that People's 15 be taken from the witness.

I ask that the witness be shown People's 16.

(Handed to witness.)

Q. Mr. Ross, do you recognize People's 16?

A. I certainly do.

Q. And the pink, the red or pink highlighted number, do you recognize that number?

A. Yes, I do.

Q. What number is the red or pink highlighted number?

A. 514-4438.

Q. Do you know whose number that is?

A. Yes. That's my other number from that phone.

Q. And from that phone, you mean the phone you purchased for Millinia Johnson?

A. That's correct.

Q. And the number that appears next to that number, do you recognize that number at the top of the page?

A. What are you talking about?

THE COURT: Sustained as to form.

A. There is a lot of numbers on here.

THE COURT: Hold it, Mr. Ross.

MR. PERRI: Your Honor, if I can have People's

15.

(Handed to counsel.)

Q. Mr. Ross, on the first line where it says outbound call and there are two 516-514-4438 numbers highlighted under call number, and under dial digits there is another cell phone number next to that. I would ask you to look at that number.

(Handed to witness.)

A. Yes. What about them?

Q. Do you recognize that phone number?

A. Yes.

Q. Whose number is that?

A. 514-4438.

Q. The number next to that number, sir? All the way on the left in the first column.

THE COURT: Hold it, Mr. Ross.

Mr. Perri, could you tell him what line you are looking at?

MR. PERRI: Your Honor, I said the very first highlighted.

THE COURT: Hold it, sir. Can you tell him what line you are asking him to look at?

MR. PERRI: Your Honor, it's the first highlighted.

THE COURT: Officer, can you hand it back to

Mr. Perri.

A. The first highlighted is not my cell number.

THE COURT: Hold it, Mr. Ross, please.

Q. On the first highlighted line on this page on the far left column there is another cell phone number under calling number. I ask you to look at that number.

THE COURT: Mr. Perri, I asked you to ask -- hold it, Officer.

What line are you asking him to look at?

MR. PERRI: The fourth line from the top, your Honor.

THE WITNESS: Thank you, Judge.

THE COURT: In the left-hand column?

MR. PERRI: Yes, your Honor.

THE COURT: Thank you.

A. 514-4438.

537-6877, 516?

Q. Yes, sir. Do you recognize that number?

A. That's my number.

MR. PERRI: Thank you, your Honor. If I can have People's 15 taken from the witness.

Q. Mr. Ross, you testified that you texted Patty, Millinia Johnson that you loved her, correct?

A. That's correct.

Q. But you didn't just use the words I love you,

correct?

A. I don't know. You know how many things I have said since then?

Q. Did you text her that a part of you died when her mother wouldn't let you see her?

A. Yes.

Q. And did you text her that she was in danger of losing you?

A. That's right.

Q. Why was she in danger of losing you?

A. Because I'm a father figure to her. You see the situation going on right now. That's what I'm talking about.

Q. And did you also text her I'll never find another Patty, you're my heart? A part of me died when she took you. I'm not the same, Patty.

A. That's right.

Q. You would text her statements like that late into the night, correct?

A. It depends, but it was nothing like you say sexual or nothing like that. She's as my daughter. I love that child like my kids and any kids in the house.

Q. Sir, she isn't your daughter, correct?

A. She is my daughter because I was taking care of her.

Q. Sir, she's not your biological daughter, correct?

A. The other kids in the house weren't either. I took care of them the same.

Q. Did you text Malik that you loved him and a part of you died?

A. He didn't need me like that. He's grown. They weren't grown.

Q. They were too old?

A. He was too old. If he needed me, I would love him the same.

Q. Was Mercedes too old for you to love her like that?

A. No. I loved all those kids the same way.

Q. Did you text Mercedes a part of you died when you couldn't see her anymore?

A. No, because she wasn't the issue.

Q. Because Patty was different?

A. You are trying to turn this around on me. I'm not saying that.

Q. Patty wasn't special to you?

A. She was special to me. She still is.

THE COURT: Mr. Ross, once you finish your answer, wait for the next question, please.

Q. But up until August of 2014 you never had a problem with Patty?

A. I still don't have a problem with Patty.

Q. And you didn't have a problem with her in October

 of 2014?

A. Never.

Q. Did you ever have a fight with Patty?

A. Never.

Q. And up until August of 2014 you testified that you didn't have any problems with Sarita Johnson with respect to the phone, correct?

A. She knew about the phone.

Q. But up until August of 2014 you didn't have any problems with Sarita Johnson about Millinia's cell phone, correct?

A. No, I didn't have any problems with her with that. She knew what was going on.

THE WITNESS: Sorry, I talk too fast, I'm sorry.

Q. Now, with respect to the second cell phone, you purchased Millinia Johnson that phone in October of 2014, correct?

A. Perhaps. I can't tell you. I would be lying. I'm under oath. I can't say that date because I don't know.

Q. Was it months after you stopped using the 514 number to text and speak with her?

A. Months after? No.

Q. And on that new phone that you gave her, you texted her statements such as God gave you to me and Paula. Sarita

can't control that. We love you forever. You're my blood?

A. That's right.

Q. You also texted her, What's the problem with you? You can't call and say hi Ray Ray? Don't forget who loves you and take care of you. Don't burn your bridges. You'll lose me, I mean it?

A. That's right. Her mother was the one involved with this. That's what made me say those things. I understood what was going on.

Q. And you texted her that you wanted to have a second phone remain a secret, correct?

A. That's right. Yes.

Q. And you texted her on the second phone that you wanted her to meet you once her mother left the house?

A. No. Once her mother -- I don't understand what you mean. I spoke too fast, I'm sorry. Can you repeat that? I wanted her to meet me, meaning?

Q. Meet me. Meet you, see you.

A. Once her mother leaves the house?

Q. Yes.

A. I don't understand that. I don't remember that. If that came up in a text, it must have been something to make it like that, but not the way you trying to make it sound.

Q. Now, you started going to Brooklyn with Millinia

Johnson in the summer of 2013, correct?

A. Yes.

Q. And it continued past her 13th birthday that same year, December?

A. Yeah. I don't remember her age, but yes, okay. I don't know if she's 13, 12. I didn't think of it like that. She was just a child to me and like my daughter. I took her like that. I didn't say she's 13 now or 12. That wasn't on my mind.

THE WITNESS: I'm sorry, I know you will be glad to get rid of me.

THE COURT: Mr. Ross, you can't say anything. Just answer the questions, please.

Q. You testified on direct that Patty wasn't appreciating you at some points in 2014; is that true?

A. Her mother didn't appreciate me, not Patty.

Q. Patty always appreciated you?

A. Always appreciated me.

Q. Patty never did anything wrong to you?

A. Never, ever.

Q. So --

A. Even now.

Q. So when you threatened to take away her phone, it wasn't a punishment for anything she did?

A. Right. We went over this before.

Q. When you threatened to take away the clarinet, it wasn't a punishment for anything she did?

A. Right. None of this was Patty.

MR. ZERNER: Objection; asked and answered as my client stated.

THE COURT: Overruled.

Q. You also threatened to take away a bank account from her; is that correct?

A. I took away the bank account when -- my son told me to do these things because of what was going on.

Q. And did you take away the bank account from her?

A. I still have a bank account. I stopped that bank account. Because all my kids, I have bank accounts for all my kids. I have life insurance policies for all my kids in case something happened to me, Patty and all my kids and Tara, all of that.

Q. But not Mercedes?

A. Not Mercedes, no. Mercedes had her dad, Robert Johnson taking care of them. Sherman taking care of Sherima. Patty didn't have anyone, that's why I took Patty under my wing.

Q. When you say Patty didn't have anyone, you mean a father?

A. Correct. Or mother.

Q. So the only one that you were taking care of was

Patty?

A. No. I was taking care of everybody in that house and the mother and the aunts and the sisters. Everybody.

Q. And you weren't being appreciated?

A. At the end what was done to me by the mother.

Q. So then it was okay to cut off the child?

A. For the mother. The mother made this like this. Let the mother see how it is, not Patty, not Millinia Johnson.

MR. PERRI: Nothing further, your Honor.

THE COURT: Ladies and gentlemen, we're going to take a break for all of us to stretch our legs and the court reporter stretch her fingers. Five minutes. Remember my admonitions.

(Whereupon, the jury exited the courtroom.)

THE COURT: Mr. Ross, you can take a five-minute break, just don't talk to anybody about your testimony while you are on break, okay.

THE WITNESS: I'm aware of this, Judge, thank you.

(A recess was taken.)

(Whereupon, the witness returned to the witness stand.)

THE CLERK: Continued case on trial, People versus Ray Ross. All parties are present. The jury is

not.

Are the People ready?

MR. PERRI: Yes.

THE CLERK: Defense ready?

MR. ZERNER: We are, thank you.

THE COURT: Can we get the jury.

(Whereupon, the jury entered the courtroom.)

THE CLERK: Let the record reflect the presence of the jury and all parties.

Are the People ready?

MR. PERRI: Yes, your Honor, the People are ready.

THE CLERK: Defense ready?

MR. ZERNER: We are.

THE CLERK: Mr. Ross, you are still under oath.

THE WITNESS: Yes, I'm aware.

THE COURT: Mr. Zerner, do you have redirect?

MR. ZERNER: No redirect, your Honor, thank you very much.

THE COURT: Mr. Ross, your testimony is concluded. You are free to step back to the table.

THE WITNESS: Thank you, your Honor.

(Whereupon, the witness returned to defense table.)

THE COURT: Can I see counsel for a second?

(A discussion was held off the record.)

THE COURT: Ladies and gentlemen of the jury, that's all the testimony you will be hearing today. So, you are free to leave for the rest of the day. We'll he see you back here again 9:30 a.m.

Remember my admonitions. Forget about the case until you come back tomorrow morning, okay. Thank you.

(Whereupon, the jury exited the courtroom.)

THE COURT: All right, with regard to tomorrow, Mr. Zerner?

MR. ZERNER: Potentially I may have one witness or potentially we may be resting.

THE COURT: People don't anticipate any rebuttal case?

MR. PERRI: No, your Honor.

THE COURT: Very good. So be prepared to offer your summations tomorrow and if time permits, the Court will charge the jury and allow them to begin deliberations knowing that we do have a day off on Thursday due to prior commitments.

MR. ZERNER: Just for the record, the day off is Wednesday, so we'll be back on Thursday.

THE COURT: Yeah, tomorrow is Tuesday, I

apologize. Yes, day off Wednesday, so they will be back on Thursday and Friday, if necessary. So, be prepared for that schedule.

MR. PERRI: Yes, your Honor.

THE COURT: The Court will make any rulings with regard to witnesses, should it be necessary, tomorrow morning.

MR. PERRI: Yes, your Honor.

MR. ZERNER: Understood, your Honor.

I think Ms. Doddato wanted to meet with us.

THE COURT: Yes, for a final charge conference and we'll get that settled. The Court is adjourned.

(Whereupon, the trial was adjourned to February 23, 2016.)

* * *