1　SUPREME COURT OF THE STATE OF NEW YORK
　　　　　COUNTY OF NASSAU :   PART 47
2　---------------------------------------x
　　THE PEOPLE OF THE STATE OF NEW YORK
3

4　　　　　　　　-against-　　　　　　　Ind. No. 1050N/15

5　　　　　　　　　　　　　　　　　　　JURY TRIAL

6　RAY ROSS,

7　　　　　　　　　　　　DEFENDANT.
　　---------------------------------------x
8
　　　　　　　　　　　Mineola, New York
9　　　　　　　　　　February 23, 2016

10

11　B E F O R E:   HON. TERENCE P. MURPHY
　　　　　　　　　　　Acting Supreme Court Justice

12

13　A P P E A R A N C E S:

14

15　　　　　　　(Same as previously noted)

16

17

18　　　　　　　　　Kathi A. Fedden
　　　　　　　　　Official Court Reporter
19

20

21　　　　　　　*　　　　　　　*　　　　　　　*

22　　　　　　　THE CLERK:   Continued case on trial, People

23　　versus Ray Ross.   The jury is not present.   All parties

24　　are present.

25　　　　　　　Are the People ready at this time?

1       MR. PERRI:  Yes, your Honor.

2       THE CLERK:  Defense ready?

3       MR. ZERNER:  We are, thank you.

4       THE COURT:  Okay.  Mr. Zerner, do you have any

5  additional witnesses for today?

6       MR. ZERNER:  No, your Honor.

7       THE COURT:  So you are going to rest?

8       MR. ZERNER:  Yes, your Honor.

9       THE COURT:  We're missing one juror, so it

10  will be a few minutes, but with regard then to closing

11  statements, both counsel are prepared to sum up?

12       MR. PERRI:  Yes, your Honor.

13       MR. ZERNER:  Of course, your Honor.

14       THE COURT:  And, Mr. Perri, how long do you

15  anticipate your summation to be?

16       MR. PERRI:  I believe I would use the hour,

17  your Honor.

18       THE COURT:  I didn't give you an hour, but you

19  say an hour.

20       MR. PERRI:  I believe so, your Honor.  That

21  was what we were told.  I apologize.

22       THE COURT:  Mr. Zerner.

23       MR. ZERNER:  I won't be anywhere near 60

24  minutes, your Honor.

25       THE COURT:  What I would like to do is have

Proceedings                                    1329

1    the summations, charge and get the jury into

2    deliberations today.  So I have a calendar matter that I

3    think is ready to go.  I'll handle that and then

4    hopefully the jury will be here in full and we'll go on

5    the record and, Mr. Zerner, you can rest.  We'll give

6    them a five-minute break for you to make your motions

7    and then we'll get right into summations.  I'll give

8    them my pre-summation charge and then you get into

9    summations.

10          We anticipate we'll charge this afternoon at

11   2:00.  I don't think we'll get it in before the morning,

12   but I would like to get the summations done before

13   morning, okay.

14          MR. PERRI:  Yes, your Honor.

15          MR. ZERNER:  Yes, sir.

16          THE COURT:  Anything for the record that we

17   need to put on?

18          MR. ZERNER:  I believe I spoke yesterday to

19   Ms. Doddato about a missing witness charge with regards

20   to Mercedes Johnson, your Honor.

21          THE COURT:  We'll deal with that right now.

22          With regard to the verdict sheet, I think both

23   counsel have approved of the verdict sheet that's been

24   presented.

25          MR. PERRI:  Yes, your Honor.

1          THE COURT:  Have you initialed a Court exhibit

2     copy?

3          MR. ZERNER:  Your Honor, thank you.  I have

4     had the opportunity to discuss that with my client and

5     we have approved of the verdict sheet, Judge.

6          THE COURT:  Very good.  That will be marked

7     Court exhibit next in order.

8          THE CLERK:  Court Exhibit X so marked.

9          THE COURT:  We've had a final charge

10    conference wherein my law secretary has gone over the

11    Court's charge with counsel and that's approved.

12         MR. PERRI:  Yes, your Honor.

13         THE COURT:  But for the one application that

14    defense is making; is that right, Mr. Zerner?

15         MR. ZERNER:  But for, yes, your Honor.

16         THE COURT:  And with regard to the missing

17    witness, what is that about?

18         MR. ZERNER:  Your Honor, there was mention

19    several times about an individual by the name of

20    Mercedes Johnson.  She's the daughter of Sarita Johnson,

21    the half sister of the complainant, Millinia Johnson in

22    this case.  She is under the control of the prosecutor.

23    The prosecutor's witnesses did mention her.  She was

24    mentioned several times by several different people.

25    She would be knowledgeable about a material issue in the

1    case, about these trips back and forth to Brooklyn.  It

2    was discussed by people in both the prosecutor's case

3    and the defense case that she was on these trips back

4    and forth to Brooklyn.  She likely could be expected to

5    provide non-cumulative testimony favorable to the

6    prosecutor.

7              This never happened.  There has been no

8    explanation as to why she wasn't produced.  She

9    certainly was not within my control and she's simply not

10   here.

11             THE COURT:  Thank you, sir.

12             Mr. Perri.

13             MR. PERRI:  Your Honor, as a preliminary

14   matter, defense counsel's application for a missing

15   witness charge is untimely.  Under People v. Fields, 76

16   N.Y.2d 761, the Court of Appeals in 1990 stated that the

17   application must be made as soon as practicable and

18   before the People rest, they should be put on notice

19   defense counsel wishes to make such an application.

20             The Second Department has subsequently stated

21   repeatedly that when such as in People v. Gonzalez --

22   withdrawn.  People v. Simmons, Second Department July 5,

23   1994, decision 92-06-071, that a request for a missing

24   witness charge not made until both sides completed their

25   cases is properly denied.

Proceedings                                    1332

1              The People have not been given an opportunity

2       if the defense counsel felt Ms. Johnson was a missing

3       witness or a necessary witness or even a material

4       witness, to have an opportunity to call that witness.

5       Even if the Court were to entertain the application,

6       your Honor, Mercedes Johnson would be expected to give

7       cumulative testimony to all the testimony that has

8       already been put forth at this trial; that she was

9       possibly on some of these trips but not on all of them.

10      She was not alone with the defendant and Millinia

11      Johnson.  That all the witnesses have testified that

12      there were many incidents where the defendant did have

13      access and opportunity to be alone with Millinia Johnson

14      on the way home from Brooklyn and 301 Coventry Road.

15      The defendant has conceded as much.

16              There is no reason that, therefore, Mercedes

17      Johnson's testimony would not be cumulative and the

18      People were not properly put on notice for such a

19      charge, your Honor.

20              THE COURT:  Defense application is denied.

21              Mr. Zerner, in an effort not to have to bring

22      the jury in and then excuse them five minutes later once

23      you announce that the defense has rested, do you wish to

24      put on your end of case motions now?

25              MR. ZERNER:  Sure, your Honor, I'll try to be

1     as efficient as possible.  I think I've shown that

2     throughout the trial.  I'm happy to do that right now,

3     your Honor.  I do anticipating resting.  Of course, I

4     will do that in front of the jury.

5                As you are instructing, I will make a motion

6     for you to dismiss all charges in this case.  I know you

7     have reserved decision when I made this motion at the

8     conclusion of the People's case.  I think it's clear

9     that there is reasonable doubt as to whether any of

10    these things ever took place.  The indictment, itself is

11    unbelievably vague and has left the defense in the

12    position of having to defend a period of time that

13    encompasses about 600 days of this indictment, your

14    Honor.

15               Furthermore, I believe the prosecutor doesn't

16    understand what the word alone means.  He constantly

17    talks about these people weren't alone together and I

18    think you have heard credible testimony from several

19    defense witnesses that put doubt into anybody's mind

20    about what the situation was between the parties

21    involved in this case and I make a motion for you to

22    dismiss each and every one of these charges in the

23    Indictment 1050N of 2015.

24               THE COURT:  Mr. Perri, you want to be heard?

25               MR. PERRI:  Yes, your Honor, just briefly.

1    The standard is not whether or not there is any

2    reasonable doubt to the defendant's guilt.  That is a

3    matter reserved for the jury.  But that a reasonable

4    jury could conclude that the defendant is guilty of

5    these crimes.

6         The People put forth a prima facie case with

7    regard to each and every element charged against the

8    defendant.  The defense case has not changed or called

9    into serious question or jeopardy the People's evidence

10   with regard to this case.

11        In the light most favorable to the People, the

12   evidence the People have presented illustrates the

13   defendant's guilt and that defense counsel's arguments

14   against the statute, itself which allows for a

15   prosecution over this time period with just simply two

16   or more incidents, one of oral sexual contact, along

17   with two incidents of sexual contact in total over three

18   or more months does not call into question at this time

19   on this motion the defendant's -- that does not call

20   into question that this case should not be presented to

21   the jury for their consideration.

22        With respect to your Honor reserving decision

23   earlier to the previous motion by defense counsel,

24   clearly in the record of Sarita Johnson's testimony she

25   testified to her daughter's date of birth, clearly

 1          providing evidence that the jury may consider that

 2          Millinia Johnson was 12-years-old at the commencement of

 3          the defendant's criminal conduct.  Thank you, your

 4          Honor.

 5                    THE COURT:  The decision is reserved.  We

 6          stand in adjournment until the jury arrives.

 7                    (A recess was taken.)

 8                    THE CLERK:  Continued case on trial, People v.

 9          Ray Ross.  The jury is not present.  All parties are

10          present, Judge.

11                    Are the People ready?

12                    MR. PERRI:  Yes, your Honor.

13                    THE CLERK:  Defense ready?

14                    MR. ZERNER:  We are, thank you.

15                    THE COURT:  Very good.  I believe the jury is

16          here, Sergeant?

17                    THE SERGEANT:  They are, Judge.

18                    THE COURT:  We'll take them when they're

19          ready.

20                    COURT OFFICER:  Jury entering.

21                    (Whereupon, the jury entered the courtroom.)

22                    THE CLERK:  Let the record reflect the

23          presence of the jury.  All parties are present.

24                    Again, are the People ready?

25                    MR. PERRI:  Yes, your Honor.

Proceedings                              1336

1           THE CLERK:   Is the defense ready?

2           MR. ZERNER:   We are, thank you.

3           THE COURT:   Good morning, ladies and gentlemen

4      of the jury.

5           Mr. Zerner, do you have any further witnesses?

6           MR. ZERNER:   No, your Honor, the defense

7      rests.

8           THE COURT:   Very good.   Thank you, sir.

9           Ladies and gentlemen, you have just heard

10     Mr. Zerner indicate that the defense has rested.   The

11     People earlier rested.   That means the testimony has

12     concluded.   Therefore, we now move to the next stage of

13     the trial where you will hear the summations of counsel.

14     So, I have some instructions for you in that regard.

15     They're very short, but I ask you to listen.

16          Members of the jury, you will now hear the

17     summations of the lawyers.   Following the summations I

18     will instruct you on the law and then you will begin

19     your deliberations.

20          Under our law, the defense counsel must sum up

21     first and the prosecutor then follows.   The lawyers may

22     not speak to you after that.

23          Summations provide each lawyer an opportunity

24     to review the evidence and submit for your consideration

25     the facts, inferences and conclusions that they contend

1        may properly be drawn from the evidence.

2                    If you find that a lawyer has accurately

3        summarized and analyzed the evidence and if you find

4        that the inferences and conclusions the lawyer asked you

5        to draw from that evidence are reasonable, logical and

6        consistent with the evidence, then you may adopt those

7        inferences and conclusions.

8                    Bear in mind the following points:

9                    First, you are the finders of fact and it is

10       for you and you alone to determine the facts from the

11       evidence that you find to be truthful and accurate.

12       Thus, you should remember that whatever the lawyers say

13       and however they say it, it's simply argument submitted

14       for your consideration.  It's not evidence.

15                   Second, remember that the lawyers are not

16       witnesses in this case.  So if a lawyer asserts as fact

17       something that is not based on the evidence, you must

18       disregard it.  Remember, nothing the lawyers say at any

19       time is evidence, so nothing the lawyers say in their

20       summations is evidence.  You have heard the evidence and

21       must decide this case on the evidence as you find it and

22       the law as I explain it.

23                   Third, during the summations one lawyer's

24       recollection of the evidence may, in good faith, differ

25       from the recollection of the other lawyer or from your

1    own recollection.  And the lawyers will undoubtedly

2    differ with each other on the conclusions to be drawn

3    from the evidence.  It is your own recollection,

4    understanding and evaluation of the evidence that

5    controls, regardless of what the lawyers have said or

6    will say about the evidence.  You and you alone are the

7    judges of the facts in this case.

8         If, during your deliberations you need to have

9    your recollection of the testimony refreshed, you may

10   have all or any portion of the testimony read back to

11   you.

12        Fourth, remember, under our law, I am

13   responsible for explaining the law, not the lawyers.  If

14   you think there is any difference between what the

15   lawyers may have said and what I say the law is, your

16   sworn duty as jurors is to follow my instructions on the

17   law as you promised me that you would.

18        Finally, if during the summations I sustain an

19   objection to a comment of a lawyer, that comment will be

20   stricken from the record and you must disregard it as if

21   it was never said.  If I overrule an objection, the

22   comment will stand.  Remember, it's simply comment and

23   not evidence.

24        Whether I sustain or overrule an objection or

25   on my own indicate that a comment must be disregarded,

1    my ruling only indicates that the comment does or does

2    not violate one of the rules of law set down for lawyers

3    to follow during summations.  It is not an attempt to

4    indicate that I have an opinion on what is said or of

5    the facts of the case or of whether the defendant is

6    guilty or not guilty.

7              Remember, under our law, you and you alone

8    judge what facts, if any, are proven and whether the

9    defendant is guilty or not guilty.  It's not me, nor the

10   lawyers that make those judgments.

11             We now turn to summations.

12             Mr. Zerner.

13             MR. ZERNER:  Thank you, your Honor.

14             THE COURT:  You're welcome, sir.

15             MR. ZERNER:  Ray Ross did not sexually molest,

16   sexually abuse, conduct any type of sexual acts against

17   his niece, Patty Johnson.  It simply didn't happen.

18             You have all heard the testimony of all of

19   these different witnesses over these last ten days and

20   your recollection and your opinion about what was said,

21   who it was said by and why it was said will rule.  The

22   judge just reminded you of that and you are going to

23   hear that again and again.

24             You folks have done a wonderful job of being

25   attentive.  I have watched you and you have watched me

Summations - Defense                                    1340

1    and I think all of us have spent every bit of our energy

2    involved with this case.  But you know what, ultimately

3    none of us were in a truck or in a room with Millinia

4    Johnson and Ray Ross.

5              You have heard from 12 different witnesses

6    here.  Ten of them told you they don't know anything

7    about anything, all right.  Two of them, Patty Johnson,

8    Millinia Johnson, and Ray Ross, let's look at what they

9    said and why they said it.

10             Now, you watched the witnesses.  You evaluate

11   People's credibility all day every day, even when you

12   don't realize you are doing it, you are doing it.  You

13   are looking at whether people are looking you in the

14   eye.  You are wondering whether they are making an

15   evaluation of what you are saying and how you are saying

16   it.

17             Now, Patty Johnson was brought in after her

18   mother, Sarita Johnson.  And you heard multiple people

19   testify about how many times they spoke about this

20   so-called sexual conduct.  You heard who they spoke to

21   and how they said what they said.  So now let's break

22   this down.

23             In the summer of 2014 it's crystal clear that

24   there is a ton of tension in the home that's being

25   discussed at 301 Coventry Road North in West Hempstead.

1    There is no debate about that, whether there were 18,

2    19, 20 people living in this four bedroom split ranch

3    house.  Picture the house.  Picture the chaos in this

4    house.  And now you have seen the personalities of

5    several of the people who live there, all right.

6              You saw Sarita Johnson and you saw Tara

7    Johnson.  They're sisters.  They're women in their early

8    fifties.  They both testified in front of you folks.

9    You saw what -- you heard what they said and you saw how

10   they said it.  Now picture them in the summer of 2014.

11   You have this extended family living in this house where

12   both of those women grew up.  It's not just a house that

13   these two adult women are living with their children and

14   then also their nieces and nephews, right.  This is the

15   house they grew up in.  And now here we are 40, 45 years

16   later and they're living there.

17             And think about what you heard about how

18   they're living there.  There is no debate about who was

19   taking care of this house.  Sarita Johnson told you she

20   didn't know how the bills got paid and she didn't pay

21   the bills.  Think about the common sense that you all

22   have with you and the Judge is going to remind you we

23   want you to apply your common sense here.  So think

24   about this.  Think about your own experiences, your own

25   home, your own family and think about the resentment

1    that builds up between parties in this type of a

2    situation.

3              So you have a situation where Ray Ross was

4    paying for this home, along with his long time

5    girlfriend Tara Johnson and Ray Ross' contributing both

6    financially and emotionally in a very positive way to

7    multiple children that are living there.  You have heard

8    that he went to parent-teacher conferences.  You heard

9    that he would provide the kids with lunch money.  You

10   heard that he would take the kids shopping for school

11   clothes.  But not just him.  And again, think about the

12   family tree of this.  I was never good at making family

13   trees and I think if I tried to make a family tree here,

14   the branches would go in such angles and such directions

15   it wouldn't look anything like anything we have ever

16   seen growing, in nature anyway, all right.

17             So you have Ray Ross who has three children

18   and you heard from these children.  You heard their

19   opinion of their father.  You heard about their

20   childhood.  And you heard from Ray Ross' ex-wife, Paula

21   Ross.  So now think about that.  And I hope again, when

22   we apply our common sense to evaluating anything, at

23   some point we put ourselves in that person's position.

24   And sometimes it's easy.  Like I would like to imagine

25   that I'm Matt Harvey of the New York Mets and what it

Summations - Defense

1  would be like to be young and a star and be playing for

2  my favorite team.  That's easy.  But let's think about

3  being Paula Ross.

4       Paula Ross is a woman who is divorced from the

5  father of her children, right.  She works hard.  She's

6  been working at the Macy's at Green Acres for years and

7  years and she also does hair.  Now my hair is not that

8  important and not that crucial and for nine dollars it

9  keeps getting shorter and greater, but I think hair is

10  very important, especially to women and especially to

11  young women.

12       So now here's Paula Ross who is voluntarily

13  helping her ex-husband's long time girlfriend's niece.

14  On a regular basis she's doing this girl's hair.  And

15  that's an extensive thing that's being done.  You heard

16  some discussion of some of the, I guess, machine would

17  be the wrong word, but devices and various curlers and

18  hot irons and different things that sometimes it was

19  being done at her home in Brooklyn and sometimes she

20  would bring all of this equipment with her to West

21  Hempstead.  And why was she doing this?  I think she was

22  doing this out of the goodness of her heart.  I think

23  this is a nice woman who is simply going out of her way

24  for her extended family.  Not even for her extended

25  family, technically, if you think about it, for her

Kathi A. Fedden, Sr. Court Reporter

Summations - Defense                                    1344

1      ex-husband's extended family.  That's a nice lady.

2              So, she came here and she talked to you about

3      what was going on in that home in West Hempstead and

4      picture it, you have heard testimony about the chaos in

5      that home, about the filth in that home and then you

6      heard about what sounded to me basically like an oasis

7      in that home.  That oasis was the small bedroom that was

8      shared by Tara Johnson and Ray Ross.

9              Now, that bedroom had a television in it and

10     the television worked in that bedroom.  Now, I think we

11     can all use our common sense, if we didn't have TV, we

12     would miss it.  Maybe some of us talk about no, I always

13     read and I watch PBS for a half hour a week.  That's not

14     me.  I watch more TV than I should and sometimes it's

15     intelligent, important TV and other times it's brain

16     candy, whatever you want to call it.

17             But you heard testimony about the TV in Ray

18     and Tara's room.  It's the only TV that is working in

19     there.  The testimony was that 19 people were living in

20     that house.  There were plenty of times when Tara and

21     Ray were home that people were coming and going in that

22     room to watch TV.  Do you really think that there were

23     multiple occasions when nobody was in the house and

24     nobody was in that room and nobody was swinging by that

25     room and saw something going on?  Because again, think

1    about the testimony you have heard, but think about the

2    testimony you have not heard.  Ask yourselves and,

3    again, placing yourself in anybody's position, and

4    anybody can accuse anybody of anything.  Anybody can

5    stand up on the witness stand and say something.

6              Now, what you don't have is, you don't have

7    any DNA.  This truck that keeps being talked about was

8    never seized, never inspected, never sprayed down with

9    any of these devices you see on CSI and Law & Order to

10   show anything was going on.  From the prosecution's

11   case, it sounds like there would be ejaculate all over

12   this truck.  It's disgusting to say.  I don't want to

13   talk about this with you folks, but this is why we're

14   here.

15             We're here because there is this allegation

16   against my client that on a regular basis in the back of

17   his truck he's masturbating while touching his niece's

18   vagina, breasts, anus.  We don't have any evidence of

19   that.  And then you are talking about these parking lots

20   where this supposedly happened and you have these photos

21   in evidence and please, look at the evidence.  Look at

22   it.  The Judge is going to tell you all that's available

23   for you, all right.

24             I tried a lot of cases and oftentimes the

25   first thing that a jury asks for is let us see the

1    evidence.  And I watched each and every one of you when

2    Mr. Perri published, showed you the documents and showed

3    you the photos and showed you the phone records.  Look

4    at them.  What you don't have in any of these parking

5    lots is any type of evidence of anything.

6              Now, you heard Detective Toussaint testify.

7    Let's talk about Detective Toussaint.  Detective

8    Toussaint has been on the job a number of years.  He

9    told you well, there are some procedures when talking to

10   a young lady, but I don't know if my commander told me

11   I'm supposed to do this and so I went out and you heard

12   about the geography of the area and all of you folks are

13   Nassau County residents, you know how far this is from

14   Dutch Broadway, where the precinct is, to West Hempstead

15   where this house is.

16             So you heard testimony that Detective

17   Toussaint went to the home.  Again, think about the time

18   line.  Apparently there is an allegation in August and

19   then there is an issue in October when Ray Ross moves

20   out of the house and December 10th is when Detective

21   Toussaint goes to the home, right.

22             Now, he goes to the home, but he doesn't go in

23   the home.  He never steps foot in the house at 301

24   Coventry Road North.  Sarita Johnson is waiting at the

25   door, sees him and then hustles outside with her

1    daughter.  Now the three of them are in the car.

2                Again, put yourself in Patty Johnson's

3    position.  I'm sure Mr. Perri is going to instruct you

4    to do that.  She's in a police car with her mother and a

5    male detective and her mother telling her you can all

6    fill in the blank.

7                So the three of them talked for a while but

8    not in front of the house, not in the house, not in

9    front of the house, not in the driveway, not in front of

10   the address, they drive a few blocks away.  That hasn't

11   been explained to me why they drive a few blocks away.

12   You're in a police car.  You can get wherever you have

13   to go pretty fast.  Whether you want to go back to the

14   precinct, whether you want to go to Starbucks, whether

15   you want to go to any well lit place, especially

16   including a police precinct where there might be a

17   female police officer or detective, have a conversation

18   about this, right.

19               Now, I asked the detective are there cameras

20   at either of these parking lots.  He said I didn't look

21   into it.  You didn't look into it?  You're investigating

22   this case.  You didn't look into it?  Why didn't you

23   look into it, Detective?  Well, ten years ago I was

24   there and when I was there ten years ago I knew there

25   weren't cameras there.

1            Now I'm no expert on computers, cameras or

2     phones or iPads or any of these things, but I can tell

3     you this, I'm pretty sure cameras have gotten smaller

4     and easier to place to hide and install and use in the

5     ten years since Detective Toussaint was talking about

6     knowing about something.  Why didn't he look into this?

7            I'll tell you why he didn't look into this.

8     We talked about this in jury selection.  It's garbage

9     in, garbage out.  This detective has --

10            MR. PERRI:  Objection.

11            THE COURT:  Hold it, Mr. Zerner.

12            Objection overruled.

13            MR. ZERNER:  Detective Toussaint has this hot

14     potato put on his desk and the commander says go deal

15     with this.  So he goes and he does what he has to do to

16     get this off of his desk.  So this woman, Sarita Johnson

17     says that this happened and she's, you know, basically

18     putting words into her child's mouth and her child says

19     X, Y and Z and the detective then goes back to the

20     precinct, types this up and then goes back to the house

21     and, again, doesn't enter the house.  Doesn't even talk

22     about that it was odd to him that he wasn't allowed

23     entry into the house.  This supposed monster isn't

24     living there.  Why not go into the house?  Why not look

25     around?  Why not get a flavor for what's going on?  For

1    who's saying this to you.

2            So the detective takes this information and

3    now it's off of his desk.

4            Now, he told you he doesn't know if anything

5    happened, how it happened, where it happened.  The only

6    evidence he has of that is a girl in front of her mother

7    saying that this happened.

8            Now, let's look at another one of the

9    prosecution's witnesses.  He calls a gentleman in from

10   Kansas that's working for the cell phone company and

11   there are hundreds and hundreds of pages of texts and

12   phone records and everything else.  Go ahead and look at

13   them.  Take a look.  You have those records.  Think

14   about what's not in those records.  And again, excuse my

15   using this language, there is no sexting, there is no

16   pictures of anybody's genitalia or anybody's private

17   parts.  There is none of that.

18           The prosecutor wants you to say well, why are

19   all these texts going on?  Who knows why people text as

20   much as they text?  People text photos of the food they

21   just ate or about to eat or they prepared.  Or they take

22   a picture of who knows.  But there are no untoward

23   pictures, there are no sexting anything in any of these

24   records.

25           Now, what you do have is you have my client

1    saying I love you.  Well, what does that mean?  It means

2    different things to different people at different times.

3    My client never says anything about anything sexual, all

4    right.  And again, think about the time line.  So if you

5    are looking at records from August, September, October,

6    all right, now you heard testimony that Sarita Johnson,

7    who you saw, who you heard, who you evaluated, she told

8    Patty what's going to be and what's not going to be as

9    far as phones, as far as who she's going to, when they

10   are going to talk to them and everything else.

11          Why is Patty Johnson sleeping with this phone

12   under her pillow?  She's sleeping with the phone under

13   the pillow because if there is a moment when she doesn't

14   have control over that phone, Sarita is going to take

15   this away from her.  How do we know this?  It happened

16   multiple times.  Sarita Johnson didn't have a phone all

17   the time and she wasn't happy that her children, her

18   14-year-old daughter did.

19          Now Sarita Johnson might have been in a tough

20   position being that her sister and her sister's long

21   time boyfriend had better financial resources, but think

22   about how she expressed her appreciation for that.

23   Think about what she said and how she said it.  Was she

24   thankful that her sister kept the lights on, kept the

25   heat on, kept food in the refrigerator or was she

1    jealous, was she petty, was she vindictive, nasty.

2    Think about that.  Think about what she said and how she

3    said it.

4              Now you also had testimony from somebody who

5    was admitted as an expert, all right.  Now I'm sure he's

6    an expert on certain things, but he's certainly no

7    expert on the People of the State of New York versus

8    this gentleman.  He never met him.  He never talked to

9    him.  He admitted he never talked to Ray Ross.  He never

10   talked to Patty Johnson.  Never talked to anybody about

11   this case.  So, in generalities, Josh Hanson was talking

12   to you about things that happened in the world, okay.

13             I can talk to you in generalities about how

14   the Cy Young Award is voted on and whether they should

15   change it or anything else.  It has nothing to do with

16   this case.  This is the prosecutor trying to prop up his

17   witnesses.

18             You heard Josh Hanson.  He's advancing his

19   career.  Fine.  You heard him talk about he's never

20   published a paper, hasn't read most of the papers that

21   we talked about and, again, the prosecutor wants to use

22   these nasty words to make you feel badly about my

23   client, but you know what, my client is not guilty.  The

24   judge told you he's not guilty.

25             MR. PERRI:  Objection.

Summations - Defense                                1352

1                THE COURT:  Ladies and gentlemen, please

2      disregard that in terms of the characterization of what

3      the Court said.  I told you initially in my charges that

4      the defendant is presumed innocent and that it's the

5      People's burden to prove the charges against the

6      defendant.

7                Continue.

8                MR. ZERNER:  And that's exactly what I was

9      going to say next is that there is a burden of proof

10      that the prosecutor has to lift and the prosecutor has

11      to prove.  He has not done that.

12                Now, you heard the expert asked about

13      different categories of complainants and different

14      categories of complainant's family members.  And you

15      heard me ask him do you ever see complainant's family

16      members with an agenda.  He admitted he did.  And he

17      admitted that sometimes somebody walks in with a child

18      and they have a reason to lie.  They have a reason to

19      misrepresent.  They have a reason to accuse somebody of

20      something.  Think about that.  Think about that.

21                From the beginning of the case you keep

22      hearing the name Ray Ross, Ray Ross, Ray Ross.  It's an

23      interesting thing because one of the very first things

24      the judge asked you all when you came in for jury

25      selection was does anybody here know this person, this

1   person, this person, this person, Ray Ross.  Had you

2   known Ray Ross, you wouldn't be able to end up on this

3   jury.  But you keep hearing the name, hearing the name

4   and you sit here and you see him here all day every day

5   sitting next to me and I promised you at the beginning

6   of the case that Ray Ross would testify and Ray Ross did

7   testify.

8           Now again, think about it yourself.  If you

9   were accused of something so awful, what would you do?

10  He, under oath, stood up in front of that chair and told

11  you he did not do this.  He would not do this.

12          Is he a sophisticated man?  No.  He wouldn't

13  tell you he's sophisticated and I'm not telling you he's

14  sophisticated.  Think to yourself, you saw different

15  testimony from different people.  Does Ray Ross look

16  like somebody who had words put in his mouth or does Ray

17  Ross strike you as a genuine person?

18          Think about what the people who know him told

19  you about him, right.  That he would, you know, take the

20  extended family to Coney Island, to the aquarium, to the

21  movies, to Red Lobsters, to other restaurants, to movies

22  and everything else.  You have a flavor for who this

23  person is, not just from what people have been telling

24  you about him, but by observing him and by listening to

25  him.  Compare and contrast that with Sarita Johnson.

1          Think about what you know about Sarita

2    Johnson.   This is a woman who has had four children by

3    three different men.   This is a woman who has not had a

4    steady job for the last 20 plus years.   This is a woman

5    who has been living in squalor and doing nothing to try

6    to remedy that.   Has she gone out and gotten a job?   Has

7    she contributed to the household finances?   Has she gone

8    to do anything to better herself?

9          Now you did hear from Patty Johnson's father.

10   This is a man that Sarita Johnson chose to have in her

11   life.   You got to observe him.

12         Now, you also heard from -- that was Rafael

13   Mickens -- and you heard from his brother George, all

14   right.   So you saw the man, warts and all.   He spoke to

15   you about a very small issue, about a phone and he

16   answered every question, whether it was put by me or put

17   by the prosecutor.   And, again, evaluate his

18   credibility.   What do you think about George Mickens?

19         Now let's talk about the time line in the

20   case.   The prosecutor will have you believe that my

21   client is this sexual deviant.   When he saw his niece in

22   March 2013 at some talent show, a switch flipped and

23   that's what began this long time frame of abuse.   There

24   is no evidence of that.   He's trying to tell you that

25   well, it's all about the phones.   It's all about the

1        phones.  You can see that he disobeyed the mother of the

2        child and the phones show this.

3                Well, you heard testimony first from the

4        prosecutor about phone number one and phone number two.

5        Actually we found out there are four phones involved and

6        the phones he calls one and two are actually phones two

7        and three.  So the first phone was given to this young

8        lady by her Uncle George Mickens.

9                Now again, think to yourself about your own

10       life, your own experience when you were a child, now

11       that you are an adult with extended families and

12       everything else.  It's very nice of this uncle to

13       provide a phone to his niece, right?  He doesn't seem

14       like a wealthy man and admitted to you that actually

15       during the course of the time when he provided the

16       phone, unfortunately, and perhaps embarrassingly, he was

17       no longer able to foot the bill.  He was very honest

18       with you about that.  That would embarrass me if all of

19       a sudden somebody called me and my phone didn't work or

20       if I went home and my television was off or the lights

21       didn't work.

22               But he told you I knew I couldn't do it.  I

23       had two jobs.  I lost one of them.  I wasn't going to be

24       able to do it, but I didn't want my niece to be without

25       her phone, so I reached out and I looked to see if

1    somebody could pick up the slack and Ray Ross could.

2    This wasn't Ray Ross initiating some type of gift of a

3    phone in order to manipulate Patty Johnson.  There is

4    nothing like that.  It's not the story.  Don't let

5    yourselves be led down that path by the prosecutor.

6    That's not the time line.

7            The situation was that George Mickens couldn't

8    afford the phone.  Ray Ross started paying the phone.

9    Just one of another thing that he was paying for that he

10   truly didn't have to pay for.

11           You know, it's a funny thing.  I have a friend

12   that if we're walking together in the city and somebody

13   says hey man, you have an extra dollar, my friend will

14   always walk away and turn to me.  I say I don't have any

15   extra money.  All the money I have is needed for me and

16   my wife and my kids, all right.  Maybe that's a selfish

17   way to go about the world and maybe it's better off if

18   you do give.  And who do you give to, right?  Sometimes

19   you have charts.  My accountant is always telling me

20   it's December, you can do this and if you have a

21   favorite charity, okay.

22           This man understands the maximum chart begins

23   at home.  So this man could have kept the extra $42 a

24   month in his pocket.  He could have used that to buy

25   himself lunch or a thousand other things, but he bought

1    a phone for his niece.  And he didn't buy it outright.

2    It wasn't his idea to buy the phone.  This young lady

3    was going to have her phone turned off, so he was kind

4    enough to pick up the payments on that phone and that's

5    what he did.

6                Now again, what was Sarita Johnson's response

7    to that?  Initially it was like fine, you want to pay

8    for it, go ahead and pay for it, just like you have been

9    paying for meals, back-to-school clothes, outings to

10   different amusement parks and this and that.  And these

11   were not one-on-one outings.

12               Again, picture the house.  Picture the

13   situation.  You have heard testimony that generally on

14   Saturdays Ray would go from the house in West Hempstead

15   to Brooklyn.  Why?  To see his kids.  He's a good

16   father.  You heard from the kids.  You heard from him.

17   He wanted to spend time with his kids.  What was he

18   doing with them?  Sometimes they would have a meal.  Why

19   would they have a meal?  Because we're all gonna have

20   meals today.  So he would have a meal with his ex-wife,

21   his kids and sometimes the people he lived with would

22   want to come with him.  He wasn't some kind of master

23   manipulator getting Tara to stay home so he can spend

24   time alone with his nieces.

25               Tara told you she works hard five, five and a

Summations - Defense                              1358

1    half days a week and Tara is not the biggest morning

2    person.  Ray is a morning person.  You know how we know

3    that?  He's a sanitation guy.  He wakes up early.

4              My first job was working at a country club

5    around the corner over here.  I used to start working at

6    dawn.  It became impossible to sleep past dawn.

7              So Ray Ross would get up and he would go to

8    Brooklyn and sometimes he would go with any combination,

9    including nobody from the house in West Hempstead to

10   Brooklyn.

11             Now, you didn't hear from Mercedes Johnson.

12   You did hear from Patty Johnson.  Patty Johnson told you

13   that she wanted to go to Brooklyn.  She would go to

14   Brooklyn.  And that there was never a situation that she

15   said that there was a problem until October of 2014.

16             What happened in October of 2014?  Her mother

17   caught her lying.  Her mother caught her disobeying her.

18   Think about Sarita Johnson.  Think about Sarita Johnson

19   catching you doing something you weren't supposed to do.

20             Now you're adults and you are strangers to

21   Sarita Johnson.  Now think about Sarita Johnson is in a

22   position of authority above you.  She's your mother.

23   How does that feel?  Think about what's happened before

24   then.  Sarita's taken away your phone and then let you

25   look around the house as if you just misplaced it.  You

1     heard testimony about that.  Think about that child.

2             Her mother's not going to open school night.

3     Her uncle is going.  And if you want to break it down,

4     it's not technically her uncle, it's her aunt's

5     boyfriend.  That's who is going to open school night.

6     That's who is going to parent-teacher conferences.

7             He didn't do anything wrong.  He's doing

8     something right.  Charity begins at home.  That's what

9     this man is doing.  He's helping people that need help

10    that are under the same roof, under the same four walls

11    as he's living with Tara Johnson.

12            During jury selection I asked you to keep an

13    open mind throughout and I know it was tough to do.  I

14    know it was, but I know that you all assured us that you

15    would.  You all took an oath that you would listen to

16    the entire case and we're almost done.  It's almost in

17    your hands.  Think to yourself about what I talked to

18    you about at the beginning, that I'm going to ask some

19    tough questions.  That there might be some crying on the

20    stand.  You are not going to hold it against me and,

21    more importantly, you are not going to hold it against

22    my client.  And I thank you for not doing that, for not

23    holding any of this against anybody, because this is a

24    man who has been falsely accused of an awful, awful

25    crime.  And all I have been doing has been defending.

1    Now, think to yourself about the two different

2    narratives that you heard.  Is it reasonable to think

3    that Sarita Johnson put her daughter up to saying that

4    this happened?  Is it reasonable to think that Patty

5    Johnson was afraid of her mother and did something to

6    get herself out of the cross hairs of her mother

7    punishing her when her mother caught her with this cell

8    phone that she knew she wasn't supposed to have?  Think

9    about that.  Everything after that is just that domino

10   being knocked over, all right.

11        This is what you heard about in October of

12   2014.  Detective Toussaint doesn't know anything more

13   than that except what's being spoon fed to him in

14   December of 2014.

15        You heard from the Sprint representative.  All

16   they're showing you is phone records.  Look at the phone

17   records, see what's there and see what's not there.

18        And you heard from a quote, unquote "expert"

19   who doesn't know the people involved in this case.  So

20   it all boils down to mother and child who are saying

21   something happened and think about why they are saying

22   it.  Think about if it's reasonable.

23        Is it reasonable to think that this is the

24   reason this allegation was made, not because there is

25   any proof of it.  Again, think about what you don't

1    have.  You don't have any camera showing that Ray Ross

2    was in some parking lot alone with the complainant.  You

3    don't have that because it never happened.

4              You don't have technicians talking about DNA

5    that was found inside of the truck, because it never

6    happened.

7              Now, think about the dysfunction in that

8    house.  Think about what you would do if Sarita Johnson

9    was yelling and screaming at you.  And again, think

10   about and if you are not sure or when you are talking,

11   your memory is different, ask for the minutes.  Ask for

12   the transcript.  Ask for anything you want, but

13   especially ask for the situation about what Patty did

14   when Sarita confronted her.  How angry was your mother

15   is the question that I asked her.  Think to yourself.

16             Now, Tara Johnson eloquently testified and,

17   again, think about her position.  Think about what she

18   said.  Think about how she said it and she talked about

19   tough love, right.  This is a woman who has been dealing

20   with her sister since they were children, right.  Think

21   about that dynamic of adult siblings in their fifties

22   still living together.  Think about the two of them.

23             Tara Johnson has been working for HSBC and the

24   various banks it was before that, since May of 1989.

25   She gets up every morning, goes to work five or six days

1    a week and then comes home to the chaos, to the

2    disgustingness [sic] in her own home because this is

3    what her sister is fostering.  This is what her sister

4    is allowing.  This is what her sister is doing.  Her

5    sister is not working, she's not contributing.  She's

6    not cleaning, she's not cooking.  She's not doing

7    anything.  She's making a bad situation worse.

8              So Tara at some point decided you know what,

9    we've got to move out.  And she told you that was in the

10   summer of 2014.  She looked at it and she said why am I,

11   along with Ray, paying for 19 people?  Financing 19

12   people.  Think about that, 19 people.  So she said

13   that's it.  We've got to start looking for another

14   place.

15             So, they did look for another place and they

16   still are together.  They have been together as a couple

17   throughout this entire ordeal and they live together now

18   in Valley Stream.  She told you that it took a while.

19   She was picky.  They found a place.  And think about the

20   tough love that she decided that she wasn't going to put

21   oil in the oil tank at the house.  She felt bad about

22   it.  She talked to you about it and she had a smaller

23   kerosene heater and that heated up some small part of

24   the house.  You can disagree about what you would do in

25   that situation or not, but think about how many years

1    led up to this.  Just think about that.  And think about

2    Tara Johnson's opinion about the whole thing.  This is

3    her niece.  This is her blood who is making this claim.

4    She doesn't believe it.

5            Now, you will look at the text messages and

6    there are some text messages in there about a clarinet

7    and there are some text messages in there about keeping

8    the phone on or not keeping the phone on and evaluate

9    it.  This is the same tough love that we're talking

10   about here where Ray told you on the witness stand just

11   yesterday, he still hopes for the best for all of these

12   folks, including Patty.  He knows what her mother has

13   done, what her mother hasn't done.  And at some point he

14   said listen, if you are not going to talk to me, then

15   you know, you've got to return the clarinet and I'm not

16   paying for the phone anymore.

17           Is that an awful thing?  Does that mean that

18   he molested her or did he pay for the phone for the

19   previous however long it was, 18 months, 24 months,

20   however long it was he was paying for that phone and he

21   said that's it, we're moving out and I'm not paying for

22   the phone anymore.  And if your mother wants to keep the

23   phone, then your mother can pay for the phone.

24           We talked about phones in jury selection

25   extensively and how phones are often used as a carrot in

Summations - Defense                                    1364

1    the stick or a punishment, especially for teenagers.

2    Look at the text messages.

3              Now, the prosecutor makes a big issue of the

4    time of text messages and the time of phone calls.   Look

5    at them.   He told you he makes hundreds of text messages

6    and phone calls a day.   Is that an awful thing or is

7    that how we keep in touch with each other in 2014, 2015,

8    2016.   Look at his records, but ask yourself if the

9    records are complete.   Is the prosecutor giving you all

10   of the records?   Is the prosecutor giving you all of the

11   story?

12             MR. PERRI:  Objection.

13             THE COURT:  Overruled.

14             MR. ZERNER:  Thank you, your Honor.

15             This is the People of the State of New York

16   versus Ray Ross.   Think about the resources of the

17   People of the State of New York.   I'm just one man

18   defending another man.   This is the prosecutor for

19   Nassau County with hundreds of prosecutors.

20             MR. PERRI:  Objection.

21             THE COURT:  Overruled.   Continue.

22             MR. ZERNER:  With thousands of police

23   personnel and he flew in a man from Kansas on a day's

24   notice to give you records.   Did he give you the

25   complete records?   Did he give you the complete story?

Kathi A. Fedden, Sr. Court Reporter

1    Or did the man from Kansas tell you I don't know, I was

2    told to look at something and show up at this address

3    and that's what I did and I showed up at this address.

4    Yeah, these are records from our phone company, okay.

5    Yes, they are phone records.

6              If you looked at anybody else's phone records,

7    there would be a lot of phone records.  Does that mean

8    you did anything wrong with the phone?  Or does it just

9    mean that you used your phone.  It's 2016.  We all have

10   a phone in our pocket.  We all have something that is

11   amazingly more powerful than the computers that NASA

12   used to put a man on the moon.  We're all walking around

13   with them right now.  But does that mean my client did

14   anything wrong because there are phone records that show

15   he made phone calls and made text messages?

16             Take a look at them.  Take a look at

17   everything, everything that you have and ask yourself

18   what you don't have and why don't you have it.

19             MR. PERRI:  Objection.

20             THE COURT:  Overruled.

21             MR. ZERNER:  Now, that scraping of the chair

22   right there is going to be the sound that I remember

23   when I think about --

24             THE COURT:  Mr. Zerner.

25             MR. ZERNER:  -- being on this trial.

1          THE COURT:  Mr. Zerner, sustained.  Please

2     keep your comments to the case at hand.

3          MR. ZERNER:  Certainly, your Honor.

4          Now think about what you heard Sarita Johnson

5     say and what she didn't say.  I asked Sarita Johnson was

6     there ever a point in time when she was no longer living

7     at the address at 301 Coventry Road North and you moved

8     out on your three oldest kids when you took up with the

9     father of your fourth child.  She denied it.

10         You heard credible testimony from Tara Johnson

11    who told you there was a point in time where Tara

12    Johnson, along with her mother, Pauline, were taking

13    care of Malik, Mercedes and Millinia Johnson.  Ask

14    yourself whether Sarita Johnson was being honest with

15    you throughout her testimony.

16         Now the Judge is going to instruct you on many

17    different areas of the law and one of them is what's

18    called in falsus uno.  It's a Latin term that basically

19    means if you think somebody was false in their testimony

20    about one thing, you can accept or disregard all of it.

21    So think about that.

22         My client sits here innocent.  He sits here

23    having to prove nothing to you, but he's proven a lot to

24    you.  He's told you a lot.  I have told you a lot.

25         I asked her, Sarita Johnson, about whether

1   Mercedes, her older daughter, would go to Brooklyn and

2   she said no.  Well, we know that Mercedes Johnson went

3   on some of these trips also.  We haven't heard from

4   Mercedes Johnson, but we do know that Sarita Johnson

5   doesn't necessarily have a handle on where her kids are

6   all day every day.  She's telling you what she wants to

7   tell you for her own agenda.  Ask yourself why.

8           You know, it's an awful thing to think about.

9   We've all been instructed or required to think about all

10  of this stuff.  Well, another thing that is difficult to

11  think about is people do lie.  Children do lie.

12  Generally children lie to try to get out of trouble.

13  Millinia Johnson was in trouble when she was caught with

14  that cell phone.  Her mother, again, you evaluate her,

15  is she someone you want to cross?  Her mother caught her

16  with the cell phone.  You heard the testimony.

17          Frequently she would miss the school bus.

18  Millinia missed the school bus.  I don't blame her for

19  missing the school bus.  Anybody misses the school bus.

20  You think about the chaos in that house.  You think the

21  kids were up and ready to go to school and having their

22  lunch and their homework and they were ready to go and

23  get on the bus?  I'm sure they weren't frequently.  This

24  was another day when that happened.  So Patty takes her

25  phone and calls her mother.  That's the oops moment.

1       That's the moment that this case turns, not any talent

2       show in March of 2013.  It's a phone call that Patty

3       makes and she's probably 100 yards away down at the

4       school bus and she calls her mother.

5               Why did she call her mother?  She missed the

6       school bus.  She was going to be late for school.  She

7       maybe had observed other children missing the school bus

8       and their mother's helped them out to remedy the

9       problem.  That's not what happened here.  There was an

10      explosion when this phone call was made.  There wasn't

11      talk about well, let me get you to school.  We'll talk

12      about it tonight or any kind of calm proportional

13      response.

14              How are you calling me?  Where are you calling

15      me from?  Patty has to answer that question to Sarita.

16      If it's reasonable for you to think that that first

17      domino was knocked over by this phone call, by this

18      phone that this young lady wanted that her uncles on

19      both sides of the family provided for her, he's not

20      guilty.  If you are not sure why this was brought

21      forward, why this girl was told by her mother what she

22      needed to do, what she needed to say, how she needed to

23      say it, my client is not guilty.

24              Think about when I asked each of them, Sarita

25      and Patty, about meeting with various members of law

1    enforcement.  Think about where they met and how they

2    met.  Look at the back of these various exhibits.  You

3    will see signatures by each of them.  Always both of

4    them.  There were other people in the house.  There were

5    detectives and police officers and other adults in the

6    house that could have brought Patty from her home to the

7    DA's office or to a police precinct, but that's not what

8    happened.  Sarita was there all the time.

9         The one time Detective Toussaint had this

10   conversation with her, the three of them were in the car

11   for the vast majority of the time and then at some point

12   Detective Toussaint realized that he had to speak

13   individually one-on-one with Patty.  Sarita was right

14   there.  Patty knew that Sarita was going to get back

15   into that police car for the drive back.  Patty knew

16   that she was going to be asked what did you say.  What

17   did he ask you?  So think about the dynamic of it.

18        Think about the situation in mid-December

19   driving in the late afternoon.  It's dark out and

20   they're going to some abandoned parking lot to have this

21   conversation.  Think about what was going on.

22        Think about the preparation.  Think about

23   which witnesses seemed programmed and which witnesses

24   seemed genuine.  Think about what you heard and how you

25   heard it from each individual.  Do you think that I

Summations - Defense                                    1370

1    could put words in George Mickens' mouth?  Do you think

2    I could put words in Ray Ross' mouth?  You heard them

3    testify under oath and tell you what happened and what

4    didn't happen and where and everything else.

5                 Think about what you saw from Sarita and Patty

6    Johnson.  Think about what they said and think about how

7    they said it.  Evaluate it.  Use your common sense.  Use

8    your experiences to determine what you think the

9    programming, the preparation was.

10                You will see these text messages.  There are

11   no nude pictures, no sexting, no elicit language.  If

12   you are not sure, my client is not guilty.  If you have

13   a reasonable doubt, my client is not guilty, it's just

14   that simple, because he has the protection of you folks.

15   You folks understand and you will be instructed again on

16   the law about reasonable doubt.  It's an expression you

17   have heard your whole life, but this is where the rubber

18   meets the road.  This is where it gets applied.  The

19   Judge will read to you the definition of that.  Listen

20   to it carefully.

21                Ultimately, if you are a reasonable person,

22   and I think we all think we're reasonable people, and if

23   you are talking to 11 other reasonable people and if you

24   are not sure, if you have doubts about any of this, my

25   client is not guilty.

1           And, most importantly, think about what you

2    heard from the witness stand.  Think about what the

3    different people said and how they said it and remember

4    that you heard from Patty Johnson's father, Patty

5    Johnson's aunt, what they thought about these

6    allegations.

7                MR. PERRI:  Objection.

8                THE COURT:  Hold it, Mr. Zerner.

9                Ladies and gentlemen, it's your recollection

10   that rules.  Counsel's comments are simply argument and

11   contentions.

12                Continue, Mr. Zerner.

13                MR. ZERNER:  Thank you, your Honor.

14                As I have said, all I want you to do is use

15   your own recollection of what you heard from the witness

16   stand.  Use your own common sense, your own life

17   experiences.  Anything you are not sure of, anything you

18   don't remember, please ask for it to be read back to

19   you.  If you are unsure, if you have doubt, my client is

20   not guilty.

21                He was asked directly, unambiguously on the

22   stand did he do this.  He told you he did not do this.

23   He would not do this.  He's a man who was providing for

24   his family, his extended family, Tara Johnson's family,

25   their extended family.  He's a good man.  He's a

1   generous man.  You have heard that from all of these

2   witnesses.  Please find him not guilty on all of these

3   charges.  Thank you.

4            THE COURT:  Thank you, Mr. Zerner.

5            MR. ZERNER:  Thank you, your Honor.

6            THE COURT:  Mr. Perri.

7            MR. PERRI:  Ladies and gentlemen of the jury,

8   the question is not, as defense counsel argued in his

9   opening, whether you could see yourself where the

10  defendant was sitting.  It's simply objectively from

11  where you are selected as jurors, aware of all the

12  evidence that has been put before you, using your common

13  sense, whether the People have met their burden.  And

14  the evidence implores you, it impels you to the

15  unescapable conclusion that the People have met their

16  burden that Millinia Johnson sat there, told you the

17  truth and that the defendant is guilty beyond a

18  reasonable doubt.

19           The irony, ladies and gentlemen, that the

20  parade of friends and family that the defense brought

21  before you and upon any real scrutiny upon what they

22  told you, the defense case actually helps you to believe

23  Millinia Johnson all along.  The defense has no burden.

24  They did not have to put on a single witness on that

25  stand, but they did.  They put on several witnesses over

1    multiple days and because they did that, it is your duty

2    as jurors to scrutinize those witnesses.  To look at

3    each and every one of those witnesses and determine what

4    to take from them and what to set aside.

5            And when you do that, I'm confident, based on

6    the evidence, that you will realize quickly that none of

7    the defense witnesses, none of them provided you with

8    any first-hand information except possibly the

9    defendant, himself that was directly relevant to the

10   material issues in this case.

11           They are not even capable of doing that

12   because as they each were forced to admit, they simply

13   were not there.  They were not in the back of the

14   defendant's truck alone with Millinia.  They were not in

15   the parking lot of National Wholesale Liquidators or

16   Western Beef.  They were not in the room with the

17   defendant and Millinia at 301 Coventry Road and the

18   defendant admitted to you that this was the situation

19   many, many times over the dates that he is charged with

20   committing these crimes.

21           He admitted that he was alone with Millinia on

22   the way home from Brooklyn countless times from the

23   summer of 2013 through the summer of 2014.  The

24   defendant also admitted to you when he was on the stand

25   that he was alone with Millinia in his room at 301

1   Coventry Road watching TV on many occasions, whether it

2   was wrestling or, as he pointed out, other shows as

3   well.  And that this happened from 2013 through 2014.

4           And Tara and the defendant both explained to

5   you that he was the adult who was home when Millinia

6   Johnson came home from school in 2013 to 2014.  None of

7   the other witnesses, by the defendant's own account, not

8   even Tara, were there at those times.  And, therefore,

9   none of the defense witnesses they put before you have

10  anything material to add to your deliberations that

11  questions the reasonableness of the defendant's guilt.

12          The evidence as a whole has shown that their

13  testimony day after day was mostly entirely irrelevant.

14  A distraction from the central question in this case of

15  this defendant's guilt.  Not the diversion of Sarita's

16  fitness of whether or not she was a good mother.  Of her

17  being on welfare, of being poor.  Of where she lived in

18  2009.  That's not the issue central to this case.  It

19  doesn't matter how many fathers her children have.

20          And although the defendant spent a lot of time

21  arguing here in front of you and questioning witnesses

22  on the stand about those issues, the only material

23  question the judge is going to put before you that you

24  have to answer as jurors is this defendant's guilt, not

25  Sarita's guilt, not Sarita's responsibility, but this

1    defendant's guilt.  She's not on trial, he is.

2                    From their witnesses first you heard from

3    Rafael Mickens, Millinia's biological father.  A cousin

4    and friend of the defendant who had no independent

5    evidence with regard to either way this case should go,

6    but he wants you to trust his judgment.  Trust the

7    judgment, rely on him because he's the man that he told

8    you was so involved in his daughter's life.  So involved

9    in his daughter's life that he didn't know the day she

10   was born.  His testimony was, I think it was 2000.  Her

11   name is Millinia.  This man, the last time he saw his

12   daughter was the October before this.  He lives one town

13   over from her and he also claimed he's very involved in

14   her school but doesn't go to her school conferences.

15   Never went to a parent-teacher conference.  He didn't

16   know when she graduated from middle school.

17                   His testimony doesn't create any reasonable

18   doubt of the defendant's guilt, but what we did learn

19   from him, if nothing else, after meeting Rafael Mickens

20   on that stand and after hearing his answers to the

21   questions, what you learned was why Millinia Johnson was

22   so desperate to find a parent, to find a male figure, to

23   find someone she can look up to.  Why she was such an

24   easy target for this defendant as a sexual perpetrator.

25                   The only fact that Rafael Mickens put before

Summations - People                                1376

1    you is something you already knew, that to Mr. Mickens'

2    cousins and friends, the defendant always appeared

3    generous to Millinia, gave her everything that he could

4    afford to do and at some point during 2013 he started to

5    pay Millinia's phone bill.  This is exactly what

6    Millinia testified to.  The defense actually provided

7    you with another reason to trust Millinia when she was

8    on the stand.

9                Next up in the defense case was George

10   Mickens, uncle to Millinia.  Convicted drug dealer.

11   Criminal many times over and a felon.  What do we learn

12   about this case from him?  We learn nothing new again.

13   We learned nothing controversial.  We barely learned

14   anything arguable or even relevant.  Uncle George paid

15   for what the defense characterize is Millinia's first

16   phone.  A phone from 2011.  Not either of the phones in

17   this case.

18                Uncle George also explained how he helped the

19   defendant take over the account and start paying for

20   Millinia's phone at some point in 2013.  All this

21   information just again corroborates what Millinia and

22   what Sarita testified to on the stand here.  And

23   everything he said actually urges you all the more to

24   believe Millinia Johnson.  Because you also heard from

25   Uncle George.

1          What you heard from almost every defense

2     witness in this case, how Millinia Johnson is a good

3     kid.  How she does well in school.  How she was on the

4     honor roll.  How she was in band.  How she played

5     sports.  You never heard from Uncle George or any

6     defense witness she's actually some devious liar.  That

7     she's a criminal mastermind, a vindictive monster that

8     would frame the defendant.  You never heard that, ladies

9     and gentlemen, because the evidence over and over again

10    tells you it's not true.

11         Then the defense put on the stand -- they have

12    no burden -- the defendant's own family, his ex-wife and

13    two children.  People who admitted they loved him and

14    wanted to help him.  Who discussed the case many, many

15    times either with each other, with him or his attorney.

16    His adult daughter Jasmyn is also the man she lives with

17    and pays all her housing expenses.  His son Justyn says

18    he's his super hero, his idol, the man he looks up to.

19    For any of the Rosses it would destroy their world to

20    have to admit their father's guilt.  And honestly, why

21    should they admit their father's guilt?

22         Unlike you, as members of the jury, they have

23    no knowledge of the critical evidence in this case.

24    They never sat and listened to Millinia testify to tell

25    you what happened to her day after day either in the

1       defendant's room or in the truck.  They never looked at

2       the defendant's phone records.  They never examined the

3       text messages that were going back and forth all hours

4       of the night between a 54-year-old man and a 13-year-old

5       girl.  They were unaware of all of that.  So why would

6       they have to admit their father did these crimes.  They

7       aren't the jurors, you are.

8               They weren't in the room.  They weren't in the

9       truck, they weren't alone with the defendant and

10      Millinia.  They don't have testimony and evidence.  You

11      do.  They don't have the testimony and the evidence that

12      you need to come to the conclusion the defendant is

13      guilty beyond a reasonable doubt.

14              And the sad reality of how the defendant's

15      conduct will shatter more lives than just Millinia's,

16      that will shatter his own family does not prove him

17      innocent.  Does not create reasonable doubt on which you

18      can base your verdict.  But nevertheless, take note of

19      how the Rosses disagreed a lot with each other and the

20      defendant, himself about the access he had to Millinia

21      and the relationship he had with Millinia.

22              Paula Ross, she said she would spend equal

23      amounts of time with Millinia, her daughters, Mercedes,

24      the defendant, Tara, Sarita and other unnamed people in

25      Brooklyn and also in Lakeview at 301 Coventry.  She

1    would be doing hair.  She would be sharing meals,

2    hanging out and she would move all of her cumbersome

3    large equipment from Brooklyn to Queens to Lakeview to

4    do the hair there just as much as it would happen in

5    Brooklyn, never being paid a dime.  Doing it out of the

6    goodness of her heart.

7            Jasmyn Ross took the stand and explained

8    early, although she had gone to Lakeview with her

9    mother, to Millinia's home where the defendant also

10   lived, they quickly stopped going there because,

11   according to Jasmyn as she testified before you, the

12   house is full of animal feces and they didn't want to go

13   back and they spent all their time in Brooklyn after

14   that.

15           And Justyn, where he claimed on

16   cross-examination that he was riding back with his

17   father to Lakeview at night with Millinia.  Although he

18   couldn't explain why he would be doing that since he

19   lives and works in Brooklyn.  He doesn't live or have a

20   room at 301 Coventry.  And then when asked on

21   cross-examination if you can just estimate in a given

22   month how many times that happened, he repeatedly said

23   he couldn't.  He couldn't give any estimate as to how

24   many times it happened because perhaps it never happened

25   at all or it happened so few times that it doesn't

1     create any reasonable doubt in this case.

2             Paula and Jasmyn never mentioned him coming

3     back with Millinia and the defendant.  Paula

4     specifically said it was either her or the defendant who

5     drove Millinia back.  Just one of the two of them, no

6     one else.  And the defendant, himself, when he admitted

7     he took Millinia back to Coventry, the defendant,

8     himself never mentioned his son being in the car with

9     them or even Paula giving rides half the time.  And if

10    his sister is right, then why is Justyn spending the

11    night randomly in a county he neither lives in or works

12    in with a house that is full of animal feces and there

13    are nine to 19 people running around in every direction.

14            Ladies and gentlemen, on the other hand, the

15    Rosses, each and every one of them, did agree about

16    something and you should take away from their testimony

17    this, they all agreed that they loved Millinia and she

18    loved them.  They all agreed that the defendant was

19    generous and was kind to Millinia.  They all agreed that

20    there were not any fights or problems of any kind

21    between Millinia Johnson and the defendant either before

22    October of 2014 or August of 2014.  They gave her

23    clothes, they gave her food.  They gave friendship.

24    They gave her a family, the girl Millinia, their Patty.

25    Not Mercedes, not Sherima, this girl that visited and

1    went on trips for free without her aunt, without her

2    mother that their father brought into their lives for no

3    apparent reason.

4         When each Ross was asked to name the people at

5    these many dinners out the defendant was paying for, it

6    was always just them when they had to name it.  It was

7    the Rosses, plus the defendant, plus Patty who is

8    Millinia and they never actually named anyone else that

9    went out on those occasions.

10        They all agreed that she was special.  She was

11   their blood.  Millinia, the girl that their father

12   decided was now his and not Sarita's.

13        Do your duty, ladies and gentlemen, look

14   beyond the noise.  You must peer past all the confusion

15   in this case and overcome the horror of admitting that

16   the evidence proves to you beyond a reasonable doubt

17   that the bizarre Cinderella story that the Rosses and

18   Tara repeat to themselves that they want to believe is

19   just that.  It's just a fairytale, a bedtime story they

20   need to tell themselves at night so they don't have to

21   fear the nightmarish reality that this defendant was

22   sexually abusing Millinia Johnson this entire time.

23        The man who saw himself as both her principal

24   charge and her personal messiah, who appeared

25   trustworthy, who appeared kind, who gained access, just

1       as Mr. Hanson explained to you, to accomplish his

2       primary goal of sexual perpetration against Millinia

3       Johnson.

4               Now, the Rosses and the defense other

5       witnesses may want to, but you took an oath to not hide

6       from the sad truth.  That the evidence implores that the

7       defendant, an adult man, put his 54-year-old mouth on a

8       then 12-year-old girl's vagina.  Millinia's vagina.

9       That the defendant, an adult man, rubbed his 54-year-old

10      penis in circles on the buttocks of a then 12-year-old

11      Millinia.  That this didn't just happen once, it didn't

12      happen twice, but it happened over and over again

13      between March 1st of 2013 and December 29th of 2013.

14      That it continued past her birth date, her 13th

15      birthday, and continued all the way into the summer.

16      All the while the defendant hoped some day he was going

17      to get to smash her.  He was going to get to actually

18      have vaginal sex with her because she belonged to him.

19              Based upon the evidence you know the defendant

20      is guilty, guilty beyond a reasonable doubt of all the

21      charges for two simple reasons.  Two realities the

22      defendant cannot avoid the truth, despite all the

23      irrelevant testimony that's been put before you, he

24      can't escape.

25              First, there is no actual evidence of any

1    reasonable motive for Millinia Johnson to have gotten on

2    the stand and to have lied to you.  And the defense

3    counsel keeps asking you to think about that.  When you

4    actually look at the evidence, there is no reasonable

5    motive for her to have lied.

6            Second, there is no reasonable innocent

7    explanation to the phone records and to the text

8    messages unless Millinia sat there, swore and told you

9    the truth.

10           Now, first, about the motive.  There is

11   nothing, not a single shred of actual evidence.  We're

12   not talking about innuendo.  We're not talking about

13   speculation.  We're not talking about hopes and dreams.

14   We're talking about evidence.  There is nothing to

15   support the rational belief that Sarita, and especially

16   Millinia, have had a motive to lie about the sexual

17   abuse.  There is no testimony or other evidence to

18   support anything defense counsel has argued to you.

19           Defense counsel would have you believe that

20   Sarita Johnson has orchestrated all of this to get the

21   house.  The house at 301 Coventry that Tara allowed to

22   go into foreclosure, despite having total control and

23   power of attorney of all her mother's assets and working

24   for a bank.  The house that Tara and Ray Ross turned the

25   heat off in, despite Tara's own children and

1    grandchildren, one as young as three months old, living

2    there at the time.  And she never felt bad about that.

3    That it was tough love.  The house that the defendant

4    doesn't own.  He has no legal claim on.

5              Ladies and gentlemen, getting rid of the

6    defendant, getting him out of 301 Coventry, it didn't

7    change anything about the house.  It doesn't change

8    Tara's power of attorney.  It doesn't put his name on

9    the deed.  It doesn't put Sarita's name on the deed.

10   All it did was leave Sarita and Millinia Johnson poorer,

11   more isolated, fiscally worse off, more desperate and

12   still living in the basement.  And, according to Tara

13   Johnson's testimony, sleeping on mattress, not even

14   beds, mattresses on the floor in the basement of that

15   same house.

16             So ask yourselves, what did they gain by

17   getting rid of Ray Ross from that house?  Nothing.

18   Absolutely nothing.

19             Focus on the time line as well.  There was

20   nothing too inconvenient for Tara and Ray up until

21   August of 2014 into October of 2014.  There was nothing

22   that not paying the bills was too disrespectful to put

23   up with until August and then October of 2014.  And

24   though defense counsel asked a lot of questions about an

25   alleged physical fight that took place between Sarita

1    and Tara in a car, about Tara letting Sarita's child go

2    with a noncustodial parent, Tara sat there on the stand

3    and told you that physical fight in no way affected her

4    relationship with her sister.  She said after the fight,

5    everything was the same as it had always been.  There is

6    no incident.  There is no trigger that changed their

7    relationship or the status quo in 301 Coventry except

8    Sarita Johnson finding those text messages.  That's the

9    only thing that changed.

10             It's not that she just discovered her daughter

11   had a phone.  It's that she saw what you will see.  What

12   you have already looked at when it was published to you

13   and what you will look at again during deliberations.

14   Text messages that any reasonable individual, any

15   reasonable parent would be upset about seeing their

16   13-year-old getting from a 54-year-old.

17             So focus again on Millinia.  She gained

18   nothing, nothing from all of this.  Nothing from sitting

19   there for two days.  Nothing for two years putting up

20   with strangers repeatedly asking her about the intimate

21   details about a sexual relationship that she had with a

22   54-year-old man.  She gains nothing from being

23   cross-examined for hours.

24             Would defense counsel have you believe from

25   his questions of Millinia she did all this in part for

1    the pizza?  She did it for the cab rides to come to the

2    district attorney's office?  She did it for a blouse,

3    for a sweater she wore in Court?  Is any of that

4    reasonable?  No.

5              But coming forward, the one thing Millinia

6    Johnson did gain, ladies and gentlemen, is that she got

7    her freedom from the abuse.  But by coming forward,

8    although she got that, and that is priceless, she lost

9    everything else.  She lost everything she thought she

10   wanted.  She lost everything that the man she thought

11   she loved was providing her.  She lost everything that

12   the replacement for a father had promised and she lost

13   everything that she thought her mother either couldn't

14   or wouldn't give her.  She lost all of that by admitting

15   what those texts meant when her mother found them both

16   times.

17             She lost everything because she exposed what

18   the defendant demanded in exchange for his inexplicable

19   generosity to this girl.  About what he demanded in

20   order to continue the flow of his affection and of the

21   goods and of the money and of the phone and everything

22   else in her life.

23             The evidence shows that this defendant, what

24   he demanded was that she give him attention, as much as

25   possible, constantly.  And if she didn't, he got upset.

1          What did the evidence show?  She had to be his

2    daughter, not Sarita's.  And finally, that Millinia,

3    first 12, then 13, she had to not just be his daughter,

4    but she had to be his lover.  He required her to submit,

5    allow him to abuse her, be his sexual play thing.  And

6    when she testified here, when she exposed the disgusting

7    price that she paid for that man's affection, on top of

8    everything else, remember that this was the first time

9    she was in the same room as him since he was not

10   voluntarily just leaving the house in October of 2014,

11   as defense counsel and defense witnesses keep saying,

12   but was escorted from that house by law enforcement.

13          Unlike many of the defense witnesses who could

14   not wait to talk and at times could not stop talking,

15   for Millinia it was hard.  Even if you turned off the

16   sound, you could see the truth of what she was telling

17   you.  You could see her tears and that those tears when

18   we just got to the point of discussing the actual sexual

19   abuse, they were hard to watch because they were the

20   sign of some deep pain inside of her.  They were not

21   evidence of an act.  They were evidence you should

22   consider of being proof of the truth of what happened to

23   that girl.

24          After all, if it was just a scheme, if it was

25   just a lie, if it was just free flowing, it could be

1       anything they wanted it to be, wouldn't she have given

2       the information a lot faster and a lot better, because

3       if it didn't really hurt her, if it didn't really pain

4       her to be in front of her abuser.  After all, she was

5       under Sarita's diabolical control, as defense counsel

6       wants you to believe, why not play up the allegations.

7       Why not say he put his penis into her mouth.  That she

8       performed oral sex on him.  Especially for Sarita.

9               If there is no truth here and if nothing

10      happened and if Sarita and Millinia are making this up,

11      when Sarita testified about walking into the room, why

12      doesn't she just say I saw them at least touching each

13      other or lying right next to each other on the bed or he

14      looked like he was about to kiss her.

15              No, she doesn't.  They don't make their story

16      worse because what they are telling you the evidence

17      shows is the truth about what happened.  And that the

18      truth, what they each knew and only what they each knew

19      and experienced, ladies and gentlemen, is enough to

20      convict the defendant beyond all reasonable doubt.

21              Because some time after the talent show, not

22      because of the talent show, but just after the talent

23      show in March 2013, when Millinia was still

24      12-years-old, the defendant put his hands down her pants

25      directly squeezing and rubbing her buttocks.  Nothing

1    more that first time.  And recall what Mr. Hanson said

2    about boundary incursions, about grooming, about making

3    sure that a victim is not going to go run and tell.  And

4    Millinia didn't.  She didn't tell anyone and she came

5    back and so it escalated and it continued to happen.

6         And though Tara Johnson unambiguously stated

7    that her boyfriend, the defendant was never alone with

8    Millinia in the bedroom, you know Millinia Johnson was

9    telling the truth when she said she was there because

10   the defendant, himself when he took the stand conceded

11   that he would watch television alone with Millinia

12   Johnson in that room.

13        And that summer after the first incident

14   Millinia was still 12-years-old, the trips to Brooklyn

15   and the sexual escalation started, Tara and the

16   defendant both told you many details about Millinia's

17   trips to Brooklyn.  Tara testified specifically about

18   how Millinia would jump into the defendant's white

19   truck.  Tara also told you she never went to Brooklyn

20   and rarely, somewhat reluctantly, participated in the

21   children's activities that the defendant was more than

22   happy to organize for all the children.  Although when

23   prompted, Tara and the defendant would say at times

24   Millinia's sister Mercedes would also go as well.

25        Think about it in the defendant and Tara's

Summations - People                                  1390

1    testimony there were no details given about Mercedes

2    trips.  There was no Mercedes jumping into the car so

3    excited to be with Ray.  There is no mention of

4    Mercedes, of what happens or how she was special and

5    this makes sense because on cross-examination the

6    defendant conceded that it was Millinia, not Mercedes

7    who was special to him.  His Patty.  Millinia was

8    different.

9            After all, Millinia, not Mercedes had become

10   his blood.  And the defendant partially admitted on

11   cross-examination that perhaps Mercedes, Millinia's

12   older sister was just too old to be special the same way

13   that Millinia was.

14           According to the defendant and according to

15   Millinia Johnson and according to Sarita Johnson, they

16   started going on these trips usually on Saturdays in

17   2013.  And according to all three of them, he would

18   drive home at night.  Again, just as Millinia told you.

19           The defendant even conceded that more often

20   than not it was just Millinia that accompanied him with

21   his family in Brooklyn on Saturdays.

22           But that is where the defendant's admissions

23   ends because, ladies and gentlemen, that is all the

24   defendant can admit to you.  Because anything more

25   proves him guilty and that, not everything defense

1    counsel argued to you, that is a motive to lie.  Because

2    unlike Millinia and Sarita Johnson, he has a clear

3    undeniable, rational motive to stop telling the truth or

4    at least the whole truth to all of you when he sat in

5    that chair.

6            The Judge is going to instruct you that he is

7    an interested witness as a matter of law.  He's

8    interested in the outcome of this case and that gives

9    him a reason not to be truthful with you.

10           What Millinia tells you happened week after

11   week in the back seat of that car, in the defendant's

12   room, at National Wholesale Liquidators, at Western Beef

13   there is not a rational explanation for her to have made

14   that up.  For Millinia described to you the temperature

15   of the defendant's semen, the manner in which he

16   masturbated himself.  The way that he would rub his

17   penis in circles on her buttocks.  The process by which

18   his penis would get bigger and point up when he rubbed

19   himself.  Those details credit her testimony.

20           For what she tells you what happened in the

21   gaps the defendant won't talk about, defense fails to

22   give you any rational explanation as to why she would be

23   lying about all of that.

24           Every defense witness told you she's a good

25   kid.  Every witness explained that the defendant and his

1    family were nothing but kind to her; that they loved

2    her.  And every witness, People and defense, told you

3    how well the defendant treated her.  He gave her

4    clothes, food, fun, phone, money, even a clarinet.

5                Getting rid of the defendant upset the status

6    quo at 301.  For better or for worse, whether you agree

7    with Sarita Johnson's lifestyle or not, she loses and

8    gains nothing by getting rid of Ray Ross except more

9    unpaid bills, a house deeper into foreclosure and no one

10   to split any of the costs.

11               What else she gets, just like her daughter, is

12   an end to the abuse.  Much in the same way, ladies and

13   gentlemen, the second truth that you cannot escape from

14   and the defendant cannot escape from in finding him

15   guilty is that there is no reasonable explanation, no

16   alternate, no innocent, no non-criminal explanation to

17   his text messages.

18               The defendant didn't have to become a witness.

19   He could have remained silent, but he didn't.  He took

20   the stand and you can scrutinize his testimony just like

21   anyone else's.  He sat there on the stand and stated

22   over and over again to you that there was nothing

23   inappropriate about any of the text messages that he

24   sent to Millinia Johnson.  That his expressions of love

25   were normal.  He was like a father figure is what he

1    likes to say about himself over and over.  A father

2    figure who texts at all hours of the day and night.

3                Nothing wrong with the defendant to text a 12-

4    and this then 13-year-old girl at 11:00 p.m., 12:00

5    a.m., 1:00 a.m., 4:00 a.m.  And when you look at the

6    phone records, ladies and gentlemen, when you go through

7    them during deliberations, again, notice how many times

8    that this happens.  It's not just any one single

9    incident, but it is over and over again.

10                There are calls at 5:46 a.m., 12:18, 12:29

11    a.m.  Out calls the defendant is placing to Millinia.

12    He calls again oftentimes past 10:00 at night, 10:13,

13    10:14.  Then again six in the morning, 12:19.  These

14    calls constantly are going on each and every month, 70,

15    77, 72 times they're calling each other every month.

16    And remember that they live together during this time,

17    ladies and gentlemen.

18                Why would you be calling and texting someone

19    whom you share a house with, who you run into day after

20    day, who you are in the same room with?  Why would you

21    need to be texting her literally, by the end in August

22    and July of 2014, 532 times in a month if you live with

23    her and you are just upstairs with her aunt?

24                The reason you have to do that, ladies and

25    gentlemen, is because you need to keep it secret.  You

1      have to conceal it.

2              And why would you have to conceal it?  Why

3      would you have to keep it secret?  Because according to

4      him, he's just checking in on her.  He's just quote

5      "trying to give a self-esteem boost."

6              When you read the actual text messages, ask

7      yourselves about a father figure giving a self-esteem

8      boost.  Was it when the defendant was continually using

9      the F word at her?  Is it when he continually threatens

10     to cut her off or is it when the father figure smothers

11     her with so much love and affection in language that is

12     more appropriate for a middle school boy across the

13     classroom than a 54-year-old man with a 13-year-old.

14             The reason he has to conceal it, ladies and

15     gentlemen, because the phone he personally purchased and

16     said on the phone yeah, I recognize, no, I don't know.

17     I don't know what I bought.  I'm not a Smartphone guy.

18     That phone he bought is a leash that he used to control

19     Millinia Johnson and he can't admit his connection to it

20     and he can't admit what it was used for.

21             It was used for constant contact with his

22     little Pattito, his blood, his child.  The object of his

23     affection that belonged to him because of everything he

24     did for her and all the money that he spent on her.

25             When you look at the text messages, ask for

1       them, read them, look through them again.  But remember

2       in his testimony this defendant said to you he never

3       used the word smash.  He had no idea what the word smash

4       meant.  He didn't know that it was sexual in nature.  No

5       idea whatsoever what that could have been.  And hold him

6       to his words where he says he didn't use that term,

7       didn't know what it was.

8               Eighteen months into the sexual abuse, ladies

9       and gentlemen, when these text messages are going back

10      and forth between the defendant who admits his phone

11      number, who admits that he texted her, who admitted

12      every other text I put before him except this series,

13      realized that this is happening 18 months into the

14      sexual abuse.  Where this conversation which is going on

15      throughout the day starts where you have Millinia

16      Johnson say something disturbing and ugly.  Remember he

17      says none of their conversations were sexual at all in

18      nature.

19              Millinia Johnson writing, You don't answer

20      your phone, I'm gonna cut your dick off, that way nobody

21      can get smashed by you.

22              And the defendant doesn't react as the father

23      figure would and say that's not an appropriate way to

24      talk to your father figure.  The defendant doesn't say

25      we have to cut this conversation off.  He keeps texting

1    and actually doesn't realize four pages of text messages

2    even that she said it.  And then suddenly a little while

3    later, he says, Hey, that's scary.

4              Millinia says, What's scary?

5              And then he says, Cutting my thing off.

6              And Millinia says that's not scary.  If I

7    can't have you, then nobody can.

8              And once again, this defendant doesn't say

9    whoa, what do you mean, like why are you talking this

10   way to me.  This is totally inappropriate.  There is no

11   surprise in his reaction in these text messages.

12             MR. ZERNER:  Objection.

13             THE COURT:  Overruled.

14             MR. PERRI:  Instead, what does the defendant

15   say?  That's selfish.  Selfish that she wants him and

16   nobody else can have him.

17             And Millinia, 18 months into sexual abuse

18   writes, No, I'm just saying what's mine is mine, nobody

19   else's.

20             His reaction, not that's inappropriate, stop.

21   Even to turn off his phone.  I'm thinking.  One more

22   chance.  And then, Don't hold your breath.  Nah, fuck

23   it, you're done.  I'm smashing.

24             Patty then has lots of questions about when.

25             Don't keep me on hold.  You will lose me to

1    somebody.

2              Demands for the clarinet.  Take away the

3    money, the music, the bank accounts.

4              No allegation here that either he's worried

5    that Sarita Johnson is going to use the phone, as he

6    claimed was his concern about why he had to take the

7    phone away.  No allegation by the defendant that Patty,

8    Millinia has done anything wrong.  No, just that he has

9    to wait.  Gets him upset.

10             And then finally, in the same line of text

11   messages at 10:43 and 10:47 at night, You left without

12   saying good night or anything.

13             I didn't want to wake you up.

14             And in the middle of all this, ladies and

15   gentlemen, just remember again here, that led him to

16   say, I'm thinking.

17             Millinia Johnson:  I'm just saying what's mine

18   is mine, nobody else's.

19             What does this 13-year-old girl think she

20   owns?  What does this 13-year-old girl thinks she has a

21   right to exclusivity about?  His penis that she's going

22   to cut off so he can't smash anybody else.  But the

23   defendant says he's just a father figure.  He's never

24   had sexual contact with Millinia Johnson and these are

25   all just innocent texts that you should ignore.  It's

Summations - People                          1398

1    not reasonable.

2          The defense also wants you to believe that

3    seeing these texts and getting angry is unreasonable for

4    Sarita Johnson.  In looking through that phone, the

5    phone she found in August of 2014, her taking the phone

6    away and getting angry was crazy.  To see those texts

7    from her 13-year-old to a 54-year-old and back, that was

8    unreasonable.  And it's not unusual that he's texting

9    and speaking like that because he does this with his own

10   children hundreds of times a month, all three of them.

11   His wife five times a week, his girlfriend three times a

12   day and he still has time for a 13-year-old who is not

13   his ex-wife or his girlfriend and not even an adult or

14   not even his own child, despite him saying she's his

15   when on the stand.

16         The defendant told you he didn't know what the

17   word smashed meant, but he used it.  He denied it

18   because he knows it proves him guilty.  He can admit

19   many of the other texts because he can even try to spin

20   them.  He's trying to tell you he's just saying I love

21   you.  Even the text when he says love or you are a piece

22   of my heart or a part of me dies when you are away from

23   me.  His idea of a father's love is not any reasonable

24   common sense of a father's love.  It's full of jealousy

25   and full of insecurity and it's full of rage.

Summations - People                                      1399

```
 1                 But it's not just one phone in this case.
 2        It's also something the defense cannot get beyond.   Even
 3        if Sarita is unreasonable and doesn't have a good
 4        relationship with the defendant, or if this was all made
 5        up and Sarita accused him in August of this conduct or
 6        just tell him to stay away from her daughter, he then
 7        goes and admits to you in secret in October, months
 8        later, which the phone records reflect there is no
 9        contact on Millinia's number for those two months, that
10        months later he goes and gets her a second phone and
11        it's a secret phone and it's a phone that not just
12        Sarita can't know about, but when you look at the text
13        messages on the second phone, ladies and gentlemen, you
14        will see the defendant's concern that anyone will know
15        about it.
16                 Again, with the defendant's phone number that
17        he admits is his number at the top of the page.   Then at
18        the bottom, soon after she gets the phone, Do anybody
19        out there know about the phone?
20                 And Millinia says, Mercedes and Malik.
21                 You think that's okay, the defendant?
22                 Millinia saying, Yes, because they want her to
23        have a phone.
24                 The defendant didn't want this just to be
25        secret from Sarita.   This was his connection to Millinia
```

Summations - People                                    1400

1   and it had to be preserved above all else.  This is not

2   tough love as the defense tries to portray it to you.

3   This isn't turning off the heat because people aren't

4   paying the bills.  This is turning off her phone or

5   threatening to turn off her phone, take away the

6   clarinet, stop allowing her to go to Brooklyn, when you

7   look at all the messages together, to control her, to

8   manipulate her to get what he wants.

9           Quite honestly, what else could this

10  54-year-old want from her except what is in those text

11  messages?  Smashing, love, affection from a 13-year-old

12  girl, sexual abuse.

13          Mr. Hanson explained to you that Millinia --

14  that disclosers are reluctant to disclose.

15          In this case Sarita Johnson gets that phone

16  call when Millinia missed the bus in October.  It wasn't

17  that she was upset Millinia missed the bus.  It wasn't,

18  she explained to you, she was upset Millinia had a

19  phone.  When did she get angry?  Once she gets into the

20  phone, has Millinia unlock it and sees these messages

21  all over again.  That what was supposed to be over has

22  now begun again.

23          On the stand you saw Millinia, just as a

24  reluctant discloser would, as Mr. Hanson tried to

25  explain, had difficulty in struggling to answer the

1    questions.  She was never eager to get the defendant,

2    not from the beginning, not with Detective Toussaint,

3    not from here on the stand.  She's not playing her part

4    in a scheme and a scam.  She's meek.  She's embarrassed.

5    She's reluctant because when you look at the text

6    messages you will also see over and over again how she

7    at that time she did think she loved him.  She was in

8    it.  In the middle of it.  I love you, Ray Ray,

9    constantly.

10            But her regret, her imagined love for the

11   defendant, any mistakes you might put onto Millinia

12   Johnson, none of that justifies what the defendant did.

13   You might not like how she spoke sometimes in those text

14   messages, but why is she doing that?  Because of what

15   this defendant did to her.  Where he brought her to

16   after 18 months.  And by her age 12 when this started,

17   13 when it ended, she can't consent.  The law protects

18   her.

19            When you listen to the Judge's charge and the

20   defendant's crimes, also know the law doesn't require

21   specific dates, it requires a starting point and a

22   finishing point.  A period of three or more months, two

23   or more acts of sexual contact and, finally, at least

24   one, just one of these acts was oral sexual contact

25   between the victim under 13 and the defendant over 18.

1          Ladies and gentlemen, of the jury, the

2     evidence satisfies all of this with not one, not two,

3     which would have been enough for a course of conduct,

4     but weekly contact and oral sexual contact from the end

5     of Millinia's sixth grade year all the way past her

6     birthday into the next summer until Sarita Johnson found

7     the phone.  The total number of incidents are ten times

8     what the law requires.

9          And what does it add up to is just tragedy.

10    You know her birthday.  She gave it to you.  Her mother

11    gave it to you, December 30, 2000.  And the defendant

12    gave you his birthday and conceded his age, 53 and then

13    54.

14          Defense counsel made a point of saying this

15    was the defendant's day in Court, but it's also

16    Millinia's only opportunity and this evidence is her

17    only chance to be considered by a jury like you.  If

18    while you deliberate you see any of your fellow jurors

19    not taking this difficult task to heart, not taking the

20    charges seriously, you have to consider to hold them to

21    their oath.

22          If someone asserts there is reasonable doubt,

23    ask them for their reasons to explain themselves, to

24    give you an answer, not just a feeling, not just a gut

25    reaction, not just a prejudice, but to actually explain

Summations - People                                    1403

1   what their reasonable doubt and rationale is because

2   that can't be satisfied by assumptions or sympathies.

3   And demand that everyone go back to the actual evidence.

4   And if someone is trying to ignore it, confront them

5   with it.  Apply your common sense to it.  You won't find

6   it lacking.

7           The day before Sarita took the second cell

8   phone from the defendant, as I mentioned in my opening,

9   I'll end with this, the defendant texted Millinia

10  Johnson, Don't worry, everything is going back like

11  before.  And that she should also be careful because

12  you're never gonna know how good she had it until it was

13  gone.

14          He told her, Don't be stupid in the next

15  couple of pages.  Nobody will ever treat you like me

16  again.

17          Nobody, no grown adult, no 54-year-old man, a

18  family friend or, as he wants to envision himself, a

19  father figure, should ever have treated Millinia

20  Johnson, 12- and 13-years-of-age like this defendant

21  did, according to the evidence.

22          The evidence before you, there is no

23  reasonable doubt that this happened.  There is no

24  alternate theory.  There is no motive.  There is no

25  actual evidence of a scheme, just proof, proof that you

1    must apply to the law to find the defendant guilty.  To

2    find the defendant, between March 1st of 2013 and

3    December 29th of 2013 had repeated, monthly, if not

4    weekly contact and oral sexual contact with Millinia

5    Johnson when she was 12 and he was 54.

6              Follow the evidence to the conclusion that

7    this conduct and contact continued past her 13th

8    birthday when the law ends, and continued all the way

9    past that, all the way through August, the text messages

10   and everything continuing to October and all of it

11   during the entire scheme of this endangered her moral,

12   mental and physical welfare.

13             Beyond all reasonable doubt, according to your

14   common sense under the law, ladies and gentlemen, the

15   only verdict you can return on this evidence is guilty.

16   Guilty on each and every count before you.  Thank you.

17             THE COURT:  Thank you, Mr. Perri.

18             So, ladies and gentlemen, next up is my

19   obligation to give you my final instructions on the law.

20   Because it's after 12:00 now and my instructions are

21   going to go for a little while, we're going to break for

22   lunch now and I'll give you the instructions immediately

23   at 2:00 p.m. and then you will retire for your

24   deliberations, okay.

25             Remember my admonitions.  Don't say anything

1        about the case.  Forget about it over lunch.  We'll see

2        you right back here at 2:00 p.m. for instructions, then

3        deliberations.

4                    (Whereupon, the jury exited the courtroom.)

5                    THE COURT:  Counsel, 2:00 p.m. sharp we'll get

6        started again.

7                    (A luncheon recess was taken.)

8                    AFTERNOON SESSION

9                    THE CLERK:  Continued case on trial, People v.

10       Ray Ross.  The jury is not present.  All parties are

11       present.

12                   People ready?

13                   MR. PERRI:  Yes, your Honor.

14                   THE CLERK:  Defense ready?

15                   MR. ZERNER:  We are, thank you.

16                   THE COURT:  Are we ready for the jury?

17                   MR. PERRI:  Yes, your Honor.

18                   THE COURT:  Do I have counsel's permission,

19       should we get a note from the jury for exhibits that are

20       in evidence, to have the clerk have the court officer

21       deliver those exhibits to the jury?

22                   MR. ZERNER:  Certainly, your Honor.

23                   MR. PERRI:  Yes, your Honor.

24                   THE COURT:  Thank you.

25                   (Whereupon, the jury entered the courtroom.)

1              THE CLERK:  Let the record reflect the

2      presence of the jury.  All parties are present.

3              Are the People ready again?

4              MR. PERRI:  Yes, your Honor.

5              THE CLERK:  Defense?

6              MR. ZERNER:  We are, thank you.

7              THE COURT:  Good afternoon, ladies and

8      gentlemen of the jury.  Welcome back.  I will now begin

9      my final instructions to you on the law and you will

10     take those instructions with you as you start to

11     deliberate on the matters at hand.

12             I will now instruct you on the law.  I will

13     first review the general principles of law that apply to

14     this case and all criminal cases.  You have heard me

15     explain some of those principles at the beginning of the

16     trial.

17             Next I will define the crimes charged in this

18     case, explain the law that applies to those definitions

19     and spell out the elements of each charged crime.

20             Finally, I will outline the process of jury

21     deliberations.

22             During these instructions I will not summarize

23     the evidence.  If necessary, I may refer to portions of

24     the evidence to explain the law that relates to it.

25             My reference to evidence or my failure to

1    refer to evidence expresses no opinion about the

2    truthfulness, accuracy or importance of any particular

3    evidence.  In fact, nothing I have said and no questions

4    that I have asked in the course of this trial was meant

5    to suggest that I have an opinion about the case.  If

6    you have formed an impression that I do have an opinion,

7    you must put it out of your mind and disregard it.

8         The level of my voice or intonation may vary

9    during these instructions.  If I do that, it's done

10   simply to help you understand the instructions.  It's

11   not done to communicate an opinion about the law or the

12   facts of the case or of whether the defendant is guilty

13   or not guilty.

14        It's not my responsibility to judge the

15   evidence here, it's yours.  You and you alone are the

16   judges of the facts and you and you alone are

17   responsible for deciding whether the defendant is guilty

18   or not guilty.

19        In your deliberations you may not consider or

20   speculate about matters relating to sentence or

21   punishment.  If there is a verdict of guilty, it will be

22   my responsibility to impose an appropriate sentence.

23        Additionally, I remind you, as I have already,

24   that what the lawyers said in their openings is not

25   evidence.  So if a lawyer in an opening stated that the

1      lawyer -- excuse me.

2             So if a lawyer in an opening stated what the

3      lawyer believed would be the evidence and it turns out

4      that no such evidence materialized, then you must

5      disregard what the lawyer said in the opening and decide

6      the case on the testimony and other evidence you heard

7      and not what the lawyer said in the opening.

8             Similarly, what a lawyer said in summation is

9      not evidence, as you know.  So, if a lawyer asserted as

10     fact something that is not based on the evidence, you

11     must disregard it.

12            Remember, a summation is for the purpose of

13     permitting the lawyers to submit to you for your

14     consideration the facts, inferences and conclusions

15     which they contend may properly be drawn from the

16     testimony and the other evidence that you had already

17     been presented with.

18            Now, a separate crime is charged against the

19     defendant in each count that will be submitted for your

20     consideration.  You must decide each count separately.

21     Your verdict on one count should not control your

22     verdict on any other count.  You have to decide it all

23     separately and distinctly.

24            When you judge the facts, you are to consider

25     only the evidence.  The evidence in a case includes the

1        testimony of the witnesses and the exhibits that were

2        received in evidence.  Testimony which was stricken from

3        the record or to which an objection was sustained must

4        be disregarded by you.  Exhibits that were received in

5        evidence are available upon your request for your

6        inspection and consideration.  Exhibits that were just

7        seen during the trial are marked for identification but

8        not received in evidence are not evidence and are thus

9        not available for your inspection and consideration, but

10       the testimony based on exhibits that were not received

11       in evidence may be considered by you.  It's just that

12       the exhibit, itself is not available for your inspection

13       and consideration.

14               Now, in evaluating the evidence you may

15       consider any fact that is proven and any inference which

16       may be drawn upon such a fact.  To draw an inference

17       means to infer, find, conclude that a fact exists or

18       does not exist based on proof of some other fact or

19       facts.

20               I'll give you an example.  You go to bed one

21       night when it's not raining.  When you wake up in the

22       morning you look out your window, you do not see rain

23       but you see that the street and sidewalk are wet and

24       that people are wearing raincoats and carrying

25       umbrellas.  Under those circumstances, it may be

1    reasonable to infer or conclude that it had rained

2    during the night.

3              In other words, the fact of rain during the

4    night is an inference that might be drawn from the

5    proven facts of the presence of the water on the street

6    and sidewalk and the people in raincoats carrying

7    umbrellas.  An inference must only be drawn from a

8    proven fact or facts and then only if the inference

9    flows naturally, reasonably, and logically from the

10   proven fact or facts, not if it is speculative.

11             Therefore, in deciding whether to draw an

12   inference, you must look and consider all the facts in

13   the light of reason, common sense and experience.

14             Among the exhibits received in evidence were

15   photographs introduced by the prosecution.  These

16   photographs purport to depict various locations or

17   objects relevant to the issues in the case.  They were

18   received in evidence to assist you in making your

19   evaluation of the testimony relating to the locations,

20   scenes or objects depicted therein.  You are the sole

21   judges of the accuracy of these exhibits and you are the

22   sole judges of the weight to be given such exhibits.

23             Now, the Court permitted the introduction of

24   two orders of protection for a strictly limited purpose.

25   You will remember Ms. Sarita Johnson's testimony

1       regarding the issuance of the protective orders.  The

2       orders of protection were admitted only to allow you to

3       evaluate Ms. Sarita Johnson's credibility regarding the

4       timing and circumstances of Mr. Ross' departure from the

5       household at 301 Coventry Road, Hempstead.  You are to

6       consider this particular evidence only in the light of

7       Ms. Johnson's responses when she was questioned and only

8       insofar as her responses reveal her credibility, if it

9       does, as demonstrated by the evidence and for no other

10      purpose.

11              The Court has received in evidence certain

12      business records from Sprint PCS.  You may consider

13      these records together with all the other proof in the

14      case in determining the issues presented you for your

15      final determination.

16              During the course of the trial you may have

17      heard colloquy or conversation between the Court and

18      counsel.  Bear in mind such exchanges between the Court

19      and counsel do not constitute evidence and must be

20      disregarded by you in your deliberations.

21              We now turn to the fundamental principles of

22      law that apply in all criminal cases, the presumption of

23      innocence, the burden of proof and the requirement of

24      proof beyond a reasonable doubt.

25              Throughout these proceedings, the defendant is

1    presumed to be innocent.  As a result, as you deliberate

2    on each count, you must find that the defendant is not

3    guilty unless, on the evidence presented at this trial,

4    you conclude that the People have proven the defendant

5    guilty beyond a reasonable doubt as to every element of

6    the crime.

7         The defendant is not required to prove that he

8    is not guilty.  In fact, the defendant is not required

9    to prove or disprove anything, as you know.  To the

10   contrary, the People have the burden of proving the

11   defendant guilty beyond a reasonable doubt.  The burden

12   of proof never shifts from the People to the defendant.

13   If the People fail to satisfy their burden of proof, you

14   must find the defendant not guilty.  If the People

15   satisfy their burden of proof, you must find the

16   defendant guilty.

17        Now what does our law mean when it requires

18   proof of guilt beyond a reasonable doubt?  The law uses

19   the term proof beyond a reasonable doubt to tell you how

20   convincing the evidence of guilt must be to permit a

21   verdict of guilty.

22        The law recognizes that in dealing with human

23   affairs, there are very few things in this world that we

24   know with absolute certainty.  Therefore, the law does

25   not require the People to prove a defendant guilty

1    beyond all possible doubt.

2              On the other hand, it's not sufficient to

3    prove that the defendant is probably guilty.

4              A reasonable doubt is an honest doubt of the

5    defendant's guilt for which a reason exists based upon

6    the nature and quality of the evidence.  It's an actual

7    doubt that a reasonable person, acting in a matter of

8    this importance, would be likely to have because of the

9    evidence that was presented or because of the lack of

10   convincing evidence.

11             Now, proof of guilt beyond a reasonable doubt

12   is proof that leaves you so firmly convinced of the

13   defendant's guilt that you have no reasonable doubt of

14   the existence of any element of the crime or of the

15   defendant's identity as the person who committed the

16   crime.

17             In making your determinations, you should be

18   guided solely by a full and fair evaluation of the

19   evidence.  After carefully evaluating the evidence, each

20   of you must decide whether or not that evidence

21   convinces you beyond a reasonable doubt of the

22   defendant's guilt.

23             Whatever your verdict may be, it must not rest

24   upon baseless speculations, nor may it be influenced in

25   any way by bias, prejudice, sympathy or by a desire to

1   bring to an end your deliberations or to avoid an

2   unpleasant duty.  If you are not convinced beyond a

3   reasonable doubt that the defendant is guilty of a

4   charged crime, you must find the defendant not guilty of

5   the crime.  If you are convinced beyond a reasonable

6   doubt that the defendant is guilty of a charged crime,

7   you must find the defendant guilty of that crime.

8         As judges of the facts, you alone determine

9   the truthfulness and accuracy of the testimony of each

10  witness presented.  You must decide whether a witness

11  told the truth and was accurate or, instead, testified

12  falsely or was mistaken.  You must also decide what

13  importance to give to the testimony you accept as

14  truthful and accurate.

15        It is the quality of the testimony that is

16  controlling, not the number of witnesses who testify.

17        If you find that any witness has intentionally

18  testified falsely to any material fact, you may

19  disregard that witness's entire testimony or you may

20  disregard so much of it as you find was untruthful and

21  accept so much of it as you find to have been truthful

22  and accurate.

23        There is no particular formula for evaluating

24  the truthfulness and accuracy of another person's

25  statements or testimony.  You bring to this process all

1    of your varied experiences.  In life you frequently

2    decide the truthfulness and accuracy of statements made

3    to you by other people.  The same factors used to make

4    those decisions should be used in this case when

5    evaluating the testimony.

6               Some of the factors you may wish to consider

7    in evaluating the testimony of a witness are as follows:

8               Did the witness have the opportunity to see or

9    hear the events about which he or she testified?

10              Did the witness have the ability to recall

11   those events accurately?

12              Was the testimony of the witness plausible and

13   likely to be true, or was it implausible and not likely

14   to be true?

15              Was the testimony of the witness consistent or

16   inconsistent with other testimony or evidence in the

17   case?

18              Did the manner in which the witness testified

19   reflect upon the truthfulness of that witness's

20   testimony?

21              To what extent, if any, did the witness's

22   background, training, education or experience affect the

23   believability of that witness's testimony?

24              Did the witness have a bias, hostility or some

25   other attitude that affected the truthfulness of the

1        witness's testimony?

2               You may consider whether a witness had or did

3        not have a motive to lie.  If a witness had a motive to

4        lie, you may consider whether and to what extent, if

5        any, that motive affected the truthfulness of that

6        witness's testimony.

7               If a witness did not have a motive to lie, you

8        may consider that as well in evaluating the witness's

9        truthfulness.

10              You may consider whether a witness had any

11       interest in the outcome of the case or, instead, whether

12       a witness has no such interest.

13              You are not required to reject the testimony

14       of an interested witness or accept the testimony of a

15       witness who has no interest in the outcome of the case.

16       You may, however, consider whether an interest in the

17       outcome or the lack of such interest affected the

18       truthfulness of the witness's testimony.

19              Now, although not required to do so, the

20       defendant in this case testified on his own behalf.  His

21       testimony should be considered by you as you would the

22       testimony of any other witness.  A defendant, of course,

23       is an interested witness, interested in the outcome of

24       the trial.  You may, as jurors, wish to keep such

25       interest in mind in determining the weight and

1      credibility to be given to his testimony.  You should

2      not, however, reject the testimony of the defendant

3      merely because of his interest.  It is your duty, as in

4      the case of all witnesses, to accept such testimony of

5      the defendant you believe to be truthful and reject only

6      such testimony you believe to be false.

7              You may consider whether a witness made

8      statements at this trial that are inconsistent with each

9      other.  You may also consider whether a witness made

10     previous statements that are inconsistent with his or

11     her testimony at trial.

12             If a witness made such inconsistent

13     statements, you may consider whether and to what extent

14     they affect the truthfulness or accuracy of that

15     witness's testimony here at this trial.

16             The contents of a prior inconsistent statement

17     are not proof of what happened.  You may use the

18     evidence of a prior inconsistent statement only to

19     evaluate the truthfulness or accuracy of the witness's

20     testimony here at trial.  You may consider whether a

21     witness's testimony is consistent with the testimony of

22     other witnesses or with other evidence in the case.

23             If there were inconsistencies by or among

24     witnesses, you may consider whether they are significant

25     inconsistencies related to important facts or, instead,

Jury Charge                                         1418

1    were the kind of minor inconsistencies that one might

2    expect from multiple witnesses to the same event.

3              In this case you heard the testimony of a

4    police officer.  The testimony of a witness should not

5    be believed solely and simply because the witness is a

6    police officer.  At the same time, a witness's testimony

7    should not be disbelieved solely and simply because the

8    witness is a police officer.  You evaluate a police

9    officer's testimony in the same way you would evaluate

10   the testimony of any other witness.

11             You will recall that Mr. Josh Hanson testified

12   about issues relating to forensic interviewing, child

13   sexual abuse and sexual perpetration and gave an opinion

14   on such matters.  Ordinarily a witness is limited to

15   testifying about facts and is not permitted to give an

16   opinion.  Where, however, specialized knowledge might

17   help the jury understand evidence, a witness with

18   expertise in the specialized field may render opinions

19   about such matters.  The expert's testimony is not

20   offered as proof that the crime -- that the charged

21   crimes occurred, it is offered for you to consider in

22   evaluating the complainant's behavior before, during or

23   after the alleged commission of the crime.

24             You should evaluate the expert's testimony

25   just as you would the testimony of any other witness.

1    You may accept or reject such testimony in whole or in

2    part just as you may with respect to the testimony of

3    any other witness.

4          In deciding whether or not to accept such

5    testimony, you may consider the following:

6          The qualifications and believability of the

7    witness.

8          The facts and other circumstances upon which

9    the witness's opinion was based.

10         The reasons given for the witness's opinion

11   and whether the witness's opinion is consistent or

12   inconsistent with the other evidence.

13         You have also heard testimony about the

14   lawyers speaking to a witness about the case before the

15   witness testified at trial.  The law permits the lawyers

16   to speak to a witness about the case before the witness

17   testifies and permits a lawyer to review with the

18   witness the questions that will or may be asked at

19   trial, including the questions that may be asked on

20   cross-examination.

21         You have also heard that a witness -- excuse

22   me.

23         Speaking to a witness about his or her

24   testimony and permitting the witness to review materials

25   pertaining to the case before the witness testifies is a

1   normal part of preparing for trial.  It's simply not

2   improper.  Of course, in the process of trial

3   preparation, a lawyer may not suggest that the witness

4   depart from the truth.

5         I will now instruct you on the law applicable

6   to the charged crimes.  As I do this, you will hear me

7   state the elements of each charged crime submitted for

8   your consideration.

9         The first count is course of sexual conduct

10  against a child in the first degree.

11        As applied to this case, under our law, a

12  person is guilty of course of sexual conduct against a

13  child in the first degree when, over a period of time

14  not less than three months in duration, he or she, being

15  18 years or more, engages in two or more acts of sexual

16  conduct which includes at least one act of oral sexual

17  conduct with a child less than 13-years-old.

18        Under our law, it is also an element of this

19  offense that the sexual conduct was committed without

20  the consent of such child.  Sexual conduct takes place

21  without a child's consent when that child is deemed, by

22  law, to be incapable of consent.

23        Under our law, a child is deemed incapable of

24  consenting to sexual conduct when he or she is less than

25  13-years-old.

1                Thus, the law deems sexual conduct with such

2        child to be without that child's consent even if, in

3        fact, the child did consent.

4                It is not a defense to this charge that the

5        actor did not know that the person with whom the actor

6        engaged in sexual conduct was less than 13-years-old or

7        that the actor believed such person was 13-years-old or

8        more on the date of the crime.

9                The terms sexual conduct, oral sexual conduct

10       and sexual contact used in this definition have their

11       own special meaning in our law.  I will now give you the

12       meaning of these terms.

13               Sexual conduct means oral sexual conduct or

14       sexual contact.

15               Oral sexual conduct means conduct between

16       persons consisting of contact between the mouth and the

17       vulva or vagina.

18               Sexual contact means any touching of the

19       sexual or other intimate parts of a person not married

20       to the actor for the purpose of gratifying sexual desire

21       of either party.  It includes the touching of the actor

22       by the victim, as well as the touching of the victim by

23       the actor, whether directly or through clothing.

24               In order for you to find the defendant guilty

25       of this crime, the People are required to prove from all

1    the evidence in the case beyond a reasonable doubt each

2    of the following three elements:

3              That over a period of time not less than three

4    months in duration, namely, on or about and between

5    March 1, 2013 through December 29, 2013 in the County of

6    Nassau, the defendant, Ray Ross, being 18-years-old or

7    more, engaged in two or more acts of sexual conduct with

8    Millinia Johnson;

9              That such sexual conduct included at least one

10   act of oral sexual conduct; and

11             Three, that Millinia Johnson was less than

12   13-years-old.

13             If you find the People have proven beyond a

14   reasonable doubt each of these elements that I have just

15   spoken about, you must find the defendant guilty of the

16   crime of course of sexual conduct against a child in the

17   first degree as charged in count one.

18             On the other hand, if you find that the People

19   have not proven beyond a reasonable doubt any one or

20   more of those elements, you must find the defendant not

21   guilty of the crime of course of sexual conduct against

22   a child in the first degree as charged in count one.

23             The second count is course of sexual conduct

24   against a child in the second degree.  I'll explain in

25   more detail in a little bit.

1    You will consider this count if and only if
2    you have found the defendant not guilty under count one.
3         Under our law, a person is guilty of course of
4    sexual conduct against a child in the second degree
5    when, over a period of time not less than three months
6    in duration, he or she being 18 years or more, engages
7    in two or more acts of sexual conduct with a child less
8    than 13-years-old.
9         Again, it is also an element of this offense
10   that the sexual conduct was committed without the
11   consent of such child.
12        As with count one, sexual conduct takes place
13   without a child's consent when that child is deemed, by
14   law, to be incapable of consent.
15        The instructions previously provided on this
16   element regarding age of consent, as well as the
17   definition of the terms sexual conduct and sexual
18   contact that I have given you under count one apply
19   similarly to count two.
20        In order for you to find the defendant guilty
21   of this crime, the People are required to prove from all
22   the evidence in the case beyond a reasonable doubt both
23   of the following two elements:
24        That over a period of time not less than three
25   months in duration, namely, on or about and between

1  March 1, 2013 through December 29, 2013 in the County of

2  Nassau, the defendant, Ray Ross, being 18-years-old or

3  more, engaged in two or more acts of sexual conduct with

4  Millinia Johnson and that Millinia Johnson was less than

5  13-years-old.

6             If you find that the People have proven beyond

7  a reasonable doubt both of the elements, you must find

8  the defendant guilty of the crime of course of sexual

9  conduct against a child in the second degree as charged

10 in count two.

11            If you find that the People have not proven

12 beyond a reasonable doubt either one or both of the

13 elements, you must find the defendant not guilty of the

14 crime of course of sexual conduct against a child in the

15 second degree as charged in count two.

16            Now, counts three and four charge endangering

17 the welfare of a child under separate and different

18 periods of time as I'll explain in a moment.

19            Under our law, a person is guilty of

20 endangering the welfare of a child when that person

21 knowingly acts in a manner likely to be injurious to the

22 physical, mental or moral welfare of a child less than

23 17-years-old.

24            A person knowingly acts in a manner likely to

25 injurious to the physical, mental or moral welfare of a

```
1    child when that person is aware that he or she is acting

2    in such a manner.  Actual harm to the child need not

3    result.  The defendant's conduct need not be

4    specifically directed at a child.

5              The defendant must act in a manner which is

6    likely to be injurious to the physical, mental or moral

7    welfare of a child knowing of the likelihood of such

8    injury.  Knowledge of the age of the child is not an

9    element of this crime and it is not a defense to this

10   charge that the defendant did not know the age of the

11   child or believed the age of the child to be 17 years or

12   more.

13             In order for you to find the defendant guilty

14   of count three, the People are required to prove from

15   all the evidence in the case beyond a reasonable doubt

16   each of the following three elements:

17             That on or about and between March 1, 2013 and

18   December 29, 2013 in the County of Nassau, the

19   defendant, Ray Ross, acted in a manner likely to be

20   injurious to the physical, mental or moral welfare of

21   Millinia Johnson;

22             That the defendant did so knowingly; and

23             That Millinia Johnson was less than

24   17-years-old.

25             If you find that the People have proven beyond
```

1    a reasonable doubt each of the three elements, you must

2    find the defendant guilty of the crime of endangering

3    the welfare of a child under this count.

4            On the other hand, if you find that the People

5    have not proven beyond a reasonable doubt any one or

6    more of the elements, you must find the defendant not

7    guilty of the crime of endangering the welfare of a

8    child as charged in count three.

9            Moving to count four, all my instructions

10   apply similarly as I recited for count three.

11           So, in order for you to find the defendant

12   guilty of endangering the welfare of a child under count

13   four, the People are required to prove from all the

14   evidence in the case beyond a reasonable doubt each of

15   the following three elements:

16           That on or about and between December 30, 2013

17   and October 17, 2014 in the County of Nassau, the

18   defendant, Ray Ross, acted in a manner likely to be

19   injurious to the physical, mental or moral welfare of

20   Millinia Johnson;

21           That the defendant did so knowingly; and

22           Finally, that Millinia Johnson was less than

23   17-years-old.

24           If you find that the People have proven beyond

25   a reasonable doubt each of these elements, you must find

1    the defendant guilty of the crime of endangering the

2    welfare of a child under count four.

3            On the other hand, if you find that the People

4    have not proven beyond a reasonable doubt any one or

5    more of these elements, you must find the defendant not

6    guilty of the crime of endangering the welfare of a

7    child as charged in count four.

8            Now, your verdict on each count you consider,

9    whether guilty or not guilty, must be unanimous.  That

10   is, each and every juror must agree to it.

11           To reach a unanimous verdict, you must

12   deliberate with the other jurors.  That means you should

13   discuss the evidence and consult with each other, listen

14   to each other, give each other's views, careful

15   consideration and reason together when considering the

16   evidence.  And when you deliberate, you should do so

17   with a view towards reaching an agreement if that can be

18   done without surrendering your individual judgment.

19           Each of you must decide this case for yourself

20   but only after a fair and impartial consideration of the

21   evidence with the other jurors.  You should not

22   surrender an honest view of the evidence simply because

23   you want the trial to end or you are outvoted.  At the

24   same time, you should not hesitate to reexamine your

25   views and change your mind if you become convinced that

1    your position was not correct.

2              As I have previously instructed, you may see

3    any or all of the exhibits which were received in

4    evidence.  Simply write me a note telling me which

5    exhibit or exhibits you want to see.

6              You may also have the testimony of any witness

7    read back to you in whole or in part.  Again, if you

8    want a read back, just write me a note telling me what

9    testimony you wish to hear.  I just ask you to be as

10   specific as possible when you send that note out so that

11   the court reporter can hone in on exactly what you are

12   asking for.

13             If you are interested in hearing only a

14   portion of the witness's testimony, please specify in

15   your note which witness and with as much detail as

16   possible which part of the testimony you want to hear.

17   I just said that to you.

18             If you have a question on the law, write me a

19   note specifying what you want me to review with you.

20   That goes to my final instructions.  I know it was long

21   and laborious and I speak at one level and one tone, so

22   if you need any instructions on the law, just ask me

23   what you need to be read back.

24             Now, as you know, the first juror selected is

25   known as the foreperson.  During deliberations the

1   foreperson's opinion and vote are not entitled to any

2   more importance than that of any other juror.  What we

3   ask of the foreperson is to sign any written note that

4   the jury sends to ·the Court.  The foreperson does not

5   have to write the note or agree with its contents.  The

6   foreperson's signature only indicates that the writing

7   is coming from the jury.

8          When the jury has reached a verdict, guilty or

9   not guilty, the entire jury will be asked to come back

10  into Court.  The foreperson will be asked whether the

11  jury has reached a verdict.  If the foreperson says yes,

12  he will then be asked what the verdict is for each

13  charged crime considered in accordance with my

14  instructions.  After that, the entire jury will be asked

15  whether that is their verdict and they will answer yes

16  or no.

17         Finally, upon the request of a party, each

18  juror will be asked individually whether the announced

19  verdict is the verdict of that juror and then upon being

20  asked, each juror will give an answer, yes or no.

21         Now, as you go in to begin your deliberations,

22  I will give you a form known as a verdict sheet.  The

23  verdict sheet lists each count submitted for your

24  consideration and the manner in which you are to

25  consider the counts and the possible verdicts.  Please

1     use the form to record your verdict with an X or a check

2     mark in the appropriate place.

3            In addition to listing the counts, I have

4     added the applicable periods of time on the verdict

5     sheet in order for you to distinguish between counts

6     three and four.  You may have heard there are different

7     periods of time as I have explained.  The sole purpose

8     of doing so is to distinguish between those counts.

9     It's not a substitute for my full instructions on the

10    meanings and elements of each charge and it should not

11    discourage you from asking me to define a crime again if

12    a question arises in regard to it.

13           There are instructions for you as you move

14    down each count.  Please follow those instructions that

15    are on the verdict sheet.

16           Finally, there are a few remaining rules that

17    you must observe during your deliberations.  First, a

18    court officer will collect all electronic devices from

19    you to hold while you are in deliberations.

20           While you are here in the courthouse

21    deliberating on the case, you will be kept together in

22    the jury room.  You may not leave the jury room during

23    deliberations.

24           Now, as you have seen already, lunch,

25    unfortunately, will not be provided.  That's a long ago

1    courtesy that is now no longer.  If tomorrow you are

2    still deliberating and lunchtime comes, you will be

3    called back from your deliberations and we'll break for

4    lunch.  I'll give you your admonitions you are not to

5    discuss the case, et cetera and have no contact with

6    anyone associated with the case, whether you see them in

7    the hallways or not, and you will go to lunch.  You will

8    then come back again and you will start your

9    deliberations or continue your deliberations.

10                The second rule, you must deliberate about the

11   case only when you are all gathered together in the jury

12   room.  You must not, for example, be discussing the case

13   as you go to and from the courtroom.  It is important

14   that each juror have the opportunity to hear whatever

15   another juror has to say about the case and that, by

16   law, must only be done when you are all gathered

17   together in the jury room.  Thus, if for any reason all

18   12 of you are not gathered together in the jury room,

19   stop deliberating and wait until all 12 are present once

20   again in the jury room.

21                During your deliberations you must discuss the

22   case only amongst yourselves.  You must not discuss the

23   case with anyone else, including a court officer or

24   permit anyone other than a fellow juror to discuss the

25   case in your presence.

1              If you have a question or request, you must

2       communicate with me by writing a note which you will

3       give to the court officer who will give it to me.  The

4       law requires that you communicate with me in writing in

5       part to make sure that there are no misunderstandings as

6       to what you are asking for.

7              I should explain that under our law, I am not

8       permitted to have a conversation about the facts of the

9       case or possible verdict or vote of the jury on any

10      count with any one juror or a group of jurors or even

11      all the jurors through a note.  Thus, in any note that

12      you send me, do not tell me what the vote of the jury is

13      on any count.

14              Could I see counsel for a second?

15              (A discussion was held off the record.)

16              THE COURT:  I'm going to finish up here in

17      just a moment.  I want to address our sole alternate

18      juror because she is special.  Since our trial jury of

19      12 is about to retire to its deliberations, I now charge

20      and emphasize there must be no further communication or

21      contact between the jury of 12 and our alternate juror.

22      Our alternate juror will be provided with a convenient

23      and private room to hang out in, if you will, to await

24      the rendition of the trial jury's verdict.  As an

25      alternate juror you are not to discuss the case with

1   anyone.  You are not to read anything about the case.

2   You are not to permit anyone to discuss it with you or

3   in your presence.  Nor are you to form any opinion as to

4   the factual issues in the case, which means you are not

5   to start deliberating in any way, shape or fashion or

6   express an opinion as to the guilt or innocence of the

7   defendant unless and until such time as you may be

8   requested to participate in the trial jury's

9   deliberations for whatever reason.  And if that should

10  happen, I'll give the entire jury further instructions

11  on how you must move forward.

12          So, I have now outlined for you the rules of

13  law applicable to this case and the processes by which

14  you are to weigh the evidence and to determine the

15  facts.  In a few minutes you will retire to the jury

16  room for your deliberations.  Your function is an

17  important one.  Remember, the People, the defendant and

18  the Court all rely upon you to give full and

19  conscientious deliberation and consideration to the

20  issues and evidence before you.  By doing so, you carry

21  out to the fullest your oaths as jurors to well and

22  truly try the issues of this case and to render a true

23  verdict.

24          You will now retire to your deliberations.

25  Please follow the directions of our court officer.

1                    (Whereupon, the sworn jury of twelve exited

2          the courtroom to begin deliberations and the alternate

3          juror exited the courtroom as well.)

4                    THE COURT:  Mr. Zerner, with reference to your

5          alerting the Court that I said tomorrow in speaking to

6          the jurors, and, of course, we're not in session

7          tomorrow, I'll address that at the close of business

8          today.

9                    MR. ZERNER:  Thank you, your Honor.

10                   THE COURT:  You're welcome.  Okay, please stay

11         by so that you can be returned to Court, should it be

12         necessary.

13                   MR. ZERNER:  Yes, your Honor.

14                   (Whereupon, the Court stood in recess while

15         awaiting a verdict.)

16                   THE CLERK:  Continued case on trial, People v.

17         Ray Ross.  All parties are present.  The jury is not.

18                   Are the People ready?

19                   MR. PERRI:  Yes, your Honor.

20                   THE CLERK:  Defense ready?

21                   MR. ZERNER:  We are, thank you.

22                   THE COURT:  Very good.  It's now 4:30.  We're

23         about to break for the day.  The Court received two

24         notes I would like to bring to counsel's attention.

25         Court Exhibit XI, first note from the jury requesting

1    evidence.  Both packets of the text messages, all phone

2    logs, photos of parking lots.  They were delivered to

3    the jury as consented to by counsel without the

4    necessity of notifying counsel.

5              Court Exhibit XII from the jury simply

6    indicates that they were done for the day.  We, the

7    jury, are in discussions but have not come to any

8    unanimous decision on any of the counts.  We are ready

9    to resume our deliberations Thursday, 2/25.  TY.  I

10   guess that's a shorthand way of saying thank you.

11             COURT OFFICER:  Jury entering.

12             (Whereupon, the jury entered the courtroom.)

13             THE CLERK:  Let the record reflect the

14   presence of the jury.  All parties are present.

15             People ready?

16             MR. PERRI:  Yes, your Honor.

17             THE CLERK:  Defense ready?

18             MR. ZERNER:  We are, thank you.

19             THE COURT:  Good afternoon, ladies and

20   gentlemen of the jury.  Today's Court session is drawing

21   to a close and I am about to excuse you for the day.

22   You will return Thursday morning at the place designated

23   by the court officer.  I think you all know where that

24   is to be at a time early enough so that you can begin

25   your deliberations at 9:30 a.m.  Be ready to begin the

1    continuance of your deliberations at 9:30 a.m.

2            The law requires that before I excuse you, I

3    review with you the rules that you must follow over the

4    course of this recess.  As you know, the rules are

5    designed to guarantee the parties a fair trial.  They

6    are the same ones that you were required to follow prior

7    to deliberations.  The law requires that I restate them

8    at this stage in order to emphasize their importance.

9    The reason for the emphasis is that you are now in a

10   critical stage.  You are in the process of deliberations

11   and you are not being sequestered.  That means that you

12   are not being kept together overnight where the Court

13   could have greater assurance that you are following the

14   rules.  You are being permitted to go home after

15   deliberations have begun.  There may now be a greater

16   temptation, for example, to discuss the case with

17   someone else or to go to the scene.  Please resist these

18   temptations.

19           To discuss the case with someone else or to

20   visit the scene or to violate any of the other

21   admonitions I have explained to you would not only

22   violate my order, but would also violate the oath that

23   you took to follow the rules.

24           So here are the rules:

25           Deliberations must be conducted only in the

1    jury room when all jurors are present.  All

2    deliberations must now cease and are not to be resumed

3    until all of you have returned on Thursday and are

4    together again in the jury room.

5              Don't converse either among yourselves or with

6    anyone else about anything related to the case during

7    the recess.

8              You remain under the obligation not to

9    request, accept, agree to accept or discuss with any

10   person the receiving or accepting of any payment or

11   benefit in return for supplying any information

12   concerning the trial.

13             Promptly report to me any incident within your

14   knowledge involving an attempt by any person to

15   improperly influence you or any member of the jury.

16             Don't visit or view the premises or place

17   where the charged crime was allegedly committed or any

18   other places or premises involved in the case.

19             Don't read, view, listen to any accounts or

20   discussions of the case reported by newspapers or any

21   other news media.

22             Don't attempt to research any fact, issue or

23   person related to this case, whether by discussion with

24   others, by research in a library or on the Internet or

25   by any other means or source.

1          You understand and I'm confident you will

2     comply with those instructions and, therefore, I release

3     you for the day and we'll see you Thursday morning.

4               (Whereupon, the jury exited the courtroom.)

5               THE COURT:   Okay, Counsel, Thursday morning.

6               (Whereupon, the trial was adjourned to

7     February 25, 2016.)

8

9               *                    *                    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
          COUNTY OF NASSAU :   PART 47
 2   ------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
 4              -against-                Ind. No. 1050N/15
 5                                       JURY TRIAL
 6   RAY ROSS,
 7                    DEFENDANT.
     ------------------------------------x
 8
                     Mineola, New York
 9                   February 25, 2016
10
     B E F O R E:   HON. TERENCE P. MURPHY
11                  Acting Supreme Court Justice
12
13   A P P E A R A N C E S:
14
                (Same as previously noted)
15
16
17              Kathi A. Fedden
18              Official Court Reporter
19
20        *              *              *
21
22              (Whereupon, the jury entered the courtroom.)
23              THE CLERK:  Continued case on trial, People v.
24   Ray Ross.  The jury is present.  All parties are
25   present, as is Mr. Ross.
```

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                    1440

1           Are the People ready to proceed at this time?

2           MR. PERRI:  Yes, your Honor.

3           THE CLERK:  Defense ready?

4           MR. ZERNER:  We are, thank you.

5           THE COURT:  Good morning, ladies and gentlemen

6      of the jury.  Welcome back.  I received two notes from

7      you.  As required by law, I have to read those notes

8      into the record.  So the first note was received or

9      timed at 10:20 a.m. this date and it's Court Exhibit

10     VIII [sic].  It says, We, the jury, request the judge

11     explain all four counts again now that we have spoken so

12     we can evaluate each count before we decide.  Thank you.

13           Secondly, upon return to the jury room, we

14     request the signed detective's statement and all of

15     Millinia's testimony.

16           With regard to this note, I will read you all

17     four counts, okay.

18           With regard to the signed detective statement,

19     that statement was not received in evidence, so if you

20     will recall my instructions, if an item was not received

21     in evidence, you can't see it or take it into the jury

22     room, but you can have any testimony regarding that

23     statement read back to you, if necessary.  So, you can

24     send me another note if that's an issue for you.

25           Then with regard to Millinia's testimony, the

Kathi A. Fedden, Sr. Court Reporter

1    court reporter has recovered that for you.  It's 240

2    pages or so, so it's a significant amount of pages that

3    will have to be read by the court reporter.  In that

4    vein, we have it ready to be read for you and we'll

5    probably do that right after the lunch hour, okay,

6    because that's the easiest way to do it.

7              And, of course, I have instructed you

8    previously in my final instructions that if there is

9    some part of testimony that you wish to be read back, we

10   can read that back to you, as you requested Millinia's.

11   If there is a particular aspect of it, it's up to you,

12   in your deliberations, you can more particularly specify

13   that to the Court in a note, okay.

14             With regard to the second note received at

15   12:00 p.m., We, the jury, would also accept a written

16   transcript of the counts or a reread of the counts

17   before the asked evidence.  That's what we're going to

18   do now.  I couldn't do that for you before because our

19   court reporter was engaged in her other business.

20             So let me read for you now the four counts.

21   The first count is course of sexual conduct against a

22   child in the first degree.

23             As applied to this case, under our law, a

24   person is guilty of course of sexual conduct against a

25   child in the first degree when, over a period of time

1    not less than three months in duration, he or she being

2    18 years or more, engages in two or more acts of sexual

3    conduct which includes at least one act of oral sexual

4    conduct with a child less than 13-years-old.

5              Under our law, it's also an element of this

6    offense that the sexual conduct was committed without

7    the consent of such child.  Sexual conduct takes place

8    without a child's consent when that child is deemed, by

9    law, to be incapable of consent.

10             Under our law, a child is deemed incapable of

11   consenting to sexual conduct when he or she is less than

12   13-years-old.  Thus, the law deems sexual conduct with

13   such child to be without that child's consent even if,

14   in fact, the child did consent.

15             It is not a defense to this charge that the

16   actor did not know that the person with whom the actor

17   engaged in sexual conduct was less than 13-years-old or

18   that the actor believed such person was 13-years-old or

19   more on the date of the crime.

20             The term sexual conduct, oral sexual conduct

21   and sexual contact used in this definition have their

22   own special meaning in our law.  I will now give you the

23   meaning of these terms:

24             Sexual conduct means oral sexual conduct or

25   sexual contact.

1        Oral sexual conduct means conduct between

2   persons consisting of contact between the mouth and the

3   vulva or vagina.

4        Sexual contact means any touching of the

5   sexual or other intimate parts of a person not married

6   to the actor for the purpose of gratifying sexual desire

7   of either party.  It includes the touching of the actor

8   by the victim, as well as the touching of the victim by

9   the actor, whether directly or through clothing.

10        In order for you to find the defendant guilty

11   of this crime, the People are required to prove from all

12   the evidence in the case beyond a reasonable doubt each

13   of the following three elements:

14        That over a period of time not less than three

15   months in duration, namely, on or about and between

16   March 1, 2013 and December 29, 2013 in the County of

17   Nassau, the defendant, Ray Ross, being 18-years-old or

18   more, engaged in two or more acts of sexual conduct with

19   Millinia Johnson;

20        That such sexual conduct included at least one

21   act of oral sexual conduct; and

22        That Millinia Johnson was less than

23   13-years-old.

24        If you find the People have proven beyond a

25   reasonable doubt each of the elements, you must find the

Proceedings                                          1444

1    defendant guilty of the crime of course of sexual

2    conduct against a child in the first degree.

3              On the other hand, if you find that the People

4    have not proven beyond a reasonable doubt any one or

5    more of these elements, you must find the defendant not

6    guilty of the crime of course of sexual conduct against

7    a child in the first degree.

8              The second count is course of sexual conduct

9    against a child in the second degree.

10             As you will recall, I instructed you that you

11   will consider this count if and only if you have found

12   the defendant not guilty under count one.

13             Under our law, a person is guilty of course of

14   sexual conduct against a child in the second degree

15   when, over a period of time not less than three months

16   in duration, he or she being 18 years or more, engages

17   in two or more acts of sexual conduct with a child less

18   than 13-years-old.  It is also an element of this

19   offense that the sexual conduct was committed without

20   the consent of such child.

21             As with count one, sexual conduct takes place

22   without a child's consent when that child is deemed, by

23   law, to be incapable of consent.

24             The instructions previously provided on this

25   element regarding age of consent, as well as the

Kathi A. Fedden, Sr. Court Reporter

1     definition of the terms sexual conduct, oral sexual

2     conduct and sexual contact that I have given you under

3     count one apply similarly to count two.

4               In order for you to find the defendant guilty

5     of this crime, the People are required to prove from all

6     the evidence in the case beyond a reasonable doubt both

7     of the following two elements:

8               That over a period of time not less than three

9     months in duration, namely, on or about and between

10    March 1, 2013 and December 29, 2013 in the County of

11    Nassau, the defendant, Ray Ross, being 18 years old or

12    more, engaged in two or more acts of sexual conduct with

13    Millinia Johnson; and

14              That Millinia Johnson was less than

15    13-years-old.

16              If you find that the People have proven beyond

17    a reasonable doubt both of those elements, you must find

18    the defendant guilty of the crime of course of sexual

19    conduct against a child in the second degree.

20              On the other hand, if you find that the People

21    have not proven beyond a reasonable doubt either one or

22    both of those elements, you must find the defendant not

23    guilty of the crime of course of sexual conduct against

24    a child in the second degree.

25              Counts three and four charge endangering the

Proceedings                    1446

1    welfare of a child under separate and different periods

2    of time as I will explain in a moment.

3                    Under our law, a person is guilty of

4    endangering the welfare of a child when that person

5    knowingly acts in a manner likely to be injurious to the

6    physical, mental or moral welfare of a child less than

7    17-years-old.

8                    The term knowingly has its own special meaning

9    in our law.  I will now give you the meaning of that

10   term.

11                   A person knowingly acts in a manner likely to

12   be injurious to the physical, mental or moral welfare of

13   a child when that person is aware that he or she is

14   acting in such a manner.  Actual harm to the child need

15   not result.  The defendant's conduct need not be

16   specifically directed at a child.  The defendant must

17   act in a manner which is likely to be injurious to the

18   physical, mental or moral welfare of a child knowing of

19   the likelihood of such injury.

20                   Knowledge of the age of the child is not an

21   element of this crime and it is not a defense to this

22   charge that the defendant did not know the age of the

23   child or believed the age of the child to be 17 years or

24   more.

25                   In order for you to find the defendant guilty

Kathi A. Fedden, Sr. Court Reporter

1    under count three, the People are required to prove from

2    all the evidence in this case beyond a reasonable doubt

3    each of the following three elements:

4           That on or about and between March 1, 2013 and

5    December 29, 2013 in the County of Nassau, the

6    defendant, Ray Ross, acted in a manner likely to be

7    injurious to the physical, mental or moral welfare of

8    Millinia Johnson;

9           That the defendant did so knowingly; and

10          That Millinia Johnson was less than

11   17-years-old.

12          If you find the People have proven beyond a

13   reasonable doubt each of those elements, you must find

14   the defendant guilty of the crime of endangering the

15   welfare of a child as charged in count three.

16          On the other hand, if you find that the People

17   have not proven beyond a reasonable doubt any one or

18   more of those elements, you must find the defendant not

19   guilty of the crime of endangering the welfare of a

20   child as charged in this count.

21          Under count four, in order for you to find the

22   defendant guilty of endangering the welfare of a child,

23   the People are required to prove from all the evidence

24   in the case beyond a reasonable doubt each of the

25   following three elements:

Proceedings                                    1448

1              That on or about and between December 30, 2013

2       and October 17, 2014 in the County of Nassau, the

3       defendant, Ray Ross, acted in a manner likely to be

4       injurious to the physical, mental or moral welfare of

5       Millinia Johnson;

6              That the defendant did so knowingly; and

7              That Millinia Johnson was less than

8       17-years-old.

9              Therefore, if you find that the People have

10      proven beyond a reasonable doubt each of these elements,

11      you must find the defendant guilty of the crime of

12      endangering the welfare of a child under count four.

13             On the other hand, if you find that the People

14      have not proven beyond a reasonable doubt any one or

15      more of the elements, you must find the defendant not

16      guilty of the crime of endangering the welfare of a

17      child as charged under count four.

18             So, ladies and gentlemen, there are the four

19      counts that you have asked for and the elements set

20      forth for those counts.  What we'll do now is I'll

21      return you back to the jury room.  You will deliberate

22      about ten minutes.  I'll give you the opportunity to

23      send out another note, if you so desire, and then we'll

24      have to break for lunch so I'll give you your

25      admonitions once again.

Proceedings                              1449

1          We'll break for lunch approximately an hour.

2     We'll get started again at 2:00 p.m., okay.

3               (Whereupon, the sworn jury of twelve exited

4     the courtroom to continue deliberations.)

5               THE COURT:  Counsel, just for the record, I

6     referred to the first note as Court Exhibit VIII.  Well,

7     my Roman numeral interpretation is lacking.  It's

8     actually Court Exhibit XIII and the second note is Court

9     Exhibit XIV.

10              So, about ten minutes.  We'll have to recall

11    them to break for lunch as required by Court rules and

12    we'll get started again at 2:00 p.m.

13              Any objection to the Court's instructions on

14    those notes, People?

15              MR. PERRI:  No, your Honor.

16              THE COURT:  Mr. Zerner?

17              MR. ZERNER:  No, your Honor.

18              THE COURT:  Very good.  Thank you.

19              (Whereupon, the Court stood in recess while

20    awaiting a verdict.)

21              THE CLERK:  Continued case on trial, People v.

22    Ray Ross.  All parties are present.  The jury is not

23    present.

24              THE COURT:  Counsel, the Court's received a

25    third note.  My law secretary has given you the

1    opportunity to review it and has read it to you.  I'll

2    call the jury in now and we'll deal with it.  I think

3    the easiest way to deal with it is to read Millinia's

4    testimony.  You agree?  Simply because the court

5    reporter cannot ensure that all the testimony pertaining

6    to conduct over the time is going to be read back.

7              MR. PERRI:  Yes, your Honor.

8              MR. ZERNER:  I agree.  Everything will be read

9    about Millinia, direct and cross?

10             THE COURT:  Yes.

11             COURT OFFICER:  Jury entering.

12             (Whereupon, the jury entered the courtroom.)

13             THE CLERK:  Let the record reflect the

14   presence of the jury.  All parties are present.

15             Are the People ready?

16             MR. PERRI:  Yes, your Honor.

17             THE CLERK:  Defense ready?

18             MR. ZERNER:  We are, thank you.

19             THE COURT:  Very good.

20             Ladies and gentlemen of the jury, I received

21   your third note asking for Millinia's testimony,

22   specifically time frame March 1, 2013 to December 29,

23   2013 pertaining to Brooklyn and bedroom at 301 Covington

24   [sic].  TY.  Thank you.  And it's signed by the jury

25   foreperson.

Proceedings                                    1451

1           We're going to break for lunch now and at 2:00

2      sharp we're going to have the court reporter read back

3      to you Millinia's testimony, both direct examination and

4      cross-examination, okay, and any redirect or recross.

5      You will get all of her testimony so that you will get

6      all of the information that you have requested in your

7      third note, okay.

8           Remember my admonitions, just forget about the

9      case.  Don't talk about it among yourselves or with

10     anyone else.

11          If you hear somebody talking about it outside,

12     ignore it and then report it back to me, okay.

13          Ignore anybody associated with the trial if

14     you see them at the pizza parlor, Chinese restaurant,

15     Dunkin Donuts, wherever they may be having lunch.

16          We'll be back 2:00 sharp to continue

17     deliberations.

18          (Whereupon, the jury exited the courtroom.)

19          THE COURT:  Counsel satisfied with the Court's

20     instructions on the note, People?

21          MR. PERRI:  Yes, your Honor.

22          MR. ZERNER:  Yes, your Honor.

23          THE COURT:  Very good, thank you.  See you at

24     2:00.

25          (A luncheon recess was taken.)

1       <u>AFTERNOON SESSION</u>

2               THE CLERK:   Continued case on trial, People v.

3       Ray Ross.   The jury is not present.   All parties are

4       present.

5               People ready at this time?

6               MR. PERRI:   Yes, your Honor.

7               THE CLERK:   Is the defense ready?

8               MR. ZERNER:   We are, thank you.

9               THE COURT:   Okay.   With regard to the two

10      notes, second and third note I believe it was, and

11      testimony, we'll have the court reporter read back

12      Millinia Johnson's testimony in full.

13              COURT OFFICER:   Jury entering.

14              (Whereupon, the jury entered the courtroom.)

15              THE CLERK:   Let the record reflect the

16      presence of the jury and all parties.

17              People ready?

18              MR. PERRI:   Yes, your Honor.

19              THE CLERK:   Defense ready?

20              MR. ZERNER:   We are, your Honor, thank you.

21              THE COURT:   Okay, ladies and gentlemen,

22      welcome back.   We'll have the court reporter go right

23      into the reading of the testimony of Millinia Johnson.

24              (Whereupon, the requested testimony was read

25      back by the reporter.)

1          THE COURT:  Kathi, can I ask you to stop for

2     one second?  I need to see the attorneys in the back for

3     one second.

4               (Pause in the proceedings.)

5          THE CLERK:  Court is reconvened.

6          THE COURT:  Okay, ladies and gentlemen of the

7     jury, I'm going to let you take a break.  We've been

8     going about an hour and the stenographer has been

9     reading for an hour, so we're going to give her a break

10    too.  We'll call you right back.

11              (Whereupon, the jury exited the courtroom.)

12         THE CLERK:  Continued case on trial, People v.

13    Ray Ross.  The jury is not present at this time, Judge.

14    All parties are.

15              People ready?

16         MR. PERRI:  Yes.

17         THE CLERK:  Defense ready?

18         MR. ZERNER:  We are, thank you.

19         THE COURT:  Counsel, under Court Exhibit XIII,

20    the jury asked for all of Millinia's testimony.  After

21    instructing the jury with regard to that inquiry with

22    the approval of counsel, the jurors then asked in

23    Exhibit XV, Court Exhibit XV for Millinia's testimony

24    specifically time framed March 1, 2013 to December 29,

25    2013 pertaining to Brooklyn and bedroom at 301, they

Proceedings                                          1454

1      write, Covington.

2              The Court -- the jury was then called in and

3      the court reporter read back Millinia's direct

4      examination from the beginning, I believe, to a point

5      where it started to go into cell phones and at that

6      point the Court interrupted the court reporter and asked

7      for a short break to conference with counsel with regard

8      to additional read back.

9              While the Court was in conference with

10     counsel, the Court received another note from the jury

11     indicating -- on Court Exhibit XVI, indicating, We, the

12     jury, are satisfied with the read back of direct so far.

13     Can we please now hear the defense cross-examination?

14     Thank you.

15             The Court then continued its conference with

16     counsel looking for specific cross-examination testimony

17     with regard to that time frame.  Quite frankly, there

18     wasn't much in that regard.  The Court did find, with

19     the expertise of the court reporter, a section of

20     cross-examination testimony, page 339, approximately

21     lines four through 12, that dealt with the specified

22     time frame within which the jury was asking for in terms

23     of the cross-examination of Millinia Johnson.

24             The Court intends to have the court reporter

25     read back that particular section of cross-examination.

Proceedings                                    1455

1    The Court and the court reporter went through the

2    computer generated transcript with fine features and

3    such and there was nothing else that the Court could

4    find that specifically dealt with that time frame.

5           That being said, I'll allow counsel to put on

6    their positions for the record.  Mr. Perri.

7           MR. PERRI:  Your Honor, the People support the

8    Court's interpretation of the note and its application

9    for the record.

10          THE COURT:  Mr. Zerner.

11          MR. ZERNER:  Your Honor, I haven't had the

12   opportunity to see Court Exhibit XVI and I respect what

13   you just put on the record, as well as Court Exhibit XV,

14   but it seems to me in Court Exhibit XV the jury says

15   that they want to hear from the complaining witness from

16   the time frame March 2013 through her birthday about

17   Brooklyn and about the bedroom.

18          Then they say in Court Exhibit XVI they are

19   satisfied with the direct.  They want to hear the cross.

20   They don't say we want to hear the cross about Brooklyn

21   and the bedroom or we want to hear the cross about the

22   complaining witness from March 1, 2013 through her

23   birthday.

24          My position is let them hear everything.  But

25   in the absence of letting them hear everything, earlier

Proceedings

1    on when we interrupted the court reporter speaking very

2    briefly, I said let them hear the whole cross and you

3    said yes, they're going to hear the whole cross.

4            THE COURT:  Hold it, sir.

5            MR. ZERNER:  The note we got subsequently from

6    that --

7            THE COURT:  Are you talking about in chambers?

8            MR. ZERNER:  No.  Once the court reporter

9    started reading anything back this afternoon, there was

10   a very brief break when your Honor called Mr. Perri and

11   I towards the back and we never actually went to your

12   chambers.

13           THE COURT:  Off the record, that conversation?

14           MR. ZERNER:  Yes, it was an off-the-record

15   conversation, but it was interrupting the beginning of

16   the direct examination that was being read back to the

17   jury.  We stepped back probably for two minutes, but the

18   whole discussion was your Honor was trying to limit, for

19   efficiency sake, for what the jury would hear with

20   regards to the read back.  We talked briefly and it was

21   clear to me the entire cross would be read back to them.

22           Nothing has changed about that because the

23   subsequent note that they sent, all it said was that

24   they are satisfied with the direct and now they want to

25   hear the cross.  Let them hear the whole cross.

Kathi A. Fedden, Sr. Court Reporter

1          THE COURT:  When the Court interrupted the

2     court reporter, it was because in reading the direct

3     examination, the testimony veered off into cell phone

4     matters and that is not what the jury requested in their

5     Court Exhibit XV regarding testimony pertaining to

6     Brooklyn and the bedroom for a time frame of March 1st

7     through December 29, 2013.  Thus, I interrupted the read

8     back so that we can move on to the next point in the

9     direct examination that dealt with the information

10    requested by the jury.

11          In going through the entire direct

12    examination, there was no more testimony regarding that

13    particular time frame.

14          We then, and quite frankly, the Court came

15    back in and gave the jury a formal break and sent them

16    back to the jury room while we were discussing this

17    matter and while we were discussing the matter, the

18    Court received the note number XVI which I have

19    explained to you.

20          In reviewing the cross-examination of

21    Millinia, but for that time frame, not time frame, but

22    that segment of testimony, page 339, lines four through

23    12, there is nothing else contextually that goes to this

24    specific time frame asked for by the jury.

25          MR. ZERNER:  Your Honor, if that's your

1    ruling, I would simply ask that we get a clarification

2    from the jury.  They said in Court Exhibit XVI they're

3    satisfied with the direct, now they want to hear the

4    cross.  To give them eight lines of the cross I don't

5    think satisfies what the simple language of Court

6    Exhibit XVI says.  Let them hear the cross.  If we're

7    not sure, let's ask them.

8              THE COURT:  Sergeant, can we have the jury

9    back?

10             MR. PERRI:  For the record, your Honor, just

11   the People's position would be that since the reading of

12   the direct testimony was broken to abide by the jurors'

13   last note, before we began read backs, that that note

14   should be applied to both direct and to

15   cross-examination.

16             To read the last note without incorporating

17   and putting into the context of the second to last note

18   is fundamentally unfair to the read back.

19             THE COURT:  Thank you, Mr. Perri.

20             COURT OFFICER:  Jury entering.

21             (Whereupon, the jury entered the courtroom.)

22             THE CLERK:  Let the record reflect the

23   presence of the jury and all parties.

24             People ready?

25             MR. PERRI:  Yes, your Honor.

1          THE CLERK:  Defense ready?

2          MR. ZERNER:  We are, thank you.

3          THE COURT:  Good afternoon, ladies and

4    gentlemen of the jury.  I received your note, Court

5    Exhibit XVI dated today's date, timed 3:25 p.m.  It

6    states, We, the jury, are satisfied with the read back

7    of the direct so far.  Can we please now hear the

8    defense cross-examination?  Thank you, your Honor.

9               That note came after your previous note,

10   Exhibit XV that asked for Millinia's testimony

11   specifically time framed March 1, 2013 to December 29,

12   2013 pertaining to Brooklyn and bedroom at 301

13   Covington.  TY.

14              Ladies and gentlemen, I'm going to return you

15   back to the jury room and I'm going to ask you to send

16   me a note clarifying for the Court exactly what you want

17   to hear with regard to defense cross-examination, okay.

18   All, part, whatever it is that you are asking for,

19   please specify that for the Court.  Thank you.

20              (Whereupon, the jury exited the courtroom.)

21          THE COURT:  People satisfied with the Court's

22   instruction?

23          MR. PERRI:  Yes, your Honor.

24          THE COURT:  Mr. Zerner?

25          MR. ZERNER:  Yes, your Honor.

Proceedings                                 1460

1           THE COURT:  Very good.

2           (Whereupon, the Court stood in recess while

3    awaiting a verdict.)

4           THE CLERK:  All parties are present.  The jury

5    is not in the courtroom at this time, Judge.

6           THE COURT:  As per the instructions of the

7    Court, the jury responded with another jury note, Court

8    Exhibit XVII received at 4:10 p.m. stating, We, the

9    jury, request cross-examination of Millinia from the

10   period March 2013 to December 2013 pertaining to trips

11   to Brooklyn and the bedroom at 301 Coventry Road.  Thank

12   you, your Honor.

13          The Court stands by its decision to read the

14   identified passages from the cross-examination of

15   Millinia Johnson, page 339, lines four through 12.  In

16   addition, however, there is an introductory question and

17   answer, if you will, on page 336, lines 20 through 22

18   that the Court will also have the court reporter read

19   back.

20          COURT OFFICER:  Jury entering.

21          (Whereupon, the jury entered the courtroom.)

22          THE CLERK:  Let the record reflect the

23   presence of the jury.

24          Are the People ready?

25          MR. PERRI:  Yes, your Honor.

Proceedings                          1461

1       THE CLERK:  Defense ready?

2       MR. ZERNER:  We are, thank you.

3       THE COURT:  Okay, ladies and gentlemen, thank

4   you for your note.  I have to read it for the record and

5   I will.  We, the jury, request cross-examination of

6   Millinia from the period March 2013 to December 2013

7   pertaining to trips to Brooklyn and the bedroom at 301

8   Coventry Road.  Thank you, your Honor.

9            I'll have the court reporter read those

10  passages right now.

11            (Whereupon, the requested testimony was read

12  back by the reporter.)

13       THE COURT:  All right, ladies and gentlemen,

14  hopefully that answers your question as you have posed

15  it to the Court.  You will be returning now to continue

16  your deliberations.

17            (Whereupon, the jury exited the courtroom to

18  continue deliberations.)

19       THE COURT:  Counsel, it's about 4:18.  They

20  have probably about 15, 20 minutes of continued

21  deliberations.  We'll break them, as required by Court

22  rules, at approximately 4:35 or so.

23            (Whereupon, the Court stood in recess while

24  awaiting a verdict.)

25       THE CLERK:  The case on trial, People v. Ray

Proceedings                                                    1462

1    Ross.  All parties are present except for the jury,

2    Judge.

3              THE COURT:  Just two matters before the jury

4    gets here.  One is, Counsel have any objection to the

5    Court's response to the jury's last question?

6              MR. PERRI:  No, your Honor.

7              THE COURT:  Mr. Zerner?

8              MR. ZERNER:  Not at this time, no.

9              THE COURT:  Very good.

10             With regard to the alternate juror, what is

11   counsel's position?  Tomorrow is Friday, by the way.

12   Let me say the Court is inclined to keep the one

13   alternate juror we have at least until tomorrow.

14             MR. PERRI:  That's fine, your Honor.

15             MR. ZERNER:  We'll rely on the Court's

16   discretion.

17             (Whereupon, the jury entered the courtroom.)

18             THE CLERK:  The jury is present.  All sides

19   present.

20             People ready?

21             MR. PERRI:  Yes, your Honor.

22             THE CLERK:  Defense ready?

23             MR. ZERNER:  We are, thank you.

24             THE COURT:  Good afternoon, ladies and

25   gentlemen of the jury.  Right now I'm going to hold

Proceedings                                1463

1       Court in recess because it's closing time.  You are not

2       sequestered, so you will be able to go home and you will

3       return again same time to begin continuing your

4       deliberations at 9:30 a.m.

5               To our alternate juror, I'm going to ask you

6       to return again tomorrow.

7               Remember my admonitions.  Forget about the

8       case, quite frankly, until you come back and all 12 are

9       situated again in the jury room.

10              Don't talk about the case during recess.

11              Don't read about it.

12              Don't visit any places mentioned.

13              Don't do any research about it.

14              Report to me if anyone tries to influence you.

15              Make no decisions, determinations until you

16      have all 12 of you back in the jury room.  Simply forget

17      about it until tomorrow.  Thank you all.  We'll see you

18      tomorrow morning.

19              (Whereupon, the jury exited the courtroom.)

20              THE COURT:  Counsel, anything for the record

21      before we break?

22              MR. PERRI:  No, your Honor.

23              MR. ZERNER:  No, your Honor, thank you.

24              THE COURT:  We are adjourned until tomorrow

25      morning.  I ask you to remain for just two minutes while

Kathi A. Fedden, Sr. Court Reporter

Proceedings                                    1464

1       the jury exits out of the courtroom or out of the

2       courthouse.

3                   MR. PERRI:   Yes, your Honor.

4                   (Whereupon, the trial was adjourned to

5       February 26, 2016.)

6

7                   *                *                *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kathi A. Fedden, Sr. Court Reporter