To Be Argued by:
John B. Latella
Time Requested: 10 Minutes

# Supreme Court of the State of New York
# Appellate Division: Second Judicial Department

―――――――――

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

A.D. No.:
2016-08383

- against -

Ind. No.:
1050N/2015

RAY ROSS,

Defendant-Appellant.

# RESPONDENT'S BRIEF

MADELINE SINGAS
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Kevin C. King
John B. Latella
  Assistant District Attorneys
    of Counsel

**CONFIDENTIAL PURSUANT TO PENAL LAW § 215.70 AND C.P.L. § 190.25(4)**

## TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................ i

Statement of Facts
Introduction ............................................................................................ 1
The Trial
Request for Johnson's NYSIS Sheet ............................................... 2
The People's Case
Defendant's Sexual Conduct ...................................................... 5
Law Enforcement Involvement, Defendant's Arrest,
And Expert Testimony ............................................................. 8
Defense Case ...................................................................................... 11
The Preclusion of Denis Sawyer's Testimony ......................... 16
Trial Order Of Dismissal, Deliberation, Verdict, And Sentence ....................... 17

Point I
The Record Shows That Defendant Received A Fair Trial; Contrary
To His Claims, The Prosecutor Disclosed All Available Information
Pertaining To The Witnesses' Credibility And The Court Properly
Precluded Irrelevant Testimony ............................................................. 19

   A.  The Prosecutor Exceeded His Disclosure Obligations
      Regarding The Witnesses' Criminal Histories ............................ 19

   B.  Because Sawyer's Testimony Regarding Johnson Was
      Wholly Immaterial To Any Issue At Defendant's Trial,
      The Court Properly Precluded Sawyer From Testifying ....................... 23

   C.  Any Errors Related To Johnson Were Harmless .................................... 25

Point II
The Evidence Establishing Defendant's Guilt, Which Included
Extensive Corroboration Of The Witnesses' Testimony, Was
Overwhelming, And Counsel Was Not Ineffective For Failing
To Make A Frivolous Argument Otherwise ........................................... 29

   A. Defendant's Unpreserved Claim Notwithstanding,
     The Proof Was Sufficient As A Matter Of Law
     Because The People Corroborated M.J.'s Testimony
     Regarding The Abuse Defendant Inflicted, Despite
     Being Under No Obligation To Do So ...................................... 29

   B. Defendant Was Afforded The Effective Assistance Of Counsel .......... 34

Conclusion ................................................................................................ 36

# Supreme Court of the State of New York
# Appellate Division: Second Judicial Department

———···✦···———

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

- against -

RAY ROSS,

Defendant-Appellant.

————

# RESPONDENT'S BRIEF

————

## PRELIMINARY STATEMENT

Defendant appeals from a judgment of the Supreme Court, Nassau County, rendered on June 30, 2016, convicting him, after a jury trial, of course of sexual conduct against a child in the second degree (Penal Law § 130.80[1][b]) and two counts of endangering the welfare of a child (Penal Law § 260.10[1]). Defendant was sentenced to a determinate term of three years' imprisonment and five years of post-release supervision for his second-degree course of sexual conduct against a child conviction,

i

and two concurrent one-year terms of incarceration for each of the endangering the welfare of a child convictions (Murphy, J., at trial and sentence).

Defendant is incarcerated pursuant to the judgment of conviction.  There were no co-defendants.

STATEMENT OF FACTS

Introduction

From March 2013 until June 2014, defendant sexually abused M.J.,[1] a then-twelve-year-old girl. Defendant lived with his girlfriend in an upstairs bedroom of a house in West Hempstead, Nassau County. M.J. and her mother Sarita Johnson ("Johnson"), the sister of defendant's girlfriend, lived in separate parts of the house with other family members. The abuse took place in defendant's bedroom, with the door closed. Defendant touched M.J.'s breasts and buttocks with his hands, and placed his penis on M.J.'s buttocks prior to ejaculating. In addition, on weekend excursions with M.J. to visit his ex-wife in Brooklyn, defendant stopped in the parking lot of a Nassau County store and touched M.J.'s breasts, buttocks, and vagina under her clothing while they sat in the back seat of his truck. After removing his own pants and exposing himself, defendant pulled down M.J.'s pants, licked M.J.'s vagina, and placed M.J.'s hand on his penis so that he would ejaculate. He told M.J. that he wanted to "smash," a term he used for sexual intercourse.

Defendant and M.J. also exchanged hundreds of texts messages on a phone that defendant had provided her. After observing defendant and M.J. together in defendant's room in the summer of 2014, Johnson confiscated M.J.'s phone and contacted the District Attorney's Office. Johnson forbade M.J. from having further

---

[1] Pursuant to Civil Rights Law § 50-b, the victim will be referred to herein as "M.J." for purposes of confidentiality.

contact with defendant, but defendant purchased M.J. a second phone and resumed texting her.

After M.J. and Johnson spoke to the Nassau County police detective in December, 2014, defendant was arrested. He was charged, under Indictment No. 1050N/15, with course of sexual conduct against a child in the first and second degrees (Penal Law §§ 130.75[1][b], 130.80[1][b]) for his conduct towards M.J. from March 1, 2013 until December 29, 2013; one count of endangering the welfare of a child (Penal Law § 260.10[1]) for his conduct that occurred between March 1, 2013 and December 29, 2013; and one count of endangering the welfare of a child for his conduct that occurred between December 30, 2013 and October 17, 2014.

At trial, defense counsel vigorously attempted to discredit M.J.'s and Johnson's testimony. The court, however, denied counsel's request for a copy of Johnson's NYSIS, or "rap sheet," and precluded a defense witness from testifying. Defendant was subsequently convicted of course of sexual conduct against a child in the second degree, and two counts of endangering the welfare of a child.

The Trial

Request for Johnson's NYSIS Record

During jury selection, Johnson informed the prosecutor that she had been arrested for shoplifting two years earlier, in 2014, and had been granted an adjournment

in contemplation of dismissal in resolution of the case (T.229-30).[2]  After receiving this information, defense counsel requested that the prosecutor conduct a complete search of her background -- "run a NYSIS" -- and turn the report over to the defense (T.229-31).  He further argued that he was entitled to know the date of Johnson's arrest (T.236-37).

The prosecutor indicated that he had already searched Johnson's criminal history, and that any records relating to the adjournment in contemplation of dismissal, which Johnson "believe[d]" she had received, would be sealed.  The prosecutor declined to release the report to defense counsel because it showed "no criminal convictions or any open cases" (T.230, 232).

After inspecting the report and determining that it was blank, the court asked the prosecutor to "gather as much information" as possible regarding the 2014 incident (T.233, 235, 289).  The prosecutor again searched the records of the District Attorney's Office and the court system, and learned that "there is only one record of any criminal matter," which dated to March 21, 1995.  The record showed that, after being charged with petit larceny, Johnson pled guilty to disorderly conduct and received fifteen days in jail (T.291).  Because related jail records reflected that Johnson was never incarcerated, however, the "official disposition in the Court system" was incorrect

---

[2] Parenthetical references preceded by "T" are to the minutes of the trial, and those preceded by "S" refer to the minutes of the sentence.  For the sake of clarity, defense witnesses are referred to by first name and all witnesses are referred to in parentheticals by their first initials and surnames.

(T.292). The prosecutor again informed the court that this was "all the information" that the People possessed (T.292).

Defense counsel renewed his argument that he was entitled to the rap sheet (T.346-47). In addition, because he had conducted his own investigation of the case and was told that Johnson had been arrested in Queens County in 2005 and in Nassau County in 2010, he requested Johnson's date of birth, which the prosecutor provided (T.348-49, 352).

Although the court was "satisfied" with the prosecutor's handling of his obligations and urged defense counsel to provide any additional information that he had, the court directed the prosecutor to conduct additional searches based on defense counsel's disclosures of the alleged 2005 and 2010 arrests (T.350-52). The prosecutor again searched for "any cases that resulted in a criminal or even an unsealed disposition," and could only find references to the 1995 case (T.355-56). He reiterated the discrepancy between the disorderly conduct disposition and the jail records in that case (T.356-57).

Defense counsel argued that the 2014 case was "perhaps" Johnson's "wedge to try to help herself" (T.359), and asserted that he was entitled to see "paperwork" related to the case (T.361). The prosecutor again stated that he had "turned over as much information" as was required under the Criminal Procedure Law and case law (T.361). He emphasized that the files were sealed, and not accessible to the People (T.361).

Thereafter, the court ruled again that "there is no criminal conviction, so there is no obligation on the assistant district attorney to provide anything else to defense counsel" (T.363). The court further noted that it would add Johnson's criminal history report to the record as a court exhibit, and that defense counsel would be permitted to inspect it (T.353, 549).

The People's Case

Defendant's Sexual Conduct

M.J., age fifteen on the day of her testimony, lived with her mother SARITA JOHNSON ("Johnson") and several family members in a two-story home in West Hempstead, Nassau County, New York. Johnson, who depended on child support for her income and received assistance from defendant in paying bills, lived on the first floor of the house with her family, while defendant and his girlfriend, Johnson's sister Tara Johnson, lived on the second floor (S. Johnson: T.446, 449, 515, 520-24, 543; M.J.: T.744-50). On the day of her testimony, M.J. attended high school and had never been left back or forced to take a long period time off from school (M.J.: T.751-52).

In March 2013, when M.J. was twelve years old and in sixth grade, she began "hanging out" with defendant, who she referred to as "Ray Ray." She and defendant watched television in his room. Defendant was on disability from his work and often remained at home watching television; defendant owned the only television set in the house (S. Johnson: T.448, 450-51, 533, 592; M.J.: T.751-57, 887-89). Although the door

5

initially remained open while M.J. was in defendant's room, defendant eventually began closing it (S. Johnson: T.451; M.J.: T.758).

On one occasion, defendant, with the door closed and while wearing only a t-shirt and boxer shorts, grabbed M.J.'s buttocks underneath her undergarments. M.J. asked defendant what he was doing, and defendant replied, "nothing" (M. Johnson: T.757-58). M.J. explained that, after this incident, she returned to defendant's room frequently. "[O]nce or twice a week," as she sat on his bed, defendant continued to touch M.J.'s buttocks and her vagina. He also fondled M.J.'s breasts under her shirt while touching his penis (M. Johnson: T.759-65). M.J. demonstrated for the jury how defendant would masturbate (M.J.: T.763).

In the summer of 2013, M.J. would also lie facedown on defendant's bed with her pants pulled down. Defendant, having closed the door to his room, rubbed his exposed penis on M.J.'s buttocks and "would cum" (T.777-79).

During the summer of 2013, on nearly every Saturday, M.J. and defendant, unaccompanied by her other family members, went on car trips to Brooklyn to visit Paula Ross, defendant's ex-wife, and his children (S. Johnson: T.452-55, 529, 561-63; M.J.: T.750, 765-66, 801, 891-92, 894-96, 943-45, 971-74, 984). Later that summer, as M.J. and defendant were returning to West Hempstead alone, defendant stopped in the parking lot of a store in West Hempstead. At defendant's command, M.J. climbed into the back seat of defendant's truck. Defendant pulled down M.J.'s pants, as well as his own pants, and exposed his penis. He made himself erect and touched her breasts,

6

buttocks, and vagina under her clothing. After kissing M.J. on the neck, he also licked M.J.'s vagina. Defendant took M.J.'s hand, placed it on his penis, and ejaculated. Defendant stated to M.J. that he wanted to "smash," a term he used to describe sexual intercourse (M.J.: T.772-76). M.J.'s weekend excursions to Brooklyn, including stops in the store parking lot during the return trip, continued from September to December 30, 2013, when M.J. turned thirteen (M. Johnson: T.782, 802-03).

In October of 2013, defendant purchased a cell phone for M.J. and agreed to pay for cellular service (M.J.: T.783, 798). M.J. called defendant's number, which was stored in the phone under the name "Ray Ray," daily. She frequently exchanged text messages with him, and slept with the phone under her pillow (M.J.: T.798-800, 884, 923). After defendant purchased her the phone, M.J. began entering defendant's room "almost every day," with the door closed and after both defendant and M.J. knew that Tara was not home. Defendant touched M.J.'s breasts and vagina (M. Johnson: T.803-06, 821-22). Defendant told M.J. that he loved her and would purchase her a car after they moved into a house together (M.J.: T.801). Defendant also loaned M.J. a clarinet so that she could join her high school's band, and attended her parent-teacher conferences (M. Johnson: T.963-67).

Defendant continued to abuse M.J. in his bedroom until June 2014, well after M.J. had turned thirteen (M. Johnson: T.806, 820). M.J. was scared, but did not tell anyone about the abuse because he had threaten to "call social services" on Johnson, and because M.J. still wanted defendant to pay for her phone (M. Johnson: T.806).

Defendant also continued to take M.J. to Brooklyn "almost every weekend," until June 2014. Upon returning from Brooklyn, he would stop in the parking lot of a different store because there were "too many people" at the old location. In the new location, defendant pulled down M.J.'s pants and touched her breasts, buttocks, and vagina. He also licked her vagina and masturbated (M. Johnson: T.802, 810, 817, 819).

### Law Enforcement Involvement, Defendant's Arrest, and Expert Testimony

Defendant's relationship with M.J., and especially their trips to Brooklyn, caused numerous fights between M.J. and Johnson during the summer of 2014. Defendant told M.J. that he would "take care" of Johnson. In July 2014, Johnson forbade M.J. from being near or contacting defendant. But later that morning, she saw M.J. and defendant together in a park as M.J. was playing with relatives. Defendant purchased an ice cream for M.J., but not any of the other children. In August of 2014, Johnson walked into defendant's room while the door was closed and saw M.J. sitting on defendant's bed as defendant was laying down (S. Johnson: T.463, 470-73; M.J.: T.823-27, 882, 890, 921-23, 949, 952, 968). Johnson ordered M.J. out of the room. Alarmed by these events, she brought M.J.'s phone to the District Attorney's office to be examined. The phone contained a series of text messages that defendant and M.J. exchanged (S. Johnson: T.482-84, 566-72, 593-98, 612, 620; M.J.: T.830-32, 882, 923-30).

Defendant and M.J. had no further contact until October 2014, when defendant gave M.J. a new phone.  M.J. resumed exchanging calls and texts using the new phone (M.J.: T.842, 852, 912, 932-34).  Although she kept the second phone a secret from her mother, Johnson discovered it when M.J. called her for a ride home on October 20, 2014.  Johnson reviewed the text messages that defendant and M.J. had exchanged, and then took M.J. to the District Attorney's Office (S. Johnson: T.484, 492-97, 573, 621-22; M.J.: T.853-54, 863-64, 869, 898, 937-41, 988).  Johnson also sought orders of protection against defendant from Family Court, after which defendant moved out of the house (M.J.: T.863; S. Johnson: T.501-03).

On December 10, 2014, M.J. and Johnson met with Nassau County Detective RHUBENS TOUSSAINT outside their home (S. Johnson: T.503, 575-585; Toussaint: T.629-30, 667-65).  After taking notes, Toussaint went to his stationhouse and typed M.J.'s statement.  He returned the same night, and M.J. and Johnson signed the statement (S. Johnson: T.585-90; Toussaint: T.631, 653-54, 664, 678, 683-84; M. Johnson: T.865, 899-911).  Toussaint collected both cell phones from Johnson and arranged for defendant's surrender (M.J.: T.788, 867; Toussaint: T.631-32, 655-59).  Approximately 520 pages of records showing telephone calls and text messages between M.J. and defendant were introduced into evidence (Sprint Representative KELLY WALKER: T.715, 724), as well as printouts of the messages recovered from both phones (M.J.: T.832-40, 854-61).

JOSH HANSON, Director of the Nassau County Child Advocacy Center, an expert in forensic interviewing, child sexual abuse, and sexual penetration, provided expert testimony on the behaviors of pedophiles and sexual predators (Hanson: T.1004-13).

Defense counsel sought to cross-examine Johnson about her 2014 arrest to determine if she had a "vested interest" in accusing defendant of sexual abuse so that she could receive an adjournment in contemplation of dismissal plea offer (T.512-13). He further posited that Johnson "did get a favorable ruling at the same time she was the complainant's mother" and claimed that he still had not seen a document showing the "date of the disposition" of the 2014 charge (T.513-14). The court precluded this cross-examination as "mere speculation," the prejudicial nature of which outweighed its probative value (T.514).

Defense counsel also informed the prosecutor of allegations that Johnson was charged with a misdemeanor in 2011 following an incident in Rockville Centre, Long Island (T.548-49). After contacting the Rockville Centre Police Department, the prosecutor informed the court that the only record concerning Johnson was for an "aided case" in 2011. The police lent assistance to Johnson, who was ill. The court made this document a court exhibit (T.554-55).

<u>Defense Case</u>

RAFAEL MICKENS ("Rafael"), a janitor and M.J.'s father, explained that he dated and lived with Johnson for eight years until their relationship ended in 2006 and he moved out of their West Hempstead home (R. Mickens: T.1068-71). They remained estranged (R. Mickens: T.1079). Rafael claimed that he was involved in M.J.'s life because he spoke to her on the phone and took her to visit family in Harlem twice a month in the summer. Despite this contact, he conceded that he did not "see her that much" or attend her parent-teacher conferences, although he offered that he was present at a school concert and her middle-school graduation (R. Mickens: T.1072-74, 1078, 1086).

Rafael's brother George had purchased M.J. a cell phone in 2011 so that he could contact her (Mickens: T.1075-77, 1081). He noted that Johnson ordered the phone service terminated (Mickens: T.1081-83).

Rafael's brother GEORGE MICKENS purchased M.J. a cell phone in 2011, with Rafael's permission, as a reward for doing well in school (G. Mickens: T. 1091-94, 1099). Defendant paid the service bill on the phone beginning in 2013, when George could no longer afford to do so (G. Mickens: T.1096, 1098).

PAULA ROSS, a sales associate who was defendant's ex-wife and mother of their three children, explained that she would see defendant and M.J. in West Hempstead and Brooklyn. They would go on outings for which defendant paid

(P. Ross: T.1104-12, 1121-25). She claimed that she had a close relationship with M.J. and that M.J. enjoyed seeing her (P. Ross: T.1115-19). On one occasion, she recalled defendant purchasing ice cream for a large group of children (P. Ross: T.1123). She conceded that she never saw defendant and M.J. together without anyone else present (P. Ross: T.1130).

JASMYN ROSS, a store clerk and defendant's daughter, noted that, in 2013, defendant would spend time with her on family outings. Defendant was "always" with M.J., and sometimes M.J.'s sister Mercedes would join them (J. Ross: T.1151-55). Defendant drove M.J. home from the trips to Brooklyn in a white truck (J. Ross: T.1157).

JUSTYN ROSS, a sanitation worker who had resided with his mother Paula in Brooklyn, also described the outings on which M.J. joined (Justyn Ross: T.1163-64, 1167). On some, but not all, occasions he rode back with M.J. and defendant to West Hempstead (Justyn Ross: T.1169-70). He also noted that, in 2014, defendant moved in with him (Justyn Ross: T.1167).

Johnson's sister TARA JOHNSON, defendant's girlfriend, claimed that she and defendant supported Johnson's children and assumed financial responsibility for their home, and also attended their parent-teacher conferences (T. Johnson: T.1196, 1204-05, 1245). She stated that defendant's room had the only functional cable television in the house, which all of her nieces and nephews who resided at the home watched. In

2013 and 2014, defendant was often alone with the children, including M.J., because he had a knee disability (T. Johnson: T.1208-09, 1256).

The sisters' relationship was strained, and they had a physical altercation in the past. When Tara and defendant were not home, the door to defendant's room was always locked to stop Johnson from stealing from Tara. Otherwise, the door remained unlocked. (T. Johnson: T.1209-11, 1217, 1242-44).

On Saturdays, defendant took the children living with him in West Hempstead on outings. Defendant grew close to M.J. because they "did a lot of things together." M.J. wished to move in with defendant (T. Johnson: T.1213, 1218-19, 1229). According to Tara, the attention defendant gave M.J., and the money he spent on her, caused Johnson to become angry and resentful of defendant, and Johnson and M.J.'s relationship grew contentious in the summer of 2014 (T. Johnson: T.1219-25, 1228-29, 1231). After Johnson saw defendant and M.J. watching television together, she made the "sudden" rule that M.J. could not spend time with defendant (T. Johnson: T.1230).

Despite being prohibited from seeing defendant, M.J. sought permission from Tara to call him on her new cell phone beginning in the fall of 2014, until Johnson took the phone away permanently (T. Johnson: T.1230, 1254). Tara admitted that police officers "escorted" defendant out of the house in 2014 and that she stayed behind. She claimed that she did so because her responsibility for "overseeing" the house was more important than ending her relationship with her sister (T. Johnson: T.1221, 1244).

Tara claimed that M.J. denied that defendant had molested her, but admitted that she had not seen any of the text message exchanges between M.J. and defendant (T. Johnson: T.1249-50).

Testifying last, defendant RAY ROSS, a fifty-five-year-old truck driver who typically worked the overnight shift, explained that he was the father of three children and was legally divorced from Paula Ross (R. Ross: T.1263-64). In 2013, he was living with Tara in West Hempstead, and was on disability because of an injury (R. Ross: T.1265-67, 1270). He claimed that he was the sole means of support for all the people who resided at the West Hempstead home (R. Ross: T.1290-93, 1297-98, 1323).

Defendant admitted that, on Saturdays in 2013, he drove his white truck to Brooklyn with M.J., sometimes accompanied by M.J.'s sister (R. Ross: T.1282-84, 1304-05, 1321). He conceded that, on many occasions, he was often alone with M.J. in his room and on return trips from Brooklyn, but he denied engaging in sexual conduct. He claimed that he was unfamiliar with the term "smash," and denied that he texted M.J. about "smashing" (R. Ross: T.1285-84, 1289-91, 1300, 1305-07).

In 2013, defendant was aware that M.J. had a cell phone that her uncle George had given her. Defendant noted that he eventually paid the bill for this phone and a second phone that he purchased for her in 2014. Defendant acknowledged that he texted M.J. that he wanted this second phone kept secret from Johnson. Nevertheless, he claimed that the arrangement through which he provided M.J. a phone pleased

Johnson until defendant's relationship with Johnson became strained in the summer of 2014 (R. Ross: T.1275-78, 1281-82, 1294, 1311, 1319-20).

Defendant acknowledged that he sent text messages to M.J. in which he told her that he "loved her;" that she was "in danger of losing" him; that "I'll never find another [M.J.], you're my heart;" that a "part of him died" when Johnson would not allow them to see each other; that he was upset that she would not call to say "hi Ray Ray;" that he did not want her to "forget who loves you and take care of you" because she would "lose" him; and that he wanted M.J. to meet him "once [Johnson] left the house." He accounted for these messages by asserting that they were sentiments that he would send to any of his children and were not "sexual," and he denied sending the final text regarding M.J. entering his room once her mother was not at home. He claimed that he sent the texts to M.J. because he wanted to boost her "esteem" (R. Ross: T.1286-88, 1309, 1316-17, 1320-22). Even though he acknowledged that he would call and send text messages to M.J. between 1:00 a.m. and 4:00 a.m., he claimed that he would do this for all of his children (R. Ross: T.1301-04)

He admitted that he attended M.J.'s parent-teacher conferences and that M.J. had become an honors student (R. Ross: T.1296-97, 1307). He further asserted that the only reason he requested the return of the clarinet he had given M.J. was because he was not "appreciated" for the support he had given her (R. Ross: T.1298, 1308).

In 2014, Johnson informed defendant that she was going to have M.J.'s cell phone turned off (R. Ross: T.1299). She also told defendant to "stay away" from M.J.,

but defendant claimed that he did not know why (R. Ross: T.1288-89). Defendant denied threatening to take the phone away first as punishment for something M.J. had done (R. Ross: T.1321).

### The Preclusion Of Denise Sawyer's Testimony

Midway through the defense case, defense counsel informed the court that, after a weekend recess, Johnson had contacted the Nassau County Police Department to make a trespassing allegation against Denies Sawyer, a neighbor, and had threatened her. Defense counsel noted that he had not previously planned to call Sawyer as a witness, but wished to do so "given what we have now" (T.741, 1051, 1141, 1143). The court asked whether defense counsel's only purpose in calling Sawyer was to "impugn" Johnson, and defense counsel answered that "[m]aybe" Sawyer had witnessed interactions between defendant and M.J. and that she could elucidate Johnson's "bias" and "perhaps even her reputation in the community" (T.1141, 1179, 1183). Defense counsel further demanded police paperwork for interactions that occurred between Johnson and Sawyer because those interactions might reflect on Johnson's credibility (T.1034-35, 1041-42, 1051, 1054).

The prosecutor acknowledged that Johnson had informed the District Attorney's Office that Sawyer had been in her backyard. Relying on *People v. Seabrook*, 76 A.D.3d 606 (2d Dept. 2010), *People v. Ruiz*, 18 A.D.3d 220 (1st Dept. 2005), and *People v. Lyons*, 2010 WL 4227250 (Supreme Court, Queens County, Oct. 10 2010) (T.1054, 1179), the

prosecutor argued that the matter was "collateral," as it had "nothing to do with the present case" (T.742). He further noted that, because defense counsel was admittedly not planning to call Sawyer until the trespass allegation arose, she had "no other relevant testimony" in the case, and that there was no evidence that Sawyer was going to offer testimony about Johnson's motive to lie (T.1143, 1179-80).

The court found that defense counsel sought to call Sawyer after a "separate and distinct and post action incident" (T.1181), and because Sawyer's testimony was "collateral" and she could not offer "any meaningful testimony," the court precluded the witness (T.1185, 1191-92).

Trial Order of Dismissal, Deliberation, Verdict, and Sentence

At the close of the People's case, defense counsel moved for a trial order of dismissal on the ground that the People had failed to establish M.J.'s date of birth. Specifically, counsel argued that M.J. had testified as to her date of birth, but no birth certificate had been offered into evidence to prove her age (T.1043-45). He further argued that the text messages were insufficient by themselves to support the count of endangering the welfare of M.J. (T.1044-45).

The prosecutor opposed the motion, noting that, in New York, a witness could testify as to his or her own age or date of birth, and that, in the light most favorable to the People, the evidence was sufficient to support all of the charges in the indictment (T.1046-47). The court reserved decision on defendant's motion (T.1047, 1335). There

was no subsequent denial of the motion, and defense counsel did not renew the motion after the verdict was rendered.

After a series of jury notes and an *Allen* charge delivered on the third day of deliberations, the jury reported that it had reached a verdict, and acknowledged the "gravity" of the case and its "deep responsibility" (T.1465-71).  Thereafter, the jury found defendant guilty of course of sexual conduct against a child in the second degree, and the two counts of endangering the welfare of a child.  The jury found defendant not guilty of course of sexual conduct against a child in the first degree (T.1473-75).

The court, after observing that it was "uncontradicted" that M.J. came from a "dysfunctional" family and that defendant had "pitted" M.J. against her family, sentenced defendant to three years in prison to be followed by five years of post-release supervision for the course of sexual conduct against a child conviction, and one year in jail on each of the endangering the welfare of a child convictions (S.22, 26).  The court directed that all of the sentences run concurrently with each other, and also imposed a lifetime order of protection in favor of M.J. (S.26).

## POINT I

The Record Shows That Defendant Received A Fair Trial; Contrary To His Claims, The Prosecutor Disclosed All Available Information Pertaining To The Witnesses' Credibility And The Court Properly Precluded Irrelevant Testimony (answering Defendant's Brief, Point II).

Defendant claims that he was denied a fair trial because defense counsel was unable to assail Johnson's credibility. Specifically, he alleges: (A) that he was entitled to review Sarita Johnson's NYSIS criminal history report for cross-examination purposes, and (B) that he should have been allowed to call Denise Sawyer as a defense witness to impeach Johnson. Both of these arguments are without merit. In any event, given the proof of defendant's guilt, any possible error was harmless.

### A. The Prosecutor Exceeded His Disclosure Obligations Regarding The Witnesses' Criminal Histories.

During jury selection, Johnson informed the prosecutor about a 2014 shoplifting arrest in Nassau County. After requests from both defense counsel and the court, the prosecutor produced a NYSIS report. This report was blank and showed no open matters or past convictions, possibly because any period of adjournment in contemplation of dismissal related to a 2014 case would have expired by the start of trial and all records relating to that since-dismissed case would be sealed. Although it did not appear on the blank NYSIS report, the prosecutor disclosed that the only record of Johnson's contact with the criminal justice system dated to 1995, when Johnson pled guilty to disorderly conduct to satisfy petit larceny charges (T.291-92, 355-57).

The prosecutor's handling of the matter "satisfied" the trial court (T.350). Indeed, because there was "no criminal conviction," there was no resulting "obligation on the assistant district attorney to provide anything else to defense counsel," despite defense counsel's request for a copy of the blank sheet (T.363). After the prosecutor nevertheless handed the NYSIS sheet to the court for inspection, the court informed defense counsel that the NYSIS sheet would be available as a court exhibit for defense counsel to inspect (T.353, 549).

Thereafter, during trial, defense counsel sought to cross-examine Johnson regarding her alleged 2014 arrest to determine if she had a "vested interest" in accusing defendant of sexual abuse in exchange for an adjournment in contemplation of dismissal disposition in that case (T.512-13). The court precluded this cross-examination as "mere speculation," the prejudicial nature of which outweighed its probative value (T.514).

The court made the proper ruling, and defendant's claim on appeal that the trial court erred in permitting the prosecutor to refuse to turn over Johnson's NYSIS sheet directly to defense counsel so that defense counsel could have cross-examined Johnson on "pending charges against the witness" (Defendant's Brief at 12) is unavailing. Under section 240.45 of the Criminal Procedure Law, the People must disclose to defendant any known criminal convictions and the existence of any criminal actions pending against trial witnesses. C.P.L. § 240.45(1)(b), (c). The People are not required, however, to fingerprint their witnesses or to cause a law enforcement agency or court to issue

a report concerning a witness, or to disclose such a report to defense counsel. C.P.L. § 240.45(1)(c); *People v. Graham*, 289 A.D.2d 417 (2d Dept. 2001).

Thus, in this case, the prosecutor exceeded his obligations under the Criminal Procedure Law when he disclosed to defense counsel all the information in his possession regarding Johnson's criminal history. Specifically, the prosecutor informed the court that Johnson had received an adjournment in contemplation of dismissal in 2014 to satisfy an apparent shoplifting incident. On the day of trial, however, the period of adjournment had expired, and the records of the case were sealed. In addition, the prosecutor conducted an extensive search of records and informed defense counsel that in 1995, Johnson had pled guilty to disorderly conduct to satisfy another petit larceny charge.

Thus, Johnson faced no pending charges that the prosecutor was required to disclose. *See People v. Clark*, 194 A.D.2d 868, 869 (3d Dept. 1993) (cases adjourned in contemplation of dismissal but which have not yet been dismissed are "considered pending charges to be disclosed" pursuant to C.P.L. § 240.45) (citing *People v. Benjamin*, 147 Misc. 2d 617, 618-20 [Supreme Court, New York County 1990]). Even if the adjournment period were still open, however, the prosecutor fulfilled his discovery obligations, as defense counsel was fully apprised of this case, as well as the 1995 disorderly conduct plea. *See People v. Williams*, 251 A.D.2d 266, 267 (1st Dept. 1998) (the mere "disclosure of the 'record of judgment of conviction'" was sufficient to comply with C.P.L. § 240.45).

Having made these disclosures, the prosecutor was under no additional obligation to disclose Johnson's blank NYSIS form, either to the court or to defense counsel. *See Graham*, 289 A.D.2d at 418 ("the trial court properly denied the defense counsel's demand for production of the NYSIS sheets" as the "prosecutor complied with his disclosure obligations under CPL [§] 240.45(1)(b), (c), and the statute expressly provides that the prosecutor shall not be required to 'cause the division of criminal justice services or other law enforcement agency or court to issue a report concerning a witness'"). In any event, despite being under no obligation to do so, the record is clear that the prosecutor ultimately exceeded the requirements of Criminal Procedure Law section 240.45. Indeed, the prosecutor disclosed the NYSIS sheet when he handed it to the court for inspection and it was made a court exhibit that defense counsel could inspect at any time (T.233, 235, 353, 549).

Citing *Giglio v. United States*, 405 U.S. 150 (1972), defendant speculatively raises the claim that the NYSIS sheet would have allowed him to probe whether Johnson received the adjournment in contemplation of dismissal in exchange for her testimony against defendant. *See* Defendant's Brief at 12. Defendant simply ignores, however, that the sheet was blank. Thus, it could not have shown the date on which the court presiding over Johnson's case granted the application for an adjournment in contemplation of dismissal. Since the case was sealed, any claim that the blank sheet could have provided defense counsel with a basis to cross-examine Johnson on plea negotiations was, as the trial court correctly concluded, "mere speculation" (T.514).

This remains no less true on appeal than it was at trial. *See People v. Brown*, 174 A.D.2d 312, 313 (1st Dept. 1991) (where the "record was sealed" and the contents of a file inaccessible to the People, no *Brady* violation could have occurred because "the exculpatory potential of the [evidence] was speculative"); *People v. Walker*, 180 A.D.2d 700, 701 (2d Dept. 1992) (no *Brady* violation when defense counsel demanded the production of arrest reports and "speculated that the arrest reports" might have contradicted police testimony). Accordingly, defendant's claims regarding the NYSIS sheet should be rejected.

   B. Because Sawyer's Testimony Regarding Johnson Was Wholly Immaterial To Any Issue At Defendant's Trial, The Court Properly Precluded Sawyer From Testifying.

After a weekend recess in testimony during the defense case, defense counsel reported to the court that he had learned about an incident involving Sarita Johnson over the weekend. According to defense counsel, Johnson had contacted the Nassau County Police Department to make a trespassing allegation against a neighbor, Denise Sawyer, and had threatened her. Even though defense counsel had not planned to call Sawyer as a witness, he announced that he wished to do so "given what we have now" (T.741, 1051, 1141, 1143). The court asked whether defense counsel's only purpose in calling Sawyer was to "impugn" Johnson. Defense counsel answered that "[m]aybe" Sawyer had witnessed interactions between defendant and M.J. and that Sawyer could elucidate Johnson's "bias" and "perhaps even her reputation in the community"

(T.1141, 1179, 1183).   In response to defense counsel's speculative argument that Sawyer could testify as to Johnson's reputation in the community, the prosecutor argued that the sole purpose in calling Sawyer was to allow her to testify about the trespass incident, which was wholly "collateral," and had "nothing to do with the present case." In support of his argument, the prosecutor emphasized defense counsel's admission that he was not planning to call Sawyer prior to the court's weekend recess and before the incident had occurred (T.742, 1143, 1179-80).

The court agreed that defense counsel sought to call Sawyer after a "separate and distinct and post action incident" (T.1181).   Because Sawyer's testimony was "collateral," and because she could not offer "any meaningful testimony," the court precluded the witness (T.1185, 1191-92).

On appeal, defendant claims that the trial court erred because Sawyer "could have discussed Johnson's credibility, as well as her reputation in the community." Defendant's Brief at 13.  Defendant is incorrect.

It is well-settled that extrinsic evidence of "immoral, vicious, or criminal acts" may not be used to impeachment a witness (*People v. Lyde*, 160 A.D.2d 817, 817-18 [2d Dept. 1990]), as such evidence will only "divert the jury's attention from the main issues involved in the trial." *People v. Pavao*, 59 N.Y.2d 282, 289-90 (1983).  As the sole purpose for calling Sawyer was to impeach Johnson's credibility with alleged bad acts that had occurred after Johnson had concluded her testimony and the People had rested, Sawyer was properly precluded from testifying.

Indeed, defense counsel's entire offer of proof regarding Sawyer's testimony was that over the weekend, Johnson accused Sawyer of trespass and threated her. This was nothing more than an attempt to discredit Johnson by eliciting details of an unrelated, irrelevant, alleged bad act that had taken place a few days earlier, and well after defense counsel had already finished cross-examining Johnson. As the proffered testimony was wholly immaterial to any issue at defendant's trial, it was properly precluded. *See People v. James*, 177 A.D.2d 595, 596 (2d Dept. 1991) ("The trial court properly exercised its discretion by refusing to admit the proffered testimony of the police informant's sister concerning the informant's purported jealousy over a third sister's relationship with the defendant. This testimony was not probative of any issues in the case."); *People v. Fitzpatrick*, 171 A.D.2d 972, 975 (3d Dept. 1991) (when proffered extrinsic evidence offered by the defendant in response to the testimony of the People's rebuttal witness was "irrelevant and immaterial to any issue involving defendant's guilt or innocence" and its only purpose would have been to "impeach a prosecution witness's credibility," the trial court properly precluded the evidence).

## C. Any Errors Related To Johnson Were Harmless.

Any claims concerning Johnson's credibility on appeal relate solely to defense counsel's impeachment ability and, as such, were harmless. M.J., the victim -- not Sarita Johnson -- was the critical witness in the case, and defense counsel exhaustively assailed the credibility of all the People's witnesses, including Johnson. Thus, even if the jury

had elected not to credit Johnson, there was overwhelming evidence of defendant's guilt from M.J. herself. *See People v. Crimmins,* 36 N.Y.2d 230, 242 (1975).

M.J. testified powerfully that, from March 2013 until June 2014, defendant abused her both in his home and in his car by touching her breasts, buttocks, and vagina beneath her clothing. He licked her vagina and placed his exposed penis on her buttocks, after which he ejaculated. He also masturbated by using his own and also M.J.'s hand, and expressed his desire to have sex with her. Defendant undertook this course of conduct only after he had ingratiated himself with M.J. and groomed her for his advances with rewards like a cell phone, a clarinet, and ice cream (Hanson: T.1007-08). Having done so, he repeatedly texted her about his love for her and their relationship.

Johnson's testimony, by contrast, was offered simply as background to corroborate M.J.'s statements, and as outcry testimony to show how the District Attorney responded to the reports of abuse. Moreover, the jury heard extensive evidence affecting Johnson's credibility, including information that her relationship with her sister was strained and had led to a physical altercation. In addition, the jury learned that Johnson stole items from Tara's room and that defendant, not Johnson, participated in M.J.'s parent-teacher conferences (M. Johnson: T.963-67; T. Johnson: T.1196, 1204-05, 1209-11, 1217, 1242-44). The jury also heard testimony about living conditions and relationships in the Johnson household, which, as the court observed,

provided an uncontradicted account of family dysfunction that defendant exploited to inflict sexual abuse on M.J. (S.22).

Additionally, defendant offered patently self-serving explanations for his conduct. In forming a relationship with M.J., he claimed he was acting simply as a father figure to her, and that his text messages were not sexual but were instead an effort to boost her "esteem." Defendant claimed that he did not know why Johnson ordered him to stay away from M.J., and denied threatening M.J. with the loss of her phone over something M.J. had done (R. Ross: T.1288-89, 1321). He denied knowing what the term "smash" implied, and even that he had ever texted the word to M.J. Most significantly, despite conceding that he was alone with M.J., he denied ever engaging in sexual conduct with her (R. Ross: T.1285-84, 1289-91, 1300, 1305-07). This testimony was additional proof of his guilt. *See People v. Moses,* 63 N.Y.2d 299, 308 (1984) ("A false alibi falls into the category of evidence ... considered indicative of consciousness of guilt and thus of guilt itself."); *Matter of Lonique M.*, 93 A.D.3d 203, 206 (1st Dept. 2012) (a defendant's false statements to police "are evidence of consciousness of guilt"); *People v. Bierenbaum,* 301 A.D.2d 119, 137 (1st Dept. 2002) (a defendant's "lies, misstatements and omissions powerfully bespeak his consciousness of guilt"); *People v. Smith*, 207 A.D.2d 713, 714 (1st Dept. 1994) (defendant's demonstrably false statements evinced consciousness of guilt); *People v. Marin*, 102 A.D.2d 14, 27 (2d Dept. 1984) (false statements by a defendant "may constitute circumstantial evidence of a consciousness of guilt from which a defendant's guilt may be inferred").

Thus, because the jury was not required to credit Johnson to convict defendant, and in fact could have discarded her testimony completely and yet still reached the same result in deliberations, any errors related to Johnson had no effect on this verdict. *See People v. Hanley*, 5 N.Y.3d 108, 114-15 (2005) (reversal warranted only when proposed extrinsic evidence could have been "relevant and material to the issue of the reliability and credibility of the complainants' testimony"). Accordingly, defendant's claims should be rejected.

<u>POINT II</u>

The Evidence Establishing Defendant's Guilt, Which Included Extensive Corroboration Of The Witnesses' Testimony, Was Overwhelming, And Counsel Was Not Ineffective For Failing To Make A Frivolous Argument Otherwise (answering Defendant's Brief, Points I and III).

Defendant relies on sections 130.16 and 260.11 of the Penal Law for his claim that the proof in this case was insufficient because M.J.'s testimony was not corroborated. *See* Defendant's Brief at 14-18. In fact, corroboration was not required in this case. M.J., an honors student, was fifteen years old on the day of her testimony, and she was twelve years old when defendant began to abuse her (M.J.: T.751-52; R. Ross: T.1307). And even if corroboration were required, plenty was provided in the form of testimony that confirmed important details of M.J.'s account of the abuse she suffered, as well as the myriad texts messages that M.J. and defendant exchanged.

    A. Defendant's Unpreserved Claim Notwithstanding, The Proof Was Sufficient As A Matter Of Law Because The People Corroborated M.J.'s Testimony Regarding The Abuse Defendant Inflicted, Despite Being Under No Obligation To Do So.

As defendant concedes, (*see* Defendant's Brief at 10), his insufficiency claim based on lack of corroboration is unpreserved. In his trial order of dismissal, defense counsel did not argue that the charges were insufficient because of a lack of corroboration. Accordingly, defendant's new insufficiency claim is unpreserved for review. *See People v. Waters*, 90 N.Y.2d 826, 828 (1997) ("theories" not identified to trial court are unpreserved); *People v. Cherry*, 302 A.D.2d 472 (2d Dept. 2003) (finding

arguments on appeal "unpreserved for appellate review since [the defendant] did not raise those specific arguments" to the court below). In any event, the claim is without merit.

"[A] legal sufficiency inquiry . . . is limited to determining whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *People v. Khan*, 18 N.Y.3d 535, 541 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 [1979]). Thus, the evidence is legally sufficient if "there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt." *People v. Clyde*, 18 N.Y.3d 145, 155 (2011).

In this case, the People were required to prove that defendant, "over a period of time not less than three months in duration . . . being eighteen years old or more, engage[d] in two or more acts of sexual conduct with a child less than thirteen years old." Penal Law § 130.80(b)(1). The People were also required to prove a lack of consent because M.J. was incapable of consent, either by being, *inter alia*, less than seventeen years of age, mentally disabled, or mentally incapacitated (Penal Law § 130.05[1], Penal Law § 130.05[2][b], Penal Law § 130.05[3][a], [b], [c]). In addition, to prove that defendant endangered M.J.'s welfare, the People were required to prove that defendant "knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old . . ." Penal Law § 260.10.

The Penal Law imposes on the People the additional burden to corroborate a victim's testimony when the lack of consent element "results solely from incapacity to consent because of the victim's mental defect, or mental incapacity." Penal Law § 130.16. If the gravamen of the endangering charge is conduct that would constitute a crime under article 130 of the Penal Law, then a corroboration requirement is also imposed if the victim lacks the capacity to consent due to "mental defect or mental incapacity." Penal Law § 260.11. Finally, with respect to age, New York follows "the long-standing rule that the necessity for corroboration of the testimony of a child under the age of 12 rests solely on whether, as determined by the Judge before whom the testimony is to be given, the child understands the nature of an oath." *People v. Fuller*, 50 N.Y.2d 628, 636 (1980).

Here, the evidence plainly showed that M.J., an accomplished student, did not suffer from any mental disease of defect; indeed, defendant in his own testimony praised M.J.'s success in school. *See People v. Cratsley*, 86 N.Y.2d 81, 84 (1995) (incapacity to consent established when the "complainant had suffered brain damage at birth"). Moreover, given that M.J. was fifteen when she testified, she was permitted to give sworn testimony and the court was not required to inquire as to whether she was fit to do so. *See People v. Mendoza,* 49 A.D.3d 559, 560 (2d Dept. 2008) ("the Supreme Court providently exercised its discretion in determining that the five-year-old complainant was competent to give sworn testimony").

Thus, although M.J. lacked the capacity to consent because of her age, the mere fact that she was under the age of seventeen when the abuse occurred did not obligate the People, under either Penal Law sections 130.16 or 260.11, to corroborate her testimony. *See People v. McLoud*, 291 A.D.2d 867, 867 (4th Dept. 2002) (where the defendant was convicted of course of sexual conduct in the first degree, "corroboration was not required" as "the 11-year-old victim gave sworn testimony and she was not incapable of consent . . . because of mental defect or incapacity") (internal quotations and citations omitted); *People v. Pumarejo*, 222 A.D.2d 616, 616 (2d Dept. 1995) ("corroboration is required only in sexual offense cases in which the victim is incapable of consent because of mental defect or incapacity, a situation which was not shown to exist here").

In any event, despite being under no obligation to do so, the People did corroborate M.J.'s testimony. It is well-settled law that the corroboration requirement of sections 130.16 and 260.11 of the Penal Law "may be satisfied with circumstantial evidence and need not point to the particular form" of the offending conduct. *People v. De Berry*, 76 A.D.2d 933, 933 (2d Dept. 1980). Here, contrary to defendant's contention (*see* Defendant's Brief at 16), there was ample circumstantial evidence corroborating defendant's sexual conduct. M.J. testified that defendant's abuse began in his bedroom as both he and M.J. were watching television alone in his room. In August of 2014, Johnson walked into defendant's room while the door was closed and saw M.J. sitting

on defendant's bed as defendant was laying down (S. Johnson: T.463, 470-73; M.J.: T.823-27, 882, 921, 923, 949, 952, 968).

Defendant's abuse of M.J. also occurred when she and defendant would return from weekend excursions to Brooklyn. Defendant stopped his white truck in a parking lot in West Hempstead and abused M.J. in the back seat of the car. Johnson and numerous defense witnesses testified as to these weekend excursions, including details about defendant's vehicle and the group activities. Moreover, defendant himself acknowledged being alone with M.J. in his room and in his truck (S. Johnson: T.452-55, 529, 561-63; Ja. Ross: T.1151-55, 1157; Ju. Ross: T.1163-64, 1167-70; T. Johnson: T.1213, 1218-19, 1229; R. Ross: T.1282-84, 1304-07, 1321). This alone was sufficient to corroborate the charges. *See People v. Dickson*, 112 A.D.2d 312, 312 (2d Dept. 1985) (corroboration established when the "testimony of the 12-year-old complainant, the defendant's niece, was specific concerning the details of the incident, and closely paralleled the defendant's own account of his activities with the complainant on the day in question insofar as they relate to the specifics of time and place").

Finally defendant argues that the text messages could not have corroborated M.J.'s testimony because there was "no description of any of the acts which complainant described in her testimony" (Defendant's Brief at 16). In those voluminous messages and records of calls totaling 520 pages of evidence, and some of which were exchanged between 1:00 a.m. and 4:00 a.m., defendant told M.J., inter alia, that he "loved her;" that she was "in danger of losing" him; that "I'll never find another

[M.J.], you're my heart;" that a "part of him died" when Sarita would not allow them to see each other; that he was upset that she would not call to say "hi Ray Ray;" that he did not want her to "forget who loves you and take care of you" because she would "lose" him; and that he wanted M.J. to meet him "once [Johnson] left the house" (R. Ross: T.1286-88, 1301-04, 1309, 1316-17, 1320-22).   Defendant conveniently ignores that these messages, sent on phones that he concededly paid for and which he wanted kept secret from Johnson, were powerful circumstantial evidence in the context of the ongoing abuse that defendant inflicted upon M.J. *See People v. Scaringe*, 137 A.D.3d 1409, 1418 (3d Dept. 2016) (victim's testimony corroborated "most significantly, by the multiple text messages introduced into evidence in which defendant, among many other things, described the day on which the victim claimed that they had sexual intercourse as 'a dream come true'").

## B.  Defendant Was Afforded The Effective Assistance Of Counsel.

Defendant further argues that this Court should reverse the judgment because defense counsel was ineffective at trial, as he failed to move for a trial order of dismissal on the ground that M.J.'s testimony was not corroborated. *See* Defendant's Brief at 7-10.  Defendant is simply wrong.

The test for determining whether a defendant was denied the right to effective assistance of counsel under the federal constitution is two-pronged:  The defendant must show that counsel's performance was deficient, i.e., less than "meaningful," and

that he was prejudiced by the deficient performance. *See Strickland v. Washington*, 466 U.S. 668 (1984). To satisfy the prejudice component, the defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. Under the state constitution, the two *Strickland* prongs are merged into one, and "prejudice is examined more generally in the context of whether defendant received meaningful representation." *People v. Benevento*, 91 N.Y.2d 708, 713 (1998). In order to prevail on a claim of ineffective assistance of counsel, a defendant must overcome the strong presumption that defense counsel rendered effective assistance (*see People v. Rivera*, 71 N.Y.2d 705, 709 [1988]; *People v. Ivanitsky*, 81 A.D.3d 976, 977 [2d Dept. 2011]) and demonstrate the absence of strategic or other legitimate explanations for the challenged conduct. *See People v. Baker*, 14 N.Y.3d 266, 270-71 (2010); *Benevento*, 91 N.Y.2d at 712. Here, defendant has not met his burden under either standard.

Defense counsel -- who vigorously defended his client against exceptionally serious allegations -- doubtless realized that this motion would have been wholly frivolous, as the People had corroborated M.J.'s testimony despite having no obligation to do so. It is, of course, well-settled that an attorney's failure to make an argument that has little or no chance of success does not constitute ineffective assistance of counsel. *See People v. Caban,* 5 N.Y.3d 143, 152 (2005)*; People v. Hampton,* 81 A.D.3d 974, 975 (2d Dept. 2011); *People v. Terrell,* 78 A.D.3d 865, 866 (2d Dept. 2010).

Accordingly, defendant's claims should be rejected.

<u>CONCLUSION</u>
<u>The Judgment Of Conviction Should Be Affirmed.</u>

Dated:   Mineola, New York
         June 29, 2017

                              Respectfully submitted,

                              MADELINE SINGAS
                              District Attorney, Nassau County
                              *Attorney for Respondent*
                              262 Old Country Road
                              Mineola, New York 11501

Kevin C. King
John B. Latella
  Assistant District Attorneys
    of Counsel

## CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3(f)

JOHN B. LATELLA does hereby certify as follows: This brief was prepared by computer; the body of the brief is double-spaced and utilizes a serifed, proportionally spaced typeface (Garamond) of 14-point size; the footnotes are single-spaced and utilize the same typeface of 12-point size; and, according to the word count of the word processing system used (Microsoft Word 2016), the brief contains 8,732 words, exclusive of any pages containing the table of contents, proof of service, and certificate of compliance.

Dated:  Mineola, New York
       June 29, 2017

JOHN B. LATELLA
Assistant District Attorney